## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOSÉ ESCOBAR MOLINA,
c/o CASA, INC.,
8151 15th Avenue
Langley Park, MD 20783

B.S.R.,
c/o CASA, INC.,
8151 15th Avenue
Langley Park, MD 20783

N.S.,
c/o CASA, INC.,
8151 15th Avenue
Langley Park, MD 20783

R.S.M.,
c/o CASA, INC.,
8151 15th Avenue
Langley Park, MD 20783

CASA, INC.,
8151 15th Avenue
Langley Park, MD 20783

*on behalf of themselves and others similarly
situated,*

        *Plaintiffs,*

      v.

U.S. DEPARTMENT OF HOMELAND
SECURITY,
245 Murray Lane SW
Washington, D.C. 20528

KRISTI NOEM, *in her official capacity as
Secretary of the U.S. Department of Homeland
Security,*
245 Murray Lane SW
Washington, D.C. 20528

No.

U.S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Avenue NW
Washington, D.C. 20530

PAMELA J. BONDI, *in her official capacity as*
*Attorney General of the United States*,
950 Pennsylvania Ave NW
Washington, D.C. 20530

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,
500 12th Street SW
Washington, D.C. 20024

TODD M. LYONS, *in his official capacity as*
*Acting Director of U.S. Immigration and*
*Customs Enforcement*,
500 12th Street SW
Washington, D.C. 20024

U.S. CUSTOMS AND BORDER
PROTECTION,
1300 Pennsylvania Avenue NW
Washington, D.C. 20004

RODNEY S. SCOTT, *in his official capacity as*
*Commissioner of U.S. Customs and Border*
*Protection*,
1300 Pennsylvania Avenue NW
Washington, D.C. 20004

U.S. BORDER PATROL,
1300 Pennsylvania Avenue NW
Washington, D.C. 20004

MICHAEL W. BANKS, *in his official capacity*
*as Chief of U.S. Border Patrol*,
1300 Pennsylvania Ave NW
Washington, D.C. 20004

U.S. DRUG ENFORCEMENT
ADMINISTRATION
8701 Morrissette Drive
Springfield, VA 22152

TERRANCE C. COLE, *in his official capacity*
*as Administrator of the U.S. Drug Enforcement*
*Administration*,
8701 Morrissette Drive
Springfield, VA 22152

                  *Defendants*.

## <u>CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

(Policy and practice of making warrantless immigration arrests without probable cause in
Washington, D.C.)

## INTRODUCTION

Over the past month and a half, plain-clothed, masked, and armed federal agents have flooded the streets of the nation's capital, indiscriminately arresting without warrants and without probable cause District residents whom the agents perceive to be Latino. Federal agents systematically arrest individuals in these immigration sweeps without a warrant and without any individualized assessment that they are in the United States unlawfully and/or that they are likely to escape before a warrant can be obtained. U.S. Immigration and Customs Enforcement ("ICE") then sends these individuals to detention centers far away from their families and lawyers. In some cases, officials belatedly realize that there is no legal basis to hold in custody the individual whom federal agents arrested without any individualized assessment and release them. Even those released from detention experience significant physical and psychological harm from their arbitrary arrest and detention, and they fear that they will experience those harms again.

Defendants' policy and practice of making immigration arrests without a warrant and without probable cause have sown terror in Latino and other communities across the District and violate unequivocal statutory restrictions on warrantless arrests. Plaintiffs José Escobar Molina, B.S.R., N.S., R.S.M., and CASA, Inc. bring this lawsuit on behalf of themselves and those similarly situated to put an end to this unlawful policy and practice in D.C.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 (right of review). It has remedial authority pursuant to 5 U.S.C. §§ 702, 705, and 706 (Administrative Procedure Act), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act), and the inherent equitable powers of this Court.

2.      Venue is proper in this District pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(e)(1) because Defendants are officers or employees of the United States and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

3.      **Plaintiff José Escobar Molina** is a 47-year-old man who has lived in D.C. for 25 years. He has maintained valid Temporary Protected Status ("TPS") for El Salvador since 2001.  On August 21, 2025, Mr. Escobar Molina was walking from his apartment building in Northwest D.C. to his work truck, about to start his workday, when two cars pulled up next to him.  As he was about to get into his truck, plain-clothed and unidentified federal agents exited the cars and— without conducting any inquiry—seized Mr. Escobar Molina, grabbing him by the arms and legs and immediately handcuffing him.  The agents arrested him without a warrant and without asking for his name, his identification, or anything about his immigration status.  The agents also did not ask him where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community prior to arresting him.  After ICE detained Mr. Escobar Molina overnight at its processing center in Chantilly, Virginia, the next day an ICE supervisor finally realized that he had valid TPS, which statutorily prohibits ICE from detaining him, and released him.  Due to his Latino ethnicity, Mr. Escobar Molina fears being arrested and detained again while going about his daily life in D.C.

3.      **Plaintiff B.S.R.**\*[1] is a 29-year-old man who moved to D.C. with his family in 2019 and lived in D.C. with them until a few weeks ago.  B.S.R. is from Honduras and has a pending asylum application in the United States because he fears persecution if he is forced to return to Honduras.

---

[1] Plaintiffs have concurrently filed a motion to proceed pseudonymously for Plaintiffs B.S.R, N.S., and R.S.M.  All pseudonyms are marked with an asterisk in their first instance.

On August 18, 2025, an officer displaying a U.S. Border Patrol ("USBP" or "Border Patrol") badge and additional unidentified agents approached B.S.R. and his father while they were in their car outside their home in Northeast D.C. and preparing to head to work.  The agents arrested B.S.R. without a warrant and without asking him for his name, his identification, or anything about his immigration status before arresting him.  They also did not ask him whom he lives with, how long he has lived here, or anything else about his ties to the community.  B.S.R. was wearing an ankle monitor ICE had previously ordered him to wear, which he showed the agents after he was arrested. After spending approximately ten hours detained at the ICE processing center in Chantilly, Virginia, he was released.  Due to his Latino ethnicity, he fears being arrested and detained again while driving through D.C. almost every day on his way to work.

4.     **Plaintiff N.S.** is a 51-year-old man who has lived in D.C. since 2024.  N.S. is from Venezuela and has a pending asylum application in the United States because he fears persecution if he is forced to return to Venezuela.  On August 12, 2025, an agent wearing a U.S. Drug Enforcement Administration ("DEA") vest and a badge and hat that said "ICE" stopped N.S. while he was in his car in the parking lot of The Home Depot in D.C., where he had just finished shopping.  The officers arrested N.S. without a warrant and without asking him anything about where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community.  After ICE held him for nearly four weeks in various detention centers around the country, it released N.S. on his own recognizance.  Due to his Latino ethnicity, he lives in fear of being arrested and detained again while going about his daily life in D.C.

5.     **Plaintiff R.S.M.** is a 36-year-old woman who has lived in D.C. with her family since 2020.  R.S.M. is from El Salvador and has a pending asylum application in the United States because she fears persecution if she is forced to return to El Salvador.  Early in the morning on

August 26, 2025, R.S.M. and her husband were driving to work when several unidentified agents surrounded them with their vehicles. The agents approached R.S.M. and her husband while they were in their car and asked them for their identification and whether they had permission to live in the United States. The agents arrested R.S.M. without a warrant and without asking her anything about where she lives, whom she lives with, how long she has lived here, or anything else about her ties to the community. After spending about ten hours detained at the ICE processing center in Chantilly, Virginia, ICE released R.S.M. with an ankle monitor. Due to her Latina ethnicity, R.S.M. lives in fear of being arrested and detained again while going about her daily life in D.C.

6.      **Plaintiff CASA, Inc.** is a national nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia. CASA's mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendant, Indigenous, and immigrant communities, and it provides a variety of social, health, employment, and legal services to immigrant communities, with a particular focus in D.C., Maryland, Virginia, Pennsylvania, and Georgia. Due to the recent surge in warrantless immigration arrests without probable cause in D.C., CASA's resources have been diverted to focus on providing emergency response services for people arrested in D.C. rather than spending those resources on the core social services it provides, interfering with CASA's core activities. CASA's members include individuals who recently have been arrested in D.C. without a warrant and without probable cause as to immigration status and/or flight risk and who are likely to face such stops and arrests in the future.

7.      **Defendant U.S. Department of Homeland Security ("DHS")** is the federal agency responsible for administering and enforcing the nation's immigration laws pursuant to 8 U.S.C. § 1103(a).

8.    **Defendant Kristi Noem** is the Secretary of DHS and is sued in her official capacity.  As Secretary of DHS, she oversees component agencies such as ICE, U.S. Customs and Border Protection ("CBP"), and U.S. Border Patrol.

9.    **Defendant U.S. Department of Justice ("DOJ")** is the federal agency responsible for enforcing federal law and overseeing many of the federal government's law enforcement agencies.

10.    **Defendant Pamela J. Bondi** is the U.S. Attorney General and is sued in her official capacity.  As Attorney General of the U.S., she leads the U.S. Department of Justice and oversees component agencies including the Drug Enforcement Administration ("DEA").

11.    **Defendant U.S. Immigration and Customs Enforcement ("ICE")** is a component agency of DHS and is tasked with managing enforcement of laws related to immigration.  Among other functions, ICE carries out stops and arrests of individuals believed to be in violation of civil immigration law, assumes custody over individuals in immigration detention, and is responsible for management and oversight of the civil immigration detention system.

12.    **Defendant Todd M. Lyons** is the Acting Director of ICE and is sued in his official capacity.  As Acting Director of ICE, he oversees its functions, including managing enforcement of laws related to immigration, carrying out stops and arrests of individuals believed to be in violation of civil immigration law, and managing the civil immigration detention system.

13.    **Defendant U.S. Customs and Border Protection ("CBP")** is a component agency of DHS that is responsible for, among other things, interdiction and processing of individuals attempting to enter or exit the United States at the U.S. border without authorization.  CBP agents, including those employed by CBP's component agencies such as U.S. Border Patrol, have been involved in making stops and arrests of individuals for civil immigration violations in D.C. pursuant to the immigration sweeps since on or about August 11, 2025.

14.    **Defendant Rodney S. Scott** is the Commissioner of CBP and is sued in his official capacity.  As Commissioner of CBP, he has direct authority over all CBP policies, procedures, and practices related to stops, arrests, and detention.

15.    **Defendant U.S. Border Patrol ("USBP" or "Border Patrol")** is a component agency of CBP and is responsible for interdiction and processing of individuals attempting to enter or exit the United States without authorization at the U.S. border.  Border Patrol agents have made stops and arrests for civil immigration violations in D.C. pursuant to the immigration sweeps since on or about August 11, 2025.

16.    **Defendant Michael W. Banks** is Chief of USBP and is sued in his official capacity.  As Chief of USBP, Defendant Banks has direct authority over all USBP policies, procedures, and practices related to stops, arrests, and detention.

17.    **Defendant U.S. Drug Enforcement Administration ("DEA")** is the federal law enforcement agency tasked with combatting and investigating drug trafficking offenses.  DEA agents have made stops and arrests for civil immigration violations in D.C pursuant to the immigration sweeps since on or about August 11, 2025.

18.    **Defendant Terrance C. Cole** is the Administrator of DEA and is sued in his official capacity.  As Administrator of DEA, Defendant Cole oversees DEA's law enforcement functions and practices.

## FACTUAL ALLEGATIONS

### A.    Mass Immigration Arrests in D.C. Since the Federal Takeover of the District in August 2025

19.    Defendants have a policy and practice of making mass civil immigration arrests in Washington, D.C., without a warrant and without the probable cause findings that are required by Congress under federal statute.  This policy and practice are tied to the President's promise to carry

out mass immigration arrests and deportations.  During the 2024 presidential campaign, President Trump promised that "on Day One . . . [w]e will begin the largest deportation operation in the history of our country."[2]  In January, after President Trump took office, the administration imposed an arrest quota of 75 arrests per day on ICE field offices across the country, including the Washington, D.C. ICE field office.[3]  In May, the arrest quota increased to a new goal of *3,000* arrests each day, a number that White House Deputy Chief of Staff Stephen Miller publicly confirmed.[4]  Miller said that "number is going to keep getting bumped higher over time."[5]

20.    To help meet the quota and carry out these mass roundups, DHS granted non-DHS federal agencies immigration enforcement powers.  *See* Press Release, U.S. Dep't of Homeland Sec., Statement from a DHS Spokesperson on Directive Expanding Immigration Law Enforcement to Some Department of Justice Officials (Jan. 23, 2025).  Agents from these other agencies lack the kind of training immigration agents are expected to have when conducting immigration arrests.[6]

21.    As part of his mass deportation plans, President Trump has exerted greater control over the nation's capital, including increasing civil immigration arrests in D.C.  On March 27, 2025, for

---

[2] Press Release, The White House, Promises Made, Promises Kept: Border Security Achieved in Fewer Than 100 Days (Apr. 28, 2025), https://www.whitehouse.gov/articles/2025/04/promises-made-promises-kept-border-security-achieved-in-fewer-than-100-days (quoting Transcripts, Roll Call, Donald Trump Holds a Campaign Rally in Concord, North Carolina – October 21, 2024, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-rally-concord-north-carolina-october-21-2024/#108).

[3] Nick Miroff & Maria Sacchetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, Wash. Post (Jan. 26, 2025), https://www.washingtonpost.com/immigration/2025/01/26/ice-arrests-raids-trump-quota.

[4] Cameron Arcand, *Trump administration sets new goal of 3,000 illegal immigrant arrests daily*, Fox News (May 29, 2025, 3:25 PM), https://www.foxnews.com/politics/trump-administration-aims-3000-arrests-illegal-immigrants-each-day.

[5] *Id.*

[6] Holmes Lybrand, et al., *FBI agents are again pulled from their day jobs to address a Trump priority*, CNN (Aug. 14, 2025), https://www.cnn.com/2025/08/14/politics/fbi-washington-immigration-epstein.

instance, he issued an Executive Order entitled "Making the District of Columbia Safe and Beautiful," which included the establishment of a Task Force to "coordinate to ensure effective Federal participation in," *inter alia*, "directing maximum enforcement of Federal immigration law and redirecting available Federal, State, or local law enforcement resources to apprehend and deport illegal aliens in the Washington, D.C. metropolitan area." Exec. Order No. 14252, 90 Fed. Reg. 14559 (Mar. 27, 2025).

22.     On August 11, 2025, President Trump declared a "crime emergency" in the District, pursuant to which he commandeered the D.C. Metropolitan Police Department ("MPD") for federal purposes and deployed 800 D.C. National Guard members to neighborhoods across the District. Exec. Order No. 14333, 90 Fed. Reg. 39301 (Aug. 11, 2025). While announcing the emergency declaration, President Trump "repeatedly turned to the topic of immigration" and declared that "[t]his city will no longer be a sanctuary for illegal alien criminals."[7]

23.     A few days later, on August 15, 2025, Attorney General Pamela Bondi issued an order purporting to direct the Mayor of D.C. to use local resources to assist with "enforcement of federal immigration law," including with "locating, apprehending, and detaining aliens unlawfully present in the United States." Order of the Att'y Gen., Order No. 6372-2025, Restoring Safety and Security to the District of Columbia (Aug. 15, 2025).

24.     An immediate and significant surge in immigration stops and arrests in D.C. followed these orders. As of September 9, 2025, over 40 percent of the arrests in D.C. made since the President's emergency declaration were federal civil immigration arrests—totaling 943 immigration arrests,

---

[7] Mike Lillis & Rebecca Beitsch, *DC officials say Trump crackdown is about immigration, power*, The Hill (Aug. 20, 2025, 5:31 PM), https://thehill.com/homenews/state-watch/5460622-trump-dc-crime-crackdown-immigration.

more than any other cause for arrests.[8]  Over a 10-day period during the surge, over 70 percent of those arrested for immigration law violations had *no* criminal records—demonstrating that the purpose of the "emergency" declaration was in fact immigration action rather than a purported crackdown on "crime."[9]

25.     The ongoing mass immigration stops and arrests have roiled life for people who live and work in D.C., particularly those whom ICE officers and other federal agents perceive to be Latino. Federal agents are stopping people while they are walking and driving in D.C. simply because the agents perceive them to be of Latino ethnicity.  In some instances, the racial profiling is blatant and explicit.  For example, on August 31, 2025, while a Latina woman was walking to a CVS in Northwest D.C. to pick up medicine for her daughter, an armed officer in camouflage stopped her to check her immigration status simply because—as the officer stated explicitly—the officer believed she did not "look like a citizen" and looked like she is from another country.  In fact, the woman is a U.S. citizen.

26.     In these encounters, Defendants' agents are systematically making immigration arrests without a warrant and without probable cause findings as to immigration status and flight risk as required under federal immigration law.  ICE has used untargeted traffic stops to arrest individuals for alleged civil immigration violations.[10]  ICE agents have arrested parents dropping off their children at school, leading neighbors to form "walking school buses" to safely escort kids to

---

[8] Alanna Durkin Richer & Rebecca Santana, *Over 40% of arrests in Trump's DC law enforcement surge relate to immigration, AP analysis finds*, Associated Press (Sept. 10, 2025), https://apnews.com/article/dc-immigration-federal-intervention-543a6079974fda90f96bae17ae53729e.

[9] *Id.*

[10] *See, e.g.*, *Trump's crackdown in DC leaves residents on edge as federal agents set up checkpoints*, WTOPnews (Aug. 21, 2025), https://wtop.com/dc/2025/08/trumps-immigration-crackdown-brings-checkpoints-and-new-fears-to-washington.

school.[11]  People have also been arrested by federal agents on their way to church in the Columbia Heights neighborhood in D.C., where a large number of immigrants live, making people afraid to attend services.[12]  Federal agents have also targeted food delivery drivers in D.C., stopping and arresting them without prior knowledge about their immigration status.[13]  *See* Jeremy Raff et al., *The D.C. Delivery Workers Hiding From ICE* N.Y. Times (Sept. 8, 2025), https://www.nytimes.com/video/world/americas/100000010349920/dc-ice-deportations-delivery-drivers-immigrants.html (D.C. delivery driver describing how federal agents in D.C. "are targeting people who look Latino").

27.    Although the "emergency" period pursuant to the August 11 declaration formally ended on September 11, mass immigration stops and arrests in D.C. are continuing.  On September 15, in response to D.C. Mayor Muriel Bowser's September 10 announcement opposing continued

---

[11] Teo Armus, *They watched ICE detain their dad. Now D.C. neighbors escort them to school.*, Wash. Post (Sept. 11, 2025), https://www.washingtonpost.com/immigration/2025/09/11/immigrants-school-kids-trump-dc; *see also Federal surge has taken a toll on children of immigrants in Washington*, PBS News (Sept. 17, 2025, 2:24 PM), https://www.pbs.org/newshour/politics/federal-surge-has-taken-a-toll-on-children-of-immigrants-in-washington.

[12] Michael Sean Winters, *DC Mass attendance falls after immigration arrests*, The Tablet (Aug. 25, 2025), https://www.thetablet.co.uk/news/dc-mass-attendance-falls-after-immigration-arrests; *see also* Madalaine Elhabbal, *ICE arrests take toll on DC churches*, Cath. News Agency (Aug. 21, 2025, 6:18 PM), https://www.catholicnewsagency.com/news/266095/ice-arrests-take-toll-on-dc-churches.

[13] Teo Armus et al., *ICE Is Joining D.C. Police Patrols. Moped Drivers Are Getting Detained*, Wash. Post (Aug. 21, 2025), https://www.washingtonpost.com/dc-md-va/2025/08/21/dc-police-ice-moped-crackdown-delivery-drivers; Didi Martinez*, Detentions of D.C. delivery drivers leave immigrant communities on edge*, NBC News (Aug. 19, 2025, 5:00 AM), https://www.nbcnews.com/news/us-news/dc-delivery-driver-detentions-spark-concern-fear-community-rcna225671.

cooperation between MPD and ICE,[14] President Trump threatened on his social media platform

Truth Social to "call a National Emergency, and Federalize, if necessary!!!"[15]



*See also* Michael W. Banks (@USBPChief), X, (Sept. 17, 2025, 10:42 A.M.)
https://t.co/U7DrgTVu0f (boasting of immigration arrests in D.C. during the weekend of
September 13, 2025).

---

[14] Sophie Rosenthal, *MPD will not continue to cooperate with ICE after emergency federal control ends*, WUSA9 (Sept. 10, 2025, 1:14 PM), https://www.wusa9.com/article/news/local/home-rule/mpd-ice-emergency-federal-surge-ends-mayor-muriel-bowser-president-donald-trump/65-452b67be-a444-4dba-925b-9519f4c87604.
[15] Donald J. Trump (@realDonaldTrump), Truth Social, (Sept. 15, 2025, 1:06 AM), https://truthsocial.com/@realDonaldTrump/posts/115206570863756188.

**B.     Defendants Have a Policy and Practice of Making Warrantless Arrests Without Making Individualized Determinations of Immigration Status and Flight Risk**

28.     Defendants have a policy and practice of making warrantless immigration arrests without conducting an individualized assessment establishing probable cause that the person being arrested is unlawfully present in the country and is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2).

29.     Congress requires immigration arrests to be based on warrants, with certain narrow exceptions.  Under 8 U.S.C. § 1357(a)(2), two conditions must be met before an agent may conduct a warrantless arrest: the agent must have "reason to believe" *both* that (1) the individual "is in the United States in violation of any [immigration] law or regulation," and (2) the individual "is likely to escape before a warrant can be obtained for his arrest."  "Reason to believe" is "considered the equivalent of probable cause," *Lau v. U.S. Immigr. & Naturalization Serv.*, 445 F.2d 217, 222 (D.C. Cir. 1971), which "must be particularized with respect to the person to be searched or seized," *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006) (quoting *Maryland v. Pringle*, 540 U.S. 366 (2003)).

30.     This is not the first time Defendants DHS and ICE have instituted a version of this unlawful policy.  In 2018, Chicago residents and non-profit organizations sued ICE for its policy and practice of conducting warrantless arrests in the Chicago area without complying with the probable cause requirements in § 1357(a)(2).  Second Amended Complaint, *Castañon Nava v. Dep't of Homeland Sec.*, No. 1:18-cv-03757 (N.D. Ill. Dec. 18, 2018), ECF 58.  After the district court denied the government's motion to dismiss, the case was resolved by a 3-year settlement agreement that required ICE to adopt a nationwide policy to prohibit warrantless arrests that failed to meet the requirements of § 1357(a)(2).  As part of the settlement, on November 23, 2021, ICE issued a Broadcast Statement of Policy making clear that "mere presence within the United States

in violation of U.S. immigration law is not, by itself, sufficient to conclude that [a noncitizen] is likely to escape before a warrant for arrest can be obtained."[16]  The Policy also listed specific factors that may be relevant to determine flight risk, including "knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, [and] ties to the community (such as a family, home, or employment) or lack thereof."[17]

31.    However, Defendants have now changed their policy in the District of Columbia in order to carry out mass arrests.  Tellingly, Defendants no longer require immigration officers to gain prior supervisor approval of, or even to fill out a paper form with information about, the person they arrest.  This reflects the administration's intention to "move[] from targeted enforcement to broad street sweeps."[18]

32.    The circumstances of the immigration arrests in D.C. illustrate Defendants' policy and practice of conducting warrantless arrests without an individualized assessment of probable cause that the person both is unlawfully present in the United States and is a flight risk.

33.    For example, on August 21, 2025, plain-clothed and unidentified federal agents arrested Mr. Escobar Molina without a warrant while he was getting in his truck to go to work.  They did not ask for his name or his identification or ask anything about his immigration status, where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community.  The agents immediately handcuffed Mr. Escobar Molina, grabbed him by the arms

---

[16] ICE Broadcast Statement of Policy, *Castañon Nava v. Dep't of Homeland Sec.*, No. 1:18-cv-03757 (N.D. Ill. Nov. 23, 2021), Appendix A to Settlement Agreement at 17-18, available at https://www.ice.gov/doclib/legalNotice/220527castanonSettlement_attA.pdf.

[17] *Id.*

[18] Julia Ainsley et al., *Under Trump administration, ICE scraps paperwork officers once had to do before immigration arrests*, NBC News (Sept. 9, 2025, 5:00 AM), https://www.nbcnews.com/politics/national-security/trump-administration-ice-scraps-paperwork-officers-immigration-arrests-rcna229407.

and legs, and called him "illegal" repeatedly.  When he responded that he has "papers" (in other words, immigration status), they replied, "No you don't. You are illegal."  After the agents put Mr. Escobar Molina into a vehicle, when Mr. Escobar Molina told them again that he had "papers," the driver of the car yelled at him, "Shut up, bitch! You're illegal."  The agents did not make an individualized determination about Mr. Escobar Molina's immigration status or flight risk before they arrested him.  While Mr. Escobar Molina was in detention, ICE fingerprinted and interviewed him and, based on DHS's standard practice, Defendants created a record of Mr. Escobar Molina's arrest.  *See* U.S. Dep't of Homeland Sec., DHS/ICE/PIA-015 Enforcement Integrated Database (May 2019), https://www.dhs.gov/publication/dhsicepia-015h-enforcement-integrated-database-eid-criminal-history-information-sharing ("The Enforcement Integrated Database . . . stores and maintains information related to the investigation, arrest, booking, detention, and removal of persons encountered during immigration and criminal law enforcement investigations and operations conducted by U.S. Immigration and Customs Enforcement (ICE) . . . [and other] components within DHS.").

34.    On August 18, 2025, federal agents, including at least one Border Patrol agent, arrested B.S.R. after he got in his car to go to work with his father.  The officers handcuffed B.S.R. and his father.  They did so without a warrant and without asking for B.S.R.'s name, his identification, or anything about his immigration status, where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community.  Indeed, shortly after his arrest, B.S.R. showed the agents the ankle monitor that he wears as a condition of release due to his processing by ICE in January 2025.  B.S.R.'s partner attempted to explain to the arresting officers that B.S.R. was already in an immigration process.  The agents did not make an individualized determination

14

about B.S.R.'s immigration status or flight risk before they arrested him.  Based on DHS's standard practice, Defendants created a record of B.S.R.'s arrest.

35.     ICE also arrested N.S. without a warrant and without making an individualized assessment of probable cause for his flight risk.  On August 12, 2025, ICE agents arrested N.S. without a warrant and without asking him anything about where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community.  The agents pulled N.S. out of the driver's seat, threw him against the car, handcuffed him, and provided him a clear bag in which to place his belongings, before placing him in the back of a van.  The agents who arrested N.S. did not make an individualized determination about his flight risk before they arrested him.  While in detention, Defendants fingerprinted, photographed, and interviewed N.S., and based on DHS's standard practice, Defendants created a record of his arrest.

36.     R.S.M. likewise was arrested by ICE without a warrant.  On August 26, 2025, she and her partner were pulled over while driving to work in D.C.  The agents asked her and her husband for identification and did not indicate that they knew who they were prior to stopping them.  The officers forcibly opened the car doors, pushed R.S.M. against the car, handcuffed her with her hands behind her backs, and put her in a car.  Before arresting her, the agents did not ask R.S.M. anything about where she lives, whom she lives with, how long she has lived here, or anything else about her ties to the community.  They did not make an individualized determination of her flight risk before they arrested her.  While in detention, Defendants fingerprinted and interviewed R.S.M., and based on DHS's standard practice, Defendants created a record of her arrest.

37.     Another individual, C.*, is a U.S. citizen who works in landscaping and frequently travels to D.C. for his work.  On the morning of August 20, 2025, as he was driving into D.C. in his work truck, he was initially stopped by a Park Police agent, who said he had trouble seeing his car tags

and needed to make sure C. and his coworker in the passenger seat were "all right." Shortly afterwards, a plainclothes agent came up to the passenger side of the car and began aggressively questioning C.'s colleague about his immigration status. Although C.'s colleague did not say anything (and had not said or done anything during the stop), the agent opened the passenger-side door, pulled C's colleague out of the car, pushed him to the ground, and restrained him. The agents did not have a warrant for C.'s colleague's arrest, nor did they ask C.'s colleague any questions about where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community before arresting him. The agents did not make an individualized determination of C.'s colleague's flight risk before they arrested him. Based on DHS's standard practice, Defendants created a record of C.'s colleague's arrest.

38.     Elias*, a CASA member, was in a car accident in D.C. on August 21, 2025, when ICE agents arrived at the scene. The agents told Elias that he was under arrest and put handcuffs on him. The agents did not ask Elias anything about where he lives, who he lives with, how long he has lived here, or anything else about his ties to the community. The agent did not make an individualized determination about Elias's flight risk before arresting him. Based on DHS's standard practice, Defendants created a record of his arrest.

39.     Another CASA member, Nerwin*, was riding in the passenger seat of a car in D.C. on August 28, 2025, when a police officer pulled the car over and told his co-worker, who was driving, that the car had expired registration. The officer stepped away to speak to someone on the phone. Afterwards, agents wearing vests that said "DHS" arrived and told Nerwin he was under arrest and brought him to the ICE Processing Center at Chantilly, Virginia, where he was detained before being moved to other detention facilities. The officer never asked Nerwin about where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community

16

before arresting and detaining him. The officer did not make an individualized determination about flight risk. Based on DHS's standard practice, Defendants created a record of his arrest.

40.    Another CASA member, Miguel*, was walking out of a grocery store in D.C. toward his car on August 18, 2025, when ICE agents approached him. One of the agents asked if he owned the car. When Miguel explained that it was his brother's car, the agent demanded that Miguel call his brother to prove it. Miguel's brother did not pick up the phone, as it was late at night, and the agents arrested Miguel without a warrant for civil immigration reasons and transported him to an ICE office in Virginia. The agents did not ask him for his name, his identification, or anything about his immigration status. Nor did they ask him about where he lives, who he lives with, how long he has lived there, or anything else about his ties to the community. The agents did not make an individualized determination about Miguel's immigration status or flight risk before they arrested him. Based on DHS's standard practice, Defendants created a record of his arrest.

41.    Another CASA member, Juan*, was arrested while taking out the trash at his workplace in D.C. on August 14, 2025. The agents approached Juan and told him that he was under arrest. They did not explain who they were or why Juan was being arrested and did not provide a warrant. The agents did not ask Juan for his name, his identification, or anything about his immigration status. Nor did they ask him about where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community. They did not make an individualized determination about his immigration status or flight risk before arresting him. Juan only learned they were immigration agents when he arrived at the detention center. Based on DHS's standard practice, Defendants created a record of his arrest.

42.    Another CASA member, Gordon*, was sitting on his motorbike in a parking lot in D.C. on August 31, 2025, when he was arrested by ICE agents. The ICE agents arrested Gordon without

17

a warrant; never asked about where he lives, who he lives with, how long he has lived here, or anything else about his ties to the community; and never made an individualized determination about flight risk. Based on DHS's standard practice, Defendants created a record of his arrest.

43.    Another CASA member, Flavio*, was working at a construction site in D.C. on August 26, 2025, when agents in green uniforms and police officers arrived and began arresting workers, including Flavio. The officers led Flavio out of the building and put him in a marked car. The agents arrested Flavio without a warrant for civil immigration reasons and did not explain why they arrested him. The agents did not ask Flavio for his name, his identification, or anything about his immigration status. Nor did they ask him about where he lives, who he lives with, how long he has lived here, or anything else about his ties to the community. They did not make an individualized determination about his immigration status or flight risk before arresting him. Based on DHS's standard practice, Defendants created a record of his arrest.

44.    Another CASA member, Antony*, was driving in D.C. on August 25, 2025, when he was forced to brake quickly to avoid hitting a police vehicle blocking the road. The federal agents, some of whom were wearing masks and hiding their faces and most of whom were wearing green uniforms with vests that said "Police," surrounded Antony's car and told him that he was under arrest and detained him. He initially was brought to a police station in D.C. before being taken to the ICE Processing Center in Chantilly, Virginia, and from there he was transferred to other detention centers. The agents arrested Antony for civil immigration reasons without a warrant and without asking him for his name, identification, or anything about his immigration status. Nor did they ask him about where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community. They did not make an individualized determination about

his immigration status or flight risk before arresting him. Based on DHS's standard practice, Defendants created a record of his arrest.

### C. Plaintiffs and D.C. Residents of Immigrant and Latino Backgrounds Anticipate and Fear Future Unlawful Arrests Due to Defendants' Policy and Practice of Making Warrantless Arrests Without Probable Cause

45.    Because of the widespread nature of the arrests pursuant to Defendants' unlawful policy and practice of making warrantless arrests without probable cause, and because of the systemic nature of Defendants' disregard for the requirements of federal law, Plaintiffs and those who live and work in D.C., particularly those of Latino ethnicity, face a substantial risk that they will be subjected to unlawful warrantless arrests in the near future.

46.    For example, Plaintiff R.S.M. has repeatedly witnessed unmarked cars patrolling her neighborhood in the northeastern part of D.C. The week that she was arrested, she saw unmarked cars patrolling the area several days in a row, and she has seen unmarked cars patrolling since her arrest. R.S.M. was arrested one block from her home.

47.    In D.C.'s most diverse neighborhoods, residents walk around scared after witnessing officers smash car windows to drag their neighbors into unmarked cars, with one resident describing her neighborhood as a "police state."[19] One lawful permanent resident in D.C. described unusually quiet streets in the Columbia Heights neighborhood, and expressed, "We don't feel safe, for the simple reason that we're Latino."[20] The U.S. citizen mother discussed above who was told by an armed officer that she does not look like a citizen now carries proof of citizenship

---

[19]    Jake Horton & Aisha Sembhi, *Videos show impact of Trump's crackdown in one Washington DC neighbourhood*, BBC (Aug. 26, 2025), at https://www.bbc.com/news/articles/c1le1zpqyzlo; Paul Schwartzman & Brittany Shammas, *A D.C. neighborhood long home to immigrants pushes back against ICE arrests*, Wash. Post (Sept. 17, 2025), https://www.washingtonpost.com/dc-md-va/2025/09/17/dc-ice-arrests-trump-takeover.

[20]    Ted Hesson & Suheir Sheikh, *Washington's immigrant neighborhoods push back against ICE arrests*, Reuters (Sept. 19, 2025, 8:14 AM), https://www.reuters.com/world/us/washingtons-immigrant-neighborhoods-push-back-against-ice-arrests-with-protests-2025-09-19.

everywhere out of fear of future arrest because, as the agent told her, he believed she looked like she was from another country.

48.     Defendants' conduct is causing ongoing harm to Plaintiffs and other Latino members of the D.C. community.  Plaintiff Escobar Molina, for example, was arrested and detained overnight in terrible conditions only to be released with an apology from an ICE officer acknowledging that he never should have been arrested in the first place.  He still experiences pain from being grabbed by his arms and legs and pushed into the arresting officers' vehicle while handcuffed.  He has since changed parts of his daily routine as he lives in fear that he will be arrested again without a warrant and without any probable cause determination.  Mr. Escobar Molina also suffers from nightmares in which he relives his arrest and imagines being arrested again.  Mr. Escobar Molina is afraid not only for himself but also for his U.S. citizen sons because they are also Latino.

49.     Plaintiff B.S.R. is also fearful of being arrested and detained again due to Defendants' unlawful policy.  As a result of Defendants' unlawful policy, B.S.R. has moved outside of D.C. However, B.S.R. continues to travel through the D.C. area in transit to worksites on a near-daily basis and is at substantial risk of arrest again in the near future as a result.

50.     Plaintiff N.S. continues to suffer from health problems due to his arrest and detention.  His knee is swollen due to being shackled for several hours at a time and sitting on several long flights as he was repeatedly transferred while detained.  He is also now experiencing leg pain and high blood pressure.  N.S. is now fearful and stressed due to his arrest and detention.  He is unable to sleep through the night.  He is scared to walk outside or drive and has stopped driving his grandchildren and youngest son to school.

51.     Plaintiff R.S.M. has felt panicked and scared to go outside due to her fear of rearrest, and she has been having difficulty sleeping.  R.S.M.'s family members are likewise deeply afraid, and

some of them are reluctant to leave the house. R.S.M. watches her 16-year-old son walk to school to ensure he will not be arrested.

52.     Defendants' policy and practice of warrantless arrests without probable cause have also significantly harmed CASA. CASA offers a wide range of social, health, job training, employment, and legal services to immigrant communities in D.C. (and in other states) in furtherance of its mission. CASA assists individuals in applying for a variety of government benefits. CASA also provides its members with free legal assistance, including free legal consultations on immigration issues, as well as several hotlines through which community members can request assistance. In the D.C. region in particular, CASA's legal services have historically focused on securing and stabilizing immigration status—both temporary and permanent status—for non-detained community members, and CASA's Health and Human Services ("HHS") program in the D.C. region has focused on increasing community members' social stability, including by assisting them with public benefits enrollments, and providing case management for a variety of needs, including access to critical health and social services.

53.     One of the hotlines that CASA operates is an ICE tip hotline, through which community members can report ICE enforcement actions that they have witnessed or experienced. The purpose of the ICE tip hotline is not to interrupt or obstruct active ICE enforcement actions, but rather to provide support to individuals and families who have been impacted by those ICE enforcement actions. Accordingly, calls to CASA's ICE tip hotline are typically to report an ICE arrest that has recently occurred. After a report is submitted to CASA, CASA investigates the report and provides legal and humanitarian support to those who have been impacted.

54.     Defendants' policy and practice of warrantless arrests without probable cause has caused a forty-fold increase in reports of immigration arrests in D.C. via CASA's ICE tipline in the two-

week period between August 14 and August 29, 2025, compared to the period from January 2025 to August 13, 2025.

55.     The surge in unlawful arrests has caused significant disruption to CASA's functions and activities, pulling CASA away from its core focus of providing services that stabilize and protect CASA members to providing rapid, emergency response to unlawful detentions affecting CASA members.  These shifts in resources and focus have impaired CASA's ability to carry out its core functions.   Specifically, detention response now comprises a significant portion of work undertaken by CASA's Legal and HHS teams.  This work is not fully compensated by these teams' budgets.  The HHS team, for example, now expends approximately 25 percent of its workload— equivalent to over one-and-a-half full-time employees—on detention response and follow-up. Rather than focusing on their core missions, these staff must now triage calls and requests for detention-related assistance, conduct needs assessments for families impacted by recent ICE detentions, and connect legal and social assistance to the families of those detained.

56.     Similarly, instead of CASA's immigration legal team being able to focus on securing long-term status for individuals, the team now spends a significant amount of time providing rapid legal response and referrals to the families of detained individuals.  Legal clinics run by CASA at which community members could previously receive assistance with immigration applications have now been replaced by rapid legal response phone calls every day to provide family members with post-arrest information and guidance.  Naturalization and U-Visa applications have been replaced with assistance locating detained loved ones and referrals to private attorneys.   In effect, mass immigration arrests in D.C.—pursuant to Defendants' policy and practice of making warrantless arrests without probable cause, which permit such mass arrests—have impaired the legal team's ability to engage in stabilizing community members through substantive, extended legal

assistance, turning CASA into an emergency legal advice and referral operation, instead of a long-term legal representation operation.

57.     CASA faces increased costs due to Defendants' unlawful policy and practice of warrantless arrests without probable cause in D.C., especially in funding its hotline services.  CASA's hotline expenses for the period covering July 27, 2025, to August 26, 2025, which includes only two weeks of the D.C. ICE enforcement surge, reflected an increase of approximately 14 percent from the previous period of June 27, 2025, to July 26, 2025.

58.     In addition, CASA's funding to provide services to the community has been jeopardized as a consequence of shifting resources to respond to ICE's unlawful seizures.  CASA's shift of human resources to detention response threatens its ability to comply with grant deliverables specified in existing grant contracts.  For example, just this month, one such county grant was reduced by 50 percent in part due to delayed progress on grant deliverables.  Through this grant, CASA's HHS team is to do significant work that directly contributes to the county's dedication to growing clean energy in low-income, working-class neighborhoods.  This work is directly tied to CASA's goals of stabilizing and improving the quality of life of community members.  Yet, the HHS team cannot conduct an intake for a community member under this grant without first addressing the community member's immediate need and concern—that their loved one has been detained.  Because of the need to divert the HHS team's attention to respond to ICE's expanded, unlawful actions against its community, CASA risks continuing to lose such critical funding that supports its mission.

59.     Defendants' unlawful policies and practices in D.C. have also impaired CASA's core function of connecting community members to social services by chilling open communication between CASA and its members.  Prior to the surge in immigration activity in D.C., CASA would

regularly connect community members to vital social services through free consultations that help members navigate complex public benefits programs. However, CASA's ability to connect community members to social services depends on members' willingness to share personal information with staff. Since immigration enforcement activity increased in D.C., community members have become increasingly reluctant to share personal information, fearful that their immigrant status will be weaponized against them even though they are, by law, permitted to access such benefits. CASA has noticed a marked decrease in participation in public benefits programs by immigrant community members. Further, cases that CASA manages and services it delivers now take longer to carry out because of the additional time that CASA must invest in building trust and providing education to each community member in this environment.

60.     These harms to CASA itself are on top of the harms CASA's members are facing as a result of Defendants' unlawful policies and practices as recounted in the stories of some individual CASA members above, including trauma, fear, and the feeling of being deprived of the basic dignity of participating in public life in D.C. CASA has many members who reside, work, and travel through Washington, D.C., many if not most of whom are Latino. These CASA members include citizens, lawful permanent residents, individuals with a variety of other immigration statuses, and undocumented noncitizens. Some of CASA's members who have been arrested will likely be or have been released from detention and will be subjected to Defendants' unlawful policy and practice of warrantless arrests without probable cause again in D.C. CASA members who reside, work, and travel through D.C. who have not yet been arrested under Defendants' unlawful policy and practice are also at substantial risk of being subjected to Defendants' policy and practice in the near future. Thus, like Plaintiffs, these CASA members face a substantial risk of being unlawfully arrested pursuant to Defendants' policy and practice.

## CLASS ACTION ALLEGATIONS

61.    Messrs. Escobar Molina, B.S.R., and N.S., and Ms. R.S.M. bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2).

62.    Messrs. Escobar Molina, B.S.R., and N.S., and Ms. R.S.M. seek to represent the following class:

> **Warrantless Arrests Class:** All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses a flight risk.

63.    Messrs. Escobar Molina and B.S.R. seek to represent the following subclass:

> **Immigration Status Subclass:** All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully.

64.    Messrs. Escobar Molina, B.S.R., and N.S., and Ms. R.S.M. seek to represent the following subclass:

> **Flight Risk Subclass:** All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk.

65.    Plaintiffs reserve the right to amend or modify the class and subclass definitions as appropriate.

66.    The proposed class and subclasses satisfy the prerequisites of Rule 23(a) and 23(b)(2). They satisfy the numerosity requirement of Rule 23(a)(1) because they include anyone who has been or will be subjected to Defendants' policy and practice of making warrantless arrests without the requisite probable cause findings.  Although the number of individuals who have been or will be subject to unlawful warrantless arrests by Defendants is not known with precision, class

members number in the thousands.  Since August 11, 2025, federal agents have arrested at least

940 people within the District, with no indications of possessing a warrant or conducting any sort

of pre-arrest, individualized assessment of the arrested person's immigration status or flight risk.

This includes at least 16 individuals of whom undersigned counsel are currently aware, who have

been arrested without a warrant and without an individualized assessment of an immigration law

violation and/or flight risk since August 11, 2025.

67.    The proposed class and subclasses satisfy the commonality requirement of Rule 23(a)(2)

as they share common issues of fact or law, including but not limited to whether Defendants'

policy and practice of warrantless arrests without individualized determinations of probable cause

for an immigration law violation or flight risk violates 8 U.S.C. § 1357(a)(2).

68.    The proposed classes also satisfy the typicality requirement of Rule 23(a)(3).  The claims

of the proposed class representatives for the Warrantless Arrests Class are typical of the claims for

that class because Messrs. Escobar Molina, B.S.R., and N.S., and Ms. R.S.M. were all arrested

without a warrant and without an individualized determination of their immigration status and/or

flight risk prior to their arrests.

69.    Plaintiffs are adequate class representatives, as required by Rule 23(a)(4), as they have no

conflict of interest with the putative class members, will fairly and adequately protect the interests

of the class, and understand and accept their responsibilities as class representatives.

70.    The proposed classes satisfy the requirements of Rule 23(b)(2) because Defendants have

acted on grounds generally applicable to the class, as they have a policy and practice, to which

everyone in the Warrantless Arrests Class and the two subclasses is subject, of making warrantless

arrests without the requisite probable cause findings.  Final injunctive or declaratory relief

therefore is appropriate to the class and subclasses as a whole.

26

71.     Counsel for Plaintiffs have extensive experience litigating class actions and cases involving civil and constitutional rights generally, and the rights of noncitizens specifically, and are therefore qualified to be certified as class counsel pursuant to Rule 23(g).

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**Violation of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(i), the *Accardi* doctrine, and the Administrative Procedure Act, 5 U.S.C. § 706: Warrantless Arrests Without Individualized Assessment of Immigration Status**

72.     Under 8 U.S.C. § 1357(a)(2), an agent may make an immigration arrest without a warrant only if they have "reason to believe" that (1) the individual "is in the United States in violation of any [immigration] law or regulation," *and* (2) the individual "is likely to escape before a warrant can be obtained for his arrest." *See also* 8 C.F.R. § 287.8(c)(2)(i), (ii) (same). "Reason to believe" is "considered the equivalent of probable cause," *Lau*, 445 F.2d at 222, which "must be particularized with respect to the person to be searched or seized," *Barham*, 434 F.3d at 573.

73.     Defendants have a policy and practice of making warrantless arrests in D.C. without making individualized determinations of immigration status and/or flight risk as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i), (ii)**.**

74.     Defendants' policy and practice of making warrantless arrests in D.C. without making individualized determinations of immigration status as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i) is a final agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A), (C), and violates the elementary principle of administrative law that agencies are required to follow their own regulations, *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

75.     This Court has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action.  5 U.S.C. § 706(2).

76.     This Court also has inherent equitable authority to enjoin violations of federal law by federal officers.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

77.     As a result of Defendants' unlawful policy and practice, Plaintiffs and members of the proposed Warrantless Arrests Class and Immigration Status Subclass are facing irreparable harm and require vacatur of Defendants' unlawful policy, injunctive relief, and/or declaratory relief to prevent continued and future irreparable injury.

## SECOND CLAIM FOR RELIEF

**Violation of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii), the *Accardi* doctrine, and the Administrative Procedure Act, 5 U.S.C. § 706: Warrantless Arrests Without Individualized Assessment of Flight Risk**

78.     Under 8 U.S.C. § 1357(a)(2), an agent may make an immigration arrest without a warrant only if they have "reason to believe" that (1) the individual "is in the United States in violation of any [immigration] law or regulation," *and* (2) the individual "is likely to escape before a warrant can be obtained for his arrest."  *See also* 8 C.F.R. § 287.8(c)(2)(i), (ii) (same).  "Reason to believe" is "considered the equivalent of probable cause," *Lau v.* , 445 F.2d at 222, which "must be particularized with respect to the person to be searched or seized." *Barham*, 434 F.3d at 573.

79.     Defendants have a policy and practice of making warrantless arrests in D.C. without making individualized determinations of immigration status and/or flight risk as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i), (ii)**.**

80.  Defendants' policy and practice of making warrantless arrests in D.C. without making individualized determinations of flight risk as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii) is a final agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C.

§ 706(2)(A), (C), and violates the elementary principle of administrative law that agencies are required to follow their own regulations. *See Accardi*, 347 U.S. at 268.

81.    This Court has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action.  5 U.S.C. § 706(2).

82.    This Court also has inherent equitable authority to enjoin violations of federal law by federal officers.  *See Armstrong*, 575 U.S. at 326.

83.    As a result of Defendants' unlawful policy and practice, Plaintiffs and members of the proposed Warrantless Arrests Class and Flight Risk Subclass are facing irreparable harm and require vacatur of Defendants' unlawful policy, injunctive relief, and/or declaratory relief to prevent continued and future irreparable injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Certify a class of all persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses a flight risk (**"Warrantless Arrests Class"**), and appoint Plaintiffs José Escobar Molina, B.S.R., N.S., and R.S.M. as class representatives;

B.    Certify a subclass of all persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully (**"Immigration Status Subclass"**) and appoint Plaintiffs José Escobar Molina and B.S.R. as the subclass representatives;

C.    Certify a subclass of all persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-

29

arrest, individualized assessment of probable cause that the person poses a flight risk (**"Flight Risk Subclass"**) and appoint Plaintiffs José Escobar Molina, B.S.R., N.S., R.S.M. as subclass representatives;

D.    Appoint the undersigned counsel as class counsel for the Warrantless Arrests Class and the Immigration Status and Flight Risk Subclasses;

E.    Declare that Defendants' policy and practice of making warrantless immigration arrests without making a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully violates 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i);

F.    Declare that Defendants' policy and practice of making warrantless immigration arrests without making a pre-arrest, individualized assessment of probable cause that the person poses a flight risk violates 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2) (ii);

G.    Vacate and set aside Defendants' policy and practice of making warrantless immigration arrests without an individualized determination of *both* an immigration law violation and flight risk, in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i), (ii);

H.    With respect to the Warrantless Arrests Class, enjoin Defendants' policy and practice of making warrantless immigration arrests without an individualized determination of probable cause of *both* an immigration law violation and flight risk in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i),(ii);

I.    With respect to the Immigration Status Subclass, enjoin Defendants' policy and practice of making warrantless immigration arrests without an individualized determination of probable cause of an immigration law violation in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i);

J.      With respect to the Flight Risk Subclass, enjoin Defendants' policy and practice of making warrantless immigration arrests without an individualized determination of probable cause of flight risk in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

K.      Order Defendants, their subordinates, agents, employees, and all others acting in concert with them to expunge all records collected and maintained about Plaintiffs and class members from their unlawful arrests, including any derivative information;

L.      Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412 and any other applicable source of law; and

M.      Award such further relief as the Court deems appropriate.

September 25, 2025

Respectfully submitted,

*s/ Adina Appelbaum*
Adina Appelbaum (D.C. Bar No. 1026331)
Ian Austin Rose (Md. Bar No. 2112140043)
Samantha Hsieh (Va. Bar No. 90800)[*]
**AMICA CENTER FOR IMMIGRANT RIGHTS**
1025 Connecticut Avenue NW, Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
austin.rose@amicacenter.org
sam@amicacenter.org

*s/ Aditi Shah*
Aditi Shah (D.C. Bar No. 90033136)
Scott Michelman (D.C. Bar No. 1006945)
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF COLUMBIA**
529 14th Street NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
ashah@acludc.org
smichelman@acludc.org

Kathryn Huddleston (Tex. Bar No. 24121679)[*++]
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
915 15th Street NW, 7th Floor
Washington, D.C. 20005
(212) 549-2500
khuddleston@aclu.org

*s/ Sirine Shebaya*
Sirine Shebaya (D.C. Bar No. 1019748)
Yulie Landan (Cal. Bar No. 348958)[*+]
Bridget Pranzatelli (D.C. Bar No. 90029726)
**NATIONAL IMMIGRATION PROJECT**
1763 Columbia Road NW, Suite 175
Washington, D.C. 20009
(213) 430-5521
sirine@niplg.org
yulie@niplg.org
bridget@niplg.org

*s/ Jehan A. Patterson*
Jehan A. Patterson (D.C. Bar No. 1012119)
Chris Kimmel (D.C. Bar No. 1047680)[**]
Alexandra Widas (D.C. Bar No. 1645372)[***]
Hassan Ahmad (D.C. Bar No. 1030682)[***]
Sean Berman (D.C. Bar No. 90026899)
Austin Riddick (D.C. Bar No. 90018117)
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
(202) 662-6000
jpatterson@cov.com
ckimmel@cov.com
awidas@cov.com
hahmad@cov.com
sberman@cov.com
ariddick@cov.com

Eva H. Lilienfeld (N.Y. Bar No. 6143085)[*]
Graham Glusman (N.Y. Bar No. 6099535)[*]
**COVINGTON & BURLING LLP**
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
elilienfeld@cov.com
gglusman@cov.com

*s/ Madeleine Gates*
Madeleine Gates (D.C. Bar No. 90024645)
**WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS AND URBAN AFFAIRS**
700 14th Street NW, #400
Washington, D.C. 20005
(202) 319-1000
madeleine_gates@washlaw.org

*s/ Ama Frimpong*
Ama Frimpong (D.C. Bar No. 1602444)[*]
**CASA, INC.**
8151 15th Avenue
Hyattsville, MD 20783
(240) 485-8844
afrimpong@wearecasa.org

*Attorneys for Plaintiffs*[21]

*Motion for Admission* pro hac vice *forthcoming.*
*Petition for Admission forthcoming.*
*Petition for Admission pending.*

+*Not Admitted in D.C.; working remotely from N.Y. and admitted in Cal. only*
++*Not Admitted in D.C.; working remotely under supervision of D.C. Bar member, practice limited to federal courts in D.C., and admitted in Ariz. and Tex. only.*

---

[21] Counsel wish to acknowledge the assistance of legal program manager Lily Hartmann; law clerks Maggie Hopkins, Marcus Ransom, and Joseph Hasbrouck; and paralegal Yahir Santillan-Guzman in the investigation of the facts and the preparation of this complaint.