**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

JOSÉ ESCOBAR MOLINA, *et al.*, *individually*
*and on behalf of all others similarly situated*

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

*Defendants*.

No. 25-cv-3417-PLF

---

**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION, TO STAY
AGENCY ACTION, AND FOR PROVISIONAL CLASS CERTIFICATION**

**TABLE OF CONTENTS**

**TABLE OF CONTENTS** ...................................................................................ii

**TABLE OF AUTHORITIES** ...........................................................................iv

**INTRODUCTION**.............................................................................................. 1

**STATUTORY BACKGROUND** ...................................................................... 2

**STATEMENT OF FACTS**................................................................................ 3

    A.    Since President Trump's August 11 Emergency Declaration in D.C., Defendants Have Been Conducting Mass Immigration Arrests in the District.............................................................................................................. 3

    B.    Defendants' Agents Are Making Warrantless Immigration Arrests in D.C. Without an Individualized Determination of Probable Cause that the Person Is Here Unlawfully and Is a Flight Risk. ............................................... 5

    C.    Plaintiffs and Putative Class Members Will Be Arrested, Detained, and Separated from Their Families Under Defendants' Unlawful Policy and Practice............................................................................................................ 14

**ARGUMENT** ................................................................................................... 17

I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims. ..................................... 18

    A.    The INA and DHS Regulations Require Agents to Make an Individualized Determination That the Person Is in the United States Unlawfully and Is a Flight Risk Before Arresting That Person Without a Warrant. ............................ 18

    B.    Defendants' Policy and Practice of Making Warrantless Immigration Arrests Without an Individualized Determination of Flight Risk Violates the INA. ....................................................................................................................... 21

    C.    Defendants' Policy and Practice of Making Warrantless Immigration Arrests Without Probable Cause as to Either of The Statutorily Required Criteria Is a Final Agency Action That Violates the APA..................................... 23

    D.    Defendants' Policy and Practice of Making Warrantless Immigration Arrests Without Probable Cause as to Flight Risk Violates the *Accardi* Doctrine........................................................................................................... 26

II.    Absent Immediate Injunctive Relief, Plaintiffs and the Putative Class Will Continue Facing Irreparable Harm Due to Defendants' Unlawful Policy and Practice..................... 27

III.    The Equities and the Public Interest Favor Plaintiffs. ..................................................... 31

IV.    Provisional Class Certification Is Warranted..................................................................... 33

**CONCLUSION** ....................................................................................................................... **34**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954)................................................................................18, 26, 27, 28

*Adams v. District of Columbia*,
285 F. Supp. 3d 381 (D.D.C. 2018).......................................................................18

*Affinity Healthcare Servs., Inc. v. Sebelius*,
720 F. Supp. 2d 12 (D.D.C. 2010)..........................................................................18

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
121 F.4th 1314 (D.C. Cir. 2024)..............................................................................18

*Aracely, R. v. Nielsen*,
319 F. Supp. 3d 110 (D.D.C. 2018).....................................................................24, 28

*Arizona v. United States*,
567 U.S. 387 (2012).....................................................................................................2

*\*Au Yi Lau v. U.S. Immig. & Naturalization Serv.*,
445 F.2d 217 (D.C. Cir. 1971)............................................................................2, 19

*\*Barham v. Ramsey*,
434 F.3d 565 (D.C. Cir. 2006)........................................................................2, 19, 20

*Barwood, Inc. v. District of Columbia*,
1999 U.S. Dist. LEXIS 21427 (D.D.C. Feb. 16, 1999) .......................................28

*Battle v. F.A.A.*,
393 F.3d 1330 (D.C. Cir. 2005).............................................................................27

*Beck v. Ohio*,
379 U.S. 89 (1964)...................................................................................................19

*Bennett v. Spear*,
520 U.S. 154 (1997)...........................................................................................24, 25

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
972 F.3d 83 (D.C. Cir. 2020).................................................................................24

*Brinegar v. United States*,
338 U.S. 160 (1949).................................................................................................20

*Changji Esquel Textile Co. Ltd. v. Raimondo*,
   40 F.4th 716 (D.C. Cir. 2022) ..................................................................................18

*Charles H. v. District of Columbia*,
   2021 WL 2946127 (D.D.C. June 16, 2021) ...............................................................33

*Cobell v. Norton*,
   240 F.3d 1081 (D.C. Cir. 2001) ................................................................................25

*Commc'ns & Control, Inc. v. F.C.C.*,
   374 F.3d 1329 (D.C. Cir. 2004) ................................................................................26

*\*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
   603 U.S. 799 (2024)............................................................................................24, 25

*Cuomo v. U.S. Nuclear Regul. Comm'n*,
   772 F.2d 972 (D.C. Cir. 1985) ..................................................................................18

*Damus v. Nielsen*,
   313 F. Supp. 3d 317 (D.D.C. 2018) .....................................................................27, 33

*De La Paz v. Coy*,
   786 F.3d 367 (5th Cir. 2015) ....................................................................................20

*de Nolasco v. U.S. Immigr. & Customs Enf't*,
   319 F. Supp. 3d 491 (D.D.C. 2018) ..........................................................................29

*Devenpeck v. Alford*,
   543 U.S. 146 (2004)..................................................................................................20

*DSE, Inc. v. United States*,
   169 F.3d 21 (D.C. Cir. 1999) ....................................................................................35

*Fisher v. Pension Benefit Guar. Corp.*,
   151 F. Supp. 3d 159 (D.D.C. 2016) ..........................................................................26

*Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) ..................................................................................32

*Holden v. Finch*,
   446 F.2d 1311 (D.C. Cir. 1971) ................................................................................27

*J.G.G. v. Trump*,
   2025 WL 1577811 (D.D.C. June 4, 2025) .................................................................35

*Jacksonville Port Auth. v. Adams*,
   556 F.2d 52 (D.C. Cir. 1977) ....................................................................................33

*Jefferson v. Harris*,
    285 F. Supp. 3d 173 (D.D.C. 2018) ...................................................................27

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ........................................................................32

*Kirwa v. U.S. Dep't of Def.*,
    285 F. Supp. 3d 21 (D.D.C. 2017) ..................................................................33

*L.G.M.L. v. Noem*,
    2025 WL 2671690 (D.D.C. Sept. 18, 2025) ...................................................33

*\*League of Women Voters of the U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ........................................................28, 31, 32, 33

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) ..........................................................................29

*Make the Rd. New York v. Noem*,
    2025 WL 2494908 (D.D.C. Aug. 29, 2025) ...............................................29, 31

*Maryland v. Pringle*,
    540 U.S. 366 (2003) ........................................................................................19

*Mexichem Specialty Resins, Inc. v. EPA*,
    787 F.3d 544 (D.C. Cir. 2015) ........................................................................28

*Michigan v. E.P.A.*,
    576 U.S. 743 (2015) ........................................................................................26

*Morales v. Chadbourne*,
    793 F.3d 208 (1st Cir. 2015) ..........................................................................19

*Morton v. Ruiz*,
    415 U.S. 199 (1974) ........................................................................................27

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut.
    Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..........................................................................................26

*N.S. v. Hughes*,
    335 F.R.D. 337 (D.D.C. 2020) ........................................................................28

*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) ........................................................................26

*Orellana v. Nobles Cnty.*,
    230 F. Supp. 3d 934 (D. Minn. 2017) ............................................................21

*P.J.E.S. by and through Escobar Francisco v. Wolf*,
   502 F. Supp. 3d 492 (D.D.C. 2020) ................................................................33

*Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*,
   313 F. Supp. 3d 62 (D.D.C. 2018) .................................................................26

*R.I.L–R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) .................................................28, 32, 34

*\*Ramirez v. U.S. Immigr. & Customs Enf't*,
   310 F. Supp. 3d 7 (D.D.C. 2018) .................................................................29

*\*Ramirez v. U.S. Immigr. & Customs Enf't*,
   338 F. Supp. 3d 1 (D.D.C. 2018) ............................................................24, 25

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
   2025 WL 1825431 (D.D.C. July 2, 2025) .....................................................25

*Rubinstein v. Brownell*,
   206 F.2d 449 (D.C. Cir. 1953) .....................................................................28

*Sierra Club v. Thomas*,
   828 F.2d 783 (D.C. Cir. 1987) .....................................................................25

*Singh v. Berger*,
   56 F.4th 88 (D.C. Cir. 2022) ........................................................................32

*Smith v. United States*,
   843 F.3d 509 (D.C. Cir. 2016) .....................................................................19

*Steele v. United States*,
   159 F. Supp. 3d 73 (D.D.C. 2016) ...............................................................34

*Tate v. Pompeo*,
   513 F. Supp. 3d 132 (D.D.C. 2021) ..............................................................29

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
   578 U.S. 590 (2016) .....................................................................................25

*United States v. Abdi*,
   2005 WL 6119695, No. 2:04-CR-88 (S.D. Ohio Sept. 12, 2005) ................22

*United States v. Cantu*,
   519 F.2d 494 (7th Cir. 1975) ...................................................................21, 23

*United States v. Green*,
   670 F.2d 1148 (D.C. Cir. 1981) ...................................................................20

*United States v. Khan*,
   324 F. Supp. 2d 1177 (D. Colo. 2004) .....................................................................23

*United States v. Pacheco-Alvarez*,
   227 F. Supp. 3d 863 (S.D. Ohio 2016) .....................................................20, 21, 23

*United States v. Quintana*,
   623 F.3d 1237 (8th Cir. 2010) ...............................................................................20

*Washington v. Reno*,
   35 F.3d 1093 (6th Cir. 1994) ..................................................................................33

*Westover v. Reno*,
   202 F.3d 475 (1st Cir. 2000) ...................................................................................21

*Ybarra v. Illinois*,
   444 U.S. 85 (1979)...........................................................................................19, 20

**Statutes, Regulations, & Rules**

5 U.S.C. § 705.........................................................................................................1, 18, 28

5 U.S.C. § 706.......................................................................................................18, 24, 28

8 U.S.C. § 1357 ........................................................................................................ *passim*

8 C.F.R. § 287.8 ...............................................................................................18, 19, 26, 27

Fed. R. Civ. P. 5 ................................................................................................................38

Fed. R. Civ. P. 23 ..................................................................................................1, 33, 34

Fed. R. Civ. P. 65 .......................................................................................................1, 35

Local Civ. R. 7 ....................................................................................................................1

**Other Authorities**

Exec. Order No. 14,252, 90 Fed. Reg. 14559 (Mar. 27, 2025).........................................4

Exec. Order No. 14,333, 90 Fed. Reg. 39301 (Aug. 11, 2025) .......................................4

Pursuant to Federal Rules of Civil Procedure 23 and 65, and 5 U.S.C. § 705, Plaintiffs José Escobar Molina, B.S.R., N.S., R.S.M., and CASA, Inc., respectfully move for provisional class certification and for a preliminary injunction and/or to stay agency action on behalf of themselves and similarly situated individuals who have been or will be subjected to Defendants' policy and practice of making warrantless immigration arrests without an individualized determination of probable cause as required by the Immigration and Nationality Act.[1]

## INTRODUCTION

Since the President's August 11, 2025, declaration of a purported "emergency" in the District of Columbia, Defendants have saturated D.C. with federal agents and instituted a policy and practice of making sweeping, warrantless civil immigration arrests without probable cause. Under this policy and practice, plain-clothed, masked, and armed federal agents arrest people who live and work in D.C., whom they perceive to be Latino, without a warrant and without making the individualized probable cause assessments—*both* that the person is in the United States unlawfully *and* that the person is likely to escape before a warrant can be obtained—required under federal law. The agents arrest individuals on their way to work, school, or church; haul them into vehicles; and transport them to detention centers where they are forced to remain in inhumane conditions, often for long periods and far away from their families and lawyers. In some cases, U.S. Immigration and Customs Enforcement ("ICE") releases individuals, but only *after* they have already suffered the physical and psychological harms that come with being arrested and detained. This policy and practice is plainly contrary to the Immigration and Nationality Act ("INA"), which requires an agent to obtain probable cause for both unlawful presence and flight risk *before* arresting a person without a warrant.

---

[1] Pursuant to Local Civil Rule 7(m), Plaintiffs' counsel conferred with Defendants' counsel about this motion, and Defendants' counsel stated that Defendants oppose the motion.

Defendants' policy and practice of *arrest first, ask questions later* has sown fear and alarm among D.C.'s Latino and immigrant communities. People who live and work in D.C., especially those whom agents may perceive to be Latino, fear being arrested and detained because agents making immigration arrests are ignoring the statutory limitations on their ability to do so without a warrant. Plaintiffs José Escobar Molina, B.S.R., N.S., R.S.M., and CASA, Inc. seek a preliminary injunction against, as well as, or in the alternative, a stay of, this policy and practice to ensure that Defendants' agents make immigration arrests in D.C. in accordance with federal law: before an agent makes an immigration arrest without a warrant, the agent must make an individualized determination of probable cause that the person *both* is in the United States unlawfully *and* is likely to escape before a warrant can be obtained.

## STATUTORY BACKGROUND

Generally, officers making immigration arrests are required to have a warrant. *See Arizona v. United States*, 567 U.S. 387, 408 (2012). "If no federal warrant has been issued, those officers have more limited authority." *Id.* That limited authority is codified in 8 U.S.C. § 1357(a)(2), which permits warrantless arrests **only if** the agent has "*reason to believe* that the [noncitizen] so arrested is in the United States in violation of any … law or regulation [made in pursuance of law regulating the admission, exclusion, expulsion, or removal of noncitizens] *and* is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2) (emphases added). Section 1357(a)(2) "must be read in light of constitutional standards, so that 'reason to believe' must be considered the equivalent of probable cause." *Au Yi Lau v. U.S. Immig. & Naturalization Serv.*, 445 F.2d 217, 222 (D.C. Cir. 1971). "Probable cause" requires a "particularized" inquiry and must be "objectively discernible." *See Barham v. Ramsey*, 434 F.3d 565, 573–74 (D.C. Cir. 2006). Accordingly, § 1357(a)(2) demands that, before an agent can make an immigration arrest without a warrant, the agent must first make an individualized determination of probable cause that the

person *both* is in the United States unlawfully *and* is a flight risk.

Defendants have recognized as much: under the settlement agreement in *Castañon Nava v. Department of Homeland Security*, No. 1:18-cv-03757 (N.D. Ill. 2018), a case brought by Chicago residents and non-profit organizations challenging ICE's policy and practice of making warrantless arrests in the Chicago area without probable cause for flight risk as required by § 1357(a)(2), ICE issued a "Broadcast Statement of Policy" making clear that "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that [a noncitizen] is likely to escape before a warrant for arrest can be *obtained*" and listing specific factors that may be relevant to a flight risk determination, including "knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, [and] ties to the community (such as a family, home, or employment) or lack thereof." Declaration of A. Widas ("Widas Decl."), Ex. 1.

## STATEMENT OF FACTS

### A.    Since President Trump's August 11 Emergency Declaration in D.C., Defendants Have Been Conducting Mass Immigration Arrests in the District.

One of President Trump's top priorities in his second term is to conduct mass deportations. During the 2024 presidential campaign, President Trump promised that "[o]n Day One … [w]e will begin the largest deportation operation in the history of our country." *Id.*, Ex. 2. In January, after President Trump took office, the administration imposed a quota of 75 immigration arrests per day on ICE field offices across the country, including on the Washington, D.C. field office. *Id.*, Ex. 3. In May, White House Deputy Chief of Staff Stephen Miller publicly announced that "[u]nder President Trump's leadership, we are looking to set a goal of a minimum of 3,000 arrests for ICE every day and President Trump is going to keep pushing to get that number up higher each and every day." *Id.*, Ex. 4.

President Trump has used executive orders to carry out his promise of mass deportations in Washington, D.C.  On March 27, 2025, the President issued an Executive Order entitled "Making the District of Columbia Safe and Beautiful," which included the establishment of a Task Force to "coordinate to ensure effective Federal participation in," *inter alia*, "directing maximum enforcement of Federal immigration law and redirecting available Federal, State, or local law enforcement resources to apprehend and deport illegal aliens in the Washington, D.C. metropolitan area."  Exec. Order No. 14,252, 90 Fed. Reg. 14559 (Mar. 27, 2025).  More recently, President Trump's August 11 declaration of an "emergency" in D.C., Exec. Order No. 14,333, 90 Fed. Reg. 39301 (Aug. 11, 2025), placed the D.C. Metropolitan Police Department under "direct federal control" for a 30-day period and deployed 800 National Guard troops onto the city's streets, Widas Decl., Ex. 20.  In announcing the August 11 emergency, President Trump repeatedly referenced the topic of immigration, declaring that the federal government was going to put things "in control very quickly, like we did in the southern border," *id.*, Ex. 5, and that "[t]his city will no longer be a sanctuary for illegal alien criminals," *id.*, Ex. 6.  A few days later, on August 15, Defendant Attorney General Pamela Bondi issued an order directing the Mayor of D.C. to use local resources to assist with "enforcement of federal immigration law," including with "locating, apprehending, and detaining aliens unlawfully present in the United States."  *Id.*, Ex. 7.

An immediate and significant surge in immigration arrests in D.C. has followed since these orders.  To facilitate mass immigration arrests in D.C., Defendant Kristi Noem, Secretary of the Department of Homeland Security ("DHS"), granted non-DHS federal agencies immigration enforcement powers, *id.*, Ex. 8, permitting agents from other federal agencies—who lack the kind of training immigration agents are expected to have—to conduct immigration arrests in D.C., *id.*, Ex. 9.  According to the *Washington Post*, since early August, "residents have sent hundreds of

videos, photos and tips" to the D.C. Migrant Solidarity Network, an immigrant support group, regarding immigration enforcement and arrests in Washington, D.C. *Id.*, Ex. 10. Amy Fischer, who leads the organization, noted that the footage "reflected a dramatic surge in dragnet-style arrest tactics" and that "[w]e just saw the roving patrols arresting anybody that looked brown, basically." *Id.* The numbers bear out the focus on immigration arrests in D.C. since August 11: "from early August until mid-September, ICE made around 1,200 arrests, according to officials with knowledge of the data." *Id.*

Mass immigration arrests in D.C. remain ongoing. Marcos Charles, the Acting Executive Associate Director of Enforcement and Removal Operations ("ERO") at ICE, announced in an interview that "[w]e're going to continue our operations in the D.C. metro area." *Id.* DHS Assistant Secretary for Public Affairs Tricia McLaughlin stated in public remarks that "DHS law enforcement will not be slowed down." *Id.*, Ex. 11. The *Washington Post* reported that "outside of the emergency operations center, ICE retains vast authority to detain D.C. residents regardless of city policies." *Id.*, Ex. 12. And social media posts by Defendant U.S. Customs and Border Protection ("CBP") confirm that immigration arrests are continuing in Washington, D.C. *Id.*, Ex. 13 (boasting of immigration arrests in D.C. during the weekend of September 13, 2025). Moreover, on September 15, President Trump threatened to declare another emergency in the District to ensure increased operations by ICE. *Id.*, Exs. 14, 15.

### B. Defendants' Agents Are Making Warrantless Immigration Arrests in D.C. Without an Individualized Determination of Probable Cause that the Person Is Here Unlawfully and Is a Flight Risk.

To conduct these mass immigration arrests in D.C., Defendants have instituted a policy and practice of making arrests without a warrant and without making an individualized assessment as to whether someone both is in the United States unlawfully *and* is a flight risk. The immigration arrests in D.C. systematically follow the same general *arrest first, ask questions later* pattern.

First, agents stop people whom they perceive to be Latino while they are walking, driving, or at work.  Second, the agents arrest those individuals without showing a warrant and without knowledge of facts that could provide an agent with probable cause to believe those individuals are in the United States unlawfully and are likely to escape before a warrant can be obtained. Third, the agents take virtually all the individuals they have arrested to an immigration detention center, where they spend days, weeks, or even longer, and in some cases are subsequently released because of a complete lack of basis for their detention.

Defendants have repeatedly admitted that they are making warrantless arrests without the required probable cause findings.  In July 2025, for example, the Department of Justice fired the acting U.S. Attorney for the Eastern District of California after she told a Border Patrol official that he could not arrest individuals without probable cause.  *Id.*, Ex. 16.  In response to this lawsuit, DHS asserted in a September 25, 2025, public statement that it "uses [the] '*reasonable suspicion*'" standard to make immigration arrests—admitting that DHS continues to violate the probable cause requirements imposed by law and uses the different, lower standard of reasonable suspicion.  *Id.*, Ex. 17 (emphasis added).  Similarly, that same day, DHS stated in a post in response to this lawsuit on the social media platform X that "DHS law enforcement uses 'reasonable suspicion' to make arrests."  *Id.*, Ex. 19.  DHS further stated that "law enforcement are trained to ask a series of well-determined questions to determine status and removability," without saying anything about flight risk.  *Id.*, Ex. 18.  Mr. Miller's mid-May instruction to ICE to stop "develop[ing] target lists of immigrants" and to instead "just go out there" and arrest people "right away" at Home Depots or 7-Elevens similarly disregarded probable cause requirements.  *Id.*, Ex. 22.  Around the same time, ICE ERO Acting Executive Associate Director Marcos Charles told his agents to "turn up the creative knob up to 11 and push the envelope … If it involves handcuffs on wrists, it's probably

worth pursuing." *Id.*, Ex. 23.

The circumstances of Plaintiffs' and other individuals' arrests demonstrate this policy and practice. For example, on August 21, 2025, Defendants' agents accosted Plaintiff Escobar Molina, a Latino D.C. resident with valid Temporary Protected Status ("TPS"), outside of his apartment building in Northwest D.C. while he was walking to his car to leave for work. Declaration of José Escobar Molina ("Escobar Molina Decl.") ¶ 5. They arrested him without showing a warrant and without asking him for his name, his identification, or anything about his immigration status, how long he has lived here, his family members, or anything else about his ties to the community. *Id.* ¶¶ 6–8. At no point did Mr. Escobar Molina attempt to resist arrest. *Id.* ¶ 7. *After* the agents arrested Mr. Escobar Molina, they repeatedly called him "illegal," and when he responded that he had documents showing his immigration status, the agents replied, "No you don't. You are illegal," and further rebuffed Mr. Escobar Molina's efforts to explain his status after they placed him into a vehicle, yelling at him, "Shut up bitch! You're illegal." *Id.* ¶¶ 6–7. It was not until after Mr. Escobar Molina spent a day and night detained at the ICE Washington Field Office in Chantilly, Virginia ("Chantilly"), and was transported to a different facility in Richmond, Virginia, that an ICE officer authorized his release upon recognizing that Mr. Escobar Molina is statutorily prohibited from being detained because he has valid TPS. *Id.* ¶ 11–14.

On August 18, 2025, federal agents, including at least one Border Patrol agent, arrested Plaintiff B.S.R. in Northeast D.C. after he got in his car to go to work with his father. Declaration of B.S.R. ("B.S.R. Decl.") ¶ 12. The agents seemed to be looking for B.S.R.'s father, but they did not have any information about B.S.R. relevant to a civil immigration arrest. *Id.* ¶ 13. Regardless of that lack of knowledge, the agents arrested B.S.R. alongside his father, placing handcuffs on him and putting him into a vehicle, without asking for B.S.R.'s name, identification, or anything

about his immigration status, where he lives, with whom he lives, how long he has lived here, or anything else about his ties to the community. *Id.* ¶¶ 14–15.  B.S.R. did not make any attempt to resist arrest. *Id.* ¶ 14.  Shortly after his arrest, B.S.R. showed the agents the ankle monitor he wears following his previous arrest by ICE in January 2025 and also told the agents he has a pending asylum application. *Id.*  The agents said that this information did not matter and that once he was in custody they would figure out if what he was saying about his status was true or not. *Id.*  B.S.R.'s partner came outside and also attempted to explain to the agents that B.S.R. was already in an immigration process, but the agents responded, "we came for two people, so we have to arrest two people." *Id.* ¶ 16.  B.S.R. suspects that those two people were his father and his mother and that because he happened to be outside in the car with his father, the agents arrested him and his father instead. *Id.*  After Defendants detained B.S.R. for more than 12 hours at Chantilly, he was released. *Id.* ¶¶ 18–20.

On August 12, 2025, immigration officers approached Plaintiff N.S. in the parking lot of a Home Depot in Northeast D.C.  Declaration of N.S. ("N.S. Decl.") ¶¶ 5–6.  N.S. had walked back to his minivan after exiting the store with a shopping cart filled with purchases. *Id.* ¶ 5.  He had just sat down in his car and turned on the engine when an officer opened the driver's side door and yelled at him, "Legal or illegal?" *Id.* ¶ 6.  This officer and another agent pulled N.S. out of the driver's seat, threw him against the car, handcuffed him and, after a 20-minute wait, placed him in the back of a van. *Id.* ¶¶ 7–11.  They did not provide a warrant or show any document to N.S. prior to arresting him. *Id.* ¶¶ 6–7.  N.S. did not make any attempt to resist arrest. *Id.* ¶ 7.  Before arresting him, the agents did not ask him anything about where he lives, with whom he lives, how long he has lived here, or anything else about his ties to the community. *Id.*  ICE detained N.S. for four weeks in various detention centers around the country before releasing him on his own

recognizance.  *Id.* ¶ 23.

On August 26, 2025, Plaintiff R.S.M. was driving to work with her husband when immigration agents pulled over their car.  Declaration of R.S.M. ("R.S.M. Decl.") ¶ 2.  The agents did not provide a warrant or show any document to R.S.M. and her husband prior to the arrest.  *Id.* ¶ 6.  Before arresting R.S.M. and her husband, the agents asked no questions about where they live, with whom they live, how long they have lived here, or anything else about their ties to the community.  *Id.*  R.S.M. did not make any attempt to resist arrest.  *Id.* ¶ 5.  She was detained at Chantilly for approximately ten hours, before being released with an ankle monitor; her husband remains detained by ICE and was transferred to a detention center in Texas.  *Id.* ¶¶ 9–13.

Several members of Plaintiff CASA, a national nonprofit membership organization, have also been arrested recently in D.C. without a warrant and without probable cause as to immigration status and/or flight risk and are likely to face such arrests in the future.  Declaration of CASA, Inc. ("CASA Decl.") ¶¶ 23–36.  On August 15, 2025, Declarant and CASA member Luz and her husband Daniel were making a food delivery on their motor bike when a police officer pulled them over and asked for their registration and their IDs.  Declaration of Luz Doe ("Luz Decl.") ¶ 3–4; CASA Decl. ¶ 26.  Approximately five minutes later, three agents emerged from two unmarked SUVs and announced they were from ICE and they were there to detain Luz and her husband.  Luz Decl. ¶ 5; CASA Decl. ¶ 26.  Luz and her husband did not make any attempt to flee or resist arrest.  Luz Decl. ¶ 5.  The agents did not provide a warrant or any documentation to Luz and her husband.  Luz Decl. ¶ 7–8; CASA Decl. ¶ 26.  Before arresting them, the agents asked no questions about how long they have been living or working in D.C., their family here, or anything else about their ties to the community.  Luz Decl. ¶ 7; CASA Decl. ¶ 26.  After being detained at Chantilly for approximately ten hours, Luz was released, whereas her husband remains in detention at a different

facility in Virginia.  Luz Decl. ¶ 9–10, 12; CASA Decl. ¶ 26.

On August 21, 2025, Declarant and CASA member Elias was on his way to a doctor's appointment to receive dialysis treatment when he was in a car accident.  Declaration of Elias Doe ("Elias Decl.") ¶ 2; CASA Decl. ¶ 25.  ICE agents arrived shortly after local police and an ICE officer arrested Elias, putting handcuffs on him and taking him to a detention center without showing him a warrant or any other document and without asking him about his immigration status, where he lives, with whom he lives, how long he has lived there, or anything else about his ties to the community.  Elias Decl. ¶¶ 3–5; CASA Decl. ¶ 25.  Elias did not attempt to flee or resist arrest.  Elias Decl. ¶ 5.  ICE released Elias later that day because he was so ill, without giving any explanation for Elias' arrest.  *Id.* ¶ 6.

On August 18, 2025, CASA member Miguel was walking out of a grocery store in D.C. toward his brother's car when ICE agents approached him.  CASA Decl. ¶ 34.  When Miguel could not prove the car belonged to his brother, the agents arrested him.  *Id.*  They did not provide a warrant or show any document to Miguel prior to the arrest.  *Id.*  Before arresting Miguel, the agents asked no questions about his individual circumstances or his ties to the community.  *Id.* The agents brought him to an immigration detention center, where the conditions were dehumanizing and unhealthy.  *Id.*  Rather than continue to endure that environment, Miguel "voluntarily" deported to his home country.  *Id.*

On August 25, 2025, Declarant and CASA member Antony was driving in Northwest D.C. when he had to stop abruptly due to a car blocking the street.  Declaration of Antony Doe ("Antony Decl.") ¶ 3; CASA Decl. ¶ 30.  Officers wearing green uniforms with vests that said "Police" and one Park Police officer approached Antony in his car and told him immediately he was under arrest.  Antony Decl. ¶¶ 4–5; CASA Decl. ¶ 30; *see also* Widas Decl., Ex. 24. ("Most federal

agents were wearing camouflage with vests that read U.S. Border Patrol, Police, or FBI.").  The agents did not provide a warrant or show any document to Antony prior to the arrest.  Antony Decl. ¶ 5; CASA Decl. ¶ 30.  Before arresting Antony, the agents asked no questions about his personal circumstances, where he lives, with whom he lives, how long he has lived there, or anything else about his ties to the community.  Antony Decl. ¶ 6; CASA Decl. ¶ 30.  Antony did not attempt to resist arrest.  Antony Decl. ¶ 5.  The agents brought him to an immigration detention center, and he remains in custody.  *Id.* ¶ 7–9; CASA Decl. ¶ 30.

On August 28, 2025, Declarant and CASA member Julio was on his way to work with his nephew, who was driving both of them when six ICE agents stopped them.  Declaration of Julio Doe ("Julio Decl.") ¶ 2; CASA Decl. ¶ 27.  The agents asked Julio and his nephew for their IDs, in response to which Julio showed his Real ID and his nephew showed his green card.  Julio Decl. ¶ 2; CASA Decl. ¶ 27.  The agents then told Julio to get out of the car, and when Julio asked why, an agent said if he did not get out, they would break down the door.  Julio Decl. ¶ 2; CASA Decl. ¶ 27.  After he got out of the car, the agents immediately handcuffed him, grabbed him by the collar, and placed him in their van.  Julio Decl. ¶ 3; CASA Decl. ¶ 27.  The agents did not provide a warrant or any documents to Julio prior to the arrest.  Julio Decl. ¶ 4; CASA Decl. ¶ 27.  Before arresting Julio, the agents asked no questions about how long he has been living or working in the D.C. area, his family, or anything else about his ties to the community.  Julio Decl. ¶ 4; CASA Decl. ¶ 27.  After spending two nights in Chantilly, Julio was eventually moved to a detention center in Texas, where he remains.  Julio Decl. ¶ 5; CASA Decl. ¶ 27.

Defendants' agents have also arrested numerous individuals who are not Plaintiffs or members of CASA under similar circumstances, without individualized assessments of both flight risk and immigration status as federal law requires.  For example, on August 20, 2025, Declarant

C., a naturalized U.S. citizen, was driving to work with a Latino colleague in Northwest D.C. when he was pulled over in his work truck by a dark blue SUV marked "Park Police." Declaration of C. ("C. Decl.") ¶ 3. One officer approached the driver's side window where C. was, while a second officer approached the passenger side where C.'s colleague was and aggressively yelled at him, "Where are you from?" *Id.* ¶¶ 3–5. C.'s colleague made no attempt to exit the car or flee. *Id.* C.'s colleague was then pulled from the vehicle, pushed to the ground, and arrested, before he could say a word. *Id.* According to C.: "Neither officer appeared to know my colleague's name, and they did not show a warrant for him." *Id.* The officers did not ask C.'s colleague any questions about his ties to the area or his individual circumstances before arresting him. *Id.*

On August 28, 2025, Declarant B.R.G. was driving to work with a colleague when he encountered a police checkpoint. Declaration of B.R.G. ("B.R.G. Decl.") ¶ 2. Police officers demanded that B.R.G. exit the car and arrested him. *Id.* ¶ 2–3. The officers did not provide a warrant or show any documentation to B.R.G. prior to the arrest. *Id.* ¶ 4. B.R.G. did not attempt to resist arrest in any way, and despite that, the officers told him that if he did try to run away, they would shoot him. *Id.* ¶ 3. Before arresting B.R.G., the agents asked no questions about how long he has lived and worked in D.C., his family here, or anything else about his ties to the community. *Id.* ¶ 4.

On September 7, 2025, Declarant W.G.M. was walking toward his girlfriend's apartment building in Northeast D.C. when he was approached by unidentified officers. Declaration of W.G.M. ("W.G.M. Decl.") ¶ 2. The officers arrested him, saying they would check his immigration status after they had already handcuffed him. *Id.* ¶ 3. The officers did not provide a warrant or show any documentation to W.G.M. prior to the arrest. *Id.* ¶ 6. W.G.M. did not make any attempt to flee or resist arrest. *Id.* ¶ 3. Before arresting W.G.M., the agents asked no questions

about his circumstances, how long he has lived and worked in D.C., whether he has family here, or anything else about his ties to the community. *Id.* ¶ 6.

On September 16, 2025, Declarant Andrés Doe was returning from work and walking to his car when ICE agents stopped him and said that he looked like a person they were looking for and demanded his identification, which he provided. Declaration of Andrés Doe ("Andrés Decl.") ¶ 2. After checking his ID and confirming he was not the person they were looking for, the agents said the check showed he lacked legal status and arrested him. *Id.* ¶ 3. They did not present a warrant or any documentation to Andrés prior to arresting him. *Id.* Andrés did not make any attempt to flee or resist arrest. *Id.* ¶ 4. Andrés informed the agents that he had a young son at home who was born in the United States, but the agents told him that did not matter. *Id.* ¶ 4.

On September 18, 2025, Angel was waiting with his coworkers outside the building where he worked when agents wearing vests that said "ERO" and "Police" approached them. CASA Decl. ¶ 28. The agents arrested Angel without asking him any questions about his immigration status, his family, how long he has been in the United States, or anything else about his ties to the community. *Id.* The agents brought Angel and his coworker, whom they also arrested, to Chantilly, and Angel remains detained at a different facility. *Id.*

Several other Declarants have experienced a similar sequence of events in their arrests: Defendants' agents approached them while they were driving, Declaration of Darwin Lopez Castañon ("Darwin Decl.") ¶ 3, Declaration of Mateo Doe ("Mateo Doe Decl.") ¶ 6; CASA Decl. ¶ 36 (describing Newrin's arrest); Declaration of Y.R.M. ("Y.R.M. Decl.") ¶ 2; Declaration of Camilo Doe ("Camilo Doe Decl.") ¶¶ 1–3; Declaration of M.P. ("M.P. Decl.") ¶¶ 3–6 (describing a sibling's arrest); Declaration of Cristina ("Cristina Decl.") ¶¶ 4–5 (describing her son's arrest); Declaration of Paola Flores Roman ("Flores Roman Decl.") ¶¶ 5, 7 (describing a client's arrest);

Declaration of Ana Gracia ("Gracia Decl.") ¶ 6 (describing a client's arrest), walking, Declaration of Javier Doe ("Javier Doe Decl.") ¶¶ 4–5; Declaration of Franco Doe ("Franco Doe Decl.") ¶¶ 2–3; Flores Roman Decl. ¶ 6 (describing her client's experience); Declaration of Fiona Lewis ("Fiona Lewis Decl.") ¶ 2 (describing a friend's arrest), or at work, Declaration of Anamaria Doe ("Anamaria Doe Decl.") ¶¶ 1–4; CASA Decl. ¶ 35 (describing Gordon's arrest); CASA Decl. ¶ 33 (describing Carlos's arrest), arrested them under circumstances that indicated the agents had no knowledge of objective facts that would lead a reasonable officer to believe that the person was in the United States unlawfully, Javier Doe Decl. ¶ 6; Mateo Doe Decl. ¶ 7; Y.R.M. Decl. ¶¶ 3–4; Franco Doe Decl. ¶¶ 3–4; B.R.G. Decl. ¶ 4; Julio Doe Decl. ¶¶ 2–4; Camilo Doe Decl. ¶¶ 3–5; M.P. Decl. ¶ 7 (describing a sibling's experience); Cristina Decl. ¶ 6 (describing her son's experience); Anamaria Doe Decl. ¶¶ 4–5; Flores Roman Decl. ¶¶ 6–7 (describing a client's experience); Gracia Decl. ¶ 6 (describing her client's experience), and without asking any questions about that person's ties to the community to make an individualized determination about their flight risk, Javier Doe Decl. ¶ 6; Mateo Doe Decl. ¶ 7; Y.R.M. Decl. ¶¶ 3–4; Franco Doe Decl. ¶¶ 3–4; B.R.G. Decl. ¶ 4; Julio Doe Decl. ¶ 4; Camilo Doe Decl. ¶ 5; M.P. Decl. ¶ 7 (describing a sibling's experience); Cristina Decl. ¶ 6 (describing her son's experience); Anamaria Doe Decl. ¶¶ 4–5; Flores Roman Decl. ¶¶ 6–7 (describing a client's experience); Gracia Decl. ¶ 6 (describing her client's experience).

### C. Plaintiffs and Putative Class Members Will Be Arrested, Detained, and Separated from Their Families Under Defendants' Unlawful Policy and Practice.

Plaintiffs Escobar Molina, B.S.R., N.S., and R.S.M. and putative class members have suffered significant harms as a result of Defendants' policy and practice of making unlawful warrantless arrests in D.C. Those who have been held in detention have suffered inhumane conditions. Mr. Escobar Molina, for example, was held in a waiting cell at Chantilly that was so

crowded it was impossible to sleep and was "fed one small bean burrito, something sweet, and a glass of water during [his] entire 23-hour stay at Chantilly." Escobar Molina Decl. ¶ 11. B.S.R. likewise was only given a burrito and a bottle of water during the approximately 14 hours he spent at Chantilly. B.S.R. Decl. ¶ 18. Declarants have described being forced to sleep on the floor of a frigid room without bedding, Julio Doe Decl. ¶ 6; B.R.G. Decl. ¶ 5 (describing a room so cold that detainees called it the "freezer"); needing to drink toilet water to survive, Y.R.M. Decl. ¶ 5; witnessing beatings by detention center guards, Y.R.M. Decl. ¶ 8; taking multiple flights in one day while chained from wrists-to-ankles, N.S. Decl. ¶¶ 18–19, Y.R.M. Decl. ¶ 6; sleeping in jails where the lights are kept on 24 hours a day, B.R.G. Decl. ¶ 6; M.P. Decl. ¶ 10; watching other detainees pass out from dehydration and hunger, Y.R.M. Decl. ¶ 5, B.S.R. Decl. ¶ 22; going days without bathing, B.S.R. Decl. ¶¶ 18, 22, M.P. Decl. ¶¶ 10–11; being told by guards that they have "no right[s] to anything," Y.R.M. Decl. ¶ 5; and innumerable other deprivations of basic human dignity. *See also, e.g.*, CASA Decl. ¶ 28 (ICE agents bragging about the bonus money they would earn from arresting Angel); N.S. Decl. ¶ 20 (detainees kept shackled while forced to urinate without a bathroom), Antony Decl. ¶ 9 (denying Antony the opportunity to contact his family for eight days following a sudden arrest), Gracia Decl. ¶ 6 (describing experience of client who sustained a nosebleed and blunt head trauma, resulting in dizziness and vomiting when officers engaged in a car chase with that individual handcuffed in the backseat and then ignored his pleas for medical attention for 40 minutes).

Numerous Plaintiffs and putative class members have also suffered the pain of separating from their families. Some individuals have been sent to ICE facilities in entirely different regions of the country, far away from the District, attorneys, and their families. This includes being sent to facilities in California, *see* N.S. Decl. ¶ 19–21, Louisiana, *see* Darwin Decl. ¶ 13, Pennsylvania,

*see* Antony Decl. ¶ 9, and Texas, *see* Cristina Decl. ¶ 7; CASA Decl. ¶ 27 (Julio), with little or no explanation as to why they are being transferred or how long they will be there. The children and families of unlawfully arrested individuals often struggle to make ends meet, compounding the trauma of the experience.

Plaintiffs and putative class members are also suffering emotional distress as a result of their unlawful arrests and detentions and live in fear of being arrested and detained again under Defendants' unlawful policy. For example, when Mr. Escobar Molina leaves his apartment, he checks for officers outside his apartment two or three times, and he no longer goes to the park with his sons out of fear of being arrested again. Escobar Molina Decl. ¶ 20. B.S.R. moved out of D.C. due to his fear of being arrested again, though he continues to travel into and through D.C. for work. B.S.R. Decl. ¶ 25. N.S. has stopped taking his grandchildren and youngest son to school out of fear of being arrested, N.S. Decl. ¶ 26, and R.S.M. has been "panicked and scared to go outside" and has not been going to work because her uniform would reveal her ankle monitor. R.S.M. Decl. ¶ 16. Her children are also now fearful of leaving the house, and her family "are living in constant fear that they will be arrested and detained by immigration." *Id.* ¶ 17. Many have difficulty sleeping and experience nightmares reliving the horror they experienced. *Id.* ¶ 16 (trouble sleeping); N.S. Decl. ¶ 26 (unable to sleep through the night); Escobar Molina Decl. ¶ 19 (nightmares); *see also* Declaration of Daniela Anello ("Anello Decl.") ¶¶ 3–8 (describing trauma to schoolchildren from ICE arrest near elementary school).

Defendants' unlawful policy and practice has also caused significant harms to CASA. CASA has needed to divert much of its staff and resources from providing social, health, employment, and legal services that are core to CASA's mission to providing emergency response services for people who have been arrested in D.C. under Defendants' policy. CASA Decl. ¶¶ 17–

22.   For example, CASA typically provides legal clinics where CASA provides community members consultations and assistance with immigration applications; instead, CASA now must prioritize daily rapid-response legal phone calls to provide information and guidance to family members of arrested individuals using resources it otherwise would have expended on working to aid individuals in obtaining asylum, other forms of affirmative immigration relief, and other forms of long-term stabilizing community benefits. *Id.* ¶ 18.

CASA also faces increased costs due to ICE's unlawful seizures, especially in funding its hotline services, and lost grant funding because staff shifts and resource diversions have forced it to miss deliverables, impairing CASA's ability to conduct its core functions of providing critical long-term social services. *Id.* ¶¶ 19–20.  Defendants' policy and practice have also chilled open communication between CASA and its members, discouraged community members from sharing personal information, and impaired CASA's core mission of connecting community members to social services. *Id.* ¶ 21.  CASA is concerned about its continued ability to provide its longstanding core social services to immigrant communities in D.C. while also executing the rapid-response work necessary to support its community members in the wake of ICE's enforcement surge. *Id.* ¶ 17.  Given the likelihood its members will continue to be arrested and detained under Defendants' unlawful policy and practice, CASA's resources, effectiveness, and entire service model is in jeopardy. *Id*.

## ARGUMENT

To obtain a preliminary injunction, a party "must show that (1) it 'is likely to succeed on the merits'; (2) it 'is likely to suffer irreparable harm in the absence of preliminary relief'; (3) 'the balance of equities tips in [its] favor'; and (4) the issuance of a preliminary injunction 'is in the public interest.'"  *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1324 (D.C. Cir. 2024) (quoting *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721 (D.C. Cir. 2022)).  The

same standard applies to a motion to stay agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 705.  *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) ("Motions to stay agency action pursuant to [§ 705 of the APA] are reviewed under the same standards used to evaluate requests for interim injunctive relief.") (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)).

As set forth below, Plaintiffs satisfy all four factors and therefore are entitled to preliminary injunctive relief as well as, or alternatively, a stay of Defendants' policy of conducting warrantless immigration arrests without an individualized determination of probable cause.  In addition, given that Plaintiffs seek preliminary injunctive relief on behalf of the proposed Warrantless Arrests class, as defined in their concurrently filed motion for class certification, the Court should provisionally certify the class and issue classwide preliminary relief.

## I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

Plaintiffs are likely to succeed on the merits of their claim that Defendants' policy and practice of making warrantless arrests in D.C. without making individualized determinations of flight risk violates 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii), the APA, 5 U.S.C. § 706(2)(A), (C), and the *Accardi* doctrine.  ECF 1, Compl., Second Claim for Relief, ¶¶ 78– 83.  *See Adams v. District of Columbia*, 285 F. Supp. 3d 381, 390 (D.D.C. 2018) (plaintiffs need only show a likelihood of success "on at least one count of [the] underlying Complaint").

### A.    The INA and DHS Regulations Require Agents to Make an Individualized Determination That the Person Is in the United States Unlawfully and Is a Flight Risk Before Arresting That Person Without a Warrant.

As noted above, under 8 U.S.C. § 1357(a)(2), an agent can make an immigration arrest without a warrant *only if* the agent "has reason to believe that the [noncitizen] so arrested is in the United States in violation of any . . . law or regulation [made in pursuance of law regulating the admission, exclusion, expulsion, or removal of noncitizens] *and* is likely to escape before a warrant

can be obtained for his arrest." 8 U.S.C. § 1357(a)(2) (emphasis added); *see also* 8 C.F.R. § 287.8(c)(2)(i) ("An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is [a noncitizen] illegally in the United States."); *id.* § 287.8(c)(2)(ii) ("A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained."). The "reason to believe" requirement in § 1357(a)(2) is the "equivalent of probable cause." *Au Yi Lau*, 445 F.2d at 222; *see also Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) ("Courts have consistently held that the 'reason to believe' phrase in § 1357 'must be read in light of constitutional standards, so that "reason to believe" must be considered the equivalent of probable cause.'") (collecting cases).

"Where the standard is probable cause, a search or seizure of a person must be supported by probable cause *particularized with respect to that person*." *Barham*, 434 F.3d at 573 (emphasis added) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)); *see also Maryland v. Pringle*, 540 U.S. 366, 371 (2003) ("[T]he belief of guilt[, a reasonable ground for which is required for probable cause,] must be particularized with respect to the person to be searched or seized."). Probable cause is an "objective" standard, *Smith v. United States*, 843 F.3d 509, 515 (D.C. Cir. 2016), which is defined as "whether, at the moment the arrest was made … the facts and circumstances within [the arresting officer's] knowledge and of which [the arresting officer] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). As a result, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). "[P]robable cause, of course, requires more than mere suspicion." *United States v. Green*, 670 F.2d 1148, 1151 (D.C. Cir. 1981) (citing

*Brinegar v. United States*, 338 U.S. 160, 175 (1949)).  Moreover, "Fourth Amendment case law makes clear that an officer cannot predicate a search or seizure on an individual's 'mere propinquity to others independently suspected of criminal activity.'"  *Barham*, 434 F.3d at 573 (quoting *Ybarra*, 444 U.S. at 91).

With respect to the probable cause findings required by 8 U.S.C. § 1357(a)(2), officers must conduct an individualized assessment that the person they are arresting without a warrant is *both* (1) in the United States unlawfully *and* (2) likely to escape arrest before a warrant can be obtained.  *See, e.g.*, *United States v. Quintana*, 623 F.3d 1237, 1241 (8th Cir. 2010) (officer was required to have "'reason to believe' (*i.e.*, probable cause to believe) that the person [being arrested] was [a noncitizen] subject to deportation because [he was] illegally present in this country … [and was] likely to escape before a warrant [could] be obtained") (last alteration in original); *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 889 (S.D. Ohio 2016) (officer making immigration arrest needed probable cause to believe person being arrested was "(1) unlawfully present in the United States and (2) likely to escape before [the arresting officer] could obtain a warrant for his arrest").

These requirements must be independently satisfied:  even where probable cause exists for one prong of § 1357(a)(2), a warrantless arrest is invalid if probable cause does not exist for the other prong.  *See* 8 U.S.C. § 1357(a)(2) (agent must have "reason to believe that the [noncitizen] so arrested is in the United States in violation of [an immigration law] *and* is likely to escape before a warrant can be obtained for his arrest") (emphasis added); *De La Paz v. Coy*, 786 F.3d 367, 376 (5th Cir. 2015) ("[E]ven if an agent has reasonable belief [that an individual is unlawfully present in the United States], before making an arrest, there must also be a likelihood of the person escaping before a warrant can be obtained for his arrest."); *Pacheco-Alvarez*, 227 F. Supp. 3d at

889 ("ICE officers may make warrantless arrests for suspected immigration violations only when they have both probable cause for the arrest *and* probable cause that the subject is likely to escape.").

**B.    Defendants' Policy and Practice of Making Warrantless Immigration Arrests Without an Individualized Determination of Flight Risk Violates the INA.**

Defendants' policy and practice violates the statutory requirement that agents make an individualized determination that a person is likely to escape before a warrant can be obtained before arresting that person.  The likelihood of escape (flight risk) prong of § 1357(a)(2) is "a *statutory limitation*" on agents' ability to arrest without a warrant that "is *always seriously applied*." *United States v. Cantu*, 519 F.2d 494, 496– 97 (7th Cir. 1975) (emphases added).  Even where there is probable cause to arrest based on the immigration status prong of § 1357(a)(2), agents act "in direct violation of the statute" where "there is no evidence that [the plaintiff] was likely to escape before a warrant could be obtained for her arrest."  *Westover v. Reno*, 202 F.3d 475, 479–80 (1st Cir. 2000); *see also, e.g.*, *Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 945 (D. Minn. 2017) ("[Plaintiff's] admission regarding his immigration status provided probable cause for the first half of what § 1357(a)(2) demands.  There is, however, no evidence that ICE or any other immigration officer had probable cause to believe that [plaintiff] was 'likely to escape before a warrant can be obtained for his arrest,' the second half of what is needed before a warrantless arrest under § 1357(a)(2) is lawful.").

ICE itself has acknowledged that it must satisfy both probable cause requirements in a Broadcast Statement of Policy pursuant to the *Castañon Nava* settlement agreement, where it stated that "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that [a noncitizen] is likely to escape before a warrant for arrest can be *obtained*" and identified factors that may be relevant to the flight risk determination, including

"the ICE Officer's ability to determine the individual's identity, knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, ties to the community (such as a family, home, or employment) or lack thereof, or other specific circumstances that weigh in favor or against a reasonable belief that the subject is likely to abscond."  Widas Decl., Ex. 1.

In none of the more than twenty arrests documented herein did the agents obtain knowledge of facts relevant to any of these factors.  Indeed, in none of the arrests did the agents ask any questions about where the person they arrested lives, how long the person has lived in the United States, who the person lives with and the person's family members, the person's work history, or anything else about the person's ties to the community—factors that courts have held militate against finding probable cause that the person poses a flight risk.  *See* Darwin Decl. ¶ 11, B.S.R. Decl. ¶ 7, CASA Decl. ¶¶ 24–28, 30–33, Escobar Molina Decl. ¶ 8, N.S. Decl. ¶ 7, R.S.M. Decl. ¶ 6, Javier Doe Decl. ¶ 6, Mateo Doe Decl. ¶ 7, Y.R.M. Decl. ¶¶ 3–4, Franco Doe Decl. ¶¶ 3–4, B.R.G. Decl. ¶ 4, Julio Doe Decl. ¶ 4, Camilo Decl. ¶ 5, M.P. Decl. ¶ 7 (describing a sibling's experience), Cristina Decl. ¶ 6 (describing her son's experience), Anamaria Doe Decl. ¶¶ 4–5, Flores Roman Decl. ¶¶ 6–7 (describing a client's experience), Gracia Decl. ¶ 6 (describing her client's experience); *see also, e.g.*, *United States v. Abdi*, 2005 WL 6119695, No. 2:04-CR-88, at *6 (S.D. Ohio Sept. 12, 2005), *rev'd on other grounds*, 463 F.3d 547 (6th Cir. 2006) (court held no probable cause for flight risk where facts, including defendant's ownership of a business, leased storefront, and apartment rental, where he lived with his then-pregnant wife and two young children, suggested that defendant had strong community ties; defendant additionally had neither moved nor traveled despite being the subject of an FBI investigation); *Pacheco-Alvarez*, 227 F. Supp. 3d at 890 (finding no probable cause of flight risk where defendant "had a stable job as a

painter; lived with his fiancée, Daisy; helped pay the rent on their home; and helped her raise her two kids") (internal citations omitted); *United States v. Khan*, 324 F. Supp. 2d 1177, 1187 (D. Colo. 2004) (facts that defendant "worked two jobs" in the community where he lived, and "contributed to rent payments for the apartment he shared with a roommate" made flight risk unlikely even though he lacked specific familial ties in the United States).   Indeed, for some individuals, Defendants ignored significant evidence that the person was *not* a flight risk: B.S.R., for instance, had an ankle monitor that he had been wearing since his previous arrest by ICE in January and that he showed to the agents after they handcuffed him.  B.S.R. Decl. ¶ 14.

Moreover, none of the Plaintiffs or Declarants displayed any furtive conduct suggesting they were likely to escape arrest, and none of them made any effort to resist or to drive or walk away. *Cf. Cantu*, 519 F.2d at 497 (finding probable cause where arrestee was speeding cross-country).  Indeed, most of them were arrested while going about daily and routine life activities. For example, Plaintiffs and Declarants have been arrested while commuting to work.  *E.g.*, Flores Roman Decl. ¶ 6 (describing client stopped en route to work); CASA Decl. ¶ 31 (same), *id.* ¶ 33 (same); Escobar Molina Decl. ¶ 5 (stopped while getting in his car to go to work); Javier Doe Decl. ¶¶ 4–5 (stopped en route to work); Julio Doe Decl. ¶ 2 (same); M.P. Decl. ¶¶ 3–4 (same); B.S.R. Decl. ¶ 3 (stopped at Home Depot), Gracia Decl. ¶ 6 (same); N.S. Decl. ¶ 5 (same); CASA Decl. ¶ 26 (stopped while waiting for food to deliver as a DoorDasher); *id.* CASA Decl. ¶ 25 (attending dialysis appointments); Elias Doe Decl. ¶ 2–3 (same); Widas Decl. Ex. 27 (going to church); CASA Decl. ¶ 34 (going back to their cars from the grocery store))

### C.    Defendants' Policy and Practice of Making Warrantless Immigration Arrests Without Probable Cause as to Either of The Statutorily Required Criteria Is a Final Agency Action That Violates the APA.

The APA directs courts to "hold unlawful and set aside" final agency actions that are (1) arbitrary, capricious, or contrary to law or (2) in excess of statutory authority.  *See* 5 U.S.C.

§ 706(2)(A), (C).   While any one of these grounds alone would suffice for an injunction, Defendants' policy and practice is unlawful for all these reasons and should be stayed and enjoined.

Defendants' policy of making warrantless immigration arrests without making the probable cause findings required by § 1357(a)(2) is a final agency action.  It is well established under D.C. Circuit law that a policy does not need to be in writing to be a final agency action for APA purposes.  *See Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) ("[W]e also agree with the Railroad Administration that the absence of a written memorialization by the agency does not defeat finality."); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018) ("Despite Defendants' assertions to the contrary, agency action need not be in writing to be judicially reviewable as a final action.") (collecting cases where APA review was available despite lack of written policy).

For an agency action to be a "final" agency action, it must be an action that "mark[s] the consummation of the agency's decisionmaking process and … one by which rights or obligations have been determined, or from which legal consequences will flow."  *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (citation omitted).  The action "must not be of a merely tentative or interlocutory nature."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997). "Courts take a pragmatic approach to finality."  *Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1, 40 (D.D.C. 2018) (citing *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016)).   When this Court granted plaintiffs' motion for a preliminary injunction in *Ramirez*, it "approach[ed] finality pragmatically" and "reasoned that Defendants had consummated a decisionmaking process by failing to consider each Plaintiff for less restrictive placements as required by the statutory provision and that legal consequences flowed from those failures." *Ramirez*, 338 F. Supp. 3d at 40.  Moreover, "where 'an agency is under an unequivocal

statutory duty to act, failure so to act constitutes, in effect, an affirmative act that triggers "final agency action" review.'" *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) (quoting *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987)).

Defendants' policy and practice of making warrantless immigration arrests without probable cause of flight risk satisfies both prongs of the final agency action test.  Defendants' policy reflects a final decision by Defendants as to how to conduct warrantless immigration arrests in D.C. in pursuit of the President's goal of mass immigration arrests and deportations; it is not an action of "merely tentative or interlocutory nature."  *Bennett*, 520 U.S. at 178; *see also* Widas Decl., Ex. 19 (DHS's post on X: "DHS law enforcement uses 'reasonable suspicion' to make arrests.").  In addition, it is an action "by which rights or obligations have been determined, or from which legal consequences will flow," *Corner Post, Inc.*, 603 U.S. at 808, given that it is determinative of whether an individual will be arrested and detained without a warrant.

Defendants' policy and practice is contrary to law and in excess of statutory authority for the reasons stated above:  it directly violates the express requirements of § 1357(a)(2).  "Under the APA, 'agency actions will be set aside if they are contrary to law—if, in other words, they are not authorized by the statutory text, or some other source of lawful authority."  *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 2025 WL 1825431, at *16 (D.D.C. July 2, 2025) (quoting *Fisher v. Pension Benefit Guar. Corp.*, 151 F. Supp. 3d 159, 165 (D.D.C. 2016)) (internal quotation marks omitted).

The policy is also arbitrary and capricious because Defendants have failed to provide any explanation or facts to support their decision to make warrantless immigration arrests without the statutorily required probable cause findings.  "The goal of [arbitrary and capricious] review is to assess whether or not the agency reached its decision through a 'logical and rational' process….

[I]t is axiomatic that the agency has to have 'articulate[d] … a rational connection between the facts found and the choice[s] [it] made.'" *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018) (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015) and *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants' failure to offer any explanation for its policy "renders its void *ab initio* rationale arbitrary and capricious." *Commc'ns & Control, Inc. v. F.C.C.*, 374 F.3d 1329, 1335–36 (D.C. Cir. 2004). In addition, Defendants' failure to comply with its own regulations— here, DHS violating 8 C.F.R. § 287.8(c)(2)(ii), which implements the flight risk prong of § 1357(a)(2)—is an independent basis to find their policy arbitrary and capricious. *Nat'l Env'l. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("[A]n agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'" (citation omitted)).

The conflict with the regulation also renders Defendants' policy invalid on another independent basis, as explained next.

### D.    Defendants' Policy and Practice of Making Warrantless Immigration Arrests Without Probable Cause as to Flight Risk Violates the *Accardi* Doctrine.

Defendants' policy and practice also violates DHS's own regulation requiring an individualized determination of probable cause for flight risk before a warrantless immigration arrest may be effected. Under the *Accardi* doctrine, it is well-settled that agencies are required to follow the procedural and substantive standards contained in their own regulations. *Holden v. Finch*, 446 F.2d 1311, 1315 (D.C. Cir. 1971); *see also Battle v. F.A.A.*, 393 F.3d 1330, 1336 (D.C. Cir. 2005) ("*Accardi* has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others."); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267– 68 (1954). In particular, "[w]here the rights of individuals are affected, it is

incumbent upon agencies to follow their own procedures." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *accord Jefferson v. Harris*, 285 F. Supp. 3d 173, 185 (D.D.C. 2018) ("[I]nterference with regulations that seek to safeguard a plaintiff's individual rights implicates the *Accardi* doctrine and its requirement that agencies abide by their own procedures."); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 336 (D.D.C. 2018) (same).

DHS's regulation, 8 C.F.R. § 287.8(c)(2)(ii), expressly requires that a "warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." This regulation protects individuals' rights under § 1357(a)(2) not to be subject to a warrantless arrest without probable cause. Defendants' failure to follow their own regulation significantly prejudices Plaintiffs and putative class members. Defendants' policy and practice of making warrantless immigration arrests without probable cause that the person Defendants' agents are arresting without a warrant "is likely to escape before a warrant can be obtained" directly violates 8 C.F.R. § 287.8(c)(2)(ii). Defendants' policy and practice should be set aside and vacated for violating the *Accardi* doctrine.

Plaintiffs accordingly are likely to succeed on the merits of their claim that Defendants' policy and practice of making warrantless immigration arrests without an individualized determination of probable cause for flight risk violates 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii); the APA, 5 U.S.C. § 706(2)(A), (C); and the *Accardi* doctrine.

## II.    Absent Immediate Injunctive Relief, Plaintiffs and the Putative Class Will Continue Facing Irreparable Harm Due to Defendants' Unlawful Policy and Practice.

Irreparable harms are "certain and great, actual and not theoretical," "so imminent that there is a clear and present need for equitable relief to prevent irreparable harm," and "beyond remediation." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (cleaned up); *see also Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015)

(applying same irreparable injury analysis to section 705 stay motion).  The D.C. Circuit has held that an "irreparable loss of personal liberty … would follow from an arrest," *Rubinstein v. Brownell*, 206 F.2d 449, 456 (D.C. Cir. 1953), and this Court has held that "there can be no injury more irreparable than being illegally arrested," *Barwood, Inc. v. District of Columbia*, 1999 U.S. Dist. LEXIS 21427, at *18 (D.D.C. Feb. 16, 1999), *overruled on other grounds*, 202 F.3d 290 (D.C. Cir. 2000).  Moreover, "[c]ourts in this and other jurisdictions have found that deprivations of physical liberty … are the sort of actual and imminent injuries that constitute irreparable harm." *Aracely, R. v. Nielsen*, at 155 (D.D.C. 2018) (collecting cases).  Indeed, "[u]nlike economic harm, the harm from detention pursuant to an unlawful policy cannot be remediated after the fact." *R.I.L–R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015).

Plaintiffs and putative class members face irreparable injury under Defendants' policy and practice of making unlawful warrantless immigration arrests in D.C.  Plaintiffs have been arrested and detained for periods ranging from hours to weeks.  *See* R.S.M. Decl. ¶¶ 2, 12 (detained for approximately 12 hours); B.S.R. Decl. ¶¶ 12, 19–20 (detained approximately 14 hours); Escobar Molina Decl. ¶¶ 5, 14 (detained for a day and a half); N.S. Decl. ¶ 23 (detained for a month). Shorter periods of restraint than these constitute irreparable harm.  *See N.S. v. Hughes*, 335 F.R.D. 337, 351–52 (D.D.C. 2020), *injunction vacated on other grounds sub nom. N.S. v. Dixon*, 141 F.4th 279 (D.C. Cir. 2025) ("A deprivation of liberty that includes being shackled and detained is a serious infringement on one's personal freedoms, and the fact that class members are detained for only a few hours does not change that fact.").  In addition, the conditions Plaintiffs and putative class members face while being arrested and detained are inhumane and devastating, including being painfully shackled, *see* B.S.R. Decl. ¶ 17; screamed at, abused, and demeaned by federal officials, Escobar Molina Decl. ¶ 7, N.S. Decl. ¶ 13, Julio Decl. ¶ 7, Y.R.M. Decl. ¶ 8; held in

overcrowded cells, Escobar Molina Decl. ¶ 11, B.S.R. Decl. ¶ 18, B.R.G. Decl. ¶ 5; denied sufficient food, N.S. Decl. ¶ 14, Escobar Molina Decl. ¶ 11, B.S.R. Decl. ¶ 18, Camilo Decl. ¶ 7; denied adequate medical care, Cristina Decl. ¶ 8, Gracia Decl. ¶ 6; forced to drink water from the toilet, Y.R.M. Decl. ¶ 5; and moved constantly between different locations, N.S. Decl. ¶¶ 12–22, Escobar Molina Decl.¶¶ 9–13, Camilo Decl. ¶¶ 7–8, Y.R.M. Decl. ¶ 6. Such "'harm from detention surely cannot be remediated after the fact' and is a quintessential irreparable harm." *Make the Rd. New York v. Noem*, 2025 WL 2494908, at *20 (D.D.C. Aug. 29, 2025) (quoting *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 31 (D.D.C. 2018)).

In addition to the irreparable harm Plaintiffs and putative class members face as a result of being detained, many people impacted by Defendants' policy and practice have young children and are now living in fear of being separated from their families. *See de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 503 (D.D.C. 2018) ("Separation irreparably harms plaintiffs every minute it persists"); *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011); *Tate v. Pompeo*, 513 F. Supp. 3d 132, 151 (D.D.C. 2021). A number of CASA's members have been separated from their children following their unlawful arrests. *See* CASA Decl. ¶¶ 29 (Mateo separated from wife and seven-year-old son); 35 (Gordon separated from wife and three children ages twelve, nine, and six); 30 (Antony separated from wife and six children); 33 (Carlos separated from wife and three children); 36 (Nerwin separated from wife and two children ages five and six); *see also* Franco Decl. ¶ 7 (separated from wife and eight-month-old daughter). Though he has TPS and his sons are U.S. citizens, Mr. Escobar Molina no longer goes to the park with his sons because he does not want them to see him get arrested, and he tells his sons to carry their passports with them at all time. Escobar Molina Decl. ¶¶ 18–20. B.S.R. moved out of D.C. for fear of being arrested again, though he continues to have to travel in D.C. for work. B.S.R. Decl. ¶ 25. N.S.

has been fearful and stressed ever since his arrest and detention and has stopped taking his grandchildren and youngest son to school. N.S. Decl. ¶ 26. R.S.M. has been panicked about leaving the house since her arrest and detention and feels hopeless and has trouble sleeping; her children are also now fearful of leaving the house. R.S.M. Decl. ¶¶ 16–17.

The harms Plaintiffs and putative class members face are sufficiently imminent to constitute irreparable harm because Defendants are continuing their policy and practice of unlawful immigration arrests in D.C. and Plaintiffs face rearrest as a result, because of where they live, work, and travel on a daily basis. Mr. Escobar Molina lives and works in the District and was arrested across the street from his home in Mount Pleasant, and he continues to see and hear about other immigration enforcement activity in his area. Escobar Molina Decl. ¶¶ 3–5, 18. B.S.R. works on job sites throughout the greater D.C. region and commutes through the District nearly every day. B.S.R. Decl. ¶ 25. N.S. both lives and works in the District. N.S. Decl. ¶¶ 3–4. R.S.M. was arrested one block from her home in Northeast D.C. and saw government patrols in her neighborhood for hours at a time for multiple days afterward. R.S.M. Decl. ¶ 14.

The conclusion of the emergency period declared on August 11 has not slowed the federal government's immigration enforcement efforts pursuant to this policy and practice in D.C. Immigration arrests in D.C. continue apace. *See, e.g.*, Anamaria Decl. ¶ 2 (arrested September 24); CASA Decl. ¶ 28 (Angel arrested September 18); Andrés Decl. ¶ 2 (arrested September 16); Anello Decl. ¶¶ 3–8 (describing September 25, 2025, arrest near elementary school); *see also* Widas Decl., Ex. 13. President Trump recently threatened to "call a National Emergency, and Federalize, if necessary!!!" to continue conducting mass immigration arrests in D.C. Widas Decl., Ex. 15. Moreover, in response to this lawsuit, DHS admitted that it uses "reasonable suspicion"— as explained above, a lower standard than probable cause—"to make arrests." *Id.*, Ex. 17. Based

on what the government has done and what it has said it will continue to do, Plaintiffs and putative class members are squarely in the path of the government's unlawful policy and practice—under which they will inevitably be unlawfully arrested again. *See Make the Rd. New York*, 2025 WL 2494908, at *20 (holding that plaintiff showed irreparable harm where its "declarations [were] replete with uncontested evidence that the Government is systematically targeting individuals attending their immigration court proceedings for placement into expedited removal").

For an organization, irreparable harm occurs where Defendants' actions "have perceptibly impaired [the organization's] programs" and "directly conflict with the organization's mission." *League of Women Voters of the U.S.*, 838 F.3d at 8 (cleaned up). In addition to the current and imminent harms to its members, CASA is also suffering and will continue to suffer irreparable injuries to its programs and mission in the absence of a stay or injunction. Defendants' unlawful policy has caused CASA to increase expenditure on its hotline for people who have been arrested by ICE, to shift staff from other programs to address arrests and detentions and to lose grant funding due to being unable to meet deliverables as a result of shifting staff around, and it has impaired CASA's ability to conduct its core functions of assisting members with securing long-term status and connecting community members to social services. CASA Decl. ¶¶ 15–21. Because Defendants' policy and practice has "perceptibly impaired" CASA's programs and "directly conflict[s] with" CASA's mission, and will continue to do so, CASA faces irreparable harm. *League of Women Voters of the U.S.*, 838 F. 3d at 8.

## III. The Equities and the Public Interest Favor Plaintiffs.

The balance of equities and public interest "merge when, as here, the Government is the opposing party." *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (quoting *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020)). Where the relief sought is squarely within the public interest, there can be no harm to the government, as the "Government cannot suffer harm from an injunction

that merely ends an unlawful practice," and the "public interest is served when administrative agencies comply with their obligations under the APA." *R.I.L.–R.*, 80 F. Supp. 3d at 191 (cleaned up); *see also Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511–12 (D.C. Cir. 2016).

As described in Section II, the injuries to Plaintiffs and putative class members are significant, and the public's interest is undoubtedly in having Defendants follow the law—including their own regulations. Moreover, the relief that Plaintiffs seek is narrowly tailored to address the unlawful conduct at issue. Plaintiffs principally request the Court to order Defendants and their agents to refrain from making warrantless immigration arrests without the probable cause findings required by § 1357(a)(2), to comply with DHS's "Broadcast Statement of Policy," which was undisputedly in place until as recently as May 2025 when making warrantless immigration arrests, and to provide documentation to Plaintiffs' counsel on a regular schedule. These reasonable and minimally intrusive requirements are necessary to ensure that Defendants' conduct conforms to the requirements of § 1357(a)(2).

On the other side of the scale, Defendants have no colorable interest in continuing their policy and practice of making immigration arrests without probable cause. "There is generally no public interest in the perpetuation of an unlawful agency action." *League of Women Voters of the U.S.*, 838 F.3d at 12. "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *see also Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) ("[T]here is an overriding public interest … in the general importance of an agency's faithful adherence to its statutory mandate."). The requested relief in no way impedes lawful immigration arrests by Defendants.

The public interest and equities therefore strongly favor Plaintiffs.

**IV.     Provisional Class Certification Is Warranted.**

This Court should provisionally certify the following class to grant preliminary injunctive

relief:

> **Warrantless Arrest Class**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses a flight risk.

"Plaintiffs … need only provisional class certification in order for the Court to grant their

preliminary injunction." *Damus*, 313 F. Supp. 3d at 329.  Although "[i]n granting such provisional

certification, the Court must still satisfy itself that the requirements of Rule 23 have been met," the

Court's "analysis is tempered … by the understanding that such certifications may be altered or

amended before the decision on the merits." *Id*. (citation omitted).  This Court has provisionally

certified class actions for purposes of granting a preliminary injunction on numerous occasions.

*See, e.g.*, *L.G.M.L. v. Noem*, 2025 WL 2671690, at \*21 (D.D.C. Sept. 18, 2025) (provisionally

certifying class for purpose of granting preliminary injunction); *Charles H. v. District of Columbia*,

2021 WL 2946127, at \*14 (D.D.C. June 16, 2021) (same); *P.J.E.S. by and through Escobar*

*Francisco v. Wolf*, 502 F. Supp. 3d 492, 520–21 (D.D.C. 2020) (same); *Damus*, 313 F. Supp. 3d

at 328–35 (same); *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 44 (D.D.C. 2017) (same);

*R.I.L.–R.*, 80 F. Supp. 3d at 191 (same).  The Court should do the same here.

Plaintiffs' concurrently filed motion for class certification and accompanying exhibits,

which are incorporated by reference here, demonstrate that the proposed class satisfies the

requirements of Rule 23(a) and (b)(2).  The class is sufficiently numerous, Fed. R. Civ. P. 23(a)(1),

as it comprises hundreds of individuals similarly situated to Plaintiffs who, since August 11, 2025,

have been or will be subject to Defendants' unlawful policy and practice.  Pls.' Mot. for Class

Cert. § I.A.  The class also satisfies the commonality requirement, Fed. R. Civ. P. 23(a)(2), because

the key legal issues in this action—including whether Defendants have a policy and practice of making warrantless immigration arrests and without a pre-arrest, individualized assessment of probable cause *both* that the person is (1) in the United States unlawfully *and* (2) poses a flight risk—are "generally applicable to the class." *Steele v. United States*, 159 F. Supp. 3d 73, 81 (D.D.C. 2016) (citation omitted).  Pls.' Mot. for Class Cert. § I.B.  The class also satisfies the typicality requirement in Rule 23(a)(3) because the individual Plaintiffs' claims arise from the same course of conduct responsible for the claims of putative class members.  Pls.' Mot. for Class Cert. § I.C.  Finally, the class satisfies the adequacy requirement in Rule 23(a)(4) because Plaintiffs do not have any antagonistic or competing interests with unnamed members of the class.  Pls.' Mot. for Class Cert. § I.D.  Plaintiffs and putative class members have also suffered the same injury arising from the Defendants' specific policy and practice of making illegal warrantless arrests.  *Id.*

Provisional class certification under Rule 23(b)(2) is appropriate because Defendants have employed—and absent the relief requested here will continue to employ—a policy and practice of making warrantless immigration arrests in D.C. without the probable cause determinations that federal law requires in a manner that generally applies to each class member, and the injunctive and declaratory relief Plaintiffs seek would benefit the entire class.  Pls.' Mot. for Class Cert. § II. Finally, Plaintiffs' counsel are qualified to serve as counsel for the provisionally certified class. *Id.* at § III.

## CONCLUSION

For the foregoing reasons, this Court should provisionally certify Plaintiffs' proposed class, grant the requested preliminary injunction as to Plaintiffs and the proposed class, and/or stay Defendants' policy and practice of making warrantless immigration arrests without the required

34

probable cause findings.[2]

_____

[2] Because the entry of an injunction will not harm the Defendants, the security required by Fed. R. Civ. P. 65(c) should be set at $1.  *See, e.g.*, *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) ("The language 'in such sum as the court deems proper' [in Rule 65(c)] has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond."); *J.G.G. v. Trump*, 2025 WL 1577811, at *31 (D.D.C. June 4, 2025), *vacated and remanded on other grounds*, 2025 WL 2317650 (D.C. Cir. Aug. 8, 2025) ("In light of the circumstances and nature of this case, [the Court] finds that a nominal amount is proper and exercises its discretion to require Plaintiffs to collectively post $1.00.").

October 3, 2025

*s/ Adina Appelbaum*
Adina Appelbaum (D.C. Bar No. 1026331)
Ian Austin Rose (Md. Bar No. 2112140043)
Samantha Hsieh (Va. Bar No. 90800)[**]
**AMICA CENTER FOR IMMIGRANT RIGHTS**
1025 Connecticut Avenue NW, Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
austin.rose@amicacenter.org
sam@amicacenter.org

*s/ Aditi Shah*
Aditi Shah (D.C. Bar No. 90033136)
Scott Michelman (D.C. Bar No. 1006945)
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF COLUMBIA**
529 14th Street NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
ashah@acludc.org
smichelman@acludc.org

Kathryn Huddleston (Tex. Bar No.
24121679)[*++]
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
915 15th Street NW, 7th Floor
Washington, D.C. 20005
(212) 549-2500
khuddleston@aclu.org

*s/ Sirine Shebaya*
Sirine Shebaya (D.C. Bar No. 1019748)
Yulie Landan (Cal. Bar No. 348958)[*+]
Bridget Pranzatelli (D.C. Bar No. 90029726)
**NATIONAL IMMIGRATION PROJECT**
1763 Columbia Road NW, Suite 175
Washington, D.C. 20009
(213) 430-5521
sirine@niplg.org
yulie@nipnlg.org
bridget@nipnlg.org

Respectfully submitted,

*s/ Jehan A. Patterson*
Jehan A. Patterson (D.C. Bar No. 1012119)
Chris Kimmel (D.C. Bar No. 1047680)[***]
Alexandra Widas (D.C. Bar No. 1645372)[***]
Hassan Ahmad (D.C. Bar No. 1030682)[***]
Sean Berman (D.C. Bar No. 90026899)
Austin Riddick (D.C. Bar No. 90018117)
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
(202) 662-6000
jpatterson@cov.com
ckimmel@cov.com
awidas@cov.com
hahmad@cov.com
sberman@cov.com
ariddick@cov.com

Eva H. Lilienfeld (N.Y. Bar No. 6143085)[**]
Graham Glusman (N.Y. Bar No. 6099535)[**]
**COVINGTON & BURLING LLP**
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
elilienfeld@cov.com
gglusman@cov.com

*s/ Madeleine Gates*
Madeleine Gates (D.C. Bar No. 90024645)
**WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS AND URBAN AFFAIRS**
700 14th Street NW, #400
Washington, D.C. 20005
(202) 319-1000
madeleine_gates@washlaw.org

*s/ Ama Frimpong*
Ama Frimpong (D.C. Bar No. 1602444)[*]
**CASA, INC.**
8151 15th Avenue
Hyattsville, MD 20783
(240) 485-8844
afrimpong@wearecasa.org

36

*Attorneys for Plaintiffs*[3]

*[*]Motion for Admission pro hac vice*
*forthcoming.*
*[**]Motion for Admission pro hac vice pending.*
*[***]Petition for Admission pending.*

*[+]Not Admitted in D.C.; working remotely*
*from N.Y. and admitted in Cal. only*
*[++]Not Admitted in D.C.; working remotely*
*under supervision of D.C. Bar member,*
*practice limited to federal courts in D.C.,*
*and admitted in Ariz. and Tex. only.*

---

[3] Counsel wish to acknowledge the assistance of legal program manager Lily Hartmann; law clerks Alexis Gorfine, Maggie Hopkins, Marcus Ransom, and Joseph Hasbrouck; and paralegal Yahir Santillan-Guzman in the investigation of the facts and the preparation of this motion.

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.  I certify that this motion will also be served via e-mail on counsel for Defendants, in accordance with Federal Rule of Civil Procedure 5(b), and on the Civil Division of the U.S. Attorney's Office for the District of Columbia, in accordance with Standing Order No. 25-55 (JEB).

Dated: October 3, 2025                    Respectfully submitted,

*/s/ Jehan A. Patterson*
Jehan A. Patterson (D.C. Bar No. 1012119)
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
(202) 662-6000
jpatterson@cov.com

*Attorney for Plaintiffs*