IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 1:25-cv-3417 |

### DECLARATION OF JOSÉ ELISEO ESCOBAR MOLINA

I, José Eliseo Escobar Molina, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is José Eliseo Escobar Molina. I was born in El Salvador in 1978, and I am currently 47 years old. I first came to the United States in 1998 and I have lived in the District of Columbia since approximately 2000. I have Temporary Protected Status (TPS), which I first applied for in 2001. I have continued to renew my TPS each time since then, including most recently in February of this year before the March application cutoff date. My renewal application from February is still pending, and my TPS is currently valid.

2. Since I first arrived in the U.S., I have traveled approximately three times on advanced parole to visit my family in El Salvador, including my parents and siblings who still reside there, and have returned to the U.S. without issue.

3. I live in an apartment in the Mount Pleasant neighborhood of DC. I live with my partner and two sons, and we have lived there for about eight years. My partner and I have been together for 21 years, and our two sons are both U.S. citizens because they were born here. My eldest son currently attends a university in DC, and my younger son, who is a

1

minor, goes to public school. I enjoy spending time with my sons and going with them to the local park when I am not working.

4. I work full-time in construction, specifically as a scaffolder. With my work in scaffolding, I travel throughout DC, Maryland, and Virginia to different job sites.

5. On August 21, 2025, at approximately 6:00 am, I left my apartment building dressed in my work clothes and was on my way to my work truck, which was parked across the street from the apartment building where I live. I had walked across the street and was about to get into the driver's seat of my truck when two Suburbans, one white and one black, drove up. Officers dressed in plainclothes got out of the vehicles. First, two of them grabbed me by the arms and immediately handcuffed me, and then the two officers from the other Suburban came over and grabbed me by the legs.

6. The officers weren't wearing uniforms or badges, and they did not identify themselves. I felt like I was being kidnapped. They called me "illegal" repeatedly, and I responded that I have papers. They said, "No you don't. You are illegal." They did not ask for my name or to see my identification, which I had with me in my wallet, before handcuffing me. After they handcuffed me, they took my wallet from my pocket but did not look at what was inside.

7. Pulling me by my limbs, they shoved me into the black Suburban. Once in the car, I told them again that I had papers. The driver of the car, who was one of the officers that handcuffed me, told me, "Shut up bitch! You're illegal." After he yelled at me, I stayed silent. I did not try to resist arrest or to flee.

8. None of the agents at any point ever identified themselves, presented a warrant, explained why they stopped me, or indicated that they knew my name prior to stopping me.  Nor did any of them ask me any questions about my ties to the community, how long I've

been living and working in DC, my family here, or anything else about my circumstances.

9. Then the two officers drove me to a local police station about eight minutes from my home. There, the officers who arrested me waited to speak to a supervisor, but I couldn't hear their conversation. We were parked there for about 15 minutes.

10. Next, I was driven to a parking lot, which was near the Pentagon and about 15 minutes from the police station. Here, there were about four vans with two officers per vehicle, and the officers had badges and jackets that read "Department of Homeland Security." These officers were waiting to collect people who had been arrested in order to transport them to Chantilly, Virginia. I was taken out of the Suburban and put into a van. I was not asked any questions before being put in the van, not even my name. I saw other cars drive up and drop off other people who had been arrested; some were put into the same van as me.

11. At around 9:00 am, I arrived at Chantilly. I had to wait about four hours to be interviewed and processed, so I was kept in a holding cell with about 65 other people. The area was so crowded that it was impossible to lie down and sleep. I was fed one small bean burrito, something sweet, and a glass of water during my entire 23-hour stay at Chantilly. It was very expensive to make any calls at the facility but I had no other choice. I called my son to help me find a lawyer.

12. About four hours after my arrival, I was finally called into a small room where they took my fingerprints and asked me questions like my name, what country I am from, and my parents' names. An officer, whose shirt said "Homeland Security," asked me the questions in Spanish, and the process took about 40 minutes. During the interview, I saw the officer was holding my work permit in his hands. The work permit specifies that I

3

have TPS. I was hopeful that the officer knew I had TPS and would release me.

13. Once the process was done, I was sent back to the holding cell where I spent the night. I did not sleep. In the early morning, I was called out of the holding area and shackled again. I became concerned and told one of the officers I had TPS. He said, "That's not legal status. TPS doesn't count as being legal here." At around 8:00 am, I was transported to an office in Richmond, Virginia.

14. The drive to Richmond was about two hours, so we arrived around 10:30 am. As I entered the building, there was a supervising ICE officer with a paper in his hand. He asked for my name, and I responded. Shortly after this, the same officer approached me and said he did not know why I had been brought to Richmond and that the officers had made an error in arresting me because I have TPS. He said to me, "Sorry you had to live through this. These are new officers. They do not know what they are doing." He apologized to me three times and said I was free to go. He gave me a copy of my TPS approval notice and told me to carry it with me so I could show it if officers stopped me again. After waiting a few hours for my son to come pick me up, I left the Richmond office around 2:30 pm on August 22, the day after I was initially arrested.

15. I have not received any kind of representation that I will not be subject to arrest or detention by ICE or by law enforcement officials for immigration purposes in the future.

16. This is the first time I had been arrested by immigration officials or had any contact with ICE in my more than 20 years living in the United States.

17. I believe I was arrested solely because of my appearance and because I live in an area with a lot of immigrants. It was clear that the officers did not know who I was, did not have a warrant, and did not have a reason to arrest me.

18. I live and work in DC, and I am very scared that I may be arrested and detained again.

Recently, I saw a police car followed closely by a Suburban pass by my apartment building, and the Suburban looked a lot like the one driven by the officers who arrested me. And I have heard about many other people arrested by ICE in my area of D.C. I fear the same for my sons because even though they are U.S. citizens, they are Hispanic just like me. I told them to carry their U.S. passports with them at all times just to be safe.

19. After this arrest, I have not been physically or mentally well. I still have pain from when the officers grabbed me by my arms and legs and pushed me into their vehicle while I was handcuffed. I have nightmares where I relive my arrest or about being arrested again.

20. Although I am still working, I have changed my habits out of fear. I leave the house even earlier and will check outside two or three times before exiting my apartment building. I'm hesitant and worry that officers might be around the corner or following me. I used to go to the park with my sons in my free time, but now I do not go because I do not want to be arrested on the way or for my sons to see me being arrested, which would traumatize them. When I am not working, I rarely leave my house.

21. Since my arrest, my partner has stopped going to work often due to fear that she too will be detained, as she has to travel on the Metro to her job. Now, she can only go to work one or two days a week, normally on the weekends, and I have to drive her.

22. I understand that there are many other people who have experienced something similar to what I experienced. I am seeking to represent a class of people in D.C. who have been arrested without a warrant and without proper reasons.

23. If the Court recognizes this case as a class action, I understand the responsibilities involved in being a plaintiff representing a class. I understand that I need to keep informed about what is going on with the case, including any agreements between the plaintiffs and the government to resolve this case. I understand that I need to think about

the interests of other proposed class members, who are people in a similar situation to me, and act on those interests. I am prepared to represent the proposed class in this case and will take my responsibilities seriously.

24. I understand that I will be part of a team making important legal decisions and directing the lawyers on this case after getting their advice. I will share what I think about these legal decisions and will be involved in the final approval of major legal decisions, including whether to settle this case with the government.

25. I will work with the other class representatives on this case to make decisions when issues come up about how to proceed.

26. I will communicate with and direct the lawyers representing the class about important motions, settlement talks, trial preparation, and trial. I understand that I am responsible for directing the lawyers on each of these things, after getting their advice. I will speak to the lawyers as often as necessary. I understand that I may need to answer questions from the government's lawyers in writing or in person.

27. I understand that if a class is certified, my lawyers will owe a duty to all members of the proposed class to provide fair and adequate representation.

28. I believe that the following organizations and law firms should be approved by the Court to serve as co-counsel for the class: Amica Center for Immigrant Rights, the American Civil Liberties Union, the National Immigration Project, the Washington Lawyers' Committee, CASA, and Covington and Burling. I believe they will work to obtain the best result for the class.

29. This declaration was read to me in full in Spanish on September 21, 2025, by a lawyer leading this case, Ian Austin Rose. I confirm and completely understand the contents of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 21, 2025.

_____
José Escobar Molina