IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSE ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 1:25-cv-3417 |

**DECLARATION OF B.S.R.**

I, B.S.R., pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is B.S.R. I was born in Honduras in 1996, and I am currently 29 years old. From 2019 until very recently, I lived in the Fort Lincoln neighborhood of the District of Columbia with my family, including my mother, father, partner, and daughter who is 13 months old and is a U.S. citizen.

2. I entered the United States with a visa in 2019 and have lived here ever since. I have a pending asylum application. From 2019 until earlier this year, I had not been arrested by or had any contact with immigration officials.

3. On or about January 28, 2025, in the morning, I was arrested outside a Home Depot in Bowie, Maryland by a group of federal officers, including some from Homeland Security. I was riding as a passenger in my boss' car. We had left our workplace to pick up some supplies at Home Depot. As we turned into the entrance to Home Depot, a car crossed in front of us and suddenly stopped, and another vehicle pulled up and stopped behind us.

1

4. A group of officers got out of those two vehicles, approached the car that I was in, and started banging on the windows. Two of the officers were wearing jackets that said "HSI," but the rest were dressed in black jackets and plainclothes. I noticed they were armed. The officer who came to my window on the passenger side of the car showed me what seemed to be a Border Patrol badge.

5. My boss, who was in the driver's seat and is a U.S. citizen, refused to roll down the car windows and told the officers they did not have the right to search the car. The officers began to threaten to break the windows. Much of the exchange between my boss and the officers was in English. I was scared that I would be beaten by the officers as they continued to yell, so I decided to get out of the car and follow their orders.

6. As soon as I got out of the car, the officers made me stand up against the car and handcuffed me. One official grabbed me by the neck even though I was following their orders. The officers did not ask me for my name or my identification at this point. They asked me if I was "illegal," and I did not respond. I heard one officer say, "Well, we'll figure it out anyways if you are."

7. At that point, the officers did not ask me any questions about my ties to the community, how long I've been living or working in the area, or anything else about my circumstances. They also did not give me any papers or show me any warrant for my arrest.

8. They drove me to a nearby shopping center, and there, the officers had me get into an unmarked van with two other people who had been arrested. There appeared to be a team of officers making arrests and another group of officers responsible for transporting people who were arrested. In the van, they asked for my name, which I gave. A male

officer told me not to worry and that he would try to make it so I could be released the same day.

9. I was taken to an office in Chantilly, Virginia, where I was held overnight. I was fingerprinted when I got there. The next morning, an officer interviewed me about my situation. He gave me a paper saying I need to appear in immigration court. Then they said I would be released. My partner came and picked me up from the Chantilly office and drove me back to our home in the District of Columbia.

10. As a condition of my release, I had to start attending check-ins with ICE and agencies that work with them. The first appointment was in March 2025 at an office in Virginia, and the second was in May. During my second check-in, the officer who was assigned to my case that day told me that there was a new rule that everyone was to be given ankle monitors, and so I was given an ankle monitor at that appointment. I continue to wear the ankle monitor to this day. My next check-in is scheduled for December 2025.

11. After I was released, I did not return to work at the same job site, but I did continue to work in remodeling. I hired a lawyer who helped me file my asylum application in June, and I plan to attend my next immigration court hearing in December of next year.

12. On August 18, 2025, at around 7:45 in the morning, I was arrested for a second time–outside my home in the Fort Lincoln neighborhood of the District of Columbia. I walked out of my house with my father, and we got into the car to go to work. Once my father and I were in the car about to drive away, a group of officers approached us. They were dressed in plainclothes, wearing sneakers and jeans and had arrived in front of my home in two unmarked vehicles, a truck and a minivan. The officer who approached my

side of the car held up what seemed to be a Border Patrol badge to the window, but the others did not have a badge or anything that identified them.

13. The officers seemed to know who my father was because one of the first things they said after they approached our car was that my father had overstayed his visa. They asked for his ID, which he gave them. They said, "This is him." The officers started to question my father, but he responded that he would not answer their questions.

14. My father and I did not make any attempt to drive away, and we got out of the car following their orders. The officers handcuffed my dad. Then, to my surprise, they handcuffed me too. The officers handcuffed me without first asking me any questions. They did not ask my name or check my ID. Once I was in handcuffs, I told them I was already in an immigration process and had applied for asylum. I used my fingers to pull up my pant leg and show the officers my ankle monitor. They asked me when and where I was arrested, and I responded in January near Baltimore. But they said it did not matter and that once I was in custody, they would figure out if what I was saying about my status was true or not. During this process, I did not try to resist arrest or to flee.

15. At that point, the officers did not ask me any questions about my ties to the community, how long I've been living or working in DC, or anything else about my circumstances. They also did not give me any papers or show me any warrant for my arrest.

16. My partner came outside and started to explain to the officers that I was already in an immigration process and had previously been arrested. The officers responded by saying, "Sorry, we came for two people, so we have to arrest two people." I think they came for my mother and father, but since I was there, they took my father and me.

17. The officers then drove me to a nearby shopping center where there is a Costco. Once in the shopping center parking lot, which was about ten minutes after I was arrested, one of the officers started asking me questions. He asked why I stayed in this country and my legal status. The officer became angry with me, so I stopped responding. At this point, I still had not been given any documents or any explanation about my arrest. We waited in the shopping center parking lot for about 30 minutes, and while there, my shoulders and back began to ache from being shackled.

18. Around 9:00 am, the officers moved me into a different vehicle and drove me and my father to the office in Chantilly, Virginia, the same location I was taken to after my first arrest. We arrived at Chantilly around 10:00 am. When I walked into Chantilly, I was hit with an awful smell of body odor. Some people told me they had been detained there for five or six days and had not been able to shower or even brush their teeth. There were 50 to 60 people detained inside Chantilly when I arrived, and arrested individuals continued to arrive all day, groups of five or so people arriving every 40 minutes. It became so packed that people were forced to sleep on the floor and others had to stand for hours. Our only access to drinking water was out of the sink attached to the back of the toilet, and the water that came out tasted like bleach. While I was there, not everyone who was detained received food because there was not enough. I was only given food once during the time I was detained at Chantilly, at around 5 pm. It was a burrito and a bottle of water.

19. At around 8:00 or 9:00 pm at night, I decided to approach an official and show him my ankle monitor. It seemed that he was not from ICE but rather a custodian or jail guard. He escorted me out of the area where everyone who was arrested waits to be processed. He considered cutting off my ankle monitor, but I told him I was concerned that taking it off

could negatively impact my immigration case. He said, "Let me see what I can do," and left to speak with people from ICE. He returned and asked me for my A number, but because I did not know it by memory, I asked to call my partner who could find it in my paperwork at home. He said, "I'm not allowed to do that." I started to tear up, the officer left, and I waited for a while longer.

20. The officer eventually returned and told me I would be released. He did not give me any paperwork, only my belongings. I had to wait an extra hour or so before I could leave Chantilly because I insisted the officers return the battery for my ankle monitor and it took a while for the officers to bring it to me. I asked to use the phone to call my partner, so she could come pick me up.

21. Before I left Chantilly, I asked if I could go say goodbye to my father, who was detained in a separate area, because I did not know if I would ever see him again. The officer agreed, and I hugged my father. He was happy that I was being released, but it was one of the most horrible feelings I have ever experienced having to leave him behind. Thinking about that moment brings me to tears. As I walked out of Chantilly, the other arrested individuals clapped for me because I was one of the few people released that day.

22. Five days after our arrival at Chantilly, officers finally started "processing" my father, meaning taking his fingerprints and asking him questions. My father was detained at Chantilly for about six days without the opportunity to shower or brush his teeth, and he had to sleep sitting up because he did not have access to a bed. He witnessed a young man faint and ambulance workers come in and out of Chantilly several times because of several medical emergencies. Since his arrest, my father has been transferred to various immigration detention centers throughout the country.

23. I have not received any explanation as to why I was arrested. Nor have I received any kind of representation that I will not be subject to arrest and detention by ICE or by law enforcement officials for immigration purposes in the future.

24. I believe I was arrested solely because of my appearance and because ICE was trying to meet its arrest quotas. It was clear that the officers did not know who I was, did not present any warrant, and did not have a reason to arrest me.

25. Since the arrest, I have been scared that I may be arrested or detained again. Because of this, I moved to Landover, Maryland, just outside of the District of Columbia. For work, they send me to job sites in D.C., Maryland, and Virginia. Even if I am not working at a job site in D.C., I still have to drive through D.C. on my way to sites in Maryland or Virginia almost every day.

26. I am a plaintiff in this proposed class action lawsuit because I want to challenge the unjustified immigration arrests that are happening in Washington D.C.

27. I understand that there are many other people who have experienced something similar to what I experienced. I am seeking to represent a class of people in D.C. who have been arrested without a warrant and without proper reasons.

28. If the Court recognizes this case as a class action, I understand the responsibilities involved in being a plaintiff representing a class. I understand that I need to keep informed about what is going on with the case, including any agreements between the plaintiffs and the government to resolve this case. I understand that I need to think about the interests of other proposed class members, who are people in a similar situation to me, and act on those interests. I am prepared to represent the proposed class in this case and will take my responsibilities seriously.

29. I understand that I will be part of a team making important legal decisions and directing the lawyers on this case after getting their advice. I will share what I think about these legal decisions and will be involved in the final approval of major legal decisions, including whether to settle this case with the government.

30. I will work with the other class representatives on this case to make decisions when issues come up about how to proceed.

31. I will communicate with and direct the lawyers representing the class about important motions, settlement talks, trial preparation, and trial. I understand that I am responsible to direct the lawyers on each of these things, after getting their advice. I will speak to the lawyers as often as necessary.

32. I understand that I may need to answer questions from the government's lawyers in writing or in person.

33. I understand that if a class is certified, my lawyers will owe a duty to all members of the proposed class to provide fair and adequate representation.

34. I believe that the following organizations and law firms should be approved by the Court to serve as co-counsel for the class: Amica Center for Immigrant Rights, the American Civil Liberties Union, the National Immigration Project, the Washington Lawyers' Committee, CASA, and Covington and Burling. I believe they will work to obtain the best result for the class.

35. This declaration was read to me in full in Spanish on September 21, 2025, by a lawyer leading this case, Ian Austin Rose. I confirm and completely understand the contents of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 21, 2025.

                                                                    B███ S███ R███