IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, et al., *on behalf of themselves and others similarly situated* <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY, et al., <br><br> *Defendants*. | No. 1:25-cv-03417 |

**DECLARATION OF N.S.**

I, N.S., pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is N.S. I was born in 1974, and I am 51 years old. I am from Venezuela. I entered the United States on or about October 13, 2022, and have lived in the United States ever since.

2. After I entered the United States, I turned myself in to Customs and Border Protection ("CBP") officers and was detained. I was released from custody with parole. I have a pending asylum application, which I filed in October 2023, and I am currently in removal proceedings with the immigration court. Based on my pending asylum application, I have a valid work permit. I also have Temporary Protected Status ("TPS") and have filed to renew my TPS. After I entered the country and was released from detention, I was required to start checking in with ICE. In November 2022, I attended my first appointment with ICE as well as additional appointments in November 2023 and November 2024. I never missed any of my ICE check-ins.

1

3. I work in construction and for a cleaning company, which has contracts to clean office buildings, warehouses, and public libraries throughout the District of Columbia. With my work in construction, I travel throughout D.C. and sometimes have work assignments in Maryland and Virginia. I have a valid driver's license from D.C.

4. I have lived in D.C. since 2024. Prior to living in the District, I lived right outside the city in Capitol Heights, Maryland, but traveled frequently into D.C. for work. Currently, I live in an apartment in the Fort Dupont neighborhood, where I live with my partner, who also has a pending asylum case, our 14-year-old child, my stepdaughter, and my grandchild. My other two sons live within ten minutes of me in the District. I plan to continue living here in D.C. to be close to my family.

5. On August 12, 2025, I was arrested around 7:20 am by immigration officers in the parking lot of the Home Depot located at 901 Rhode Island Ave NE in Washington, DC (zip code 20018). I woke up early that day and received some texts about a construction job. For my job, I was asked to go to Home Depot to buy materials for the job site. I left my house around 6:30 am, and it took me about 15 minutes to drive to Home Depot. After I finished purchasing the materials for the construction job, I walked out of the store with my cart of purchases when I saw people running and yelling, "ICE! ICE!" Because I was pushing the cart full of materials and I had my identification with me, I did not start running and instead walked to my car, a minivan, with my purchases. At that moment, I decided to call my family friend, who is an attorney and the person who helped me file my asylum application, to tell her ICE was there, and she encouraged me to stay calm.

6. I got into my car and turned it on. As I finished closing the car door and my hand was still on the door handle, an officer approached my car, opened the driver's side door, and

yelled at me, "Legal or illegal?" At this point, I was still on the phone with my family friend, who told me once more to remain calm. The officer was wearing a green vest that had the letters "DEA" on it, but he also wore a badge and a hat that said "ICE." His face was covered. After he quickly opened the car door, the officer grabbed my arm. I said "I am legal" and gave him my driver's license, my work permit, and a copy of my asylum application receipt that I keep in my wallet in my car. The officer had not yet asked me to get out of the car, and he seemed indecisive about what to do with me. I do not believe the officer knew who I was before he approached me because he did not show me any documents or a warrant and his question showed that he did not know my immigration background.

7. A second officer, who was dressed in plainclothes with a black vest that said ICE and had his face covered, walked up and joined the first officer. He said, "What's the deal?" The first officer handed him my identification documents. The second officer said, "No, no, no!," and said to arrest me. He told me I was an "illegal" and that "my papers are useless." The two officers pulled me out of the driver's seat, threw me up against the side of my car, and handcuffed me behind my back. At no point did I make any effort to resist arrest. Neither of the officers at any point ever identified themselves, presented a warrant, explained why they stopped me, or indicated that they knew me or my name prior to stopping me. The officers never asked me any questions about how long I have been living here, my family members, my work history, or anything else about my ties to the community.

8. Next, the two officers escorted me to an area of the Home Depot parking lot where several other handcuffed individuals were sitting on the ground. The officers demanded I

sit down too. I asked, "How can I sit down with my hands cuffed behind my back?" The officers pushed me down to the ground. A different officer came and moved my handcuffs to the front.

9. I asked the officers if they could escort me back to my car so I could turn it off and collect my phone, wallet, and keys. They agreed and took me back briefly and gave me a clear bag for my belongings, which the officers had me hold.

10. The scene outside the Home Depot was chaotic. There were about ten cars that belonged to the officers who were making the arrests and about 20 officers present. Some people were running out of fear, and one man who ran away from the officers was shot in the back with what I believe were rubber bullets. He fell to the ground and hit his head, and the officers tackled and arrested him. I later saw him at the Chantilly ICE office for a brief period of time, and he looked very beaten up.

11. I sat on the ground with about eight to ten other arrested people for about 20 minutes. In another area of the parking lot, there were about 15 other handcuffed individuals sitting down. While I was waiting, I asked to see a warrant, but I was told to be quiet. Then, I was put in the back of a van with another young man, who was also in handcuffs and crying. The young man was wearing his work uniform when he was arrested and had also been at Home Depot buying materials. There was only one immigration officer driving the van.

12. Leaving the Home Depot, we drove along Rhode Island Avenue for about ten minutes until we arrived at a parking lot that was next to a hospital. Several other cars pulled into the parking lot, and the officers got out of the vehicles, but I was not taken out of the van. The officers started speaking with each other, taking off their vests, and taking pictures

with each other. We were waiting there for about an hour. Once we left this parking lot, the officer drove us around the District of Columbia for a while, and we even returned to the Home Depot where I was arrested. I witnessed officers drive in front of a white work van, break into the van, and throw the man who they arrested on the ground, which was shocking to watch.

13. At around 2:00 pm, I arrived at the ICE office in Chantilly, Virginia. I was taken to a room that was full with about 40 other people. Here, I was able to make a collect call to my son who paid about $60 to speak to me for around five minutes. In the holding area, I began to speak to others about where they had been arrested. Some said Home Depot or in the street. If we tried to ask the officers questions, they yelled at us, "Gossiper! Motherfucker!" Meanwhile, some of the officers were chatting with each other about the arrests that they had made that day, showing each other videos while they smiled and laughed. "I got six!," yelled one officer. "No, I got five!" said another, as if it were a game to them.

14. I waited several hours in the holding area, until I was escorted out at around midnight. I still had not been interviewed, processed, or fingerprinted at this point. I was handcuffed and shackled at my feet and put on a large bus. I was really scared because I didn't know where they were taking me, and the handcuffs and shackles were so tight I could barely move. We were driven about two hours from the Chantilly office, and around 2:30 am on August 13, 2025, the bus arrived at a detention center. An officer escorted us off the bus and took us inside for processing, where I was fingerprinted, was asked some basic questions, and had my picture taken. I was given some bread, an apple, and a bottle of water. Having eaten next to nothing all day, this was one of the best-tasting apples I've

ever had. After processing–now around 4:00 am–they escorted a group of us into a large space that was like a gym where there were mattresses on the floor and told us this is where we would sleep. However, I only got a couple hours of sleep because at around 6:00 am, we were woken up to be handcuffed again and transported back to the Chantilly ICE office.

15. On August 13, 2025, I spent the entire day at Chantilly. I was not processed until 4:00 or 5:00 pm. During processing, the officer asked if I was there for entering the country illegally. I was confused by his question and said I have a pending asylum application and TPS. The officer took my fingerprints and my pictures, asked for my current address, and asked some other basic questions like how many children I have. The officer kept pressuring me to sign for voluntary departure or to accept deportation, but I refused to sign anything and asked that they treat me with respect. I asked for a free phone call, but a young ICE officer told me to shut up. Once processing was finished, the officer warned me that I would be transported again to a different detention center and gave me a court date for August 25, 2025.

16. At around midnight, a group of officers who are responsible for transporting people arrived with handcuffs and shackles in hand. Once I was shackled and put on a bus, I was driven to Caroline Detention Center about one and a half hours from Chantilly. I believe we arrived at Caroline in the early morning on August 14, 2025. After I arrived at Caroline, I was processed once more and gave my fingerprints again.

17. On August 25, 2025, I appeared for my first immigration court hearing through a video call. My attorney was present too. The immigration judge asked for my name and confirmed my preferred language is Spanish. The judge spoke to my attorney in English

6

for some time. I was given a continuance, and the immigration judge confirmed my bond hearing was scheduled for August 28, 2025.

18. On or about August 26, 2025, around midnight, I was taken out of the dormitory and spent the night in a holding cell. At 6:00 or 7:00 am, officers responsible for transporting us arrived and took us out to a bus. Once we were on the bus, we drove to an ICE office nearby to pick up some paperwork. Then, we were driven to an airport in Virginia and put on a plane that took us to Alexandria, Louisiana. I was handcuffed with my ankles shackled and a chain at my waist during the bus ride and flight to Louisiana.

19. I spent one night at the Alexandria detention center located next to the tarmac where the ICE flights come and go. My handcuffs and shackles were only taken off for the time I was in the detention center to sleep. The next morning, around 6:00 am, I was shackled again, but this time, I was put on a plane to Arizona. In Arizona, I was not taken to a detention center, but there was a staging center next to the airport. Then, I boarded another flight to Washington state. In Washington, I did not leave the airport and I was still handcuffed, shackled, and wearing the waist chain. Lastly, I was put on a flight from Washington state to California. Once we landed in California, I was put on a bus for a four-hour drive to the Otay Mesa Detention Center. I arrived at the Otay Mesa Detention Center at around 8:00 pm on Thursday, August 28, 2025.

20. I was fed very little during this transfer from Virginia to California and shackled throughout the entire ordeal, besides when I was held briefly overnight at Alexandria. At one point, I had to stand shackled for about three hours as we waited to board the plane. Some people were about to urinate on themselves, and the transport officers would tell us to go in the corner up against the wall to urinate because we had no access to a bathroom.

7

When I boarded the different planes, officers would buckle our seatbelts for us because we were handcuffed and shackled, and we weren't permitted to get up to even use the bathroom during the flights. If there were an emergency on the plane, I am not sure I would have survived because I was handcuffed and shackled.

21. Because of all the transfers, I did not get to attend my bond hearing with the immigration judge but my attorney was present. I later learned that the immigration judge denied me bond because she did not have jurisdiction because of the way I entered the country. I also missed a regular immigration court hearing in my case that same day but was told a change of court would be filed so my hearings could take place in California. When I was finally in processing in Otay Mesa, I asked about my court hearing that was scheduled, but the officer rudely said none of it mattered. Eventually, I was given a court date of September 15, 2025.

22. Once at Otay Mesa, I became very upset about the fact that I was detained and how I had been treated up to that point. I was not sure if I could survive detention. I tried to speak to my family as much as possible to stay calm and keep my spirits up. I even cried when I got a new lawyer who would help me fight for my release after my bond was denied.

23. I was released on my own recognizance from ICE custody on September 9, 2025, after 28 days detained in five states and D.C. I arrived home in D.C. on September 10, 2025. While I was being processed for release from ICE custody, I was given an ankle monitor and scheduled for a check-in on September 18, 2025, at the ICE office in Chantilly, Virginia. I was so happy and relieved to go home to my partner, children, and grandchildren. I attended the ICE check-in on September 18, 2025, and ICE directed me to go to the nearby ISAP office the same day, which I did. ISAP gave me a new

appointment for February 11, 2026.

24. Since I entered this country in October 2022, this is the first and only time I was arrested or detained by ICE. I have not had any issues with meeting deadlines or appearing at appointments in relation to my immigration case. Most recently, I attended my immigration court hearing virtually on September 15, 2025, which was still scheduled with the San Diego immigration court. The judge explained that my case would be transferred back to the court that covers the cases of people who live in D.C., so I am waiting for my next court date.

25. Although I was released, I am suffering the effects of my arrest and detention. My knee has been swollen after being shackled for several hours at a time and sitting for several long flights. Since my detention and now that I have an ankle monitor, I have had leg pain and am dealing with high blood pressure. During one of the medical exams that was done while I was detained, a nurse told me that I am pre-diabetic, which I did not know before my arrest. I need to work to pay my rent and my car insurance, but it is difficult to return to work under these conditions, especially with the ankle monitor.

26. The arrest affected me a lot psychologically. I am fearful and often stressed now. I am unable to sleep through the night. I am scared to walk outside or drive, so I have had my son drive me places since I returned home or told my family members to take an Uber, when I would normally drive them (even though I am paying for my car insurance and Ubers are expensive). I do not leave the house much and have stopped taking my grandchildren or my youngest son to school or their activities.

27. I am a plaintiff in this proposed class action lawsuit because I want to challenge the unjustified immigration arrests that are happening in Washington D.C.

28. I understand that there are many other people who have experienced something similar to what I experienced. I am seeking to become a class representative if the Court recognizes this case as a class action, and I understand the responsibilities involved in being a plaintiff representing a class. I understand that I need to keep informed about what is going on with the case, including any agreements between the plaintiffs and the government to resolve this case. I understand that I need to think about the interests of other proposed class members, who are people in a similar situation to me, and act on those interests. I am prepared to represent the proposed class in this case and will take my responsibilities seriously.

29. I understand that I will be part of a team making important legal decisions and directing the lawyers on this case after getting their advice. I will share what I think about these legal decisions and will be involved in the final approval of major legal decisions, including whether to settle this case with the government.

30. I will work with the other class representatives on this case to make decisions when issues come up about how to proceed.

31. I will communicate with and direct the lawyers representing the class about important motions, settlement talks, trial preparation, and trial. I understand that I am responsible to direct the lawyers on each of these things, after getting their advice. I will speak to the lawyers as often as necessary.

32. I understand that I may need to answer questions from the government's lawyers in writing or in person.

33. I understand that if a class is certified, my lawyers will owe a duty to all members of the proposed class to provide fair and adequate representation.

34. I believe that the following organizations and law firms should be approved by the Court to serve as co-counsel for the class: Amica Center for Immigrant Rights, the American Civil Liberties Union, the National Immigration Project, Washington Lawyers' Committee, CASA, and Covington and Burling. I believe they will work to obtain the best result for the class.

35. This declaration was read to me in full in Spanish on September 22, 2025 by Lily Hartmann, a legal assistant at the National Immigration Project. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 30, 2025.

_____
N.S.