**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, et al., *on behalf of themselves and others similarly situated*<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>*Defendants*. | No. 1:25-cv-03417 |

**DECLARATION OF R.S.M.**

I, R.S.M., pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is R.S.M. I am 36 years old and I am from El Salvador. My husband is Mexican, and we have two children who are 16 and 18 years old. I entered the United States with my two children in 2017 and have lived in the United States ever since. My family currently has a pending U visa application after my son was assaulted and robbed by armed attackers in 2024, and I also have a pending asylum case. Since 2020, I have lived in the northeastern part of the District of Columbia and worked in the District in housekeeping.

2. On August 26, 2025, around 6:00 am, my husband was driving us to work, and I was in the passenger seat. My husband and I both have valid driver's licenses, my husband is the car owner, the license plates and registration were current, and my husband was driving within the speed limit. We were about one block from our home when a car turned on their lights and signaled for us to stop the car. In total, about seven cars pulled up and surrounded us. The officers got out of their vehicles and came up to our car. At this point,

there were officers standing on both the driver and passenger side, and they started banging on the car windows, demanding that we put the windows down. My husband lowered his window a little bit so we could speak with the officers but not all the way down.

3. Once the officers were standing on both sides of our car, they asked us in English for a REAL ID. We asked what was happening. The officers asked for a REAL ID again. The officers also asked if we have permission to live in the United States. They demanded to see our IDs, and we gave them our drivers licenses. We took out our papers, including a document that shows we have a pending U visa application and another paper that shows we have a lawyer, and we told the officers about our U visa application. They responded that our paperwork did not matter at all.

4. The officers demanded that we lower the car windows all the way down. The female officer was holding a device that she placed in front of my husband's face, while he was still in the car. From what I understand, she used the device to scan his face once a green light turned on. Then, the officer waited a moment for a result to appear on the device. The other officers said to her, "Is it him?" She responded, "No." For a moment, I was relieved and thought they would not arrest us, but one officer said it did not matter that my husband didn't match the person they were looking for, and the officer decided to arrest us anyway.

5. The officers directed us to open the car doors, but with the windows down, they reached inside our car and opened the doors before we could. Once we got out of our car, the officers pushed us up against the car and handcuffed us with our hands behind our backs and put us in their vehicle. I did not make any attempt to resist arrest.

6. Before the officers handcuffed us, they never asked me any questions about how long I have been living here, my family members, my work history, my ties to the community, or anything else about my circumstances. They never showed us any documents or a warrant, and they did not even seem to know our names when they stopped us.
7. Six of the seven officers that stopped and arrested us were not wearing any identification, were dressed in plainclothes, and had their faces covered. Only one officer was wearing a uniform and identified himself as a federal officer.
8. After we were arrested and put in the officer's car, the officer drove for about four minutes until he stopped next to the local police station. There, the officers moved our handcuffs so our hands were restrained in front of our bodies. The male officer who previously identified himself as a federal officer asked me, "Are you R- S-?" He also asked me in English what country I was from. The officer already had our drivers licenses because we handed them over when we were first asked for our IDs. Those were the only two questions I was asked while we were stopped near the police station. At this point, I started to cry, and the federal officer told me not to be scared. We stopped here for about ten minutes.
9. Then, my husband and I were driven to the immigration office in Chantilly, Virginia. We were driven together in the same car while two officers followed in two other cars. We arrived at Chantilly around 8:00 am. Once we arrived at Chantilly, they took away all our belongings and made us take off our belts and earrings. I asked for the officers to give me back my immigration papers, including the document that shows I have a lawyer, but the officers refused and said they'd keep our papers. I was sent to a separate holding cell

from my husband. I waited a while until I was finally called for an interview and to give my fingerprints.

10. A male officer was taking my fingerprints and basic information, but a female officer said to me, “Do you know why you are here?” I told her no but that I wanted to know. The female officer said I was there because I have a deportation order. I responded that was not true and that my case is pending. I also told her I had been living here for several years. She responded, “So you think because you are in a process that we can’t deport you?” I felt the officer was becoming aggressive with me, so I decided to stay quiet.

11. I was sent back to the holding cell and after waiting a while longer, the officer called me again and said I needed to sign some documents. I asked them what they wanted me to sign. The officer said, “Hurry up. Your attorney is outside.” While I am not fluent in English, I noticed the paperwork mentioned an ankle monitor, going to the ISAP office, and there was one document about immigration court. I asked for my husband and whether he would be released with me too. The officers asked me who my husband was, and I pointed him out. The officer responded by saying we didn’t have the same case, so he would not be released. The officers at Chantilly did not give me the chance to say goodbye to my husband, even though I wasn’t sure when I would see him again.

12. I was escorted to a different office where I was given an ankle monitor. I had already been forced to wear an ankle monitor for about fifteen months after I entered the country in 2017, but it was eventually removed. I was sad to have been given one again. I was released from Chantilly around 6:00 pm that same day.

13. Sadly, my husband remains detained by ICE, and he was denied bond by the immigration judge on September 10, 2025. He was first detained at the Farmville detention center but is now detained in Texas.

14. The week that I was arrested, I had seen unmarked cars patrolling the area where my family lives or parked on the street several days in a row. From what I recall, they were in my neighborhood from about August 26 until September 2, patrolling from 4:00 am to 10:00 pm each day. I saw a Durango patrolling the neighborhood again on September 17.

15. Since I entered the country and was released from detention at the border, this is the first time I have been arrested by immigration officers.

16. Ever since this arrest, I have felt panicked and scared to go outside and be arrested again so I have mostly stayed home. I have stopped going to work because my work uniform is a dress and I am embarrassed for others to see my ankle monitor while I am working, though with my husband detained, I am not sure how I will be able to support my children or keep our home running. I feel very hopeless because I cannot do anything for my husband and I have not been sleeping.

17. My children do not want to leave the house either after my arrest. My 16-year-old son can walk to and from school, and now I am always watching out the window to make sure he arrives safely. I have other family members here in the U.S., and like me, they are living in constant fear they will be arrested and detained by immigration.

18. I am a plaintiff in this proposed class action lawsuit because I want to challenge the unjustified immigration arrests that are happening in Washington, D.C.

19. I understand that there are many other people who have experienced something similar to what I experienced. I am seeking to become a class representative if the Court recognizes

this case as a class action, and I understand the responsibilities involved in being a plaintiff representing a class. I understand that I need to keep informed about what is going on with the case, including any agreements between the plaintiffs and the government to resolve this case. I understand that I need to think about the interests of other proposed class members, who are people in a similar situation to me, and act on those interests. I am prepared to represent the proposed class in this case and will take my responsibilities seriously.

20. I understand that I will be part of a team making important legal decisions and directing the lawyers on this case after getting their advice. I will share what I think about these legal decisions and will be involved in the final approval of major legal decisions, including whether to settle this case with the government.
21. I will work with the other class representatives on this case to make decisions when issues come up about how to proceed.
22. I will communicate with and direct the lawyers representing the class about important motions, settlement talks, trial preparation, and trial. I understand that I am responsible to direct the lawyers on each of these things, after getting their advice. I will speak to the lawyers as often as necessary.
23. I understand that I may need to answer questions from the government's lawyers in writing or in person.
24. I understand that if a class is certified, my lawyers will owe a duty to all members of the proposed class to provide fair and adequate representation.
25. I believe that the following organizations and law firms should be approved by the Court to serve as co-counsel for the class: Amica Center for Immigrant Rights, the American

Civil Liberties Union, the National Immigration Project, and Washington Lawyers' Committee, CASA, and Covington and Burling. I believe they will work to obtain the best result for the class.

26. This declaration was read to me in full in Spanish on September 22, 2025, by Lily Hartmann, a legal assistant from the National Immigration Project. I confirm and completely understand the contents of this declaration.

I declare under penalty of perjury that the foregoing is true and correct to the best of knowledge and belief.

Executed on September 30, 2025.

RSM

R.S.M.