IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 25-cv-3417 |

# DECLARATION OF GEORGE ESCOBAR, CHIEF OF PROGRAMS AND SERVICES, CASA, INC.

I, George Escobar, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Chief of Programs and Services of CASA, Inc. ("CASA"). CASA is a national nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia. Founded in 1985, CASA has more than 173,000 lifetime members from across the United States. CASA's members are predominantly noncitizens in a variety of immigration statuses.

2. I have worked at CASA for fourteen years. In my role, I oversee CASA's portfolio of community-facing direct services, including its health, legal, and educational services; employment and workforce development programs; financial literacy and tax programs; and parent engagement programs. An important part of my role is to understand the needs and experiences of our members so that I can work with my staff to design appropriate interventions to address those needs. I therefore speak frequently with community members and receive feedback from

my staff regarding CASA members' fears, concerns, and decisions.

3. I make this statement based upon personal knowledge, files, and documents of CASA that I have reviewed (such as case files, reports, and collected case metrics), as well as information supplied to me by employees of CASA whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting CASA business.

**CASA's Mission and Activities**

4. A CASA member is a person who shares CASA's values, envisions a future where we can achieve full human rights for all, and is convinced that, when united and organized, we can create a more just society by building power in our working-class and immigrant communities. CASA members play an important role in deciding what campaigns we work on and how CASA serves the community.

5. CASA membership is voluntary. In order to become a member, an individual must apply for membership, pay dues, and subscribe to the principles of CASA. CASA members also must self-identify as members of an immigrant or working-class community.

6. Currently, the annual fee for CASA membership is $35. Alternatively, individuals may pay a recurring membership fee of $5 per month. The membership fee can be waived for individuals who experience financial hardship or are otherwise unable to pay. Members are also offered the opportunity, for an additional $5, to obtain a CASA ID. This is a physical, picture identification card that contains basic information about the member. For many of our immigrant members, this card may be the only type of picture identification they have, other than documents from their home country. In certain jurisdictions, CASA IDs are recognized for the purposes of engaging with certain government agencies, including the police.

7. CASA's mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendant, Indigenous, and immigrant communities. From CASA's beginnings in a church basement, we have envisioned a future with diverse and thriving communities living free from discrimination and fear, working together with mutual respect to achieve human rights for all.

8. In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities, with a particular focus in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia. CASA also offers a more limited suite of services remotely to our members across the United States. Those individuals who are not geographically close to a physical CASA office are offered the opportunity to join a national organizing committee, whose members are entitled to vote on CASA's organizational priorities and are integrated into our member-led system of internal democratic governance. CASA also conducts campaigns to inform members of immigrant communities of their rights and assists individuals in applying for a variety of government benefits. In addition, CASA provides our members with free remote legal assistance, including free legal consultations on immigration issues.

9. In the D.C. area, CASA's immigration legal services have historically focused on securing and stabilizing immigration status, both temporary and permanent status, for non-detained community members. For example, we have historically held a large portfolio of affirmative relief cases such as Temporary Protected Status (TPS), Deferred Action for Childhood Arrivals (DACA), U Visas for survivors of crime, and naturalization, with the goal of securing status for individuals that allows them to live and work in the United States without fear of deportation.

10. This work typically begins with a legal consultation with the individual, during

3

which we obtain comprehensive information about the individual's background and history. Thereafter, we determine what immigration relief, if any, the individual might have, and then decide whether we can extend legal assistance (in the form of *pro se* assistance or representation) to the individual, to help them secure that immigration relief. Core components of this extended legal assistance include client interviews and meetings, preparation of applications and evidentiary filings, legal research and writing, appearances before adjudicative bodies, and other relevant duties as required for ethical and competent legal assistance.

11. Our Health and Human Services (HHS) program operates similarly in the D.C. area, in that the focus of the program is to increase community members' social stability. Our HHS staff assists eligible community members with public benefits enrollments, such as, SNAP, Care for Kids, emergency Medicaid, school enrollment, free and reduced lunch enrollment and more; as well as provides case management for a variety of needs, such as Social Security Administration disability and retirement, Medicare, Medicaid, and charitable financial assistance from hospitals. In sum, our HHS staff members provide essential health and social services to community members and families to keep them healthy and stabilized. Core components of these functions include comprehensive needs assessments; conversations with community members; application completion and submission; visits to schools, clinics, and other essential spaces; and conversations with various essential service providers, as required to secure benefits and protections for community members.

12. There are various ways through which community members can seek services from CASA, but one primary way is by calling one of our hotlines, operated by a third party call answering service. For example, callers seeking health services can call 301-270-8432; and callers seeking legal services can call 1-888-765-2272. The different numbers route through the same

third party call answering service, which bills CASA based on the amount of time that it spends receiving and fielding calls for us, under one account.

13. One of the hotlines that CASA operates through the call answering service is an ICE tip hotline, through which community members can report ICE enforcement actions that they have witnessed or experienced. The purpose of the ICE tip hotline is not to interrupt or obstruct active ICE enforcement actions, but rather, to provide support to individuals and families who have been impacted by those ICE enforcement actions. Accordingly, calls to our hotline are typically to report an ICE arrest that has recently occurred. After a report is submitted to CASA, CASA investigates the report and provides legal and humanitarian support to those who have been impacted. Since January 2025, community members have been able to reach CASA's ICE tip hotline by dialing 1-888-214-6016.

**Harm to CASA From ICE's Unlawful Stops and Seizures**

14. CASA's practice is to log every incident of ICE enforcement action that is reported to us, whether through our ICE tip hotline, or through other avenues. Among other data points, we collect and log the date, time, and location of the enforcement action as indicated by the reporter. Prior to August 2025, we received approximately two reports of D.C. ICE enforcement action incidents per month. Once ICE expanded its enforcement efforts in D.C. in August 2025, that number skyrocketed to approximately three to five detention reports per day. We logged approximately forty reports of ICE detentions in D.C. in the two-week period between August 14 and August 29, 2025, representing a forty-fold increase in detention reports.

15. Since ICE expanded its enforcement efforts in D.C., CASA's D.C.-facing work has increased drastically, due to responding to the forty-fold increase in D.C. ICE detentions reported to us. ICE's unlawful arrests have caused a significant disruption to our functions and activities,

pulling us away from our core focus of providing services that stabilize and protect CASA members to providing rapid, emergency response to unlawful ICE detentions affecting CASA members.

16.  Families that are impacted by ICE detention are understandably immediately focused on receiving those services that can potentially reduce the harmful impacts of the detention. In other words, the detention is an impediment to our ability to provide our core services to these families. Community members are not engaging with us about benefits enrollment and other services that might lead to long-term stability when their immediate concern and need is on altering the detention status of their loved one. Without first addressing that immediate concern and need for which they sought our assistance, it is impossible to engage them on those longer-term, stabilizing strategies and services that are so critical to CASA's mission.  We must meet our community members' immediate, detention-related needs through rapid, emergency response in an attempt to clear the path for them to receive other services for which they might be eligible.

17.  The staff shift to emergency ICE detention response has impaired CASA's ability to carry out its core functions. Specifically, detention response now comprises a significant portion of work undertaken by CASA's Legal and HHS teams. This work is not fully compensated by these teams' budgets. The HHS team, for example, now expends approximately 25 percent of its workload—equivalent to over one-and-a-half full-time employees—on detention response and follow-up. Rather than focusing on their core missions and activities, these staff members must now triage calls and requests for detention-related assistance, conduct needs assessments for the families of those detained, and connect them to legal and social supports tied to the detention incident.

18.  Similarly, instead of our immigration legal team being able to focus on securing

long-term status for individuals, the team spends a significant amount of time providing rapid legal response and referrals to the families of detained individuals. CASA legal clinics at which community members could receive consultations and assistance with immigration applications have now been replaced by rapid legal response phone calls every day to provide family members with post-arrest information and guidance. Naturalization and U Visa applications have been replaced with assistance locating detained loved ones and referrals to private attorneys. In effect, ICE's enforcement activities have impaired our legal team's ability to engage in stabilizing our community members through substantive, extended legal assistance, turning us into a brief legal advice and referral operation, instead of a legal representation operation.

19.  CASA also faces increased costs due to ICE's unlawful seizures, especially in funding its hotline services. Since January 2025, including after ICE began its widespread seizures in D.C. resulting in a forty-fold increase in D.C.-detention calls to the ICE tip hotline—the average bill for this call answering service has increased. Our bill for the period covering July 27, 2025 to August 26, 2025, which includes two weeks of the D.C. ICE enforcement surge, reflected an increase of approximately 14% from the previous period of June 27, 2025 to July 26, 2025. Similarly, our bill for the period covering August 27, 2025 to September 26, 2025 reflected a further increase of 5% over the period before.

20.  CASA's funding to provide services to our community is jeopardized as a consequence of shifting resources to respond to ICE's unlawful seizures. CASA's shift of human resources to detention response threatens our ability to comply with grant deliverables specified in existing grant contracts. For example, in September 2025, we were notified that one such county grant was reduced by 50% in part due to delayed progress on grant deliverables. Through this grant, our HHS team is to do significant work, including conducting needs assessments, that

directly contributes to the county's dedication to growing clean energy in low-income, working class neighborhoods. This work is directly tied to our goals of stabilizing and improving the quality of life of our community members. Yet, our HHS team cannot even conduct an intake for a community member under this grant when the community member is laser-focused on the fact that their loved one was unlawfully detained by ICE; the HHS team must first address the community member's immediate need and concern. Because of the need to divert HHS team's attention to respond to ICE's expanded, unlawful actions against our community, we risk continuing to lose such critical funding that supports our mission.

21. ICE's unlawful detentions have impaired CASA's core function of connecting community members to social services by chilling open communication between CASA and its members. Prior to the surge in ICE activity in D.C., CASA would regularly connect community members to vital social services through free consultations that help members navigate complex public benefits programs. However, CASA's ability to connect community members to social services depends on members' willingness to share personal information with staff. Since ICE increased its enforcement in D.C., community members have become increasingly reluctant to share personal information, fearful that their immigrant status will be weaponized against them. CASA has noticed a marked decrease in participation in public benefits programs by immigrant community members. Further, cases that CASA manages and services it delivers now take longer to carry out because of the additional time that CASA must invest in building trust and providing education to each community member in this environment.

22. ICE's unlawful detentions have contributed to the additional investment needed to build trust and complete needs assessments and public benefits applications for our members. For example, HHS staff members have had to adopt new protocols to build trust, such as always

displaying their CASA Staff ID badge while in the field, and also sharing pictures of their Staff ID via text when conducting intakes over the phone. It is now common for Community Resource Navigators and Community Health Workers on our HHS team to report that an activity or application that once took a single engagement to complete now requires two to three follow-ups with the individual, so that trust is assured and the community member feels safe providing confidential information.

**Harm to CASA's Members From ICE's Unlawful Stops and Seizures**

23.     Because of the services that we provide our members, we are acutely aware of the harms that ICE's unlawful seizures will cause many of CASA's members. Specifically, as demonstrated by the individual circumstances described below, ICE's unlawful seizures irreparably harm the communities and members that CASA serves by separating and traumatizing families, jeopardizing livelihoods, and cutting off access to essential healthcare and services. Further, ICE's unlawful seizures have instilled so much fear in CASA's members, regardless of their immigration status, that many are deprived of the basic dignity of participating in public life in D.C., including taking kids to school, going to work and church, or riding the Metro.

24.     Based on CASA's records, I am aware of several members who have been harmed by ICE's unlawful seizures:

25.     **Elias** is a CASA member, who is 41 years old and identifies as Latino. Elias underwent open heart surgery in May 2024. Since the operation, his doctor has required him to go to a clinic in Washington, D.C., three times a week to receive dialysis treatment. On the morning of August 20, 2025, Elias was on his way to receive his treatment when he was in a car accident with an Amazon vehicle. Local police initially responded, but soon, ICE officers wearing vests that said "ICE" appeared as well. The ICE officers did not appear to know anything about Elias.

9

One of the ICE officers asked Elias where he was from and asked to see his Salvadoran identification card after Elias said he was from El Salvador. When Elias offered to show the officer his U.S.-issued driver's license, the officer said that wouldn't be necessary. Instead, the ICE officer simply looked at Elias's El Salvador ID, told Elias he was under arrest, and began handcuffing him. Prior to his arrest, the ICE officers never presented any document or warrant and never explained why Elias was being arrested. Also prior to his arrest, the ICE officers never asked Elias for his immigration status or ask any questions about his ties to the community, whether he had family members in the United States, where he lived or how long he had lived there, or anything else about his individual circumstances. The officers took Elias to the ICE office in Chantilly, Virginia, where he was detained for several hours before he was released around 6 p.m. The detention caused Elias to miss his dialysis appointment that day, making him feel very sick due to his blood pressure spiking. Elias has been unable to sleep because of the stress and fear the arrest injected into his life. Elias fears that he will be detained or deported to El Salvador, where he will be unable to access the life-saving medical care he requires.

26.     **Luz** is a CASA member. She is 34 years old and lives in Hyattsville, Maryland. Prior to her 32-year old partner Daniel's arrest and detention, he also lived in Hyattsville with Luz. Both Luz and Daniel are from Venezuela, have pending asylum applications, and entered the United States through the CBP One process in December of 2024. On the morning of August 15, 2025, Luz and Daniel were working their Door Dash delivery jobs together when they were pulled over by a Metropolitan Police Department ("MPD") car on 14th Street N.W. After inquiry by the officer, Luz and Daniel provided their motorbike's registration, their Venezuelan IDs, and Luz's Venezuelan passport. The MPD officer reviewed the documents and did not say anything, but sent a text on his phone. Approximately five minutes later, two unmarked SUVs arrived with three

agents who announced they were from ICE. The ICE agents claimed that Luz and Daniel had entered the country illegally and that they were there to detain Luz and Daniel. In response, Luz and Daniel told the ICE agents that they had pending asylum applications, but the ICE agents ignored this information and said that Luz and Daniel were "illegal". Luz and Daniel were then handcuffed, placed in separate vehicles and driven to the ICE Detention Center in Chantilly, Virginia. Prior to Luz's and Daniels's arrest, the ICE agents never presented a warrant, explained why they stopped Luz and Daniel, or indicated that they knew Luz's and Daniels's names. The ICE agents also never asked any questions about Luz's and Daniel's ties to the community, how long they had lived and worked in DC, or their family in D.C. Luz was held at the Chantilly Detention Center all day until approximately 10:00 PM when she was released from her cell and was able to speak with officials about her immigration status. Luz was subsequently released from ICE custody and told that she would receive an immigration court date in December. Daniel was not released from ICE custody and was moved to the Caroline Detention Center in Virginia the following day, where he is currently detained. Daniel has experienced unhealthy and crowded conditions at the Caroline Detention Center, which has resulted in severe anxiety, insomnia, and other health issues. Luz has struggled to financially support herself during Daniel's detention and has experienced severe anxiety due to his absence.

27. **Juilo** and his wife are CASA members with pending asylum cases and work authorization. He has lived in the United States since 2003. Before his arrest, Julio lived with his wife and four children between the ages of four and 19. Julio relies on his work authorization to provide for his family as a plumber. On August 28, 2025, he and his nephew were on their way to work when six ICE agents stopped them a few blocks south of the Walmart on Georgia Ave. NW in Washington, D.C. The agents requested that they both show their documentation. Julio showed

his Real ID compliant driver's license, and his nephew showed his green card. The officers asked Julio to step out of the car. When he asked why, they threatened to break down the door. Julio felt terrified and complied. When he stepped out of the car, he saw even more ICE agents. Without asking him any other questions, they put him in handcuffs and grabbed his collar. After a brief discussion, the ICE officers decided Julio was not "fine" and put him in a van. As they drove him to the detention site in Chantilly, Julio heard the officers bragging and celebrating how easy it had been to arrest him. The officers did not show them any documents or warrants, nor did he ask Julio any questions about his ties to the community or his individual circumstances. ICE originally detained Julio in a freezing concrete room in Chantilly, before moving him to a detention center in Texas. He is still detained. The arrest has been traumatizing both for Julio and his family. His wife is scared to step outside. Their children cry and ask for their father.

28.    **Angel** is the husband of a CASA member. He, his wife, and their six-year-old son are from El Salvador but fled persecution there, applying for asylum in the United States. Their applications are still pending. Angel, through his asylum application, was able to obtain his work authorization card and had a job as a mechanic in Washington D.C. On the morning of September 18, 2025, he was waiting for the owner of the shop at which he worked to open the building. While he and his coworkers were outside, several cars pulled into the parking lot. Men in uniforms got out of the cars and approached Angel and his colleagues. While the men were wearing different uniforms, all of them were wearing vests that said "ERO" and "Police." Angel knew the vests meant the men worked for ICE. Without asking Angel any questions about his legal status, his family, how long he had been in the U.S., or anything else about his personal circumstances, the officers placed him in handcuffs. When Angel tried to explain that he had an asylum application and work authorization, the officers said it didn't matter. Some of the officers placed Angel and

12

his coworker in a car and took them to the ICE office in Chantilly. During the drive, the men were bragging about the amount of money they earned as a bonus for arresting Angel. Angel is now in Caroline Detention Facility, where he is being denied medication for his cardiac arrhythmia. Angel's wife has been so traumatized by the arrest that she quit her job, even though the family needs her income to survive, because she is so scared that she will also be arrested.

29.     **Mateo** is the husband of a CASA member who, before his arrest, lived in Hyattsville, Maryland, with his wife and seven-year-old son. Mateo and his family fled their home country of Venezuela and applied for asylum in the United States. Those applications are still pending. Mateo was able to obtain work authorization through this application and worked as a delivery driver for DoorDash in D.C. to support not only his wife and son in the U.S., but also his young children in Venezuela. On August 21, 2025, Mateo was on his parked electric bike in the parking lot of a McDonald's on Georgia Avenue, picking up a delivery. As he mounted the bike to leave, two unmarked cars pulled in on either side of Mateo. Four officers got out and surrounded him. The agents wore masks on their faces. They had on plain clothes but with vests and badges that said "ICE.". They asked Mateo if he could be in the country, so he explained he had a pending asylum application and work authorization, plus a Maryland issued driver's license. Mateo showed the officers these documents, but it did not matter. They told him he was under arrest. When he asked why, they said it was because he was not a permanent resident. They did not show him a warrant or any other document. They did not ask him any questions about his life in the U.S., his family, his ties to the community, or anything else about his circumstances. The officers first took Mateo to an area outside the Pentagon, where he and about ten other men were transported in a white van to an ICE office in Chantilly, Virginia. Two days later, ICE moved Mateo to the Farmville Detention Center in Virginia, where he stayed for about two weeks before being

13

transferred to the South Texas Detention Complex in Pearsall, Texas. He remains there a month later, despite his asylum application, work permit, lack of criminal history, and close ties to the community.

30.     **Antony** is a CASA member who has been in the United States since 2005. Before his detention, he lived in Silver Spring, Maryland, right outside Washington, D.C., with his wife and six children. The morning of August 25, 2025, Antony was near the intersection of Mt. Pleasant St. N.W. and 16th St. N.W. in D.C. when had to slam on the breaks to avoid hitting a car and people that were blocking the street. After he stopped, another car arrived and several officers exited. Several officers wearing green uniforms and "Police" vests, as well as a Park Police officer, then approached Antony's vehicle. The officers asked Antony to step out of the car and informed him he was under arrest. The officers never asked for his name, identification, or provide any reason for his arrest. Antony asked why he was being detained and the officers responded "that's just the way the law is." Antony never received any documents or warrants explaining what happened, nor did the officers ask him any questions about his ties to the community or his individual circumstances. After his arrest, the officers took Antony to a Park Police station in the Rock Creek neighborhood of D.C., where he waited for three hours. It was only at this point that the officers asked Antony any questions about his immigration status. The agents eventually came back with a large group of people; other individuals who they had arrested. Antony recalls all the men were Latino, like himself. The agents moved Antony and the rest of the group to the ICE office in Chantilly, Virginia. ICE then transferred Antony to federal jail in Richmond, Virginia, where he was held for eight days. Antony was then transferred to the detention center near Pittsburgh, Pennsylvania, more than four hours away from his family, where he remains detained today. Since his arrest, Antony's family has suffered emotionally and financially. Antony

14

supported his family by working for a company that repaired and installed air conditioners. Without his income, there is not enough money to support his six children—all U.S. Citizens and the the youngest of whom is only 18 months old. The emotional toll is also great, as Antony's children have become so anxious following their father's arrest that it is impacting their performance in school.

31. **Javier** is a CASA member. Javier is 43 years old and identifies as Latino. Prior to Javier's arrest and deportation, he lived in Washington, D.C., with his wife and three children. Javier's oldest child is 18 years old, but he also has a four-year-old and a six-month-old baby, both of whom are U.S. citizens. Approximately three years ago, Javier's oldest daughter was the victim of a violent assault. Javier and his family subsequently applied for U-Visas and those applications are still pending. On September 10, 2025 around 6:00 a.m., Javier was on his way to work when four immigration officials wearing ICE uniforms approached him after he exited the Fort Totten Metro Stop in D.C. One of the ICE officials stopped Javier and showed him a photo of a person who looked Latino, asking Javier whether he knew the person in the photo. Javier answered in the negative, but the ICE agent then asked for Javier's immigration documents. Javier responded that he had a pending U-Visa application, but otherwise did not have any documentation on him. The ICE official left to speak to one of his colleagues and returned, telling Javier "I'm sorry sir, but I have to arrest you." Javier was then put in handcuffs, placed in the ICE officials' vehicle, and taken to the ICE detention center in Chantilly, Virginia. Prior to Javier's arrest, the ICE officials did not explain why he was being arrested nor did they ask him any questions about how long he had been in the United States, whether he had family in D.C., his ties to the community, nor anything else about his personal circumstances. Javier was held at the Chantilly detention center for a full day before being transferred to a jail facility in Richmond, Virginia, where he was held

for two days. Javier was then transferred to a detention center in Louisiana, where he was detained for several days until he was deported on September 26, 2025. Prior to Javier's deportation and while he was detained, he was asked by immigration officials to sign a document, which Javier understood would signify his consent for deportation. Javier told the immigration officials that he had a pending U-Visa application and that he wanted to see a judge, but the immigration officials said that Javier had to sign the document. Javier ultimately signed the document out of fear of what would happen to him if he chose not to sign. Javier's arrest and deportation has severely impacted his family, who were financially dependent on Javier's income. Javier's wife is afraid that she may also be arrested and his children have been traumatized by his arrest and deportation. Javier's youngest children have even asked police officers whether they know where their father is.

32.   **Franco** is a CASA member. Franco is 21 years old and is originally from Venezuela, where he was tortured in prison by Venezuelan officials. Franco received Temporary Protected Status ("TPS") in June of 2023 and has lived in the Washington D.C. area since that time. Prior to his arrest, Franco lived with his wife and his eight-month old daughter, who is a U.S. citizen. On August 17, 2025, Franco was working his Uber delivery driver job in the Capitol Hill neighborhood of D.C. when he noticed several federal agents and police officers surrounded his motorcycle after he had completed a delivery. Franco was asked for his social security card, work permit, motorcycle title, and his driver's license, all of which he provided. While the agents did not ask for Franco's immigration status, he told them that he had TPS. The agents then handcuffed Franco and placed him into a nearby vehicle. At no time prior to Franco's arrest did the agents provide a warrant or explain why he was being stopped and arrested. The agents also did not ask Franco any questions about his family members, where he lived or how long he had

lived there, his work history, or anything else about his ties to the community. Following his arrest, Franco was transported to a facility in Chantilly, Virginia, where he was held for approximately four hours and asked identifying questions. Franco was then transferred to a facility in Farmville, Virginia, where he remains detained. Franco's arrest has been difficult for his family because his wife and 8-month old daughter are financially dependent on him. Franco's family has been forced to move because they can no longer afford the location where they were previously living. Franco's wife also had an accident and so is unable to work. She also has increased risk of suffering a stroke due to a low platelet count.

33.     **Carlos** is a CASA member who lives in Washington, D.C., with his wife and three U.S. Citizen children. Carlos has lived in the United States since he arrived in 2004 as a 22-year-old. He maintained a job as a construction worker to care for his family. On his way to work on September 9, 2025, he was pulled over by a police car. But when he complied and the officers approached his car, he realised they were ICE officers, rather than local police. The three officers that approached him had vests that said "ICE." They asked Carlos to step out of his car. The officers asked to see his immigration documents. When Carlos told them he did not have any, they put him in handcuffs and told him he was under arrest. They did not explain why they were detaining him, nor did they give him any document or warrant for the arrest. They did not ask him any questions about his ties to the community or his individual circumstances. ICE officers took Carlos first to an area by the Pentagon, and then moved him to the ICE office in Chantilly, Virginia. Two days later he was moved to a jail in Richmond, and then to Winn Correctional Center in Louisiana. He remains in ICE detention, leaving both him and his family traumatized.

34.     **Miguel** is a CASA member. The circumstances of Miguel's arrest and detention were reported to CASA by his family member, and so are included here upon information and

17

belief. Miguel is only 23 years old and lived in Washington, D.C., with his aunt. Miguel is a driven young man. He worked in a local restaurant to support both his family here, as well as his parents in El Salvador. He also attended school so he could assist his family even more in the future. On the night of August 18, 2025, Miguel was walking out of a grocery store in Washington, D.C., when he was approached by ICE officials. They asked Miguel if the car he was driving belonged to him. He responded that it was his brother's. The officials, however, did not believe him, and demanded he call his brother. Since it was late in the evening, Miguel's brother was asleep and did not answer the calls. In response, the ICE officials arrested and detained Miguel. They did not show him any document or warrant or ask him any questions about his ties to the community or his individual circumstances. The officers took Miguel to the ICE office in Chantilly, Virginia. The conditions there were dehumanizing and unhealthy—the officers failed to feed them at times. Miguel could not bear the weight of detention and "voluntarily" deported to El Salvador. ICE agents did not allow him to bring his personal possessions when he left the country.

35. **Gordon** is the husband of a CASA member. The circumstances of Gordon's arrest and detention were reported to CASA by his wife, and so are included here upon information and belief. Gordon worked as a delivery driver to support his wife and three children. His oldest child is only 12, with the other two being six and nine. On the morning of August 31, 2025, Gordon was waiting on his motorbike in the parking lot of a Denny's at 1250 Blandensburg Rd NE in Washington, D.C.. As he waited, a police officer approached him and asked to see Gordon's driver's license. When Gordon said he did not have one, the officer told him to wait. Soon after, ICE officers appeared. They asked Gordon again for his license. When he could not provide one, the agents arrested him. They did not show him any document or warrant or ask him any questions about his ties to the community or his individual circumstances. The ICE officers detained Gordon

in Farmville Detention Center, which is a three and a half hour driver from his family. He remains there today. Without his income, Gordon's family is struggling financially to survive. They are also suffering emotionally. His children are too young to understand what has happened and ask where their father is every day.

36. **Nerwin** is the husband of a CASA member. The circumstances of Nerwin's arrest and detention were reported to CASA by his wife, and so are included here upon information and belief. Nerwin is an approved beneficiary of his wife's approved I-130 family petition, and he is in the process of getting his green card. Nerwin has lived in the United States since 2013 and lived with his wife and two U.S. citizen children, who are five and six years old, prior to his detention. Nerwin was on his way to his job as a painter with a co-worker around 9:00 a.m. on August 28, 2025. Since Nerwin does not have a driver's license, he was in the passenger seat. A police officer signaled for the car to pull over around 295 N, Malcolm X Ave in Washington, D.C. When the pair did so, the officer informed them that the car had an expired registration and requested both men show documentation. Nerwin explained that he had an approved I-130 family petition but did not have the papers with him. The officer stepped away and soon after immigration officials arrived in a car. The cars were Department of Homeland Security vehicles. The immigration officials approached Nerwin and asked to see his papers. He explained again that he had an approved I-130 petition. The officers probed if he was married to a U.S. citizen, which Nerwin confirmed. Nerwin showed the agents his Real ID and passport. After looking up his name in the system, the agents returned, asked Nerwin to step out of the car, told him he was under arrest, and put him in handcuffs. The officer did not show Nerwin any document or warrant, or ask him any questions about his ties to the community or his individual circumstances. ICE originally detained him in the ICE office in Chantilly, Virginia, then moved him to a jail in Virginia for 11 days, and then

19

transferred him again to Farmville Detention Center in Virginia. He remains there now, while his children cry every day and ask where their father is.

    I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  October 3, 2025                    Respectfully submitted,

                                                              */s/ George Escobar*
                                                              George Escobar