## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>    *Defendants*. | Civil Action No. 25-3417 (BAH) |

## BRIEF OF *AMICI CURIAE* WASHINGTON TEACHERS' UNION, THE DC ALLIANCE FOR CHARTER TEACHERS AND STAFF LOCAL 1927, AND INDIVIDUAL EDUCATORS IN SUPPORT OF PLAINTIFFS

Alice C. Hwang
Daniel M. Rosenthal
Charlotte H. Schwartz
Sejal Singh
James & Hoffman, P.C.
1629 K Street NW, Suite 1050
Washington, DC 20006
Tel: (202) 496-0500
achwang@jamhoff.com
dmrosenthal@jamhoff.com
chschwartz@jamhoff.com
ssingh@jamhoff.com

*Counsel for Amici*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................. 2

ARGUMENT ........................................................................................... 4

I.   Defendants' Unlawful Policy is Disrupting Schools, Undermining Student Learning, and Will Separate Students From Their Families ......................... 4

   A.   Defendants have terrorized and traumatized students, teachers, and school communities by conducting enforcement actions at or near D.C. schools and separating students from their parents. ............................................. 4

   B.   Defendants' mass, baseless immigration arrests are creating an absenteeism crisis in D.C. schools and severely disrupting learning. ................................... 7

   C.   Defendants' baseless, warrantless mass arrests have made D.C.'s schools less safe by destroying trust in law enforcement ...................................... 13

   D.   Teachers and schools are being forced to divert significant time, effort, and resources to address the terror that Defendants' warrantless, mass arrests are causing in D.C.'s school communities ........................................ 13

II.  Absent Immediate Injunctive Relief, Students and Schools Across the District Will Suffer Irreparable Harm ............................................. 16

III. The Public Interest and the Balance of the Equities Favor an Injunction ...................................................................................... 18

CONCLUSION ...................................................................................... 18

# TABLE OF AUTHORITIES

*Asterisks designate cases or authorities counsel chiefly relies upon.

**Cases**

*de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491 (D.D.C. 2018) .................................................................................................. 16, 18

*Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020). ............... 17

*Issa v. Lancaster*, 847 F.3d 121 (3d Cir. 2017) ......................................... 16

*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1 (D.D.C. 2016) .............. 18

*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011) ................................. 16

*N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104 (9th Cir. 2010) .............................. 17, 18

*Tate v. Pompeo*, 513 F. Supp. 3d 132 (D.D.C. 2021). .................................. 16

*Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034 (7th Cir. 2017) .................. 16

**Statutes**

D.C. Code § 38-208(c)(1)(A) ......................................................... 11

**Other Authorities**

Arya Ansari & Michael Gottfried, *The Grade-Level and Cumulative Outcomes of Absenteeism During Elementary School*, 92 CHILD DEV. 4 (2021).......................... 8, 17

Ashley Na & Kelly Hesedal, *Parent Detained, Taken by ICE Near Linda Vista Elementary School*, CBS 8 (Aug. 18, 2025) ...................................... 6

Bilal Rahman, *California Stops Homeland Security Agents Entering Elementary Schools*, NEWSWEEK (Apr. 11, 2025)........................................... 6

Carolyn Heinrich, Mónica Hernández, & Mason Shero, *Repercussions of a Raid: Health and Education Outcomes of Children Entangled in Immigration Enforcement*, 42 J. OF POL'Y ANALYSIS & MGMT. 350 (2022) ..................... 12

Dana Goldstein & Irene Casado Sanchez, *Immigration Raids Add to Absence Crisis for Schools*, N.Y. TIMES (June 16, 2025)...................................... 8

Gustavo Solis, *Arrest Near a South Bay High School is Latest in a String of Immigration Enforcements Close to Schools*, KPBS 65 (Aug. 22, 2025) ............... 6

Henry May, Lauren P. Bailes, & Danielle M. Riser, *Absenteeism & Achievement in Early Elementary Grades: A Multilevel Organizational Analysis*, 30 J. OF ED. FOR STUDENTS PLACED AT RISK 4 (2024)........................................ 17

Joseph P. Ryan et al., *Early Exposure to Child Maltreatment and Academic Outcomes*, 23 CHILD MALTREATMENT 4 (2018)........................................ 11

Julian Berger, *ICE Detains Man Taking His Child to East Charlotte School*, WFAE 90.7 (May 13, 2025)............................................................ 6

Lucrecia Santibañez & Cassandra Guarino, *The Effects of Absenteeism on Academic and Social-Emotional Outcomes*, POL'Y ANALYSIS FOR CAL. EDUC., (Oct. 2020)........ 17

Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged, and Detained for Days*, PROPUBLICA (Oct. 16, 2025)............................................................................... 7

Press Release, ACLU of S. Cal., *United Farm Workers and Bakersfield Residents Sue Border Patrol for Unlawful Practices* (Feb. 26, 2025)............................................. 8

Ted Oberg, *ICE Data Shows Surge in DC-Area Arrests of People Without Criminal Convictions*, NBC4 WASH. (Aug. 28, 2025) .................................................................. 7

Thomas S. Dee, *Recent Immigration Raids Increased Student Absences* 4 (Anneberg EdExchange, Ed Working Paper No. 25-1201) .............................................................. 8

U.S. DEP'T OF EDUC., *Chronic Absenteeism*, (Aug. 21, 2025) ...................................... 17

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici* are the Washington Teachers' Union ("WTU"), the District of Columbia Alliance of Charter Teachers and Staff Local 1927 (DC ACTS) (both locals of the American Federation of Teachers), and individual teachers and educators at District of Columbia Public Schools ("DCPS") and public charter schools throughout the District of Columbia. The WTU is the collective bargaining representative for over 5,000 D.C. educators, from preschool through twelfth grade. The WTU's mission is to ensure and promote conditions that are vital to effective teaching and services for all students. The WTU champions fairness, democracy, economic opportunity, and high-quality public education for students, their families, and the communities their members serve. Helping children and students is at the core of WTU's mission, as is fighting for economic opportunity, a living wage, and fairness in the workplace for its members.

DC ACTS is the collective bargaining representative for educators at several D.C. charter schools. DC ACTS seeks to create opportunities for professional advancement and develop systematic solutions that provide support for all charter school staff. Through collective bargaining, DC ACTS empowers District of Columbia charter school communities, creates common understanding, and fosters school cultures where everyone is crew, not passengers. Ensuring the safety and well-being of students and their families is vital to this mission.

Many WTU members, DC ACTS members, as well as the individual educator *amici* teach students whose families are vulnerable to immigration enforcement.[1] Further, *amici* are vulnerable to immigration enforcement themselves. Every day, *amici* are impacted by Defendants' warrantless arrests on school communities or expend a huge amount of effort to address the devastating impact of their policy. *Amici* therefore have a strong interest in enjoining this unlawful practice.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Beginning August 11, 2025—just weeks before the start of the school year—District of Columbia residents have been subjected to mass, arbitrary immigration arrests, frequently based on little more than the color of their skin. Numerous residents have been detained in dragnet-style arrests on their way to work, outside metro stations, at restaurants, at construction sites, and—critically to *amici*—at or near schools. In carrying out these mass immigration arrests, Defendants have instituted an unlawful policy and practice of arresting people without either warrant or an individualized assessment of probable cause.

The victims of these warrantless arrests include teachers, parents, and students who are themselves or whose families are members of the putative class. These arrests create special harm to the children of D.C., including some members of the putative class, and their educational advancement.

---

[1]      In order to ensure the privacy and safety of *amici* and their students, the individual *amici* are identified by their initials only.

First, the Defendants' conduct has traumatized children who have witnessed or heard about the arrests, or who have been separated from detained family members.

Second, by causing widespread fear among students and families of leaving their homes, the arrests have created an attendance crisis in D.C. schools, as educators report a sudden spike in absenteeism, including among putative class members.

Third, schools have become less safe as educators and students fear requesting assistance from law enforcement.

Fourth, teachers and schools have been forced to spend time and resources to ensure that their students, especially Latino students, can learn. For example, teachers take time out of their day every day to manage or run carpools, accompany students to and from the bus or metro, and organize neighborhood "walking buses" to ensure that young students can walk safely to school while their parents remain safely at home.

These consequences constitute irreparable harm to students, families, and educators, including those who are members of the putative class, and warrant a preliminary injunction.

## ARGUMENT

I.    **Defendants' Unlawful Policy is Disrupting Schools, Undermining Student Learning, and Will Separate Students from Their Families.**

A.    <u>Defendants have terrorized and traumatized students, teachers, and school communities by conducting enforcement actions at or near D.C. schools and separating students from their parents.</u>

Federal agents are arresting and detaining members of D.C. schools' communities at or near schools, at times in front of schoolchildren, inciting fear and severely undermining the ability of D.C. educators to provide a safe learning environment for their students. Defendants appear to be intentionally conducting arrests at or near schools at times when students and families are present, with the effect of maximizing the trauma and fear felt by students. For example, D.P., an elementary school teacher, described several arrests taking place near the school just before dismissal, thus ensuring that his elementary school students and their parents witness the arrests. E.S., a DCPS educator, observed an arrest at the beginning of the school year approximately one block away from her elementary school at dismissal time in a direction that many families travel. L.B., a preschool teacher at a charter school, described how many students became terrified after witnessing a situation in which Immigration and Custom Enforcement (ICE) agents attempted to arrest a child outside of school and then tackled a member of the school staff who went outside due to the significant disruption this was causing.

Students and families have also been traumatized by arrests away from school. R.C., an elementary schoolteacher, explained that a significant enforcement action in the neighborhood the week before school started led to widespread fear in

4

the school community, right at the beginning of the school year—an especially crucial time for elementary school students who learn essential skills and routines that set the standard for the entire school year. A significant number of students at R.C.'s school had a parent or close family member detained by ICE, many of whom had open asylum cases and work permits. As she put it, these were parents who worked hard, supported their kids, and reliably attended parent-teacher and other school events—and now their families' lives have been ruined by this unlawful policy. Similarly, two families at S.O.'s school find themselves in desperate straits after their primary breadwinners were detained by ICE. In both cases, the family member had lived in the United States for over fifteen years and had no criminal record. But now, the children of the affected families regularly come to school hungry, terrified, and in extreme emotional distress.

Several teachers and educators explained that because their young students are regularly witnessing and hearing about these arrests, they are frequently terrified by just seeing police cars around the school, or the national guard surveilling the neighborhood. For example, D.P. explained that when a parent called and asked him to drive her daughter to school because of reported ICE activity in the neighborhood, he found himself taking a bawling second grader to school. R.C. recounted that, when a teacher was driving a fifth grader to school and passed a police car, the fifth grader ducked down and exclaimed "is that them?!"

D.C. Council At-Large Member Robert White has reported receiving numerous similar accounts of traumatizing arrests throughout the District. Council

Member White described a "pattern" of "children witnessing arrests near dismissal or along walking routes; residents and teachers afraid to intervene or ask questions; and MPD officers responding with hostility when bystanders attempted to understand what was happening."[2]

This pattern has repeated itself across the country in cities and counties where Defendants have deployed ICE agents at or near schools. For instance, this past spring, ICE agents arrived unannounced at a California elementary school and attempted to arrest five children.[3] ICE arrested a man while he was dropping his child off at school in Charlotte, North Carolina around the same time.[4] Throughout August of this year, ICE arrested four parents at or near schools in the San Diego, California area, including at least one who was about to pick up his elementary-school-aged child, who was then left at the school with no one to pick her up.[5] This

---

[2]    Letter posted by @robertwhitedc.bsky.social, BLUESKY (Oct. 17, 2025 at 6:30 PM ET), https://bsky.app/profile/robertwhitedc.bsky.social/post/3m3gd64ibz22q.

[3]    Bilal Rahman, *California Stops Homeland Security Agents Entering Elementary Schools*, NEWSWEEK (Apr. 11, 2025), https://www.newsweek.com/california-agents-elementary-schools-homeland-security-2058493.

[4]    Julian Berger, *ICE Detains Man Taking His Child to East Charlotte School*, WFAE 90.7 (May 13, 2025), https://www.wfae.org/race-equity/2025-05-13/ice-detains-man-taking-his-child-to-east-charlotte-school.

[5]    Gustavo Solis, *Arrest Near a South Bay High School is Latest in a String of Immigration Enforcements Close to Schools*, KPBS 65 (Aug. 22, 2025), https://www.kpbs.org/news/border-immigration/2025/08/22/arrest-near-a-south-bay-high-school-is-latest-in-a-string-of-immigration-enforcements-close-to-schools; Ashley Na & Kelly Hesedal, *Parent Detained, Taken by ICE Near Linda Vista Elementary School*, CBS 8 (Aug. 18, 2025), https://www.cbs8.com/article/news/local/parent-detained-ice-near-linda-vista-elementary-school/509-6721460a-6cc4-43ee-96b1-7839d5133cc1.

pattern of conduct shows that, absent judicial intervention, ICE will continue to traumatize the District's schoolchildren through its unlawful, warrantless arrests.

B. Defendants' mass, baseless immigration arrests are creating an absenteeism crisis in D.C. schools and severely disrupting learning.

The trauma and long-lasting fear that these arrests instill in children is reason enough to enjoin Defendants' unlawful, mass arrests. But if that were not enough, it should be no surprise that when children and their families are terrified, it is also severely disruptive to students' learning.

Most obviously, Defendants' mass, warrantless immigration arrests have already caused a sudden increase in absenteeism in D.C. schools. In interviews with counsel, D.C. teachers report that absenteeism has spiked in their classrooms because both students and their parents fear being arrested and detained on the way to school. Because Defendants have a policy and practice of making indiscriminate arrests—without a warrant or an individualized determination of probable cause—students and parents could be arrested on the way to school regardless of their criminal history or immigration status.[6] And because Defendants' unlawful policy and practice provides ready cover for racial profiling, teachers report that absences have been particularly acute among Latino and Hispanic students.

---

[6]     *See, e.g.*, Ted Oberg, *ICE Data Shows Surge in DC-Area Arrests of People Without Criminal Convictions*, NBC4 WASH. (Aug. 28, 2025), https://www.nbcwashington.com/investigations/ice-data-dc-arrests/3981520/; Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged, and Detained for Days*, PROPUBLICA (Oct. 16, 2025), https://www.propublica.org/article/immigration-dhs-american-citizens-arrested-detained-against-will.

A recent Stanford University study found that, in early 2025, a series of Customs and Border Patrol (CBP) immigration raids in central California caused daily student absences to jump by 22 percent.[7] Much like the Defendants' policy and practice of baseless arrests in D.C., CBP's central California immigration sweep was described by observers as "a broad dragnet," with federal agents making indiscriminate arrests without a warrant and targeting victims based on the color of their skin.[8] Although the immigration raids did "not occur on or near school grounds," parents and students feared being arrested, detained, and separated from their families if they stepped outside their homes—and many families opted to stay home, rather than risk being subjected to a warrantless immigration arrest.[9] The Stanford study found that absenteeism rose most precipitously for younger children, who are at acute risk of falling behind on basic math skills, reading, and socio-emotional development.[10]

This research mirrors the experiences of D.C. educators, who report that classroom attendance has already fallen sharply this school year as parents are

---

[7]    Thomas S. Dee, *Recent Immigration Raids Increased Student Absences* 4 (Anneberg EdExhange, Ed Working Paper No. 25-1201), https://edworkingpapers.com/ai25-1202.

[8]    *Id.*; *see also* Press Release, ACLU of S. Cal., *United Farm Workers and Bakersfield Residents Sue Border Patrol for Unlawful Practices* (Feb. 26, 2025), https://www.aclusocal.org/en/press-releases/united-farm-workers-and-bakersfield-residents-sue-border-patrol-unlawful-practices.

[9]    Dana Goldstein & Irene Casado Sanchez, *Immigration Raids Add to Absence Crisis for Schools*, N.Y. TIMES (June 16, 2025), https://www.nytimes.com/2025/06/16/us/immigration-raids-school-absences-deportation-fears.html.

[10]    Arya Ansari & Michael Gottfried, *The Grade-Level and Cumulative Outcomes of Absenteeism During Elementary School*, 92 CHILD DEV. 4 at 14–15 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC9075049/pdf/nihms-1787193.pdf.

terrified to leave their homes. Indeed, ICE's arrests in D.C. may be causing a worse absenteeism crisis because the arrests *are* occurring at or near schools. For example:

- E.W., an instructional coach for elementary school students, reports that attendance at her school plummeted in September, almost immediately after immigration enforcement activity in the neighborhood surrounding the school increased, with particularly severe absences on days when Defendants are reportedly active in the neighborhood. For example, E.W. reports that in just one multilingual classroom, ten out of 31 students have "significant" attendance issues. One elementary school student missed nearly the first full month of school.

- J.S., a kindergarten teacher, reports that—in the less than two months since the school year began—several of her current and former students have quickly accrued a substantial number of absences. These absences are directly linked to Defendants' indiscriminate immigration arrests: for example, J.S. described a family who was taking their kids to school, learned of ICE activity on the way to school, and went home rather than risk an illegal arrest.

- L.B., a DCPS educator, reported that several preschoolers missed the first few weeks of the school year entirely because their parents feared being swept up in Defendants' dragnet arrests.

- N.M., an educator at a D.C. elementary school, reports that several of her young students have just been disenrolled from school due to continued absences, likely because students or families are terrified of immigration arrests, without any indication whether they have now enrolled somewhere else. Another of her students missed the first five weeks of the school year. Others attend sporadically based on reports of ICE enforcement actions in the neighborhood.

- R.C., an elementary schoolteacher, reported that nearly half of the Latino population of her school started regularly missing school last spring during the initial surge of warrantless arrests.

- E.S., a DCPS teacher, reported that multiple students in her elementary school were consistently absent at the beginning of the school year—a critical time for elementary education—because their families did not feel safe and feared family separation.

- Even when students are able to attend school more regularly, several teachers reported a significant decrease in students participating in after-school programs, as they instead participate in carpools and walking buses to ensure they can get home safely. Teachers also report a significant decrease in parental involvement in school activities. According to one teacher, J.S., attendance plummeted at her school's Hispanic Heritage Month celebration, likely because many families and students are afraid to attend events associated with Hispanic culture when ICE uses racial profiling to conduct

10

arrests. Likewise, E.S. observed that at her school, which has a significant Latino population, only two to three Latino families attended this year's Back to School night—a critical event for teachers to build relationships with families and set up students for success. The event had been well attended in the past.

Making matters worse, many families may soon be reported to Child and Family Services (CFS) because of the fear instilled by Defendants' unlawful indiscriminate mass-arrest policy. When a student under 13 years old accrues more than 10 unexcused absences, District law requires schools to report that student to CFS. D.C. Code § 38-208(c)(1)(A). Families who are reported to CFS may then be investigated for neglect—a traumatic and intrusive process that could lead parents to lose custody of their minor children. Research shows that students who are subjected to a CFS investigation have depressed math and reading scores and are significantly more likely to repeat a grade, even when that investigation finds no neglect or abuse.[11]

Because Defendants have caused an absence crisis in District schools, school employees may soon be forced to report students to CFS. J.S., a D.C. kindergarten teacher, estimated that between five to six percent of the students at her school are at risk of being reported for chronic absences, even though she believes that the large majority of children who are staying home for fear of unlawful immigration

---

[11]    Joseph P. Ryan et al., *Early Exposure to Child Maltreatment and Academic Outcomes*, 23 CHILD MALTREATMENT 4, 370 (2018), https://max-gross.github.io/website_documents/child_maltreatment_academic_outcomes.pdf.

come from loving, healthy homes. In other words, families are facing an impossible choice: take their children to school, and risk being arrested in front of their children, detained, and indefinitely separated from their families; or stay home, which could eventually lead to a CFS investigation and loss of custody of their children. For loving parents subject to Defendants' unlawful policy, there is literally no option that ensures they can stay with their children.

Even for students able to attend school regularly, learning has been disrupted by the extreme stress caused by Defendants' actions. Long-standing social science research shows that school-aged children who worry daily about being separated from their parents due to immigration enforcement experience long-term decline in educational attainment. For instance, a 2015 study found that immigration enforcement has the largest, negative impacts on children ages 6 to 13, who become 25.2% more likely to drop out.[12] A 2017 study found that, in school districts with significant immigration raids, the reading and math proficiency rates of Hispanic children and those with limited English proficiency led to a "large, immediate negative effects" on "the reading and math proficiency rates," which "persisted for multiple years and were not seen among White children."[13]

---

[12]     Carolyn Heinrich, Mónica Hernández, & Mason Shero, *Repercussions of a Raid: Health and Education Outcomes of Children Entangled in Immigration Enforcement*, 42 J. OF POL'Y ANALYSIS & MGMT. 350, 7 (2022), https://onlinelibrary.wiley.com/doi/abs/10.1002/pam.22443 (discussing studies).
[13]     *Id.* at 8.

C. Defendants' baseless, warrantless mass arrests have made D.C.'s schools less safe by destroying trust in law enforcement.

Defendants' baseless arrests are also undermining school safety. For example, D.P. reports that the majority of students and educators at the school where he works now feel uncomfortable calling 911. Previously, D.P.'s school had a productive relationship with local police in addressing issues arising from drug use near his school. Because the school community no longer feels safe asking the police for help, out of fear that doing so could result in an unlawful arrest and detention, D.P. and his colleagues have had to find workarounds to keep their students safe when there are individuals in crisis due to drug use near the school. D.C. Council Member Robert White also reported an incident during which the Metropolitan Police Department (MPD) told concerned parents and teachers that "If you have such a problem with us, don't call 911 next time."[14] The message to school communities is clear: they cannot count on law enforcement to keep their students safe. Instead, law enforcement, including local police, will only put their families in danger.

D. Teachers and schools are being forced to divert significant time, effort, and resources to address the terror that Defendants' warrantless, mass arrests are causing in D.C.'s school communities.

Teachers across the District, who are already stretched thin, are diverting significant time, money, and resources to ensure that their students can get to and from school safely and avoid being separated from their parents. Numerous teachers described setting up a transportation system to help students get to school

---

[14]    Robert White (@robertwhitedc.bsky.social), *supra* note 2.

without their parents having to risk being arrested and detained in front of their elementary-age children. For example, E.W. described a fellow teacher who shepherds two full cars of students every day, because those students' caregivers are afraid to leave the house. This teacher drives to students' neighborhoods twice every morning to pick them up for school, then twice in the afternoon to return them. Several teachers take time out of their day every day to manage or run carpools, many at their own expense. Teachers also accompany students to and from the bus or metro, and organize neighborhood "walking buses" or safety patrols to ensure that young students can walk safely to school while their parents remain safely at home.

Even when teachers are able to get terrified students to school, they devote significant classroom time to helping students manage the fear and trauma they are suffering because of Defendants' dragnet arrests, thereby reducing the time available for learning. One educator, E.S., shared that she had to devote instructional time to reassuring students that it was safe to be at school after a student described ICE detaining their family member. Another teacher, R.C., spent 45 minutes calming down a student who was having a panic attack after witnessing ICE detain a close family member. R.C. has had to spend so much time addressing the devastating impacts of these warrantless arrests that she had to give up running an extracurricular activity she normally runs.

Several educators also explained that they are spending a significant amount of time, and their own money, helping families pick up the pieces when they are

targeted by Defendants' unlawful, warrantless arrests. L.B. now has to spend time establishing protocols and helping families plan for what to do if no one comes to pick up her three-year-old students, in the event that their parents are arrested by ICE. R.C. described spending a significant amount of time helping families raise money to deal with the effects of these arrests, and helping to find pro bono and affordable legal help for family members who have been unlawfully detained. She also had to spend time and effort helping a family figure out where exactly their family member was being held because ICE refused to tell them, and then provided funds out of her own pocket for the family to be able to call him.

S.O., who works at a D.C. charter school, has had to devote significant time, effort, and resources to helping make sure that families affected by Defendants' warrantless arrests have enough to eat. The primary breadwinners of two families she works with were detained by ICE, leaving mothers with multiple children desperate to try to make ends meet. Even for parents who have been lucky enough not to be arrested yet, many are so afraid of being detained that they have stopped working so as to avoid leaving the house, making it extremely difficult to provide for their families.

Finally, several teachers explained that their schools are having to divert precious resources to pay for shuttles and extra counselors and psychologists. They are also starting to spend time and money developing tools for how to speak to school-aged children about the extreme stress they and their peers are experiencing because of ICE's warrantless arrests.

## II.    Absent Immediate Injunctive Relief, Students and Schools Across the District Will Suffer Irreparable Harm.

The harms that *amici* witness and attempt to address in District schools every day are well recognized in the case law as irreparable harm justifying preliminary injunctive relief.

First, D.C. students who are separated from their parents are experiencing irreparable harm—harm that will follow them for years to come. *See de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 503 (D.D.C. 2018) ("Separation irreparably harms plaintiffs every minute it persists"); *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011); *Tate v. Pompeo*, 513 F. Supp. 3d 132, 151 (D.D.C. 2021). In previously holding that family separation constitutes irreparable harm, this Court relied on the American Academy of Pediatrics' policy statement explaining that the "'psychological distress, anxiety, and depression associated with separation from a parent would follow the children well after the immediate period of separation—even after the eventual reunification with a parent or other family.'" *De Nolasco*, 319 F. Supp. 3d at 503.

Second, even for those who have not yet been separated from their parents, a child who is denied access to their education suffers irreparable harm that warrants a preliminary injunction. *See, e.g.*, *Issa v. Lancaster*, 847 F.3d 121, 142 (3d Cir. 2017) (holding that denying students the language resources needed to learn constituted irreparable harm because denying a student a sound education could "change the trajectory of a child's life"); *Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034, 1045 (7th Cir. 2017) (holding that a school's bathroom policy caused

irreparable harm to a transgender student because walking a long distance to a gender-neutral bathroom "cause[d] him to miss class time"), *abrogated on other grounds*, *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020).

Students who are frequently absent from school will face a significant and persistent drop in their math and reading scores,[15] are four times more likely to drop out of high school,[16] and suffer lasting harms to their executive functioning and socio-emotional development.[17] Further, longitudinal research suggests that a child who is frequently absent from school in one year will be more likely to miss school in future years, compounding learning loss over time.[18] Here, no amount of money damages could make students whose families are members of the putative class whole for losing their opportunity to learn. *See also N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1107–08 (9th Cir. 2010) (upholding a district court's finding that plaintiffs suffered irreparable harm when they missed just 17 days of school).

---

[15]    Henry May, Lauren P. Bailes, & Danielle M. Riser, *Absenteeism & Achievement in Early Elementary Grades: A Multilevel Organizational Analysis*, 30 J. OF ED. FOR STUDENTS PLACED AT RISK 4, (2024), https://www.tandfonline.com/doi/full/10.1080/10824669.2024.2413483.

[16]    U.S. DEP'T OF EDUC., *Chronic Absenteeism*, (Aug. 21, 2025), https://www.ed.gov/teaching-and-administration/supporting-students/chronic-absenteeism.

[17]    Lucrecia Santibañez & Cassandra Guarino, *The Effects of Absenteeism on Academic and Social-Emotional Outcomes*, POL'Y ANALYSIS FOR CAL. EDUC., (Oct. 2020), https://edpolicyinca.org/publications/effects-absenteeism-academic-and-social-emotional-outcomes.; Arya Ansari & Michael Gottfried, *The Grade-Level and Cumulative Outcomes of Absenteeism During Elementary School*, 92 Child. Dev. 4 at 14–15 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC9075049/pdf/nihms-1787193.pdf.

[18]    Ansari & Gottfried, *supra* note 17.

III.    **The Public Interest and the Balance of the Equities Favor an Injunction.**

There are no legitimate interests on the other side of the ledger that could possibly outweigh the irreparable harm that this policy is causing daily to students and parents, many of whom are members of the putative class. As in prior cases preliminarily enjoining immigration enforcement practices that result in family separation, the "public's interest in enforcing the criminal and immigration laws of this country would be unaffected by the issuance" of the injunction, because the Executive Branch will remain "free to prosecute those who unlawfully enter the United States and institute removal proceedings against them." *De Nolasco*, 319 F. Supp. 3d at 504. Moreover, a spike in school absences, resulting dips in math and reading scores, and unsafe schools hurt the public interest. *Cf. N.D.*, 600 F.3d at 1113 ("[T]he public certainly did not benefit from a decrease in the number of instructional days").

In contrast, there is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence," including those requiring probable cause before making a warrantless arrest. *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.D.C. 2016) (quotation marks omitted).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be granted.

Respectfully submitted,

/s/ Alice C. Hwang
Alice C. Hwang

18

Daniel M. Rosenthal
Charlotte H. Schwartz
Sejal Singh

James & Hoffman, P.C.
1629 K Street NW, Suite 1050
Washington, DC 20006
Tel: (202) 496-0500
Fax: (202) 496-0555
achwang@jamhoff.com
dmrosenthal@jamhoff.com
chschwartz@jamhoff.com
ssingh@jamhoff.com

Dated: October 27, 2025                    *Counsel for Amici*