### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.,* *individually and on behalf of all others similarly situated* <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br> Defendants. | Case No.: 25-cv-3417-BAH |

**BRIEF OF *AMICI CURIAE* DISTRICT OF COLUMBIA**
**LEGAL SERVICES ORGANIZATIONS IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Megan D. Browder
Legal Aid DC
1331 H Street, NW, Suite 350
Washington, D.C. 20005
Telephone: (202) 661-5967
mbrowder@legalaiddc.org

*Counsel for Amici*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.............................................................................................ii

DISCLOSURE STATEMENT ....................................................................................... v

INTERESTS OF *AMICI CURIAE*................................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 1

ARGUMENT .................................................................................................................. 3

    I.    WARRANTLESS ARRESTS WITHOUT PROBABLE CAUSE HARM ALL
    DISTRICT RESIDENTS.......................................................................................... 3

        A.   ICE's Policy and Practice Flouts the Law and Harms District Residents............... 3

        B.   Warrantless Arrest Campaigns Do Not Reduce Crime or Violence......................... 8

    II.   DEFENDANTS' UNLAWFUL POLICY AND PRACTICE HARMS LEGAL
    SERVICES ORGANIZATIONS ............................................................................11

        A.   *Amici* have expended funds for client and employee safety .....................................11

        B.   *Amici* have diverted resources away from their core services to new areas of law
           .................................................................................................................................. 12

ADDENDUM.............................................................................................................. A-1

## TABLE OF AUTHORITIES

**Cases**

*\*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)...............................................................11

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13

   (D.C. Cir. 2011)...................................................................................................... 12

*Coal. for Humane Immigrant Rights v. United States Dep't of Homeland Sec.*, 780 F. Supp. 3d 79
   (D.D.C. 2025) ......................................................................................................... 12

*Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167 (2d Cir. 2021)............................................ 12

*Envt'l Integrity Project v. McCarthy*, 139 F. Supp. 3d 25 (D.D.C. 2015) .................................... 12

*Turlock Irrigation Dist. v. FERC*, 786 F.3d 18 (D.C. Cir. 2015) .................................................... 12

*\*United States v. Texas*, 144 F.4th 632 (5th Cir. 2025).................................................................... 13

**Statutes**

8 U.S.C. § 1101 ....................................................................................................................... 9

8 U.S.C. § 1357........................................................................................................................ 2

22 U.S.C. § 7101...................................................................................................................... 9

**Other Authorities**

ACLU & RIGHTS WORKING GRP., *The Persistence of Racial and Ethnic Profiling in the United
   States*, at 29 (2009) ................................................................................................ 2

Aisha Alsinai, et al., *Use of Immigration Status for Coercive Control in Domestic Violence
   Protection Orders*, FRONTIERS IN SOCIOL. 1, 3-4 (Apr. 28, 2023) .............................. 10

AM. IMMIGR. COUNCIL, *Immigrants in District of Columbia* ......................................................... 5

AM. IMMIGR. COUNCIL, *New data shows the number of immigrant entrepreneurs in the
   Washington, D.C. metro area grew by more than 11% in one year* (July 18, 2019)................... 5

AM. IMMIGR. COUNCIL, *U.S. Citizen Children Impacted by Immigration Enforcement* (June 4,
   2021) ................................................................................................................. 6

Aziz Huq, *The Consequences of Disparate Policing: Evaluating Stop and Frisk as a Modality of Urban Policing*, 101 MINN. L. REV. 2397, 2435 (2017) ............................................................... 8

DC ACCESS TO JUSTICE COMM'N, *Delivering Justice: Addressing Civil Legal Needs in the District of Columbia*, at 4 (2019) ................................................................................................. 13

Emily Baumgaertner Nunn, *Migrants are skipping medical care, fearing ICE, doctors say*, NY TIMES (May 9, 2025) ..................................................................................................................... 6

Families United DC Metro .................................................................................................................. 12

Hameed Aleaziz, *How Washington became a testing ground for ICE*, N.Y. TIMES ........................ 8

Jessica Sidman & Franziska Wild, *Many DC restaurant workers fear going to work amid Trump's immigration crackdown*, WASHINGTONIAN (Aug. 26, 2025) ........................................ 5

José Luis Ávila, *ICE hunt targets students and their families at the start of the new school year*, EL PAIS (Sept. 4, 2025) ............................................................................................................. 8

José Olivares & Will Craft, *Immigrants with no criminal record now largest group in ICE detention*, GUARDIAN (Sept. 26, 2025) ...................................................................................... 8

Joseph Nwadiuko, et al., *Changes in Health Care Use Among Undocumented Patients, 2014-2018* JAMA NETWORK ................................................................................................................. 6

Kira Lerner, *DC eateries suffer as workers terrified of ICE stay home: 'You don't want to go outside.'* (Aug. 29, 2025) ............................................................................................................ 5

Meg Anderson, *Lawyers, judges see a chilling effect from immigrants' arrests at criminal courthouses*, NPR (Aug. 8, 2025) ......................................................................................... 11

Memo. from Alejandro N. Mayorkas, DHS Sec'y, "Guidelines for Enforcement Actions in or Near Protected Areas (Oct. 27, 2021) ..................................................................................... 5

Moriah Ballingit, *Federal surge has taken a toll on children of immigrants in Washington*, PBS (Sept. 17, 2025) ......................................................................................................................... 7

Nicci Mattey, *Mass Deportation in the U.S.: Explainer*, at 4 (Sept. 30, 2024) .............................. 3

Paul Schwartzman & Britney Shammas, *A D.C. neighborhood long home to immigrants pushes back against ICE arrests*, WASH. POST (Sept. 17, 2025) ........................................................... 4

PHYSICIANS FOR HUMAN RIGHTS, *Consequences of Fear: How the Trump Administration's Immigration Policies and Rhetoric Block Access to Health Care*, at 8-11 (Apr. 2025) ............. 6

iii

Shira Markoff, et al., *The devastating economic and human toll of mass deportation*, DC FISCAL POL'Y INST. (Aug. 2025) .................................................................................................. 3

Steve Inskeep & Christopher Thomas, *Trump promised the 'largest deportation' in U.S. history. Here's how he might start*, NPR (Nov. 14, 2024) ........................................................ 1

Teddi Nicolaus, *Immigrants Bypassing Care in Wake of Deportation Fears*, 55:4 THE NATION'S HEALTH 12 (June 2025) ...................................................................................................... 6

Teo Armus, *They watched ICE detain their dad. now D.C. neighbors escort them to school*, N.Y. TIMES (Sept. 11, 2025) .................................................................................................... 8

Thomas S. Dee, *Recent Immigration Raids Increased Student Absences*, Ed Working Paper No. 25-1202 (June 2025) ...................................................................................................... 8

U.S. CITIZENSHIP & IMMIGR. SERV., *Abused Spouses, Children and Parents* ............................... 10

U.S. CITIZENSHIP & IMMIGR. SERV., *Victims of Human Trafficking: T Nonimmigrant Status* ........ 9

U.S. DEP'T OF HOMELAND SEC., Memo. from Benjamine C. Huffman, Acting Sec'y to Caleb Vitello, Acting ICE Director & Pete R. Flores, Customs & Border Protect., "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025) .................................................... 5

U.S. IMMIGR. & CUSTOMS ENF'T, *U.S. Immigration and Customs Enforcement Administrative Arrest Statistics* ........................................................................................................... 1

## DISCLOSURE STATEMENT

In accordance with Local Civil Rule 7(o)(5), *amici* certify that (1) *amici* are non-profit, tax-exempt organizations that have issued no stock; have no parent corporation; and no publicly-owned corporation owns 10% or more of their stock; (2) the brief was authored entirely by counsel for the *amici curiae* and not by counsel for any party, in whole or in part; (3) no party or counsel for any party contributed money to fund preparing or submitting the attached brief; and (4) apart from *amici curiae*, no other person contributed money to fund preparing or submitting the attached brief.

**INTERESTS OF *AMICI CURIAE***

*Amici* legal services organizations represent and assist District of Columbia residents living in poverty and those living in low-income households, the majority of whom are people of color. *Amici*'s clients include people who daily risk being arrested or detained because ICE fails to follow the law, which requires an individualized assessment that any specific individual is undocumented and is a flight risk, before arrest. The federal government's unlawful policy and practice harms both *amici*'s clients and the *amici* themselves.

*Amici* include Legal Aid DC, African Communities Together, Ayuda, Bread for the City, Children's Law Center, DC Affordable Law Firm, and Tzedek DC. Individual statements of interest for each *amicus* are appended to this brief.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

On the campaign trail, President Trump made aggressive immigration enforcement a key talking point and his goal was clear: he wanted to "launch the largest deportation program of criminals in the history of America."[1] After initial data showed that ICE arrests were flat or down for the first quarter of this year as compared to the prior year, the Administration changed tactics.[2] While the Administration publicly declared that ICE would be focusing on "criminals," on the ground the agency ramped up a policy to hit daily arrest quotas, regardless of whether ICE agents made an individualized determination that an individual has committed a crime (or even an immigration violation) or that they are a flight risk. That alone violates the Fourth Amendment,

---

[1] Steve Inskeep & Christopher Thomas, *Trump promised the 'largest deportation' in U.S. history. Here's how he might start*, NPR (Nov. 14, 2024), https://www.npr.org/2024/11/12/nx-s1-5181962/trump-promises-a-mass-deportation-on-day-1-what-might-that-look-like.

[2] U.S. IMMIGR. & CUSTOMS ENF'T, *U.S. Immigration and Customs Enforcement Administrative Arrest Statistics*, https://www.ice.gov/statistics (comparing arrests from Q1 FY2024 to Q1 FY2025).

1

the Immigration and Nationality Act, 8 U.S.C. § 1357, and DHS regulations. ICE further compounds this harm by targeting people who fit the "profile" of the kind of undocumented immigrants that the government seeks to deport: Black and Brown non-English speakers who work certain jobs. There is simply no way for federal officers to know based on the racial or ethnic group that someone appears to belong to, the language they are speaking, or their job that there is probable cause that that individual is an undocumented immigrant or that they would likely flee before the agent could obtain a warrant.

The federal government's policy and practice of racial, ethnic, and linguistic profiling has dark roots in this country. From Japanese internment camps to post-9/11 mass detentions,[3] each time that federal law enforcement overreaches in the name of security or crime, whole communities are harmed. The current Administration's policy to arrest first and ask questions later is no different.

*Amici* see firsthand the harm that this policy causes, for clients, their families and communities, and the organizations that serve them. If defendants are not enjoined, District residents and *amici* will continue to be irreparably harmed. District residents, regardless of their immigration status, are afraid to go about their daily lives: they have to weigh going to work, taking their children to school, going to church, or going to the doctor against the increasingly high possibility that they will be arrested and detained just because of how they look or the language they speak. Legal services organization are also harmed. *Amici* have expended, and will continue to expend, additional resources to ensure that clients can address emergent matters safely and are adequately represented.

---

[3] *See generally* ACLU & RIGHTS WORKING GRP., *The Persistence of Racial and Ethnic Profiling in the United States*, at 29 (2009), https://www.aclu.org/sites/default/files/pdfs/humanrights/cerd_finalreport.pdf.

**ARGUMENT**

I.   **WARRANTLESS ARRESTS WITHOUT PROBABLE CAUSE HARM ALL DISTRICT RESIDENTS.**

   A.   *ICE's Policy and Practice Flouts the Law and Harms District Residents.*

Despite constitutional, statutory, and regulatory requirements that ICE officers must have probable cause before detaining or arresting someone suspected of being undocumented, federal officers have ripped District residents and visitors from their vehicles, outside of their homes, and ambushed them at once previously safe locations like doctor's offices and schools. Warrantless ICE detentions and arrests do not just harm undocumented immigrants. Because ICE's policy is to arrest first and ask questions later, U.S. citizens and immigrants with lawful and protected status are also at risk every time they leave their homes. In addition to the harms Plaintiffs describe from being unlawfully arrested or detained, ICE's policy instills fear in communities, which affects their financial, physical, and emotional health.[4]

Roughly half of DC's immigrant population are not U.S. citizens, and about half of those non-citizens are undocumented.[5] That means that even if federal officers were able to accurately identify and detain every immigrant in DC, only 1 in every 4 of those individuals would be undocumented and, correspondingly, 75% of those individuals would be U.S. citizens or have lawful status. Because ICE detains or arrests people in violation of statutory requirements that officers make an individualized determination about their immigration status and whether they are

---

[4] *See, e.g.*, Nicci Mattey, *Mass Deportation in the U.S.: Explainer*, at 4 (Sept. 30, 2024), https://forumtogether.org/wp-content/uploads/2024/09/Explainer-Mass-Deportation-in-the-US.pdf.

[5] Shira Markoff, et al., *The devastating economic and human toll of mass deportation*, DC FISCAL POL'Y INST. (Aug. 2025), https://www.dcfpi.org/all/the-devastating-economic-and-human-toll-of-mass-deportation/#post-32326-endnote-5.

a flight risk, *amici* regularly encounter clients and applicants for our services who are afraid to come to work, particularly if they work in ICE-targeted industries like construction[6] and hospitality.

The chilling effect impacts economic stability; several clients have reduced work hours, missed shifts, or left employment entirely out of concern that travel to and from the workplace may expose them to detention. One *amicus* client quit her job because she was so afraid that ICE would arrest or detain her at her job or en route. Another *amicus* reports that a regular community-outreach participant who is in the United States lawfully informed *amicus* that he was afraid to do his contracting work because his immigration papers had been stolen from him during a robbery. Yet another *amicus* client is the primary caregiver for her autistic son, who is non-speaking and has other medical needs, including a seizure disorder. She is so afraid to leave her home due to her fear of being detained that she no longer goes to the grocery store, sees friends, or engages in community activities. She only leaves her home to take her son, who has significant disabilities, to and from his specialized school.

Immigrants make up roughly 16% of D.C.'s workforce,[7] including almost 50% of construction workers and 39% of tourism and hospitality workers.[8] Even when employees are citizens or have

---

[6] Paul Schwartzman & Britney Shammas, *A D.C. neighborhood long home to immigrants pushes back against ICE arrests*, WASH. POST (Sept. 17, 2025), https://www.washingtonpost.com/dc-md-va/2025/09/17/dc-ice-arrests-trump-takeover/.

[7] AM. IMMIGR. COUNCIL, *Immigrants in District of Columbia*, https://map.americanimmigrationcouncil.org/locations/district-of-columbia/#.

[8] AM. IMMIGR. COUNCIL, *New data shows the number of immigrant entrepreneurs in the Washington, D.C. metro area grew by more than 11% in one year* (July 18, 2019), https://www.americanimmigrationcouncil.org/press-release/new-data-shows-the-number-of-immigrant-entrepreneurs-in-the-washington-d-c-metro-area-grew-by-more-than-11-percent-in-one-year/.

legal status, "the fear is pervasive" because "[n]obody wants to spend a night in jail while your family struggles to show immigration authorities you have the paperwork."[9]

ICE's unlawful policies are also harming residents' health because people delay medical care out of fear of detention and arrest. Immediately after President Trump took office, DHS rescinded a prior policy that protected certain sensitive areas from ICE enforcement.[10] That prior policy recognized that ICE enforcement actions have an "impact on people's willingness to be in the protected area and receive or engage in the essential services or activities that occur there."[11] Accordingly, ICE generally would not take enforcement actions at schools, medical facilities, churches, or courthouses among other places. DHS's rescission of the protected areas policy, as compounded by the illegal policies and practices challenged in this case, has resulted in fewer people seeking routine and needed medical care.[12] Health care centers around the country report

---

[9] Jessica Sidman & Franziska Wild, *Many DC restaurant workers fear going to work amid Trump's immigration crackdown*, WASHINGTONIAN (Aug. 26, 2025), https://www.washingtonian.com/2025/08/26/many-dc-restaurant-workers-fear-going-to-work-amid-trumps-immigration-crackdown/; *see also* Kira Lerner, *DC eateries suffer as workers terrified of ICE stay home: 'You don't want to go outside.'* (Aug. 29, 2025), https://www.theguardian.com/us-news/2025/aug/29/trump-ice-washington-dc-restaurants (noting that "many immigrants, both documented and undocumented, fear coming into DC and being on the streets, and some have been detained by ICE").

[10] U.S. DEP'T OF HOMELAND SEC., Memo. from Benjamine C. Huffman, Acting Sec'y to Caleb Vitello, Acting ICE Director & Pete R. Flores, Customs & Border Protect., "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025), https://www.dhs.gov/sites/default/files/2025-03/25_0120_S1_enforcement-actions-in-near-protected-areas.pdf.

[11] Memo. from Alejandro N. Mayorkas, DHS Sec'y, "Guidelines for Enforcement Actions in or Near Protected Areas (Oct. 27, 2021), https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw10272021.pdf.

[12] PHYSICIANS FOR HUMAN RIGHTS, *Consequences of Fear: How the Trump Administration's Immigration Policies and Rhetoric Block Access to Health Care*, at 8-11 (Apr. 2025) (detailing provider stories of increased no-shows and cancellations due to patient fear and how that fear extends to U.S. citizens and family members), https://phr.org/wp-

5

upwards of 30% of patients missing appointments and 40% of patients not picking up their prescriptions because they have to choose between health care and potential detention.[13] A study showed that during the first Trump Administration, anti-immigration sentiment led to a 43% decrease in primary care visits for undocumented children and a 34% decrease in undocumented adults.[14] Research also shows that prior immigration crackdowns result in "poorer birth outcomes and mental health status, lapses in care, and fewer people accessing the types of public programs that reduce illness and poverty overall."[15]

*Amici* expect even more severe outcomes from ICE's current "arrest first, ask questions later" policy. For example, one *amicus* client is the primary caregiver for her son, who is non-speaking, non-ambulatory, and has significant medical needs. During the COVID-19 pandemic, he was hospitalized with COVID for several months and has been unable to leave his bed since he came home. The client and her son live in a large apartment complex where ICE officers are in the parking lot daily, sometimes with as many as five trucks. They arrest residents, construction workers, delivery people, and other visitors on sight, causing extreme fear in the client and other

---

content/uploads/2025/04/Consequences-of-Fear_Research-Brief_PHR_April-2025.pdf#xd_co_f=YjkxNzY4M2UtZDYzMy00Y2U2LWIzNTItYmQxMDViYzE2MDFh~.

[13] Teddi Nicolaus, *Immigrants Bypassing Care in Wake of Deportation Fears*, 55:4 THE NATION'S HEALTH 12 (June 2025), https://www.thenationshealth.org/content/55/4/1.2.

[14] Joseph Nwadiuko, et al., *Changes in Health Care Use Among Undocumented Patients, 2014-2018* JAMA NETWORK, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2777033.

[15] Emily Baumgaertner Nunn, *Migrants are skipping medical care, fearing ICE, doctors say*, NY TIMES (May 9, 2025), https://www.nytimes.com/2025/05/08/health/migrants-health-care-trump.html#:~:text=They%20are%20finding%20that%20people,Leer%20en%20espa%C3%B1ol; *see also* AM. IMMIGR. COUNCIL, *U.S. Citizen Children Impacted by Immigration Enforcement* (June 4, 2021), https://www.americanimmigrationcouncil.org/fact-sheet/us-citizen-children-impacted-immigration-enforcement/.

residents in the apartment complex. Her son receives nursing care through his insurance, but the nursing care is less consistent with ICE in the parking lot, so he does not always have the care he needs. The client has not left the apartment building in almost three months since ICE began sitting in the parking lot, and she notes that other neighbors have also not left the property over fear of being detained.

ICE's unlawful detention and arrest policies also destabilize whole families. After ICE detained a D.C. father from Guatemala while he was buying milk for his family, his three children—all U.S. citizens—were either too afraid or too upset to go to school.[16] *Amici*'s clients and applicants have similar experiences. ICE's warrantless arrests combined with the rescission of the protected areas policy means that parents are afraid to take their children to school and children are afraid that their parents may not be there when they get home. Moreover, the increased presence of armed law enforcement on routes to schools further heightens parents' concern for their own safety and that of their children as they travel to school. While some parent groups have organized "walking buses" to get children to school, there is a serious risk of increased truancy due to families' fear of attending school.[17] Truancy is already an issue in D.C. schools, which is only exacerbated by ICE's unlawful policy.[18]

---

[16] Moriah Ballingit, *Federal surge has taken a toll on children of immigrants in Washington*, PBS (Sept. 17, 2025), https://www.pbs.org/newshour/politics/federal-surge-has-taken-a-toll-on-children-of-immigrants-in-washington.

[17] Teo Armus, *They watched ICE detain their dad. now D.C. neighbors escort them to school*, N.Y. TIMES (Sept. 11, 2025), https://www.washingtonpost.com/immigration/2025/09/11/immigrants-school-kids-trump-dc/.

[18] José Luis Ávila, *ICE hunt targets students and their families at the start of the new school year*, EL PAIS (Sept. 4, 2025), https://english.elpais.com/usa/2025-09-04/ice-hunt-targets-students-and-their-families-at-the-start-of-the-new-school-year.html#; *cf.* Thomas S. Dee, *Recent Immigration*

7

B. *Warrantless Arrest Campaigns Do Not Reduce Crime or Violence.*

ICE's warrantless and suspicionless arrests are likely to *increase* crime. ICE arrests in D.C. for the two months of August and September were 1300% more than arrests in the seven month period from January through July.[19] Although President Trump cited violent crime as the reason for the current ICE deployment, more than half of people ICE arrested since August 2025 have no criminal record.[20] ICE's policy of warrantless arrests without making individualized determinations destroys trust between community members and police and ultimately leads to reduced crime reporting.[21]

For example, some *amici* assist clients with T- and U-visa applications, which provide nonimmigrant visas for eligible victims of human trafficking and certain crimes who cooperate with law enforcement, respectively. Congress created the T- and U-visa programs to protect victims of crimes and "[s]trengthen the ability of law enforcement agencies" to "detect, investigate, and prosecute" cases of human trafficking, domestic violence, sexual assault, and other crimes.[22] Since President Trump's federal deployment of ICE agents, however, immigrants are afraid to cooperate

---

*Raids Increased Student Absences*, Ed Working Paper No. 25-1202 (June 2025), https://edworkingpapers.com/sites/default/files/ai25-1202.pdf.

[19] Hameed Aleaziz, *How Washington became a testing ground for ICE*, N.Y. TIMES (Oct.1, 2025), https://www.nytimes.com/2025/10/01/us/politics/washington-dc-ice.html.

[20] José Olivares & Will Craft, *Immigrants with no criminal record now largest group in ICE detention*, GUARDIAN (Sept. 26, 2025),

[21] *See, e.g.*, Aleaziz, *supra* n. 17; Aziz Huq, *The Consequences of Disparate Policing: Evaluating Stop and Frisk as a Modality of Urban Policing*, 101 MINN. L. REV. 2397, 2435 (2017).

[22] U.S. CITIZENSHIP & IMMIGR. SERV., *Victims of Human Trafficking: T Nonimmigrant Status*, https://www.uscis.gov/humanitarian/victims-of-human-trafficking-t-nonimmigrant-status#:~:text=Traffickers%20often%20take%20advantage%20of,investigate%20and%20prosec ute%20human%20trafficking;  https://www.uscis.gov/policy-manual/volume-3-part-c-chapter-1

with the police and apply for a T- or U-visa or other forms of relief. That is not only contrary to Congress's purpose in creating the visas[23] but makes the entire community less safe because victims are not reporting crimes or are too afraid to cooperate with law enforcement. As one example, an *amicus* client was raped as a minor and initially reported it to the police. Even though the client could identify the rapist, they stopped cooperating with the police out of fear of immigration enforcement.

ICE's unlawful policy only ramp up the elevated anxiety and a profound sense of uncertainty that accompany decisions about whether and how to pursue immigration relief. In particular, clients with prior removal orders or claims involving complex statutory barriers face acute fear of enforcement consequences. Compounding these challenges, clients have expressed distrust and concern regarding potential information-sharing between courts, law enforcement agencies, and federal immigration authorities, which can deter participation in family court proceedings or victim-based relief processes.

For example, one *amicus* assisted a client with humanitarian parole status whose partner physically, emotionally, and financially abused them and tried to coerce them into marriage. The client has not filed a report against the abuser because they fear deportation. Another client, who was brutally persecuted in her home country for being a woman's activist, is eligible for a T- and U-visa as a victim of sexual assault and trafficking that occurred in the United States. *Amicus* had been working with her for months to report the crimes that occurred here and apply for a T- and U-visa. She is too scared to work with law enforcement, however, because of ICE's increased immigration enforcement and detentions. ICE's policy and practice of unlawful arrests also

---

[23] *See* 8 U.S.C. § 1101; 22 U.S.C. § 7101.

emboldens violent criminals and people may even target undocumented people because they are less likely to seek police help. As the government itself acknowledges, this is common in the domestic violence context, where abusive partners frequently use immigration status as a tool of their abuse.[24] *Amici* have seen an increase of this control dynamic since ICE ramped up its arrest first, ask questions later policy.

ICE's illegal warrantless arrests undermine the functioning of the legal system in myriad other ways. *Amici*'s clients are afraid to go to court, even when it is necessary to provide their own defense, provide testimony for a custody or protective order, or as a witness in cases that are unrelated to their immigration status, even if an in-person meeting or proceeding would be more effective.[25] After one *amicus* client saw a neighbor snatched while taking the trash out, she was too afraid to leave her building. Although she requires translation that is easier in person, she has asked that *amicus* meet her in her apartment to prepare for hearings and requested remote hearings. One *amicus* reports several clients who did not go to their immigration hearings because they fear immigration enforcement at the courthouse. Local domestic violence organizations have seen about 36% fewer immigrant clients this year versus last year. These experiences reflect not isolated individual choices, but the broader systemic impact of enforcement practices that undermine access to justice, destabilize families, and create significant barriers to safety and legal remedies.

---

[24] U.S. CITIZENSHIP & IMMIGR. SERV., *Abused Spouses, Children and Parents*, https://www.uscis.gov/humanitarian/abused-spouses-children-and-parents; *see also* Aisha Alsinai, et al., *Use of Immigration Status for Coercive Control in Domestic Violence Protection Orders*, FRONTIERS IN SOCIOL. 1, 3-4 (Apr. 28, 2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10175620/.

[25] Meg Anderson, *Lawyers, judges see a chilling effect from immigrants' arrests at criminal courthouses*, NPR (Aug. 8, 2025), https://www.npr.org/2025/08/08/nx-s1-5467685/lawyers-judges-see-a-chilling-effect-from-immigrants-arrests-at-criminal-courthouses.

## II.    DEFENDANTS' UNLAWFUL POLICY AND PRACTICE HARMS LEGAL SERVICES ORGANIZATIONS

*Amici* are nonprofit organizations with finite resources that provide legal services to District residents living in poverty. Defendants' unlawful conduct pulls those resources away from *amici*'s core activities "in a way that substantially impairs their ability to help their clients." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

### A.    Amici *have expended funds for client and employee safety.*

Because of ICE's unlawful arrest first, ask questions later policy, *amici* clients are afraid to use public transportation to meet with their lawyers or attend in-person court or administrative proceedings. *Amici* also have employees who, despite their lawful status, fear that ICE will unlawfully arrest or detain them. ICE's conduct therefore "perceptibly impair[s]" *amici*'s ability to "provide services," forcing *amici* to use their "resources to counteract that harm." *Coal. for Humane Immigrant Rights v. United States Dep't of Homeland Sec.*, 780 F. Supp. 3d 79, 88 (D.D.C. 2025) (quoting *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015)). In response to ICE's conduct, *amici* have provided rideshare funds for clients to safely meet with their lawyer, attend mediation, and attend court. These costs are not a "self-inflicted budgetary choice," *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (quoting *Envt'l Integrity Project v. McCarthy*, 139 F. Supp. 3d 25, 38 (D.D.C. 2015)) or "incurred at [*amici*'s] own initiative," but reasonably necessary to continue [*amici*'s] established core activit[ies]," *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 174 (2d Cir. 2021).

At one *amicus*, senior staff spent significant time developing resources and plans to react to the increased immigration enforcement. In collaboration with other organizations, including AMICA, *amicus* staff spent over 100 hours alone on creating the website Families United DC

11

Metro,[26] which helps families at risk of detention and deportation learn about their rights in the DC Metro Area related to family safety planning and immigration. *Amicus* then partnered with other *amici* to launch a new stream of internal and pro bono work related to immigration custodial powers of attorneys, which includes creating and translating documents, creating and conducting trainings, reconfiguring their intake database and online intake, and training internal staff and pro bono attorneys. *Amicus* also launched community training for allies and impacted community members. These new streams of work require significant staff time, including overtime hours for hourly staff, which did not exist previously at *amicus*. Other *amici* have helped clients execute custodial and financial powers of attorney to protect their families in the event of detention or deportation and planned emergency clinics to help clients create detention and deportation plans.

B.  Amici *have diverted resources away from their core services to new areas of law.*

The District, like the rest of the country, faces a severe access to justice crisis. One study showed that anywhere between 75% to 97% of DC civil litigants are unrepresented.[27] *Amici* are part of the limited number of nonprofits whose mission is to reduce the access to justice gap and serve as many people as possible. They must decide how to allocate limited resources among ever-increasing need. ICE's unlawful arrests and detentions "directly affect[s]" *amici*'s "ability to provide legal services to immigrants." *United States v. Texas*, 144 F.4th 632, 642-43 (5th Cir. 2025). ICE's policy of arresting first and asking questions later has led to arrests of individuals with protected status, who *amici* then represent. For example, one *amicus* whose core immigration activities have previously been limited to helping clients obtain Special Immigrant Juvenile Status

---

[26] Families United DC Metro, https://familiesuniteddcmetro.org/.

[27] DC ACCESS TO JUSTICE COMM'N, *Delivering Justice: Addressing Civil Legal Needs in the District of Columbia*, at 4 (2019), https://dcaccesstojustice.org/files/Delivering_Justice_2019.pdf.

(SIJS) and T- and U-visas has had to expand its practice areas after ICE, without a warrant, detained a client who had SIJS approval. The client's removal proceedings were terminated in 2021, but *amicus* have now had to work to get the client out of detention, including forays into new areas of practice, like habeas petitions. This work takes considerably more resources, which limits *amicus*'s ability to help other clients. ICE has also accelerated check-ins for unaccompanied children and survivors of domestic violence. Although clients usually attend these check-ins on their own, clients are more reluctant to attend and *amici* now often accompany clients because ICE has detained and arrested individuals without probable cause of immigration status or that the person will be a flight risk. Additionally, one *amicus* now prepares draft stays of removal in advance in case those clients are detained at a check-in—a practice that was unnecessary before. These actions and additional diversion of resources are in direct response to ICE's unlawful policies and are additionally harm *amici*.

## CONCLUSION

For the foregoing reasons, and those set forth by Plaintiffs, this Court should enjoin ICE from targeting, detaining, and arresting individuals without making an individualized determination of probable cause that a person is undocumented and is a flight risk.

Respectfully submitted,

*/s/ Megan D. Browder*
Megan D. Browder (D.C. Bar No. 1552273)
Legal Aid DC
1331 H Street, NW, Suite 350
Washington, D.C. 20005
Telephone:  (202) 661-5967
Fax: (202) 727-2132
E-mail:  mbrowder@legalaiddc.org

*Counsel for Amici*

13

**ADDENDUM**

*Amicus* **Legal Aid DC** ("Legal Aid") is the oldest and largest general civil legal services provider in the District. Legal Aid provides direct legal services that help more than 10,000 District residents each year and advocates for systemic change to improve laws and policies that affect people living in poverty in the District. Legal Aid has been a leader in access to justice to ensure that every District resident has a meaningful ability to participate in the judicial process—an interest that has been significantly impaired by residents' fears of going to court due to expanded and unlawful law enforcement activities. In addition, Legal Aid represents domestic violence survivors to help achieve safety and stability. Survivors' fear in reporting crime to law enforcement has increased because of the use of the District's law enforcement processes for immigration enforcement.

*Amicus* **African Communities Together** (ACT) is a membership-based organization of African immigrants fighting for civil rights, opportunity, and a better life for themselves and their families. Across three chapters in New York City, Philadelphia, and the DC metro area, ACT connects African immigrants to critical services, helps Africans develop as leaders, and organizes its communities on the issues that matter. In DC, ACT holds weekly in-person legal clinics at its Eastern Market office as well as additional clinics at churches, mosques, and community centers throughout the city. It also regularly hosts rallies, legislative meetings, and press events on Capitol Hill as part of its federal advocacy work. As a result of the government's unlawful arrest practices, ACT's clients and members, regardless of immigration status, express fear about traveling in and around DC for legal services or to conduct advocacy. ACT has had to divert resources to address this new reality.

*Amicus* **Ayuda** advocates for low-income immigrants through direct legal, social and language services, training and outreach in Washington, D.C., Maryland, and Virginia. In 2024,

A-1

Ayuda provided 3,109 immigrants with legal and social services and provided more than 12,554 language access services for Limited English Proficient (LEP), Deaf, and Hard-of-Hearing individuals. Ayuda's clients—many of whom are survivors of crimes like domestic violence and trafficking—have been harmed by the federal government's enforcement practices, which instill fear, disrupt access to services, and divert Ayuda's limited resources away from its core mission of ensuring safety and justice for immigrant communities.

*Amicus* **Bread for the City** is a nonprofit organization that each year provides more than 30,000 low-income residents of Washington, D.C., with free comprehensive services, including supplemental food, clothing, medical care, social services, and legal services. We work to uproot racism, a major cause of poverty. The mission of Bread for the City is to help Washington, DC residents living with low incomes develop their power to determine the future of their own communities. We are committed to treating our clients with the dignity and respect that all people deserve.   The Legal Clinic at Bread for the City provides free legal services in the areas of family, landlord-tenant,  public benefits, and immigration law. Our immigration practice helps noncitizens in a variety of immigration legal matters, including applications for work permits, green cards, asylum, Temporary Protected Status (TPS), citizenship, and a variety of other humanitarian benefits for victims of domestic violence, child abuse, or violent crimes, such as U-visa, T-visas, and Special Immigrant Juvenile Status (SIJS). Therefore, the community we serve will likely be disproportionately affected by the subject DHS policy and would require Bread to divert more resources to counteract the harmful impact.

*Amicus* **Children's Law Center** believes every child should grow up with a strong foundation of family, health and education and live in a world free from poverty, trauma, racism and other forms of oppression.  Our more than 100 staff—together with DC children and families,

A-2

community partners and pro bono attorneys—use the law to solve children's urgent problems today and improve the systems that will affect their lives tomorrow.  Since our founding in 1996, we have reached more than 50,000 children and families directly and multiplied our impact by advocating for city-wide solutions that benefit hundreds of thousands more.  Our work also includes providing representation, resources, and training to families and allies of families fearing future detention or deportation.

*Amicus* **DC Affordable Law Firm** (DCALF) is a leading legal services organization providing free and accessible legal representation to more than 500 modest- and low-income DC residents each year — empowering the 1 in 5 residents otherwise excluded from the legal marketplace with critical legal services in central areas of human need. DCALF deploys innovative programs and strategies to bridge systemic civil justice gaps and expand access to representation across the District of Columbia. DCALF has worked alongside immigrants and their families since 2017, delivering a wide range of humanitarian immigration legal services to DC residents and their families, and empowering clients through training, resources, and representation to address their immigration legal needs and safeguard their futures in response to fears of detention or deportation.

*Amicus* **Tzedek DC** is a nonprofit headquartered at the University of the District of Columbia David A. Clarke School of Law whose mission is to safeguard the legal rights and financial health of DC residents with low incomes dealing with the often devastating consequences of abusive debt collection practices and other consumer related issues. Tzedek DC conducts outreach to Spanish-speaking DC residents through its Sin Deudas, Sin Dudas program, which includes tabling at community events, providing financial literacy classes, and giving legal advice at drop-in clinics. Tzedek DC has had to cancel some of its Sin Deudas, Sin Dudas programming

A-3

A-4

or convert it to online virtual events because many members of the community, including those who are documented, are afraid to attend events in person due to immigration raids targeting all Latinos.