UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSE ESCOBAR MOLINA, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>DEPARTMENT OF HOMELAND<br>SECURITY, et al.,<br><br>    Defendants. | Civil Action No. 25-3417 (BAH) |

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR A
PRELIMINARY INJUNCTION AND CLASS CERTIFICATION**

# TABLE OF CONTENTS

Table of Contents .................................................................................................. i

Introduction ....................................................................................................... 1

Background ......................................................................................................... 2

    I.     Procedural Background. ................................................................... 2

    II.    Legal Background. ......................................................................... 3

    III.   Factual Background. ....................................................................... 4

Legal Standards ................................................................................................... 7

    I.     Preliminary Injunction ................................................................... 7

    II.    Class Certification ......................................................................... 8

Argument ............................................................................................................ 9

    I.     Plaintiffs Are Unlikely to Succeed on the Merits of their Claims. ......................... 9

        A.     Plaintiffs Lack Standing to Enjoin Arrests. ................................................. 9

        B.     The INA Strips the Court of Jurisdiction to hear Plaintiffs' Claims......... 15

        C.     Plaintiffs Cannot Proceed Under the APA Because They Have Not Shown that the Purported Policy and Practice of Making Warrantless Arrests is a Final Agency Action. ........................................................................... 21

        D.     The Arrests Were Supported by Probable Cause and an Individualized Flight Risk Assessment. .......................................................................... 25

        E.     Plaintiffs Seek an Impermissible "Follow the Law" Injunction. .............. 28

        F.     Plaintiffs Fail to State Plausible Claims Against DEA............................. 29

    II.    Plaintiffs Fail to Show Irreparable Harm. ................................................. 30

    III.   Balance of Equities Favor Denying the Injunction. ............................................ 31

    IV.   Plaintiffs Should Be Ordered to Post Security. ...................................................... 33

    V.    The Court Should Deny Plaintiffs' Motion to Certify a Class.............................. 33

        A.     Plaintiffs Cannot Represent a Class Because they Lack Standing. .......... 34

B.      The INA Prevents the Court from Granting Class Wide Relief Here....... 35

C.      Plaintiffs Have Not Satisfied Their Burden to Demonstrate Numerosity. 37

D.      Plaintiffs Cannot Identify a Common Question That Would Drive
        Resolution of this Litigation. .................................................................. 38

E.      The Named Plaintiffs' Claims Are Not Typical of the Putative Class. .... 42

F.      The Named Individual Plaintiffs Are Inadequate Representatives........... 43

G.      Plaintiffs Cannot Satisfy the Requirements for a Class Under Rule
        23(b)(2). ................................................................................................... 44

Conclusion .................................................................................................................... 45

## INTRODUCTION

Plaintiffs Jose Escobar Molina, B.S.R., N.S., and R.S.M. are aliens living in Washington, DC who were arrested by immigration law enforcement agents in August 2025 but have since been released. Plaintiff CASA, Inc. ("CASA") an immigrant rights organization, alleges it has members similarly situated to the individual Plaintiffs. They collectively bring claims under the Administrative Procedure Act ("APA") alleging the arrests that took place in August violated 8 U.S.C. § 1357(a)(2) and related regulations, which prevent immigration law enforcement agents from making an arrest unless the agents have probable to cause to believe that the arrestee is in the United States in violation of U.S. immigration laws and the arrestee is likely to escape before a warrant can be obtained for his arrest. Plaintiffs seek a preliminary injunction to prevent "warrantless immigration arrests in this District unless, pre-arrest, the arresting agent has probable cause to believe that the person being arrested is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii)." The Court should deny Plaintiffs any injunctive relief they seek because they have not satisfied any of the four factors necessary to demonstrate entitlement to a preliminary injunctive relief.

Plaintiffs are unlikely to succeed on the merits of their claims. First, Plaintiffs lack standing because the injuries that they allege have already occurred and their assertion that those injuries will occur again is based on rank speculation. Second, because immigration arrests are part of the removal process the Immigration and Nationality Act ("INA"), specifically 8 U.S.C. §§ 1252(a)(5), (b)(9), and (g), strips the Court of jurisdiction to hear Plaintiffs' claims. Third, the policy and practice that Plaintiffs attempt to challenge is not a final agency action and thus unreviewable under the APA. Fourth, immigration law enforcement agents had probable cause to believe that Plaintiffs were in the United States in violation of U.S. immigration laws and thus the

arrests were conducted according to law.  Fifth, Plaintiffs seek an impermissible "follow the law" injunction.

Even Plaintiffs could succeed on the merits, the extraordinary preliminary injunctive relief that Plaintiffs request should be denied because they have not established irreparable harm. Plaintiffs assert that they are at risk of being rearrested but have not established that their rearrest is imminent and thus fall short of carrying their burden to establish irreparable harm.  Finally, the balance of equities favors the government because the injunction would interfere with the Executive Branch's prerogative to enforce the Nation's immigration laws as enacted by Congress.

Plaintiffs additionally seek to represent a class of aliens who they contend were also arrested in violation of 8 U.S.C. § 1357(a)(2), known as the "warrantless arrest class."  But the Court should deny Plaintiffs' motion for class certification because Plaintiffs lack standing to seek class certification and § 1252(f)(1) prevents the Court from issuing classwide relief.  Plaintiffs also fail to satisfy the requirements of numerosity, commonality, and typicality necessary to qualify for class certification as set forth in Federal Rule of Civil Procedure ("Rule") 23.  Finally, Plaintiffs would not adequately represent the proposed class because the relief available to Plaintiffs would not satisfy every individual in the proposed "warrantless arrest class."

## BACKGROUND

### I.     Procedural Background.

Plaintiffs brought this lawsuit on September 25, 2025, alleging that immigration arrests that Defendants conducted in Washington, DC in August 2025 were unlawful under the INA, *see* Compl. (citing 8 U.S.C. § 1357(a)(2)) and thus contrary to law under the APA.  5 U.S.C. § 706(2)(A)(C)(D).  Plaintiffs claimed that Defendants were acting pursuant to a policy and practice of making warrantless immigration arrests in Washington, DC without a pre-arrest individualized determination of probable cause to believe that the person being arrested is likely

to escape before a warrant can be obtained.  Compl. ¶¶ 77, 83.  One week later, Plaintiffs moved for preliminary injunction attempting to enjoin this alleged policy and certify a class of similarly situated aliens.  Mot. for Prelim. Inj. (ECF No. 17); Mot. for Class Cert (ECF No. 19).

## II.    Legal Background.

The INA permits an immigration enforcement officer to arrest an alien in the United States without a warrant if the officer "has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest."  8 U.S.C. § 1357(a)(2).  Regulations promulgated under the INA track the statute specifying that "an arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States."  8 C.F.R. § 287.8(c)(2)(i).  These arrests require a warrant unless "the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained."  *Id.* § 287.8(c)(2)(ii).

An alien arrested without a warrant must be "examined by an officer other than the arresting officer."  *Id.* § 287.3(a).  "If the examining officer is satisfied that there is *prima facie* evidence that the arrested alien . . . is present in the United States in violation of the immigration laws, the officer will either refer the case to an immigration judge for further inquiry . . . , order the alien removed . . . , or take whatever other action may be appropriate or required under the laws or regulations applicable to the particular case.  *Id.* at § 287.3(b).  The government ordinarily will make an initial determination within forty-eight hours of the apprehension whether the alien will remain in custody, be paroled, be released on bond or be released on recognizance.  *Id.* § 287.3(d).

III.    **Factual Background.**

On March 27, 2025, President Trump issued Executive Order 14,252 entitled "Making the District of Columbia Safe and Beautiful." 90 Fed. Reg. 14559.  The Executive Order established the D.C. Safe and Beautiful Task Force to coordinate activities among federal law enforcement agencies.  Exec. Order 14,252 § 3.  Among other activities, President Trump directed the task force "to coordinate to ensure effective Federal participation in . . . directing maximum enforcement of Federal immigration law and redirecting available Federal, State, or local law enforcement resources to apprehend and deport illegal aliens in the Washington, D.C. metropolitan area."  *Id.* § 3(c)(i).  As part of this initiative, beginning August 11, 2025, Immigration Customs Enforcement ("ICE") Enforcement and Removal Operations began conducting targeted enforcement operations under Title 8 authorities.  Ex. 1, Joseph Simon Decl. ¶ 9.  ICE received assistance from other federal law enforcement agencies, including Customs and Border Protection ("CBP").  *Id.* ¶¶ 8, 10; *see also* Ex. 2, Kenneth Blanchard Decl. ¶ 4.

Plaintiff Jose Escobar Molina, an El Salvadoran National, has lived in Washington, DC with temporary protected status since 2001.  Jose Escobar Molina Decl. ¶ 1 (ECF No. 17-2).  On the morning of August 21, 2025, immigration agents arrested Escobar Molina as he was walking from his apartment to his truck.  *Id.* ¶ 5.  Prior to the arrest, immigration agents learned that Escobar Molina's temporary protected status had expired on March 9, 2025.  Ex. 2, Blanchard Decl. ¶ 7.  The agents transported Escobar Molina to an ICE processing center in Chantilly, Virginia and held him at that facility overnight.  Escobar Molina Decl. ¶ 10-11.  The following day, Escobar Molina was released.  *Id.* ¶ 14.

Plaintiff B.S.R., a Honduran National, has lived in Washington, DC since 2019 and has a pending application for asylum in the United States, B.S.R. Decl. ¶¶ 1-2 (ECF No. 17-3), but overstayed his B-2 visa.  Ex. 2, Blanchard Decl. ¶ 8.  The Government has initiated removal

proceedings against B.S.R. by issuing him a notice to appear in immigration court on January 29, 2025. Ex. 1, Simon Decl. ¶ 21. B.S.R. has been appearing for regular check-ins with ICE while his asylum application is pending and during a check-in in May 2025, B.S.R. was placed in an alternative to detention program and ordered to wear an ankle monitor. B.S.R. Decl. ¶ 10; Ex. 1, Simon Decl. ¶ 26. On August 9, 2025, B.S.R. violated one of the terms of his alternative to detention program because he failed to keep his ankle monitor charged. Ex. 1, Simon Decl. ¶ 21. Nine days later, immigration law enforcement agents arrested B.S.R. while he was in his car outside of his home. B.S.R. Decl. ¶ 12. The agents held B.S.R. at the Chantilly processing center for ten hours before releasing him. *Id.* ¶¶ 20-21. Removal proceedings against B.S.R. remain ongoing. *See* Ex. 1, Simon Decl. ¶ 21.

Plaintiff N.S., a Venezuelan National, lives in Washington, D.C. with temporary protected status and has a pending application for asylum in the United States. N.S. Decl. ¶ 1 (ECF No. 17-4). N.S. is also in removal proceedings. Ex. 1, Simon Decl. ¶ 22. Since November 2022, N.S. has attended annual check-ins with ICE, with his most recent check-in in November 2024. N.S. Decl. ¶ 2. On August 12, 2025, an immigration law enforcement agent arrested N.S. in his car outside of a Home Depot where he had just finished shopping. *Id.* ¶ 12. On that same day, ICE issued N.S. a notice to appear in immigration court. Ex. 1, Simon Decl. ¶ 22. Over the next four weeks, ICE held N.S. at various detention centers around the country including in Virginia, Arizona, and California. N.S. Decl. ¶¶ 19-20 (ECF No. 17-4). On August 25, 2025, while he was held at the Caroline Detention Facility in Bowling Green, Virginia, N.S. appeared for an immigration court hearing through a video call but the immigration judge continued the hearing to September 15, 2025. *Id.* ¶¶ 17, 21. On September 8, 2025, ICE fitted N.S. with an ankle monitor, released him on his own recognizance, and ordered him to appear for a check-in on September 18,

2025, at the ICE facility in Chantilly. *Id.* ¶ 23. N.S. virtually attended his September 15 immigration court hearing but the hearing occurred at the San Diego immigration court, and the immigration judge informed N.S. that his case would be transferred to the Washington, D.C. immigration court for a subsequent hearing. *Id.* ¶ 24. As of September 30, 2025, N.S. has not received a new date to appear in immigration court. *Id.* N.S. also appeared for his September 18 check-in at the Chantilly ICE facility where he was directed to check in with the Intensive Supervision Appearance Program office. *Id.* ¶ 23. The Intensive Supervision Office gave N.S. a new appointment for February 11, 2026. *Id.*

Plaintiff R.S.M., an El Salvadoran National, has lived in Washington, DC since 2020 and has a pending asylum application. R.S.M. Decl. ¶ 1 (ECF No. 17-4). On August 26, 2025, immigration agents stopped R.S.M. while she was in her car with her husband driving to work. R.S.M. Decl. ¶¶ 2-8. The agents arrested R.S.M. and held her at the Chantilly processing center for ten hours. *Id.* ¶¶ 8-12. The agents released R.S.M. under an alternative to detention program with an ankle monitor. *id.* ¶ 12; Ex. 1, Simon Decl. ¶ 23. R.S.M. is also in removal proceedings as ICE issued him a notice to appear in immigration court. Ex. 1, Simon Decl. ¶ 23.

Finally, CASA alleges that its organization's members have been placed in fear of detention or have been detained by Defendants' immigration enforcement actions. Compl. ¶ 6.

Plaintiffs seek to represent a class of purportedly similarly situated to Plaintiffs known as the "warrantless arrest class," which comprises "[a]ll persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses a flight risk." Mot. for Class Cert. at 5 (ECF No. 19).

# LEGAL STANDARDS

## I.     <u>Preliminary Injunction</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). A party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (*quoting Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). The last two factors merge when the government is the opposing party. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019); *accord Pub. Citizen Health Rsch. Grp. v. Acosta,* 363 F. Supp. 3d 1, 20 (D.D.C. 2018). "[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors in order to secure such an 'extraordinary remedy.'" *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).

Before the Supreme Court's decision in *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. *Damus v. Nielsen*, Civ. A. No. 18-0578 (JEB), 2018 WL 3232515, at *4 (D.D.C. July 2, 2018) (quoting *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009)). The Supreme Court subsequently reaffirmed its disagreement with the sliding scale approach holding that "a plaintiff seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Winter*, 555 U.S. at 20). And where, as here, a party "seeks a mandatory injunction—to change the status

quo through action rather than merely to preserve the status quo—typically the moving party must meet a higher standard than in the ordinary case: the movant must show 'clearly' that [it] is entitled to relief or that extreme or very serious damage will result." *Farris v. Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006).

## II.     Class Certification

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979); *see also Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013) (same).  To fall within this exception, a plaintiff "must affirmatively demonstrate his compliance" with Rule 23.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  As the Supreme Court has explained, "Rule 23 does not set forth a mere pleading standard." *Id*.  Indeed, "certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied[.]'" *Id.* at 350–51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

To meet this "affirmative" burden of compliance with Rule 23, Plaintiffs must demonstrate the existence of each and every element required by Rule 23(a) that: (1) there are sufficiently numerous parties ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims of the named plaintiff are typical of those of the class ("typicality"); and (4) the named plaintiff will fairly and adequately protect the interests of the class ("adequacy of representation").  Fed. R. Civ. P. 23(a); *see also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997).  "[A]ctual, not presumed, conformance with Rule 23(a) [is] indispensable." *Falcon*, 457 U.S. at 160.  The proposed class must also "satisfy at least one of the three requirements listed in Rule 23(b)." *Wal-Mart*, 564 U.S. at 345.  Plaintiffs here assert that their class should proceed under Rule 23(b)(2), which permits class action litigation where "the party opposing the class has acted … on grounds that apply generally to the class, so that final

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

Fed. R. Civ. P. 23(b)(2).

## ARGUMENT

### I. Plaintiffs Are Unlikely to Succeed on the Merits of their Claims.

Plaintiffs are unlikely to succeed on the merits of their claims for five reasons.  First, Plaintiffs lack standing to bring these claims because their claims are based on pure speculation that they will be rearrested simply because they were arrested in the past.  Second, certain Plaintiffs were arrested as part of removal proceedings and thus the INA prevents them from obtaining the relief that they seek in District Court.  Third, Plaintiffs' APA claims cannot succeed because the policy and practice that they challenge as unlawful is not a final agency action reviewable under the APA.  Fourth, immigration law enforcement agents had probable cause to believe the individual Plaintiffs were in the United States unlawfully and were a flight risk making their respective arrests consistent with the law.  Finally, the injunction that Plaintiffs seek is impermissible because it simply requires Defendants to follow the law.

#### A.    Plaintiffs Lack Standing to Enjoin Arrests.

##### 1.    Individual Plaintiffs Lack Standing

Plaintiffs must show a real and immediate risk of future injury to them—not merely past contact or generalized allegations.  As such, the individual Plaintiffs lack Article III standing for forward-looking relief.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013).  Past contact does not create a presumption of imminent repetition.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983).

To establish standing, a plaintiff must demonstrate (i) that he has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief.  *FDA v. All. for*

*Hippocratic Med.*, 602 U.S. 367, 380 (2024).  The Supreme Court has rejected "past-is-prologue" standing.  Specifically, in *Lyons,* 461 U.S. at 101-11, the Supreme Court held that a plaintiff previously subjected to a chokehold lacked standing to enjoin future chokeholds absent a concrete, imminent threat that he personally would be choked again; a past incident and an alleged departmental practice were not enough.  Here, the individual Plaintiffs' standing theory is a redux of *Lyons*.

Escobar Molina speculates that he will be arrested again because he is Hispanic, lives in a neighborhood with many immigrants, has not received any representation that he will not be subject to an immigration arrest, and recently saw a police car followed by a Suburban outside of his apartment building and the Suburban looked like the ones driven by the officers who arrested him.  Escobar Molina Decl. ¶¶ 15, 17, 18 (ECF No. 17-2).  B.S.R. speculates that he will be arrested again because of his appearance, ICE's need to meet its arrest quotas, and because he has not received any representations that he will not be rearrested.  B.S.N. Decl. ¶¶ 23-24 (ECF No. 17-3).  R.S.M. simply describes "unmarked cars" patrolling the neighborhood where she lives.  R.S.M Decl. ¶ 14 (ECF No. 17-5).  Finally, N.S. provides no reason for why he believes he will be arrested again.  *See generally*, N.S. Decl. (ECF No. 17-4).

As in *Lyons*, Plaintiffs cannot show standing because they have no basis beyond mere speculation to believe that they will be subjected to the allegedly unlawful treatment, namely that they were arrested or will be arrested again without probable cause or an individualized flight risk determination.  "Absent a sufficient likelihood that he will again be wronged in a similar way," Plaintiffs are "no more entitled to an injunction than any other citizen []; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional."  *Lyons*, 461 U.S. at 111; *see also Spokeo, Inc. v. Robins*,

578 U.S. 330, 339-40 (2016) (holding that an "injury in fact must also be 'concrete,'" which "must be 'de facto'; that is, it must actually exist."). Without concrete evidence that they will be unlawfully arrested again, Plaintiffs claims are based on "subjective apprehensions," not the "reality of the threat of repeated injury," that is necessary to establish standing. *Lyons*, 461 U.S. at 107.

Additionally*,* the mere fact that allegedly unlawful government enforcement operation has been authorized does not satisfy the "certainly impending" requirement. In *Clapper,* 568 U.S. at 412, the plaintiffs claimed that the government's allegedly unlawful surveillance activities injured them by interfering with their foreign contacts. But the Supreme Court rejected their concerns about enforcement as insufficient, as their speculated harm relied on a legal provision that "authorizes—but does not mandate or direct—the surveillance that respondents fear." *Id*. Similarly, *Lyons,* 461 U.S. at 105 concluded that, even if the defendant police department did have a practice of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force," the plaintiff had still failed to show a "real and immediate" injury. In other words, showing that the police department was generally likely to continue to employ chokeholds was not enough to show that the plaintiff himself would likely be subject to that chokehold again.

Here, Plaintiffs claim there is an alleged policy of unlawful law enforcement, but as in *Lyons*, even if such a policy existed, it is insufficient to show standing. Moreover, Plaintiffs' showing of a purported unlawful enforcement policy is far weaker than the one the Court considered in *Lyons*. Here, ICE's directives expressly prohibit the precise conduct that Plaintiffs allege: warrantless arrests under § 1357(a)(2) without prior consideration of flight risk. Plaintiffs assert that ICE has a pattern and practice of acting otherwise, but that evidence consists of their individual arrest experiences, pseudonymous third-party anecdotes, and third-party statements by

immigration attorneys.  *See* Declarations, ECF No. (17-2 to17-27).  At most, those declarations describe varying, unconnected encounters, not an official, routinely applied, district-wide warrantless arrest pattern and practice.  Plaintiffs thus have not even shown an unlawful law enforcement policy—let alone that they face a "real and immediate" threat of being harmed by it. *Lyons*, 461 U.S. at 102. Plaintiffs identify no written policy authorizing the arrests that they complain of because there is none.  And the record shows mixed, incident-specific operations by different law enforcement agencies—not a uniform "official sanction."  Further, there is no evidence in the record that any of the Plaintiffs have been unlawfully arrested since the incidents they describe in their respective declarations or Complaint.  Without a concrete, near-term risk that the individual Plaintiffs will be rearrested without a warrant or probable cause, their injunctive claim fails for lack of standing.  *Chaplaincy of Full Gospel Churches v. Navy*, 697 F.3d 1171, 1175 (D.C. Cir. 2012) ("Where, as here, plaintiffs seek forward-looking injunctive relief, past injuries alone are insufficient to establish standing.  Instead, plaintiffs must show that they face an imminent threat of future injury." (citation modified)).

None of the four individual Plaintiffs have Article III standing to obtain injunctive relief barring arrests based on the purported prohibited factors alone or in combination, to form probable cause for an arrest.  Crucially, the policy that Plaintiffs allege led to their arrests does not exist. Immigration law enforcement agents are trained to make individualized probable cause and flight risk determinations prior to making arrests including in annual refresher trainings that include training on 8 U.S.C. § 1357 and 8 C.F.R. § 287.8.  Ex. 1, Simon Decl. ¶ 23.  As explained further below (*infra* § I(D)), there is no doubt that agents had lawful reasons to make the arrests without warrants in part because B.S.R., N.S. and R.S.M. were in removal proceedings, *id.*, ¶¶ 26-28, and Escobar-Molina's temporary protected status had expired.  Ex. 2, Blanchard Decl. ¶ 7.  Therefore,

Plaintiffs cannot demonstrate that they were arrested solely based on impermissible factors, much less that they face any immediate and likely risk of being subjected to an unlawful arrest in the future. *See Clapper*, 568 U.S. at 412.

More importantly, the Supreme Court's recent order in *Noem v. Perdomo,* No. 25A169, 2025 U.S. LEXIS 2779 (U.S. Sept. 8, 2025), further supports the conclusion that Plaintiffs lack standing here. In *Perdomo*, the plaintiffs alleged that federal immigration agents engaged in a pattern of stops without reasonable suspicion of an immigration violation, and the Supreme Court stayed a district court's injunction based on those allegations pending appeal. *Id.* Although the Court did not elaborate on why it viewed the federal government as likely to succeed on the merits, Justice Kavanaugh explained in a concurrence that under the "Court's decision in [*Lyons*], plaintiffs likely lack[ed] Article III standing to seek a broad injunction restricting immigration officers from making . . . investigative stops." *Id.* at *2 (Kavanaugh, J., concurring). Justice Kavanaugh explained that in his view, the plaintiffs did not have "standing to obtain future injunctive relief . . . merely because [they] experienced past harm and fear its recurrence," and otherwise had "no good basis to believe that law enforcement will unlawfully stop them in the future . . . and certainly no good basis for believing that any stop . . . is imminent." *Id.* Such "interim orders" from the Supreme Court "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). This is a like case. The Supreme Court's ruling in *Perdomo* thus supports a finding that Plaintiffs lack Article III standing to seek prospective injunctive relief because they have not shown that they will likely be imminently arrested without a warrant and with no reason to believe they pose a flight risk.

Finally, Plaintiffs also lack standing to challenge ICE's purported warrantless arrest policy as it may apply to other nonparties because individuals do not have standing to challenge

immigration arrest practices as they relate to other nonparties.  In *United States v. Texas*, 599 U.S. 670 (2023), certain states claimed that the federal government's immigration arrest policies violated certain statutes and sought "to order the Executive Branch to alter its arrest policy."  *Id.* at 674.  The Supreme Court held that the states lacked standing to bring such claims because it had "long held 'that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.'"  *Id. (*quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 619 (1973)).  For this reason, even if the states were correct that the federal government's immigration arrest policies violated the immigration statute, they lacked standing to bring claims challenging federal immigration arrest policies.  *Id.* (taking "no position on whether the Executive Branch here is complying with its legal obligations under" the relevant statutes). After all, a cognizable injury requires more than "an asserted right to have the Government act in accordance with law." *Hippocratic Med.*, 602 U.S. at 381.  Accordingly, the Court's decision in *Texas* confirms that Plaintiffs here lack standing to challenge arrest policies affecting other nonparties.

### 2.  CASA Lacks Associational Standing

The lack of imminence defeats CASA's standing to pursue prospective injunctive relief. Associational standing requires proof that an organization's "members would otherwise have standing to sue in their own right" and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hippocratic Med.*, 602 U.S. at 398 (Thomas, J., concurring) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  But, just like the individual Plaintiffs in this case, any risk of future harm to CASA members is speculative.  George Escobar Decl. ¶¶ 25-36 (ECF No. 17-6); *see Spokeo*, 578 U.S. at 341 ("the risk of real harm cannot satisfy the requirement of concreteness" for purposes of standing).  Absent any nonspeculative probability of injury to their members an organizational

plaintiff, like CASA, lacks standing. *Stavrianoudakis v. Fish & Wildlife Serv.*, 108 F.4th 1128, 1143–44 (9th Cir. 2024) (citing *Lyons*, 461 U.S. at 101) (no associational standing for warrantless searches because it was speculative that any members would be harmed in the future). The same reasons discussed above that undermine the individual Plaintiffs' standing also defeat the members' standing, which deprives CASA of associational standing.

**B.    The INA Strips the Court of Jurisdiction to hear Plaintiffs' Claims.**

Immigration arrests are part of the removal process. ICE has initiated removal proceedings against B.S.R., N.S., and R.S.M, Ex. 1, Simon Decl. ¶¶ 21-23, and Escobar Molina's temporary protected status has expired which required further review. Ex. 2, Blanchard Decl. ¶ 7. Thus, even if the Court finds that Plaintiffs have standing to bring claims, the INA prevents the Court from granting the relief that Plaintiffs seek.[1]

> 1.    The Court Lacks Jurisdiction to Review the Individual Plaintiffs' Claims Under 8 U.S.C. § 1252(a)(5) and (b)(9)

Under 8 U.S.C. § 1252(b)(9), "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provision, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final [removal] order." And a petition for review filed in the appropriate court of appeals is the sole and exclusive means for judicial review of a final removal order. *See* 8 U.S.C.§ 1252(a)(5). In other words, if a claim challenges a "decision to detain [an alien] in the first place or seek removal," a district court lacks jurisdiction to consider

---

[1]    Defendants do not have sufficient personal identifying information for the members listed in CASA's declaration (e.g., the members' alien numbers), and thus, Defendants are unable to verify whether those members are also subject to removal proceedings. Those alleged members are not parties in this case and, as discussed, above CASA lacks standing to bring any claim here.

that claim and the claim instead must be reviewed through the administrative process. *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018).

The arrests that the individual Plaintiffs challenge were actions taken to remove them from the United States, that is, to "detain [them] in the first place and seek their removal." *Jennings*, 583 U.S. at 294. Plaintiffs challenge the questions of law and fact behind these actions, specifically, whether Defendants had probable cause for the arrests. *See generally* Compl. Because the individual Plaintiffs challenge questions of law and fact arising from these actions taken to remove them, 8 U.S.C. § 1252(a)(5), (b)(9) require that they bring these claims in petitions for review in the court of appeals. *Meza v. Renaud*, 9 F.4th 930, 935 (D.C. Cir. 2021) ("Meza thus seeks to contest a question of fact arising from his removal proceeding, which he could have done only by filing a timely petition for review of his removal order[.]"). Indeed, petitions for review commonly consider challenges related to whether immigration authorities had reasonable suspicion to stop, or probable cause to arrest, an alien. *See, e.g.*, *Sanchez v. Sessions*, 904 F.3d 643 (9th Cir. 2018); *Yanez-Marquez v. Lynch*, 789 F.3d 434, 461 (4th Cir. 2015); *Oliva-Ramos v. Att'y Gen.*, 694 F.3d 259, 274 (3d. Cir. 2012). And these same legal questions are commonly raised by aliens in removal proceedings, asking administrative and federal courts of appeal to suppress evidence of their removability due to Fourth Amendment or regulatory violations or terminate proceedings due to the same. *Sanchez*, 904 F.3d at 653-54 (alleged race-based stop by Coast Guard challenged in removal proceedings; citing *Rajah v. Mukasey*, 544 F.3d 427, 446-47 (2d Cir. 2008)); *Leal-Burboa v. Garland*, No. 21-70279, 2022 WL 17547799 (9th Cir. 2022) (alleged race-based stop challenged in removal proceedings); *Oliva-Ramos*, 694 F.3d at 274 (seeking suppression of evidence in removal proceedings based on allegations that agents "failed

to obtain proper consent to enter the apartment, that they arrested [the petitioner] without a warrant and without probable cause, and that they seized him without reasonable suspicion.").

If a legal remedy for unlawful stops and arrests is provided in removal proceedings, then these challenges are part of the decision to remove an alien. It does not matter that a class remedy "might be more efficient than requiring each applicant to file a [petition for review]," or preferred as a method to challenge "policy and practice," because 8 U.S.C. § 1252(b)(9) plainly precludes "all district court review of any issue raised in a removal proceeding." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1029, 1034 (9th Cir. 2016) ("We conclude that §§ 1252(a)(5) and 1252(b)(9) channel review of all claims, including policies-and-practices challenges, through the [petition for review] process whenever they 'arise from' removal proceedings."); *E.O.H.C. v. Sec'y of Homeland Sec.,* 950 F.3d 177, 188 (3d Cir. 2020) (upholding dismissal of alien's deprivation of counsel claim because "the court of appeals can redress any deprivation of counsel in the removal proceedings before the alien is removed."). Aliens arrested under the INA are so arrested because of probable cause of removability, making the arrest of an alien is directly, linearly part of the removal process. Thus, Plaintiffs' claims are barred because the "legal questions" in this case challenging the arrests are directly part of the removal process. *Jennings*, 583 U.S. at 295 n.3. Accordingly, the Court lacks jurisdiction pursuant to 8 U.S.C. § 1252(a)(5) and (b)(9) to entertain Plaintiffs' challenges here.

### 2. The Relief That Plaintiffs Seek Is Foreclosed by 8 U.S.C. § 1252(g)

Section 1252(g) also bars Plaintiffs' claims. Section 1252(g) provides that "notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to [1] commence proceedings, [2] adjudicate cases, or [3] execute removal orders against any alien," except through a petition for review from a final order of removal filed in a court of appeals. Although this section "does not sweep broadly," *Tazu v. Att'y*

*Gen.*, 975 F.3d 292, 296 (3d Cir. 2020), its "narrow sweep is firm," *E.F.L. v. Prim*, 986 F.3d 959, 964-65 (7th Cir. 2021). Courts "cannot entertain challenges to the enumerated executive branch decisions or actions" outside a petition for review. *E.F.L.,* 986 F.3d at 964. The Supreme Court has explained that 8 U.S.C. § 1252(g) is "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485 & n.9 (1999) ("Section 1252(g) seems clearly designed to give some measure of protection to . . . discretionary determinations.").

Section 1252(g) prohibits district courts from hearing challenges to decisions and actions about whether and when to commence removal proceedings. *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002) ("We construe § 1252(g) . . . to include not only a decision in an individual case whether to commence, but also when to commence, a proceeding."). Multiple Circuit courts have held Section 1252(g) applies to the discretionary decision to execute a removal order. *See Tazu*, 975 F.3d at 297–99 ("The plain text of § 1252(g) covers decisions about whether and when to execute a removal order."); *Rauda v. Jennings*, 55 F.4th 773, 777–78 (9th Cir. 2022) ("No matter how [petitioner] frames it, his challenge is to the Attorney General's exercise of his discretion to execute [his] removal order, which we have no jurisdiction to review."); *E.F.L.*, 986 F.3d at 964–65 (holding that § 1252(g) barred review of the decision to execute a removal order while an individual sought administrative relief); *Camerena v. Director, ICE*, 988 F.3d 1268, 1272, 1274 (11th Cir. 2021) (holding that § 1252(g) bars review of challenges to the discretionary decision execute a removal order); *Arce v. United States*, 899 F.3d 796, 800 (9th Cir. 2018) (finding that § 1252(g) would bar claims asking the Attorney General to delay the execution of a removal order); *Hamama v. Homan*, 912 F.3d 869, 874 (6th Cir. 2018) ("Under a plain reading of the text of the statute, the Attorney General's enforcement of long-standing removal orders falls

squarely under the Attorney General's decision to execute removal orders and is not subject to judicial review.").  Under the plain text of § 1252(g), the provision must apply equally to decisions and actions to commence proceedings that ultimately may end in the execution of a final removal order. *See Jimenez-Angeles*, 291 F.3d at 599; *see also Humphries v. Various Fed. INS Emps.*, 164 F.3d 936, 945 (5th Cir. 1999) (determining that § 1252(g) prohibited review of an alien's First Amendment retaliation claim based on the Attorney General's decision to put him into exclusion proceedings).

The scope of § 1252(g) also bars district courts from hearing challenges to the method by which the Secretary of Homeland Security chooses to commence removal proceedings. *See Alvarez v. ICE*, 818 F.3d 1194, 1203 (11th Cir. 2016) ("[§ 1252(g)] bars us from questioning ICE's discretionary decisions to commence removal—and thus necessarily prevents us from considering whether the agency should have used a different statutory procedure to initiate the removal process."); *Saadulloev v. Garland*, Civ. A. No. 23-00106, 2024 WL 1076106, at *3 (W.D. Pa. Mar. 12, 2024) ("The Government's decision to arrest Saadulloev on April 4, 2023, clearly is a decision to 'commence proceedings' that squarely falls within the jurisdictional bar of § 1252(g)."). Here, arresting Plaintiffs to commence removal proceedings is an "action . . . to commence proceedings" that this Court lacks jurisdiction to review. *Tazu*, 975 F.3d at 298–99 ("Tazu also challenges the Government's re-detaining him for prompt removal. . . . While this claim does not challenge the Attorney General's *decision* to execute his removal order, it does attack the *action* taken to execute that order. So, under § 1252(g) and (b)(9), the District Court lacked jurisdiction to review it.").

In *Tazu*, 975 F.3d at 298, the Third Circuit considered an alien's challenge to his detention prior to removal.  The Third Circuit carefully analyzed the plain text of the statute and determined that the word the verb "'execute' means '[t]o perform or complete'" and held that detaining the

- 19 -

alien is "a key part of executing his removal order" and therefore a challenge to a pre-removal

detention is also barred by § 1252(g). *Id*. at 298-99 (quoting, "Execute," Black's Law Dictionary

(11th ed. 2019)). Just as in *Tazu,* 975 F.3d at 298, where the court determined that an alien could

not challenge a detention prior to removal, Plaintiffs here cannot challenge their arrests prior to

removal because to "perform or complete a removal" Defendants must first arrest Plaintiffs. Like

a detention, an arrest is "integral to the act of 'execut[ing] [a] removal order[].'" *Id.*

To be sure, Plaintiffs plead their claims as claims under the APA and the *Accardi* doctrine.

*See* Mot. for Prelim. Inj. at 23-27 (ECF No. 17). Specifically, Plaintiffs claim that Defendants'

alleged failure to comply with 8 U.S.C. § 1357(a)(2) in conducting the arrests was "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law" 5 U.S.C. § 706(2)(A)

and in violation of the government's own policy. *Id.* However, Plaintiffs cannot bypass section

1252(g) simply because they raise a claim that Defendants did not comply with the APA or their

governing statutes and regulations, just as the plaintiffs in *American-Arab Anti-Discrimination*

*Committee*, 525 U.S. at 488, could not bypass section 1252(g) by alleging selective enforcement

constitutional claims. Indeed, such an outcome "would gut § 1252(g)" because "[f]uture

petitioners could restyle any challenge to the [covered] actions . . . as a challenge to the Executive's

general lack of authority to violate due process, equal protection, the [Administrative Procedure

Act], or some other federal law." *Tazu*, 975 F.3d at 298; *see also E.F.L.,* 986 F.3d at 964 (noting

that the restyling of claims would make § 1252(g) a "paper tiger.").

Plaintiffs can obtain review "through a petition for review from a final order of removal

filed in a court of appeals" 8 U.S.C. § 1252(g), but not before this Court in the first instance. This

Court should follow *Tazu* and find that section 1252(g) bars district-court review and relief. *See*

*Tazu*, 975 F.3d at 300 (reading § 1252(g) to funnel questions into a petition for review in the court of appeals).

C.   **Plaintiffs Cannot Proceed Under the APA Because They Have Not Shown that the Purported Policy and Practice of Making Warrantless Arrests is a Final Agency Action.**

Plaintiffs bring this case under the APA asserting that Defendants has adopted a policy (or pattern and practice) of unlawful warrantless arrests, and that this amounts to a final agency action subject to challenge under the APA.  Compl. ¶¶ 77, 83. *See also* Mot. for PI at 23-26.  But Plaintiffs fail to show that there is a final agency action to challenge here.  In general, judicial review under the APA "is available only for 'final agency action.'"  *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (quoting 5 U.S.C. § 704).  The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent[,] or denial thereof, or failure to act."  5 U.S.C. § 551(13).  In limiting APA review to "final" agency action, Congress restricted "pervasive oversight by federal courts over the manner . . . of agency compliance with . . . congressional directives," which would "inject[] the judge into day-to-day agency management."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004).

The Supreme Court has articulated "two conditions that generally must be satisfied for agency action to be 'final' under the APA."  *Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (citing *Bennett v. Spear*, 520 U.S. 154 (1997)).  "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature."  *Id.* (quoting *Bennett*, 520 U.S. at 177).  "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.* (quoting *Bennett*, 520 U.S. at 177–78).  The APA thus permits courts to consider only those claims that challenge discrete, "identifiable" final actions with "concrete effects."  *Lujan v. Nat'l*

*Wildlife Fed'n*, 497 U.S. 871, 890 (1990). Plaintiffs are not challenging an action that meets either condition.

       1.       Plaintiffs Have Not Challenged A Final Action That Is The <u>Consummation Of An Agency Decision-Making Process.</u>

An agency's final policy decision that binds its employees may reflect a discrete, consummated decision-making process and meet the first condition for final agency action. For example, in *Biden v. Texas*, 597 U.S. 785, 808 (2022), the Supreme Court held that two DHS memoranda terminating a policy (the Migrant Protection Protocols) under which certain aliens were returned to Mexico met the first condition for final agency action, because the memoranda marked the consummation of the agency's decisionmaking process and "bound DHS staff" to not follow the Protocols. In contrast, an agency practice is not enough, without more, to meet this condition. In *Lujan*, 497 U.S. at 877–78, the Court explained that the mere fact that an agency has taken multiple similar actions does not suffice to show that a different, discrete final agency action exists knitting them all together. There, the plaintiffs characterized various individual decisions about public land management as a "land withdrawal review program," and sought review under the APA. The Supreme Court held that the agency decisions could not be combined in this way and considered a single, final "agency action" under the APA. *Id.* at 890; *see also id.* at 891 (APA does not allow plaintiffs to amalgamate actions into a purported overarching policy and then "seek wholesale improvement of th[e] program by court decree").

Applying *Lujan*, courts reject APA claims like the ones in this case where a plaintiff (1) identifies several discrete, allegedly unlawful acts; (2) claims that a common pattern, policy, or practice underlies all the acts; and (3) attempts to challenge the purported pattern, policy, or practice. *See, e.g.*, *Nat'l Treasury Emps Union v. Vought*, 149 F.4th 762, 783–84 (D.C. Cir. 2025) (multiple actions that changed an agency's operations characterized as overarching decision to

shut down the agency); *Bark v. United States Forest Serv.*, 37 F.Supp.3d 41, 50 (D.D.C. 2014) (claimed policy based on five instances of agency permitting concessioners to improperly charge use fees).

Plaintiffs' APA claims here are like the claims in these cases: they assert that Defendants' conduct in various different arrests shows an agency pattern and practice of not complying with section 1357(a)(2), which they seek to challenge under the APA. As in the cases discussed above and under *Lujan*, this means that they have not challenged an agency action that reflects the consummation of an agency decision-making process, such as a written policy that binds employees. *Cf. Nat'l Treasury Emps. Union*, 149 F.4th at 787 ("Cases involving final agency action not committed to writing are few and far between."). On the contrary, ICE issued directives to its officers directing them to comply with section 1357(a)(2), *see e.g.,* Broadcast Statement of Policy, Appendix A, https://www.ice.gov/doclib/legalNotice/220527castanonSettlement_attA.pdf (last visited Oct. 29, 2025), and provides annual training to its officers on complying with section 1357(a)(2), Ex 1, Simon Decl. ¶ 23, but Plaintiffs do not challenge those policies.

Plaintiffs also have not shown that Defendants are "applying some particular measure across the board" in all law enforcement encounters that result in warrantless arrests. *Lujan*, 497 U.S. at 890 n.2 (conceding that such a measure may be susceptible to APA review). ICE agents in Washington, DC do not make a warrantless arrest each time they encounter an alien who they have reason to believe is in the United States unlawfully. Ex. 1, Simon Decl. ¶¶ 11-19. And even if Plaintiffs had shown an across-the-board practice, that still would be insufficient in this case, as they have not shown that such an across-the-board practice is the result of some other "specific order or regulation" that is "final." *Lujan*, 497 U.S. at 890 n.2.

In short, the first condition for final agency action is not met because Plaintiffs have not shown that the purported wrongful pattern and practice is the result of a concrete, identifiable, consummated decision-making process.

2. Plaintiffs Have Not Shown The Alleged General Policy And Practice Itself Has Direct Consequences For Them.

Plaintiffs also have not met the second condition for final agency action: that the challenged action itself determined "rights or obligations" or is a source "from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78. For agency action to be "final," the "legal consequences" of the challenged action must be "direct and appreciable." *Hawkes*, 578 U.S. at 597. An internal directive can meet this test if it "b[inds] [agency] staff" to act a certain way that affects third parties. *Texas*, 597 U.S. at 808–09 (memo that "forb[ade]" agency employees from "continu[ing] a program" determined rights and obligations of program's beneficiaries); *cf. Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 426 (D.C. Cir. 2004) (no final agency action where agency letter did not "[c]ompel[] [any] one to do anything").

Here, Plaintiffs do not challenge the actual directives Defendants have issued that direct immigration law enforcement agents to comply with § 1357(a)(2) when making warrantless arrests. Rather, they point to an alleged policy and practice of violating that provision, but they have not shown that Defendants have made a decision that will assuredly affect Plaintiffs if immigration law enforcement agents encounter them. Plaintiffs have not shown, for example, that Defendants required that all warrantless arrests in Washington, DC be made without assessing the statutory factors. Such assertions would be untrue. Ex. 1, Simon Decl. ¶¶ 11-19. Nor are ICE agents in Washington, DC trained to simply ignore the chance of escape when deciding whether to make a warrantless arrest. *Id.* ¶ 19. There is no policy that predetermines the outcome before the encounter happens—i.e., that mandates an unlawful arrest. For that matter, there is no such

practice, either—namely, immigration agents do not arrest every alien they encounter whom they have reason to believe is in the country unlawfully. Ex. 1, Simon Decl. ¶¶ 11-19. The purported policy and practice of warrantless arrests thus does not meet the second condition for final agency action.

In sum, neither condition for final agency action is met. Plaintiffs' APA claims challenging the purported policy and practice thus are unlikely to succeed.

### D. The Arrests Were Supported by Probable Cause and an Individualized Flight Risk Assessment.

Even if Plaintiffs had identified a final agency action, their APA claims still fail because they have not shown Defendants have a practice of making warrantless arrests in Washington, DC without regard to the risk of flight, or that such a practice was applied to them. Because Plaintiffs' APA claims fail their claims under the *Accardi* doctrine similarly fail. Under section 1357(a)(2), immigration officials "have power without warrant . . . to arrest any alien in the United States, if [they have] reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest." *Id.* The "reason to believe" phrase in 8 U.S.C. §1357 "must be considered the equivalent of probable cause." *Au Yi Lau v. INS*, 445 F.2d 217, 222 (D.C. Cir. 1971); *see also, Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015); *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010) ("Because the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in § 1357(a)(2) means constitutionally required probable cause.").

Establishing probable cause "is not a high bar." *Kaley v. United States*, 571 U. S. 320, 338 (2014). "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Illinois v. Gates*, 462 U. S. 213, 243-44 (1983)). "Because probable cause deals with probabilities and

depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *Wesby*, 583 U.S. at 57 (citation modified).

Numerous contextual factors may signal that escape is likely before a warrant can be obtained. These include "[w]hen an alien's removability 'is clear and undisputed,'" *Vazquez-Medrano v. Sessions*, 726 F. App'x 92, 93 (2d Cir. 2018) (quoting *Contreras v. United States*, 672 F.2d 307, 309 (2d Cir. 1982)), when the alien admitted that he "had been picked up before," *Aguirre v. INS*, 553 F.2d 501, 502 (5th Cir. 1977), or appeared "extremely nervous" and seemed to be "looking for an opportunity to run," *United States v. Meza-Campos*, 500 F.2d 33, 34 (9th Cir. 1974), or admitted that he had previously been removed, *United States v. Puebla-Zamora*, 996 F.3d 535, 538 (8th Cir. 2021), or attempted to evade custody, *Contreras*, 672 F.2d at 309, or was "stopped in a vehicle." *United States v. Murillo-Gonzalez*, 524 F.Supp.3d 1139, 1151 (D.N.M. 2021), *aff'd*, No. 22-2123, 2024 WL 3812480 (10th Cir. Aug. 14, 2024) (citing *United States v. Quintana*, 623 F.3d 1237, 1241 (8th Cir. 2010)), or presented conflicting documents when questioned about his status. *Yam Sang Kwai v. Immigration & Naturalization Service*, 411 F.2d 683, 687 (D.C. Cir. 1969); *see also United States v. Sagastume-Galicia*, Mag. No. 19-0287 (BAH), 2020 U.S. Dist. LEXIS 70806, at *13 (D.D.C. Apr. 22, 2020) (Defendant is a flight risk because he is "not currently employed," and "[c]ombined with defendant's history of physical violence and his inability to conform his conduct to court-ordered removal, his undocumented status and the existence of the detainer tip this factor in favor of detention.").

Finally, neither 8 U.S.C. § 1357(a)(2) nor 8 C.F.R. § 287.8(c)(2)(ii) imposes any affirmative obligation on immigration law enforcement officers to make the assessment of the risk of flight in any particular manner. Given that an alien is free to leave at any point during a consensual encounter, officers must make these assessments quickly and based on limited

information.  *Murillo-Gonzalez*, 524 F. Supp. 3d at 1151 (deferring "to the officer's on-the-scene judgments" and upholding an arrest under § 1357(a)(2)).  "Because of the difficulty of making an on-the-spot determination as to the likelihood of escape without any opportunity to verify information provided or to conduct a full-scale interview, an [immigration] officer's determination will not be upset if there is any reasonable basis for it."  *Contreras*, 672 F.2d at 308 (citation modified).  Plaintiffs' arrests do not show that immigration law enforcement officers have a practice of ignoring probable cause or the risk of flight before making warrantless arrests.  The circumstances behind each arrest demonstrate that agents approached each of the named Plaintiffs with probable cause that they had committed an immigration violation and were a flight risk.

Immigration law enforcement agents targeted Escobar Molina because CBP had information that Escobar Molina's temporary protected status had expired five months earlier.  Ex 2, Blanchard Decl. ¶ 9.  Escobar-Molina was about to drive away in his truck before agents arrested him.  Escobar Molina Decl. ¶ 5 (ECF No. 17-2).  Additionally, CBP records showed that Escobar Molina had been charged with simple assault in 2019.  Ex 2, Blanchard Decl. ¶ 9.

B.S.R. was targeted for arrest because he had overstayed his B-2 visa making him subject to removal.  Ex 2, Blanchard Decl. ¶ 10.  B.S.R. had been enrolled in an alternative to detention monitoring program since June 5, 2025, and on August 9, 2025, nine days before he was arrested, B.S.R. violated a term of the alternative to detention program by failing to charge his ankle monitor.  Ex. 1, Simon Decl. ¶ 21.  B.S.R. was sitting in his vehicle when agents encountered him, B.S.R. Decl. ¶ 12 (ECF No. 17-3), and CBP records showed that in 2025, B.S.R. had been charged with domestic violence and simple assault.  Ex 2, Blanchard Decl. ¶ 10.

When agents encountered N.S. he was sitting in the driver's seat of his car with the engine running.  N.S. Decl. ¶ 6 (ECF No. 17-4).

Finally, immigration law enforcement agents had reason to believe that R.S.M. was not going to cooperate with them. R.S.M. was in her car with her husband when agents approached them and despite the agents' commands for them to roll down their widow, R.S.M.'s husband only lowered his window "a little bit." R.S.M. Decl. ¶ 2 (ECF No. 17-5). Officers also asked the couple for the identifications three times before they complied. *Id.* ¶ 3. The couple eventually showed officers proof that they have a pending application for a U-visa. *Id.*

Because the evidence shows that agents made individualized flight risk determinations prior to making warrantless arrests, Plaintiffs' claim that Defendants violated the *Accardi* doctrine is inaccurate. Mot for PI at 27. The *Accardi* doctrine binds an agency to its own legislative rules. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954). Defendants fully complied with that command as the arrests were made consistent with 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i)-(ii).

### E.      Plaintiffs Seek an Impermissible "Follow the Law" Injunction.

Distilled to its core, Plaintiffs seek an impermissibly vague "follow the law" injunction. Rule 65(d)(1) requires that any injunction be "specific in terms" and "describe in reasonable detail—and not by reference to the complaint or other document—the act or acts sought to be restrained." "[T]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). And this limitation prevents federal courts from arrogating to themselves the power to generally superintend the Executive Branch's execution of the laws. *See Trump v. CASA, Inc.*, 606 U.S. 831, 858 (2025) ("[T]he Judiciary does not have unbridled authority to enforce" the Executive's "duty to follow the law.").

Here, Plaintiffs seek an order enjoining Defendants from "making warrantless immigration arrests in this District unless, pre-arrest, the arresting agent has probable cause to believe that the person being arrested is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii)." Pls.' Prop. Prelim. Inj. at 2 (ECF No. 17-28). This is merely a restatement of the statutory requirements without any further explanation specifying what Defendants are prohibited from doing. And probable cause is a fact-specific, totality-of-the-circumstances inquiry—a "fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *Wesby*, 583 U.S. at 57. Thus, an injunction simply restating the requirement of probable cause as specified in 8 U.S.C. § 1357(a)(2) is impermissible under the law.

With no particularized contours for probable cause, the district court's injunction is an unqualified weapon for Plaintiffs to chill immigration agents' ability to effectively perform their duties. *Cf. Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Plaintiffs would risk nothing by alleging each arrest violates the injunction, insulated by the vagueness of what constitutes probable cause, but Defendants will always be held to account. The injunction in effect sanctions keeping immigration enforcement agencies entangled in constant litigation, disrupting operations, deterring recruitment, and chilling the ardor of current agents. *Perdomo*, 2025 U.S. LEXIS 2779, at 9. ("after-the-fact judicial second-guessing and contempt proceedings will inevitably chill lawful immigration enforcement efforts.").

### F. Plaintiffs Fail to State Plausible Claims Against DEA.

Finally, Plaintiffs name the Drug Enforcement Administration ("DEA") and its Administrator as Defendants in this lawsuit. *See generally* Compl. Even taking the Complaint's allegations as true, there are no allegations that DEA made illegal immigration arrests of Plaintiffs in violation of immigration laws asserted in the complaint. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("Plausibility requires "more than a sheer possibility that a

defendant has acted unlawfully," but it is not a "probability requirement." *Id.* (quoting *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 556 (2007)). Notably, the only allegation involving the DEA in the Complaint is that the agent who stopped N.S. in the Home Depot parking lot was wearing a vest with the letters "DEA" even as that same agent was wearing an ICE badge. Compl. ¶ 4. Plaintiffs do not plead any facts demonstrating that any DEA agent made an immigration arrest. *See generally id.* A claim crosses from conceivable to plausible when it contains factual allegations that, if proved, would "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Banneker Ventures*, 798 F.3d at 1129. Here, Plaintiffs plead no allegations suggesting any DEA employee engaged in any wrongful conduct, and thus, Plaintiffs fail to state a claim against DEA.

## II.    Plaintiffs Fail to Show Irreparable Harm.

Even if the Court finds that Plaintiffs have a likelihood of succeeding on the merits, the court should still deny the preliminary injunction because Plaintiffs have failed to establish that they will suffer irreparable harm absent preliminary relief. The "high standard for irreparable injury" requires a two-fold showing: First, because an irreparable injury "must be both certain and great," Plaintiffs "must show 'the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Second, "the injury must be beyond remediation." *Id.* Importantly, irreparable harm "is a threshold requirement for granting temporary injunctive relief." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 8 (D.D.C. 2009).

Here, Plaintiffs are not seeking to prevent irreparable harm. Instead, they seek an injunction to prevent past harms from recurring. As explained above, past law enforcement contact does not create a presumption of imminent repetition. *Lyons*, 461 U.S. at 105-06. "Absent a

sufficient likelihood that [they] will again be wronged in a similar way," Plaintiffs cannot establish standing to seek an injunction much less irreparable harm. *Id.* at 111. Additionally, Plaintiffs' belief that they will be rearrested without probable cause is speculative and it is well established that a movant cannot show "certain[] impending" injury when the asserted injury is based on a "speculative chain of possibilities." *Clapper*, 568 U.S. at 410. Because Plaintiffs cannot establish standing to seek an injunction, they likewise cannot establish irreparable harm. *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity,* 950 F.2d 1401, 1410 (9th Cir. 1991).

CASA argues it has experienced irreparable harm because its members' arrests have caused "injuries to [CASA's] programs and mission" by diverting its resources to assist aliens that have been arrested and detained. Mot. for PI at 39. But CASA voluntarily chose to redirect its mission and priorities and cannot establish irreparable harm based on an injury that it could avoid. *Morgan v. White*, 964 F.3d 649, 651 (7th Cir. 2020) ("One important question, when a plaintiff seeks emergency relief, is whether the plaintiff has brought the emergency on himself."); *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) ("It is well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted.");*Cf. Hippocratic Med.,* 602 U.S. at 394. ("an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action.").

Thus, because Plaintiff have failed to demonstrate that they will suffer irreparable harm absent preliminary relief, the Court should deny Plaintiffs' motion for a preliminary injunction.

## III. Balance of Equities Favor Denying the Injunction.

Finally, where the government is a party, the balance of equities and public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp.*

*Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991). Here, the balance of the equities and public interest tips decisively in Defendants' favor. Plaintiffs' motion fails to acknowledge the substantial governmental harm an injunction imposes by usurping authority over enforcement of our Nation's immigration laws, which the Constitution and federal statutes commit to the Executive Branch. *Perdomo,* 2025 U.S. LEXIS 2779, at *8 (quoting *CASA*, 606 U.S. at 861 ("Any time that the Government is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.")). The Washington, DC area is a crucial priority for immigration enforcement, and this proposed preliminary injunction would throw a central element of immigration enforcement, immigration arrests, into intolerable uncertainty. Granting this order would risk unintended operational consequences and public-safety concerns. *Perdomo,* 2025 U.S. LEXIS 2779, at *9 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)) (acknowledging the "myriad 'significant economic and social problems' caused by illegal immigration[.]"). Indeed, as shown by Plaintiffs' proposed preliminary injunction order, such an injunction would inject the judiciary into micromanaging every operation and stop conducted in a district of 700,000 people. That is untenable.

The public interest favors lawful, effective enforcement within constitutional limits. *Nken,* 556 U.S. at 435; *Jennings*, 583 U.S. at 286. Preventing the Executive Branch from implementing a major enforcement priority and effectuating the immigration laws Congress enacted weighs in favor of the denial of the preliminary injunction. *Perdomo*, 2025 U.S. LEXIS 2779, at *12-13 ("we now likewise must decline to step outside our constitutionally assigned role to improperly restrict reasonable Executive Branch enforcement of the immigration laws."). "The Judiciary does not set immigration policy or decide enforcement priorities" but merely "ensure[s], in justiciable cases, that the Executive Branch acts within the confines of the Constitution and federal statutes."

*Id.* at 12.  As explained in the merits portion above, Defendants are acting within these parameters. The proposed injunction also would inflict irreparable harm on Defendants by supplanting the political branches' judgments and intruding on the separation of powers.  *See CASA*, 606 U.S. at 857-58.  In contrast, "[t]he interests of individuals who are illegally in the country in avoiding" arrest "is ultimately an interest in evading the law[,]" which "is not an especially weighty legal interest." *Perdomo*, 2025 U.S. LEXIS 2779, at *10.  Accordingly, the equities favor Defendants.

## IV.     Plaintiffs Should Be Ordered to Post Security.

For the reasons stated above, the Court should deny Plaintiffs' motion in its entirety. Nevertheless, should the Court issue any injunctive relief, the Court should also order Plaintiffs to post security.  Under Rule 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c).  In the event the Court issues an injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction.  *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (a district court has "broad discretion . . . to determine the appropriate amount of an injunction bond").

## V.      The Court Should Deny Plaintiffs' Motion to Certify a Class

Class certification is inappropriate unless a plaintiff satisfies four threshold requirements. Fed. R. Civ. P. 23(a).  These are "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *Id.*  These four requirements are known as "numerosity, commonality, typicality, and adequate representation." *Wal-Mart*, 564 U.S. at 349.  Rule 23(a) also requires that "a class representative must be part of the class" he seeks to certify. *Id.*  Plaintiffs seek to certify a "warrantless arrest class" to include

"[a]ll persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses a flight risk."  Mot. for Class Cert. at 5 (ECF No. 19).  But the court should not certify this class for the threshold reasons that Plaintiffs lack standing to seek class certification and Section 1252(f)(1) prohibits the Court from issuing class wide relief.  Beyond the threshold reasons, Plaintiffs do not meet any of the four elements to satisfy class certification.

### A.    Plaintiffs Cannot Represent a Class Because they Lack Standing.

"Any analysis of class certification must begin with the issue of standing." *Prado-Steiman v. Bush*, 221 F.3d 1266, 1280 (11th Cir. 2000); *see also Spokeo*, 578 U.S. at 338 n.6 ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.'" (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976))).  To have standing to certify a class, Plaintiffs must demonstrate that they have suffered "a concrete and particularized legal harm, coupled with a sufficient likelihood that [they] will again be wronged in a similar way." *Id.; see also Doe v. District of Columbia*, 216 F.R.D. 5, 9 (D.D.C. 2003).  Here, even assuming the allegations raised in Plaintiffs' Complaint are true—which Defendants do not concede—Plaintiffs lack standing because they cannot demonstrate any sufficient likelihood that they will be wronged again in a similar way. *See Spokeo*, 578 U.S. at 340 (for purposes of standing, the Court has "made it clear time and time again that an injury in fact must be both concrete and particularized.").

As explained above (*supra* § I(A)), Plaintiffs lack standing to seek a broad, forward-looking injunction to enjoin putative policy practices because, beyond "subjective apprehensions," Plaintiffs cannot demonstrate with sufficient likelihood or imminency that they will face similar

encounters with immigration law enforcement officers as described in their respective declarations. Plaintiffs aver that ICE released a Broadcast Statement Policy in 2021 providing guidance on probable cause requirements in effectuating warrantless arrests. Mot. for Prelim. Inj. at 40 (ECF No. 17). Plaintiffs, therefore, invite this Court to consider challenges to a concededly unsanctioned "policy and practice of 'arrest first, ask questions later,'" the reoccurrence of which is conjectural. Mot. for Class Cert at 1 (ECF No. 19). Even if such a policy were in place, immigration law enforcement officers may rely on a host of factual and circumstantial factors in their reasonable belief assessment of probable cause and flight-risk. *Cf. Perdomo*, 2025 U.S. LEXIS 2779, at *6 (finding plaintiffs standing theory deficient because "even if the Government had a policy of making stops based on the factors prohibited by the District Court, immigration officers might not rely only on those factors if and when they stop plaintiffs in the future").

Therefore, even if Plaintiffs were improperly arrested previously, they have not established that they will be harmed again in a similar way and thus lacks standing to represent a class.

### B.     The INA Prevents the Court from Granting Class Wide Relief Here.

8 U.S.C. § 1252(f)(1), provides: "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221–1231] other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." By providing that "no court (other than the Supreme Court) shall" have the power to grant coercive programmatic relief against the covered statutes, Section 1252(f)(1) operates on the premise that the lower courts will sometimes err and inappropriately restrict the government's ability to effectuate the removal process. *See* H.R. Rep. No. 469, 104th Cong., 2d Sess. Pt. 1, at 161 (1996) ("[S]ingle district courts or courts of appeal do not have authority to enjoin procedures established by Congress to reform the process of removing

illegal aliens from the U.S.").  Congress made the permissible choice to allow the government to continue enforcing certain immigration statutes—pursuant to its own interpretation of those statutes and their regulations—until the Supreme Court has spoken on the issue by preventing district courts from issuing class-wide orders.

Congress's prohibition on class-wide orders that enjoin or restrain "the 'operation of' the relevant statutes is best understood to refer to the Government's efforts to enforce or implement them." *Garland v. Gonzalez*, 596 U.S. 543, 550 (2022).  "[T]he operation of the provisions is a reference not just to the statute itself but to the way that it is being carried out." *Id*.  For this reason, although Plaintiffs claim that Defendants are not complying with 8 U.S.C. § 1357(a)(2), a non-covered provision, 8 U.S.C. § 1226, provides for the apprehension and detention of aliens, and 8 U.S.C. § 1229 provides for the initiation of removal proceedings.  Both Sections 1226 and 1229 are covered by 8 U.S.C. § 1252(f)(1) and thus enjoining Defendants' warrantless arrest authority under 8 U.S.C. § 1357 necessarily interferes with operation of Sections 1226 and 1229.

The D.C. Circuit rejected arguments to the contrary in *N.S. v. Dixon*, 141 F.4th 279, 284 (D.C. Cir. 2025), which vacated a district court injunction prohibiting the U.S. Marshals Service "from arresting and detaining criminal defendants in the Superior Court for the District of Columbia for suspected civil immigration violations."  In that case, the plaintiff argued "Section 1252(f)(1) did not prevent the district court from entering the injunction because the enjoined actions are governed by § 1357, which relates to warrantless arrests and is not among the provisions to which § 1252(f)(1) applies." *Id.* at 288.  The D.C. Circuit disagreed and found "an injunction that restrains the Government from carrying out an arrest and detention of a criminal defendant . . . clearly affects provisions to which § 1252(f)(1) applies." *Id*. at 289.  Specifically, the injunction was improper because it "enjoined the Marshals from arresting and detaining any

criminal defendant suspected of a civil immigration violation, which includes arrests made with a warrant issued pursuant to § 1226(a) and the detention of any alien charged with any of the crimes listed in § 1226(c)." *Id.* at 290. Notably, the D.C. Circuit reached this ruling even while acknowledging that the plaintiff "may be correct . . . there are multiple instances of the Marshals making civil immigration arrests without [a warrant]." *Id.*

Any restrictions on Defendants abilities to conduct arrests restricts "the way that" Sections 1226 and 1229 are "being carried out" by the Government on a class-wide basis. *Gonzalez*, 596 U.S. at 550. Thus, even if the Court agrees with Plaintiffs that the arrests are unlawful, the Court is "barred by § 1252(f)(1) from entering a class-wide injunction preventing such arrests and detention." *N.S.,* 141 F.4th at 290 (citing *Gonzalez*, 596 U.S. at 552-53).

### C.     Plaintiffs Have Not Satisfied Their Burden to Demonstrate Numerosity.

A class plaintiff has the burden of showing that Rule 23(a)'s requirements are met. *Gatore v. Dep't of Homeland Sec.*, 327 F. Supp. 3d 76, 86-87 (D.D.C. 2018). "To satisfy this burden, 'a party seeking class certification must affirmatively demonstrate his compliance with the Rule— that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.'" *Id.* at 87 (quoting *Wal-Mart*, 564 U.S. at 350). Numerosity requires the Court to determine whether the class is so numerous that it would make joinder impracticable. Fed. R. Civ. P. 23(a)(1). "Generally, courts have found that a proposed class consisting of at least forty members will satisfy the impracticability requirement." *Johnson v. District of Columbia*, 248 F.R.D. 46, 52 (D.D.C. 2008). Although Plaintiffs need not prove the exact class size with certainty, they must provide "a reasonable basis for the estimate provided." *Kifafi v. Hilton Hotels Ret. Plan*, 189 F.R.D. 174, 176 (D.D.C. 1999).

Here, Plaintiffs heavily rely on speculation that a sufficiently numerous groups of individuals make up the "warrantless arrest class" based on assumed future unnamed claimants

and estimations from officials that immigration agents made "around 1,200 arrests" in Washington, DC between early August and mid-September 2025. Mot. Class Cert. at 10. Beyond the identified putative class members in Plaintiffs' motion, Plaintiffs provide no further substantive analysis to support the extrapolation that there are or will be sufficiently numerous individuals who will be arrested without a warrant and without a pre-arrest assessment of probable cause or flight risk. Simply asserting that 1,200 immigration arrests occurred in Washington, DC does not establish that the proposed class members "number in the hundreds." *Id.* at 9. Plaintiffs merely speculate that unlawful arrests will occur by virtue of continued enforcement of federal immigration law in Washington, DC. The total number of immigration enforcement arrests says nothing about the number of warrantless arrests presumed to have been executed without a pre-assessment of probable cause. Plaintiffs offer no indication of how many of the 1,200 ICE arrests were made subject to an impermissible policy and practice, and Plaintiffs themselves identify roughly forty alleged instances, some of which are based on second-hand accounts. *See* Plaintiffs Declarations (ECF No. 17-2—17-27). Thus, Plaintiffs' class size estimate lacks a reasonable basis and fails to satisfy their burden for class certification. *See generally Feinman v. F.B.I.*, 269 F.R.D. 44, 51 (D.D.C. 2010) (concluding that plaintiffs failed to prove numerosity because there was inadequate support for their numerical assumptions).

### D. Plaintiffs Cannot Identify a Common Question That Would Drive Resolution of this Litigation.

Even could Plaintiffs satisfy the numerosity prong, the proposed class fails to establish "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To establish commonality, Plaintiffs must demonstrate that "the class members 'have suffered the same injury.'" *Wal-Mart*, 564 U.S. at 349-50. This does not mean that class members merely "suffered a violation of the same provision of law" or raise some common questions. *Id.* Class members

suffer the same injury only if their claims turn on a common contention "of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Thus, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a class wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* Further, where a plaintiff alleges the defendant has engaged in a policy or practice that has "consistently and uniformly injured the putative class members, the plaintiff must provide 'significant proof' that such a policy or practice exists." *Parker v. Bank of Am., N.A.*, 99 F. Supp. 3d 69, 81 (D.D.C. 2015) (citing *Walmart*, 564 U.S. at 354).

Here, Plaintiffs argue the commonality element is satisfied because each "putative class member has been or will be subject to the same policy and practice by Defendants of unlawful warrantless arrests." Mot. Class Cert. at 12 (ECF No. 19). But this broad stroke justification is insufficient. The Supreme Court has held that a class action "may only be certified if the trial court is satisfied, after rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Falcon,* 457 U.S. at 161. In *Falcon*, a district court certified a class in a plaintiff-employee's Title VII action against his employer where the plaintiff claimed, without offering evidence, that the company had a policy of racial discrimination. *Id.* at 149-52. The Fifth Circuit affirmed the class certification. *Id.* at 147. The Supreme Court, however, reversed and held that there was "a wide gap" between (1) an individual claim of discrimination and an unsupported allegation that a company had a policy of discrimination, and "(2) the existence of a class of persons who have

suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact." *Id.* at 157. Same here.

As in *Falcon*, Plaintiffs' unsupported allegations of Defendants' unlawful policy or practice are insufficient absent a rigorous analysis of those claims, particularly because whether immigration agents have probable cause to effectuate arrests is an inherently fact-specific and individualized inquiry. *See e.g., Wesby,* 583 U.S. at 56-57 ("because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules."). Indeed, as explained above (*supra* § I(D)), the stop and arrest of Plaintiffs occurred under differing individual circumstances that undermine a finding of a systemic policy and practice.

For instance, some individuals presented identification to agents while others did not. *Compare* Andrés Decl. ¶ 2 (ECF No. 17-9) ("They told me I needed to present my ID, which I did."), *with* Escobar Decl. ¶ 35 (ECF No. 17-6) (Gordon did not present identification). Some officers wore plain clothes while others wore identifiable uniforms. *Compare* M.P. Decl. ¶ 4 (ECF No. 17-23) ("The agents were plain clothed and were not wearing anything to indicate that they were law enforcement."), *with* N.S. Decl. ¶ 6 (ECF No. 17-4) (agent wore an "ICE" badge and DEA vest). B.S.R., N.S. and R.S.M. are in removal proceedings, Ex. 1, Simon Decl. ¶¶ 21-23, whereas Escobar-Molina is not currently in removal proceedings. *Id.* ¶ 21. Some individuals were detained for a duration of a few hours while others for several days or longer. Ex. 2, CBP Decl. *Compare* R.S.M. Decl. ¶ 5 (ECF No. 17-5) (detained at Chantilly for ten hours before being released), *with* N.S. Decl. ¶ 23 (ECF No. 17-4) (released on his own recognizance from ICE custody after twenty-eight days detained in multiple states). Further, some individuals remain in custody across the country while others were removed. *Compare* R.S.M Decl. ¶ 11 (ECF No.

17-5) (R.S.M.'s husband remains in custody after R.S.M. was released) *with* Lopez Castanon Decl. ¶ 1 (ECF No. 17-16) (removed after detention); CASA Decl. ¶ 34 (ECF No. 17-6) (voluntarily departed to his home country following detention). Finally, some arrests occurred outside home improvement stores while others occurred outside the home or while driving. *Compare* N.S. ¶ 5 (ECF No. 17-4) (arrested in the parking lot of Home Depot), *with* Escobar Molina Decl. ¶ 5 (ECF No. 17-2) (arrested across the street from his apartment); Antony Decl. ¶¶ 4-5 (ECF No. 17-10) (stopped in his car at an intersection).

The proposed "warrantless arrest class" also fails because class members will no doubt have widely varying fact patterns regarding familial ties, employment status, and other community connections. As explained above, Courts evaluate these and similar factors in making flight risk determinations. *Compare United States v. Vasquez-Benitez*, 919 F.3d 546, 551 (D.C. Cir. 2019) (noting that, in part because defendant "ha[d] a wife, two children and a job as a dishwasher in the D.C. area" for a long time period, the third factor likely favored release), *with Sagastume-Galicia*, 2020 U.S. Dist. LEXIS 70806, at *13 (defendant "not currently employed," and "[c]ombined with defendant's history of physical violence and his inability to conform his conduct to court-ordered removal, his undocumented status and the existence of the detainer tip this factor in favor of detention."). Given the differences among the putative class members and the multiple subsidiary issues involved in resolving the overarching contention, class wide resolution is an inappropriate.

Class actions are for common questions of fact and injury, and the widely differing factual patterns experienced by circumstantially separate plaintiffs, may not have suffered injury, militates against the suitability of challenging arrests through a class action. *See generally In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013) ("[W]e do expect the common

evidence to show all class members suffered some injury"). The lack of commonality between Plaintiffs' arrests directly undermine their claim of a policy and practice of unlawful arrests.

### E. The Named Plaintiffs' Claims Are Not Typical of the Putative Class.

Typicality requires a finding that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Its aims are to ensure "'that the class representatives have suffered injuries in the same general fashion as absent class members.'" *In re Vitamins Antitrust Litig*., 209 F.R.D. 251, 260 (D.D.C. 2002) (quoting *Thomas v. Albright,* 139 F.3d 227, 228 (D.C. Cir. 1998)). That said, "[b]ecause Rule 23 requires that both the claims and the defenses be typical, a proposed class representative will not satisfy Rule 23(a)(3) if the representative is subject to a unique defense that is likely to become a major focus of the litigation." *Rail Freight*, 287 F.R.D. at 33 (citation modified).

Typicality is lacking here for similar reasons that doom commonality. The proposed class fails to contemplate the many factors that are involved in making an individualized assessment of probable cause and flight risk. The individual factual circumstances of arrest vary here to such a degree that Rule 23(a)(3) cannot be satisfied. *See Romberio v. UnumProvident Corp.*, 385 F. App'x 423, 432 (6th Cir. 2009) (where "individualized assessments are necessary" the class fails on typicality under Rule 23(a)(3)). Take, for example, the fact that some proposed class representatives were unable or refused to provide identification. *See e.g.,* CASA Decl. ¶ 35 (ECF No. 17-6). Other proposed class members complied by presenting some form of identification. *See* Andrés Decl. ¶ 2 (ECF No. 17-9). This alone shows that the putative classes representatives' claims or defenses cannot be typical of the members of the "warrantless arrest class."

Indeed, the proposed "warrantless arrest class" lacks typicality for the same reasons they lack commonality: The proffered class definitions cannot address the many factors that are involved in making an individualized assessment of probable cause and flight risk. This is because

an individualized assessment is a necessary component for determining whether class members have the same or similar injury: unlawful stop and arrest. For example, a flight risk determination may include factors such as whether individuals are eligible for relief from removal, have criminal convictions which bar them from relief, have final removal orders, or have been previously removed, in addition to the circumstances of their warrantless arrests. Because these individualized circumstances are necessary to the probable cause and flight risk analysis and thus relevant to a court's consideration of whether class members share similar injury, Plaintiffs proposed classes fail to meet the typicality requirement.

### F.    The Named Individual Plaintiffs Are Inadequate Representatives.

The adequacy-of-representation requirement under Rule 23(a)(4) requires that the named parties "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Adequacy is particularly important for a Rule 23(b)(2) class because members of such a class have 'no opportunity . . . to opt out' and no entitlement to 'notice of the action.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 207 (D.D.C. 2020) (quoting *Wal-Mart,* 564 U.S. at 362). There are generally two criteria recognized by courts to satisfy adequacy: "(1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and (2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel.'" *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D C. Cir. 1997). Plaintiffs cannot satisfy the first element.

The four named Plaintiffs, as proposed class representatives, will not fairly and adequately protect the class interests because, as discussed above, the proposed class encompasses a broad range of individuals with different factual bases for their claims, and different avenues of possible relief. As an example, Plaintiffs cannot fairly and adequately protect the interests of those arrested in different circumstances from their own, such as those arrested as part of anti-human trafficking

or alien smuggling operations, worksite enforcement, or those who entered the United States lawfully but illegally overstayed a visa. Put simply, claiming a few examples of allegedly unlawful arrests is insufficient to justify a case proceeding as a class action.

### G. Plaintiffs Cannot Satisfy the Requirements for a Class Under Rule 23(b)(2).

Plaintiffs fail to satisfy the requirements of Rule 23(b)(2), which requires a showing that Defendants have acted on "grounds that apply generally to the class" and that injunctive or declaratory relief is "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Thus, Plaintiffs must show that "relief is available to the class as a whole" and that the challenged conduct "can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360.

Here, Plaintiffs have failed to do so. This is because, again, each alien presents a unique set of circumstances. As demonstrated by the declarations Plaintiffs submitted, the type of alleged harm resulting from the warrantless detention differs from person to person because of each person's individual circumstances. Thus, each arrested alien has a unique set of circumstances and unique avenues for seeking relief. Some will undoubtedly apply for immigration relief including asylum and cancellation of removal. *See, e.g., Barboza-Cruz v. Garland*, No. 22-2745, 2023 U.S. App. LEXIS 1827, at *6-7 (8th Cir. Jul. 19, 2023) (an individual may seek cancellation of removal if he can show eligibility including but not limited to exceptional and extremely unusual hardship). Of those, some may have plausible claims that may lead to relief in the future. Others may have criminal convictions that may bar them from relief and require their detention without bond under 8 U.S.C. § 1226(c). *Rodriguez v. Robbins*, 715 F.3d 1127, 1131 (9th Cir. 2013) (8 U.S.C. § 1226 "subjects certain aliens who are deportable or inadmissible on account of their criminal history to mandatory detention pending proceedings to remove them from the United States."). These differing circumstances belie Plaintiffs' argument that highly individualized

questions regarding the encounters can be characterized as violations generally applicable to the proposed "warrantless arrest class." Because Plaintiffs fail to allege a specific alleged violation applicable to the whole class, relief on a class wide basis is inappropriate.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motions.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

BRIAN P. HUDAK, D.C. Bar #90034769
Chief, Civil Division

By:    */s/ John J. Bardo*
JOHN J. BARDO, D.C. Bar #1655534
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-2539

*Attorneys for the United States of America*

Dated: October 31, 2025