UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOSE ESCOBAR MOLINA, et al., )
)
Plaintiffs, )
)
vs. ) CASE NO. 1:25-cv-03417-BAH
)
U.S. DEPARTMENT OF HOMELAND )
SECURITY, et al., )
)
Defendants. )
____________________________ )

TRANSCRIPT OF MOTION HEARING
**BEFORE THE HONORABLE BERYL A. HOWELL, DISTRICT JUDGE**
Wednesday - November 19, 2025
10:00 a.m. - 12:49 p.m.
Washington, DC

**FOR THE PLAINTIFFS:**
American Civil Liberties Union of DC
BY: ADITI SHAH
529 14th Street, NW, Suite 722
Washington, DC 20045

National Immigration Project
BY: YULIE LANDAN
1763 Columbia Road, NW, Suite 175 #896645
Washington, DC 20009

Covington & Burling, LLP
BY: JEHAN ASLAM PATTERSON
850 10th Street, NW
Washington, DC 20001

---

**SONJA L. REEVES**
**Registered Diplomate Reporter**
**Certified Realtime Reporter**
**Federal Official Court Reporter**
333 Constitution Avenue, NW
Washington, DC 20001
Transcript Produced from the Stenographic Record

**FOR THE PLAINTIFFS (CONTINUED):**

Washington Lawyers' Committee
BY: MADELEINE GATES
700 14th Street, NW, Suite 400
Washington, DC 20003

Amica Center For Immigrant Rights
BY: IAN AUSTIN ROSE
1 North Charles Street, Suite 2305
Baltimore, Maryland 21201

**FOR THE DEFENDANTS:**

Office of the United States Attorney
BY: JOHN BARDO and JOHN TRUONG
601 D Street, NW
Washington, DC 20530

(Call to Order of the Court at 10:00 a.m.)

DEPUTY CLERK: Civil Case 25-3417, *Jose Escobar Molina versus United States Department of Homeland Security, et al.*

Counsel, would you please come forward and identify yourself for the record.

MS. SHAH: Good morning, Your Honor. Aditi Shah for plaintiffs. With me at counsel table are my co-counsel, Yulie Landan, Madeleine Gates.

THE COURT: Could you raise your hands, because otherwise you're just a bunch of names.

MS. LANDAN: Yulie Landan.

MS. SHAH: Madeleine Gates. Jehan Patterson. And Austin Rose.

THE COURT: All right. Thank you. Good morning.

MR. BARDO: Good morning, Your Honor. John Bardo, Assistant U.S. Attorney on behalf of the government. I'm joined at counsel table by Assistant U.S. Attorney John Truong.

THE COURT: Good morning. All right. Well, I have before me two pending motions from plaintiffs, so I'll start with plaintiffs as the moving party.

MS. SHAH: Good morning again, Your Honor. Aditi Shah for plaintiffs. If it's all right with Your Honor, I would like to start by presenting on our motion for a preliminary injunction and for the stay of agency action, and my colleague, Ms. Landan, will argue the motion for class certification.

THE COURT: Landan. Okay. All right. Well, let's start with the PI. You may have things that you want to cover, but I have a number of things I want to just get clear from my understanding of the record presented by both sides.

So I do think it's helpful at the outset of this case to make clear what's at issue and what isn't at issue, particularly since you're seeking injunctive relief, and that injunctive relief, if granted, must be as narrow as possible to address what the scope of the case is.

Also, there are so many public announcements by federal officials about what's at stake here and it's echoed somewhat in the government's -- or the defendants' papers that I think it makes it even more important to make clear what's really being challenged here.

I mean, in the plaintiffs' exhibits are remarks, for example, by the President that this city will no longer be a sanctuary for illegal alien criminals, echoed by a DHS spokeswoman saying, "Criminal aliens are a public safety threat and there should be no place for sanctuary policies that place crime over the community."

And I think some of those public statements may lead some people to think that this case is about non-citizens who are criminals and have violated our criminal law when it is not, so I think it's really important to set that out about what the subject matter is of these claims and this lawsuit.

So just to be clear about what's not at issue in this lawsuit, plaintiffs are not challenging the authority of federal law enforcement agents to make criminal arrests either with a warrant or without a warrant for suspected criminal conduct whether that suspected criminal conduct is engaged in by a non-citizen or a U.S. citizen. Is that correct?

MS. SHAH: That's correct, Your Honor.

THE COURT: And as a legal matter, arresting a non-citizen for suspected civil, civil immigration status violations is a civil arrest, right?

MS. SHAH: That's correct.

THE COURT: And the DC Circuit has made that clear just a few months ago in *N.S. v. Dixon* where they talked about removal being a civil sanction, not a criminal penalty imposed to punish criminal conduct. Is that correct?

MS. SHAH: That's absolutely correct.

THE COURT: What is that noise I'm hearing?

DEPUTY CLERK: The public line --

THE COURT: Fell off? Oh, you have to put it back on. Okay. Why don't you go ahead and do that. It's a little distracting for those of us right up here at the bench.

Let's let my courtroom deputy finish doing that.

(Pause)

THE COURT: That's one thing I want to make clear about what's at issue and what is not. So the next thing is

plaintiffs are not challenging any longstanding authority by immigration law enforcement authorities under the Immigration and Naturalization Act, the INA, for ICE to make civil arrests of non-citizens pursuant to an administrative warrant and to detain non-citizens during the pendency of removal proceedings when the statutory requirements are met. Is that right?

MS. SHAH: That's correct.

THE COURT: Okay. So plaintiffs are also not challenging the authority provided in the INA to make warrantless civil arrests of a non-citizen to facilitate that person's removal from the country when statutory and regulatory requirements are met. Is that correct?

MS. SHAH: Absolutely correct, Your Honor.

THE COURT: So plaintiffs are only challenging the way that warrantless civil immigration arrests are seemingly being carried out in DC under what the plaintiffs allege is a new administration policy, but this has nothing to do with criminal arrests for criminal conduct authorized under any other law. Is that correct?

MS. SHAH: That's correct.

THE COURT: So to be absolutely specific about what we're talking about here today, plaintiffs' challenge is only to warrantless civil arrests being carried out in DC in a manner that plaintiffs allege fails to meet the legal requirements under the INA Section 1357(a)(2), which requires

that civil immigration arrests -- remember, not criminal -- must be based on probable cause to believe the non-citizen is in the United States unlawfully and is likely to escape before a warrant may be obtained. Is that correct?

MS. SHAH: That's correct.

THE COURT: Okay. So defendants raised a whole bunch of jurisdictional grounds for why this Court should not get into the merits of plaintiffs' claims, and I would like to discuss those first before turning to the preliminary relief that's requested.

And just, no surprise here, I have some concern about the breadth of the proposed relief requested, just so you can get prepared for that. I don't know who is arguing about that. Maybe you are.

MS. SHAH: I will be.

THE COURT: So let's -- I mean, the jurisdictional grounds are a number of INA provisions, but also standing. And so let's start with standing.

So for plaintiffs to have standing to sue for preliminary injunctive relief, which is what you're seeking here today, they must show imminent and concrete risk of future harm, or as the Supreme Court has put it, "A plaintiff must show that he is, quote, 'realistically threatened by a repetition of this experience.'"

Now, citing the Supreme Court's 1983 case in *Lyons*,

the defendants contend, with credit to the defendants, some catchy phrasing, the Supreme Court has rejected past is prologue standing. They are correct on that, right?

MS. SHAH: They are correct that past injury alone is not sufficient to establish the substantial risk for future injury.

THE COURT: Right, because what the defendants say is that's all the plaintiffs are alleging here, they have been subject to a civil immigration arrest, they are just speculating that it could happen to them again, so why do they need any prospective injunctive relief. So why aren't they right on that?

MS. SHAH: For a couple of reasons, Your Honor. So we are not relying solely on the past unlawful arrests that the plaintiffs and more than 20 -- more than two dozen arrests that we have documented in the supporting declarations here. We're not relying solely on the fact that these unlawful arrests have already happened.

THE COURT: But have any of them been arrested twice?

MS. SHAH: The plaintiffs have not been arrested twice in the approximately two months or month and a half since we submitted the initial declarations, but the policy that we have alleged here is ongoing. And all of the evidence that we have put forward that's in the record before Your Honor shows that there is a policy and practice by the government of agents

making immigration arrests in the District without making any individualized determination of probable cause as to a person's flight risk before arresting them. And that's apparent not only through all of the arrests that we have documented here that show that in every single one of them the agents did not ask any questions about the person's ties to the community, did not make any inquiry whatsoever as to the person's personal circumstances, simply stopped them, apprehended them, put handcuffs on, put them in a van and hauled them to the detention center at Chantilly.

THE COURT: And both the statute -- just to be clear, both the statute and the implementing regulation requires probable cause, not just of unlawful status in the country, again, not a criminal offense, no criminal violation there, generally speaking, but it is the second prong that is the plaintiffs' focus of -- the second prong of the probable cause finding required for a civil immigration arrest that the person -- there is a risk of flight before a warrant can be obtained. That's the focus of the plaintiffs' lawsuit; is that right?

MS. SHAH: That's the focus of our motion for preliminary injunction where we believe the evidence that we submitted is strongest to show that although the statute and the regulation require probable cause for both prongs of 1357(a)(2), the evidence that we have submitted shows we think

conclusively that agents are not making any sort of individualized determination as to probable cause for flight risk, and the statute, the regulation, and all of the case law interpreting the statute hold that both elements are required.

THE COURT: Okay. So let me talk for a second about how quotas play a role, if any, in your standing argument. The administration, based on the Widas declaration, indicates that the administration has progressed from a quota of about 1,800 daily arrests required in January 2025 to a new quota of 3,000 daily arrests in May of 2025, and has promised it will keep pushing to get that number up higher each and every day.

Do plaintiffs know what the current quota is and whether it's changed from the 3,000 per day of immigration arrests, and, if so, what the current quota is?

MS. SHAH: Your Honor, I don't believe we have a more updated quota number. I'm aware, although I don't have the precise case or filing in front of me at this moment, that in a different litigation the government submitted some sort of declaration saying that it's not a quota but a goal or in some way trying to undercut --

THE COURT: Is that in the Northern District of Illinois Nova litigation?

MS. SHAH: I'm not certain. I looked at it a while ago, but I think regardless of what the government has said about the quota declaration, Mr. Miller, who is one of the

architects of this administration's immigration policy certainly did make that statement and we have that in the record here, and whether it's construed as a strict quota requirement or just a goal, the government has been repeatedly, as demonstrated through its repeated public statements, the government has been aspiring to increase the number of immigration arrests.

I believe one of the quotes that we submitted, I think it was Mr. Miller who said, "Turn the creativity notch to 100. If it results in someone being in handcuffs, that's all we care about." So the push towards having a large number of arrests that the administration can talk about, that they can post about, that they can sort of tout as we arrested this many hundreds of people in these cities today, that's still very much part of the mission and purpose of what the government is doing with immigration arrests right now in the District. And that policy is ongoing.

In the declarations that the government submitted, they talk about how this surge in immigration enforcement, the policy began on August 11th when President Trump declared the purported state of emergency in the District of Columbia, and they don't say anywhere that that "Make DC Safe and Beautiful" operation, pursuant to which these lawless immigration arrests have been happening, has ended or even quieted down in any sort of way. And we have seen this through the fact that DHS has

deputized federal agents from other agencies to make these arrests. Defendants don't dispute that either. And --

THE COURT: Let me just pause you right there because I want a clear answer to my question.

Do plaintiffs believe it is a fair consideration to consider the quotas language being issued by the White House in considering whether or not the named plaintiffs are realistically threatened by a repetition of the challenged civil arrest experience and policy?

MS. SHAH: Yes, we do, Your Honor, and not only the quotas statements, but the other public statements that defendants have also made that are also in the record before Your Honor and are also statements that defendants haven't disputed or even addressed in their opposition brief.

I think it's the combination of the statements that the White House has made about these quotas, goals of number of immigration arrests, plus, the repeated statements made by DHS in writing as well as in an interview by the Chief Border Patrol Agent stating unequivocally that they are not using the standard that is required under Section 1357(a)(2) to make immigration arrests.

They have stated very clearly and publicly that they are using a different, lower standard to make immigration arrests, and those statements haven't been explained by defendants in their opposition.

THE COURT: Okay. So let me just turn to CASA standing because CASA is asserting as one of the organizational plaintiffs both associational and organizational standing, and defendants say CASA has neither.

CASA has to satisfy three requirements for standing, associational standing, and plaintiffs say that the defendants only challenged the first one, namely that its members would have standing to sue in their own right.

Are the four named plaintiffs, individual plaintiffs, members of CASA?

MS. SHAH: I don't believe so.

THE COURT: So if I found standing by those four individual plaintiffs it would naturally flow that that first requirement for standing, associational standing by CASA would be met?

MS. SHAH: I will double-check, Your Honor, but I believe that the four individual named plaintiffs are not members of CASA, but the theory for why the members of CASA do have standing in their own right is the same as for the individual plaintiffs, that they face a substantial risk of unlawful rearrest pursuant to defendants' policy and practice of making immigration arrests in the District without probable cause for flight risk.

THE COURT: And if CASA is found to have associational standing, is there any reason to address organizational

standing?

MS. SHAH: We think that the associational standing elements are satisfied for CASA, and so it has standing in that respect, just as the individual named plaintiffs have shown standing in this case based on all the evidence before Your Honor.

But independently of those two standing theories, CASA also has organizational standing in this case, which as we have noted --

THE COURT: That's not my question. If I found associational standing by CASA, is it still necessary for some reason that you will have to enlighten me about why I need to reach the question of organizational standing?

MS. SHAH: We don't think so, Your Honor. If Your Honor finds associational standing for CASA --

THE COURT: What is the plaintiffs' best argument for CASA's organizational standing?

MS. SHAH: CASA has organizational standing because it is facing ongoing harm and injury to its core organizational mission. As CASA explained in its declaration, its mission as an organization is to provide long-term services to its constituents, to community members, individuals who usually are from immigrant backgrounds, and their goal as an organization really is to provide long-term social services, access to healthcare, other kind of, even with respect to legal services,

it's a long-term affirmative legal services seeking status in the United States. Response to detention and the kind of rapid response services that it has been forced to provide in the onslaught of the defendants' policy and practice here is not part of CASA's mission, and this is evident through the diversion of resources that it has experienced since August 11th.

For example, they lost 50 percent of a county grant because they were delayed in the progress of their grant deliverables because they had to divert so much of their resources to the rapid response detention work that is not core to their mission at all.

They have had to divert, I believe it's 25 percent of health and human services staff to providing help for people who have been calling on CASA's hotline reporting arrests and detention. That has been a huge diversion of resources for CASA away from what those individual staff members would otherwise be doing to serve CASA's core mission.

And as the DC Circuit held in *League of Women Voters versus Newby*, when an organization is forced to divert its resources away from its core mission, away from its priorities and its primary purposes, that constitutes organizational harm and suffices for organizational standing.

I just want to reiterate that because defendants' policy is ongoing, these harms are ongoing for CASA. It's not

predicated on a showing of a substantial risk of future injury to CASA. This is ongoing injury that CASA is facing. As we speak, it's being forced to divert its resources and expend them in ways that, contrary to what defendants argue, is not in any form voluntary at all. This is not something that CASA wants to do. It is being forced to do this because the -- because of the warrantless immigration arrests that defendants have been conducting without meeting the statutory requirements.

THE COURT: I want to shift to the other jurisdictional hurdles that the defendants have elaborated on in their opposition to the PI motion. Defendants argue that even if plaintiffs could establish standing and get past that subject matter hurdle, they say that judicial review here is blocked, at least by this Court, by the INA provisions codified at 8 U.S.C. Sections 1252(a)(5), (b)(9) and (g), and that class action relief is blocked by Section 1252(f)(1), another INA provision. So those are a lot of statutory obstacles.

And this Court has got to listen to Congress when it says you're not supposed to play in this sandbox. I have to listen to that. So I want to review what those statutory blocks are and how they affect the claims that are pending in front of me brought by the plaintiffs.

I'm going to start basically in order with 1252(a)(5) and (b)(9). Those provide a jurisdictional bar on district

court review of the decision to seek removal. And for Plaintiffs N.S. and R.S.M., ICE arrested them and detained them, and only after their arrest were they given notices to appear for removal proceedings or NTAs.

So do NTAs initiate removal proceedings? Is my understanding correct of what the NTA purpose is?

MS. SHAH: That's correct, Your Honor.

THE COURT: So based on that timing, were these two plaintiffs subject to civil immigration arrests before the NTAs were issued?

MS. SHAH: That's correct. So the sequence here for R.S.M. and N.S. is that they were arrested unlawfully, and the unlawful arrest is the only thing that all of the individual plaintiffs are challenging here. It is only that piece. They are not challenging their removal proceedings.

Mr. Escobar Molina, as defendants acknowledge, is not even in removal proceedings. He has no order of removal against him. And for R.S. and N.S.M. the arrest happened before they were issued the notice to appear.

THE COURT: And doesn't 1252(b)(9) apply only when a person is actually challenging a final order of removal, and none of the named -- or the individual plaintiffs have final orders of removal against them, do they?

MS. SHAH: I don't believe any of the individual named plaintiffs have final orders of removal, that's correct, and

many of them are still proceeding in their removal proceedings, at least for the three that are actually in removal proceedings, and they are seeking status through the forums available to them.

THE COURT: So is the specific situations of these individual plaintiffs ones that put them outside the coverage of 1252(a)(5) and (b)(9) from the plaintiffs' point of view?

MS. SHAH: Absolutely, Your Honor. And for (b)(9), I would just point out also that (b)(9), of course, is part of 1252(b), and (b) starts by saying "with respect to review of an order of removal," that's a limiting clause that applies to every subsection of 1252(b).

This is not a case where there is any claim about an order of removal. We are not seeking review of an order of removal. None of the plaintiffs are challenging any aspect of their removal proceedings. In fact, I think one way to think about these INA jurisdictional bars that defendants raise is that the claim here is about something that happened for most of the plaintiffs who are even in removal proceedings before they were ever placed in removal proceedings, and these are challenges and claims that the plaintiffs would have brought even if none of them were in removal proceedings.

They are challenging the unlawful nature of how they were placed in handcuffs and put in vans and brought to a detention center where they were given only one burrito a day.

That is what they are challenging, the unlawful nature of their arrest, regardless of the fact that some of them are in removal proceedings.

THE COURT: Let's move on to 1252(g), which bars jurisdiction over challenges. I'm going to quote from the statute, statutory provision to the, quote, "decision to commence removal proceedings."

So if N.S. and R.S.M.'s arrests were made in anticipation of commencing removal proceedings, why wouldn't 1252(g) bar jurisdiction here?

MS. SHAH: Your Honor, the Supreme Court has repeatedly interpreted 1252(g) and its scope in a limited way, and it's done so in recognition of the fact that if 1252(g) were read to swallow every single thing that never would have happened if the plaintiffs had never been placed in removal proceedings, it would interfere with every other jurisdictional provision in the INA, all of the other judicial review provisions, and it would sweep far too widely.

That's what the Supreme Court held in the *Reno* case where the court in fact stated that 1252(g) was really directed at a particular evil. It was directed at attempts to impose judicial constraints on prosecutorial discretion, and of course, there is no relevance of prosecutorial discretion when it comes to whether agents are following the requirements of 1357(a)(2) to make an arrest without a warrant.

And for reference, the Illinois District Court in the *Castañon-Nava* case has a thorough discussion of 1252(g) and rejects the government's arguments regarding 1252(g) in exactly the same context where the plaintiffs there also challenged a policy and practice.

THE COURT: You're talking about the 2018 decision?

MS. SHAH: Yes, I'm talking about the 2018.

THE COURT: Because there is a more recent one.

MS. SHAH: The 2018 decision. The pincite is on page 895 of that case.

With respect to the INA jurisdictional bars, this Court also has good company in the district court's decision in *United Farm Workers* which also recently rejected these same arguments.

THE COURT: Okay. So the defendants cite a Western District of Pennsylvania case that held that 1252(g) barred review of an immigration arrest where the arresting officers served the immigrant with a notice to appear during the arrest to commence removal proceedings, and that's *Saadulloev v. Garland*, Western District of Pennsylvania from March 12th of 2024.

Plaintiffs didn't address that case in reply, so how would plaintiffs distinguish that case? Did that case appear to have some preexisting plan to commence the removal proceedings since the arresting agent was prepared with an NTA

at the time of the arrest?

MS. SHAH: Your Honor, if I recall this Western District of Pennsylvania case correctly, that case, like the other cases that defendants have cited, involved the plaintiffs, or in some cases the defendant, in that case challenging their removal proceedings or some aspect of their removal proceedings.

So I believe that the *Saadulloev* case, if I'm remembering correctly, is similar to the *Tazu* case where there was also a challenge to the detention in that case, but the court understood in context that the detention challenge there was directly tied to the removal challenge that the plaintiff was raising.

So in all of the cases that defendants cite they are very different from this challenge here where the only claims that we are raising have to do with the arrest and the unlawful nature of arrest. And again, the challenge is to the arrest regardless of the fact that they are in removal proceedings. They are not -- plaintiffs don't talk about their removal proceedings in these papers because they are not relevant to the claims that plaintiffs are making, and, of course, one of them is not even in removal proceedings at all.

THE COURT: Mr. Molina?

MS. SHAH: Yes, Mr. Escobar Molina.

THE COURT: Let's move on to the jurisdictional bar in

1252(f)(1) which bars this Court from issuing class action relief on challenges to certain covered INA provisions, specifically the covered provisions are Sections 1221 through 1231.

And I understand plaintiffs' argument is they are challenging DHS or ICE policy, alleged policy, on executing warrantless civil immigration arrests under 1357(a)(2), which is not one of those covered provisions, and so because of that, this case and the putative class action that the plaintiffs seek are not subject to the class action bar. So could you explain why it's not --

MS. SHAH: Your Honor --

THE COURT: -- other than -- because I think that the defendants make the argument that look at *N.S. v. Dixon*, the circuit recently in June just vacated an injunction issued, and so even though -- and the arrest there was also under 1357(a)(2), just like the plaintiffs are seeking here, but the injunction was vacated, so why aren't they right?

MS. SHAH: So, Your Honor, Ms. Landan has prepared to discuss the (f)(1) bar if it's all right for --

THE COURT: Hop on up. Your time has come.

MS. LANDAN: Thank you, Your Honor.

THE COURT: Why aren't I bound by the DC Circuit's decision in *N.S. v. Dixon*?

MS. LANDAN: Because of the difference in the scope of

the injunction at issue in N.S. and the requested injunction here. In N.S. the court, the DC Circuit, said it was beside the point that the named plaintiff's arrest might have been warrantless under 1357 because the injunction itself covered all civil immigration arrests by the U.S. Marshal Service, including arrests with warrants under 1226, the detention of non-citizens with certain criminal convictions under 1226(c) and presumably also lawful warrantless arrests.

Here, plaintiffs only seek an injunction over the unlawful warrantless arrests. Agents are still going to be able to arrest with the warrant under 1226. They're still able to detain --

THE COURT: Which is a covered provision?

MS. LANDAN: Which is a covered provision. And the only other covered provision that defendants point to is 1229, the initiation of removal proceedings, which is unrelated to the warrantless arrests. The defendants can initiate removal proceedings without ever arresting an individual, so the request here is much narrower in scope and impact than the N.S. injunction.

THE COURT: Okay. So what you're saying is that the injunction was vacated in N.S. not because the DC Circuit found that the noncovered provision 1357(a)(2) could somehow be shoehorned into the bar, the 1252(f)(1) bar, for class action relief, but because the injunction at issue in *N.S. v. Dixon*

was simply overbroad.

MS. LANDAN: Correct. The injunction directly restricted the ability to carry out the covered provisions.

THE COURT: Okay. All right. I want to go back to the PI.

MS. LANDAN: Thank you, Your Honor.

THE COURT: Thank you. So let's go back to one of the defendants' main arguments here for why this whole case collapses because the alleged policy doesn't exist. So in what -- one of the pieces of proof that the plaintiffs present in the record for why their position that this alleged policy of warrantless civil immigration arrests being executed without meeting the required prongs under 1357(a)(2) is statements by Department of Homeland Security leadership and senior management.

So one of the statements was made in the context of the administration's Chicago arrest operations and some of the others are by a DHS spokesperson. But none of those are an official written policy or regulation or statements by the DHS secretary. So why are these statements that the plaintiffs have put forward in the Widas declaration -- two Widas declarations at Exhibits 17 and 19 and Exhibits 1 and 2 to the second Widas declaration, why are those sufficient -- why should they be enough to find that there is this new policy adopted by DHS?

MS. SHAH: So, Your Honor, we think that the statements by these high-level government officials demonstrate that defendants have, themselves, acknowledged and expressed publicly that they are not following the statutory requirements under 1357(a)(2) to make immigration arrests, and this Court has previously credited statements like that from high-level government officials in determining whether an unwritten policy exists.

For example, in the *Aracely* case, *Aracely versus Nielsen,* that case concerned whether there was an unwritten policy by the government of improperly taking into account deterrence of illegal immigration in denying people's parole requests, and in the court's discussion in that case about the evidence supporting the existence of an unwritten policy, the court specifically credited statements made by high-level government officials showing that they are taking deterrence into account in some way as proof of the existence of this policy.

We think that the statements that the government has made here repeatedly, including in at least one of the exhibits we provided in response to this case that they are not using probable cause, that they are using a different, lower standard to make immigration arrests. And that was stated without any caveats, without any specificity of only in this jurisdiction or only in these circumstances. It was a blanket statement

that they are using the wrong standard to make immigration arrests.

And we think that those statements, not in isolation, but collectively and in conjunction with all of the other evidence that we have put forward in this record, including the more than two dozen arrests that we documented that show that defendants' statements are true that they are not using probable cause to make immigration arrests, these two pieces combined suffice to establish the existence of the policy and practice here.

And as this Court has held in multiple cases, as the DC Circuit has held as well, a policy does not need to be in writing to be a real policy or indeed to even be a final agency action. In, I believe it was the *CropLife America versus EPA* case, the agency there had -- the agency policy/regulation that counted as a final agency action was in a press release, not that dissimilar, I think, from the press release that DHS has issued here saying --

THE COURT: So particularly when the spokesperson for DHS issues statements saying this is -- as the spokesperson, I am articulating what DHS's position and policies are, we're using reasonable suspicion, it's because of that particular person's position that we can attribute that policy as a correct statement. We can attribute that statement as a correct statement of DHS policy.

So it's not just somebody from DHS speaking, it's particularly the spokesperson who has repeated -- who has more than once at least in the record here said they are using reasonable suspicion, not probable cause.

MS. SHAH: I think that's right, Your Honor. As we've stated in our papers and as Your Honor knows, the Federal Rules of Evidence are not binding on the Court when considering a motion for preliminary injunction. But even if they were, given the nature of these statements, I think under the Federal Rules of Evidence, they would count as party admissions and evidence in that respect.

THE COURT: Okay. So I'm going to jump to a little bit of a slightly different topic, because plaintiffs do make the allegation in the complaint that to help meet the quota and carry out mass round-ups, DHS granted non-DHS federal agencies immigration enforcement powers, put them out on the street to make immigration arrests despite the fact that -- and I quote from the complaint, paragraph 20: "Agents from these other agencies lack the kind of training immigration agents are expected to have when conducting immigration arrests."

And this language in the complaint is a little bit soft after -- in my reading of the Circuit's decision in *N.S. v. Dixon* because the Circuit there made it very clear that INA regulations require -- it's not just expected, require -- immigration officers to receive training before they are even

authorized to make civil immigration arrests and that when this authority is delegated to other federal agents, they too must undergo required training prior to making a civil immigration arrest.

So the DC Circuit in *N.S. v. Dixon* concluded that the U.S. Marshals who had been delegated authority by the Attorney General to make civil immigration arrests of a non-citizen were not authorized to make those arrests because they failed to comply with the required training under the regulations at 8 C.F.R. 287.5(e)(3) and 287.5(c)(1). So the DC Circuit concluded lack of training to these delegated officers means invalid civil immigration arrests.

So I thought the complaint allegation on that was a little soft given recent DC Circuit law, which was very strong, like, you can't be making civil immigration arrests unless you have the required training, period. Short stop. It's required by the regs.

So plaintiffs have submitted these declarations from arrested non-citizens saying that the agents who arrested them did not identify themselves.

So do plaintiffs have concerns that the reports that arresting agents did not identify themselves when making civil immigration arrests could make it difficult to ascertain if the arrests were conducted by properly trained agents with the authority even to make the arrests?

MS. SHAH: There is a huge concern about that, Your Honor. And that's exactly why we included those details in the declarations as well as in the complaint and elsewhere in our papers. And there is -- part of the immigration regulations actually require an arresting officer to identify himself or herself when making the arrest, and many of the declarations demonstrate that that simply has not been happening.

In terms of the --

THE COURT: Well, how does the -- I mean, when I look at the plaintiffs' proposed injunctive relief, because I do find in the face of June binding DC Circuit law about training required for civil immigration arrests, I was interested to look at the proposed order for injunctive relief, and did I miss it or does it require anywhere any training in the face of the *N.S. v. Dixon*?

MS. SHAH: The proposed order we submitted, Your Honor, does not specifically request that training, and we would be happy to modify our proposed submission or to discuss that further here. I think the reason that we didn't focus on training as much in our papers --

THE COURT: Well, why? Because both the *Farm Workers* settlement, the *Nava* settlement, *Broadcast Policy*, they all talk about training. So it was sort of a, you know, the DC Circuit was just reading the regs. This is what's required. U.S. Marshals didn't get the training when the Attorney General

delegated to them civil immigration enforcement arrest authority, so done, invalid arrest, so it just seems very simple. Why didn't you address it?

MS. SHAH: I think it's because we were a little bit afraid of the unknown with respect to the facts in our case. So because so many of the individuals we have talked to who have submitted declarations in support of this motion -- of our motion for a preliminary injunction said -- and this is true based on their accounts -- that the people who arrested them, the agents, were wearing plain clothes, often masked, maybe had a badge or something but didn't identify themselves, it was not clear to us exactly how many of the arrests were being conducted by which agents of which agency.

And so it was difficult for us to tell based on the facts we have been able to gather so far how many of the agents are from agencies outside of ICE and CBP where that presumption that they haven't received the training might apply. And we also I don't think had the level of facts that made us feel secure enough to bring a claim with respect to lack of training.

I think that this is an issue that would be very important for us to explore further in discovery, which we plan to seek regardless of what happens with the preliminary injunction here. We think that two of the biggest things that we can learn through discovery here are: one, is there, in

fact, some written memorandum or directive from the government to DHS leadership to subordinate agency members making explicit what DHS has already said in public statements about not using probable cause to make these warrantless immigration arrests and, two, to learn more about exactly who are the agents from which agencies making these arrests in DC, what is the structure like of delegating these powers?

Right now we kind of just know broadly that this delegation has happened and there have been a number of agents from other agencies involved in immigration arrests in DC, but we don't know the specifics.

And so I think with that, we would also seek information about what kind of training are these individuals receiving, because you are absolutely correct based on the Circuit's decision in *N.S. v. Dixon* as well as the limited details provided in defendants' declarations that when they talk about training, they don't say they have also provided training to agents from other agencies, so --

THE COURT: I know, but the defendants' declarations, the two they submitted are totally silent on that issue.

MS. SHAH: Exactly.

THE COURT: All right. So none of the four individual plaintiffs had legal status when subjected to a civil -- their civil immigration arrest; is that correct?

MS. SHAH: That is not correct for Mr. Escobar Molina.

He had valid TPS status. I know defendants say that his TPS status had expired, but as we explain on page -- I'll just get there really quickly, on page 18 of our reply brief in Footnote 6, which explains some of the details of how TPS status works. Basically, Mr. Escobar Molina had timely applied to renew his TPS status, and if an individual has timely applied to renew their TPS status, their status is valid. It's not his fault that the agency didn't act fast enough to grant his renewal application.

THE COURT: Okay. And then for two of the individual plaintiffs, they had filed applications for asylum, and my understanding is that the official instructions when you fill out the asylum application is while your asylum application is pending, you're not subject to removal; is that right?

MS. SHAH: That's correct, Your Honor. While the asylum application is pending, a final order of removal would not issue until the asylum application has been adjudicated.

THE COURT: Resolved.

MS. SHAH: Yes.

THE COURT: So were they -- was their status, since at the time of their civil immigration arrest they had asylum applications pending, was their status lawful or unlawful?

MS. SHAH: That's a complicated question, Your Honor. I think it goes back a little bit to what you were saying at the very beginning of this hearing, where you made crystal

clear that it is not a crime -- generally, it is not a crime to just be in the United States without lawful status. That, I think, is almost verbatim what the Supreme Court said in *Arizona versus United States*.

THE COURT: That is virtually verbatim what they said way back when.

MS. SHAH: Exactly. Despite any of the evolutions that may have happened --

THE COURT: Despite the confusion of people always combining the words "criminal" and "alien," you know, it's not the law.

MS. SHAH: Exactly. Phraseology of criminal illegal alien I think causes too much confusion.

THE COURT: Yes.

MS. SHAH: So whether someone with a pending asylum application has lawful status is a slightly trickier question because the immigration laws give the government discretion to arrest an individual whose asylum application is pending. And I think over various administrations over the past several decades, there have been varying levels of enforcement with respect to individuals who have pending asylum applications.

I think in some administrations and in some years, generally there has been a practice to not arrest or detain individuals who have pending asylum applications, especially when they don't have anything else in their record to suggest

that they are either a danger to society or a flight risk.

And so it's kind of unusual to think that you would just arrest someone and place them in civil immigration detention during the pendency of their asylum application.

THE COURT: It's very costly to taxpayers.

MS. SHAH: It is also very costly to the taxpayers, and we have also documented the immense psychological and physical harms that accrue on someone when they are placed in a detention center where they are given only one burrito a day, forced to sleep standing, torn away from their families and loved ones, often can't communicate with counsel, very long list of problems there.

But I think it's fair to say that the immigration laws give discretion to the government to arrest and detain individuals who have pending asylum applications. The law, however, is structured to constrain that discretion when those arrests are being made without a warrant.

I think that's why the requirements are really important here in 1357(a)(2), it basically says, as the Supreme Court said in *Arizona versus United States*, that because it's generally not a crime to just be in the United States without lawful status, the government can make arrests if someone is here unlawfully but only under certain circumstances.

And that's exactly what this case is about. It's about making sure that if the government wants to exercise that

discretion for a reason perhaps only the government knows to arrest and detain individuals who are not a danger to society, have nothing else on their record, other than the fact that they are applying for status to live lawfully in this country, they can do that only in the limited circumstances that are prescribed by the statute.

THE COURT: All right. So part of the reason I'm asking and trying to figure out did any of the individual plaintiffs have lawful status is because the complaint proposes a warrantless arrest class and then two subclasses: the immigration status subclass and the flight risk subclass.

And I have some concern that if none of the plaintiffs had lawful status in the United States at the time of their civil immigration arrest, then it would create a conflict for those plaintiffs to represent a class of people for whom ICE officers did not have probable cause to believe the person had unlawful status, if that makes sense, because for the plaintiffs to be class representatives of this class, of the immigration status subclass or even of the warrantless arrest class as proposed in the complaint, they have to have had lawful status at the time of the civil immigration arrest to challenge that they were not -- that that prong of 1357(a)(2) was not met for them.

And so that's part of why I was trying to figure out did any of them have lawful status at the time they were

arrested.

But I think for the purposes of the preliminary injunction, you're not seeking a class certification for either the warrantless arrest class or the immigration status subclass but only the flight risk subclass. Do I have that right?

Because I have been trying to sort through the complaint versus the class certification motion and the PI motion compared to the proposed orders for your two pending motions, sort of where are we at with this?

MS. SHAH: Yes, Your Honor. I'm just going to pull up the definition exactly as we stated it in our --

THE COURT: I can tell you. Which one do you want, warrantless arrest class, immigration status subclass or flight risk subclass?

MS. SHAH: I have got it in front of me now. I think the way we have been thinking about the proposed classes here -- and I'll give the response and then also let Ms. Landan elaborate should I miss anything. The overarching warrantless arrest class that we have proposed here includes people who -- for whom agents --

THE COURT: You proposed only in your complaint?

MS. SHAH: As well as on page 33 of our preliminary injunction motion. We say without a pre-arrest individualized determination that the person is in the United States unlawfully and is a flight risk. So we have sought provisional

class certification of the overarching warrantless arrest class for purposes of our preliminary injunction motion.

And the reason that we think that that is at least possible, if not appropriate in this situation, is because the way the class is defined is that it includes people who -- for whom agents did not have probable cause as to either element. So if they didn't have --

THE COURT: But can they be a class representative of the group of people for whom the agents did not have probable cause to believe they had unlawful status if none of them had lawful status at the time of the civil immigration arrest?

MS. SHAH: So we think they can be under the proposed definition because of the "and," and that the person is a flight risk. So even if they -- even if defendants had probable cause as to unlawful presence for some of the plaintiffs --

THE COURT: Well, let me just say your proposed order for the class certification motion only asks for certification of a class without a warrant and without a pre-arrest individualized assessment of probable cause that the person is in the United States -- so you do want both, not just the flight risk.

All right. So in order to certify this class, don't I have to find that one of the individual plaintiffs or the individual members of CASA who are subject to a civil

immigration arrest could represent a class of people subject to a civil immigration arrest when they had lawful status in the country? And what plaintiffs fit that bill --

MS. SHAH: Two responses to that.

THE COURT: -- to be adequate representative and competent representative?

MS. SHAH: Two responses. First, and hopefully to put some of this confusion about the class definitions at ease, we would be comfortable with the Court amending the class definition to individuals for whom agents did not have probable cause as to flight risk, particularly for purposes of the preliminary injunction, that is the claim that we have moved on, and so --

THE COURT: Well, you will be preparing that draft of the new proposed order. But keep track of all the things you might have to be doing.

MS. SHAH: Yes.

THE COURT: Okay. All right. And then I won't have to figure out what you called the complicated issue of whether their status was lawful or not at the time of the civil immigration arrest for the named -- for the individual plaintiffs in the case, right?

MS. SHAH: Yes. And also just for clarity purposes, it's not just whether they had lawful status but whether the agents made an individualized determination of probable cause

that the person had unlawful status.

For B.S.R., for example, his arrest, the facts in his declaration show that it was really an improper propinquity arrest.

THE COURT: What was the word you used?

MS. SHAH: Propinquity. I believe that was used in maybe the *Pringle* case to show that an arrest -- it violates the Fourth Amendment when agents arrest someone just because they are next to someone that they have probable cause for. They need independent probable cause for that person. And with B.S.R., the agents themselves said, well, we came here for two people, so we're arresting two people. And they made no individualized assessment as to B.S.R.

THE COURT: That was disturbing.

All right. Just one quick question on declaratory relief which is requested in the complaint in the prayer for relief and is not in the proposed PI order or the class certification proposed order. So are plaintiffs saving any requests for declaratory relief for final judgment?

MS. SHAH: I think that's right, Your Honor. Right now we really are seeking the immediate relief that is the most important for our plaintiffs and for the putative class members, people in DC who every day are living in fear that they will be arrested unlawfully and subject to detention and being torn away from their families, and we think that the

injunction and the stay request address that immediate need.

THE COURT: Okay. So plaintiffs' proposed PI order also seeks to include relief under 5 U.S.C. Section 705, which is the APA provision authorizing staying or delaying enforcement of the alleged policy which, allegedly here, is making warrantless immigration arrests in this district without a pre-arrest individualized determination of probable cause to believe that the person being arrested is likely to escape before a warrant can be obtained.

So if the injunctive relief in some form is granted, wouldn't the requested stay under the APA Section 705 be superfluous? Why would plaintiffs need both as is reflected in the proposed order?

MS. SHAH: We think that if the injunction is granted, the stay is not necessary. However, courts have done both. Judge Lamberth in, I believe it was early summer, issued an order granting both the preliminary injunction and the Section 705 stay request because the elements for both are the same and both were satisfied. So I think there is nothing wrong with granting both, but if the injunction is granted, then I don't think we need the stay order.

THE COURT: Okay. Now let's get to the balance of equities, which is the other factor that before any injunctive relief is granted has to be met by the plaintiffs. Specifically, the plaintiffs have to show a likelihood not only

of success on the merits but that the balance of equities and public interest is in their favor.

And here, the defendants argue quite vigorously that the balance of equities tips decisively in the defendants' favor, and they describe various problems if the requested injunctive relief is granted, including -- and I'm just -- put them into two different buckets. The defendants describe civil immigration arrests would be thrown into intolerable uncertainty, a situation that defendants say would risk unintended operational consequences and public safety concerns.

And the second bucket is that the judiciary would be injected into micromanaging every operation and stop -- not even arrest, stop, conducted in a district of 700,000 people, a result that the defendants say would be untenable.

And I need to hear the plaintiffs' response to those two buckets of dire consequences if the injunctive relief requested is granted.

I'll start with the immigration arrests being thrown into intolerable uncertainty. So what is the plaintiffs' response to that?

MS. SHAH: Your Honor, our response is that there is absolutely no evidence that that would happen. Again, I think this goes back to the way that Your Honor started this hearing by making very, very clear exactly what we're challenging here and what we're not challenging.

We are not challenging the government's ability to make a lawful civil immigration arrest. We are not challenging their ability to make immigration arrests with a warrant. We are not challenging their ability to make immigration arrests without a warrant and with the probable cause findings that are required under the statute.

There is no reason to think that enjoining an unlawful policy of making unlawful warrantless immigration arrests would slow down or in any way impede the government's goal of making civil immigration arrests. What it might do is ensure that there is less of an emphasis on numbers --

THE COURT: Meeting quotas?

MS. SHAH: Meeting quotas and just numbers in general without any regard to whether those numbers are actually justified under the law and whether those numbers are being reached in a proper manner.

THE COURT: Well, in terms of the operational -- unintended operational consequences -- and I'm going to ask the defendants about that, no surprise there, but my understanding, and it's reflected in the declarations submitted by the defendants, that paperwork is filled out at every civil immigration arrest. And so couldn't the recording of probable cause as to each prong be documented as to each civil immigration arrest and that recording of the probable cause findings as to both unlawful status and risk of flight be

something that would help assess whether there has been a compliance with the law and the regulations, 1357(a)(2) and the implementing regulations for that?

And that does not seem, one, that far different from what they are already required to do in filling out forms for every civil immigration arrest and perhaps requiring that those forms be filled out, if that's necessary, might be something that would give some operational clarity as to what the injunction requires.

MS. SHAH: Absolutely, Your Honor. I'm not sure what the unintended consequences are that defendants referenced in their filing, but defendants themselves -- the government agreed to do this kind of documentation almost I think exactly what we have requested in the proposed order when they agreed to the broadcast statement of policy in settling the *Castañon-Nava* case. They themselves said we'll do this documentation, and I believe in the Simon declaration it's also said that agents are at least encouraged to do this kind of documentation.

THE COURT: The I200 form.

MS. SHAH: Right. And recording what happened in the arrest if, for some reason, they are not able to get a warrant, which in the civil immigration arrest context it's an administrative warrant, anyway.

THE COURT: I know. I think people hear "warrant" and

they think a judge is involved, and that's not at all the case. It's not a criminal matter at all. It's an administrative warrant discretionary on the part of the administration.

MS. SHAH: Exactly. They outline these procedures themselves, and the procedures that defendants had in place to carry out lawful immigration arrests have been in place for years, if not decades. So it's very difficult for me to understand why there would be such unintended consequences or interference with their ability to make lawful immigration arrests when there have been policies and procedures in place to do those before this unlawful policy of not following those procedures.

THE COURT: Well, you know, I appreciate and I understand from reading the papers that the plaintiffs are not seeking to interfere in any way with removal proceedings, final orders of removal, arrests with warrants, even administrative warrants, let alone warrants where there is criminal activity believed or reasonably suspected to be ongoing. So couldn't that narrow scope of the injunctive relief be clearer in the proposed order?

MS. SHAH: It could. And we would be happy to make any modifications that Your Honor sees fit with the proposed order. The proposed order that we submitted, much of it is in line and in -- kind of copied from what the government previously agreed to in the broadcast statement of policy and

also borrows from what the *United Farm Workers* court ordered in its preliminary injunction.

THE COURT: But I think clarity is really important in this context --

MS. SHAH: Yes.

THE COURT: -- particularly given some of the confusion from statements by high-ranking government officials.

Okay. So this is the thing that really caught my attention in the government's opposition, and that's micromanaging by the Court. The defendants have raised a concern about injecting the Court into micromanaging every immigration-related stop and arrest in DC, and I think you would agree with me that that is not intended by the plaintiffs' proposed injunctive relief and is also something to avoid. So how does the requested injunctive relief in the proposed order by the plaintiffs avoid this problem cited by the defendants?

MS. SHAH: So we think that the issue of potential involvement from the Court is not in our proposed relief because nowhere do we request that defendants submit this kind of documentation to the Court. We do have a documentation request. We would like the Court to order the government to do it and to do exactly what they already agreed to do in the broadcast statement of policy. But we don't say they have to submit that documentation to the Court or that the Court needs

to order that they submit this documentation to the Court.

We, as plaintiffs' attorneys, have been in touch, not only with our own plaintiffs and CASA's members and individuals who submitted declarations, but we have also been hearing from individuals in the community at large, people who are facing these unlawful arrests, including some of my colleagues have been in touch with individuals who have been arrested we think under circumstances very similar to those documented here, without a warrant and without probable cause, and we keep hearing about these arrests, which is why we need this injunction.

THE COURT: Let's just look at the language because I'm all about the text. All right?

And so one of the things that the proposed order seeks, and that's in paragraph 1, is that defendants and their agents are enjoined from making warrantless immigration arrests in this district unless pre-arrest the arresting agent has probable cause to believe that the person being arrested is likely to escape before a warrant can be obtained as required by 18 U.S.C. Section 1357(a)(2) and 8 C.F.R. 287.8(c)(2)(ii).

So the defendants suggest that this proposed provision in the proposed order would allow plaintiffs to, quote, risk nothing by alleging that each civil immigration arrest violates this provision in the injunction because probable cause can be fact-specific and vague.

And so as a consequence, once the documentation required under the injunctive relief is provided by the defendants to the plaintiffs and plaintiffs' counsel, you scour them and you say out of these 100 arrests, 10 of them the explanation is insufficient on the form, and then bring it to court in a contempt proceeding for violation of the injunction order, and then I will be tied up in my otherwise very busy schedule, hearing witnesses, perhaps the arresting agents testify about what they did put in the document, what they didn't put in the document.

From my perspective, that's a nightmare scenario, as the defendants are well aware when they caught my attention with their micromanaging stops and arrests for civil immigration matters in the District.

So how could the scope of that be made to avoid what the defendants contemplate as potentially happening?

MS. SHAH: I have one suggestion to modify the language to try to address that concern, Your Honor. And I think this will help also frame a bit better exactly what we are trying to stop here.

So the problem with defendants' unlawful policy is that they are not making any individualized determination of probable cause as to flight risk at all. We are not challenging the specific facts of every single arrest, whether the probable cause determination was erroneous. I think that's

a different question and meant for a different case.

Here, the challenge that we're mounting is that they are not making any individualized determination at all. That's the same kind of policy that was at issue in *United Farm Workers* that the court credited as the basis for finding commonality to certify the class there. And it's the same challenge we raise here.

So I think -- I wonder if -- for paragraph 1, if we were to modify the language to say "unless pre-arrest the arresting agent has made an individualized determination of probable cause," then that might help because that will then avoid the situation Your Honor described of us receiving documentation -- let's say there have been 50 arrests in over a period of two, three days and we go through that documentation, and we see that in ten of them there was no probable cause, the documentation is supposed to address the issue of whether there was at least an individualized determination, were any questions asked. This is why I think the specificity --

THE COURT: Wouldn't for those ten, I would be having hearings for those ten stops or arrests --

MS. SHAH: I think if --

THE COURT: -- because you're challenging a policy here.

MS. SHAH: Yes.

THE COURT: But this is written, or at least in

paragraph 1, as to a specific arrest as opposed to enjoining the alleged policy of making warrantless arrests, based on only reasonable suspicion as opposed to probable cause.

So I'm not sure that the proposal that you're making of saying, yeah, they have really got to fill out that paperwork to demonstrate their individualized assessment as to both prongs as legally required puts me in the position of determining on I don't know how many different arrests, civil immigration arrests, whether that documentation is sufficient or not.

This is not normally -- that's not at a policy level. That's at an individual arrest level, and that's what I think the defendants have pointed out as being at least one problem even with the proposal of the injunctive relief.

MS. SHAH: I think I understand that better now, Your Honor. And it is -- as our motion makes clear, it is the policy that we are seeking to enjoin. It is the policy and the practice, and we would be -- if I can take a moment to just confer with my co-counsel?

THE COURT: You might need to take more than a moment. You might have to go back and wordsmith.

But in terms of reviewing something that avoids -- let me put it to you this way. It's your burden. You want the injunctive relief. You have to meet the injunctive relief factor that the balance of equities tip in your favor and not

the defendants'. The defendants making very strong arguments about this Court, me, this specific Court being subject to becoming an immigration-related court and supervising arrests and stops, even potentially for civil immigration arrests in the country brought to the Court's attention by the plaintiffs when they think the documentation for that arrest is insufficient to show individualized consideration of the two prongs.

That's a significant involvement of this Court in immigration enforcement here that gives me pause.

MS. SHAH: Understood, Your Honor. I will certainly go back with my team, and we will wordsmith and submit a modified proposed order in line with what Your Honor has said, and I'll just say right now --

THE COURT: You'll submit it -- you should probably confer with the defendants about whether that would or would not address their concern, at least to that, understanding that the defendants will maintain their standing and jurisdictional bar arguments.

Okay. Anything further?

MS. SHAH: Nothing further right now. Thank you, Your Honor.

THE COURT: Is there anything further that you wanted to add on class certification? I think I covered all of my questions. But if there is something you think I should be

aware of, I want to give you an opportunity to address that now.

MS. LANDAN: Thank you, Your Honor. Just a brief clarification. Plaintiffs chose to move and certify one class. If the Court believes that there should be two subclasses in that as presented in the complaint, plaintiffs could certainly propose that and --

THE COURT: I'm concerned about -- that you have no named plaintiff or members of CASA who have clear lawful status in the U.S. to be adequate representatives of what you have described in your complaint as the overarching class or subclass for unlawful status.

MS. LANDAN: Yes, Your Honor.

THE COURT: That's what I'm concerned about.

MS. LANDAN: Mr. Escobar Molina very clearly has lawful status in the U.S. through his temporary protected status. We do have an individual plaintiff who is very much adequate representative for that subclass as well. That's the main clarification I wanted to make.

THE COURT: Thank you.

All right. Mr. Bardo?

MR. BARDO: Good morning, Your Honor.

THE COURT: Good morning.

MR. BARDO: Would you -- is there any particular place Your Honor would like to start or --

THE COURT: Yes, I'll just proceed.

So the plaintiffs' reply brief starts off by summarizing what the defendants do not dispute in this case, and I actually think that's pretty helpful to get clarity as to the record here and help us focus on what's disputed as opposed to what's undisputed.

Let me just start with what plaintiffs say is undisputed, and I want to make sure that they are right and my understanding is correct.

So first, the INA's 1357(a)(2) provides authority to make warrantless civil immigration arrests of non-citizens for a civil infraction of the immigration law.

Do the defendants agree that the individual plaintiffs were arrested pursuant to this authority in 1372(a)(2) and were not criminally arrested for any criminal law violation?

MR. BARDO: We agree, Your Honor.

THE COURT: And plaintiffs say defendants do not contest the plaintiffs' arrests were made without a warrant. Is that correct?

MR. BARDO: We agree with that, Your Honor.

THE COURT: Now, a warrantless civil arrest for a civil infraction of immigration law is only allowed where the arresting agent has probable cause to believe both that the non-citizen being arrested does not have legal status in the U.S. and that the non-citizen poses a flight risk before a

warrant may be obtained.

Do defendants agree that probable cause for both prongs under 1357(a)(2) are required?

MR. BARDO: It's escape risk, Your Honor, and, yes, we do agree.

THE COURT: Escape risk versus flight risk?

MR. BARDO: That's correct, Your Honor.

THE COURT: You're right. Okay.

And is there a big different between flight and escape?

MR. BARDO: I'm not sure there is a big -- well, flight, flight implies that they are -- there isn't really a big difference, Your Honor. I just want to clarify the language in the statute because plaintiffs keep using the term "flight" and I want to clarify the statute says "escape." That's all.

THE COURT: Okay, but can you give me an example of where that would make a difference?

MR. BARDO: Escape risk, so, for example, the circuit courts around the country have talked about various ways in which an agent could believe that someone is an escape risk, and that could be someone as simple as the alien is in a vehicle and can get away from the officers.

THE COURT: Flee from the officers?

MR. BARDO: Yes.

THE COURT: Okay. But thank you for tying us back to the textual text of the statute.

Okay. Plaintiffs say defendants, and I quote, "Defendants do not contest that the agents did not ask plaintiffs any questions about their ties to the community or anything about their personal circumstances to elicit facts relevant to flight or escape risk." That's what the plaintiffs say in their reply at page 19.

Do defendants dispute that the federal agents making the civil arrests of the four individual plaintiffs, Molina, B.S.R., N.S. and R.S.M. did so without obtaining any information about their ties to the community?

MR. BARDO: We do dispute that, Your Honor. Two of the plaintiffs were targeted arrests. That's Mr. Escobar Molina and B.S.R. Customs and Border Protection agents specifically went out to look for Mr. Escobar Molina and arrest him because he had -- they had information that he had an expired TPS and that he had also been charged with simple assault and domestic violence.

It turns out that the TPS had not actually been revoked, but it had been expired. And at the time of the arrest, the CBP agents believed in good faith that he was in the country unlawfully.

THE COURT: Is that in the record anywhere?

MR. BARDO: It is, yes, Your Honor.

THE COURT: Because I did expect to see declarations from the arresting officers and I didn't get those.

MR. BARDO: There is a declaration from Kenneth Blanchard, who is the deputy executive assistant commissioner for operation support. I'll refer you to paragraph 7. It's ECF No. 50-2, paragraph 7.

THE COURT: So why is it, if this was targeted, meaning that they didn't just come upon Mr. Molina and say we're doing a civil immigration arrest here and arresting you, but this was targeted because they knew his TPS status had expired, didn't they also see in his records that he made an application for a continuation of it, which made his status here lawful. This made no sense to me.

MR. BARDO: The application doesn't confer lawful status, Your Honor. What does give them lawful status, which the CBP agents were not aware of at the time they made the arrest, was that USCIS had not revoked the status. Revoking the status requires an extra step, but the information they had was that he had an expired TPS.

THE COURT: That's not precisely my question. They saw his TPS had been expired, but the plaintiffs raise this question, and I think it's a good one, if they were specifically targeting him and looking at his records to see that his TPS had expired, how could they also not see that he had made an application for an extension of it?

MR. BARDO: They may well have seen that, Your Honor, but, again, applying for an extension doesn't confer lawful status.

THE COURT: Fine, but they may have seen that, but they didn't. Doesn't that raise a question about whether they actually had specifically targeted him if they didn't see that he also had application to extend it?

MR. BARDO: The fact that he has an application doesn't matter because the status is expired, and, yes, he's applied, but the application doesn't confer lawful status, and having -- applying for TPS also doesn't prevent ICE from initiating removal proceedings. It does prevent them from carrying out a removal, but it doesn't prevent the initiation of proceedings.

THE COURT: Uh-huh.

MR. BARDO: And yes, they also had information that he had a criminal history, which, as other circuits have acknowledged, is part of the consideration in whether an alien is an escape risk.

THE COURT: So the other person you said was B.S.R., he had been specifically targeted?

MR. BARDO: That's correct, Your Honor.

THE COURT: So the agents looking at documents sent agents specifically out to arrest Mr. Molina and Mr. B.S.R. Is that the defendants' position?

MR. BARDO: That's correct, Your Honor.

THE COURT: And is that what I am supposed to understand from the otherwise fairly vague language in Mr. Blanchard's declaration in paragraph 7 and 8, that Mr. Molina was specifically targeted and B.S.R. was specifically targeted?

MR. BARDO: That's correct, Your Honor.

THE COURT: And if they were specifically targeted, based on this document review, why didn't they get a warrant?

MR. BARDO: I can't --

THE COURT: There is so many questions raised from this declaration and so many -- that I had. What does "specifically targeted" mean, and if they had specifically targeted and were looking at documentation, why didn't they see the full file?

And if they were actually specifically targeted, why isn't there an explanation of why they didn't get a warrant?

MR. BARDO: Well --

THE COURT: An administrative warrant is easy to fill out. You just get a supervisor at DHS or ICE and they just fill it out and there you go.

MR. BARDO: Well, the statute allowed them to make both these arrests without a warrant because they had enough information to believe that the person, both B.S.R. and Escobar Molina, were escape risks. They had information that B.S.R. --

THE COURT: Why did they have understanding that they were escape risks?

MR. BARDO: Because of their criminal history and the fact that B.S.R. had overstayed a B-2 visa and he had also, I believe -- I believe, yes, B.S.R. was also -- yes, he also had his -- he had stopped charging his ankle monitor as well, so he was already in, it's an alternative to detention program and wasn't complying with the terms of that program.

THE COURT: Uh-huh.

MR. BARDO: And Your Honor's question about -- you were asking me about what it means to specifically target someone. Specifically targeted is when the agents, they have a person, a specific person that they are told they have to go out and get. That's different than a collateral arrest when they arrest people who they encounter while conducting other operations.

THE COURT: And you have no explanation for why, if they were specifically targeting somebody, why they didn't see that there had been a request for an extension of the TPS on Mr. Molina's part, and for both Mr. Molina and B.S.R. why they didn't issue a warrant. There is no explanation for that in the operation and you don't know?

MR. BARDO: I don't know why they didn't get a warrant, but regarding the TPS status, all they knew was that he had applied. And the fact that he applied doesn't confer

lawful status. But I do not know why they were not aware that USCIS hadn't affirmatively revoked the status.

What matters for purposes of probable cause is what the agents reasonably believed, not what turns out to be true after the fact.

THE COURT: And plaintiffs have provided several public statements issued or made by DHS officials. These include the October 25th -- September 25, 2025, DHS posting on X stating that DHS uses reasonable suspicion to make arrests; October 2, 2025, DHS Assistant Secretary Tricia McLaughlin saying in a statement, quote, "DHS law enforcement uses reasonable suspicion to make arrests"; October 6, 2025, DHS press release stating its law enforcement uses reasonable suspicion to make arrests; October 7, 2025, Chief Border Patrol Agent Gregory Bovino is quoted as saying, "We need reasonable suspicion to make an immigration arrest. You notice I did not say probable cause, nor did I say I need a warrant."

You would agree that reasonable suspicion is not the requisite probable cause required for a civil immigration arrest under 1357(a)(2)?

MR. BARDO: That's correct, not for an arrest. It's sufficient for a stop, but not an arrest.

THE COURT: And we're not talking about stops here, we're talking about only arrests?

MR. BARDO: That's correct, Your Honor.

THE COURT: Now, according to plaintiffs, and I quote, "Defendants do not disavow these statements or dispute that they constitute the government's view." Is that characterization correct?

MR. BARDO: These are statements by communications people in the government. They are not necessarily vetted by attorneys.

THE COURT: The Chief Border Patrol Agent Gregory Bovino, he's not a spokesperson, is he?

MR. BARDO: No, he's not. He's the Chief Border Patrol Agent, but the social media posts are comm -- posted by the comms team, not necessarily vetted by attorneys. I can only speak to what the agents in the field are trained, and the agents in the field are given Fourth Amendment training twice a year and are trained on what --

THE COURT: I'm going to get to training in a minute. The defendants, from what I have seen in these declarations, don't dispute that these were public statements that were actually made by DHS officials. Is that correct? You're not disputing that they were made?

MR. BARDO: We don't dispute they were made, but we do dispute that they characterize DHS's policy.

THE COURT: What's your basis for disputing that?

MR. BARDO: The agents are trained to follow 1357(a)(2), and these are statements --

THE COURT: Where does it say that anywhere in the two declarations that have been submitted, because the two declarations by Simon, who is the Deputy Field Office Director for Enforcement and Removal Operations, ERO for ICE, and for Kenneth Blanchard, who is the Acting Deputy Executive Commissioner, I guess his short title is DEAC of CPB, I don't see anywhere that they state actually what the policy is currently for civil immigration arrests under 1357(a)(2) to provide clarification of what the DHS spokesperson and their Chief Border Patrol Agent is saying.

MR. BARDO: I would refer you, Your Honor, to Mr. Simon's declaration beginning with paragraph 11 through 19 where he talks about the standards for arrests, and specifically paragraph 18 of Mr. Simon's declaration discusses the training that ERO agents receive.

THE COURT: Mr. Bardo, is there any statement in that description that ICE agents are trained and DHS has the position contrary to what the DHS spokesperson has said that they are not using reasonable suspicion to make civil immigration arrests but instead are using probable cause, which is required for that statute to withstand Fourth Amendment constitutional scrutiny?

MR. BARDO: Your Honor, it says on paragraph 18, "ERO officers receive refresher training on arrests twice a year, which includes training on the Fourth Amendment, 8 U.S.C. 1357

and 8 C.F.R. 287.8. The most recent trainings were held on August 13, 19 and 21, 2025 in the Washington field office.

THE COURT: And doesn't that prove my point that he never says that what the DHS spokesperson said and what the Chief CPB Border Patrol Agent said was wrong, that they are not using reasonable suspicion in executing civil immigration arrests under 1357 but are instead using what is constitutionally required, which is probable cause?

MR. BARDO: He references 1357 and that's the statute.

THE COURT: He does not explain how it's actually being implemented though, does he?

MR. BARDO: He does say they are instructed on 1357 and the requirements of 1357. And these statements --

THE COURT: Mr. Bardo, you're becoming useless to me. Perhaps your supervisor should stand up and speak, because I am telling you it never says that reasonable suspicion is not being used, correct or not? Answer my question, please.

MR. BARDO: No, it doesn't say reasonable suspicion is used.

THE COURT: Based on these two declarations, I have no idea whether what the DHS spokesperson is saying and the Chief Border Patrol Agent, Bovino, is saying is that they are only using reasonable suspicion and not probable cause; is that correct? I cannot tell that they are using the correct probable cause standard from these two declarations submitted

with the defendants' opposition.

MR. BARDO: Well, Your Honor --

THE COURT: Correct or not? It doesn't make that clear.

MR. BARDO: It makes clear that they are trained on 1357, and 1357 says you need probable cause. And I --

THE COURT: But these declarations do not say that, do they?

MR. BARDO: That say that they are trained on 1357.

THE COURT: Without saying precisely how they are being trained anymore?

MR. BARDO: It doesn't elaborate further, that's correct.

THE COURT: Okay.

MR. BARDO: I would -- I mean, these statements by non-attorneys, like people who work in the communications department, they don't necessarily understand like you and I do reasonable suspicion, probable cause. These are legal terms of art that are often thrown around by non-attorneys that isn't --

THE COURT: Well, the two declarations you have submitted are by very senior high-ranking officers at ICE. One is involved with immigration enforcement activities in DC. The other one, Blanchard, he's the senior CPB official in charge of various groups, including law enforcement compliance. I fully expected when I read these declarations, Mr. Bardo, to say --

to see them say we are applying 1357(a)(2) as it's required to be interpreted, probable cause standard for two prongs.

It is nowhere in either one of these senior ICE CPB declarations as to how they are interpreting now that statute. Okay. And that silence in both of the declarations submitted by the defendants as to the key issue here of whether DHS is implementing 1357(a)(2) civil immigration arrests using the proper standard, that is the challenge here, that they are not, the silence in these two declarations to me speaks very loudly.

What do you say to that?

MR. BARDO: Again, Your Honor, I would just simply disagree that the declarations don't say that. They reference 1357, and, sure, maybe they could have gone into more detail.

THE COURT: But you didn't. Why not, because you couldn't get these two DHS senior ICE officials to make it clear that 1357 -- that the spokesperson for DHS was wrong, that the Chief Border Patrol Agent was wrong when they said DHS is making civil immigration arrests with reasonable suspicion, which they said repeatedly?

You couldn't get these two senior DHS officials to come out and say they are wrong, we're using probable cause?

MR. BARDO: In retrospect, I should have. I didn't think to do that at the time, but there are training slides that we do have that we could provide to the Court in at least -- there may be law enforcement sensitive stuff on them

that might prevent us -- that may make us have to redact.

THE COURT: This is a preliminary injunction hearing. You could have witnesses. Call them on over. I can hear them testify to it. You could put on witnesses. You want to call these two declarants to come and testify about it and what you think they now should have said? You can have an opportunity to put on evidence. Do you want to do that?

MR. BARDO: We would not want to have these people testifying today. They haven't been prepared to testify. I would only refer Your Honor to what they say in the declaration.

THE COURT: And what they say in their declaration is silence on the actual standard being applied or whether what the DHS spokesperson or the Chief CPB Border Patrol Agent said was what was being done, which was reasonable suspicion, not the lawful standard for execution of civil immigration arrests under 1357(a)(2).

But if you want an opportunity to put them on under oath to clarify the record on that, I'll give you that opportunity.

MR. BARDO: Well, Your Honor, with respect, we would just have to agree to disagree on that, but, yeah, we would --

THE COURT: Agree to disagree about what?

MR. BARDO: About whether the declarations are sufficient to explain that they follow 1357.

THE COURT: So with respect to Mr. Molina's, I understand it, the defendants' position is that ICE learned about his expired status before he was arrested, not afterwards?

MR. BARDO: That's correct, Your Honor.

THE COURT: And that's what I'm supposed to understand specifically targeted means?

MR. BARDO: Yes, in the -- Mr. Blanchard's declaration from CPB. It was CBP that conducted this arrest.

THE COURT: And before N.S. was arrested on August 12, 2025, did DHS or ICE have a specific plan to commence removal proceedings for him prior to his arrest, or was that decision made after his arrest?

MR. BARDO: That decision was made after the arrest, Your Honor.

THE COURT: Uh-huh. And he had -- N.S. at the time had a pending asylum application at the time of his arrest; is that correct?

MR. BARDO: Yes, that's correct, Your Honor.

THE COURT: And to make a warrantless civil arrest, an officer has to have probable cause to believe the non-citizen is in the U.S. in violation of any law or regulation regulating the admission, exclusion, expulsion or removal of aliens, and the official USCIS instruction sheet for asylum application states that, quote, "While your case is pending, you will be

permitted to remain in the United States." That's USCIS Form I-589.

So in what sense was N.S. in the United States in violation of the law since he had a pending asylum application under the official USCIS instructions on that asylum application?

MR. BARDO: He had come in unlawfully, Your Honor. As I mentioned before, the fact that he had a pending TPS application doesn't prevent them from initiating removal proceedings. It would only prevent them from carrying out a removal.

THE COURT: And at the time of his civil immigration arrest in this case, he didn't have any removal proceedings pending against him; is that correct? That only happened afterwards?

MR. BARDO: That's correct. He was issued a notice to appear after he was arrested.

THE COURT: And defendants have claimed that B.S.R. was arrested because he failed to charge his ankle monitor that was assigned to him, and to make that claim you cite the Simon declaration.

MR. BARDO: It's in both declarations, Your Honor.

THE COURT: Paragraph 21, "Based upon ICE records, B.S.R. had been served with notice to appear."

I don't see anywhere in the Simon declaration,

although the defendants' opposition cites to it, or the Blanchard declaration, that he was arrested because he failed to charge his ankle monitor.

So, for example, I think you cite Simon declaration paragraph 21. Could you look at 21 and see where it says anything about failing to charge his ankle monitor, and then you could turn to the Blanchard declaration at paragraph 8 and tell me where it says that.

MR. BARDO: Okay. So paragraph --

THE COURT: Where did that come from, the failure to -- it's not in these declarations. Is that a post-hoc fact? I just want the record to be clear. And then I want you to tell me where you got that information and was it after his civil immigration arrest, so that wasn't the reason for the civil immigration arrest because the timeline doesn't work.

MR. BARDO: Yeah, you're correct, Your Honor. That is not in the declarations, but there is --

THE COURT: Where did you get that fact?

MR. BARDO: From the -- from talking to folks at CBP and by looking at his arrest packet. We certainly can supplement the record with that information, but, yes, he was specifically targeted. They did have information that he had overstayed his B-2 visa and that he had criminal charges for domestic violence and simple assault and that he had violated the terms of the alternative to detention program that he was

placed in in January of 2025.

THE COURT: Okay. Do you know what the current quota is for immigration requests and whether that current quota has changed since the May 2025 quota of 3,000 per day nationwide?

MR. BARDO: I'm not aware of any binding quotas, Your Honor.

THE COURT: Or goals. Since you're being very precise about language, Mr. Bardo, so whether you call it a quota or a goal, would you say that the White House has issued instructions back in May of 2025 that I think they used the word "quota," but maybe they used the word "goal," that they wanted 3,000 immigration arrests per day. How would you describe that? What's your preferred term?

MR. BARDO: I'm aware of statements by administration officials to that effect, but I am --

THE COURT: Would you prefer "quota," "goal," what would you prefer?

MR. BARDO: I mean, I believe the term is "goal," but I'm not prepared to offer a view on what DHS's official policy is, but we can certainly supplement the record with that information.

THE COURT: Yes, what the current goal or quota or whatever other term is being used is, and if it remains 3,000 per day, you can let me know that or whether it's increased, because I think that there was some indication that that number

was certainly increased from January to May. I'm curious about whether it has also increased.

So the defendants do discount as, quote-unquote, "mere speculation," plaintiffs' concern that they will be subject to the defendants' -- what the plaintiffs allege is the defendants' policy of unlawful warrantless arrests for lack of probable cause to believe both necessary prongs under 1357(a)(2).

And plaintiffs respond to that by saying that they have already been unlawfully arrested once while attending to the business of daily life and they have the attributes of the persons that DHS or ICE are targeting, namely they're Latino looking, they have low-wage jobs, they are living in Latino neighborhoods. So do the defendants dispute that those are the attributes of persons being targeted for arrest under 1357(a)(2)?

MR. BARDO: We do dispute that, Your Honor. Each arrest is an individualized determination. No single factor controls, but certain factors in combination can present probable cause for an arrest. But I think --

THE COURT: Are those relevant factors that are looked at?

MR. BARDO: They are relevant factors, but any one of those wouldn't necessarily be sufficient in and of itself, but this is consistent with what the Supreme Court decided in

*Lyons*, that just because you have been subject to an unlawful action by the government in the past doesn't automatically mean it's going to happen to you again. And just over the summer Justice --

THE COURT: But in *Lyons* -- let me start with *Lyons* before we turn to *Perdomo*. In *Lyons* the Supreme Court did hold that a plaintiff subject to a choke hold by LA police didn't have standing for injunctive relief because he could not show -- just to be clear, this is paraphrasing on my part -- all police officers always in LA choke any citizen that the police encountered, or that was one way they could have shown that the prediction of this happening again was going to happen again; one, they always do it, or, two, that the city ordered or authorized police officers to act in such a manner.

So the court concluded that the plaintiff in that case, *Lyons*, didn't indicate why he might realistically be threatened by police officers who acted within the strictures of the city's policy.

So in *Lyons* there was no policy. The court said there is no policy here, and so how can you -- you can't get a prospective injunction.

Here, what's at issue is the alleged policy as articulated by senior DHS officials to use an unlawful standard, namely reasonable suspicion rather than probable cause, to make warrantless civil immigration arrests, and that

plaintiffs also say that that's a policy that actually targets people with the plaintiffs' attributes.

So why doesn't -- why isn't that enough to differentiate this from *Lyons*?

MR. BARDO: Like in *Lyons*, we also maintain that there is no policy, and I understand plaintiffs dispute that, but we maintain there is no policy. And *Lyons* also --

THE COURT: Would you agree that in *Lyons* they had no LA County senior officials from the mayor's office down to police officers saying anything about using choke holds in a regular way?

MR. BARDO: I'm not aware of anything like that in *Lyons*.

THE COURT: That is different from here, right?

MR. BARDO: Well, I think the key point in *Lyons* is that just because it's happened in the past, you can't have past is prologue standing. Just because you were subject to a choke hold in the past doesn't mean you have standing to challenge a choke hold because it's pure speculation that it will happen to you again.

THE COURT: Right. Okay. You brought up *Perdomo*, Justice Kavanaugh's concurrence in *Perdomo* where he was the single justice who raised a question about the plaintiffs' standing there, and he did so in his single concurrence with the brief emergency order that stayed the district court's

injunction after the Ninth Circuit had denied the injunction, denied the stay.

So what Justice Kavanaugh simply said is that there is a certain combination of factors that may be considered in evaluating reasonable suspicion for a stop to ask questions under INA Section 1357(a)(1), which would you agree is a different INA section than 1357(a)(2) authorizing civil immigration arrests which is at issue in this case?

MR. BARDO: That's correct, Your Honor.

THE COURT: Justice Kavanaugh was the only justice offering any reasoning for the stay, and he explained that the plaintiffs might not have standing since they were only speculating that a combination of certain factors raising reasonable suspicion would apply to them and such speculation was insufficient for standing.

In contrast here, plaintiffs are challenging ICE's apparent adoption of a policy, not specific individualized factors, a policy to use the wrong legal standard altogether for civil arrest under 1357(a)(2), not just attacking a combination of different factors for a stop on reasonable suspicion.

Why aren't all of these differences with *Perdomo* make that case completely different?

MR. BARDO: Well, in *Perdomo* the plaintiffs were claiming that ICE's actions weren't in compliance with (a)(1),

and that's the same thing that the plaintiffs in this case are -- not in this case, a different statute, but it's the same theory that Congress passed these provisions of the INA and ICE isn't following them. That's even -- it was -- it concerned stops and reasonable suspicion in *Perdomo*.

Here, we're dealing with arrests and probable cause, but it's the same general theory, that the government is not abiding by the terms of the statute.

THE COURT: And not abiding by the terms of the statute in pretty different ways. There was what confluence of factors would be sufficient for reasonable suspicion for a stop under 1357(a)(1), and here it's totally different statute, it's an arrest requiring probable cause and it's a claim not about a confluence of factors, but it's about whether or not they are using the wrong standard altogether as articulated by senior DHS officials. You don't think that that is distinguishing?

MR. BARDO: No, Your Honor, because probable cause is also a confluence of factors. It just requires more factors. Reasonable suspicion and probable cause, they are part of the same spectrum. You need some factors to have reasonable suspicion to make a stop, but you would need even more factors to have probable cause to make an arrest. It's still a confluence of factors.

THE COURT: Okay. Do defendants suggest that the single concurrence by Justice Kavanaugh in *Perdomo* is any way

binding precedent or even persuasive, particularly since, as plaintiffs point out, the concurrence was issued without the benefit of merits briefing or even argument in connection with the one-paragraph stay order?

MR. BARDO: It's persuasive. It wouldn't be binding precedent, but it's persuasive. And it's a signal of how the -- considering that the Supreme Court overturned the injunction that the lower court had issued and that this one justice explained his reasoning in that way, it gives you some clues as to how the Supreme Court might view this case.

THE COURT: Or he will view the case.

MR. BARDO: Yes, and he --

THE COURT: We have no indication of how the other justices in the majority on that stay decision, not even on the merits decision, will view it. No reason to spend any more time on that.

To establish standing in addition to showing an injury in fact, the named plaintiffs have to also establish causation and redressability. Plaintiffs point out that defendants do not challenge the traceability or redressability requirements of standing. And so do defendants rest solely on injury in fact for plaintiffs' lack of standing?

MR. BARDO: In this brief we do, Your Honor, yes. I will -- was Your Honor going to move to associational standing next, or --

THE COURT: Yes, you can talk about that if you like.

MR. BARDO: Yes. Well, our associational standing, two parts. I mean, the first part the, like the individual plaintiffs, the members of CASA don't have standing for the exact same reasons. But two, I want to address something that opposing counsel said during her time.

THE COURT: Of course.

MR. BARDO: Opposing counsel talks about the harm to CASA from having to divert resources toward addressing warrantless immigration arrests when that's not their mission.

THE COURT: So you're talking about their lack of organizational standing?

MR. BARDO: Correct, Your Honor. CASA is voluntarily choosing to step outside what they consider their normal -- their normal mission. And I would point the Court to this case *Hippocratic Medicine*, a recent Supreme Court case, where the court says that, "An organization has not suffered a concrete injury caused by defendants' action, cannot spend" -- excuse me. "An organization that has not suffered a concrete injury caused by a defendants' action cannot spend its way into standing simply by expending money to gather information and advocate against the defendants' action."

That's what CASA seems to be doing here, and that would not be sufficient to confer standing.

THE COURT: Would you agree that if CASA meets the

requirements for associational standing, which I understand you dispute, is there any reason to consider organizational standing?

MR. BARDO: I believe -- I don't think you need -- I don't believe you need to have both for them to have standing.

THE COURT: That's my understanding as well.

Let's turn to some of the jurisdictional issues that the defendants have raised.

Plaintiffs argue that INA section 1252(f)(1) does not bar a stay or vacatur of agency action under the Administrative Procedure Act, nor does it bar declaratory relief since the text of 1252(f)(1) only limits class action relief to certain parts of the subchapter, specifically INA Section 1221 through 1231.

So do defendants dispute that 1252(f)(1) does not apply to relief under the APA or to declaratory relief?

MR. BARDO: It doesn't apply to relief -- the merits of the relief, but it does apply to the Court's ability to certify a class. That's why we raised it in our portion where we discuss class certification.

THE COURT: Okay. And do you think *N.S. v. Dixon*, the DC Circuit's most recent case addressing 1252(f)(1), helps you here?

MR. BARDO: It absolutely does, Your Honor, because the plaintiff made the exact same argument in that case that

plaintiffs are making here, that a violation of 1357 is not a covered provision, but the DC Circuit disagreed saying that the injunction was improper because it enjoined the Marshal Service from arresting and detaining any criminal defendant suspected of a civil immigration violation, which includes arrests made with a warrant pursuant to 1226(a), which is a covered provision, and detention of any alien charged with any of the crimes listed in 1226(c), also a covered provision.

THE COURT: I read that provision of *N.S. v. Dixon* as saying this injunction is overbroad, it covered far beyond just 1357(a)(2), civil immigration arrests.

Why do you read it as saying 1252(f)(1) covers 1357(a)(2)? I don't read it that way. Why am I wrong?

MR. BARDO: It covers -- it prevents the Court from allowing class certification to resolve this case, because --

THE COURT: If the injunctive relief goes beyond -- if the injunctive relief is overbroad, because that was the problem in *N.S. v. Dixon*, right, the injunctive relief covered all arrests by the U.S. Marshal Service and immigration-related matters no matter what the circumstances, 1226, 1357, covered -- it was overbroad.

Why isn't that different here if the injunctive relief is limited to 1357(a)(2)?

MR. BARDO: Because in that case, the Court wouldn't allow the injunctive relief for 1357(a)(2). That was the

statute that *N.S. v. Dixon* was dealing with, and at least I understand from --

THE COURT: Just from the language you just read, I have read the same text in the decision, it's really just saying that this was an overbroad injunction, so they vacated it and sent it back. But that was -- okay.

I know that you relied on *N.S. v. Dixon* for saying that the class action bar in (f)(1) applies to 1357(a)(2) arrests.

MR. BARDO: Correct.

THE COURT: I scoured this opinion. I don't see that. I see they looked at -- they said it was not a covered -- 1357(a)(2) wasn't covered. They said but this injunctive relief is overbroad, so they vacated the injunction as overbroad, not -- they made no holding that (f)(1) applies to 1357(a)(2) to bar class actions to enforce 1357(a)(2).

I just -- I really wanted to get clarification from you as to where did you see that in the decision that I'm missing it? But if you're just looking at that same language, that language is in the decision, that language is basically this was an overbroad injunction. That's how I read it.

MR. BARDO: The DC Circuit said that the injunction restrains the government from carrying out an arrest and a detention of a criminal defendant, which is one of the actions that 1252(f)(1) applies to.

THE COURT: Okay. All right. So let's look at the other jurisdictional bars that you have raised. 1252(a)(5) and (b)(9). The defendants maintain that 1252(a)(5), (b)(9) and (g) all bar the Court from reviewing the two claims brought by the plaintiffs challenging DHS's alleged policy of warrantless civil immigration arrests without probable cause.

And would you agree that 1252(a)(5) and (b)(9) are INA provisions that limit judicial review of orders of removal and there was no orders of removal at issue with respect to the four individual plaintiffs at the time of their immigration arrests?

MR. BARDO: We read those statutes, Your Honor, as channeling these types of claims into the removal proceedings. Congress specifically allows an alien subject to removal proceedings to challenge the removal proceedings by raising theories, such as, oh, I was arrested without probable cause or I was unlawfully detained. These are supposed to be litigated before the circuit court challenging a removal order.

With respect to the three plaintiffs who are in removal proceedings, they will have the opportunity to challenge. If they believe their arrests were unlawful, they will have the opportunity to challenge that at that point, not before this Court.

THE COURT: All right. Even though the Supreme Court decisions in *Jennings*, *Nielsen*, and *Department of Homeland*

*Security v. Regents of University of California*, all Supreme Court, the Supreme Court has refused the breadth that you are urging me to adopt here of barring judicial review that's not directly and expressly tied to a removal proceeding, because this might lead to a removal proceeding?

Isn't the Supreme Court very careful to say that is an overbroad reading of the statute?

MR. BARDO: No, Your Honor, because an arrest is part of a removal proceeding. It's part of the process. Arrest, detention, it's the initiation of the removal proceeding.

THE COURT: All right.

MR. BARDO: And would you like --

THE COURT: And what -- all right. Let's go to whether -- anything else you want to say about the jurisdictional bars?

MR. BARDO: I would also like to point the Court to 1252(g), which strips the Court of jurisdiction to hear any cause or claim on behalf of any alien arising from the decision to commence proceedings, adjudicate cases or execute removal orders. And I think the Third Circuit decision in *Tazu versus Attorney General* is on point here where the plaintiff challenged his pre-removal detention, and the Court in that case said that detaining an alien is part of executing a removal proceeding.

We would make the same argument for arresting an alien

is, like detaining, is also a key part of executing the removal order.

THE COURT: In *Tazu*, where the Third Circuit found that 1252(g) barred review of the situation in that case, wasn't the order of removal already issued at the time that Tazu was detained, and so it was -- there was clearly an order of removal in effect at the time of Tazu, which is why the Third Circuit found that 1252(g) barred the review.

Isn't that a very different factual situation where we have here, where none of the individual plaintiffs have orders of removal against them at this point?

MR. BARDO: They are in removal proceedings though, Your Honor, and the statute applies to decisions to commence removal proceedings as well as to execute removal orders. Making the arrest is just part of initiating the removal.

THE COURT: In *Tazu* wasn't an order of removal already issued at the time of the detention and that is part of the key factual determination made by the Third Circuit to find that 1252(g) applied?

MR. BARDO: That was part of the determination, yes, Your Honor.

THE COURT: Yes. Let's turn to the APA final agency action challenge of the defendants or concern that the defendants have raised. The DC Circuit in *CropLife v. EPA* found that an agency's press release that had clear and

unequivocal language constituted a final agency action.

Here, we have a number of press statements, plus corroboration by a CBP Chief Border Patrol Agent, all confirming that the policy of DHS being implemented and making civil immigration arrests was to use reasonable suspicion, not probable cause.

Why doesn't *CropLife*, binding precedent from the Circuit, provide strong support for concluding that the plaintiffs have established the policy that they allege?

MR. BARDO: Because each of these arrests involve unique circumstances. We have got two plaintiffs who were targets of arrests. And for the other two, we have probable cause and an articulation of flight risk.

And again, Your Honor, we dispute that those statements reflect the agency's policies, but there is no -- there is no specific rights or obligations that have been established because ICE agents do not make arrests every time they encounter an alien. In some circumstances, they may just issue a notice to appear. It's a fact-specific determination.

And it's not -- these arrests aren't being made pursuant to some broader policy.

THE COURT: How would you otherwise distinguish *CropLife America v. EPA*, DC Circuit case from 2003?

MR. BARDO: Well, in that case, I don't think there was any dispute that the press release constituted agency

policy. Here we do dispute that it constitutes agency policy and there isn't a specific policy that's applied each time -- well, to the extent there is any policy, it's the one specified in the statute, but it's not applied each time they encounter an unauthorized alien.

THE COURT: So the defendants also seek dismissal of plaintiffs' claims against DEA.

MR. BARDO: That's correct, Your Honor.

THE COURT: Saying -- I mean, the test for dismissal is whether the claim is plausible. And are DEA agents part of the law enforcement contingency being used to assist in the surge of law enforcement presence in DC?

MR. BARDO: They are part of the broader "Make DC Safe and Beautiful" initiative, but they did not conduct any arrests of the four plaintiffs in this case. And right now, we are only talking about the four plaintiffs in this case. We can't speak to the declarations that are submitted under pseudonyms. We don't know those peoples' full names. We don't have their A numbers.

And this allegation in the complaint just says that the person was wearing a DEA vest, but they were wearing an ICE badge, so they were ICE agents. And we have documentation that it was ICE who conducted the arrest. None of these arrests -- there is no dispute that ICE and CBP have Title 8 authority to conduct the arrests, and that's who was conducting the arrests

in these cases.

THE COURT: The record before me indicates that the Attorney General has designated agents from multiple law enforcement agencies to assist DHS and ICE in immigration enforcement; is that correct?

MR. BARDO: That's correct, yes.

THE COURT: Are DEA agents part of the law enforcement agencies that the Attorney General has designated to assist DHS and ICE in immigration enforcement?

MR. BARDO: They have been given Title 8 authority.

THE COURT: Is it also correct that DEA agents often identify themselves with "DEA" in big letters someplace on their apparel?

MR. BARDO: I can't speak to that, but they would certainly -- they certainly wouldn't be wearing a badge from another agency if they were in fact DEA agents.

THE COURT: What's your -- really? What's your knowledge of that?

MR. BARDO: If you're an agent for the DEA, why would you wear a badge that says "ICE"?

THE COURT: If you're an agent for some other agency other than DEA, why would you be wearing apparel that says "DEA" in big letters on it?

MR. BARDO: I think the badge is the official designation of what you're affiliated with.

THE COURT: Well, that will be a matter for discovery if we proceed to discovery in this case, because in my experience as a former prosecutor, DEA agents proudly wore their apparel labeled "DEA," to associate themselves with DEA. And given the record evidence, sworn declarations from 29 different people, a number of them saying that the agents doing the arrests of these civil immigration arrests didn't identify themselves, so seeing a person wearing apparel with "DEA" on it is enough to make this a plausible claim.

Why should I say it's implausible and dismiss DEA from the case?

MR. BARDO: I can only speak to what happened for the specific plaintiff.

THE COURT: It would have to rest for discovery to find out whether the plausibility of this claim turns out to be fact, right?

MR. BARDO: No, Your Honor, because this is -- R.S.M. is the only one that's making any allegation about DEA, and this person is wearing an ICE badge. And the paperwork that we have suggests that -- it says that R.S.M. was arrested by ICE, not by DEA.

THE COURT: That paperwork has not been submitted in the record or produced to plaintiffs to examine it; is that right?

MR. BARDO: No, but Mr. Simon's declaration says that

R.S.M. was arrested by ICE.

THE COURT: He says he was arrested by ICE, but since there are lots of other agencies that have been designated, delegated by the Attorney General to assist, does that mean that there was nobody else present, no other agents from any other agency present? That declaration doesn't say that.

MR. BARDO: This case though is about arrests, and I think the agency that's conducting the actual arrest is what matters. I mean, are other agents maybe nearby to be a presence and provide support, but the arresting agency is what matters. They are the ones that have to abide by 1357(a)(2).

THE COURT: Mr. Bardo, do you agree that if this Court were to find that defendants did have the policy as alleged by plaintiffs of conducting warrantless civil immigration arrests without probable cause to find a risk of escape, then that policy would violate the INA, DHS's implementing regulations, the APA, and the Accardi doctrine?

MR. BARDO: If the Court were to find that, yes, but as I have mentioned before, there is no such policy, but, yes, we don't dispute, the two sides, as to what the law is.

THE COURT: Okay. How many different agencies have contributed federal agents to assist in making immigration arrests in DC?

MR. BARDO: The only ones that are actually conducting the arrests are CBP and ICE. And I don't -- short answer is I

don't know, Your Honor. I know other agencies have been given Title 8 authority, but I have focused my attention on the four plaintiffs that are parties to this case, and these four plaintiffs were arrested by ICE and CBP.

THE COURT: When you say they were arrested, does that mean that there were no other agents from outside CBP or ICE present at the scene in helping to conduct the arrests?

MR. BARDO: It's possible they were present, but I don't know that for sure, Your Honor.

THE COURT: And for the agents from outside CBP and ICE who have been designated to assist CBP and ICE in making immigration arrests in DC, have any steps been put into place to provide any training to those agents from other agencies?

MR. BARDO: I don't know the answer to that question, Your Honor, but we can provide that information for you.

THE COURT: When?

MR. BARDO: Probably pretty quickly.

THE COURT: Because you agree that the two declarations submitted by the defendants are silent as to what training has been provided to other agents outside of CBP and ICE regarding any training to make them -- make any civil immigration arrests they might make valid under *N.S. v. Dixon*, which found you don't have the right training, invalid arrest.

MR. BARDO: We agree that the declarations are silent on that, but, again, only people arrested by CBP and ICE are

parties to this case, so that's what we are addressing.

These plaintiffs, they wouldn't have standing to challenge actions by another agency that's not involved with arresting them.

THE COURT: All right. So one of the things that defendants make this point in their brief that, quote, "Whereas here a party seeks a mandatory injunction, meaning to change the status quo through action rather than merely to preserve the status quo, typically, the moving party must meet a higher standard than in the ordinary case."

At the same time, defendants say DHS has no policy or practice in making civil immigration arrests under Section 1357(a)(2) without the proper probable cause, which sort of led me to a bit of a conundrum that I wanted to ask you.

If DHS is in fact, as you say, complying with the requirements of 1357(a)(2), despite what the spokespeople say and the Chief Border Patrol Agent, why would requiring DHS to do so require a change in the status quo?

MR. BARDO: Requiring DHS to comply with a law that it already is complying with would not require a change in the status quo, but plaintiffs are seeking injunctions preventing these types of arrests that are lawful arrests, so, in that case, it would be a change to the status quo. We maintain that the four arrests that are the subject of this lawsuit are lawful arrests.

THE COURT: Let's go to the balance of the equities because defendants argue that if the plaintiffs get past the jurisdictional hurdles, standing, and the INA's judicial review of various bars and class action bars, and show a likelihood of success on the merits, that the balance of the equities and public interest tips decisively in the defendants' favor, citing the two big problems that I pointed out with the plaintiffs.

So could you just explain what it is with respect to the first bucket of problems, you know, untenable situation of operational concerns, what precisely are you talking about?

MR. BARDO: Well, because plaintiffs are seeking a follow-the-law injunction, and if there is an injunction in place any individual who is arrested could conceivably say "I was arrested in violation of this injunction" and we would have the problem Your Honor was describing in the last --

THE COURT: That's the second bucket of issues. The first bucket of issues, as I understood it, is it would disrupt operations, it would disrupt operations to do immigration law enforcement. I was struggling to understand.

It was pretty vivid language used in your opposition brief, but I wanted -- I deal with concrete facts. So putting aside all hyperbole and general descriptions, like what operationally would be affected by following the law that you only arrest, make civil immigration arrests under 1357(a)(2),

when you show probable cause to meet both prongs of the statute in the regulation? What operationally would be difficult about that?

MR. BARDO: I think it's related to the second bucket, Your Honor. It would slow down immigration enforcement efforts because any plaintiff could come forward and say you're in violation of the injunction and we would have to have a mini trial about whether the government is complying with the injunction.

THE COURT: So really it's not operationally on the ground, so to speak, because don't they already have to fill out the I200 form, as the Simon declaration says, about every time they make a civil immigration arrest, they already have to fill out a form saying why they are making the arrest?

MR. BARDO: That's right.

THE COURT: What does that I200 form say? Does it say anything about what's your individualized determination based on to find probable cause to believe this person has unlawful status and poses a risk of escape? Does that form have a part for them to fill out on that?

MR. BARDO: I don't know for sure. It should, but I haven't looked at one of those.

THE COURT: It should have those things in it for them to describe the basis for the civil immigration arrest?

MR. BARDO: It should, yes, Your Honor.

THE COURT: As an operational matter, they would have to fill out the form anyway to explain that, so complying with the law, and as an operational matter, wouldn't mean they would have to fill out ten more forms or do anything more than they are already to supposed to be doing, so with respect to that bucket of problems --

MR. BARDO: It would pull agents away from their regular duties conducting these arrests and haul them in to court to defend each one of the arrests.

THE COURT: That goes to the second bucket, as I understood.

MR. BARDO: And if I could mention something else, Your Honor. It would also chill agents' enforcement initiatives. It may make them less likely to conduct an arrest. It may cause them to hesitate knowing that an injunction is in place to conduct an otherwise lawful arrest.

THE COURT: Huh. Well, they would certainly have to comply with the law, so I don't -- I'm not, you know, making it clear that an injunction that says you have to follow the law, guys, how is that going to chill them from following the law?

MR. BARDO: Well, a follow-the-law injunction is impermissible, so you touch on another problem.

THE COURT: Uh-huh. Well, this would be making clear that to the extent that any of the agents on the ground are listening to guidance from the DHS spokesperson that only

reasonable suspicion is required to make a civil immigration arrest under 1357(a)(2) or from the Chief Border Patrol Agent that you only need reasonable suspicion and no need to get a warrant --

MR. BARDO: Well, they should be following --

THE COURT: -- then maybe a clarifying injunction to clarify what the actual law is might be helpful, or you think not?

MR. BARDO: I mean, clarifying injunctions aren't permitted by Rule 65. They are trained to follow the law in the academy and in their refresher courses. That's what they should be basing their actions on.

THE COURT: Anything further?

MR. BARDO: Nothing further, Your Honor, on the injunction. Did Your Honor want to discuss class certification?

THE COURT: I'll hear anything you have to add.

MR. BARDO: The main reason why a class should not be certified is that each of these arrests is an individualized determination, and you don't even have commonality among the four plaintiffs. As we discussed, each of them has a different backstory. Two of them were targeted arrests. We have one who has a lapsed TPS status. He's not in removal proceedings, the other four are. There are just too many dissimilarities among the plaintiffs to certify this as a class.

THE COURT: Thank you, Mr. Bardo.

MR. BARDO: Thank you, Your Honor.

THE COURT: Any reply?

MS. SHAH: Just briefly, Your Honor. I would like to start by making some corrections on certain record statements that Mr. Bardo made in his presentation just now, specifically with respect to two of our named plaintiffs, Mr. Escobar Molina and B.S.R.

First, with respect to the criminal charge, the alleged criminal charge for B.S.R., we have checked with our client, and there is no evidence of any criminal charge for B.S.R. He's not aware of one at least, and we think that certainly if he had such a charge, he would know and he would tell us.

And even if there were any such criminal charge, it certainly must have been dropped because there is nothing in the record. We really haven't been able to find any evidence to show that he even had a criminal charge.

THE COURT: This was a charge from 2025?

MS. SHAH: Yes.

THE COURT: So it's fairly recent. It's not like it's ancient?

MS. SHAH: Even if there were one, we have to assume, based on our discussions with our client, that it was dropped.

With Mr. Escobar Molina, I believe Mr. Bardo didn't

mention that the criminal charge that he had was dropped in 2019. It's not active and has not been active since six years ago.

And more importantly, I think with both of these criminal charges, as well as all of the other facts that defendants have made about B.S.R. and Escobar Molina, there is nothing in the record to show that the agents who actually arrested Mr. Escobar Molina and B.S.R. knew of these facts.

And in fact, I would like to say that for the ankle monitor charging issue for B.S.R., as we pointed out in our papers as well, it's quite strange to us that they included this fact for a couple of reasons.

First, we have checked with our client. He said there was no charging issue with his ankle monitor. He's been going to regular appointments as required under the conditions of his alternative to detention program, and they haven't expressed concern or issue about the charging of his ankle monitor.

Also, as we noted in our papers, the alternatives to detention management program, and that would include the ankle monitors, that's managed by a different agency. Actually, I believe it's a contractor, and it's not through CBP, so it's very strange that this fact, alleged fact, was included in CBP's declaration and that it was CBP agents who arrested B.S.R.

So the ankle monitor charging point I think is

irrelevant. And to the extent that the ankle monitor is relevant here, I think it's very clearly a fact cutting against a probable cause determination that B.S.R. would be a flight risk. I think an ankle monitor is sort of, by definition, something that shows that this person can't be a flight risk.

THE COURT: At the time of the civil immigration arrest, did he point out, according to his declaration, that he was wearing an ankle monitor?

MS. SHAH: That's correct. He tried very hard to point that out and instead the agents made clear that they would not listen to him. As the agent said, they were there to arrest two people, and they came for two people, that's what they were going to do.

And I also just wanted to clarify, I believe Mr. Bardo may have mistaken Mr. Escobar Molina's TPS status with -- I think what Mr. Bardo was referring to was the initial application for TPS. That's not the situation that Mr. Escobar Molina was in. He had already timely applied for renewal of his TPS status, and the renewal process is different.

Once someone has applied to renew their TPS status, their status is valid. By default, he had valid TPS status at the time that he was arrested unlawfully as we have stated in the declaration.

And in fact, the next day after he was detained overnight at Chantilly, one of the officers I believe even

apologized to Mr. Escobar Molina demonstrating that he really should not have been arrested at all, that this was clearly a mistaken arrest and exactly the kind of unlawful arrest that we are trying to prevent by seeking an injunction of the defendants' unlawful policy and practice.

And the last thing I want to say about these arrests and the facts that again there is nothing in the evidence to show that the agents who actually arrested the named plaintiffs knew of any of these facts. We really have no idea what they knew or didn't know, other than what the plaintiffs have --

THE COURT: Mr. Bardo says that that's the meaning, although it's not obvious, but that's the meaning of the words "specifically targeted."

MS. SHAH: That's exactly the point I was going to turn to, Your Honor. I have been very confused by the use of the word "targeted" in defendants' filings, because I'm not sure what that means or in what sense these arrests were targeted.

THE COURT: The timing of specifically targeted, because it doesn't say he was specifically targeted on such and such a date because of such and such a reason, and this was all before the arrests. The declarations are very vague on the timing, pre- or post-arrest.

But I think from what Mr. Bardo said, and Mr. Bardo is an officer of the court, if he finds out he's incorrect, must

correct the record, because as I was understanding what the government's representation was here is that specifically targeted means all this happened, whatever it was, before the arrest.

MS. SHAH: I understand that implication. I think there is nothing in the record to support that. There is no evidence to suggest that when defendants have used the word "targeted" that that is actually what they meant.

THE COURT: It was all pre-arrest?

MS. SHAH: Exactly, that it was all pre-arrest and that these are facts that the agents who were actually involved in conducting these arrests were aware of before making the arrest. There is no evidence in the record to support either of these inferences, and that's why I don't think that there can be any credit to the use of the term "targeted" here.

It feels meaningless to me without there being any evidence to show why they were targeted. And I would reiterate something that I think came out in your discussion with Mr. Bardo, that if they were indeed targeted in the sense that these were facts that the agents knew of before they made the arrest, why didn't they have a warrant? Defendants don't dispute that they didn't have a warrant, and we know what the process for obtaining an administrative warrant is in these circumstances, so --

THE COURT: One of the declarations, I think Simon

says we could do it on the spot. We could sit in a car, a supervisor could sit there and they say we're going to arrest this particular person and they could just write out the warrant right in the car at the time of the arrest. I mean, it is apparently very easy to get a warrant.

MS. SHAH: Right, and I don't want to suggest that this standard for obtaining an administrative warrant to conduct these arrests is so watered down that it could open a potentially other host of problems of misuse of administrative warrants. I don't want to go there, but --

THE COURT: I know that's not at issue here.

MS. SHAH: Exactly. It's in fact quite the opposite. So I just wanted to conclude the colloquy about correcting some of the facts and what they actually mean with respect to B.S.R. and Escobar Molina by stressing that the use of the word "targeted" in their submissions really I think is toothless in the way that it presents with the evidentiary record that we have here.

And the only other thing I wanted to say is that we think that the evidence that we have submitted, both the more than two dozen arrests that have been documented in sworn declarations attesting to this systematic practice and policy of making immigration arrests without a warrant and without an individualized determination of probable cause for flight risk, plus defendants' own statements, which, again, Your Honor is

allowed to consider in the preliminary injunction posture, they would be even, I think, admissible as party admissions, and this Court has in prior cases credited those kinds of statements, collectively all of these pieces of evidence demonstrate that there is a policy and practice of making these types of unlawful warrantless immigration arrests in the District.

And we completely understand Your Honor's concerns with respect to manageability for some aspects of the proposed preliminary injunction order, and we will promptly submit a modified version to Your Honor for Your Honor's consideration.

But notwithstanding those details which are important but which we will hash out, we think that the injunctive relief we have sought here is critical to protect the safety and wellbeing of the individual plaintiffs, every person in DC who would fall into this class and is living in fear of being torn away from their families and their lives, as well as to CASA who has still and is continuing to expend a massive amount of resources, not voluntarily, but because they have to because that's what their members are coming to them with right now. They would also really like to get back to their core mission of serving the people in their membership with the services that they are actually supposed to provide.

If there is anything else that I can address for Your Honor, I would be happy to.

THE COURT: Timing. I don't like to leave hearings without knowing when to expect supplemental filings. So when can I expect supplemental filings from the plaintiffs?

MS. SHAH: Can I take just one minute to confer with my team?

THE COURT: Uh-huh.

(Pause)

MS. SHAH: By end of day tomorrow.

THE COURT: All right. 5:00 p.m. tomorrow.

Do the defendants want a time period for any supplemental filings, or you want to rest on the record as it is now?

MR. BARDO: Your Honor, we would like the opportunity to supplement our (f)(1) arguments, and we would certainly want to know specifically what they are submitting in order to appropriately respond. I mean, next week is Thanksgiving, and we need to order the transcript and confer with our clients, so could we have two weeks from today?

THE COURT: No. All right. So today is Wednesday. The plaintiffs are submitting their supplementation by 5:00 p.m. tomorrow. You can have until Monday at 5:00 p.m.

MR. BARDO: Understood, Your Honor.

THE COURT: All right. Anything further from the plaintiffs today?

MS. SHAH: Just one small thing. I wanted to confirm,

Your Honor. So we will plan to submit a modified proposed order for the preliminary injunction motion by 5:00 p.m. tomorrow. Is there any other modified order or anything that the Court would like us to submit as well, or is that -- that's the main one? Great.

THE COURT: If there are any other facts that you think are probative, I would expect you to support those facts with supplemental declarations.

MS. SHAH: Yes.

THE COURT: But I'm not going to tell you how to litigate your case, but I can only look at what's in the record and sworn to. Silence is loud in this case, particularly from the defendants' point of view, but they just want to brief (f)(1), that's fine.

MS. SHAH: Absolutely, Your Honor. Thank you.

THE COURT: All right.

MS. LANDAN: Your Honor, sorry. Defendants mentioned they would like to supplement their (f)(1) argument, so to the extent they have raised new arguments, would plaintiffs have an opportunity to respond to legal arguments they make?

THE COURT: Yes. Their supplement is going to be due Monday at 5:00. You can have until Tuesday at 5:00. So it will only be me working over Thanksgiving. How lucky for you all.

All right. Anything further from the defense?

MR. BARDO: Nothing further, Your Honor.

THE COURT: You're all excused.

(Proceedings concluded at 12:49 p.m.)

CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Columbia, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 19th day of November, 2025.

/s/ Sonja L. Reeves
SONJA L. REEVES, RDR-CRR
FEDERAL OFFICIAL COURT REPORTER

**#**

**#896645** [1] - 1:16

**'**

**'realistically** [1] - 7:23

**/**

**/s** [1] - 103:12

**1**

**1** [5] - 2:5, 24:22, 46:15, 48:8, 49:1
**1,800** [1] - 10:8
**10** [1] - 47:4
**100** [2] - 11:9, 47:4
**10:00** [2] - 1:10, 3:1
**10th** [1] - 1:18
**11** [1] - 61:12
**11th** [2] - 11:20, 15:7
**12** [1] - 66:10
**1221** [2] - 22:3, 77:13
**1226** [3] - 23:6, 23:11, 78:20
**1226(a** [1] - 78:6
**1226(c** [2] - 23:7, 78:8
**1229** [1] - 23:15
**1231** [2] - 22:4, 77:14
**1252(a)(5** [6] - 16:16, 16:24, 18:7, 80:2, 80:3, 80:7
**1252(b** [1] - 18:10
**1252(b)** [1] - 18:12
**1252(b)(9** [1] - 17:20
**1252(f)(1** [9] - 16:17, 22:1, 23:24, 77:9, 77:12, 77:15, 77:22, 78:12, 79:25
**1252(g** [12] - 19:4, 19:10, 19:12, 19:13, 19:20, 20:2, 20:3, 20:16, 81:17, 82:4, 82:8, 82:19
**12:49** [2] - 1:10, 103:3
**12th** [1] - 20:20
**13** [1] - 62:2
**1357** [14] - 23:4, 61:25, 62:7, 62:9, 62:12, 62:13, 63:6, 63:9, 64:13, 64:16, 65:25, 78:1, 78:20
**1357(a)(1** [2] - 73:6, 74:12
**1357(a)(2** [33] - 6:25, 9:25, 12:20, 19:25, 22:7, 22:17, 23:23, 24:13, 25:5, 34:19, 35:22, 43:2, 46:20, 52:10, 53:3, 59:20, 60:25, 61:8, 64:1, 64:7, 70:16, 73:7, 73:19, 78:11, 78:13, 78:23, 79:8, 79:13, 79:16, 89:13, 89:16, 90:25, 93:2
**1357(a)(2)** [5] - 65:17, 70:8, 78:25, 79:16, 87:11
**1372(a)(2** [1] - 52:14
**14th** [2] - 1:13, 2:2
**17** [1] - 24:22
**175** [1] - 1:16
**1763** [1] - 1:16
**18** [4] - 32:3, 46:20, 61:14, 61:23
**19** [5] - 1:10, 24:22, 54:8, 61:12, 62:2
**1983** [1] - 7:25
**19th** [1] - 103:10
**1:25-cv-03417-BAH** [1] - 1:5

**2**

**2** [2] - 24:22, 59:10
**20** [2] - 8:15, 27:18
**20001** [2] - 1:19, 1:24
**20003** [1] - 2:3
**20009** [1] - 1:16
**2003** [1] - 83:23
**20045** [1] - 1:14
**2018** [3] - 20:6, 20:7, 20:9
**2019** [1] - 95:2
**2024** [1] - 20:21
**2025** [14] - 1:10, 10:9, 10:10, 59:8, 59:10, 59:12, 59:14, 62:2, 66:11, 69:1, 69:4, 69:10, 94:19, 103:10
**20530** [1] - 2:9
**21** [4] - 62:2, 67:23, 68:5
**21201** [1] - 2:5
**2305** [1] - 2:5
**25** [2] - 15:13, 59:8
**25-3417** [1] - 3:2
**25th** [1] - 59:8
**287.5(c)(1)** [1] - 28:10
**287.5(e)(3** [1] - 28:10
**287.8** [1] - 62:1
**287.8(c)(2)(ii)** [1] - 46:20
**29** [1] - 86:5

**3**

**3,000** [5] - 10:9, 10:13, 69:4, 69:12, 69:23
**33** [1] - 36:22
**333** [1] - 1:24

**4**

**400** [1] - 2:2

**5**

**5** [1] - 40:3
**50** [2] - 15:8, 48:13
**50-2** [1] - 55:6
**529** [1] - 1:13
**5:00** [6] - 101:9, 101:21, 102:2, 102:22

**6**

**6** [2] - 32:4, 59:12
**601** [1] - 2:8
**65** [1] - 93:10

**7**

**7** [4] - 55:5, 55:6, 57:4, 59:14
**700** [1] - 2:2
**700,000** [1] - 41:13
**705** [3] - 40:3, 40:11, 40:18
**722** [1] - 1:13

**8**

**8** [10] - 16:16, 28:9, 46:20, 57:4, 61:25, 62:1, 68:7, 84:24, 85:10, 88:2
**850** [1] - 1:18
**895** [1] - 20:10

**A**

**a)(1** [1] - 73:25
**a.m** [2] - 1:10, 3:1
**abide** [1] - 87:11
**abiding** [2] - 74:8, 74:9
**ability** [6] - 24:3, 42:1, 42:3, 42:4, 44:9, 77:18
**able** [5] - 23:11, 30:15, 43:22, 94:17
**above-entitled** [1] - 103:8
**absolutely** [9] - 5:16, 6:13, 6:21, 18:8, 31:14, 41:22, 43:10, 77:24, 102:15
**academy** [1] - 93:11
**Accardi** [1] - 87:17
**access** [1] - 14:24
**according** [2] - 60:1, 96:7
**account** [2] - 25:11, 25:17
**accounts** [1] - 30:9
**accrue** [1] - 34:8
**accurate** [1] - 103:7
**acknowledge** [1] - 17:16
**acknowledged** [2] - 25:3, 56:18
**Act** [2] - 6:3, 77:11
**act** [2] - 32:8, 71:14
**acted** [1] - 71:17
**Acting** [1] - 61:5
**action** [19] - 3:24, 16:17, 22:1, 22:9, 22:10, 23:24, 26:14, 26:16, 71:2, 76:18, 76:20, 76:22, 77:10, 77:12, 79:8, 82:23, 83:1, 89:8, 90:4
**actions** [5] - 73:25, 79:16, 79:24, 89:3, 93:12
**active** [2] - 95:2
**activities** [1] - 63:22
**activity** [1] - 44:17
**actual** [3] - 65:13, 87:8, 93:7
**add** [2] - 50:24, 93:17
**addition** [1] - 75:17
**address** [11] - 4:9, 13:25, 20:22, 30:3, 40:1, 47:18, 48:16, 50:17, 51:1, 76:5, 100:24
**addressed** [1] - 12:14
**addressing** [3] - 76:9, 77:22, 89:1
**adequate** [3] - 38:5, 51:10, 51:18
**Aditi** [2] - 3:6, 3:21
**ADITI** [1] - 1:13
**adjudicate** [1] - 81:19
**adjudicated** [1] - 32:17
**administration** [6] - 6:17, 10:7, 10:8, 11:12, 44:3, 69:14
**administration's** [2] - 11:1, 24:17
**administrations** [2] - 33:19, 33:22
**administrative** [8] - 6:4, 43:24, 44:2, 44:16, 57:19, 98:23, 99:7, 99:9
**Administrative** [1] - 77:10
**admissible** [1] - 100:2
**admission** [1] - 66:23
**admissions** [2] - 27:10, 100:2
**adopt** [1] - 81:3
**adopted** [1] - 24:25
**adoption** [1] - 73:17
**advocate** [1] - 76:22
**affect** [1] - 16:22
**affected** [1] - 90:24
**affiliated** [1] - 85:25
**affirmatively** [1] - 59:2
**afraid** [1] - 30:5
**afterwards** [2] - 66:4, 67:15
**agencies** [13] - 12:1, 27:15, 27:19, 30:16, 31:6, 31:10, 31:18, 85:4, 85:8, 87:3, 87:21, 88:1, 88:13
**agency** [20] - 3:24, 26:13, 26:15, 26:16, 30:13, 31:2, 32:8, 77:10, 82:22, 83:1, 83:25, 84:1, 85:16, 85:21, 87:6, 87:8, 87:10, 89:3, 95:20
**agency's** [2] - 82:25, 83:15
**Agent** [12] - 12:19, 59:15, 60:8, 60:11, 61:10, 62:5, 62:22, 64:17, 65:14, 83:3, 89:17, 93:2
**agent** [8] - 20:25, 46:17, 48:10, 52:23, 53:21, 85:19, 85:21, 96:11
**agents** [67] - 5:3, 8:25, 9:5, 10:1, 12:1, 19:24, 23:10, 27:18, 27:19, 28:2, 28:19, 28:22, 28:24, 30:10, 30:13, 30:15, 31:5, 31:9, 31:18, 36:20,

37:6, 37:9, 38:10, 38:25, 39:8, 39:11, 43:18, 46:16, 47:8, 54:4, 54:9, 54:15, 54:22, 55:16, 56:23, 56:24, 58:12, 59:4, 60:13, 60:14, 60:24, 61:15, 61:17, 83:17, 84:10, 84:22, 85:3, 85:7, 85:11, 85:16, 86:3, 86:6, 87:5, 87:9, 87:22, 88:6, 88:10, 88:13, 88:20, 92:7, 92:24, 95:7, 95:23, 96:10, 97:8, 98:11, 98:20
**agents'** [1] - 92:13
**ago** [3] - 5:13, 10:24, 95:3
**agree** [16] - 45:13, 52:13, 52:16, 52:20, 53:2, 53:5, 59:18, 65:22, 65:23, 72:8, 73:6, 76:25, 80:7, 87:12, 88:18, 88:24
**agreed** [4] - 43:13, 43:14, 44:25, 45:23
**ahead** [1] - 5:20
**al** [3] - 1:3, 1:6, 3:3
**alien** [12] - 4:17, 33:10, 33:13, 53:22, 56:18, 78:7, 80:14, 81:18, 81:23, 81:25, 83:18, 84:5
**aliens** [2] - 4:18, 66:23
**allegation** [4] - 27:14, 28:13, 84:20, 86:18
**allege** [4] - 6:16, 6:24, 70:5, 83:9
**alleged** [11] - 8:23, 22:6, 24:9, 24:11, 40:5, 49:2, 71:22, 80:5, 87:13, 94:10, 95:22
**allegedly** [1] - 40:5
**alleging** [2] - 8:8, 46:23
**allow** [2] - 46:22, 78:25
**allowed** [3] - 52:22, 57:22, 100:1
**allowing** [1] - 78:15
**allows** [1] - 80:14
**almost** [2] - 33:3, 43:13
**alone** [2] - 8:4, 44:17
**alternative** [3] - 58:7, 68:25, 95:16
**alternatives** [1] - 95:18
**altogether** [2] - 73:18, 74:15
**amending** [1] - 38:9
**Amendment** [4] - 39:8, 60:14, 61:21, 61:25
**America** [2] - 26:14, 83:23
**American** [1] - 1:12
**Amica** [1] - 2:4
**amount** [1] - 100:18
**ancient** [1] - 94:22
**ankle** [12] - 58:6, 67:19, 68:3, 68:6, 95:9, 95:14, 95:17, 95:19, 95:25, 96:1, 96:4, 96:8
**announcements** [1] - 4:10
**answer** [4] - 12:4, 62:17, 87:25, 88:14
**anticipation** [1] - 19:9
**anyway** [2] - 43:24, 92:2
**APA** [5] - 40:4, 40:11, 77:16, 82:22, 87:17
**apologized** [1] - 97:1
**apparel** [4] - 85:13, 85:22, 86:4, 86:8
**apparent** [2] - 9:3, 73:17
**appear** [7] - 17:4, 17:19, 20:18, 20:23, 67:17, 67:24, 83:19
**application** [20] - 32:9, 32:13, 32:16, 32:17, 33:16, 33:18, 34:4, 55:12, 55:14, 55:25, 56:7, 56:8, 56:10, 66:17, 66:24, 67:4, 67:6, 67:9, 96:17
**applications** [5] - 32:11, 32:22, 33:21, 33:24, 34:15
**applied** [11] - 32:5, 32:7, 56:10, 58:25, 65:13, 82:19, 84:2, 84:4, 96:18, 96:20
**applies** [5] - 18:11, 79:8, 79:15, 79:25, 82:13
**apply** [6] - 17:20, 30:17, 73:14, 77:16, 77:17, 77:18
**applying** [4] - 35:4, 56:2, 56:11, 64:1
**appointments** [1] - 95:15
**appreciate** [1] - 44:13
**apprehended** [1] - 9:8
**appropriate** [1] - 37:4
**appropriately** [1] - 101:16
**Aracely** [2] - 25:9
**architects** [1] - 11:1
**argue** [6] - 3:25, 16:4, 16:12, 41:3, 77:9, 90:2
**arguing** [1] - 7:13
**argument** [8] - 10:6, 14:16, 22:5, 22:14, 75:3, 77:25, 81:25, 102:18
**arguments** [8] - 20:3, 20:14, 24:8, 50:1, 50:19, 101:14, 102:19, 102:20
**arising** [1] - 81:18
**Arizona** [2] - 33:4, 34:20
**arrest** [118] - 5:10, 8:9, 9:17, 12:9, 17:3, 17:13, 17:18, 19:2, 19:25, 20:17, 20:18, 21:1, 21:16, 21:17, 22:16, 23:3, 23:11, 24:17, 28:4, 29:6, 30:1, 30:2, 31:24, 32:21, 33:18, 33:23, 34:3, 34:14, 35:2, 35:10, 35:14, 35:19, 35:21, 36:4, 36:13, 36:19, 36:23, 37:1, 37:11, 37:19, 38:1, 38:2, 38:21, 39:2, 39:4, 39:7, 39:8, 40:7, 41:13, 42:2, 42:22, 42:24, 43:6, 43:22, 43:23, 45:12, 46:17, 46:23, 47:24, 48:9, 49:1, 49:12, 50:6, 52:21, 54:16, 54:22, 55:9, 55:17, 56:24, 58:14, 58:15, 59:16, 59:20, 59:21, 59:22, 66:9, 66:12, 66:13, 66:14, 66:17, 66:20, 67:13, 68:14, 68:15, 68:20, 70:15, 70:18, 70:20, 73:19, 74:13, 74:22, 79:23, 81:8, 81:9, 82:15, 84:23, 87:8, 88:23, 90:25, 91:13, 91:14, 91:24, 92:15, 92:16, 93:2, 96:7, 96:12, 97:3, 97:23, 98:4, 98:9, 98:10, 98:13, 98:21, 99:2, 99:4
**arrested** [36] - 8:19, 8:20, 11:13, 17:2, 17:12, 28:19, 30:9, 36:1, 39:24, 40:8, 46:7, 46:18, 52:14, 52:15, 52:24, 66:3, 66:10, 67:17, 67:19, 68:2, 70:10, 80:16, 86:20, 87:1, 87:2, 88:4, 88:5, 88:25, 90:14, 90:15, 95:8, 95:23, 96:22, 97:2, 97:8
**arresting** [18] - 5:8, 9:3, 20:17, 20:25, 23:18, 28:22, 29:5, 39:12, 46:17, 47:8, 48:10, 52:23, 55:2, 55:9, 78:4, 81:25, 87:10, 89:4
**arrests** [145] - 5:3, 6:3, 6:10, 6:15, 6:18, 6:23, 7:1, 8:14, 8:15, 8:17, 9:1, 9:4, 10:9, 10:10, 10:14, 11:7, 11:11, 11:16, 11:23, 12:2, 12:17, 12:21, 12:24, 13:22, 15:15, 16:7, 17:9, 19:8, 22:7, 23:5, 23:6, 23:8, 23:10, 23:17, 24:12, 25:5, 25:23, 26:2, 26:6, 26:8, 27:17, 27:20, 28:1, 28:7, 28:8, 28:12, 28:15, 28:23, 28:24, 28:25, 29:12, 30:12, 31:4, 31:6, 31:10, 34:17, 34:22, 40:6, 41:8, 41:18, 42:3, 42:4, 42:8, 42:10, 44:6, 44:10, 44:16, 46:6, 46:10, 46:16, 47:4, 47:13, 48:13, 48:20, 49:2, 49:8, 49:9, 50:3, 50:4, 52:11, 52:18, 54:10, 54:14, 57:23, 59:9, 59:12, 59:14, 59:24, 61:8, 61:13, 61:20, 61:24, 62:7, 64:7, 64:18, 65:16, 69:12, 70:6, 71:25, 73:8, 74:6, 76:10, 78:5, 78:11, 78:19, 79:9, 80:6, 80:11, 80:21, 83:5, 83:10, 83:12, 83:17, 83:20, 84:14, 84:23, 84:25, 86:7, 87:7, 87:14, 87:23, 87:25, 88:7, 88:12, 88:22, 89:12, 89:22, 89:24, 89:25, 90:25, 92:8, 92:9, 93:19, 93:22, 97:6, 97:17, 97:22, 98:12, 99:8, 99:21, 99:23, 100:6
**art** [1] - 63:19
**articulated** [2] - 71:23, 74:15
**articulating** [1] - 26:21
**articulation** [1] - 83:13
**ascertain** [1] - 28:23
**aside** [1] - 90:23
**ASLAM** [1] - 1:18
**aspect** [2] - 18:15, 21:6
**aspects** [1] - 100:9
**aspiring** [1] - 11:6
**assault** [2] - 54:19, 68:24
**asserting** [1] - 13:2
**assess** [1] - 43:1
**assessment** [3] - 37:20, 39:13, 49:6
**assigned** [1] - 67:20
**assist** [6] - 84:11, 85:4, 85:8, 87:4, 87:22, 88:11
**Assistant** [3] - 3:16, 3:17, 59:10
**assistant** [1] - 55:4
**associate** [1] - 86:4
**associational** [10] - 13:3, 13:6, 13:14, 13:24, 14:2, 14:11, 14:15, 75:24, 76:2, 77:1
**assume** [1] - 94:23
**asylum** [16] - 32:11, 32:13, 32:16, 32:17, 32:21, 33:15, 33:18, 33:21, 33:24, 34:4, 34:15, 66:17, 66:24, 67:4, 67:5
**attacking** [1] - 73:19
**attempts** [1] - 19:21
**attending** [1] - 70:10
**attention** [4] - 45:9, 47:12, 50:5, 88:2
**attesting** [1] - 99:22
**Attorney** [9] - 2:7,

3:16, 3:17, 28:6, 29:25, 81:21, 85:3, 85:8, 87:4
**attorneys** [5] - 46:2, 60:7, 60:12, 63:16, 63:19
**attribute** [2] - 26:23, 26:24
**attributes** [3] - 70:11, 70:15, 72:2
**August** [4] - 11:20, 15:7, 62:2, 66:10
**AUSTIN** [1] - 2:4
**Austin** [1] - 3:13
**authorities** [1] - 6:2
**authority** [12] - 5:2, 6:1, 6:9, 28:2, 28:6, 28:25, 30:2, 52:10, 52:14, 84:24, 85:10, 88:2
**authorized** [4] - 6:18, 28:1, 28:8, 71:14
**authorizing** [2] - 40:4, 73:7
**automatically** [1] - 71:2
**available** [1] - 18:4
**Avenue** [1] - 1:24
**avoid** [4] - 45:15, 45:16, 47:15, 48:12
**avoids** [1] - 49:22
**aware** [10] - 10:16, 47:12, 51:1, 55:16, 59:1, 69:5, 69:14, 72:12, 94:12, 98:12

## B

**b)(9** [6] - 16:16, 18:7, 18:8, 18:9, 80:3, 80:7
**b)(9)** [2] - 16:25, 80:3
**B-2** [2] - 58:4, 68:23
**B.S.R** [24] - 39:2, 39:11, 39:13, 54:11, 54:15, 56:20, 56:24, 57:5, 57:24, 57:25, 58:4, 58:5, 58:20, 67:18, 67:24, 94:8, 94:10, 94:12, 95:6, 95:8, 95:10, 95:24, 96:3, 99:14
**backgrounds** [1] - 14:23
**backstory** [1] - 93:22
**badge** [6] - 30:11, 84:22, 85:15, 85:20, 85:24, 86:19
**balance** [6] - 40:22, 41:1, 41:4, 49:25, 90:1, 90:5
**Baltimore** [1] - 2:5
**bar** [13] - 16:25, 19:10, 21:25, 22:10, 22:20, 23:24, 50:19, 77:10, 77:11, 79:8, 79:16, 80:4
**BARDO** [124] - 2:8, 3:15, 51:22, 51:24, 52:16, 52:20, 53:4, 53:7, 53:11, 53:19, 53:25, 54:13, 54:25, 55:3, 55:14, 56:1, 56:8, 56:16, 56:22, 57:1, 57:7, 57:10, 57:18, 57:22, 58:3, 58:10, 58:23, 59:21, 59:25, 60:5, 60:10, 60:21, 60:24, 61:11, 61:23, 62:9, 62:12, 62:18, 63:2, 63:5, 63:9, 63:12, 63:15, 64:11, 64:22, 65:8, 65:21, 65:24, 66:5, 66:8, 66:14, 66:19, 67:7, 67:16, 67:22, 68:9, 68:16, 68:19, 69:5, 69:14, 69:18, 70:17, 70:23, 72:5, 72:12, 72:15, 73:9, 73:24, 74:17, 75:5, 75:12, 75:23, 76:2, 76:8, 76:13, 77:4, 77:17, 77:24, 78:14, 78:24, 79:10, 79:22, 80:12, 81:8, 81:12, 81:16, 82:12, 82:20, 83:10, 83:24, 84:8, 84:13, 85:6, 85:10, 85:14, 85:19, 85:24, 86:12, 86:17, 86:25, 87:7, 87:18, 87:24, 88:8, 88:14, 88:17, 88:24, 89:19, 90:12, 91:4, 91:15, 91:21, 91:25, 92:7, 92:12, 92:21, 93:5, 93:9, 93:14, 93:18, 94:2, 101:13, 101:22, 103:1
**Bardo** [16] - 3:15, 51:21, 61:16, 62:14, 63:25, 69:8, 87:12, 94:1, 94:6, 94:25, 96:14, 96:16, 97:11, 97:24, 98:19
**barred** [3] - 20:16, 82:4, 82:8
**barring** [1] - 81:3
**bars** [8] - 18:17, 19:4, 20:11, 22:1, 80:2, 81:15, 90:4
**Based** [1] - 67:23
**based** [12] - 7:2, 10:7, 14:5, 17:8, 30:9, 30:14, 31:14, 49:2, 57:9, 62:20, 91:17, 94:24
**basing** [1] - 93:12
**basis** [3] - 48:5, 60:23, 91:24
**Beautiful** [2] - 11:22, 84:14
**becoming** [2] - 50:3, 62:14
**BEFORE** [1] - 1:9
**began** [1] - 11:20
**beginning** [2] - 32:25, 61:12
**behalf** [2] - 3:16, 81:18
**believes** [1] - 51:5
**bench** [1] - 5:21
**benefit** [1] - 75:3
**BERYL** [1] - 1:9
**beside** [1] - 23:2
**best** [1] - 14:16
**better** [2] - 47:19, 49:15
**between** [1] - 53:9
**beyond** [2] - 78:10, 78:16
**big** [6] - 53:9, 53:11, 53:13, 85:12, 85:23, 90:7
**biggest** [1] - 30:24
**bill** [1] - 38:3
**binding** [6] - 27:7, 29:11, 69:5, 75:1, 75:5, 83:7
**bit** [6] - 27:13, 27:21, 30:4, 32:24, 47:19, 89:14
**Blanchard** [5] - 55:4, 61:5, 63:23, 68:2, 68:7
**Blanchard's** [2] - 57:4, 66:8
**blanket** [1] - 25:25
**blocked** [2] - 16:15, 16:17
**blocks** [1] - 16:22
**Border** [13] - 12:18, 54:15, 59:14, 60:8, 60:10, 61:10, 62:5, 62:22, 64:17, 65:14, 83:3, 89:17, 93:2
**borrows** [1] - 45:1
**bound** [1] - 22:23
**Bovino** [3] - 59:15, 60:9, 62:22
**breadth** [2] - 7:12, 81:2
**brief** [9] - 12:14, 32:3, 51:3, 52:2, 72:25, 75:23, 89:6, 90:22, 102:13
**briefing** [1] - 75:3
**briefly** [1] - 94:4
**bring** [2] - 30:19, 47:5
**broadcast** [3] - 43:15, 44:25, 45:24
**Broadcast** [1] - 29:22
**broader** [2] - 83:21, 84:13
**broadly** [1] - 31:8
**brought** [6] - 16:23, 18:21, 18:24, 50:5, 72:21, 80:4
**bucket** [7] - 41:11, 90:10, 90:17, 90:18, 91:4, 92:6, 92:10
**buckets** [2] - 41:7, 41:16
**bunch** [2] - 3:10, 7:6
**burden** [1] - 49:23
**Burling** [1] - 1:17
**burrito** [2] - 18:25, 34:9
**business** [1] - 70:11
**busy** [1] - 47:7
**BY** [5] - 1:13, 1:15, 1:18, 2:4, 2:8

## C

**C.F.R** [3] - 28:10, 46:20, 62:1
**California** [1] - 81:1
**cannot** [3] - 62:24, 76:18, 76:20
**car** [2] - 99:1, 99:4
**care** [1] - 11:10
**careful** [1] - 81:6
**carried** [2] - 6:16, 6:23
**carry** [3] - 24:3, 27:15, 44:6
**carrying** [3] - 56:13, 67:10, 79:23
**CASA** [28] - 13:1, 13:2, 13:4, 13:5, 13:10, 13:14, 13:18, 13:24, 14:3, 14:7, 14:11, 14:15, 14:18, 14:20, 15:17, 15:25, 16:2, 16:5, 37:25, 51:9, 76:4, 76:9, 76:13, 76:23, 76:25, 100:17
**CASA's** [5] - 14:17, 15:5, 15:15, 15:18, 46:3
**Case** [1] - 3:2
**case** [67] - 4:5, 4:9, 4:22, 7:25, 10:3, 10:17, 14:5, 14:8, 18:13, 19:19, 20:2, 20:10, 20:16, 20:22, 20:23, 21:3, 21:5, 21:8, 21:9, 21:10, 22:9, 24:8, 25:9, 25:10, 25:13, 25:21, 26:15, 30:5, 34:24, 38:22, 39:7, 43:16, 44:1, 48:1, 52:3, 66:25, 67:13, 71:16, 73:8, 73:23, 74:1, 74:2, 75:10, 75:11, 76:15, 76:16, 77:22, 77:25, 78:15, 78:24, 81:23, 82:4, 83:23, 83:24, 84:15, 84:16, 86:2, 86:11, 87:7, 88:3, 89:1, 89:10, 89:23, 102:11, 102:12
**CASE** [1] - 1:5
**cases** [7] - 21:4, 21:5, 21:14, 26:11, 81:19, 85:1, 100:3
**Castañon** [2] - 20:2, 43:16
**Castañon-Nava** [2] - 20:2, 43:16
**catchy** [1] - 8:2
**caught** [2] - 45:8, 47:12
**causation** [1] - 75:18
**caused** [2] - 76:18, 76:20
**causes** [1] - 33:13
**caveats** [1] - 25:24
**CBP** [16] - 30:16, 54:22, 55:16, 66:9, 68:19, 83:3, 84:24, 87:25, 88:4, 88:6, 88:10, 88:11, 88:20, 88:25, 95:21, 95:23
**CBP's** [1] - 95:23
**Center** [1] - 2:4
**center** [3] - 9:10, 18:25, 34:9
**certain** [9] - 10:23, 22:2, 23:7, 34:23, 70:19, 73:4, 73:13, 77:12, 94:5
**certainly** [12] - 11:2, 50:11, 51:6, 68:20, 69:20, 70:1, 85:15, 92:17, 94:13, 94:16,

101:14
**CERTIFICATE** [1] - 103:5
**certification** [11] - 3:25, 36:3, 36:7, 37:1, 37:18, 39:18, 50:24, 77:20, 78:15, 93:16
**Certified** [1] - 1:23
**certified** [1] - 93:19
**certify** [6] - 37:23, 48:6, 51:4, 77:19, 93:25, 103:7
**challenge** [17] - 6:22, 21:10, 21:11, 21:12, 21:15, 21:17, 35:22, 48:2, 48:7, 64:8, 72:19, 75:20, 80:15, 80:21, 80:22, 82:23, 89:3
**challenged** [5] - 4:14, 12:8, 13:7, 20:4, 81:22
**challenges** [3] - 18:21, 19:5, 22:2
**challenging** [22] - 5:2, 6:1, 6:9, 6:14, 17:14, 17:15, 17:21, 18:15, 18:23, 19:1, 21:6, 22:6, 41:24, 41:25, 42:1, 42:2, 42:4, 47:24, 48:22, 73:16, 80:5, 80:18
**change** [4] - 89:7, 89:18, 89:20, 89:23
**changed** [2] - 10:13, 69:4
**channeling** [1] - 80:13
**Chantilly** [2] - 9:10, 96:25
**characterization** [1] - 60:4
**characterize** [1] - 60:22
**charge** [12] - 63:23, 67:19, 68:3, 68:6, 94:9, 94:10, 94:11, 94:13, 94:15, 94:18, 94:19, 95:1
**charged** [2] - 54:18, 78:7
**charges** [2] - 68:23, 95:5
**charging** [5] - 58:6, 95:10, 95:14, 95:17, 95:25
**Charles** [1] - 2:5
**check** [1] - 13:16
**checked** [2] - 94:10, 95:13
**Chicago** [1] - 24:17
**Chief** [12] - 12:18, 59:14, 60:8, 60:10, 61:10, 62:5, 62:21, 64:17, 65:14, 83:3, 89:17, 93:2
**chill** [2] - 92:13, 92:20
**choke** [5] - 71:7, 71:10, 72:10, 72:18, 72:19
**choosing** [1] - 76:14
**chose** [1] - 51:4
**Circuit** [21] - 5:12, 15:19, 23:2, 23:22, 26:12, 27:23, 28:5, 28:10, 28:14, 29:11, 29:24, 73:1, 78:2, 79:22, 81:20, 82:3, 82:8, 82:18, 82:24, 83:8, 83:23
**circuit** [3] - 22:15, 53:19, 80:18
**Circuit's** [4] - 22:23, 27:22, 31:15, 77:22
**circuits** [1] - 56:17
**circumstances** [10] - 9:8, 25:25, 34:23, 35:5, 46:8, 54:6, 78:20, 83:11, 83:18, 98:24
**cite** [4] - 20:15, 21:14, 67:20, 68:4
**cited** [2] - 21:4, 45:16
**cites** [1] - 68:1
**cities** [1] - 11:14
**citing** [2] - 7:25, 90:7
**citizen** [10] - 5:6, 5:9, 6:10, 7:2, 28:7, 52:24, 52:25, 66:21, 71:10
**citizens** [6] - 4:22, 6:4, 6:5, 23:7, 28:19, 52:11
**city** [2] - 4:16, 71:13
**city's** [1] - 71:18
**civil** [79] - 3:2, 5:9, 5:10, 5:14, 6:3, 6:10, 6:15, 6:23, 7:1, 8:9, 9:17, 12:9, 17:9, 22:7, 23:5, 24:12, 28:1, 28:3, 28:7, 28:12, 28:15, 28:22, 29:12, 30:1, 31:23, 31:24, 32:21, 34:3, 35:14, 35:21, 37:11, 37:25, 38:2, 38:20, 41:7, 42:2, 42:10, 42:21, 42:23, 43:6, 43:23, 46:23, 47:13, 49:8, 50:4, 52:11, 52:12, 52:21, 52:22, 54:10, 55:9, 59:19, 61:8, 61:19, 62:6, 64:7, 64:18, 65:16, 66:20, 67:12, 68:14, 68:15, 71:25, 73:7, 73:19, 78:5, 78:11, 80:6, 83:5, 86:7, 87:14, 88:21, 89:12, 90:25, 91:13, 91:24, 93:1, 96:6
**Civil** [1] - 1:12
**claim** [10] - 18:13, 18:18, 30:19, 38:12, 67:20, 74:13, 81:18, 84:10, 86:9, 86:15
**claimed** [1] - 67:18
**claiming** [1] - 73:25
**claims** [9] - 4:25, 7:8, 16:22, 18:21, 21:15, 21:21, 80:4, 80:13, 84:7
**clarification** [4] - 51:4, 51:19, 61:9, 79:17
**clarify** [5] - 53:13, 53:15, 65:19, 93:7, 96:14
**clarifying** [2] - 93:6, 93:9
**clarity** [4] - 38:23, 43:8, 45:3, 52:4
**class** [43] - 3:25, 16:16, 22:1, 22:9, 22:10, 23:24, 35:10, 35:15, 35:18, 35:20, 36:3, 36:4, 36:7, 36:13, 36:19, 37:1, 37:5, 37:8, 37:18, 37:19, 37:23, 38:1, 38:8, 38:9, 39:17, 39:22, 48:6, 50:24, 51:4, 51:11, 77:12, 77:19, 77:20, 78:15, 79:8, 79:16, 90:4, 93:15, 93:18, 93:25, 100:16
**classes** [1] - 36:16
**clause** [1] - 18:11
**clear** [23] - 4:3, 4:6, 4:13, 5:1, 5:12, 5:24, 9:11, 12:4, 27:23, 30:12, 33:1, 41:24, 49:16, 51:9, 63:4, 63:5, 64:16, 68:12, 71:9, 82:25, 92:19, 92:23, 96:10
**clearer** [1] - 44:19
**clearly** [5] - 12:22, 51:15, 82:6, 96:2, 97:2
**CLERK** [2] - 3:2, 5:18
**client** [3] - 94:11, 94:24, 95:13
**clients** [1] - 101:17
**clothes** [1] - 30:10
**clues** [1] - 75:9
**co** [2] - 3:7, 49:19
**co-counsel** [2] - 3:7, 49:19
**codified** [1] - 16:15
**collapses** [1] - 24:9
**collateral** [1] - 58:14
**colleague** [1] - 3:24
**colleagues** [1] - 46:6
**collectively** [2] - 26:4, 100:4
**colloquy** [1] - 99:13
**COLUMBIA** [1] - 1:1
**Columbia** [3] - 1:16, 11:21, 103:7
**combination** [5] - 12:15, 70:19, 73:4, 73:13, 73:20
**combined** [1] - 26:9
**combining** [1] - 33:10
**comfortable** [1] - 38:9
**coming** [1] - 100:20
**comm** [1] - 60:11
**commence** [6] - 19:7, 20:19, 20:24, 66:11, 81:19, 82:13
**commencing** [1] - 19:9
**commissioner** [1] - 55:4
**Commissioner** [1] - 61:6
**Committee** [1] - 2:1
**commonality** [2] - 48:6, 93:20
**comms** [1] - 60:12
**communicate** [1] - 34:11
**communications** [2] - 60:5, 63:16
**community** [6] - 4:20, 9:6, 14:22, 46:5, 54:5, 54:12
**company** [1] - 20:12
**compared** [1] - 36:8
**competent** [1] - 38:6
**complaint** [13] - 27:14, 27:18, 27:21, 28:13, 29:3, 35:9, 35:20, 36:7, 36:21, 39:16, 51:6, 51:11, 84:20
**completely** [2] - 73:23, 100:8
**compliance** [3] - 43:2, 63:24, 73:25
**complicated** [2] - 32:23, 38:19
**comply** [3] - 28:9, 89:19, 92:18
**complying** [5] - 58:8, 89:15, 89:20, 91:8, 92:2
**conceivably** [1] - 90:14
**concern** [9] - 7:11, 29:1, 35:12, 45:11, 47:18, 50:17, 70:4, 82:23, 95:17
**concerned** [4] - 25:10, 51:8, 51:14, 74:4
**concerns** [4] - 28:21, 41:10, 90:11, 100:8
**conclude** [1] - 99:13
**concluded** [4] - 28:5, 28:11, 71:15, 103:3
**concluding** [1] - 83:8
**conclusively** [1] - 10:1
**concrete** [4] - 7:21, 76:17, 76:19, 90:22
**concurrence** [4] - 72:22, 72:24, 74:25, 75:2
**conditions** [1] - 95:15
**conduct** [10] - 5:5, 5:15, 6:18, 84:14, 84:25, 88:7, 92:14, 92:16, 99:8
**conducted** [5] - 28:24, 30:13, 41:13, 66:9, 84:23
**conducting** [9] - 16:8, 27:20, 58:15, 84:25, 87:8, 87:14, 87:24, 92:8, 98:12
**confer** [9] - 49:19, 50:16, 55:14, 56:2, 56:10, 58:25, 76:24, 101:4, 101:17
**Conference** [1] - 103:9
**confirm** [1] - 101:25
**confirming** [1] - 83:4
**conflict** [1] - 35:14
**confluence** [4] - 74:10, 74:14, 74:18, 74:23

**conformance** [1] - 103:8
**confused** [1] - 97:15
**confusion** [4] - 33:9, 33:13, 38:8, 45:7
**Congress** [3] - 16:19, 74:3, 80:14
**conjunction** [1] - 26:4
**connection** [1] - 75:3
**consequence** [1] - 47:1
**consequences** [5] - 41:10, 41:16, 42:18, 43:11, 44:8
**consider** [4] - 12:6, 76:14, 77:2, 100:1
**consideration** [4] - 12:5, 50:7, 56:18, 100:11
**considered** [1] - 73:4
**considering** [3] - 12:7, 27:7, 75:7
**consistent** [1] - 70:25
**constituents** [1] - 14:22
**constitute** [1] - 60:3
**constituted** [2] - 83:1, 83:25
**constitutes** [2] - 15:22, 84:1
**Constitution** [1] - 1:24
**constitutional** [1] - 61:22
**constitutionally** [1] - 62:8
**constrain** [1] - 34:16
**constraints** [1] - 19:22
**construed** [1] - 11:3
**contemplate** [1] - 47:16
**contempt** [1] - 47:6
**contend** [1] - 8:1
**contest** [2] - 52:18, 54:4
**context** [5] - 20:4, 21:11, 24:16, 43:23, 45:4
**contingency** [1] - 84:11
**continuation** [1] - 55:12
**CONTINUED** [1] - 2:1
**continuing** [1] - 100:18
**contractor** [1] - 95:21
**contrary** [2] - 16:4, 61:18
**contrast** [1] - 73:16
**contributed** [1] - 87:22
**controls** [1] - 70:19
**conundrum** [1] - 89:14
**convictions** [1] - 23:7
**copied** [1] - 44:24
**core** [5] - 14:19, 15:11, 15:18, 15:21, 100:21
**correct** [55] - 5:6, 5:7, 5:11, 5:15, 5:16, 6:7, 6:12, 6:13, 6:19, 6:20, 7:4, 7:5, 8:3, 8:4, 17:6, 17:7, 17:11, 17:25, 24:2, 26:24, 26:25, 31:14, 31:24, 31:25, 32:15, 52:9, 52:19, 53:7, 56:22, 57:1, 57:7, 59:21, 59:25, 60:4, 60:19, 62:17, 62:24, 63:3, 63:13, 66:5, 66:18, 66:19, 67:14, 67:16, 68:16, 73:9, 76:13, 79:10, 84:8, 85:5, 85:6, 85:11, 96:9, 98:1
**correcting** [1] - 99:13
**corrections** [1] - 94:5
**correctly** [2] - 21:3, 21:9
**corroboration** [1] - 83:3
**costly** [2] - 34:5, 34:6
**counsel** [9] - 3:4, 3:7, 3:17, 34:11, 47:3, 49:19, 76:6, 76:8
**count** [1] - 27:10
**counted** [1] - 26:16
**country** [7] - 6:11, 9:13, 35:4, 38:3, 50:5, 53:20, 54:23
**county** [1] - 15:8
**County** [1] - 72:9
**couple** [2] - 8:13, 95:12
**course** [4] - 18:9, 19:23, 21:21, 76:7
**courses** [1] - 93:11
**Court** [54] - 1:23, 3:1, 7:7, 7:22, 8:2, 16:15, 16:19, 19:11, 19:19, 20:1, 20:12, 22:1, 25:5, 26:11, 27:7, 33:3, 34:20, 38:9, 45:10, 45:11, 45:19, 45:21, 45:22, 45:25, 46:1, 50:2, 50:9, 51:5, 64:24, 70:25, 71:6, 75:7, 75:10, 76:15, 76:16, 78:14, 78:24, 80:4, 80:23, 80:24, 81:2, 81:6, 81:16, 81:17, 81:22, 87:12, 87:18, 100:3, 102:4, 103:6, 103:6
**court** [16] - 17:1, 19:20, 21:11, 23:2, 25:15, 45:1, 47:6, 48:5, 50:3, 71:15, 71:19, 75:8, 76:17, 80:18, 92:9, 97:25
**COURT** [223] - 1:1, 3:9, 3:14, 3:18, 4:1, 5:8, 5:12, 5:17, 5:19, 5:24, 6:8, 6:14, 6:21, 7:6, 7:16, 8:7, 8:19, 9:11, 10:5, 10:21, 12:3, 13:1, 13:12, 13:24, 14:10, 14:16, 16:10, 17:8, 17:20, 18:5, 19:4, 20:6, 20:8, 20:15, 21:23, 21:25, 22:13, 22:21, 22:23, 23:13, 23:21, 24:4, 24:7, 26:19, 27:12, 29:9, 29:21, 31:19, 31:22, 32:10, 32:18, 32:20, 33:5, 33:9, 33:14, 34:5, 35:7, 36:12, 36:21, 37:8, 37:17, 38:5, 38:14, 38:18, 39:5, 39:14, 40:2, 40:22, 42:12, 42:17, 43:20, 43:25, 44:13, 45:3, 45:6, 46:12, 48:19, 48:22, 48:25, 49:20, 50:15, 50:23, 51:8, 51:14, 51:20, 51:23, 52:1, 52:17, 52:21, 53:6, 53:8, 53:17, 53:24, 54:1, 54:24, 55:1, 55:7, 55:20, 56:4, 56:15, 56:20, 56:23, 57:2, 57:8, 57:11, 57:19, 58:1, 58:9, 58:17, 59:6, 59:23, 60:1, 60:8, 60:16, 60:23, 61:1, 61:16, 62:3, 62:10, 62:14, 62:20, 63:3, 63:7, 63:10, 63:14, 63:20, 64:14, 65:2, 65:12, 65:23, 66:1, 66:6, 66:10, 66:16, 66:20, 67:12, 67:18, 67:23, 68:10, 68:18, 69:2, 69:7, 69:16, 69:22, 70:21, 71:5, 72:8, 72:14, 72:21, 73:10, 74:9, 74:24, 75:11, 75:13, 76:1, 76:7, 76:11, 76:25, 77:6, 77:21, 78:9, 78:16, 79:3, 79:11, 80:1, 80:24, 81:11, 81:13, 82:3, 82:16, 82:22, 83:22, 84:6, 84:9, 85:2, 85:7, 85:11, 85:17, 85:21, 86:1, 86:14, 86:22, 87:2, 87:12, 87:21, 88:5, 88:10, 88:16, 88:18, 89:5, 90:1, 90:17, 91:10, 91:16, 91:23, 92:1, 92:10, 92:17, 92:23, 93:6, 93:13, 93:17, 94:1, 94:3, 94:19, 94:21, 96:6, 97:11, 97:19, 98:9, 98:25, 99:11, 101:1, 101:6, 101:9, 101:19, 101:23, 102:6, 102:10, 102:16, 102:21, 103:2, 103:13
**Court's** [3] - 7:25, 50:5, 77:18
**court's** [3] - 20:12, 25:13, 72:25
**courtroom** [1] - 5:22
**courts** [2] - 40:15, 53:20
**cover** [1] - 4:2
**coverage** [1] - 18:6
**covered** [17] - 22:2, 22:3, 22:8, 23:4, 23:13, 23:14, 23:15, 24:3, 50:24, 78:2, 78:6, 78:8, 78:10, 78:18, 78:21, 79:12, 79:13
**covers** [2] - 78:12, 78:14
**Covington** [1] - 1:17
**CPB** [6] - 61:6, 62:5, 63:23, 64:3, 65:14, 66:9
**create** [1] - 35:14
**creativity** [1] - 11:9
**credit** [2] - 8:1, 98:15
**credited** [4] - 25:6, 25:15, 48:5, 100:3
**crime** [4] - 4:20, 33:1, 34:21
**crimes** [1] - 78:8
**Criminal** [1] - 4:18
**criminal** [29] - 4:23, 5:3, 5:4, 5:5, 5:14, 5:15, 6:17, 6:18, 7:1, 9:14, 23:7, 33:10, 33:12, 44:2, 44:17, 52:15, 56:17, 58:3, 68:23, 78:4, 79:24, 94:9, 94:10, 94:11, 94:15, 94:18, 95:1, 95:5
**criminally** [1] - 52:15
**criminals** [2] - 4:17, 4:23
**critical** [1] - 100:14
**CropLife** [4] - 26:14, 82:24, 83:7, 83:23
**CRR** [1] - 103:12
**crystal** [1] - 32:25
**curious** [1] - 70:1
**current** [5] - 10:12, 10:14, 69:2, 69:3, 69:22
**Customs** [1] - 54:15
**cutting** [1] - 96:2

## D

**daily** [3] - 10:9, 10:10, 70:11
**danger** [2] - 34:1, 35:2
**date** [1] - 97:21
**Dated** [1] - 103:10
**days** [1] - 48:14
**DC** [37] - 1:11, 1:12, 1:14, 1:16, 1:19, 1:24, 2:3, 2:9, 5:12, 6:16, 6:23, 11:22, 15:19, 22:23, 23:2, 23:22, 26:12, 28:5, 28:10, 28:14, 29:11, 29:23, 31:6, 31:10, 39:23, 45:12, 63:22, 77:22, 78:2, 79:22, 82:24, 83:23, 84:12, 84:13, 87:23, 88:12, 100:15
**DEA** [17] - 84:7, 84:10, 84:21, 85:7, 85:11, 85:12, 85:16, 85:19, 85:22, 85:23, 86:3, 86:4, 86:8, 86:10, 86:18, 86:21
**DEAC** [1] - 61:6
**deal** [1] - 90:22
**dealing** [2] - 74:6,

79:1
**decades** [2] - 33:20, 44:7
**decided** [1] - 70:25
**decision** [17] - 17:1, 19:6, 20:6, 20:9, 20:12, 22:24, 27:22, 31:15, 66:12, 66:14, 75:14, 75:15, 79:4, 79:18, 79:20, 81:18, 81:20
**decisions** [2] - 80:25, 82:13
**decisively** [2] - 41:4, 90:6
**declarants** [1] - 65:5
**declaration** [27] - 10:7, 10:19, 10:25, 14:20, 24:21, 24:23, 39:3, 43:17, 55:3, 57:4, 57:12, 61:12, 61:14, 65:11, 65:12, 66:8, 67:21, 67:25, 68:2, 68:4, 68:7, 86:25, 87:6, 91:12, 95:23, 96:7, 96:23
**declarations** [37] - 8:16, 8:22, 11:18, 24:22, 28:18, 29:3, 29:6, 30:7, 31:16, 31:19, 42:20, 46:4, 55:1, 60:17, 61:2, 61:3, 62:20, 62:25, 63:7, 63:20, 63:25, 64:4, 64:5, 64:9, 64:12, 65:24, 67:22, 68:11, 68:17, 84:17, 86:5, 88:19, 88:24, 97:22, 98:25, 99:22, 102:8
**declaratory** [4] - 39:15, 39:19, 77:11, 77:16
**declared** [1] - 11:20
**default** [1] - 96:21
**defend** [1] - 92:9
**defendant** [3] - 21:5, 78:4, 79:24
**Defendants** [3] - 1:7, 54:4, 60:2
**DEFENDANTS** [1] - 2:7
**defendants** [76] - 7:6, 8:1, 8:7, 12:2, 12:12, 12:13, 12:25, 13:4, 13:6, 16:4, 16:7, 16:11, 16:12, 17:16, 18:17, 20:15, 21:4, 21:14, 22:14, 23:15, 23:17, 25:3, 32:1, 37:14, 41:3, 41:7, 41:9, 41:14, 42:19, 42:21, 43:11, 43:12, 44:5, 45:10, 45:17, 45:20, 46:15, 46:21, 47:3, 47:12, 47:16, 49:13, 50:1, 50:16, 50:18, 52:3, 52:13, 52:17, 53:2, 54:3, 54:9, 60:17, 64:6, 67:18, 70:3, 70:14, 74:24, 75:19, 75:21, 77:8, 77:15, 80:3, 82:23, 82:24, 84:6, 87:13, 88:19, 89:6, 89:11, 90:2, 95:6, 98:7, 98:21, 101:10, 102:17
**defendants'** [25] - 4:12, 13:21, 15:4, 15:24, 24:8, 26:7, 31:16, 31:19, 41:4, 47:21, 50:1, 56:25, 63:1, 66:2, 68:1, 70:5, 70:6, 76:18, 76:20, 76:22, 90:6, 97:5, 97:16, 99:25, 102:13
**defense** [1] - 102:25
**defined** [1] - 37:5
**definition** [4] - 36:11, 37:13, 38:10, 96:4
**definitions** [1] - 38:8
**delayed** [1] - 15:9
**delaying** [1] - 40:4
**delegated** [5] - 28:2, 28:6, 28:11, 30:1, 87:4
**delegating** [1] - 31:7
**delegation** [1] - 31:9
**deliverables** [1] - 15:10
**demonstrate** [4] - 25:2, 29:7, 49:6, 100:5
**demonstrated** [1] - 11:5
**demonstrating** [1] - 97:1
**denied** [2] - 73:1, 73:2
**denying** [1] - 25:12
**department** [1] - 63:17
**Department** [3] - 3:3, 24:14, 80:25
**DEPARTMENT** [1] - 1:6
**deputized** [1] - 12:1
**deputy** [2] - 5:22, 55:4
**DEPUTY** [2] - 3:2, 5:18
**Deputy** [2] - 61:3, 61:5
**describe** [4] - 41:5, 41:7, 69:13, 91:24
**described** [2] - 48:12, 51:11
**describing** [1] - 90:16
**description** [1] - 61:17
**descriptions** [1] - 90:23
**designated** [4] - 85:3, 85:8, 87:3, 88:11
**designation** [1] - 85:25
**despite** [4] - 27:17, 33:7, 33:9, 89:16
**detail** [1] - 64:13
**details** [4] - 29:2, 31:16, 32:4, 100:12
**detain** [5] - 6:5, 23:12, 33:23, 34:14, 35:2
**detained** [4] - 17:2, 80:17, 82:6, 96:24
**detaining** [3] - 78:4, 81:23, 82:1
**detention** [20] - 9:10, 15:2, 15:11, 15:16, 18:25, 21:10, 21:11, 23:6, 34:4, 34:9, 39:24, 58:7, 68:25, 78:7, 79:24, 81:10, 81:22, 82:17, 95:16, 95:19
**determination** [18] - 9:2, 10:2, 36:24, 38:25, 40:7, 47:22, 47:25, 48:3, 48:10, 48:17, 70:18, 82:18, 82:20, 83:19, 91:17, 93:20, 96:3, 99:24
**determining** [2] - 25:7, 49:8
**deterrence** [2] - 25:12, 25:16
**DHS** [46] - 4:17, 11:25, 12:17, 22:6, 24:18, 24:19, 24:25, 26:17, 26:20, 26:25, 27:1, 27:15, 31:2, 31:3, 57:20, 59:7, 59:8, 59:9, 59:10, 59:11, 59:12, 60:19, 61:9, 61:17, 61:18, 62:4, 62:21, 64:6, 64:15, 64:16, 64:17, 64:20, 65:14, 66:11, 70:12, 71:23, 74:16, 83:4, 85:4, 85:8, 89:11, 89:15, 89:17, 89:19, 92:25
**DHS's** [5] - 26:21, 60:22, 69:19, 80:5, 87:16
**difference** [3] - 22:25, 53:13, 53:18
**differences** [1] - 73:22
**different** [26] - 10:18, 12:23, 21:15, 25:22, 27:13, 41:7, 43:4, 48:1, 49:8, 53:9, 58:14, 72:14, 73:7, 73:20, 73:23, 74:2, 74:10, 74:12, 78:22, 82:9, 86:6, 87:21, 93:21, 95:20, 96:19
**differentiate** [1] - 72:4
**difficult** [4] - 28:23, 30:14, 44:7, 91:2
**Diplomate** [1] - 1:22
**dire** [1] - 41:16
**directed** [2] - 19:20, 19:21
**directive** [1] - 31:1
**directly** [3] - 21:12, 24:2, 81:4
**Director** [1] - 61:3
**disagree** [3] - 64:12, 65:22, 65:23
**disagreed** [1] - 78:2
**disavow** [1] - 60:2
**discount** [1] - 70:3
**discovery** [5] - 30:22, 30:25, 86:1, 86:2, 86:14
**discretion** [6] - 19:22, 19:23, 33:17, 34:14, 34:16, 35:1
**discretionary** [1] - 44:3
**discuss** [5] - 7:9, 22:20, 29:18, 77:20, 93:15
**discussed** [1] - 93:21
**discusses** [1] - 61:14
**discussion** [3] - 20:2, 25:13, 98:18
**discussions** [1] - 94:24
**dismiss** [1] - 86:10
**dismissal** [2] - 84:6, 84:9
**dispute** [19] - 12:2, 52:3, 54:9, 54:13, 60:2, 60:18, 60:21, 60:22, 70:14, 70:17, 72:6, 77:2, 77:15, 83:14, 83:25, 84:1, 84:24, 87:20, 98:22
**disputed** [2] - 12:14, 52:5
**disputing** [2] - 60:20, 60:23
**disrupt** [2] - 90:18, 90:19
**dissimilar** [1] - 26:17
**dissimilarities** [1] - 93:24
**distinguish** [2] - 20:23, 83:22
**distinguishing** [1] - 74:16
**distracting** [1] - 5:21
**District** [13] - 9:1, 10:21, 11:16, 11:21, 13:22, 20:1, 20:16, 20:20, 21:3, 47:14, 100:7, 103:6
**DISTRICT** [3] - 1:1, 1:1, 1:9
**district** [6] - 16:25, 20:12, 40:6, 41:13, 46:17, 72:25
**disturbing** [1] - 39:14
**diversion** [2] - 15:6, 15:16
**divert** [5] - 15:10, 15:13, 15:20, 16:3, 76:9
**Dixon** [14] - 5:13, 22:14, 22:24, 23:25, 27:23, 28:5, 29:15, 31:15, 77:21, 78:9, 78:18, 79:1, 79:7, 88:22
**doctrine** [1] - 87:17
**document** [3] - 47:9, 47:10, 57:9
**documentation** [15] - 43:13, 43:17, 43:19, 45:21, 45:25, 46:1, 47:1, 48:13, 48:14, 48:16, 49:9, 50:6, 57:14, 84:22
**documented** [7] - 8:16, 9:4, 26:6, 34:7, 42:23, 46:8, 99:21
**documents** [1] - 56:23
**domestic** [2] - 54:19,

68:24
**done** [4] - 19:13, 30:2, 40:15, 65:15
**double** [1] - 13:16
**double-check** [1] - 13:16
**down** [5] - 11:24, 42:9, 72:9, 91:5, 99:8
**dozen** [3] - 8:15, 26:6, 99:21
**draft** [1] - 38:14
**dropped** [3] - 94:16, 94:24, 95:1
**due** [1] - 102:21
**during** [4] - 6:5, 20:18, 34:4, 76:6
**duties** [1] - 92:8

## E

**early** [1] - 40:16
**ease** [1] - 38:8
**easy** [2] - 57:19, 99:5
**ECF** [1] - 55:6
**echoed** [2] - 4:11, 4:17
**effect** [2] - 69:15, 82:7
**efforts** [1] - 91:5
**either** [7] - 5:3, 12:2, 34:1, 36:3, 37:6, 64:3, 98:13
**elaborate** [2] - 36:18, 63:12
**elaborated** [1] - 16:11
**element** [1] - 37:6
**elements** [3] - 10:4, 14:3, 40:18
**elicit** [1] - 54:6
**elsewhere** [1] - 29:3
**emergency** [2] - 11:21, 72:25
**emphasis** [1] - 42:11
**encounter** [3] - 58:15, 83:18, 84:4
**encountered** [1] - 71:11
**encouraged** [1] - 43:18
**end** [1] - 101:8
**ended** [1] - 11:24
**enforce** [1] - 79:16
**Enforcement** [1] - 61:4
**enforcement** [22] - 5:3, 6:2, 11:19, 27:16, 30:1, 33:20, 40:5, 50:10, 59:11, 59:13, 63:22, 63:24, 64:25, 84:11, 84:12, 85:4, 85:5, 85:7, 85:9, 90:20, 91:5, 92:13
**engaged** [1] - 5:5
**enjoin** [1] - 49:17
**enjoined** [2] - 46:16, 78:3
**enjoining** [2] - 42:7, 49:1
**enlighten** [1] - 14:12
**ensure** [1] - 42:10
**entitled** [1] - 103:8
**EPA** [3] - 26:14, 82:24, 83:23
**equities** [6] - 40:23, 41:1, 41:4, 49:25, 90:1, 90:5
**ERO** [3] - 61:4, 61:15, 61:23
**erroneous** [1] - 47:25
**escape** [15] - 7:3, 40:8, 46:19, 53:4, 53:6, 53:10, 53:15, 53:19, 53:21, 54:7, 56:19, 57:25, 58:2, 87:15, 91:19
**ESCOBAR** [1] - 1:3
**Escobar** [17] - 3:2, 17:16, 21:24, 31:25, 32:5, 51:15, 54:14, 54:16, 57:24, 94:7, 94:25, 95:6, 95:8, 96:15, 96:17, 97:1, 99:15
**especially** [1] - 33:24
**establish** [5] - 8:5, 16:13, 26:9, 75:17, 75:18
**established** [2] - 83:9, 83:17
**et** [3] - 1:3, 1:6, 3:3
**evaluating** [1] - 73:5
**evidence** [18] - 8:23, 9:22, 9:25, 14:5, 25:14, 26:5, 27:11, 41:22, 65:7, 86:5, 94:11, 94:17, 97:7, 98:7, 98:13, 98:17, 99:20, 100:4
**Evidence** [2] - 27:7, 27:10
**evident** [1] - 15:5
**evidentiary** [1] - 99:17
**evil** [1] - 19:21
**evolutions** [1] - 33:7
**exact** [2] - 76:5, 77:25
**Exactly** [1] - 98:10
**exactly** [17] - 20:3, 29:2, 30:12, 31:5, 31:21, 33:7, 33:12, 34:24, 36:11, 41:24, 43:13, 44:4, 45:23, 47:19, 97:3, 97:14, 99:12
**examine** [1] - 86:23
**example** [7] - 4:16, 15:8, 25:9, 39:2, 53:17, 53:19, 68:4
**exclusion** [1] - 66:23
**excuse** [1] - 76:18
**excused** [1] - 103:2
**execute** [2] - 81:19, 82:14
**executed** [1] - 24:12
**executing** [4] - 22:6, 62:6, 81:23, 82:1
**execution** [1] - 65:16
**Executive** [1] - 61:5
**executive** [1] - 55:4
**exercise** [1] - 34:25
**Exhibits** [2] - 24:22
**exhibits** [2] - 4:15, 25:20
**exist** [1] - 24:9
**existence** [3] - 25:14, 25:17, 26:9
**exists** [1] - 25:8
**expect** [4] - 55:1, 101:2, 101:3, 102:7
**expected** [3] - 27:20, 27:24, 63:25
**expend** [2] - 16:3, 100:18
**expending** [1] - 76:21
**experience** [3] - 7:24, 12:9, 86:3
**experienced** [1] - 15:6
**expired** [9] - 32:2, 54:18, 54:21, 55:11, 55:19, 55:21, 55:24, 56:9, 66:3
**explain** [6] - 22:11, 32:2, 62:10, 65:25, 90:9, 92:2
**explained** [4] - 12:24, 14:20, 73:11, 75:9
**explains** [1] - 32:4
**explanation** [4] - 47:5, 57:17, 58:17, 58:21
**explicit** [1] - 31:2
**explore** [1] - 30:22
**expressed** [2] - 25:3, 95:16
**expressly** [1] - 81:4
**expulsion** [1] - 66:23
**extend** [1] - 56:7
**extension** [3] - 55:25, 56:2, 58:19
**extent** [4] - 84:3, 92:24, 96:1, 102:19
**extra** [1] - 55:18

## F

**f)(1** [6] - 22:20, 79:8, 79:15, 101:14, 102:14, 102:18
**face** [3] - 13:20, 29:11, 29:14
**facilitate** [1] - 6:10
**facing** [3] - 14:19, 16:2, 46:5
**fact** [31] - 8:17, 11:25, 18:16, 19:2, 19:13, 19:20, 21:18, 27:17, 31:1, 35:3, 46:25, 56:8, 58:4, 58:25, 59:5, 67:8, 68:11, 68:18, 75:18, 75:22, 83:19, 85:16, 86:16, 89:15, 95:9, 95:12, 95:22, 96:2, 96:24, 99:12
**fact-specific** [2] - 46:25, 83:19
**factor** [3] - 40:23, 49:25, 70:18
**factors** [14] - 70:19, 70:21, 70:23, 73:4, 73:13, 73:18, 73:20, 74:11, 74:14, 74:18, 74:20, 74:21, 74:23
**facts** [16] - 30:5, 30:15, 30:18, 39:2, 47:24, 54:6, 90:22, 95:5, 95:8, 97:7, 97:9, 98:11, 98:20, 99:14, 102:6, 102:7
**factual** [2] - 82:9, 82:18
**failed** [3] - 28:8, 67:19, 68:2
**failing** [1] - 68:6
**fails** [1] - 6:24
**failure** [1] - 68:10
**fair** [2] - 12:5, 34:13
**fairly** [2] - 57:3, 94:21
**faith** [1] - 54:22
**fall** [1] - 100:16
**families** [3] - 34:10, 39:25, 100:17
**far** [4] - 19:18, 30:15, 43:4, 78:10
**Farm** [4] - 20:13, 29:21, 45:1, 48:4
**fast** [1] - 32:8
**fault** [1] - 32:8
**favor** [4] - 41:2, 41:5, 49:25, 90:6
**fear** [2] - 39:23, 100:16
**federal** [8] - 1:23, 4:11, 5:3, 12:1, 27:15, 28:2, 54:9, 87:22
**Federal** [3] - 27:6, 27:9, 103:6
**FEDERAL** [1] - 103:13
**fell** [1] - 5:19
**few** [1] - 5:13
**field** [3] - 60:13, 60:14, 62:2
**Field** [1] - 61:3
**figure** [3] - 35:8, 35:24, 38:19
**file** [1] - 57:15
**filed** [1] - 32:11
**filing** [2] - 10:17, 43:12
**filings** [4] - 97:16, 101:2, 101:3, 101:11
**fill** [9] - 32:12, 49:5, 57:19, 57:21, 91:11, 91:14, 91:20, 92:2, 92:4
**filled** [2] - 42:21, 43:7
**filling** [1] - 43:5
**final** [10] - 17:21, 17:22, 17:25, 26:13, 26:16, 32:16, 39:19, 44:15, 82:22, 83:1
**findings** [2] - 42:5, 42:25
**fine** [2] - 56:4, 102:14
**finish** [1] - 5:22
**first** [10] - 7:9, 13:7, 13:13, 38:7, 52:10, 76:3, 90:10, 90:18, 94:9, 95:13
**fit** [2] - 38:3, 44:22
**flee** [1] - 53:24
**flight** [25] - 9:3, 9:18, 10:2, 13:23, 34:1, 35:11, 36:5, 36:13, 36:25, 37:14, 37:22, 38:11, 42:25, 47:23, 52:25, 53:6, 53:9, 53:12, 53:15, 54:7, 83:13, 96:3, 96:5, 99:24

**flow** [1] - 13:13
**focus** [5] - 9:16, 9:19, 9:21, 29:19, 52:5
**focused** [1] - 88:2
**folks** [1] - 68:19
**follow** [6] - 60:24, 65:25, 90:13, 92:19, 92:21, 93:10
**follow-the-law** [2] - 90:13, 92:21
**following** [7] - 19:24, 25:4, 44:11, 74:4, 90:24, 92:20, 93:5
**Footnote** [1] - 32:4
**FOR** [4] - 1:1, 1:12, 2:1, 2:7
**forced** [5] - 15:3, 15:20, 16:3, 16:6, 34:10
**foregoing** [1] - 103:7
**form** [9] - 16:5, 40:10, 43:20, 47:5, 91:12, 91:14, 91:16, 91:19, 92:2
**Form** [1] - 67:1
**format** [1] - 103:8
**former** [1] - 86:3
**forms** [3] - 43:5, 43:7, 92:4
**forums** [1] - 18:3
**forward** [5] - 3:4, 8:24, 24:21, 26:5, 91:6
**four** [13] - 13:9, 13:12, 13:17, 31:22, 54:10, 80:10, 84:15, 84:16, 88:2, 88:3, 89:24, 93:21, 93:24
**Fourth** [4] - 39:8, 60:14, 61:21, 61:25
**frame** [1] - 47:19
**front** [3] - 10:17, 16:23, 36:15
**full** [2] - 57:15, 84:18
**fully** [1] - 63:24
**future** [3] - 7:21, 8:5, 16:1

## G

**Garland** [1] - 20:20
**GATES** [1] - 2:2
**Gates** [2] - 3:8, 3:12
**gather** [2] - 30:15, 76:21
**General** [6] - 28:7, 29:25, 81:21, 85:3, 85:8, 87:4
**general** [3] - 42:13, 74:7, 90:23
**generally** [4] - 9:15, 33:1, 33:23, 34:21
**given** [10] - 17:3, 18:25, 27:9, 28:14, 34:9, 45:6, 60:14, 85:10, 86:5, 88:1
**goal** [9] - 10:19, 11:4, 14:23, 42:9, 69:9, 69:11, 69:16, 69:18, 69:22
**goals** [2] - 12:16, 69:7
**government** [28] - 3:16, 8:25, 10:18, 10:24, 11:4, 11:6, 11:15, 11:18, 25:2, 25:7, 25:11, 25:16, 25:19, 31:1, 33:17, 34:14, 34:22, 34:25, 35:1, 43:12, 44:24, 45:7, 45:22, 60:6, 71:2, 74:7, 79:23, 91:8
**government's** [7] - 4:12, 20:3, 42:1, 42:9, 45:9, 60:3, 98:2
**grant** [3] - 15:8, 15:9, 32:8
**granted** [8] - 4:8, 27:15, 40:10, 40:14, 40:20, 40:24, 41:6, 41:17
**granting** [2] - 40:17, 40:20
**great** [1] - 102:5
**Gregory** [2] - 59:15, 60:8
**ground** [2] - 91:11, 92:24
**grounds** [2] - 7:7, 7:17
**group** [1] - 37:9
**groups** [1] - 63:24
**guess** [1] - 61:6
**guidance** [1] - 92:25
**guys** [1] - 92:20

## H

**half** [1] - 8:21
**handcuffs** [3] - 9:9, 11:10, 18:24
**hands** [1] - 3:9
**happy** [3] - 29:18, 44:21, 100:25
**hard** [1] - 96:9
**harm** [4] - 7:22, 14:19, 15:22, 76:8
**harms** [2] - 15:25, 34:8
**hash** [1] - 100:13
**haul** [1] - 92:8
**hauled** [1] - 9:9
**health** [1] - 15:14
**healthcare** [1] - 14:25
**hear** [5] - 41:15, 43:25, 65:3, 81:17, 93:17
**hearing** [7] - 5:17, 32:25, 41:23, 46:4, 46:10, 47:8, 65:2
**HEARING** [1] - 1:9
**hearings** [2] - 48:20, 101:1
**held** [6] - 15:19, 19:19, 20:16, 26:11, 26:12, 62:1
**help** [6] - 15:14, 27:14, 43:1, 47:19, 48:11, 52:5
**helpful** [3] - 4:5, 52:4, 93:7
**helping** [1] - 88:7
**helps** [1] - 77:22
**hereby** [1] - 103:7
**herself** [1] - 29:6
**hesitate** [1] - 92:15
**high** [5] - 25:2, 25:6, 25:15, 45:7, 63:21
**high-level** [3] - 25:2, 25:6, 25:15
**high-ranking** [2] - 45:7, 63:21
**higher** [2] - 10:11, 89:9
**himself** [1] - 29:5
**Hippocratic** [1] - 76:16
**history** [2] - 56:17, 58:3
**hoc** [1] - 68:11
**hold** [5] - 10:4, 71:6, 71:7, 72:18, 72:19
**holding** [1] - 79:15
**holds** [1] - 72:10
**Homeland** [3] - 3:3, 24:14, 80:25
**HOMELAND** [1] - 1:6
**Honor** [107] - 3:6, 3:15, 3:21, 3:22, 5:7, 6:13, 8:13, 8:24, 10:15, 12:10, 12:13, 13:16, 14:6, 14:14, 14:15, 17:7, 18:8, 19:11, 21:2, 22:12, 22:19, 22:22, 24:6, 25:1, 27:5, 27:6, 29:2, 29:17, 32:15, 32:23, 36:10, 39:20, 41:21, 41:23, 43:10, 44:22, 47:18, 48:12, 49:16, 50:11, 50:13, 50:22, 51:3, 51:13, 51:22, 51:25, 52:16, 52:20, 53:4, 53:7, 53:13, 54:13, 54:25, 55:15, 56:1, 56:22, 57:1, 57:7, 59:25, 61:11, 61:23, 63:2, 64:11, 65:10, 65:21, 66:5, 66:15, 66:19, 67:7, 67:22, 68:16, 69:6, 70:17, 73:9, 74:17, 75:23, 75:24, 76:13, 77:24, 80:12, 81:8, 82:13, 82:21, 83:14, 84:8, 86:17, 88:1, 88:9, 88:15, 90:16, 91:5, 91:25, 92:13, 93:14, 93:15, 94:2, 94:4, 97:15, 99:25, 100:11, 100:25, 101:13, 101:22, 102:1, 102:15, 102:17, 103:1
**Honor's** [3] - 58:10, 100:8, 100:11
**HONORABLE** [1] - 1:9
**hop** [1] - 22:21
**hopefully** [1] - 38:7
**host** [1] - 99:9
**hotline** [1] - 15:15
**House** [3] - 12:6, 12:16, 69:9
**HOWELL** [1] - 1:9
**huge** [2] - 15:16, 29:1
**human** [1] - 15:14
**hundreds** [1] - 11:14
**hurdle** [1] - 16:14
**hurdles** [2] - 16:11, 90:3
**hyperbole** [1] - 90:23

## I

**I-589** [1] - 67:2
**I200** [3] - 43:20, 91:12, 91:16
**IAN** [1] - 2:4
**ICE** [36] - 6:3, 17:2, 22:6, 30:16, 35:15, 56:11, 57:20, 61:4, 61:17, 63:21, 64:3, 64:15, 66:2, 66:11, 67:23, 70:12, 74:3, 83:17, 84:21, 84:22, 84:23, 84:24, 85:4, 85:9, 85:20, 86:19, 86:20, 87:1, 87:2, 87:25, 88:4, 88:6, 88:11, 88:21, 88:25
**ICE's** [2] - 73:16, 73:25
**idea** [2] - 62:21, 97:9
**identify** [7] - 3:4, 28:20, 28:22, 29:5, 30:11, 85:12, 86:7
**illegal** [3] - 4:17, 25:12, 33:12
**Illinois** [2] - 10:22, 20:1
**immediate** [2] - 39:21, 40:1
**immense** [1] - 34:7
**immigrant** [2] - 14:23, 20:18
**Immigrant** [1] - 2:4
**immigration** [125] - 5:9, 6:2, 6:15, 7:1, 8:9, 9:1, 9:17, 10:13, 11:1, 11:7, 11:16, 11:19, 11:23, 12:17, 12:21, 12:23, 13:22, 16:7, 17:9, 20:17, 22:7, 23:5, 24:12, 25:5, 25:12, 25:23, 26:1, 26:8, 27:16, 27:17, 27:19, 27:20, 27:25, 28:1, 28:3, 28:7, 28:12, 28:15, 28:23, 29:4, 29:12, 30:1, 31:4, 31:10, 31:24, 32:21, 33:17, 34:3, 34:13, 35:11, 35:14, 35:19, 35:21, 36:4, 36:13, 37:11, 38:1, 38:2, 38:21, 40:6, 41:8, 41:18, 42:2, 42:3, 42:4, 42:8, 42:10, 42:22, 42:24, 43:6, 43:23, 44:6, 44:9, 45:12, 46:16, 46:23, 47:14, 49:9, 50:3, 50:4, 50:10, 52:11, 52:12, 52:22, 55:9, 59:16, 59:19, 61:8, 61:20, 62:6, 63:22, 64:7, 64:18, 65:16, 67:12, 68:14, 68:15, 69:3, 69:12, 71:25, 73:8, 76:10, 78:5, 78:11, 78:19, 80:6, 80:10, 83:5, 85:4, 85:9, 86:7, 87:14, 87:22, 88:12, 88:22, 89:12, 90:19,

90:25, 91:5, 91:13, 91:24, 93:1, 96:6, 99:23, 100:6
**Immigration** [2] - 1:15, 6:2
**immigration-related** [3] - 45:12, 50:3, 78:19
**imminent** [1] - 7:21
**impact** [1] - 23:19
**impede** [1] - 42:9
**impermissible** [1] - 92:22
**implausible** [1] - 86:10
**implemented** [2] - 62:11, 83:4
**implementing** [4] - 9:12, 43:3, 64:7, 87:16
**implication** [1] - 98:5
**implies** [1] - 53:12
**important** [7] - 4:13, 4:24, 30:22, 34:19, 39:22, 45:3, 100:12
**importantly** [1] - 95:4
**impose** [1] - 19:21
**imposed** [1] - 5:14
**improper** [2] - 39:3, 78:3
**improperly** [1] - 25:11
**INA** [18] - 6:3, 6:9, 6:25, 7:17, 16:15, 16:17, 18:17, 19:17, 20:11, 22:2, 27:23, 73:6, 73:7, 74:3, 77:9, 77:13, 80:7, 87:16
**INA's** [2] - 52:10, 90:3
**include** [3] - 40:3, 59:8, 95:19
**included** [3] - 29:2, 95:11, 95:22
**includes** [4] - 36:19, 37:5, 61:25, 78:5
**including** [6] - 23:6, 25:20, 26:5, 41:6, 46:6, 63:24
**incorrect** [1] - 97:25
**increase** [1] - 11:6
**increased** [3] - 69:24, 70:1, 70:2
**indeed** [2] - 26:13, 98:19
**independent** [1] - 39:10
**independently** [1] - 14:7
**indicate** [1] - 71:16
**indicates** [2] - 10:7, 85:2
**indication** [2] - 69:25, 75:13
**individual** [28] - 13:9, 13:13, 13:17, 13:20, 14:4, 15:17, 17:13, 17:22, 17:24, 18:6, 23:18, 31:22, 32:6, 32:10, 33:18, 35:8, 37:24, 37:25, 38:21, 49:12, 51:17, 52:13, 54:10, 76:3, 80:10, 82:10, 90:14, 100:15
**individualized** [18] - 9:2, 10:2, 36:23, 37:20, 38:25, 39:13, 40:7, 47:22, 48:3, 48:10, 48:17, 49:6, 50:7, 70:18, 73:17, 91:17, 93:19, 99:24
**individuals** [11] - 14:22, 30:6, 31:13, 33:21, 33:24, 34:15, 35:2, 38:10, 46:3, 46:5, 46:7
**inferences** [1] - 98:14
**information** [13] - 31:13, 54:12, 54:17, 55:18, 56:16, 57:24, 57:25, 68:13, 68:21, 68:22, 69:21, 76:21, 88:15
**infraction** [2] - 52:12, 52:22
**initial** [2] - 8:22, 96:16
**initiate** [2] - 17:5, 23:17
**initiating** [3] - 56:12, 67:9, 82:15
**initiation** [3] - 23:16, 56:13, 81:10
**initiative** [1] - 84:14
**initiatives** [1] - 92:14
**injected** [1] - 41:12
**injecting** [1] - 45:11
**injunction** [54] - 3:24, 9:22, 22:15, 22:18, 23:1, 23:4, 23:9, 23:20, 23:22, 23:25, 24:2, 27:8, 30:8, 30:24, 36:3, 36:23, 37:2, 38:12, 40:1, 40:14, 40:17, 40:20, 43:9, 45:2, 46:11, 46:24, 47:6, 65:2, 71:21, 73:1, 75:7, 78:3, 78:10, 79:5, 79:14, 79:21, 79:22, 89:7, 90:13, 90:15, 91:7, 91:9, 92:16, 92:19, 92:21, 93:6, 93:15, 97:4, 100:1, 100:10, 102:2
**injunctions** [2] - 89:21, 93:9
**injunctive** [25] - 4:7, 4:8, 7:20, 8:11, 29:10, 29:13, 40:10, 40:23, 41:6, 41:16, 44:19, 45:14, 45:15, 47:2, 49:14, 49:24, 71:8, 78:16, 78:17, 78:18, 78:22, 78:25, 79:13, 100:13
**injury** [9] - 8:4, 8:6, 14:19, 16:1, 16:2, 75:17, 75:21, 76:18, 76:19
**inquiry** [1] - 9:7
**instead** [3] - 61:20, 62:7, 96:10
**instructed** [1] - 62:12
**instruction** [1] - 66:24
**instructions** [3] - 32:12, 67:5, 69:10
**insufficient** [3] - 47:5, 50:7, 73:15
**intended** [1] - 45:13
**interest** [2] - 41:2, 90:6
**interested** [1] - 29:12
**interfere** [2] - 19:16, 44:15
**interference** [1] - 44:9
**interpreted** [2] - 19:12, 64:2
**interpreting** [2] - 10:4, 64:4
**interview** [1] - 12:18
**intolerable** [2] - 41:8, 41:19
**invalid** [3] - 28:12, 30:2, 88:23
**involve** [1] - 83:10
**involved** [6] - 21:4, 31:10, 44:1, 63:22, 89:3, 98:11
**involvement** [2] - 45:19, 50:9
**irrelevant** [1] - 96:1
**isolation** [1] - 26:3
**issue** [23] - 4:6, 5:1, 5:25, 23:1, 23:25, 30:21, 31:20, 32:17, 38:19, 45:18, 48:4, 48:16, 58:21, 64:6, 71:22, 73:8, 80:9, 83:19, 95:10, 95:14, 95:17, 99:11
**issued** [13] - 12:6, 17:10, 17:19, 22:15, 26:18, 40:16, 59:7, 67:16, 69:9, 75:2, 75:8, 82:5, 82:17
**issues** [4] - 26:20, 77:7, 90:17, 90:18
**issuing** [1] - 22:1
**itself** [2] - 23:4, 70:24

## J

**January** [3] - 10:9, 69:1, 70:1
**JEHAN** [1] - 1:18
**Jehan** [1] - 3:12
**Jennings** [1] - 80:25
**jobs** [1] - 70:13
**John** [2] - 3:15, 3:17
**JOHN** [2] - 2:8
**joined** [1] - 3:17
**JOSE** [1] - 1:3
**Jose** [1] - 3:2
**judge** [1] - 44:1
**JUDGE** [1] - 1:9
**Judge** [1] - 40:16
**judgment** [1] - 39:19
**Judicial** [1] - 103:9
**judicial** [6] - 16:14, 19:17, 19:22, 80:8, 81:3, 90:3
**judiciary** [1] - 41:11
**jump** [1] - 27:12
**June** [2] - 22:15, 29:11
**jurisdiction** [4] - 19:5, 19:10, 25:24, 81:17
**jurisdictional** [13] - 7:7, 7:16, 16:11, 16:25, 18:17, 19:16, 20:11, 21:25, 50:18, 77:7, 80:2, 81:15, 90:3
**Justice** [4] - 71:4, 72:22, 73:3, 74:25
**justice** [4] - 72:23, 73:10, 75:8
**justices** [1] - 75:14
**justified** [1] - 42:15

## K

**Kavanaugh** [3] - 73:3, 73:10, 74:25
**Kavanaugh's** [1] - 72:22
**keep** [4] - 10:10, 38:15, 46:9, 53:14
**Kenneth** [2] - 55:3, 61:5
**key** [4] - 64:6, 72:15, 82:1, 82:17
**kind** [12] - 14:25, 15:2, 27:19, 31:8, 31:13, 34:2, 43:13, 43:18, 44:24, 45:20, 48:4, 97:3
**kinds** [1] - 100:3
**knowing** [2] - 92:15, 101:2
**knowledge** [1] - 85:18
**knows** [2] - 27:6, 35:1

## L

**LA** [3] - 71:7, 71:10, 72:9
**labeled** [1] - 86:4
**lack** [6] - 27:19, 28:11, 30:19, 70:6, 75:22, 76:11
**Lamberth** [1] - 40:16
**Landan** [6] - 3:8, 3:11, 3:25, 4:1, 22:19, 36:17
**LANDAN** [11] - 1:15, 3:11, 22:22, 22:25, 23:14, 24:2, 24:6, 51:3, 51:13, 51:15, 102:17
**language** [14] - 12:6, 27:21, 46:12, 47:18, 48:9, 53:14, 57:3, 69:8, 79:3, 79:19, 79:20, 83:1, 90:21
**lapsed** [1] - 93:23
**large** [2] - 11:11, 46:5
**last** [2] - 90:16, 97:6
**Latino** [2] - 70:12, 70:13
**law** [36] - 4:23, 5:3, 6:2, 6:18, 10:3, 28:14, 29:11, 33:11, 34:15, 42:15, 43:2, 52:12, 52:15, 52:22, 59:11, 59:13, 63:24, 64:25, 66:22, 67:4, 84:11,

84:12, 85:3, 85:7, 87:20, 89:19, 90:13, 90:19, 90:24, 92:3, 92:18, 92:19, 92:20, 92:21, 93:7, 93:10
**lawful** [28] - 23:8, 32:22, 33:2, 33:16, 34:22, 35:9, 35:13, 35:21, 35:25, 37:11, 38:2, 38:20, 38:24, 42:2, 44:6, 44:9, 51:9, 51:16, 55:13, 55:14, 55:15, 56:2, 56:10, 59:1, 65:16, 89:22, 89:25, 92:16
**lawfully** [1] - 35:4
**lawless** [1] - 11:23
**laws** [2] - 33:17, 34:13
**lawsuit** [4] - 4:25, 5:2, 9:19, 89:24
**Lawyers'** [1] - 2:1
**lead** [2] - 4:21, 81:5
**leadership** [2] - 24:14, 31:2
**League** [1] - 15:19
**learn** [2] - 30:25, 31:5
**learned** [1] - 66:2
**least** [13] - 16:15, 18:2, 25:20, 27:3, 37:3, 43:18, 48:17, 48:25, 49:13, 50:17, 64:25, 79:1, 94:12
**leave** [1] - 101:1
**led** [1] - 89:13
**legal** [9] - 5:8, 6:24, 14:25, 15:1, 31:23, 52:24, 63:18, 73:18, 102:20
**legally** [1] - 49:7
**less** [2] - 42:11, 92:14
**letters** [2] - 85:12, 85:23
**level** [6] - 25:2, 25:6, 25:15, 30:18, 49:11, 49:12
**levels** [1] - 33:20
**Liberties** [1] - 1:12
**life** [1] - 70:11
**likelihood** [2] - 40:25, 90:4
**likely** [4] - 7:3, 40:8, 46:19, 92:14
**limit** [1] - 80:8
**limited** [4] - 19:12, 31:15, 35:5, 78:23
**limiting** [1] - 18:11
**limits** [1] - 77:12
**line** [3] - 5:18, 44:24, 50:13
**list** [1] - 34:12
**listed** [1] - 78:8
**listen** [3] - 16:19, 16:21, 96:11
**listening** [1] - 92:25
**litigate** [1] - 102:11
**litigated** [1] - 80:17
**litigation** [2] - 10:18, 10:22
**live** [1] - 35:4
**lives** [1] - 100:17
**living** [3] - 39:23, 70:13, 100:16
**LLP** [1] - 1:17
**long-term** [3] - 14:21, 14:24, 15:1
**longstanding** [1] - 6:1
**look** [8] - 22:14, 29:9, 29:13, 46:12, 54:16, 68:5, 80:1, 102:11
**looked** [4] - 10:23, 70:21, 79:12, 91:22
**looking** [6] - 55:23, 56:23, 57:14, 68:20, 70:13, 79:19
**lost** [1] - 15:8
**loud** [1] - 102:12
**loudly** [1] - 64:9
**loved** [1] - 34:11
**low** [1] - 70:13
**low-wage** [1] - 70:13
**lower** [3] - 12:23, 25:22, 75:8
**lucky** [1] - 102:23
**Lyons** [13] - 7:25, 71:1, 71:5, 71:6, 71:16, 71:19, 72:4, 72:5, 72:7, 72:8, 72:13, 72:15

**M**

**Madeleine** [2] - 3:8, 3:12
**MADELEINE** [1] - 2:2
**main** [4] - 24:8, 51:19, 93:18, 102:5
**maintain** [5] - 50:18, 72:5, 72:7, 80:3, 89:23
**majority** [1] - 75:14
**manageability** [1] - 100:9
**managed** [1] - 95:20
**management** [2] - 24:15, 95:19
**mandatory** [1] - 89:7
**manner** [3] - 6:24, 42:16, 71:14
**March** [1] - 20:20
**Marshal** [3] - 23:5, 78:3, 78:19
**Marshals** [2] - 28:6, 29:25
**Maryland** [1] - 2:5
**masked** [1] - 30:10
**mass** [1] - 27:15
**massive** [1] - 100:18
**matter** [10] - 4:25, 5:8, 16:14, 44:2, 56:9, 78:20, 86:1, 92:1, 92:3, 103:8
**matters** [5] - 47:14, 59:3, 78:20, 87:9, 87:11
**mayor's** [1] - 72:9
**McLaughlin** [1] - 59:10
**mean** [18] - 4:15, 7:16, 29:9, 57:13, 63:15, 69:18, 71:2, 72:18, 76:3, 84:9, 87:4, 87:9, 88:6, 92:3, 93:9, 99:4, 99:14, 101:16
**meaning** [4] - 55:8, 89:7, 97:11, 97:12
**meaningless** [1] - 98:16
**means** [5] - 28:11, 58:11, 66:7, 97:17, 98:3
**meant** [2] - 48:1, 98:8
**media** [1] - 60:11
**Medicine** [1] - 76:16
**meet** [5] - 6:24, 27:14, 49:24, 89:9, 91:1
**meeting** [4] - 16:8, 24:13, 42:12, 42:13
**meets** [1] - 76:25
**members** [13] - 13:7, 13:10, 13:18, 14:22, 15:17, 31:2, 37:25, 39:23, 46:3, 51:9, 76:4, 100:20
**membership** [1] - 100:22
**memorandum** [1] - 31:1
**mention** [2] - 92:12, 95:1
**mentioned** [3] - 67:8, 87:19, 102:17
**mere** [1] - 70:3
**merely** [1] - 89:8
**merits** [6] - 7:8, 41:1, 75:3, 75:15, 77:17, 90:5
**met** [5] - 6:6, 6:12, 13:15, 35:23, 40:24
**micromanaging** [4] - 41:12, 45:10, 45:11, 47:13
**might** [15] - 23:3, 30:17, 38:16, 42:10, 43:7, 48:11, 49:20, 49:21, 65:1, 71:16, 73:12, 75:10, 81:5, 88:22, 93:7
**Miller** [2] - 10:25, 11:9
**mini** [1] - 91:7
**minute** [2] - 60:16, 101:4
**miss** [2] - 29:14, 36:18
**missing** [1] - 79:19
**mission** [10] - 11:15, 14:20, 15:5, 15:12, 15:18, 15:21, 76:10, 76:15, 100:21
**mistaken** [2] - 96:15, 97:3
**misuse** [1] - 99:9
**modifications** [1] - 44:22
**modified** [4] - 50:13, 100:11, 102:1, 102:3
**modify** [3] - 29:18, 47:17, 48:9
**Molina** [22] - 3:2, 17:16, 21:23, 21:24, 31:25, 32:5, 51:15, 54:10, 54:15, 54:16, 55:8, 56:24, 57:5, 57:25, 58:20, 94:7, 94:25, 95:6, 95:8, 96:18, 97:1, 99:15
**MOLINA** [1] - 1:3
**Molina's** [3] - 58:20, 66:1, 96:15
**moment** [3] - 10:17, 49:18, 49:20
**Monday** [2] - 101:21, 102:22
**money** [1] - 76:21
**monitor** [11] - 58:6, 67:19, 68:3, 68:6, 95:10, 95:14, 95:17, 95:25, 96:1, 96:4, 96:8
**monitors** [1] - 95:20
**month** [1] - 8:21
**months** [2] - 5:13, 8:21
**morning** [7] - 3:6, 3:14, 3:15, 3:18, 3:21, 51:22, 51:23
**most** [4] - 18:18, 39:21, 62:1, 77:22
**MOTION** [1] - 1:9
**motion** [14] - 3:23, 3:25, 9:21, 16:12, 27:8, 30:7, 30:8, 36:7, 36:8, 36:23, 37:2, 37:18, 49:16, 102:2
**motions** [2] - 3:19, 36:9
**mounting** [1] - 48:2
**move** [4] - 19:4, 21:25, 51:4, 75:24
**moved** [1] - 38:12
**moving** [2] - 3:20, 89:9
**MR** [123] - 3:15, 51:22, 51:24, 52:16, 52:20, 53:4, 53:7, 53:11, 53:19, 53:25, 54:13, 54:25, 55:3, 55:14, 56:1, 56:8, 56:16, 56:22, 57:1, 57:7, 57:10, 57:18, 57:22, 58:3, 58:10, 58:23, 59:21, 59:25, 60:5, 60:10, 60:21, 60:24, 61:11, 61:23, 62:9, 62:12, 62:18, 63:2, 63:5, 63:9, 63:12, 63:15, 64:11, 64:22, 65:8, 65:21, 65:24, 66:5, 66:8, 66:14, 66:19, 67:7, 67:16, 67:22, 68:9, 68:16, 68:19, 69:5, 69:14, 69:18, 70:17, 70:23, 72:5, 72:12, 72:15, 73:9, 73:24, 74:17, 75:5, 75:12, 75:23, 76:2, 76:8, 76:13, 77:4, 77:17, 77:24, 78:14, 78:24, 79:10, 79:22, 80:12, 81:8, 81:12, 81:16, 82:12, 82:20, 83:10, 83:24, 84:8, 84:13, 85:6, 85:10, 85:14, 85:19, 85:24, 86:12, 86:17, 86:25, 87:7, 87:18, 87:24, 88:8, 88:14, 88:17, 88:24, 89:19, 90:12, 91:4, 91:15, 91:21, 91:25, 92:7, 92:12, 92:21, 93:5, 93:9, 93:14,

93:18, 94:2, 101:13, 101:22, 103:1
**MS** [97] - 3:6, 3:11, 3:12, 3:21, 5:7, 5:11, 5:16, 6:7, 6:13, 6:20, 7:5, 7:15, 8:4, 8:13, 8:20, 9:21, 10:15, 10:23, 12:10, 13:11, 13:16, 14:2, 14:14, 14:18, 17:7, 17:11, 17:24, 18:8, 19:11, 20:7, 20:9, 21:2, 21:24, 22:12, 22:19, 22:22, 22:25, 23:14, 24:2, 24:6, 25:1, 27:5, 29:1, 29:16, 30:4, 31:21, 31:25, 32:15, 32:19, 32:23, 33:7, 33:12, 33:15, 34:6, 36:10, 36:15, 36:22, 37:12, 38:4, 38:7, 38:17, 38:23, 39:6, 39:20, 40:14, 41:21, 42:13, 43:10, 43:21, 44:4, 44:21, 45:5, 45:18, 47:17, 48:21, 48:24, 49:15, 50:11, 50:21, 51:3, 51:13, 51:15, 94:4, 94:20, 94:23, 96:9, 97:14, 98:5, 98:10, 99:6, 99:12, 101:4, 101:8, 101:25, 102:9, 102:15, 102:17
**multiple** [2] - 26:11, 85:3
**must** [8] - 4:8, 7:2, 7:21, 7:22, 28:2, 89:9, 94:16, 97:25

## N

**N.S** [25] - 5:13, 17:2, 17:12, 19:8, 22:14, 22:24, 23:1, 23:2, 23:19, 23:22, 23:25, 27:22, 28:5, 29:15, 31:15, 54:11, 66:10, 66:16, 67:3, 77:21, 78:9, 78:18, 79:1, 79:7, 88:22
**N.S.M** [1] - 17:18
**named** [12] - 12:7, 13:9, 13:17, 14:4, 17:22, 17:24, 23:3, 38:21, 51:9, 75:18, 94:7, 97:8
**namely** [3] - 13:7, 70:12, 71:24
**names** [2] - 3:10, 84:18
**narrow** [2] - 4:8, 44:19
**narrower** [1] - 23:19
**National** [1] - 1:15
**nationwide** [1] - 69:4
**Naturalization** [1] - 6:3
**naturally** [1] - 13:13
**nature** [4] - 18:23, 19:1, 21:17, 27:9
**Nava** [3] - 20:2, 29:22, 43:16
**nearby** [1] - 87:9
**necessarily** [4] - 60:6, 60:12, 63:17, 70:24
**necessary** [4] - 14:11, 40:15, 43:7, 70:7
**need** [20] - 8:11, 14:12, 26:12, 39:10, 40:1, 40:12, 40:21, 41:15, 46:10, 49:20, 59:15, 59:17, 63:6, 74:20, 74:21, 77:4, 77:5, 93:3, 101:17
**needs** [1] - 45:25
**neighborhoods** [1] - 70:14
**never** [4] - 19:14, 19:15, 62:4, 62:16
**new** [5] - 6:16, 10:9, 24:24, 38:15, 102:19
**Newby** [1] - 15:20
**next** [5] - 5:25, 39:9, 75:25, 96:24, 101:16
**Nielsen** [2] - 25:10, 80:25
**nightmare** [1] - 47:11
**Ninth** [1] - 73:1
**NO** [1] - 1:5
**nobody** [1] - 87:5
**noise** [1] - 5:17
**non** [17] - 4:22, 5:6, 5:9, 6:4, 6:5, 6:10, 7:2, 23:7, 27:15, 28:7, 28:19, 52:11, 52:24, 52:25, 63:16, 63:19, 66:21
**non-attorneys** [2] - 63:16, 63:19
**non-citizen** [8] - 5:6, 5:9, 6:10, 7:2, 28:7, 52:24, 52:25, 66:21
**non-citizens** [6] - 4:22, 6:4, 6:5, 23:7, 28:19, 52:11
**non-DHS** [1] - 27:15
**noncovered** [1] - 23:23
**none** [9] - 17:22, 18:15, 18:22, 24:18, 31:22, 35:12, 37:10, 82:10, 84:23
**normal** [2] - 76:14, 76:15
**normally** [1] - 49:11
**North** [1] - 2:5
**Northern** [1] - 10:21
**notch** [1] - 11:9
**noted** [2] - 14:9, 95:18
**nothing** [11] - 6:17, 35:3, 40:19, 46:23, 50:21, 93:14, 94:16, 95:7, 97:7, 98:6, 103:1
**notice** [6] - 17:19, 20:18, 59:16, 67:16, 67:24, 83:19
**notices** [1] - 17:3
**notwithstanding** [1] - 100:12
**Nova** [1] - 10:22
**November** [2] - 1:10, 103:10
**nowhere** [2] - 45:20, 64:3
**NTA** [2] - 17:6, 20:25
**NTAs** [3] - 17:4, 17:5, 17:9
**number** [11] - 4:3, 7:17, 10:11, 10:16, 11:6, 11:11, 12:16, 31:9, 69:25, 83:2, 86:6
**numbers** [5] - 42:11, 42:13, 42:14, 42:15, 84:19
**NW** [6] - 1:13, 1:16, 1:18, 1:24, 2:2, 2:8

## O

**oath** [1] - 65:19
**obligations** [1] - 83:16
**obstacles** [1] - 16:18
**obtained** [5] - 7:4, 9:19, 40:9, 46:19, 53:1
**obtaining** [3] - 54:11, 98:23, 99:7
**obvious** [1] - 97:12
**October** [4] - 59:8, 59:10, 59:12, 59:14
**OF** [3] - 1:1, 1:6, 1:9
**offense** [1] - 9:14
**offer** [1] - 69:19
**offering** [1] - 73:11
**office** [3] - 2:7, 62:2, 72:9
**Office** [1] - 61:3
**officer** [3] - 29:5, 66:21, 97:25
**officers** [14] - 20:17, 27:25, 28:11, 35:16, 53:23, 53:24, 55:2, 61:24, 63:21, 71:10, 71:14, 71:17, 72:10, 96:25
**official** [7] - 24:19, 32:12, 63:23, 66:24, 67:5, 69:19, 85:24
**Official** [2] - 1:23, 103:6
**OFFICIAL** [1] - 103:13
**officials** [13] - 4:11, 25:2, 25:7, 25:16, 45:7, 59:7, 60:19, 64:15, 64:20, 69:15, 71:23, 72:9, 74:16
**often** [4] - 30:10, 34:11, 63:19, 85:11
**once** [4] - 27:3, 47:1, 70:10, 96:20
**one** [48] - 5:24, 9:5, 10:25, 11:8, 13:2, 13:7, 18:16, 18:25, 20:8, 21:21, 22:8, 24:7, 24:10, 24:16, 25:20, 30:25, 34:9, 36:12, 37:24, 39:15, 43:4, 46:14, 47:17, 49:13, 51:4, 55:22, 63:21, 63:23, 64:3, 70:23, 71:11, 71:13, 75:4, 75:8, 79:24, 84:3, 86:18, 89:5, 91:22, 92:9, 93:22, 94:12, 94:23, 96:25, 98:25, 101:4, 101:25, 102:5
**one-paragraph** [1] - 75:4
**ones** [4] - 18:6, 34:11, 87:11, 87:24
**ongoing** [7] - 8:23, 11:17, 14:19, 15:25, 16:2, 44:18
**onslaught** [1] - 15:4
**open** [1] - 99:8
**operation** [4] - 11:23, 41:12, 55:5, 58:22
**operational** [7] - 41:10, 42:17, 42:18, 43:8, 90:11, 92:1, 92:3
**operationally** [3] - 90:24, 91:2, 91:10
**operations** [4] - 24:17, 58:16, 90:19
**Operations** [1] - 61:4
**opinion** [1] - 79:11
**opportunity** [8] - 51:1, 65:6, 65:18, 65:20, 80:20, 80:22, 101:13, 102:20
**opposed** [3] - 49:1, 49:3, 52:5
**opposing** [2] - 76:6, 76:8
**opposite** [1] - 99:12
**opposition** [7] - 12:14, 12:25, 16:12, 45:9, 63:1, 68:1, 90:21
**order** [41] - 16:24, 17:17, 17:21, 18:11, 18:14, 29:13, 29:16, 32:16, 37:17, 37:23, 38:15, 39:17, 39:18, 40:2, 40:13, 40:17, 40:21, 43:14, 44:20, 44:23, 45:16, 45:22, 46:1, 46:14, 46:22, 47:7, 50:13, 72:25, 75:4, 80:18, 82:2, 82:5, 82:6, 82:16, 100:10, 101:15, 101:17, 102:2, 102:3
**Order** [1] - 3:1
**ordered** [2] - 45:1, 71:13
**orders** [9] - 17:23, 17:25, 36:8, 44:16, 80:8, 80:9, 81:20, 82:10, 82:14
**ordinary** [1] - 89:10
**organization** [5] - 14:21, 14:23, 15:20, 76:17, 76:19
**organizational** [12] - 13:2, 13:3, 13:25, 14:8, 14:13, 14:17, 14:18, 14:19, 15:22, 15:23, 76:12, 77:2
**original** [1] - 103:7
**otherwise** [6] - 3:10, 15:18, 47:7, 57:3, 83:22, 92:16
**outline** [1] - 44:4
**outset** [1] - 4:5
**outside** [6] - 18:6, 30:16, 76:14, 88:6, 88:10, 88:20
**overarching** [3] -

36:18, 37:1, 51:11
**overbroad** [9] - 24:1, 78:10, 78:17, 78:21, 79:5, 79:14, 79:15, 79:21, 81:7
**overnight** [1] - 96:25
**overstayed** [2] - 58:4, 68:23
**overturned** [1] - 75:7
**own** [4] - 13:8, 13:19, 46:3, 99:25

## P

**p.m** [6] - 1:10, 101:9, 101:21, 102:2, 103:3
**packet** [1] - 68:20
**page** [6] - 20:9, 32:2, 32:3, 36:22, 54:8, 103:8
**papers** [8] - 4:12, 21:20, 27:6, 29:4, 29:20, 44:14, 95:11, 95:18
**paperwork** [4] - 42:21, 49:6, 86:19, 86:22
**paragraph** [15] - 27:18, 46:15, 48:8, 49:1, 55:5, 55:6, 57:4, 61:12, 61:14, 61:23, 67:23, 68:5, 68:7, 68:9, 75:4
**paraphrasing** [1] - 71:9
**parole** [1] - 25:12
**part** [23] - 11:15, 15:5, 18:9, 29:4, 35:7, 35:24, 44:3, 56:18, 58:20, 71:9, 74:19, 76:3, 81:8, 81:9, 81:23, 82:1, 82:15, 82:17, 82:20, 84:10, 84:13, 85:7, 91:19
**particular** [4] - 19:21, 26:22, 51:24, 99:3
**particularly** [7] - 4:7, 26:19, 27:2, 38:11, 45:6, 75:1, 102:12
**parties** [2] - 88:3, 89:1
**parts** [2] - 76:3, 77:13
**party** [5] - 3:20, 27:10, 89:7, 89:9, 100:2
**passed** [1] - 74:3
**past** [10] - 8:2, 8:4, 8:14, 16:13, 33:19, 71:2, 72:16, 72:17, 72:18, 90:2
**Patrol** [12] - 12:19, 59:14, 60:8, 60:11, 61:10, 62:5, 62:22, 64:17, 65:14, 83:3, 89:17, 93:2
**Patterson** [1] - 3:12
**PATTERSON** [1] - 1:18
**Pause** [2] - 5:23, 101:7
**pause** [2] - 12:3, 50:10
**penalty** [1] - 5:14
**pendency** [2] - 6:5, 34:4
**pending** [16] - 3:19, 16:22, 32:14, 32:16, 32:22, 33:15, 33:18, 33:21, 33:24, 34:15, 36:8, 66:17, 66:25, 67:4, 67:8, 67:14
**Pennsylvania** [3] - 20:16, 20:20, 21:3
**people** [26] - 4:22, 11:14, 15:14, 30:9, 33:9, 35:15, 36:19, 37:5, 37:9, 38:1, 39:12, 39:23, 41:13, 43:25, 46:5, 58:15, 60:6, 63:16, 65:8, 72:2, 86:6, 88:25, 96:12, 100:22
**people's** [1] - 25:12
**peoples'** [1] - 84:18
**per** [4] - 10:13, 69:4, 69:12, 69:24
**percent** [2] - 15:8, 15:13
**Perdomo** [7] - 71:6, 72:21, 72:22, 73:22, 73:24, 74:5, 74:25
**perhaps** [4] - 35:1, 43:6, 47:8, 62:15
**period** [3] - 28:16, 48:14, 101:10
**permitted** [2] - 67:1, 93:10
**person** [21] - 9:18, 17:21, 35:16, 36:24, 37:13, 37:20, 39:1, 39:10, 40:8, 46:18, 56:20, 57:24, 58:13, 84:21, 86:8, 86:19, 91:18, 96:5, 99:3, 100:15
**person's** [5] - 6:11, 9:2, 9:6, 9:7, 26:23
**personal** [2] - 9:7, 54:6
**persons** [2] - 70:12, 70:15
**perspective** [1] - 47:11
**persuasive** [3] - 75:1, 75:5, 75:6
**phraseology** [1] - 33:12
**phrasing** [1] - 8:2
**physical** [1] - 34:8
**PI** [6] - 4:2, 16:12, 24:5, 36:7, 39:17, 40:2
**piece** [1] - 17:14
**pieces** [3] - 24:10, 26:8, 100:4
**pincite** [1] - 20:9
**place** [10] - 4:19, 34:3, 44:5, 44:6, 44:10, 51:24, 88:12, 90:14, 92:16
**placed** [5] - 18:20, 18:24, 19:15, 34:8, 69:1
**plain** [1] - 30:10
**plaintiff** [10] - 7:22, 21:12, 51:9, 51:17, 71:7, 71:15, 77:25, 81:21, 86:13, 91:6
**plaintiff's** [1] - 23:3
**plaintiffs** [126] - 3:7, 3:19, 3:20, 3:22, 5:2, 6:1, 6:8, 6:14, 6:16, 6:24, 7:19, 8:8, 8:15, 8:20, 10:12, 12:5, 12:7, 13:3, 13:6, 13:9, 13:13, 13:17, 13:20, 14:4, 16:13, 16:23, 17:9, 17:14, 17:22, 17:25, 18:6, 18:15, 18:19, 18:21, 19:15, 20:4, 20:22, 20:23, 21:5, 21:19, 21:21, 22:9, 22:17, 23:9, 24:10, 24:20, 27:13, 28:18, 28:21, 31:23, 32:11, 35:9, 35:12, 35:15, 35:18, 37:16, 37:24, 38:3, 38:22, 39:18, 39:22, 40:12, 40:24, 40:25, 44:14, 45:16, 46:3, 46:22, 47:3, 50:5, 51:4, 51:6, 52:7, 52:13, 52:17, 53:14, 54:3, 54:5, 54:7, 54:10, 54:14, 55:21, 59:6, 60:1, 70:5, 70:9, 72:1, 72:6, 73:12, 73:16, 73:24, 74:1, 75:2, 75:18, 75:19, 76:4, 77:9, 78:1, 80:5, 80:10, 80:19, 82:10, 83:9, 83:11, 84:15, 84:16, 86:23, 87:14, 88:3, 88:4, 89:2, 89:21, 90:2, 90:8, 90:12, 93:21, 93:25, 94:7, 97:8, 97:10, 100:15, 101:3, 101:20, 101:24, 102:19
**Plaintiffs** [2] - 1:4, 17:2
**PLAINTIFFS** [2] - 1:12, 2:1
**plaintiffs'** [22] - 4:15, 6:22, 7:8, 9:16, 9:19, 14:16, 18:7, 22:5, 29:10, 40:2, 41:15, 41:19, 45:14, 46:2, 47:3, 52:2, 52:18, 70:4, 72:2, 72:23, 75:22, 84:7
**plan** [4] - 20:24, 30:22, 66:11, 102:1
**plausibility** [1] - 86:15
**plausible** [2] - 84:10, 86:9
**play** [2] - 10:6, 16:20
**plus** [3] - 12:17, 83:2, 99:25
**point** [19] - 18:7, 18:9, 23:3, 23:15, 62:3, 72:15, 75:2, 75:19, 76:15, 80:22, 81:16, 81:21, 82:11, 89:6, 95:25, 96:7, 96:10, 97:14, 102:13
**pointed** [3] - 49:13, 90:7, 95:10
**police** [6] - 71:7, 71:10, 71:11, 71:14, 71:17, 72:10
**policies** [4] - 4:19, 26:21, 44:10, 83:15
**Policy** [1] - 29:22
**policy** [67] - 6:17, 8:22, 8:25, 11:1, 11:17, 11:20, 12:9, 13:21, 15:4, 15:25, 20:5, 22:6, 24:9, 24:11, 24:19, 24:24, 25:7, 25:11, 25:14, 25:18, 26:9, 26:12, 26:13, 26:23, 26:25, 40:5, 42:8, 43:15, 44:11, 44:25, 45:24, 47:21, 48:4, 48:22, 49:2, 49:11, 49:17, 60:22, 61:7, 69:19, 70:6, 71:18, 71:19, 71:20, 71:22, 72:1, 72:6, 72:7, 73:17, 73:18, 80:5, 83:4, 83:9, 83:21, 84:1, 84:2, 84:3, 87:13, 87:16, 87:19, 89:11, 97:5, 99:22, 100:5
**policy/regulation** [1] - 26:15
**portion** [1] - 77:19
**poses** [2] - 52:25, 91:19
**position** [7] - 24:11, 26:21, 26:23, 49:7, 56:25, 61:18, 66:2
**possible** [3] - 4:8, 37:4, 88:8
**post** [3] - 11:12, 68:11, 97:23
**post-arrest** [1] - 97:23
**post-hoc** [1] - 68:11
**posted** [1] - 60:11
**posting** [1] - 59:8
**posts** [1] - 60:11
**posture** [1] - 100:1
**potential** [1] - 45:18
**potentially** [3] - 47:16, 50:4, 99:9
**powers** [2] - 27:16, 31:7
**practice** [11] - 8:25, 13:21, 15:4, 20:5, 26:10, 33:23, 49:18, 89:12, 97:5, 99:22, 100:5
**prayer** [1] - 39:16
**pre** [9] - 36:23, 37:19, 40:7, 46:17, 48:9, 81:22, 97:23, 98:9, 98:10
**pre-arrest** [7] - 36:23, 37:19, 40:7, 46:17, 48:9, 98:9, 98:10
**pre-removal** [1] - 81:22
**precedent** [3] - 75:1, 75:6, 83:7
**precise** [2] - 10:17, 69:7
**precisely** [3] - 55:20, 63:10, 90:11
**predicated** [1] - 16:1
**prediction** [1] - 71:12
**preexisting** [1] -

20:24
**prefer** [2] - 69:16, 69:17
**preferred** [1] - 69:13
**preliminary** [17] - 3:23, 7:9, 7:20, 9:22, 27:8, 30:8, 30:23, 36:2, 36:22, 37:2, 38:12, 40:17, 45:2, 65:2, 100:1, 100:10, 102:2
**prepared** [5] - 7:13, 20:25, 22:19, 65:9, 69:19
**preparing** [1] - 38:14
**prescribed** [1] - 35:6
**presence** [3] - 37:15, 84:12, 87:10
**present** [6] - 24:10, 70:19, 87:5, 87:6, 88:7, 88:8
**presentation** [1] - 94:6
**presented** [2] - 4:4, 51:6
**presenting** [1] - 3:23
**presents** [1] - 99:17
**preserve** [1] - 89:8
**President** [2] - 4:16, 11:20
**press** [6] - 26:16, 26:17, 59:13, 82:25, 83:2, 83:25
**presumably** [1] - 23:8
**presumption** [1] - 30:16
**pretty** [4] - 52:4, 74:10, 88:17, 90:21
**prevent** [7] - 56:11, 56:12, 56:13, 65:1, 67:9, 67:10, 97:4
**preventing** [1] - 89:21
**prevents** [1] - 78:14
**previously** [2] - 25:6, 44:25
**primary** [1] - 15:22
**Pringle** [1] - 39:7
**priorities** [1] - 15:21
**probable** [64] - 7:2, 9:2, 9:13, 9:16, 9:24, 10:2, 13:22, 25:22, 26:8, 27:4, 31:4, 35:16, 37:6, 37:9, 37:15, 37:20, 38:10, 38:25, 39:9, 39:10, 40:7, 42:5, 42:22, 42:24, 46:9, 46:18, 46:24, 47:23, 47:25, 48:11, 48:15, 49:3, 52:23, 53:2, 59:3, 59:17, 59:19, 61:20, 62:8, 62:23, 62:25, 63:6, 63:18, 64:2, 64:21, 66:21, 70:7, 70:20, 71:24, 74:6, 74:13, 74:17, 74:19, 74:22, 80:6, 80:16, 83:6, 83:12, 87:15, 89:13, 91:1, 91:18, 96:3, 99:24
**probative** [1] - 102:7
**problem** [6] - 45:16, 47:21, 49:13, 78:18, 90:16, 92:22
**problems** [6] - 34:12, 41:5, 90:7, 90:10, 92:6, 99:9
**Procedure** [1] - 77:11
**procedures** [4] - 44:4, 44:5, 44:10, 44:12
**proceed** [2] - 52:1, 86:2
**proceeding** [7] - 18:1, 47:6, 81:4, 81:5, 81:9, 81:10, 81:24
**proceedings** [38] - 6:5, 17:4, 17:5, 17:15, 17:17, 18:1, 18:3, 18:16, 18:19, 18:20, 18:22, 19:3, 19:7, 19:9, 19:16, 20:19, 20:25, 21:6, 21:7, 21:18, 21:20, 21:22, 23:16, 23:18, 44:15, 56:12, 56:14, 66:12, 67:10, 67:13, 80:13, 80:15, 80:20, 81:19, 82:12, 82:14, 93:23
**Proceedings** [1] - 103:3
**process** [3] - 81:9, 96:19, 98:23
**Produced** [1] - 1:25
**produced** [1] - 86:23
**program** [5] - 58:7, 58:8, 68:25, 95:16, 95:19
**progress** [1] - 15:9
**progressed** [1] - 10:8
**Project** [1] - 1:15
**prologue** [2] - 8:3, 72:17
**promised** [1] - 10:10
**promptly** [1] - 100:10
**prong** [4] - 9:15, 9:16, 35:22, 42:23
**prongs** [8] - 9:24, 24:13, 49:7, 50:8, 53:3, 64:2, 70:7, 91:1
**proof** [2] - 24:10, 25:17
**proper** [3] - 42:16, 64:8, 89:13
**properly** [1] - 28:24
**propinquity** [2] - 39:3, 39:6
**proposal** [2] - 49:4, 49:14
**propose** [1] - 51:7
**proposed** [30] - 7:12, 29:10, 29:13, 29:16, 29:18, 35:20, 36:8, 36:16, 36:19, 36:21, 37:12, 37:17, 38:15, 39:17, 39:18, 40:2, 40:13, 43:14, 44:20, 44:22, 44:23, 45:14, 45:16, 45:19, 46:14, 46:21, 46:22, 50:13, 100:9, 102:1
**proposes** [1] - 35:9
**prosecutor** [1] - 86:3
**prosecutorial** [2] - 19:22, 19:23
**prospective** [2] - 8:11, 71:21
**protect** [1] - 100:14
**protected** [1] - 51:16
**Protection** [1] - 54:15
**proudly** [1] - 86:3
**prove** [1] - 62:3
**provide** [11] - 14:21, 14:24, 15:3, 16:25, 61:9, 64:24, 83:8, 87:10, 88:13, 88:15, 100:23
**provided** [7] - 6:9, 25:21, 31:16, 31:17, 47:2, 59:6, 88:20
**provides** [1] - 52:10
**providing** [1] - 15:14
**provision** [14] - 16:18, 19:6, 19:17, 23:13, 23:14, 23:15, 23:23, 40:4, 46:21, 46:24, 78:2, 78:7, 78:8, 78:9
**provisional** [1] - 36:25
**provisions** [9] - 7:17, 16:15, 19:18, 22:2, 22:3, 22:8, 24:3, 74:3, 80:8
**pseudonyms** [1] - 84:17
**psychological** [1] - 34:7
**public** [12] - 4:10, 4:18, 4:21, 5:18, 11:5, 12:11, 31:3, 41:2, 41:10, 59:7, 60:18, 90:6
**publicly** [2] - 12:22, 25:4
**pull** [2] - 36:10, 92:7
**punish** [1] - 5:15
**pure** [1] - 72:19
**purported** [1] - 11:21
**purpose** [2] - 11:15, 17:6
**purposes** [6] - 15:22, 36:2, 37:2, 38:11, 38:23, 59:3
**pursuant** [6] - 6:4, 11:23, 13:21, 52:14, 78:6, 83:21
**push** [1] - 11:11
**pushing** [1] - 10:11
**put** [19] - 5:19, 7:22, 8:24, 9:8, 9:9, 18:6, 18:24, 24:21, 26:5, 27:16, 38:7, 41:6, 47:9, 47:10, 49:23, 65:4, 65:7, 65:18, 88:12
**putative** [2] - 22:9, 39:22
**puts** [1] - 49:7
**putting** [1] - 90:22

## Q

**questions** [6] - 9:6, 48:18, 50:25, 54:5, 57:11, 73:5
**quick** [1] - 39:15
**quickly** [2] - 32:3, 88:17
**quieted** [1] - 11:24
**quite** [3] - 41:3, 95:11, 99:12
**quo** [5] - 89:8, 89:9, 89:18, 89:21, 89:23
**quota** [16] - 10:8, 10:9, 10:12, 10:14, 10:16, 10:19, 10:25, 11:3, 27:14, 69:2, 69:3, 69:4, 69:8, 69:11, 69:16, 69:22
**quotas** [7] - 10:6, 12:6, 12:11, 12:16, 42:12, 42:13, 69:5
**quote** [11] - 7:23, 19:5, 19:6, 27:17, 46:22, 54:3, 59:11, 60:1, 66:25, 70:3, 89:6
**quote-unquote** [1] - 70:3
**quoted** [1] - 59:15
**quotes** [1] - 11:8

## R

**R.S** [1] - 17:18
**R.S.M** [6] - 17:2, 17:12, 54:11, 86:17, 86:20, 87:1
**R.S.M.'s** [1] - 19:8
**raise** [5] - 3:9, 18:17, 48:7, 55:21, 56:5
**raised** [9] - 7:6, 45:10, 57:11, 72:23, 77:8, 77:19, 80:2, 82:24, 102:19
**raising** [4] - 21:13, 21:16, 73:13, 80:15
**ranking** [2] - 45:7, 63:21
**rapid** [2] - 15:2, 15:11
**rather** [2] - 71:24, 89:8
**RDR** [1] - 103:12
**RDR-CRR** [1] - 103:12
**reach** [1] - 14:13
**reached** [1] - 42:16
**read** [9] - 19:14, 63:25, 78:9, 78:12, 78:13, 79:3, 79:4, 79:21, 80:12
**reading** [4] - 27:22, 29:24, 44:14, 81:7
**real** [1] - 26:13
**realistically** [2] - 12:8, 71:16
**really** [21] - 4:14, 4:24, 14:24, 19:20, 32:3, 34:18, 39:3, 39:21, 45:3, 45:8, 49:5, 53:12, 79:4, 79:17, 85:17, 91:10, 94:17, 97:1, 97:9, 99:16, 100:21
**Realtime** [1] - 1:23
**rearrest** [1] - 13:21
**reason** [13] - 13:25, 14:12, 29:19, 35:1, 35:7, 37:3, 42:7, 43:22, 68:14, 75:15, 77:2, 93:18, 97:21
**reasonable** [27] -

26:22, 27:4, 49:3, 59:9, 59:12, 59:13, 59:15, 59:18, 61:19, 62:6, 62:16, 62:18, 62:23, 63:18, 64:18, 65:15, 71:24, 73:5, 73:14, 73:20, 74:5, 74:11, 74:19, 74:20, 83:5, 93:1, 93:3
**reasonably** [2] - 44:18, 59:4
**reasoning** [2] - 73:11, 75:9
**reasons** [3] - 8:13, 76:5, 95:12
**receive** [3] - 27:25, 61:15, 61:24
**received** [1] - 30:17
**receiving** [2] - 31:14, 48:12
**recent** [6] - 20:8, 28:14, 62:1, 76:16, 77:22, 94:21
**recently** [2] - 20:13, 22:15
**recognition** [1] - 19:13
**record** [29] - 3:5, 4:4, 8:24, 11:3, 12:12, 24:11, 26:5, 27:3, 33:25, 35:3, 52:5, 54:24, 65:19, 68:12, 68:21, 69:20, 85:2, 86:5, 86:23, 94:5, 94:17, 95:7, 98:1, 98:6, 98:13, 99:17, 101:11, 102:11, 103:8
**Record** [1] - 1:25
**recording** [3] - 42:22, 42:24, 43:21
**records** [3] - 55:11, 55:23, 67:23
**redact** [1] - 65:1
**redressability** [2] - 75:19, 75:20
**Reeves** [2] - 103:6, 103:12
**REEVES** [2] - 1:22, 103:12
**refer** [3] - 55:5, 61:11, 65:10
**reference** [2] - 20:1, 64:12
**referenced** [1] - 43:11
**references** [1] - 62:9
**referring** [1] - 96:16
**reflect** [1] - 83:15
**reflected** [2] - 40:12, 42:20
**refresher** [2] - 61:24, 93:11
**refused** [1] - 81:2
**regard** [1] - 42:14
**regarding** [3] - 20:3, 58:24, 88:21
**regardless** [4] - 10:24, 19:2, 21:18, 30:23
**Regents** [1] - 81:1
**Registered** [1] - 1:22
**regs** [2] - 28:17, 29:24
**regular** [3] - 72:11, 92:8, 95:15
**regulating** [1] - 66:22
**regulation** [6] - 9:12, 9:24, 10:3, 24:19, 66:22, 91:2
**regulations** [7] - 27:24, 28:9, 29:4, 43:2, 43:3, 87:16, 103:8
**regulatory** [1] - 6:11
**reiterate** [2] - 15:24, 98:17
**rejected** [2] - 8:2, 20:13
**rejects** [1] - 20:3
**related** [4] - 45:12, 50:3, 78:19, 91:4
**release** [5] - 26:16, 26:17, 59:13, 82:25, 83:25
**relevance** [1] - 19:23
**relevant** [5] - 21:20, 54:7, 70:21, 70:23, 96:2
**relied** [1] - 79:7
**relief** [42] - 4:7, 4:8, 7:9, 7:12, 7:20, 8:11, 16:17, 22:2, 23:25, 29:10, 29:13, 39:16, 39:17, 39:19, 39:21, 40:3, 40:10, 40:24, 41:6, 41:16, 44:19, 45:14, 45:15, 45:19, 47:2, 49:14, 49:24, 71:8, 77:11, 77:12, 77:16, 77:17, 77:18, 78:16, 78:17, 78:18, 78:22, 78:25, 79:14, 100:13
**relying** [2] - 8:14, 8:17
**remain** [1] - 67:1
**remains** [1] - 69:23
**remarks** [1] - 4:15
**remember** [1] - 7:1
**remembering** [1] - 21:9
**Removal** [1] - 61:4
**removal** [70] - 5:14, 6:5, 6:11, 17:1, 17:4, 17:5, 17:15, 17:17, 17:21, 17:23, 17:25, 18:1, 18:2, 18:11, 18:14, 18:15, 18:16, 18:19, 18:20, 18:22, 19:2, 19:7, 19:9, 19:15, 20:19, 20:24, 21:6, 21:7, 21:12, 21:18, 21:19, 21:22, 23:16, 23:17, 32:14, 32:16, 44:15, 44:16, 56:12, 56:13, 66:11, 66:23, 67:9, 67:11, 67:13, 80:8, 80:9, 80:13, 80:14, 80:15, 80:18, 80:20, 81:4, 81:5, 81:9, 81:10, 81:19, 81:22, 81:24, 82:1, 82:5, 82:7, 82:11, 82:12, 82:14, 82:15, 82:16, 93:23
**renew** [3] - 32:6, 32:7, 96:20
**renewal** [3] - 32:9, 96:18, 96:19
**Reno** [1] - 19:19
**repeated** [3] - 11:5, 12:17, 27:2
**repeatedly** [4] - 11:4, 19:12, 25:20, 64:19
**repetition** [2] - 7:24, 12:8
**reply** [5] - 20:22, 32:3, 52:2, 54:8, 94:3
**REPORTER** [1] - 103:13
**Reporter** [4] - 1:22, 1:23, 1:23, 103:6
**reporting** [1] - 15:15
**reports** [1] - 28:21
**represent** [2] - 35:15, 38:1
**representation** [1] - 98:2
**representative** [4] - 37:8, 38:5, 38:6, 51:18
**representatives** [2] - 35:18, 51:10
**request** [7] - 23:19, 29:17, 40:1, 40:18, 45:20, 45:22, 58:19
**requested** [9] - 7:10, 7:12, 23:1, 39:16, 40:11, 41:5, 41:17, 43:14, 45:15
**requests** [3] - 25:13, 39:19, 69:3
**require** [7] - 9:24, 27:24, 29:5, 29:14, 89:18, 89:20
**required** [23] - 9:17, 10:4, 10:9, 12:20, 24:13, 28:3, 28:9, 28:16, 29:12, 29:24, 42:6, 43:5, 46:19, 47:2, 49:7, 53:3, 59:19, 61:21, 62:8, 64:1, 93:1, 95:15
**requirement** [2] - 11:4, 13:14
**requirements** [12] - 6:6, 6:12, 6:25, 13:5, 16:9, 19:24, 25:4, 34:18, 62:13, 75:20, 77:1, 89:16
**requires** [5] - 6:25, 9:12, 43:9, 55:18, 74:18
**requiring** [4] - 43:6, 74:13, 89:17, 89:19
**requisite** [1] - 59:19
**resolve** [1] - 78:15
**resolved** [1] - 32:18
**resources** [7] - 15:6, 15:11, 15:16, 15:21, 16:3, 76:9, 100:19
**respect** [18] - 14:4, 14:25, 18:10, 20:11, 27:11, 30:5, 30:19, 33:21, 65:21, 66:1, 80:9, 80:19, 90:9, 92:5, 94:7, 94:9, 99:14, 100:9
**respond** [3] - 70:9, 101:16, 102:20
**response** [8] - 15:2, 15:3, 15:11, 25:21, 36:17, 41:15, 41:20, 41:21
**responses** [2] - 38:4, 38:7
**rest** [3] - 75:21, 86:14, 101:11
**restrains** [1] - 79:23
**restricted** [1] - 24:3
**result** [1] - 41:14
**results** [1] - 11:10
**retrospect** [1] - 64:22
**review** [13] - 16:14, 16:21, 17:1, 18:10, 18:14, 19:17, 20:17, 57:9, 80:8, 81:3, 82:4, 82:8, 90:3
**reviewing** [2] - 49:22, 80:4
**revoked** [3] - 54:21, 55:17, 59:2
**Revoking** [1] - 55:17
**rights** [1] - 83:16
**Rights** [1] - 2:4
**risk** [34] - 7:21, 8:5, 9:3, 9:18, 10:3, 13:20, 13:23, 16:1, 34:1, 35:11, 36:5, 36:14, 36:25, 37:14, 37:22, 38:11, 41:9, 42:25, 46:22, 47:23, 52:25, 53:4, 53:6, 53:19, 53:21, 54:7, 56:19, 83:13, 87:15, 91:19, 96:4, 96:5, 99:24
**risks** [2] - 57:25, 58:2
**Road** [1] - 1:16
**role** [1] - 10:6
**Rose** [1] - 3:13
**ROSE** [1] - 2:4
**round** [1] - 27:15
**round-ups** [1] - 27:15
**Rule** [1] - 93:10
**Rules** [2] - 27:6, 27:10

## S

**Saadulloev** [2] - 20:19, 21:8
**Safe** [2] - 11:22, 84:13
**safety** [3] - 4:18, 41:10, 100:14
**sanction** [1] - 5:14
**sanctuary** [2] - 4:17, 4:19
**sandbox** [1] - 16:20
**satisfied** [2] - 14:3, 40:19
**satisfy** [1] - 13:5
**saving** [1] - 39:18
**saw** [1] - 55:21
**scenario** [1] - 47:11
**scene** [1] - 88:7
**schedule** [1] - 47:8
**scope** [6] - 4:9, 19:12, 22:25, 23:19, 44:19, 47:15
**scour** [1] - 47:3
**scoured** [1] - 79:11
**scrutiny** [1] - 61:22
**second** [8] - 9:15, 9:16, 10:5, 24:23, 41:11, 90:17, 91:4,

92:10
**Secretary** [1] - 59:10
**secretary** [1] - 24:20
**section** [2] - 73:7, 77:9
**Section** [10] - 6:25, 12:20, 16:17, 40:3, 40:11, 40:17, 46:20, 73:6, 77:13, 89:12
**Sections** [2] - 16:16, 22:3
**secure** [1] - 30:19
**SECURITY** [1] - 1:6
**Security** [3] - 3:3, 24:14, 81:1
**see** [15] - 48:15, 55:1, 55:11, 55:23, 55:24, 56:6, 57:14, 58:18, 61:7, 64:1, 67:25, 68:5, 79:11, 79:12, 79:18
**seeing** [1] - 86:8
**seek** [6] - 17:1, 22:10, 23:9, 30:23, 31:12, 84:6
**seeking** [13] - 4:7, 7:20, 15:1, 18:3, 18:14, 22:17, 36:3, 39:21, 44:15, 49:17, 89:21, 90:12, 97:4
**seeks** [3] - 40:3, 46:15, 89:7
**seem** [1] - 43:4
**seemingly** [1] - 6:15
**sees** [1] - 44:22
**senior** [9] - 24:14, 63:21, 63:23, 64:3, 64:15, 64:20, 71:23, 72:9, 74:15
**sense** [5] - 35:17, 55:13, 67:3, 97:17, 98:19
**sensitive** [1] - 64:25
**sent** [2] - 56:23, 79:6
**September** [1] - 59:8
**sequence** [1] - 17:11
**serve** [1] - 15:18
**served** [2] - 20:18, 67:24
**Service** [3] - 23:5, 78:3, 78:19
**services** [7] - 14:21, 14:24, 14:25, 15:1, 15:3, 15:14, 100:22
**serving** [1] - 100:22
**set** [1] - 4:24
**settlement** [2] - 29:22
**settling** [1] - 43:15
**several** [2] - 33:19, 59:6
**Shah** [2] - 3:6, 3:21
**SHAH** [88] - 1:13, 3:6, 3:12, 3:21, 5:7, 5:11, 5:16, 6:7, 6:13, 6:20, 7:5, 7:15, 8:4, 8:13, 8:20, 9:21, 10:15, 10:23, 12:10, 13:11, 13:16, 14:2, 14:14, 14:18, 17:7, 17:11, 17:24, 18:8, 19:11, 20:7, 20:9, 21:2, 21:24, 22:12, 22:19, 25:1, 27:5, 29:1, 29:16, 30:4, 31:21, 31:25, 32:15, 32:19, 32:23, 33:7, 33:12, 33:15, 34:6, 36:10, 36:15, 36:22, 37:12, 38:4, 38:7, 38:17, 38:23, 39:6, 39:20, 40:14, 41:21, 42:13, 43:10, 43:21, 44:4, 44:21, 45:5, 45:18, 47:17, 48:21, 48:24, 49:15, 50:11, 50:21, 94:4, 94:20, 94:23, 96:9, 97:14, 98:5, 98:10, 99:6, 99:12, 101:4, 101:8, 101:25, 102:9, 102:15
**sheet** [1] - 66:24
**shift** [1] - 16:10
**shoehorned** [1] - 23:24
**short** [3] - 28:16, 61:6, 87:25
**show** [16] - 7:21, 7:23, 9:5, 9:23, 26:6, 39:3, 39:7, 40:25, 50:7, 71:9, 90:4, 91:1, 94:18, 95:7, 97:8, 98:17
**showing** [3] - 16:1, 25:16, 75:17
**shown** [2] - 14:4, 71:11
**shows** [3] - 8:24, 9:25, 96:5
**sides** [2] - 4:4, 87:20
**signal** [1] - 75:6
**significant** [1] - 50:9
**silence** [4] - 64:5, 64:9, 65:13, 102:12
**silent** [3] - 31:20, 88:19, 88:24
**similar** [2] - 21:9, 46:8
**Simon** [7] - 43:17, 61:3, 67:20, 67:25, 68:4, 91:12, 98:25
**Simon's** [3] - 61:12, 61:14, 86:25
**simple** [4] - 30:3, 53:22, 54:18, 68:24
**simply** [6] - 9:8, 24:1, 29:7, 64:11, 73:3, 76:21
**single** [7] - 9:5, 19:14, 47:24, 70:18, 72:23, 72:24, 74:25
**sit** [2] - 99:1, 99:2
**situation** [7] - 37:4, 41:9, 48:12, 82:4, 82:9, 90:10, 96:17
**situations** [1] - 18:5
**six** [1] - 95:2
**sleep** [1] - 34:10
**slides** [1] - 64:23
**slightly** [2] - 27:13, 33:16
**slow** [2] - 42:9, 91:5
**small** [1] - 101:25
**social** [2] - 14:24, 60:11
**society** [2] - 34:1, 35:2
**soft** [2] - 27:22, 28:14
**solely** [3] - 8:14, 8:17, 75:21
**someone** [11] - 11:10, 33:15, 34:3, 34:8, 34:22, 39:8, 39:9, 53:21, 53:22, 58:12, 96:20
**someplace** [1] - 85:12
**somewhat** [1] - 4:12
**Sonja** [2] - 103:6, 103:12
**SONJA** [2] - 1:22, 103:12
**sorry** [1] - 102:17
**sort** [9] - 10:1, 10:18, 11:13, 11:24, 29:23, 36:6, 36:9, 89:13, 96:4
**sought** [2] - 36:25, 100:14
**speaking** [2] - 9:15, 27:1
**speaks** [1] - 64:9
**specific** [13] - 6:21, 18:5, 46:25, 47:24, 49:1, 50:2, 58:13, 66:11, 73:17, 83:16, 83:19, 84:2, 86:13
**specifically** [29] - 22:3, 25:15, 29:17, 40:25, 54:16, 55:23, 56:6, 56:21, 56:24, 57:5, 57:6, 57:8, 57:13, 57:16, 58:11, 58:12, 58:18, 61:14, 66:7, 68:22, 77:13, 80:14, 94:6, 97:13, 97:19, 97:20, 98:2, 101:15
**specificity** [2] - 25:24, 48:18
**specifics** [1] - 31:11
**specified** [1] - 84:3
**spectrum** [1] - 74:20
**speculating** [2] - 8:10, 73:13
**speculation** [3] - 70:4, 72:19, 73:14
**spend** [3] - 75:15, 76:18, 76:20
**spokespeople** [1] - 89:16
**spokesperson** [12] - 24:18, 26:19, 26:20, 27:2, 60:9, 61:9, 61:18, 62:4, 62:21, 64:16, 65:14, 92:25
**spokeswoman** [1] - 4:18
**spot** [1] - 99:1
**staff** [2] - 15:14, 15:17
**stake** [1] - 4:11
**stand** [1] - 62:15
**standard** [14] - 12:20, 12:23, 25:22, 26:1, 62:25, 64:2, 64:8, 65:13, 65:16, 71:24, 73:18, 74:15, 89:10, 99:7
**standards** [1] - 61:13
**standing** [50] - 7:17, 7:18, 7:19, 8:3, 10:6, 13:2, 13:3, 13:5, 13:6, 13:8, 13:12, 13:14, 13:19, 13:25, 14:1, 14:2, 14:3, 14:5, 14:7, 14:8, 14:11, 14:13, 14:15, 14:17, 14:18, 15:23, 16:13, 34:10, 50:18, 71:8, 72:17, 72:18, 72:24, 73:12, 73:15, 75:17, 75:21, 75:22, 75:24, 76:2, 76:4, 76:12, 76:21, 76:24, 77:1, 77:3, 77:5, 89:2, 90:3
**start** [10] - 3:19, 3:23, 4:2, 7:18, 16:24, 41:18, 51:25, 52:7, 71:5, 94:5
**started** [1] - 41:23
**starts** [2] - 18:10, 52:2
**state** [2] - 11:21, 61:7
**statement** [10] - 11:2, 25:25, 26:24, 26:25, 43:15, 44:25, 45:24, 59:11, 61:16
**statements** [35] - 4:21, 11:5, 12:11, 12:13, 12:15, 12:17, 12:24, 24:13, 24:16, 24:19, 24:20, 25:2, 25:6, 25:15, 25:19, 26:3, 26:7, 26:20, 27:9, 31:3, 45:7, 59:7, 60:2, 60:5, 60:18, 60:25, 62:13, 63:15, 69:14, 83:2, 83:15, 94:5, 99:25, 100:4
**STATES** [1] - 1:1
**states** [1] - 66:25
**States** [15] - 2:7, 3:3, 7:3, 15:2, 33:2, 33:4, 34:20, 34:21, 35:13, 36:24, 37:21, 67:1, 67:3, 103:6, 103:9
**stating** [3] - 12:19, 59:9, 59:13
**status** [63] - 5:9, 9:13, 15:1, 18:3, 31:23, 32:1, 32:2, 32:5, 32:6, 32:7, 32:20, 32:22, 33:2, 33:16, 34:22, 35:4, 35:9, 35:11, 35:13, 35:17, 35:19, 35:21, 35:25, 36:4, 36:13, 37:10, 37:11, 38:2, 38:20, 38:24, 39:1, 42:25, 51:9, 51:12, 51:16, 51:17, 52:24, 55:10, 55:12, 55:15, 55:17, 55:18, 56:3, 56:9, 56:10, 58:24, 59:1, 59:2, 66:3, 89:8, 89:9, 89:18, 89:21, 89:23, 91:19, 93:23, 96:15, 96:19, 96:20, 96:21
**statute** [24] - 9:11, 9:12, 9:23, 10:3, 10:4, 19:6, 35:6, 42:6, 53:14, 53:15, 54:2, 57:22, 61:21, 62:9, 64:4, 74:2, 74:8, 74:10, 74:12, 79:1, 81:7, 82:13, 84:4,

91:1
**statutes** [1] - 80:12
**statutory** [7] - 6:6, 6:11, 16:8, 16:18, 16:21, 19:6, 25:4
**stay** [11] - 3:24, 40:1, 40:11, 40:15, 40:18, 40:21, 73:2, 73:11, 75:4, 75:14, 77:10
**stayed** [1] - 72:25
**staying** [1] - 40:4
**stenographic** [1] - 103:7
**Stenographic** [1] - 1:25
**step** [2] - 55:18, 76:14
**steps** [1] - 88:12
**still** [7] - 11:14, 14:11, 18:1, 23:10, 23:11, 74:22, 100:18
**stop** [10] - 28:16, 41:12, 41:13, 45:12, 47:20, 59:22, 73:5, 73:20, 74:11, 74:21
**stopped** [2] - 9:8, 58:6
**stops** [5] - 47:13, 48:20, 50:4, 59:23, 74:5
**strange** [2] - 95:11, 95:22
**Street** [5] - 1:13, 1:18, 2:2, 2:5, 2:8
**street** [1] - 27:16
**stressing** [1] - 99:15
**strict** [1] - 11:3
**strictures** [1] - 71:17
**strips** [1] - 81:17
**strong** [3] - 28:14, 50:1, 83:8
**strongest** [1] - 9:23
**structure** [1] - 31:7
**structured** [1] - 34:16
**struggling** [1] - 90:20
**stuff** [1] - 64:25
**subchapter** [1] - 77:13
**subclass** [9] - 35:11, 35:19, 36:4, 36:5, 36:13, 36:14, 51:12, 51:18
**subclasses** [2] - 35:10, 51:5
**subject** [16] - 4:25, 8:9, 16:14, 17:9, 22:10, 32:14, 37:25, 38:1, 39:24, 50:2, 70:4, 71:1, 71:7, 72:17, 80:14, 89:24
**subjected** [1] - 31:23
**submission** [1] - 29:18
**submissions** [1] - 99:16
**submit** [8] - 45:20, 45:25, 46:1, 50:12, 50:15, 100:10, 102:1, 102:4
**submitted** [21] - 8:22, 9:23, 9:25, 10:18, 11:8, 11:18, 28:18, 29:16, 30:7, 31:20, 42:20, 44:23, 46:4, 61:2, 62:25, 63:21, 64:5, 84:17, 86:22, 88:19, 99:20
**submitting** [2] - 101:15, 101:20
**subordinate** [1] - 31:2
**subsection** [1] - 18:12
**substantial** [3] - 8:5, 13:20, 16:1
**success** [2] - 41:1, 90:5
**sue** [2] - 7:19, 13:8
**suffered** [2] - 76:17, 76:19
**suffice** [1] - 26:9
**suffices** [1] - 15:23
**sufficient** [8] - 8:5, 24:23, 49:9, 59:22, 65:25, 70:24, 74:11, 76:24
**suggest** [5] - 33:25, 46:21, 74:24, 98:7, 99:6
**suggestion** [1] - 47:17
**suggests** [1] - 86:20
**Suite** [4] - 1:13, 1:16, 2:2, 2:5
**summarizing** [1] - 52:3
**summer** [2] - 40:16, 71:3
**superfluous** [1] - 40:12
**supervising** [1] - 50:3
**supervisor** [3] - 57:20, 62:15, 99:2
**supplement** [5] - 68:21, 69:20, 101:14, 102:18, 102:21
**supplemental** [4] - 101:2, 101:3, 101:11, 102:8
**supplementation** [1] - 101:20
**support** [7] - 30:7, 55:5, 83:8, 87:10, 98:6, 98:13, 102:7
**supporting** [2] - 8:16, 25:14
**supposed** [7] - 16:20, 48:16, 57:2, 66:6, 80:17, 92:5, 100:23
**Supreme** [16] - 7:22, 7:25, 8:2, 19:11, 19:19, 33:3, 34:19, 70:25, 71:6, 75:7, 75:10, 76:16, 80:24, 81:1, 81:2, 81:6
**surge** [2] - 11:19, 84:12
**surprise** [2] - 7:11, 42:19
**suspected** [5] - 5:4, 5:5, 5:9, 44:18, 78:4
**suspicion** [27] - 26:22, 27:4, 49:3, 59:9, 59:12, 59:14, 59:16, 59:18, 61:19, 62:6, 62:16, 62:18, 62:23, 63:18, 64:18, 65:15, 71:24, 73:5, 73:14, 73:21, 74:5, 74:11, 74:19, 74:21, 83:5, 93:1, 93:3
**swallow** [1] - 19:14
**sweep** [1] - 19:18
**sworn** [3] - 86:5, 99:21, 102:12
**systematic** [1] - 99:22

## T

**table** [2] - 3:7, 3:17
**talks** [2] - 61:13, 76:8
**target** [1] - 58:11
**targeted** [27] - 54:14, 55:7, 55:10, 56:6, 56:21, 57:5, 57:6, 57:8, 57:13, 57:14, 57:16, 58:12, 66:7, 68:22, 70:15, 93:22, 97:13, 97:16, 97:18, 97:19, 97:20, 98:3, 98:8, 98:15, 98:17, 98:19, 99:16
**targeting** [3] - 55:23, 58:18, 70:12
**targets** [2] - 72:1, 83:12
**taxpayers** [2] - 34:5, 34:6
**Tazu** [6] - 21:9, 81:20, 82:3, 82:6, 82:7, 82:16
**team** [3] - 50:12, 60:12, 101:5
**temporary** [1] - 51:16
**ten** [4] - 48:15, 48:19, 48:20, 92:4
**term** [8] - 14:21, 14:24, 15:1, 53:14, 69:13, 69:18, 69:23, 98:15
**terms** [8] - 29:8, 42:17, 49:22, 58:8, 63:18, 68:25, 74:8, 74:9
**test** [1] - 84:9
**testify** [4] - 47:9, 65:4, 65:5, 65:9
**testifying** [1] - 65:9
**text** [4] - 46:13, 54:2, 77:12, 79:4
**textual** [1] - 54:2
**Thanksgiving** [2] - 101:16, 102:23
**THE** [226] - 1:1, 1:9, 1:12, 2:1, 2:7, 3:9, 3:14, 3:18, 4:1, 5:8, 5:12, 5:17, 5:19, 5:24, 6:8, 6:14, 6:21, 7:6, 7:16, 8:7, 8:19, 9:11, 10:5, 10:21, 12:3, 13:1, 13:12, 13:24, 14:10, 14:16, 16:10, 17:8, 17:20, 18:5, 19:4, 20:6, 20:8, 20:15, 21:23, 21:25, 22:13, 22:21, 22:23, 23:13, 23:21, 24:4, 24:7, 26:19, 27:12, 29:9, 29:21, 31:19, 31:22, 32:10, 32:18, 32:20, 33:5, 33:9, 33:14, 34:5, 35:7, 36:12, 36:21, 37:8, 37:17, 38:5, 38:14, 38:18, 39:5, 39:14, 40:2, 40:22, 42:12, 42:17, 43:20, 43:25, 44:13, 45:3, 45:6, 46:12, 48:19, 48:22, 48:25, 49:20, 50:15, 50:23, 51:8, 51:14, 51:20, 51:23, 52:1, 52:17, 52:21, 53:6, 53:8, 53:17, 53:24, 54:1, 54:24, 55:1, 55:7, 55:20, 56:4, 56:15, 56:20, 56:23, 57:2, 57:8, 57:11, 57:19, 58:1, 58:9, 58:17, 59:6, 59:23, 60:1, 60:8, 60:16, 60:23, 61:1, 61:16, 62:3, 62:10, 62:14, 62:20, 63:3, 63:7, 63:10, 63:14, 63:20, 64:14, 65:2, 65:12, 65:23, 66:1, 66:6, 66:10, 66:16, 66:20, 67:12, 67:18, 67:23, 68:10, 68:18, 69:2, 69:7, 69:16, 69:22, 70:21, 71:5, 72:8, 72:14, 72:21, 73:10, 74:9, 74:24, 75:11, 75:13, 76:1, 76:7, 76:11, 76:25, 77:6, 77:21, 78:9, 78:16, 79:3, 79:11, 80:1, 80:24, 81:11, 81:13, 82:3, 82:16, 82:22, 83:22, 84:6, 84:9, 85:2, 85:7, 85:11, 85:17, 85:21, 86:1, 86:14, 86:22, 87:2, 87:12, 87:21, 88:5, 88:10, 88:16, 88:18, 89:5, 90:1, 90:17, 91:10, 91:16, 91:23, 92:1, 92:10, 92:17, 92:23, 93:6, 93:13, 93:17, 94:1, 94:3, 94:19, 94:21, 96:6, 97:11, 97:19, 98:9, 98:25, 99:11, 101:1, 101:6, 101:9, 101:19, 101:23, 102:6, 102:10, 102:16, 102:21, 103:2
**themselves** [11] - 25:3, 28:20, 28:22, 30:11, 39:11, 43:12, 43:16, 44:5, 85:12, 86:4, 86:8
**theories** [2] - 14:7, 80:16
**theory** [3] - 13:18, 74:3, 74:7
**thinking** [1] - 36:16
**Third** [4] - 81:20, 82:3, 82:8, 82:18
**thorough** [1] - 20:2
**threat** [1] - 4:18
**threatened** [3] - 7:23, 12:8, 71:17

**three** [4] - 13:5, 18:2, 48:14, 80:19
**thrown** [3] - 41:8, 41:18, 63:19
**tied** [3] - 21:12, 47:7, 81:4
**ties** [3] - 9:6, 54:5, 54:12
**timeline** [1] - 68:15
**timely** [3] - 32:5, 32:6, 96:18
**timing** [4] - 17:8, 97:19, 97:23, 101:1
**tip** [1] - 49:25
**tips** [2] - 41:4, 90:6
**Title** [3] - 84:24, 85:10, 88:2
**title** [1] - 61:6
**today** [7] - 6:22, 7:21, 11:14, 65:9, 101:18, 101:19, 101:24
**tomorrow** [4] - 101:8, 101:9, 101:21, 102:3
**toothless** [1] - 99:16
**topic** [1] - 27:13
**torn** [3] - 34:10, 39:25, 100:16
**totally** [2] - 31:20, 74:12
**touch** [3] - 46:2, 46:7, 92:22
**tout** [1] - 11:13
**toward** [1] - 76:9
**towards** [1] - 11:11
**TPS** [21] - 32:1, 32:4, 32:6, 32:7, 54:18, 54:20, 55:10, 55:19, 55:21, 55:24, 56:11, 58:19, 58:24, 67:8, 93:23, 96:15, 96:17, 96:19, 96:20, 96:21
**traceability** [1] - 75:20
**track** [1] - 38:15
**trained** [9] - 28:24, 60:13, 60:15, 60:24, 61:17, 63:5, 63:9, 63:11, 93:10
**training** [27] - 27:19, 27:25, 28:3, 28:9, 28:11, 28:16, 29:11, 29:14, 29:17, 29:20, 29:23, 29:25, 30:17, 30:20, 31:13, 31:17, 31:18, 60:14, 60:16, 61:15, 61:24, 61:25, 64:23, 88:13, 88:20, 88:21, 88:23
**trainings** [1] - 62:1
**Transcript** [1] - 1:25
**transcript** [4] - 101:17, 103:7, 103:7, 103:8
**TRANSCRIPT** [1] - 1:9
**trial** [1] - 91:8
**Tricia** [1] - 59:10
**trickier** [1] - 33:16
**tried** [1] - 96:9
**true** [4] - 26:7, 30:8, 59:4, 103:7
**Trump** [1] - 11:20
**Truong** [1] - 3:17
**TRUONG** [1] - 2:8
**try** [1] - 47:18
**trying** [6] - 10:20, 35:8, 35:24, 36:6, 47:20, 97:4
**Tuesday** [1] - 102:22
**Turn** [1] - 11:9
**turn** [6] - 13:1, 68:7, 71:6, 77:7, 82:22, 97:15
**turning** [1] - 7:9
**turns** [3] - 54:20, 59:4, 86:15
**twice** [4] - 8:19, 8:20, 60:14, 61:24
**two** [49] - 3:19, 8:15, 8:21, 14:7, 17:8, 24:21, 26:6, 26:8, 30:24, 31:5, 31:20, 32:10, 35:10, 36:8, 38:4, 38:7, 39:11, 39:12, 41:7, 41:16, 48:14, 50:7, 51:5, 54:13, 61:1, 61:2, 62:20, 62:25, 63:20, 64:2, 64:9, 64:15, 64:20, 65:5, 71:13, 76:3, 76:5, 80:4, 83:11, 83:12, 87:20, 88:18, 90:7, 93:22, 94:7, 96:12, 99:21, 101:18
**tying** [1] - 54:1
**types** [3] - 80:13, 89:22, 100:6
**typically** [1] - 89:9

## U

**U.S** [12] - 1:6, 3:16, 3:17, 5:6, 23:5, 28:6, 29:25, 51:10, 51:16, 52:25, 66:22, 78:19
**U.S.C** [4] - 16:16, 40:3, 46:20, 61:25
**unauthorized** [1] - 84:5
**uncertainty** [2] - 41:9, 41:19
**under** [43] - 6:2, 6:16, 6:18, 6:25, 12:20, 22:7, 22:16, 23:4, 23:6, 23:7, 23:11, 24:13, 25:5, 27:9, 28:9, 34:23, 37:12, 40:3, 40:11, 42:6, 42:15, 46:8, 47:2, 53:3, 59:20, 61:8, 62:7, 65:17, 65:18, 67:5, 70:7, 70:15, 73:6, 73:19, 74:12, 77:10, 77:16, 84:17, 88:22, 89:12, 90:25, 93:2, 95:15
**undercut** [1] - 10:20
**undergo** [1] - 28:3
**understood** [5] - 21:11, 50:11, 90:18, 92:11, 101:22
**undisputed** [2] - 52:6, 52:8
**unequivocal** [1] - 83:1
**unequivocally** [1] - 12:19
**unintended** [4] - 41:10, 42:18, 43:11, 44:8
**Union** [1] - 1:12
**unique** [1] - 83:11
**United** [18] - 2:7, 3:3, 7:3, 15:2, 20:13, 33:2, 33:4, 34:20, 34:21, 35:13, 36:24, 37:21, 45:1, 48:4, 67:1, 67:3, 103:6, 103:9
**UNITED** [1] - 1:1
**University** [1] - 81:1
**unknown** [1] - 30:5
**unlawful** [29] - 8:14, 8:17, 9:13, 13:21, 17:13, 18:23, 19:1, 21:16, 23:10, 32:22, 35:17, 37:10, 37:15, 39:1, 42:7, 42:8, 42:25, 44:11, 46:6, 47:21, 51:12, 70:6, 71:1, 71:23, 80:21, 91:18, 97:3, 97:5, 100:6
**unlawfully** [10] - 7:3, 17:12, 34:23, 36:25, 39:24, 54:23, 67:7, 70:10, 80:17, 96:22
**unless** [3] - 28:15, 46:17, 48:9
**unquote** [1] - 70:3
**unrelated** [1] - 23:16
**untenable** [2] - 41:14, 90:10
**unusual** [1] - 34:2
**unwritten** [3] - 25:7, 25:10, 25:14
**up** [7] - 5:21, 10:11, 22:21, 36:10, 47:7, 62:15, 72:21
**updated** [1] - 10:16
**ups** [1] - 27:15
**urging** [1] - 81:3
**USCIS** [5] - 55:17, 59:2, 66:24, 67:1, 67:5
**useless** [1] - 62:14
**uses** [3] - 59:9, 59:11, 59:13

## V

**vacated** [5] - 22:15, 22:18, 23:22, 79:5, 79:14
**vacatur** [1] - 77:10
**vague** [3] - 46:25, 57:3, 97:22
**valid** [5] - 32:1, 32:7, 88:22, 96:21
**van** [1] - 9:9
**vans** [1] - 18:24
**various** [5] - 33:19, 41:5, 53:20, 63:24, 90:4
**varying** [1] - 33:20
**vehicle** [1] - 53:23
**verbatim** [2] - 33:3, 33:5
**version** [1] - 100:11
**versus** [9] - 3:3, 15:20, 25:9, 26:14, 33:4, 34:20, 36:7, 53:6, 81:20
**vest** [1] - 84:21
**vetted** [2] - 60:6, 60:12
**view** [7] - 18:7, 60:3, 69:19, 75:10, 75:11, 75:15, 102:13
**vigorously** [1] - 41:3
**violate** [1] - 87:16
**violated** [2] - 4:23, 68:24
**violates** [2] - 39:7, 46:23
**violation** [9] - 9:14, 47:6, 52:15, 66:22, 67:4, 78:1, 78:5, 90:15, 91:7
**violations** [1] - 5:10
**violence** [2] - 54:19, 68:24
**virtually** [1] - 33:5
**visa** [2] - 58:4, 68:23
**vivid** [1] - 90:21
**voluntarily** [2] - 76:13, 100:19
**voluntary** [1] - 16:5
**Voters** [1] - 15:19
**vs** [1] - 1:5

## W

**wage** [1] - 70:13
**wants** [2] - 16:6, 34:25
**warrant** [36] - 5:4, 6:4, 7:4, 9:18, 19:25, 23:11, 34:17, 37:19, 40:9, 42:3, 42:5, 43:22, 43:24, 43:25, 44:3, 46:9, 46:19, 52:18, 53:1, 57:9, 57:17, 57:19, 57:23, 58:21, 58:24, 59:17, 78:6, 93:4, 98:21, 98:22, 98:23, 99:4, 99:5, 99:7, 99:23
**warrantless** [30] - 6:10, 6:15, 6:23, 16:7, 22:7, 23:4, 23:8, 23:10, 23:17, 24:12, 31:4, 35:10, 35:19, 36:4, 36:13, 36:18, 37:1, 40:6, 42:8, 46:16, 49:2, 52:11, 52:21, 66:20, 70:6, 71:25, 76:10, 80:5, 87:14, 100:6
**warrants** [5] - 23:6, 44:16, 44:17, 99:10
**Washington** [9] - 1:11, 1:14, 1:16, 1:19, 1:24, 2:1, 2:3, 2:9, 62:2
**watered** [1] - 99:8
**ways** [3] - 16:4, 53:20, 74:10
**wear** [1] - 85:20
**wearing** [8] - 30:10, 84:21, 85:15, 85:22, 86:8, 86:19, 96:8
**Wednesday** [2] - 1:10, 101:19
**week** [1] - 101:16
**weeks** [1] - 101:18
**wellbeing** [1] - 100:15

**Western** [3] - 20:15, 20:20, 21:2
**whatsoever** [1] - 9:7
**Whereas** [1] - 89:6
**White** [3] - 12:6, 12:16, 69:9
**whole** [2] - 7:6, 24:8
**Widas** [4] - 10:7, 24:21, 24:23
**widely** [1] - 19:18
**withstand** [1] - 61:21
**witnesses** [3] - 47:8, 65:3, 65:4
**Women** [1] - 15:19
**wonder** [1] - 48:8
**word** [6] - 39:5, 69:11, 97:16, 98:7, 99:15
**words** [2] - 33:10, 97:12
**wordsmith** [2] - 49:21, 50:12
**wore** [1] - 86:3
**Workers** [4] - 20:13, 29:21, 45:1, 48:5
**works** [1] - 32:5
**write** [1] - 99:3
**writing** [2] - 12:18, 26:13
**written** [3] - 24:19, 31:1, 48:25

**Y**

**year** [2] - 60:15, 61:24
**years** [3] - 33:22, 44:7, 95:2
**yourself** [1] - 3:5
**YULIE** [1] - 1:15
**Yulie** [2] - 3:7, 3:11