APPEAL,TYPE–D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:25–cv–03417–BAH</u>

| | |
|---|---|
| ESCOBAR MOLINA et al v. U.S. DEPARTMENT OF HOMELAND SECURITY et al | Date Filed: 09/25/2025 |
| Assigned to: Judge Beryl A. Howell | Jury Demand: None |
| Cause: 05:0706 Judicial Review of Agency Actions | Nature of Suit: 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

| | | |
|---|---|---|
| **JOSE' ESCOBAR MOLINA** | represented by | **Adina Bassin Appelbaum** |

**JOSE' ESCOBAR MOLINA**   represented by   **Adina Bassin Appelbaum**
AMICA CENTER FOR IMMIGRANT
RIGHTS
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
202–899–1412
Fax: 202–331–3341
Email: adina@amicacenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aditi Shah**
AMERICAN CIVIL LIBERTIES UNION
OF DC
529 14th Street NW
Ste 722
Washington, DC 20045
202–457–0800
Email: ashah@acludc.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Widas**
COVINGTON AND BURLING
850 10th St. NW
Washington, DC 20001
202–662–5770
Email: awidas@cov.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ama Frimpong–Houser**
CASA
8151 15th Ave
Hyattsville, MD 20783
240–485–8844
Email: afrimpong@wearecasa.org

1

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hassan Ahmad**
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
202–662–6000
Email: hahmad@cov.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ian Austin Rose**
AMICA CENTER FOR IMMIGRANT
RIGHTS
Immigration Impact Lab
1 N. Charles St
Suite 2305
Baltimore, MD 21201
202–788–2509
Email: austin.rose@amicacenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jehan Aslam Patterson**
COVINGTON & BURLING LLP
850 10th Street NW
Washington, DC 20001
202–662–5187
Fax: 202–383–8118
Email: jpatterson@cov.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sirine Shebaya**
NATIONAL IMMIGRATION PROJECT
1763 Columbia Road NW
Suite 175 #896645
Washington, DC 20009
202–656–4788
Email: sirine@nipnlg.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Austin T Riddick**
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
202–662–5039

Email: ariddick@cov.com
*ATTORNEY TO BE NOTICED*

**Graham Michael Glusman**
COVINGTON & BURLING LLP
30 Hudson Yards
New York, NY 10001
212–841–1000
Email: gglusman@cov.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
WASHINGTON LAWYERS'
COMMITTEE
700 14th St. NW, Ste. 400
Washington, DC 20003
202–319–1044
Email: madeleine_gates@washlaw.org
*ATTORNEY TO BE NOTICED*

**Samantha Hsieh**
AMICA CENTER FOR IMMIGRANT
RIGHTS
1025 Connecticut Avenue NW
Suite 701
Washington, DC 20036
202–908–6902
Email: sam@amicacenter.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
ACLU FOUNDATION OF THE
DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, DC 20045
202–601–4267
Email: smichelman@acludc.org
*ATTORNEY TO BE NOTICED*

**Sean Berman**
COVINGTON & BURLING, LLP
One CityCenter
850 10th St NW
Washington, DC 20001
202–662–5644
Email: sberman@cov.com
*ATTORNEY TO BE NOTICED*

**Yulie Landan**
NATIONAL IMMIGRATION PROJECT

1763 Columbia Road NW
Suite 175 #896645
Washington, DC 20009
213–430–5521
Email: yulie@nipnlg.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**B.S.R.**                        represented by    **Adina Bassin Appelbaum**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aditi Shah**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Widas**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ama Frimpong–Houser**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hassan Ahmad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ian Austin Rose**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jehan Aslam Patterson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sirine Shebaya**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Austin T Riddick**
(See above for address)

4

*ATTORNEY TO BE NOTICED*

**Graham Michael Glusman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samantha Hsieh**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Berman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yulie Landan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

N.S.                          represented by  **Adina Bassin Appelbaum**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aditi Shah**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Widas**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ama Frimpong–Houser**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hassan Ahmad**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ian Austin Rose**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jehan Aslam Patterson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sirine Shebaya**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Austin T Riddick**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Graham Michael Glusman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samantha Hsieh**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Berman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yulie Landan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**R.S.M.**                    represented by **Adina Bassin Appelbaum**
                              (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aditi Shah**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Widas**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ama Frimpong–Houser**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hassan Ahmad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ian Austin Rose**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jehan Aslam Patterson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sirine Shebaya**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Austin T Riddick**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Graham Michael Glusman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samantha Hsieh**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Berman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yulie Landan**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**CASA, INC.**
*on behalf of themselves and others*
*similarly situated*

represented by **Adina Bassin Appelbaum**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aditi Shah**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Widas**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ama Frimpong–Houser**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hassan Ahmad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ian Austin Rose**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jehan Aslam Patterson**
(See above for address)

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sirine Shebaya**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Austin T Riddick**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Graham Michael Glusman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samantha Hsieh**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Berman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yulie Landan**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**U.S. DEPARTMENT OF**                    represented by    **John Bardo**
**HOMELAND SECURITY**                                      DOJ–USAO
                                                            601 D Street NW
                                                            Washington, DC 20530
                                                            (202) 870–6770
                                                            Email: john.bardo@usdoj.gov
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**KRISTI L. NOEM**
*in her official capacity as Secretary of the
U.S. Department of Homeland Security*

represented by **John Bardo**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF JUSTICE**

represented by **John Bardo**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Defendant**

**PAMELA J. BONDI**
*in her official capacity as Attorney
General of the United States*

represented by **John Bardo**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT**

represented by **John Bardo**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Defendant**

**TODD M. LYONS**
*in his official capacity as Acting Director
of U.S. Immigration and Customs
Enforcement*

represented by **John Bardo**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. CUSTOMS AND BORDER
PROTECTION**

represented by **John Bardo**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Defendant**

**RODNEY S. SCOTT**
*in his official capacity as Commissioner
of U.S. Customs and Border Protection*

represented by **John Bardo**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. BORDER PATROL**

represented by **John Bardo**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Defendant**

**MICHAEL W. BANKS**
*in his official capacity as Chief of U.S.*
*Border Patrol*

represented by **John Bardo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DRUG ENFORCEMENT**
**ADMINISTRATION**

represented by **John Bardo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**TERRANCE C. COLE**
*in his official capacity as Administrator of*
*the U.S. Drug Enforcement*
*Administration*

represented by **John Bardo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**WASHINGTON TEACHERS' UNION**

represented by **Alice C. Hwang**
JAMES & HOFFMAN, P.C.
1629 K Street, NW, Suite 1050
Washington, DC 20006
202–496–0500
Fax: 202-496-0555
Email: achwang@jamhoff.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**D.C. ALLIANCE FOR CHARTER**
**TEACHERS AND STAFF LOCAL**
**1927**

represented by **Alice C. Hwang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**INDIVIDUAL EDUCATORS**

represented by **Alice C. Hwang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**LEGAL AID DC**

represented by **Megan Browder**
LEGAL AID DC
1331 H St. NW
Suite 350
Washington, DC 20005
202–661–5967
Email: mbrowder@legalaiddc.org

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**BUSBOYS AND POETS**                    represented by    **Barak Cohen**
PERKINS COIE LLP
700 13th Street, NW
Suite 600
Washington, DC 20005
(202) 654−6337
Fax: (202) 654−9997
Email: bcohen@perkinscoie.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline M. Mew**
PERKINS COIE LLP
700 13th Street, NW
Suite 800
Washington, DC 20005−3960
202−654−1767
Fax: 202−654−6211
Email: cmew@perkinscoie.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**CHEFS STOPPING AAPI HATE**             represented by    **Barak Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline M. Mew**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**COUNCIL FIRE**                         represented by    **Barak Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline M. Mew**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**IMMIGRANT FOOD**                       represented by    **Barak Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline M. Mew**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**IMPACT GC, LLP**                    represented by  **Barak Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline M. Mew**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**MASA GROUP**                    represented by  **Barak Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline M. Mew**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**THRIFT THE DISTRICT**                    represented by  **Barak Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline M. Mew**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**ERIK BRUNER–YANG**                    represented by  **Barak Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline M. Mew**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**8TH DAY FAITH COMMUNITY**                    represented by  **Soojin Jeong**
HOGAN LOVELLS US LLP
555 13th St, NW
Washington, DC 20004

202−637−5600
Email: soojin.jeong@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**ALL SOULS CHURCH, UNITARIAN**          represented by   **Soojin Jeong**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**CARDINAL MCELROY, ROMAN**          represented by   **Soojin Jeong**
**CATHOLIC ARCHBISHOP OF**                           (See above for address)
**WASHINGTON**                                        *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**THE CATHOLIC UNIVERSITY OF**          represented by   **Soojin Jeong**
**AMERICA**                                          (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**CHRIST LUTHERAN CHURCH,**          represented by   **Soojin Jeong**
**INC.**                                             (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**DUMBARTON UNITED**          represented by   **Soojin Jeong**
**METHODIST CHURCH**                         (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**EPISCOPAL DIOCESE OF**          represented by   **Soojin Jeong**
**WASHINGTON**                                   (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**THE FESTIVAL CENTER**          represented by   **Soojin Jeong**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**FIRST CONGREGATIONAL UCC**

represented by **Soojin Jeong**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**FRANCISCAN ACTION NETWORK**

represented by **Soojin Jeong**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**LUTHER PLACE MEMORIAL CHURCH**

represented by **Soojin Jeong**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**METROPOLITAN WASHINGTON D.C. SYNOD OF THE EVANGELICAL LUTHERAN CHURCH IN AMERICA, INC.**

represented by **Soojin Jeong**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**PAX CHRISTI USA**

represented by **Soojin Jeong**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**PEACE FELLOWSHIP CHURCH**

represented by **Soojin Jeong**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**REVEREND DR. ROSE HERR WAYLAND, SIXTH PRESBYTERIAN CHURCH**

represented by **Soojin Jeong**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**REVEREND RACHEL CORNWELL, DUMBARTON UNITED METHODIST CHURCH**

represented by **Soojin Jeong**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**SACRED HEART ROMAN CATHOLIC CHURCH**               represented by   **Soojin Jeong**
                                                                      (See above for address)
                                                                      *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*

Amicus

**SIXTH PRESBYTERIAN CHURCH**            represented by   **Soojin Jeong**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

Amicus

**ST. MATTHEWS EPISCOPAL**               represented by   **Soojin Jeong**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

Amicus

**ST. STEPHEN AND THE INCARNATION EPISCOPAL CHURCH**    represented by   **Soojin Jeong**
                                                                        (See above for address)
                                                                        *LEAD ATTORNEY*
                                                                        *ATTORNEY TO BE NOTICED*

Amicus

**WASHINGTON DC CONGREGATION, COMMUNITY OF CHRIST**    represented by   **Soojin Jeong**
                                                                       (See above for address)
                                                                       *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

Amicus

**WASHINGTON NATIONAL CATHEDRAL**        represented by   **Soojin Jeong**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/25/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC–11982927) filed by B.S.R., JOS ESCOBAR MOLINA, N.S., R.S.M., CASA, INC.. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons, # 13 Summons)(Patterson, Jehan) (Entered: 09/25/2025) |
| 09/25/2025 | 2 | SEALED MOTION to Proceed Under Pseudonym filed by B.S.R., CASA, INC., JOS ESCOBAR MOLINA, N.S., R.S.M. (Attachments: # 1 Exhibit 1, # 2 Text of Proposed Order)(Patterson, Jehan) (Entered: 09/25/2025) |
| 09/25/2025 | 3 | NOTICE of Appearance by Sean Berman on behalf of All Plaintiffs (Berman, Sean) (Entered: 09/25/2025) |

| 09/25/2025 | 4 | NOTICE of Appearance by Adina Bassin Appelbaum on behalf of All Plaintiffs (Appelbaum, Adina) (Entered: 09/25/2025) |
|---|---|---|
| 09/25/2025 | 5 | NOTICE of Appearance by Ian Austin Rose on behalf of B.S.R., CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M. (Rose, Ian) (Entered: 09/25/2025) |
| 09/25/2025 | 6 | NOTICE of Appearance by John Bardo on behalf of MICHAEL W. BANKS, PAMELA J. BONDI, TERRANCE C. COLE, TODD M. LYONS, KRISTI NOEM, RODNEY S. SCOTT, U.S. BORDER PATROL, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. DRUG ENFORCEMENT ADMINISTRATION, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (Bardo, John) (Entered: 09/25/2025) |
| 09/25/2025 | 7 | NOTICE of Appearance by Austin T Riddick on behalf of B.S.R., CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M. (Riddick, Austin) (Entered: 09/25/2025) |
| 09/25/2025 | 8 | NOTICE of Appearance by Aditi Shah on behalf of All Plaintiffs (Shah, Aditi) (Main Document 8 replaced on 10/3/2025) (zjm). (Entered: 09/25/2025) |
| 09/25/2025 | 9 | NOTICE of Appearance by Scott Michelman on behalf of All Plaintiffs (Michelman, Scott) (Entered: 09/25/2025) |
| 09/26/2025 | 10 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by B.S.R., CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Notice of Filing, # 2 Declaration, # 3 Declaration, # 4 Declaration, # 5 Text of Proposed Order)(Patterson, Jehan) (Entered: 09/26/2025) |
| 09/30/2025 | 11 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Graham M. Glusman, Filing fee $ 100, receipt number ADCDC–11996005. Fee Status: Fee Paid. by B.S.R., CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Patterson, Jehan) (Entered: 09/30/2025) |
| 09/30/2025 | 12 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Eva Lilienfeld, Filing fee $ 100, receipt number ADCDC–11996012. Fee Status: Fee Paid. by B.S.R., CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Patterson, Jehan) (Entered: 09/30/2025) |
| 10/01/2025 | 13 | MEMORANDUM OPINION AND ORDER: The Court ORDERS that: 1) Plaintiffs' 2 Motion to Proceed Under Pseudonyms is GRANTED, subject to any further consideration by the United States District Judge to whom this case is randomly assigned; 2) All parties shall use the pseudonyms listed in the Complaint in all documents filed in this action; 3) Plaintiffs' 10 Motion for Leave to File Document Under Seal is GRANTED and deemed filed; and 4) Within seven days of this Order, Plaintiffs shall file a sealed declaration containing their real names and residential addresses, which Defendants may access. Signed by Chief Judge James E. Boasberg on October 1, 2025. (lcjeb1) (Entered: 10/01/2025) |
| 10/01/2025 | 14 | NOTICE of Appearance by Sirine Shebaya on behalf of All Plaintiffs (Shebaya, Sirine) (Main Document 14 replaced on 10/3/2025) (zjm). (Entered: 10/01/2025) |
| 10/01/2025 | 15 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Samantha Hsieh, Filing fee $ 100, receipt number ADCDC–11997680. Fee Status: Fee Paid. by B.S.R., |

| | | |
|---|---|---|
| | | CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M.. (Attachments: # 1 Declaration for Pro Hac Vice Admission, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Appelbaum, Adina) (Attachment 1 replaced on 10/3/2025) (zjm). (Entered: 10/01/2025) |
| 10/02/2025 | 16 | NOTICE of Appearance by Madeleine Gates on behalf of All Plaintiffs (Gates, Madeleine) (Entered: 10/02/2025) |
| 10/03/2025 | | Case Assigned to Judge Paul L. Friedman. (zmtm) (Entered: 10/03/2025) |
| 10/03/2025 | 17 | MOTION for Preliminary Injunction *, to Stay Agency Action, and for Provisional Class Certification* by B.S.R., CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M.. (Attachments: # 1 Declaration Widas, # 2 Declaration Escobar Molina, # 3 Declaration B.S.R., # 4 Declaration N.S., # 5 Declaration R.S.M., # 6 Declaration CASA, Inc., # 7 Declaration Ana Gracia, # 8 Declaration Anamaria Doe, # 9 Declaration Andres Doe, # 10 Declaration Antony Doe, # 11 Declaration B.R.G., # 12 Declaration C., # 13 Declaration Camilo Doe, # 14 Declaration Cristina Doe, # 15 Declaration Daniela Anello, # 16 Declaration Darwin, # 17 Declaration Elias Doe, # 18 Declaration Fiona Lewis, # 19 Declaration Franco Doe, # 20 Declaration Javier Doe, # 21 Declaration Julio Doe, # 22 Declaration Luz Doe, # 23 Declaration M.P., # 24 Declaration Mateo Doe, # 25 Declaration Flores Roman, # 26 Declaration W.G.M., # 27 Declaration Y.R.M., # 28 Text of Proposed Order)(Patterson, Jehan). Added MOTION to Stay, MOTION to Certify Class on 10/15/2025 (zjm). (Entered: 10/03/2025) |
| 10/03/2025 | | NOTICE OF ERROR regarding 15 MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Samantha Hsieh, Filing fee $ 100, receipt number ADCDC–11997680. Fee Status: Fee Paid.. The following error(s) need correction: Declaration must have an original, ink signature. Please refile using the event Declaration. (zjm) (Entered: 10/03/2025) |
| 10/03/2025 | 18 | Consent MOTION For Non–Plaintiff Declarants to Proceed Under Pseudonyms by B.S.R., CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M.. (Attachments: # 1 Text of Proposed Order)(Patterson, Jehan) (Entered: 10/03/2025) |
| 10/03/2025 | 19 | MOTION to Certify Class by B.S.R., CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M.. (Attachments: # 1 Declaration Appelbaum, # 2 Declaration Shah, # 3 Declaration Huddleston, # 4 Declaration Shebaya, # 5 Declaration Gates, # 6 Declaration Patterson, # 7 Text of Proposed Order)(Patterson, Jehan) (Entered: 10/03/2025) |
| 10/03/2025 | 20 | Case randomly reassigned to Judge Beryl A. Howell. Judge Paul L. Friedman is no longer assigned to the case. (rj) (Entered: 10/03/2025) |
| 10/03/2025 | | MINUTE ORDER (paperless), upon consideration of plaintiffs' 17 Motion for Preliminary Injunction, for a Stay, and for Provisional Class Certification, DIRECTING the parties to confer and file jointly, by October 7, 2025, a proposed schedule to govern briefing on plaintiffs' motion, including the parties' position on consolidating plaintiffs' motion with summary judgment on the merits of this case. Signed by Judge Beryl A. Howell on October 3, 2025. (lcbah2) (Entered: 10/03/2025) |
| 10/06/2025 | | MINUTE ORDER (paperless), GRANTING plaintiffs' 11 and 12 Motions for Leave to Appear Pro Hac Vice as to Graham M. Glusman and Eva Lilienfeld; and DENYING WITHOUT PREJUDICE plaintiffs' 15 Motion for Leave to Appear Pro Hac Vice as to Samantha Hsieh for failure to include an ink signature, *see* Notice of Error (Oct. 3, |

| | | |
|---|---|---|
| | | 2025), and failure to include an office telephone number as required by LCvR 83.2(c)(2). Signed by Judge Beryl A. Howell on October 6, 2025. (lcbah2) (Entered: 10/06/2025) |
| 10/06/2025 | 21 | STANDING ORDER. Signed by Judge Beryl A. Howell on October 6, 2025. (lcbah2) (Entered: 10/06/2025) |
| 10/06/2025 | | MINUTE ORDER (paperless), upon consideration of plaintiffs' 18 Consent Motion for Non–Plaintiff Declarants to Proceed Under Pseudonyms, consented to by the government, *id.* at 2, GRANTING plaintiffs' motion that the 16 non–plaintiff declarants who submitted declarations in support of plaintiffs' 17 Motion for Preliminary Injunction, to Stay Agency Action, and for Preliminary Class Certification, and 19 Motion for Class Certification, be allowed to proceed under pseudonyms, for the reasons articulated in *Molina v. DHS*, No. 25–cv–3417 (JEB), 2025 WL 2800807, *2 (D.D.C. Oct. 1, 2025), ECF No. 13, namely that, at this stage, the risk of retaliation declarants face and the possible effects on future immigration proceedings outweigh the public's interest in knowing the declarants' identities. Signed by Judge Beryl A. Howell on October 6, 2025. (lcbah2) (Entered: 10/06/2025) |
| 10/06/2025 | | Set/Reset Deadlines: Plaintiffs Sealed Declaration due by 10/8/2025. (mac) (Entered: 10/06/2025) |
| 10/06/2025 | | Set/Reset Deadlines: Parties Joint Proposed Schedule due by 10/7/2025 (mac) (Entered: 10/06/2025) |
| 10/06/2025 | 22 | SUMMONS (12) Issued Electronically as to All Defendants, and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zmtm) (Entered: 10/06/2025) |
| 10/06/2025 | | NOTICE OF NEW CASE ERROR The following error(s) need correction: Missing summonses– U.S. government. When naming a U.S. government agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit additional summons for the U.S. Attorney using the event Request for Summons to Issue. (zmtm) (Entered: 10/06/2025) |
| 10/06/2025 | 23 | DECLARATION by B.S.R., CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M. re 15 MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Samantha Hsieh, Filing fee $ 100, receipt number ADCDC–11997680. Fee Status: Fee Paid.. (Appelbaum, Adina) (Entered: 10/06/2025) |
| 10/06/2025 | 24 | REQUEST FOR SUMMONS TO ISSUE filed by B.S.R., JOSE' ESCOBAR MOLINA, N.S., R.S.M., CASA, INC.. Related document: 1 Complaint, filed by R.S.M., B.S.R., CASA, INC., N.S., JOSE' ESCOBAR MOLINA.(Patterson, Jehan) (Entered: 10/06/2025) |
| 10/06/2025 | 25 | SEALED DOCUMENT filed by B.S.R., CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M. re 13 Order,,, Set Deadlines,,, Memorandum & Opinion,, (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Declaration)(Patterson, Jehan) (Entered: 10/06/2025) |
| 10/06/2025 | | MINUTE ORDER (paperless) GRANTING plaintiffs' 15 Motion for Leave for Samantha Hsieh to Appear *Pro Hac Vice*, as supplemented by plaintiffs' 23 Declaration with corrected signature and phone number. Samantha Hsieh may enter an appearance *pro hac vice* for the purpose of representing plaintiffs. Counsel admitted *pro hac vice* should register for e–filing via PACER and file a notice of appearance |

| | | |
|---|---|---|
| | | pursuant to LCrR 44.5(a). <u>Click for instructions.</u> Signed by Judge Beryl A. Howell on October 6, 2025. (lcbah2) (Entered: 10/06/2025) |
| 10/07/2025 | <u>26</u> | NOTICE of Appearance by Samantha Hsieh on behalf of All Plaintiffs (Hsieh, Samantha) (Entered: 10/07/2025) |
| 10/07/2025 | <u>27</u> | PROPOSED BRIEFING SCHEDULE by B.S.R., CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M.. (Attachments: # <u>1</u> Text of Proposed Order)(Shah, Aditi) (Entered: 10/07/2025) |
| 10/07/2025 | <u>28</u> | NOTICE of Appearance by Graham Michael Glusman on behalf of All Plaintiffs (Glusman, Graham) (Entered: 10/07/2025) |
| 10/07/2025 | | MINUTE ORDER (paperless), upon consideration of parties' <u>27</u> Joint Status Report, issuing the following SCHEDULING ORDER in accord with the dates proposed jointly by the parties:<br>1. by October 29, 2025, defendants shall file any combined response to plaintiffs' <u>17</u> Motion for Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification and <u>19</u> Motion for Class Certification; and<br>2. by November 7, 2025, plaintiffs shall file any reply in support of those motions. Any necessary hearing will be scheduled following consideration of the briefing submitted by the parties.<br><br>Signed by Judge Beryl A. Howell on October 7, 2025. (lcbah2) (Entered: 10/07/2025) |
| 10/08/2025 | | Set/Reset Deadlines: Defendants Combined Responses To Plaintiffs' <u>17</u> Motion for Preliminary Injunction, To Stay Agency Action, And For Provisional Class Certification And <u>19</u> Motion For Class Certification due by 10/29/2025. Plaintiff Reply due by 11/7/2025. (mac) (Entered: 10/08/2025) |
| 10/08/2025 | <u>29</u> | SUMMONS (1) Issued Electronically as to U.S. Attorney (mg) (Entered: 10/08/2025) |
| 10/08/2025 | <u>30</u> | SEALED DOCUMENT (DECLARATION) filed by B.S.R., CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M.. re <u>2</u> Sealed Motion to Proceed Under Pseudonym. (This document is SEALED and only available to authorized persons.) (Attachments: # <u>1</u> Declaration, # <u>2</u> Declaration)(mg) (Entered: 10/08/2025) |
| 10/08/2025 | <u>31</u> | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by CASA, INC. (Patterson, Jehan) (Entered: 10/08/2025) |
| 10/09/2025 | <u>32</u> | NOTICE of Appearance by Hassan Ahmad on behalf of All Plaintiffs (Ahmad, Hassan) (Entered: 10/09/2025) |
| 10/10/2025 | <u>33</u> | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 10/8/2025. Answer due for ALL FEDERAL DEFENDANTS by 12/7/2025. (Attachments: # <u>1</u> Acknowledgment of Service)(Shah, Aditi) (Entered: 10/10/2025) |
| 10/17/2025 | <u>34</u> | MOTION for Leave to File *Supplemental Declarations in Support of Motion for Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification* by B.S.R., CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M.. (Attachments: # <u>1</u> Declaration Second Widas Decl., # <u>2</u> Declaration Pena Decl., # <u>3</u> Declaration Lopez Funez Decl., # <u>4</u> Declaration Reyes Solis Decl., # <u>5</u> Text of Proposed Order)(Patterson, Jehan) (Entered: 10/17/2025) |
| 10/17/2025 | <u>35</u> | |

| | | |
|---|---|---|
| | | MOTION for Non–Plaintiff Declarant to Proceed Under Pseudonym by B.S.R., CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M.. (Attachments: # 1 Text of Proposed Order)(Patterson, Jehan) (Entered: 10/17/2025) |
| 10/20/2025 | | MINUTE ORDER (paperless) GRANTING plaintiffs' 34 Motion for Leave to File Supplemental Declarations in Support of Motion for Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification, pursuant to LCvR 65.1, given that more than a week remains before the government's response to plaintiffs' 17 Motion for Preliminary Injunction is due and the government "takes no position" on the filing of supplemental declarations, *id.* at 1 n.1; and GRANTING plaintiffs' unopposed 35 Motion for Non–Plaintiff Declarant to Proceed Under Pseudonym, for the same reasons explained in the October 6, 2025, Minute Order. The declarations and exhibits attached to the Motion for Leave to File Supplemental Declarations are considered filed and need not be re–docketed. Signed by Judge Beryl A. Howell on October 20, 2025. (lcbah2) (Entered: 10/20/2025) |
| 10/22/2025 | 36 | Unopposed MOTION for Extension of Time to *Oppose Plaintiffs' Motions for Preliminary Injunction and Class Certification* by MICHAEL W. BANKS, PAMELA J. BONDI, TERRANCE C. COLE, TODD M. LYONS, KRISTI NOEM, RODNEY S. SCOTT, U.S. BORDER PATROL, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. DRUG ENFORCEMENT ADMINISTRATION, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Text of Proposed Order)(Bardo, John) (Entered: 10/22/2025) |
| 10/23/2025 | | MINUTE ORDER (paperless), GRANTING defendants' 36 Unopposed Motion for Extension of Time to Oppose Motions for Preliminary Injunction and Class Certification, and DIRECTING defendants to file, by October 31, 2025, any response to plaintiffs' 17 Motion for Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification and 19 Motion to Certify Class. Signed by Judge Beryl A. Howell on October 23, 2025. (lcbah2) (Entered: 10/23/2025) |
| 10/24/2025 | | Set/Reset Deadlines: Defendants Response To Plaintiffs' 17 Motion For Preliminary Injunction, To Stay Agency Action, and for Provisional Class Certification and 19 Motion To Certify Class due by 10/31/2025 (mac) (Entered: 10/24/2025) |
| 10/27/2025 | 37 | MOTION for Leave to File Amicus Brief by WASHINGTON TEACHERS' UNION, D.C. ALLIANCE FOR CHARTER TEACHERS AND STAFF LOCAL 1927, INDIVIDUAL EDUCATORS. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Hwang, Alice) (Entered: 10/27/2025) |
| 10/27/2025 | 38 | NOTICE of Appearance by Alice C. Hwang on behalf of D.C. ALLIANCE FOR CHARTER TEACHERS AND STAFF LOCAL 1927, INDIVIDUAL EDUCATORS, WASHINGTON TEACHERS' UNION (Hwang, Alice) (Entered: 10/27/2025) |
| 10/28/2025 | | MINUTE ORDER (paperless) GRANTING Washington Teachers' Union et al.'s 37 Motion for Leave to File an Amicus Curiae Brief in Support of Plaintiffs, to which plaintiffs consent and defendants "do[] not take a position." *Id.* ¶ 8. Signed by Judge Beryl A. Howell on October 28, 2025. (lcbah2) (Entered: 10/28/2025) |
| 10/28/2025 | 46 | AMICUS BRIEF by D.C. ALLIANCE FOR CHARTER TEACHERS AND STAFF LOCAL 1927, INDIVIDUAL EDUCATORS, WASHINGTON TEACHERS' UNION. (Attachments: # 1 Text of Proposed Order)(mg) (Entered: 10/30/2025) |
| 10/29/2025 | 39 | |

| | | |
|---|---|---|
| | | MOTION for Leave to File Amicus Brief by LEGAL AID DC. (Attachments: # 1 Amicus Brief)(Browder, Megan) (Entered: 10/29/2025) |
| 10/29/2025 | 40 | NOTICE of Appearance by Megan Browder on behalf of LEGAL AID DC (Browder, Megan) (Entered: 10/29/2025) |
| 10/29/2025 | 41 | MOTION for Leave to File Amicus Brief by BUSBOYS AND POETS, CHEFS STOPPING AAPI HATE, COUNCIL FIRE, IMMIGRANT FOOD, IMPACT GC, LLP, MASA GROUP, THRIFT THE DISTRICT, ERIK BRUNER–YANG. (Attachments: # 1 Exhibit 1 – Brief, # 2 Exhibit 2 – Proposed Order, # 3 Exhibit Disclosure Statement)(Mew, Caroline) (Entered: 10/29/2025) |
| 10/29/2025 | 42 | NOTICE of Appearance by Caroline M. Mew on behalf of ERIK BRUNER–YANG, BUSBOYS AND POETS, CHEFS STOPPING AAPI HATE, COUNCIL FIRE, IMMIGRANT FOOD, IMPACT GC, LLP, MASA GROUP, THRIFT THE DISTRICT (Mew, Caroline) (Entered: 10/29/2025) |
| 10/29/2025 | 43 | MOTION for Leave to File Amicus Brief by 8TH DAY FAITH COMMUNITY, ALL SOULS CHURCH, UNITARIAN, CARDINAL MCELROY, ROMAN CATHOLIC ARCHBISHOP OF WASHINGTON, THE CATHOLIC UNIVERSITY OF AMERICA, CHRIST LUTHERAN CHURCH, INC., DUMBARTON UNITED METHODIST CHURCH, EPISCOPAL DIOCESE OF WASHINGTON, THE FESTIVAL CENTER, FIRST CONGREGATIONAL UCC, FRANCISCAN ACTION NETWORK, LUTHER PLACE MEMORIAL CHURCH, METROPOLITAN WASHINGTON D.C. SYNOD OF THE EVANGELICAL LUTHERAN CHURCH IN AMERICA, INC., PAX CHRISTI USA, PEACE FELLOWSHIP CHURCH, REVEREND DR. ROSE HERR WAYLAND, SIXTH PRESBYTERIAN CHURCH, REVEREND RACHEL CORNWELL, DUMBARTON UNITED METHODIST CHURCH, SACRED HEART ROMAN CATHOLIC CHURCH, SIXTH PRESBYTERIAN CHURCH, ST. MATTHEWS EPISCOPAL, ST. STEPHEN AND THE INCARNATION EPISCOPAL CHURCH, WASHINGTON DC CONGREGATION, COMMUNITY OF CHRIST, WASHINGTON NATIONAL CATHEDRAL. (Attachments: # 1 Exhibit A – Brief of Churches, Faith Leaders, and Religious Organizations As Amici Curiae in Support of Plaintiffs, # 2 Text of Proposed Order)(Jeong, Soojin) (Entered: 10/29/2025) |
| 10/29/2025 | 44 | NOTICE of Appearance by Soojin Jeong on behalf of 8TH DAY FAITH COMMUNITY, ALL SOULS CHURCH, UNITARIAN, CARDINAL MCELROY, ROMAN CATHOLIC ARCHBISHOP OF WASHINGTON, CHRIST LUTHERAN CHURCH, INC., DUMBARTON UNITED METHODIST CHURCH, EPISCOPAL DIOCESE OF WASHINGTON, FIRST CONGREGATIONAL UCC, FRANCISCAN ACTION NETWORK, LUTHER PLACE MEMORIAL CHURCH, METROPOLITAN WASHINGTON D.C. SYNOD OF THE EVANGELICAL LUTHERAN CHURCH IN AMERICA, INC., PAX CHRISTI USA, PEACE FELLOWSHIP CHURCH, REVEREND DR. ROSE HERR WAYLAND, SIXTH PRESBYTERIAN CHURCH, REVEREND RACHEL CORNWELL, DUMBARTON UNITED METHODIST CHURCH, SACRED HEART ROMAN CATHOLIC CHURCH, SIXTH PRESBYTERIAN CHURCH, ST. MATTHEWS EPISCOPAL, ST. STEPHEN AND THE INCARNATION EPISCOPAL CHURCH, THE CATHOLIC UNIVERSITY OF AMERICA, THE FESTIVAL CENTER, WASHINGTON DC CONGREGATION, COMMUNITY OF CHRIST, WASHINGTON NATIONAL CATHEDRAL (Jeong, Soojin) (Entered: 10/29/2025) |
| 10/30/2025 | 45 | |

| | | |
|---|---|---|
| | | NOTICE of Appearance by Barak Cohen on behalf of ERIK BRUNER–YANG, BUSBOYS AND POETS, CHEFS STOPPING AAPI HATE, COUNCIL FIRE, IMMIGRANT FOOD, IMPACT GC, LLP, MASA GROUP, THRIFT THE DISTRICT (Cohen, Barak) (Entered: 10/30/2025) |
| 10/30/2025 | | MINUTE ORDER (paperless) GRANTING Legal Aid DC et al.'s 39 Motion for Leave to File an Amici Curiae Brief in Support of Plaintiffs, to which plaintiffs consent and defendants "do[] not take a position." *Id.* at 1. Signed by Judge Beryl A. Howell on October 30, 2025. (lcbah1) (Entered: 10/30/2025) |
| 10/30/2025 | | MINUTE ORDER (paperless) GRANTING Busboys and Poets et al.'s 41 Motion for Leave to File Brief as Amici Curiae in Support of Plaintiffs, to which plaintiffs consent and defendants "take no position." *Id.* at 2. Signed by Judge Beryl A. Howell on October 30, 2025. (lcbah1) (Entered: 10/30/2025) |
| 10/30/2025 | | MINUTE ORDER (paperless) GRANTING 8th Day Faith Community et al.'s 43 Motion for Leave to File Brief as Amici Curiae in Support of Plaintiffs, to which plaintiffs consent and defendants "do not take a position." *Id.* &para 1. Signed by Judge Beryl A. Howell on October 30, 2025. (lcbah1) (Entered: 10/30/2025) |
| 10/30/2025 | 47 | AMICUS BRIEF by LEGAL AID DC. (mg) (Entered: 10/31/2025) |
| 10/30/2025 | 48 | AMICUS BRIEF by ERIK BRUNER–YANG, BUSBOYS AND POETS, CHEFS STOPPING AAPI HATE, COUNCIL FIRE, IMMIGRANT FOOD, IMPACT GC, LLP, MASA GROUP, THRIFT THE DISTRICT. (mg) (Entered: 10/31/2025) |
| 10/30/2025 | 49 | AMICUS BRIEF by 8TH DAY FAITH COMMUNITY, ALL SOULS CHURCH, UNITARIAN, CARDINAL MCELROY, ROMAN CATHOLIC ARCHBISHOP OF WASHINGTON, CHRIST LUTHERAN CHURCH, INC., DUMBARTON UNITED METHODIST CHURCH, EPISCOPAL DIOCESE OF WASHINGTON, FIRST CONGREGATIONAL UCC, FRANCISCAN ACTION NETWORK, LUTHER PLACE MEMORIAL CHURCH, METROPOLITAN WASHINGTON D.C. SYNOD OF THE EVANGELICAL LUTHERAN CHURCH IN AMERICA, INC., PAX CHRISTI USA, PEACE FELLOWSHIP CHURCH, REVEREND DR. ROSE HERR WAYLAND, SIXTH PRESBYTERIAN CHURCH, REVEREND RACHEL CORNWELL, DUMBARTON UNITED METHODIST CHURCH, SACRED HEART ROMAN CATHOLIC CHURCH, SIXTH PRESBYTERIAN CHURCH, ST. MATTHEWS EPISCOPAL, ST. STEPHEN AND THE INCARNATION EPISCOPAL CHURCH, THE CATHOLIC UNIVERSITY OF AMERICA, THE FESTIVAL CENTER, WASHINGTON DC CONGREGATION, COMMUNITY OF CHRIST, WASHINGTON NATIONAL CATHEDRAL. (mg) (Entered: 10/31/2025) |
| 10/31/2025 | 50 | Memorandum in opposition to re 17 MOTION for Preliminary Injunction *, to Stay Agency Action, and for Provisional Class Certification* MOTION to Stay MOTION to Certify Class, 19 MOTION to Certify Class filed by MICHAEL W. BANKS, PAMELA BONDI, TERRANCE C. COLE, TODD M. LYONS, KRISTI NOEM, RODNEY S. SCOTT, U.S. BORDER PATROL, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. DRUG ENFORCEMENT ADMINISTRATION, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Text of Proposed Order)(Bardo, John) (Entered: 10/31/2025) |
| 11/03/2025 | 51 | NOTICE of Appearance by Alexandra Widas on behalf of All Plaintiffs (Widas, Alexandra) (Entered: 11/03/2025) |

| 11/03/2025 | 52 | Consent MOTION For Leave to File Combined Reply in support of Plaintiffs' Motions by JOSE' ESCOBAR MOLINA. (Attachments: # 1 Text of Proposed Order)(Patterson, Jehan) (Entered: 11/03/2025) |
|---|---|---|
| 11/04/2025 | | MINUTE ORDER (paperless) GRANTING plaintiffs' 52 Consent Motion for Leave to File Combined Reply in Support of Plaintiffs' Motions. Signed by Judge Beryl A. Howell on November 4, 2025. (lcbah1) (Entered: 11/04/2025) |
| 11/07/2025 | 53 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Yulie Landan, Filing fee $ 100, receipt number ADCDC–12068838. Fee Status: Fee Paid. by B.S.R., CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M.. (Attachments: # 1 Exhibit Declaration of Yulie Landan, # 2 Exhibit Certificate of Good Standing, # 3 Exhibit Proposed Order)(Shebaya, Sirine) (Entered: 11/07/2025) |
| 11/07/2025 | 54 | REPLY to opposition to motion re 19 Motion to Certify Class, 17 Motion for Preliminary Injunction,,,,, Motion to Stay,,,,, Motion to Certify Class,,,, filed by B.S.R., CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M.. (Patterson, Jehan) (Entered: 11/07/2025) |
| 11/11/2025 | | MINUTE ORDER (paperless) GRANTING the plaintiffs' 53 Motion for Admission Pro Hac Vice. Ms. Yulie Landan may enter an appearance pro hac vice for the purpose of representing the plaintiffs in this action. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Beryl A. Howell on November 11, 2025. (lcbah1) (Entered: 11/11/2025) |
| 11/11/2025 | 55 | NOTICE of Appearance by Yulie Landan on behalf of All Plaintiffs (Landan, Yulie) (Entered: 11/11/2025) |
| 11/12/2025 | | MINUTE ORDER (paperless), upon consideration of 17 Plaintiffs' Motion for a Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification, 19 Plaintiffs' Motion for Class Certification, and related filings, ORDERING the parties to appear on November 19, 2025, at 10:00 a.m. in Courtroom 26A before Judge Beryl A. Howell for a hearing regarding the plaintiffs' motions. Signed by Judge Beryl A. Howell on November 12, 2025. (lcbah1) (Entered: 11/12/2025) |
| 11/12/2025 | | Set/Reset Hearings: Motion Hearing set for 11/19/2025 at 10:00 AM in Courtroom 26A– In Person before Judge Beryl A. Howell. (mac) (Entered: 11/12/2025) |
| 11/17/2025 | 56 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Ama Frimpong, Filing fee $ 100, receipt number ADCDC–12084153. Fee Status: Fee Paid. by B.S.R., CASA, INC., JOSE' ESCOBAR MOLINA, N.S., R.S.M.. (Attachments: # 1 Declaration Exhibit A, Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Appelbaum, Adina) (Entered: 11/17/2025) |
| 11/17/2025 | | MINUTE ORDER (paperless) GRANTING the plaintiffs' 56 Motion for Admission *Pro Hac Vice*. Ms. Ama Frimpong may enter an appearance *pro hac vice* for the purpose of representing the plaintiffs in this action. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Beryl A. Howell on November 17, 2025. (lcbah1) Modified on 11/19/2025. (zalh) (Entered: 11/17/2025) |
| 11/18/2025 | 57 | NOTICE of Appearance by Ama Frimpong–Houser on behalf of All Plaintiffs (Frimpong–Houser, Ama) (Entered: 11/18/2025) |
| 11/18/2025 | | |

| | | |
|---|---|---|
| | | NOTICE: Members of the public or media who wish to listen to live audio of the hearing scheduled for November 19, 2025 at 10:00AM ET, without physically attending the proceeding, may do so by dialing the Toll Free Number: 833–990–9400, Meeting ID: 491822013. Any use of the public access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24–31 (JEB), available here: <https://www.dcd.uscourts.gov/sites/dcd/files/Standing%20Order% 20No.%2024–31_001.pdf > **Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court.** (zalh) (Entered: 11/18/2025) |
| 11/18/2025 | 58 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 10/07/2025. (Attachments: # 1 Copy of return receipt)(Ahmad, Hassan) Modified service date on 11/19/2025 (mg). (Entered: 11/18/2025) |
| 11/18/2025 | 59 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. All Defendants (Attachments: # 1 Copies of return receipts)(Ahmad, Hassan) (Entered: 11/18/2025) |
| 11/18/2025 | 60 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. TERRANCE C. COLE served on 10/20/2025; TODD M. LYONS served on 10/20/2025; U.S. DEPARTMENT OF HOMELAND SECURITY served on 11/4/2025; U.S. DEPARTMENT OF JUSTICE served on 10/8/2025; U.S. DRUG ENFORCEMENT ADMINISTRATION served on 10/10/2025; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT served on 10/28/2025. (See docket entry 59 to view document) (mg) (Entered: 11/19/2025) |
| 11/19/2025 | | Minute Entry for proceedings held before Judge Beryl A. Howell: Motion Hearing held on 11/19/2025 re 17 MOTION for Preliminary Injunction , *to Stay Agency Action, and for Provisional Class Certification* MOTION to Stay MOTION to Certify Class filed by R.S.M., B.S.R., CASA, INC., N.S., JOSE' ESCOBAR MOLINA. Heard and taken under advisement. (Court Reporter Sonja Reeves.) (dot) (Entered: 11/19/2025) |
| 11/20/2025 | 61 | TRANSCRIPT OF MOTION HEARING before Judge Beryl A. Howell held on November 19, 2025; Page Numbers: 1–121. Court Reporter Sonja L. Reeves, RDR, CRR, Telephone number (202) 354–3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |

| | | |
|---|---|---|
| | | Redaction Request due 12/11/2025. Redacted Transcript Deadline set for 12/21/2025. Release of Transcript Restriction set for 2/18/2026.(Reeves, Sonja) (Entered: 11/20/2025) |
| 11/20/2025 | 62 | NOTICE of Proposed Order by JOSE' ESCOBAR MOLINA re 19 MOTION to Certify Class , 17 MOTION for Preliminary Injunction , *to Stay Agency Action, and for Provisional Class Certification* MOTION to Stay MOTION to Certify Class (Attachments: # 1 Text of Proposed Order Preliminary Injunction Motion, # 2 Text of Proposed Order Class Certification Motion)(Patterson, Jehan) (Entered: 11/20/2025) |
| 11/24/2025 | 63 | SUPPLEMENTAL MEMORANDUM to re 50 Memorandum in Opposition,, filed by MICHAEL W. BANKS, PAMELA J. BONDI, TERRANCE C. COLE, TODD M. LYONS, KRISTI NOEM, RODNEY S. SCOTT, U.S. BORDER PATROL, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. DRUG ENFORCEMENT ADMINISTRATION, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Declaration Supplemental Simon Declaration, # 2 Declaration Supplemental Blanchard Declaration, # 3 Text of Proposed Order)(Bardo, John) (Entered: 11/24/2025) |
| 11/25/2025 | 64 | ERRATA by MICHAEL W. BANKS, PAMELA J. BONDI, TERRANCE C. COLE, TODD M. LYONS, KRISTI NOEM, RODNEY S. SCOTT, U.S. BORDER PATROL, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. DRUG ENFORCEMENT ADMINISTRATION, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT re 63 Supplemental Memorandum,,. (Attachments: # 1 Supplement Corrected Supplemental Brief, # 2 Exhibit Redline)(Bardo, John) (Entered: 11/25/2025) |
| 11/25/2025 | 65 | SUPPLEMENTAL MEMORANDUM to re 19 MOTION to Certify Class , 17 MOTION for Preliminary Injunction , *to Stay Agency Action, and for Provisional Class Certification* MOTION to Stay MOTION to Certify Class filed by JOSE' ESCOBAR MOLINA. (Patterson, Jehan) (Entered: 11/25/2025) |
| 11/26/2025 | 66 | ERRATA by JOSE' ESCOBAR MOLINA re 65 Supplemental Memorandum,. (Attachments: # 1 Corrected Supplemental Memorandum, # 2 Corrected Notice of Revised Proposed Orders, # 3 Redline to Supplemental Memorandum, # 4 Redline to Notice of Revised Proposed Orders)(Patterson, Jehan) (Entered: 11/26/2025) |
| 12/02/2025 | 67 | ORDER GRANTING IN PART AND DENYING IN PART plaintiffs' 17 Motion for Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification; and DENYING without prejudice 19 plaintiffs' Motion for Class Certification. See Order for further details. Signed by Judge Beryl A. Howell on December 2, 2025. (lcbah1) (Entered: 12/02/2025) |
| 12/02/2025 | 68 | MEMORANDUM OPINION regarding plaintiffs' 17 Motion for Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification; and plaintiffs' 19 Motion for Class Certification. Signed by Judge Beryl A. Howell on December 2, 2025. (lcbah1) (Entered: 12/02/2025) |
| 12/03/2025 | | DEPOSIT of Funds re 68 in the amount of $ 1.00, Receipt Number 210895. (mg) Modified docket text on 12/4/2025 (mg). (Entered: 12/04/2025) |
| 12/04/2025 | 69 | MOTION for Extension of Time to *Respond to the Complaint* by MICHAEL W. BANKS, PAMELA J. BONDI, TERRANCE C. COLE, TODD M. LYONS, KRISTI |

| | | |
|---|---|---|
| | | NOEM, RODNEY S. SCOTT, U.S. BORDER PATROL, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. DRUG ENFORCEMENT ADMINISTRATION, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Text of Proposed Order)(Bardo, John) (Entered: 12/04/2025) |
| 12/05/2025 | 70 | Memorandum in opposition to re 69 MOTION for Extension of Time to *Respond to the Complaint* filed by JOSE' ESCOBAR MOLINA. (Attachments: # 1 Text of Proposed Order)(Patterson, Jehan) (Entered: 12/05/2025) |
| 12/05/2025 | | MINUTE ORDER (paperless), GRANTING IN PART and DENYING IN PART defendants' 69 Motion for Extension of Time to Respond to Complaint, over plaintiffs' 70 Memorandum in Opposition, and DIRECTING defendants to file, by January 9, 2026, any response to the 1 Complaint, given that plaintiffs have an interest in advancing the case toward discovery and potentially seeking complete relief, including relief sought in plaintiffs' Complaint but not in their 17 Motion for Preliminary Injunction, but that defendants may reasonably need more time to file a response in light of the findings and reasoning from the 68 Memorandum Opinion preliminarily enjoining defendants' policy. Signed by Judge Beryl A. Howell on December 5, 2025. (lcbah2) (Entered: 12/05/2025) |
| 12/08/2025 | | Set/Reset Deadlines: Defendants Response To The 1 Complaint due by 1/9/2026. (mac) (Entered: 12/08/2025) |
| 01/09/2026 | 71 | ANSWER to Complaint by MICHAEL W. BANKS, PAMELA J. BONDI, TERRANCE C. COLE, TODD M. LYONS, KRISTI L. NOEM, RODNEY S. SCOTT, U.S. BORDER PATROL, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. DRUG ENFORCEMENT ADMINISTRATION, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT.(Bardo, John) (Entered: 01/09/2026) |
| 01/23/2026 | 72 | MEET AND CONFER STATEMENT. (Attachments: # 1 Text of Proposed Order)(Shah, Aditi) (Entered: 01/23/2026) |
| 01/26/2026 | | MINUTE ORDER (paperless), upon consideration of the parties' 72 Joint Proposed Schedule, ISSUING the following scheduling order to govern proceedings in this case:<br><br>1. By February 19, 2026, defendants shall produce the administrative record and file the administrative record certified list;<br><br>2. By March 5, 2026, plaintiffs shall file their motion for discovery, if any;<br><br>3. By March 19, 2026, defendants shall file their response to any motion for discovery by plaintiffs; and<br><br>4. By March 26, 2026, plaintiffs shall file their reply in support of any motion for discovery.<br><br>Signed by Judge Beryl A. Howell on January 26, 2026. (lcbah1) (Entered: 01/26/2026) |
| 01/27/2026 | | Set/Reset Deadlines: Motions due by 3/5/2026. Responses due by 3/19/2026 Replies due by 3/26/2026. Defendants Administrative Record due by 02/19/2026. Plaintiffs Motion For Discovery due by 03/05/2026. Defendants Response To Any Motion For |

| | | |
|---|---|---|
| | | Discovery By Plaintiffs due by 03/19/2026. Plaintiffs Reply In Support Of Any Motion For Discovery due by 03/26/2026. (mac) (Entered: 01/27/2026) |
| 02/02/2026 | 73 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 68 Memorandum & Opinion, 67 Order on Motion for Preliminary Injunction,, Order on Motion to Certify Class,, Order on Motion to Stay,,, by KRISTI L. NOEM, TERRANCE C. COLE, U.S. DRUG ENFORCEMENT ADMINISTRATION, U.S. BORDER PATROL, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, TODD M. LYONS, RODNEY S. SCOTT, U.S. DEPARTMENT OF HOMELAND SECURITY, PAMELA J. BONDI, U.S. CUSTOMS AND BORDER PROTECTION, MICHAEL W. BANKS, U.S. DEPARTMENT OF JUSTICE. Fee Status: No Fee Paid. (Bardo, John) (Entered: 02/02/2026) |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSE ESCOBAR MOLINA, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 25-3417 (BAH) |
| DEPARTMENT OF HOMELAND SECURITY, et al., | |
| Defendants. | |

## <u>DEFENDANTS' NOTICE OF APPEAL</u>

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of

Appeals for the District of Columbia Circuit the Court's December 2, 2025 Order (ECF No. 67),

and Memorandum Opinion (ECF No. 68) granting Plaintiffs' motion for a preliminary injunction.

Dated: February 2, 2026
      Washington, DC

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


By:        */s/ John J. Bardo*
      JOHN J. BARDO, D.C. Bar #1655534
      Assistant United States Attorney
      601 D Street, NW
      Washington, DC 20530
      (202) 252-2539

      *Attorneys for the United States of America*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*, |
| Plaintiffs, |
| v. |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, |
| Defendants. |

Civil Action No. 25-3417 (BAH)

Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

This case arises in the wake of a publicly declared emergency in our Nation's Capital explained by the current president, in part, to ensure that "[t]his city will no longer be a sanctuary for illegal alien criminals," Decl. of Alexandra Widas, Pls.' Counsel ("Widas Decl."), Ex. 6,[1] ECF No. 17-1, and in the midst of public announcements by other federal officials that "[c]riminal aliens are a public safety threat, and there should be no place for sanctuary policies that place crime over the community," *id.*, Ex. 10.[2]  Such repeated conjoined use by high-ranking officials of the words "criminal" and "alien" prompts the need for clarification of two fundamental facts in reviewing the two pending motions brought by individual immigrants and an immigrant-focused organization in this case.  First, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States."  *Arizona v. United States*, 567 U.S. 387, 407 (2012) (citing *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984)).  As a legal matter, an immigration

---

[1]    Widas Decl., Ex. 6, ECF No. 17-1 at 43 (Mike Lillis and Rebecca Beitsch, *DC Critics Slam Trump's Crackdown as Power Grab Focused on Immigration* at 3, The Hill (Aug. 20, 2025), https://perma.cc/D259-Q7F4).
[2]    *Id.*, Ex. 10, ECF No. 17-1 at 60 (Hamed Aleaziz et al., *How Washington Became a Testing Ground for ICE* at 4, N.Y. Times (Oct. 1, 2025)).

1

status violation is a *civil* violation, as the D.C. Circuit made clear just a few months ago.  *See N.S. v. Dixon*, 141 F.4th 279, 281-82, 286-87 (D.C. Cir. June 27, 2025) (indicating that immigration arrests are a civil sanction, not a criminal penalty).  Consequently, viewing all immigrants potentially subject to removal as criminals is, as a legal matter, plain wrong.  Second, immigration policy is indisputably important and "can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws."  *Arizona*, 567 U.S. at 395 (citing *Harisiades* v. *Shaughnessy*, 342 U.S. 580, 588-589 (1952)).  Treating all immigrants potentially subject to removal as if they were criminals highlights the Supreme Court's wise caution that "[p]erceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad."  *Id*.

Plaintiffs—whom plaintiffs describe as including Temporary Protected Status holders, immigrant asylum-seekers, and CASA, Inc., a membership organization of immigrants—move to enjoin preliminarily the Department of Homeland Security ("DHS"), its Secretary, and other federal agencies and officers (collectively, "defendants") from conducting warrantless civil immigration arrests in the District of Columbia ("the District") without making individualized probable cause determinations as to each arrestee's risk of escape, as required by 8 U.S.C. § 1357(a)(2), or in the alternative to stay the agency policy permitting such arrests.  *See* Pls.' Motion for a Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification ("Pls.' Prelim. Inj. Mot."), ECF No. 17.  In that motion, plaintiffs also seek provisional certification of a class of individuals "for whom Defendants did not make a pre-arrest, individualized assessment of probable cause as to flight risk," named herein the "Unassessed Escape Risk Class."  Pls.' Notice of Filing Revised Proposed Orders for Plaintiffs' Motions, ECF

No. 62.  Separately, plaintiffs also move for certification of a broader class consisting of all persons who, since August 11, 2025, have been or will be arrested in the District for alleged civil immigration violations without an administrative warrant and without probable cause, and an additional subclass to the Unassessed Escape Risk Class.  *See id.* at 4; *see also* Pls.' Motion for Class Certification ("Pls.' Class Cert. Mot."), ECF No. 19.

Making clear what is not at issue in this lawsuit is helpful at the outset.  Plaintiffs are not challenging the authority of federal law enforcement agents to make criminal arrests—either with a warrant or without a warrant—for suspected *criminal* conduct, whether that suspected criminal conduct is engaged in by a noncitizen or a U.S. citizen.  *See* Nov. 19, 2025 Hearing Transcript ("Hr'g Tr.") at 5:7, ECF No. 61.  Plaintiffs are also not challenging the long-standing authority under the Immigration and Naturalization Act ("INA") for Immigration and Customs Enforcement ("ICE") to make *civil* arrests of noncitizens, pursuant to an administrative warrant, and to detain noncitizens during the pendency of removal proceedings, when the statutory requirements are met. *See* 8 U.S.C. § 1226(a) (authorizing arrest of a noncitizen pursuant to an administrative warrant and detention during the pendency of removal proceedings); *see also* Hr'g Tr. at 6:7.  Nor are plaintiffs challenging the *authority* provided in the INA to make warrantless civil arrests of a noncitizen to facilitate that person's removal from the country, when statutory and regulatory requirements are met.  *See* 8 U.S.C. § 1357(a)(2); *see also* Hr'g Tr. at 6:13.  Plaintiffs are only challenging the *way* that warrantless civil immigration arrests are seemingly being carried out in the District under an allegedly new administration policy—*i.e.*, a policy that plaintiffs claim fails to meet legal requirements under section 1357(a)(2) of the INA requiring officers to have probable cause to believe the noncitizen is in the United States unlawfully *and* is likely to escape before a warrant may be obtained.  *See* Hr'g Tr. at 6:20, 7:5.

For the reasons discussed below, plaintiffs' motion to enjoin preliminarily defendants from continuing any policy or practice of conducting warrantless civil immigration arrests in the District without making individualized probable cause determinations as to each arrestee's risk of escape, as required by 8 U.S.C. § 1357(a)(2), is granted, and a final decision on the requested certification of a class and both subclasses will be reserved for a later time. Defendants are preliminarily enjoined from enforcing their policy of conducting warrantless civil immigration arrests without probable cause to believe that the arrestee is likely to escape before an administrative warrant can be obtained; and only plaintiffs' proposed Unassessed Escape Risk Class is provisionally certified.[3]

## I.    BACKGROUND

The relevant factual and procedural background is summarized below.

### A.    Factual Background

#### 1.    *Declaration of Crime Emergency in the District on August 11, 2025, With Direction for "Mass" Immigration Arrests*

On August 11, 2025, the current presidential administration declared a "crime emergency" in the District of Columbia, prompting the deployment of 800 National Guard members from the District and other parts of the United States and removal of control of the D.C. Metropolitan Police Department from local government officials. Compl. ¶ 22, ECF No. 1 (quoting Exec. Order No. 14333, 90 Fed. Reg. 39301 (Aug. 11, 2025)). Four days later, U.S. Attorney General Pamela Bondi ordered the Mayor of the District to provide assistance with "the enforcement of federal immigration law" and with "locating, apprehending, and detaining aliens unlawfully present in the

---

[3]    Since plaintiffs' motion for a preliminary injunction is granted, as explained below, plaintiffs' alternative request to stay the agency action need not be considered. *See* Pls.' Prelim. Inj. Mot., ECF No. 17; Hr'g Tr. at 40:20-21 (plaintiffs' counsel agreeing that "if the injunction is granted, then I don't think we need the stay order").

United States." *Id.* ¶ 23 (quoting Order of the Att'y Gen., Order No. 6372-2025, Restoring Safety and Security to the District of Columbia (Aug. 15, 2025)).

According to plaintiffs, the administration's push for "mass immigration arrests" effected a change in the policy and procedures by which such civil arrests are conducted. Compl. ¶ 19. For approximately 15 years, ICE, a component of DHS, has required its officers to fill out a form identifying an arrest target—listing the targeted person's appearance, home, and occupation, and cataloging their criminal history—and to gain supervisor approval, before making an immigration arrest. *Id.* at ¶ 31.[4]

Plaintiffs allege that defendants have instituted a new "arrest first, ask questions later" policy of making warrantless civil immigration arrests without probable cause to believe someone is both in the United States unlawfully and an escape risk. Pls.' Prelim. Inj. Mot. at 5-6 (emphasis omitted). In support, plaintiffs proffer evidence of defendants repeatedly admitting to making warrantless civil arrests without the required probable cause findings. *See id.* at 6-7. For example, in July 2025, the Department of Justice fired the acting U.S. Attorney for the Eastern District of California after she told a Border Patrol official that he could not arrest immigrants without probable cause. *See* Widas Decl., Ex. 16.[5] In September 25, 2025, DHS issued a public statement calling the allegations in this lawsuit "disgusting, reckless, and categorically FALSE" because "DHS law enforcement uses '*reasonable suspicion*' to make arrests." *Id.*, Ex. 17 (emphasis added).[6] Obviously, DHS's quoted reference to "reasonable suspicion" is not the requisite "probable cause" standard required for civil immigration arrests. DHS further stated on its website

---

[4]    Compl. ¶ 31 (citing Julia Ainsley et al., *Under Trump administration, ICE scraps paperwork officers once had to do before immigration arrests*, NBC News (Sept. 9, 2025), https://perma.cc/6ZTC-PP6T).

[5]    Widas Decl., Ex. 16, ECF No. 17-1 at 86-87 (Heather Knight and Hamed Aleaziz, *Trump Fired a U.S. Attorney Who Insisted on Following a Court Order* at 1-2, NY Times (Sept. 26, 2025)).

[6]    *Id.*, Ex. 17, ECF No. 17-1 at 95 (Teo Armus and Jenny Gathright, *Lawsuit accuses ICE of illegally arresting Latino immigrants in D.C.* at 2, The Washington Post (Sept. 25, 2025)).

that its officers are "trained to ask a series of well-determined questions to determine status and removability" when they "encounter individuals subject to arrest," without any mention of the requisite prong of escape risk for executing a warrantless civil immigration arrest. *Id.*, Ex. 18.[7] The next month, Chief Border Patrol Agent Gregory Bovino, in a public statement, reiterated, "We need reasonable suspicion to make an immigration arrest . . . . You notice I did not say probable cause, nor did I say I need a warrant." Second Decl. of Alexandria Widas ("Second Widas Decl."), Ex. 2, ECF No. 34-1.[8] These and other federal public official statements have misstated, eschewed or ignored the requisite legal standard for executing warrantless civil immigration arrests, while pressing the need for urgency in executing such arrests. *See, e.g.*, Widas Decl., Ex. 19 (post from DHS's official social media account, @DHSgov, reiterating that DHS "uses 'reasonable suspicion'" to make civil immigration arrests and that "[t]he Supreme Court recently vindicated us on this question"); *id.*, Ex. 22 (quoting statement from White House Deputy Chief of Staff Stephen Miller, instructing ICE to stop developing target lists of immigrants and to instead "just go out there and arrest illegal aliens" at Home Depots or 7-Elevens, betting that he and a handful of agents could go out on the District's streets and arrest 30 people right away)[9]; *id.*, Ex. 23 (quoting statement from Acting Executive Associate Director of ICE Enforcement and Removal Operations telling his agents to "turn up the creative knob up to 11 and push the envelope," and

---

[7]     *Id.*, Ex. 18, ECF No. 17-1 at 101 (*DHS Debunks New York Times False Reporting: DHS Does NOT Deport U.S. Citizens* ("*DHS Oct. 1, 2025 Press Release*") at 1, DHS (Oct. 1, 2025), https://perma.cc/3PCA-2M7C).

[8]     Second Widas Decl., Ex. 2, ECF No. 34-1 at 8 (Priscilla Alvarez and Michael Williams, *Border Patrol official denies racial profiling factors in immigration arrests, says officers do consider whether people appear "panicked" or "scared"* ("*Border Patrol official denies racial profiling*") at 1, CNN (Oct. 7, 2025), https://perma.cc/26HB-FVVN).

[9]     *Id.*, Ex. 22, ECF No. 17-1 at 121 (Elizabeth Findell et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown; After deportations fell short of President Trump's campaign promises, federal agents summoned to a meeting in Washington were told to 'just go out there and arrest illegal aliens'* at 1, The Wall Street J. (June 10, 2025)).

6

another statement from a senior ICE official telling agents, "If it involves handcuffs on wrists, it's probably worth pursuing").[10]

Since this alleged change in policy for warrantless civil immigration arrests, such arrests have proliferated. According to one analysis, 943 immigration arrests took place between August 7 and September 9, 2025, comprising over 40% of all arrests in the District. Compl. ¶ 24.[11] Although the emergency period declared by the current president ended on September 11, 2025, plaintiffs allege that "mass immigration stops and arrests in D.C. are continuing." *Id.* ¶ 27; *see* Widas Decl., Ex. 10 (quoting Acting Executive Associate Director of ICE Enforcement and Removal Operations, who announced, "We're going to continue our operations in the D.C. metro area")[12]; *id.*, Ex. 11 (quoting Tricia McLaughlin, DHS Assistant Secretary for Public Affairs, who publicly remarked, "DHS law enforcement will not be slowed down")[13]; *id.*, Ex. 13 (U.S. Customs and Border Protection Chief Michael W. Banks, in a social media post published under the username @USBPChief, highlighting the immigration arrests in the District during the weekend of September 13, 2025).

### 2. Plaintiffs Initiate This Action Challenging Defendants' Alleged Policy and Practice of Making Warrantless Civil Immigration Arrests Without Probable Cause in the District.

Plaintiffs are four noncitizens with pending immigration applications—including for asylum and Temporary Protected Status renewal—and the nonprofit membership organization CASA, Inc., which has a mission to "improv[e] the quality of life in working-class Black,

---

[10]    *Id.*, Ex. 23, ECF 17-1 at 130, 132 (José Olivares, *US immigration officers ordered to arrest more people even without warrants* at 2, 4, The Guardian (June 4, 2025), https://perma.cc/528F-FQJB).

[11]    Compl. ¶ 24 (citing Alanna Durkin Richer & Rebecca Santana, *Over 40% of arrests in Trump's DC law enforcement surge relate to immigration, AP analysis finds*, Associated Press (Sept. 10, 2025), https://perma.cc/T4AQ-FZML).

[12]    Widas Decl., Ex. 10, ECF No. 17-1 at 61 (*How Washington Became a Testing Ground for ICE* at 5).

[13]    *Id.*, Ex. 11, ECF No. 17-1 at 69 (*DHS Scores Major Victory at Supreme Court* at 1, DHS (Sept. 8, 2025) https://perma.cc/5ACN-HFVV).

Latino/a/e, Afro-descendant, Indigenous, and immigrant communities" and provide "social, health, employment, and legal services to immigrant communities."  Compl. ¶ 6.  These plaintiffs allege they—or in the case of CASA, their members—were arrested by defendants' agents without an administrative warrant and without the required probable cause findings.  *See* Compl. ¶¶ 3-5. The named individual and organizational plaintiffs and putative class are described below.

### a.  José Escobar Molina

José Escobar Molina was born in El Salvador and has lived in the United States since 1998. Pls.' Mot, Decl. of José Eliseo Escobar Molina ("Escobar Molina Decl.") ¶ 1, ECF No. 17-3.  He successfully applied, in 2001, for Temporary Protected Status ("TPS"), which protects him from detention and deportation because of his immigration status.  *Id.*; *see also Temporary Protected Status*, U.S. Citizenship & Immigr. Servs., https://perma.cc/X8LM-6NY2 ("Once granted TPS, an individual . . . cannot be detained by DHS on the basis of his or her immigration status in the United States.").

Defendants claim that Escobar Molina was "specifically targeted" by immigration enforcement personnel "based on information in law enforcement records," Supplemental Decl. of Kenneth Blanchard Jr. ("Supp. Blanchard Decl.") ¶ 8, ECF No. 63-2, which showed that Escobar Molina's Temporary Protected Status "expired" on March 9, 2025, and that he had a "2019 criminal charge for simple assault," Defs.' Opp'n, Ex. 2, Decl. of Kenneth Blanchard ("Blanchard Decl.") ¶ 7, ECF No. 50-2.[14]  Yet, plaintiffs claim—and defendants later appear to concede, *see* Hr'g Tr. at 54:20-23—that Escobar Molina timely applied to renew his TPS status before that expiration date.  *See* Escobar Molina Decl. ¶ 1.  Plaintiffs also note, without apparent

---

[14]    None of the underlying records for these attestations have been submitted to the record by defendants.

dispute by defendants, that Escobar Molina's criminal charge for simple assault was dropped in 2019. *See* Hr'g Tr. at 95:1-2.

At approximately 6:00 AM on August 21, 2025, Escobar Molina was walking to his work truck, dressed in his work clothes, to go to his job as a scaffolder. Escobar Molina Decl. ¶ 4-5. Two unmarked vehicles pulled up near his truck. *Id.* ¶ 5. Two people in plainclothes exited their vehicle, "grabbed [Molina] by the arms and immediately handcuffed [him]." *Id.* Two more people in plainclothes "grabbed [him] by the legs," *id.* ¶ 5, and "[p]ulling [him] by [his] limbs, the[] [four officers] shoved [him] into the[ir] black Suburban," *id.* ¶ 7. None of these people were "wearing uniforms or badges," and "they did not identify themselves," leading Escobar Molina to "fe[el] like [he] was being kidnapped." *Id.* ¶ 6.

These plainclothes people turned out to be law enforcement officers, who "did not ask [Molina] for [his] name or to see [his] identification, which [he] had with [him] in [his] wallet." *Id.* Nor did they "present[] a warrant, explain[] why they stopped [him], or indicate[] that they knew [his] name prior to stopping [him]." *Id.* ¶ 8. They did not "ask [him] any questions about [his] ties to the community," *id.*, such as his partner and two sons with whom he lives in Mount Pleasant, *id.* ¶ 3. When Escobar Molina repeatedly told the officers that he "had papers," the officers responded first by saying, "No you don't. You are illegal," *id.* ¶ 6, and then by "yell[ing]," "Shut up bitch! You're illegal," *id.* ¶ 7.

Without being asked for his name or any form of identification, Escobar Molina was taken "to a parking lot . . . near the Pentagon," where he was "put into a van" by officers with "badges and jackets that read 'Department of Homeland Security,'" *id.* ¶ 10, and then to an ICE facility in Chantilly, Virginia, where he arrived around 9:00 AM, *id.* ¶ 11. Around four hours later, Escobar Molina was interviewed by an officer who had a physical copy of Escobar Molina's work permit.

*Id.* ¶ 12.  While at Chantilly, Escobar Molina was held with about 65 other people in a waiting cell "so crowded that it was impossible to lie down and sleep."  *Id.* ¶ 11.  He was "fed one small bean burrito, something sweet, and a glass of water during [his] entire 23-hour stay."  *Id.*

After staying overnight in the facility in Chantilly, Escobar Molina was transported to a facility in Richmond, Virginia, from which he was released later that day.  *Id.* ¶ 14.  The "supervising ICE officer" who facilitated his release told Escobar Molina that the supervising officer "did not know why [Molina] had been brought to Richmond and that the officers had made an error in arresting [him] because [he] ha[s] TPS."  *Id.*  After "apologiz[ing] to [Molina] three times," the supervising officer "gave [him] a copy of [his] TPS approval notice and told [him] to carry it with [him] so [he] could show it if officers stopped [him] again" and told him he "was free to go."  *Id.*

b.  <u>B.S.R.</u>

B.S.R. was born in Honduras and has lived in the United States since 2019 when he entered with a visa, B.S.R. Decl. ¶¶ 1-2, ECF No. 17-3, which defendants note he has overstayed, *see* Blanchard Decl. ¶ 8.  He has been civilly arrested by immigration authorities twice since January 20, 2025, including once after August 11, 2025.   Defendants claim B.S.R. was "specifically targeted" by immigration enforcement personnel "based on information in law enforcement records," Supp. Blanchard Decl. ¶ 8, showing that B.S.R. "overstayed his B-2 visa and was in the country unlawfully" and had "a 2025 criminal charge for domestic violence and simple assault," Blanchard Decl. ¶ 8.[15]  Plaintiffs, however, dispute this 2025 criminal charge relates to B.S.R.  *See* Hr'g Tr. at 94:9-14.

---

[15]    None of the underlying records for these attestations have been submitted to the record by defendants.

On the morning of January 28, 2025, B.S.R. was a passenger in his boss's car, and they had left their workplace to pick up supplies at Home Depot.  B.S.R. Decl. ¶ 3.  As they turned into the Home Depot parking lot, two cars parked in front of and behind them.  *Id.*  Several officers exited the two vehicles and "started banging on the windows" of B.S.R.'s boss's car.  *Id.* ¶ 4.  Two of the officers wore jackets emblazoned with "HSI," and the rest were in plainclothes.  *Id.*  One officer showed B.S.R. a Border Patrol badge through the passenger-side window.  *Id.*

B.S.R.'s boss, who is a U.S. citizen, "told the officers they did not have the right to search the car," at which point the "officers began to threaten to break the windows." *Id.* ¶ 5.  B.S.R. was "scared" and "decided to get out of the car and follow their orders."  *Id.*  The officers did not ask for his name or ID, but, after "grabb[ing] [B.S.R.] by the neck," one officer asked "if [he] was 'illegal,'" to which B.S.R. did not respond.  *Id.*  ¶ 6.  Another officer then said, "Well, we'll figure it out anyways if you are." *Id.*  The officers did not display a warrant or "ask [B.S.R.] any questions about [his] ties to the community," *id.* ¶ 7, such as his family and 13-month-old U.S. citizen daughter who live in the District, *id.* ¶ 1.  B.S.R. was taken to a shopping center parking lot where he was transferred into a van and only then was he asked for his name.  *Id.* ¶ 8.  The officers eventually transferred him to Chantilly, where he was released with directions to check in periodically with ICE and to appear in immigration court.  *Id.* ¶¶ 9-10.  During his May 2025 check-in with ICE, he was given an ankle monitor.  *Id.* ¶ 10.  In June 2025, B.S.R. filed an asylum application.  *Id.* ¶ 11.

On the morning of August 18, 2025, B.S.R. left his home with his father, and both got into their shared car to go to work.  *Id.* ¶ 12.  Two unmarked vehicles pulled up and officers in plainclothes got out and approached B.S.R. and his father's car.  *Id.*  One officer showed B.S.R. a Border Patrol badge through the window.  *Id.*  The officers asked B.S.R.'s father whether he had

overstayed his visa and asked for his ID, which B.S.R.'s father provided. *Id.* ¶ 13. B.S.R. and his father exited their car upon being ordered to do so. *Id.* ¶ 14. Without asking for B.S.R.'s name or ID, the officers handcuffed B.S.R. *Id.* Even after B.S.R. showed the officers his ankle monitor and explained that he was already subject to immigration monitoring, the officers "said it did not matter and that once [B.S.R.] was in custody, they would figure out if what [he] was saying about [his] status was true." *Id.* ¶ 14. The officers did not show a warrant or ask B.S.R. any questions about his ties to the community. *Id.* ¶ 15. When B.S.R.'s partner came outside and objected to the arrest, the officers "responded by saying, 'Sorry, we came for two people, so we have to arrest two people.'" *Id.* ¶ 16. After being taken to a Costco parking lot and questioned by an officer, *id.* ¶ 17, B.S.R. and his father were eventually transferred to the facility in Chantilly, *id.* ¶ 18.

While at Chantilly, B.S.R. "was hit with an awful smell of body odor." *Id.* ¶ 18. "Some people told [him] they had been detained there for five or six days and had not been able to shower or even brush their teeth." *Id.* "There were 50 to 60 people detained inside Chantilly" when B.S.R. arrived, with "groups of five or so people arriving every 40 minutes," rendering the waiting cell "so packed that people were forced to sleep on the floor and others had to stand for hours." *Id.* B.S.R. recalls that the "only access to drinking water was out of the sink attached to the back of the toilet, and the water that came out tasted like bleach." *Id.* B.S.R. remained at Chantilly for over twelve hours, during which he was given only a burrito and a bottle of water. *Id.* ¶¶ 18-19.

B.S.R. was released late that night, *id.* ¶ 20, although his father remained detained for longer and has been moved to "various immigration detention centers throughout the country," *id.* ¶ 22. B.S.R. describes leaving his father behind as "one of the most horrible feelings [he] ha[s] ever experience[d]." *Id.* ¶ 21.

12

c. <u>N.S.</u>

N.S. was born in Venezuela and has lived in the United States since October 2022. N.S. Decl. ¶ 1, ECF No. 17-4. When he entered the United States, he turned himself into Customs and Border Protection ("CBP") and was eventually released from custody on parole. *Id.* ¶ 2. He filed an asylum application in October 2023, filed an application to renew his Temporary Protected Status, and has a work permit. *Id.* At the same time, he is currently engaged in removal proceedings and has regular check-ins with ICE. *Id.*

On the morning of August 12, 2025, N.S. purchased some supplies from Home Depot for a construction job. *Id.* ¶ 5. As he walked back to his minivan with his supplies, he "saw people running and yelling, 'ICE! ICE!'" *Id.* He "was pushing the cart full of materials and . . . had his identification with [him]," so he "did not start running and instead walked to [his] car." *Id.*

According to N.S., after he got into his car and turned it on, an officer "opened the driver's side door, and yelled at [him], 'Legal or illegal?'" *Id.* ¶ 6. The officer grabbed N.S.'s arm. *Id.* N.S. showed the officer his driver's license, work permit, and asylum paperwork. *Id.* A second officer approached and reviewed N.S.'s documents; the second officer then told the first officer "to arrest [N.S.]" because "[he] was an 'illegal' and . . . '[N.S.'s] papers are useless.'" *Id.* ¶ 7. The officers "pulled [N.S.] out of the driver's seat, threw [him] up against the side of [his] car, and handcuffed [him] behind [his] back." *Id.* Although the first officer wore a vest that said "DEA" and a badge and hat that said "ICE," and the second officer wore a vest that said "ICE," *id.* ¶¶ 6-7, neither of the officers "identified themselves, presented a warrant, explained why they stopped [N.S.], or indicated that they knew [N.S.] or [his] name," nor did they ask him any questions about his ties to the community, *id.* at ¶ 7, such as his partner, children, stepchild, and grandchild who live in the District, *id.* ¶ 4. When N.S. asked to see a warrant, he was "told to be quiet." *Id.* ¶ 11.

13

In contrast, defendants assert, without submitting any declarations directly from arresting officers or other officers at the scene of the arrest, that ICE records indicate "ICE officers identified themselves as police with immigration, displayed badges and had marked law enforcement gear, [and] established positive identification [before] plac[ing] N.S. under arrest."  Defs.' Opp'n, Ex. 1, Declaration of Joseph Simon ("Simon Decl.") ¶ 22, ECF No. 50-1.

In the same Home Depot parking lot where he was arrested, N.S. watched federal agents execute additional arrests, with other arrestees being "shot in the back with what [he] believe[d] were rubber bullets" or "throw[n] . . . on the ground."  *Id.* ¶¶ 10-12.  N.S. was transported to Chantilly, *id.* ¶ 14, and then moved several more times to different immigration facilities, *id.* ¶¶ 14-22.  During this period, N.S. was "fed very little" and at one point "had to stand shackled for about three hours as [he] waited to board the plane," and was told "to go in the corner up against the wall to urinate because [there was] no access to a bathroom."  *Id.* ¶ 20.  N.S. was eventually "released on [his] own recognizance from ICE custody on September 9, 2025, after 28 days detained in five states and D.C."  *Id.* ¶ 23.

d. R.S.M.

R.S.M. was born in El Salvador and has lived in the United States since 2017.  R.S.M. Decl. ¶ 1, ECF No. 17-5.  Her family has a pending U-visa application and she has a pending asylum case.  *Id.*[16]

---

[16]    The U-visa program allows a noncitizen who has "suffered substantial physical or mental abuse as a result of having been a victim" of a violent crime in the United States to obtain legal status for four years by cooperating with the government in the prosecution of that crime.  8 U.S.C. § 1101(a)(15)(U); *see also United States v. Browne*, 953 F.3d 794, 801 (D.C. Cir. 2020); *Guerra Rocha v. Barr*, 951 F.3d 848, 850 (7th Cir. 2020); *Coria v. Garland*, 114 F.4th 994, 998 (9th Cir. 2024) ("U visas are made available to certain aliens who are victims of criminal activity in the United States and who come forward to report it; certain family members of the applicant are also eligible for derivative U visa status.").

14

On the morning of August 26, 2025, R.S.M. was a passenger in a car with her husband, who was driving them both to work, when they were pulled over by a car with police lights and then "surrounded" by "about seven cars." *Id.* ¶ 2. Officers stood "on both the driver and passenger side" of the car and "started banging on the car windows." *Id.* R.S.M. and her husband passed the officers their drivers' licenses and their U-visa paperwork, but the officers "responded that [their] paperwork did not matter at all." *Id.* ¶ 3. One of the officers "used [a] device to scan [R.S.M.'s husband's] face . . . [and] waited a moment for a result to appear on the device." *Id.* ¶ 4. The other officers asked "It is him?," to which the officer with the scanner responded "No." *Id.* Another officer "said it did not matter that [R.S.M.'s] husband didn't match the person they were looking for, and . . . decided to arrest [them] anyway." *Id.* The officers "were not wearing any identification" and "[o]nly one officer was wearing a uniform." *Id.* ¶ 7. The officers "never showed [R.S.M. and her husband] any documents or a warrant, and they did not even seem to know [R.S.M.'s or her husband's] names when th[e officers] stopped [them]." *Id.* ¶ 6. The officer also did not ask any questions about their ties to the community, *id.*, such as their two teenage children who live in D.C., *id.* ¶ 1. In contrast, defendants assert, without submitting any declarations directly from arresting officers or other officers at the scene of the arrest, that ICE records indicate R.S.M.'s "arrest occurred after a consensual encounter and pedigree questions where an immigration officer determined that R.S.M. illegally entered the United States without inspection and was amenable to an enforcement action." Simon Decl. ¶ 23.

R.S.M. and her husband were taken to the immigration facility in Chantilly, Virginia. R.S.M. Decl. ¶ 9. She was eventually released with an ankle monitor, *id.* ¶ 12, although her husband remained in detention and the officers "did not give [her] the chance to say goodbye to

[her] husband, even though [she] wasn't sure when [she] would see him again," *id.* ¶ 11; *see also id.* ¶ 13 (noting that her husband remains detained).

e.  CASA, Inc.

CASA, Inc., is a national nonprofit membership organization.  Decl. of George Escobar, CASA Chief of Programs & Servs. ("CASA Decl.") ¶ 1, ECF No. 17-6.  CASA's members "are predominantly noncitizens in a variety of immigration statuses."  *Id.*  Prospective members must apply, pay dues, and "subscribe to the principles of CASA."  *Id.* ¶ 5.

CASA's mission is to "create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendant, Indigenous, and immigrant communities."  *Id.* ¶ 7.  To accomplish its mission, CASA "offers a wide variety of social, health, job training, employment, and legal services to immigrant communities, with a particular focus in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia."  *Id.* ¶ 8.  CASA's D.C. services have "historically focused on securing and stabilizing immigration status, both temporary and permanent status, for non-detained community members," such as by supporting TPS, Deferred Action for Childhood Arrivals ("DACA"), U-visa, and naturalization applications.  *Id.* ¶ 9.  In addition to these immigration services, CASA assists members with "public benefits enrollments" and facilitates connections "with various essential service providers."  *Id.* ¶ 11.

CASA alleges that both the organization itself and the organization's members have been harmed in several ways by defendants' challenged practice of allegedly making warrantless immigration arrests without probable cause.

As to harms against the organization, CASA first alleges that the ICE arrests have diverted CASA's resources from its primary mission.  The organization witnessed a "forty-fold increase" in reports of ICE detentions in the period of August 14, 2025, to August 29, 2025, compared to the

16

rate of reports between January 2025 and August 14, 2025. *Id.* ¶ 14. CASA alleges that the increased arrests "have caused a significant disruption to [CASA's] functions and activities, pulling [the organization] away from [its] core focus of providing services that stabilize and protect CASA members to providing rapid, emergency response." *Id.* ¶ 15. "[D]etention response now comprises a significant portion of work undertaken by CASA's Legal and [Health] teams," including work "not fully compensated by these teams' budgets." *Id.* ¶ 17.

Additionally, CASA alleges several financial injuries. CASA's call-service costs have increased; compared to the month period between June 27 and July 26, 2025, the month period between July 27 and August 26, 2025, saw 14% higher costs, and the month period between August 27 and September 26, 2025, saw 5% higher costs than that. *Id.* ¶ 19. One of CASA's grants was reduced by 50% in September 2025 because of "delayed progress on grant deliverables," which CASA attributes to its team's inability to "even conduct an intake" for the program funded by the grant "when the community member is laser-focused on the fact that their loved one was . . . detained by ICE." *Id.* ¶ 20.

Lastly, CASA alleges that increased immigration arrests have directly interfered with its mission, by chilling members from sharing information with CASA staff because members are "fearful that their immigrant status will be weaponized against them." *Id.* ¶ 21. "[A]ctivit[ies] or application[s] that once took a single engagement to complete now require[] two to three follow-ups with the individual, so that trust is assured and the community member feels safe providing confidential information." *Id.* ¶ 22.

In addition to these alleged harms to CASA itself, CASA describes injuries to its members as a result of defendants' challenged new policy in the District of executing warrantless civil immigration arrests based on a lower standard than probable cause. CASA's Chief of Programs

and Services and many CASA members describe stories of arrest similar to those articulated by the named individual plaintiffs. As support, plaintiffs have submitted declarations detailing civil immigration arrests of twelve CASA members. *See* CASA Decl. ¶¶ 25-36 (describing arrests of twelve members, some of whom also submitted pseudonymous individual declarations); *see* Antony Doe Decl., ECF No. 17-10; Elias Doe Decl., ECF No. 17-17; Franco Doe Decl., ECF No. 17-19; Javier Doe Decl., ECF No. 17-20; Julio Doe Decl., ECF No. 17-21; Luz Doe Decl., ECF No. 17-22; Mateo Doe Decl., ECF No. 17-24.[17]

Members report that they were approached by officers who did not identify themselves, wore plain clothes, and drove unmarked vehicles. *See, e.g.*, Antony Doe Decl. ¶¶ 4-5 ("There were several police officers in the area, and they surrounded me. Some of them were wearing masks and hiding their faces. . . . They approached me, asked me to step out of the car, and told me I was under arrest."); Julio Doe Decl. ¶ 4 ("Throughout the whole interaction [with the "many" ICE agents who arrested him], none of the agents at any point identified themselves . . . ."); Luz Doe Decl. ¶ 5 (ICE agents emerged from "two unmarked SUVs"); Mateo Doe Decl. ¶ 6 ("[T]wo unmarked cars pulled up . . . . Four officers wearing masks got out of the cars. They were wearing jeans and t-shirts, but green vests and badges that said 'ICE.'").

The officers displayed no warrants. *See, e.g.*, Antony Doe Decl. ¶ 5 ("I asked them why they were detaining me, and they said that's how the law is. . . . They did not show me any documents or warrant either."); Elias Doe Decl. ¶ 5 ("The officers . . . did not give me any documents or a warrant prior to arresting me."); Franco Doe Decl. ¶ 4 ("The agents never provided

---

[17]    Plaintiffs were granted leave, without objection from defendants, for non-plaintiff declarants to proceed under pseudonyms, Pls.' Consent Motion for Non-Plaintiff Declarants to Proceed Under Pseudonyms at 2, ECF No. 18; *see* Min. Order (Oct. 6, 2025) (granting plaintiffs' motion). Defendants qualified their consent "without prejudice to the government's ability to seek disclosure of those declarant's identities as necessary at the appropriate time," *id.* at 2, but have not, to date, sought any further identifying information.

any reason and never presented me with a warrant or any order for my arrest."); Julio Doe Decl. ¶ 4 ("[N]one of the agents . . . presented a warrant, or indicated that they knew me or my name prior to the arrest."); Luz Doe Decl. ¶ 7 ("Although they said they were from ICE, the officers did not present a warrant, explain why they stopped us, or indicate that they knew our names prior to stopping us."); Mateo Doe Decl. ¶ 7 ("When I asked why [they were arresting me], they said it was because I wasn't a permanent resident. . . . They did not hand me any documents or warrants."); CASA Decl. ¶ 34 (while arresting CASA member Miguel, ICE officials "did not show him any document or warrant"); *id.* ¶ 36 (while arresting CASA member's husband, DHS officials "did not show [him] any document or warrant").

Members were then either not questioned at all or briefly questioned about their status—but not about their ties to the community—before being arrested. *See, e.g.*, Antony Doe Decl. ¶ 6 ("Before they arrested me, the officers did not ask me any questions about my personal circumstances. They didn't ask about how long I have been in the United States, if I have family here, if I have a job, or anything else."); Elias Doe Decl. ¶¶ 3-5 (ICE agents "did not explain why they were arresting me," after asking only where he was from and to see his Salvadoran ID, which he provided. "At no point … did they ask me if I had immigration status or if I was a U.S. citizen . . . or anything else about my individual circumstances."); Franco Doe Decl. ¶ 4 ("Before arresting me, the agents did not ask me any questions about my family members, where I live and how long I have lived there, my work history, or anything else about my ties to the community."); Luz Doe Decl. ¶ 7 (None of the arresting officers "ask[ed] us any questions about our ties to the community, how long we have been living or working in D.C., [or] our family here . . . ."); Julio Doe Decl. ¶¶ 2-4 ("[T]hey asked for my ID . . . . They told me to get out of the car, and I asked why. The agent said if I didn't get out, they would break down the door. . . . The agents immediately put

handcuffs on me and grabbed me by the collar.  I asked why . . . .  One of the agents said that I was 'fine.'  Another agent said that I wasn't, and they put me in the van."); CASA Decl. ¶ 34 ("They asked Miguel if the car he was driving belonged to him.  He responded that it was his brother's. The officials, however, did not believe him, and demanded he call his brother. . . . Miguel's brother was asleep and did not answer the calls.  In response, the ICE officials arrested and detained Miguel . . . [without] ask[ing] him any questions about his ties to the community or his individual circumstances."); *id.* ¶ 36 (DHS officers arrested Nerwin "[a]fter looking up his name in the system" but without "ask[ing] him any questions about his ties to the community or his individual circumstances.").

According to plaintiffs, these arrests were frequently accompanied by deprivations of basic human dignity, including being ill-treated, with inadequate food, uncomfortable and crowded sleeping facilities, and without information as to the duration or locations of detention.  *See* Pls.' Prelim. Inj. Mot. at 15.  For example, declarants have described while in DHS custody being forced to sleep in a freezing and cramped room without bedding, Julio Doe Decl. ¶ 6 ("In one room, there were no beds, so we were sleeping on the concrete floor.  In another room with 100 people, we slept in bunk beds that were very close together."), being fed little food, *id.* ¶ 7 ("[W]e were still tied up and couldn't even eat the small sandwich they gave us."); Mateo Doe Decl. ¶ 9 (describing meals as "very small"); CASA Decl. ¶ 34 (describing CASA member Miguel as experiencing "dehumanizing and unhealthy" conditions where "officers failed to feed them at times"), and being separated from their families and sent to far-away ICE facilities with little explanation as to why they were being transferred or how long they would be there, *see, e.g.*, Antony Doe Decl. ¶ 9 (Pennsylvania); Javier Doe Decl. ¶ 7 (Louisiana); Mateo Doe Decl. ¶ 9 (Texas); CASA Decl. ¶ 33 (CASA member Carlos moved to Louisiana).  They were also subjected to hearing guards brag

20

about the bonus money they would earn from the arrests. *See* CASA Decl. ¶ 27 ("Julio heard the officers bragging and celebrating how easy it had been to arrest him."); *id.* ¶ 28 ("During the drive, the men were bragging about the amount of money they earned as a bonus for arresting Angel.").

Several members also describe experiencing worsening health issues because of their arrest and detention and inadequate provision of medical care. *See* CASA Decl. ¶ 28 ("Angel is now in Caroline Detention Facility, where he is being denied medication for his cardiac arrhythmia."); Elias Doe Decl. ¶¶ 6, 8 ("When ICE arrested me, they forced me to miss my [dialysis] treatment [following open heart surgery]. . . .  After several hours, the ICE officers said I could leave that evening because I was so sick after missing my dialysis treatment."); Luz Doe Decl. ¶ 14 ("[My partner] Daniel has been suffering from severe anxiety and has had difficulty sleeping" since he was arrested and detained.  "He has had to see a psychologist multiple times because of his anxiety. He has also been to the doctor at the detention center multiple times because he has a rash over his body . . . .").

     f. <u>Other Arrested Individuals</u>

Plaintiffs have also submitted seventeen declarations, of which ten are pseudonymous, from individuals who are neither individual plaintiffs or CASA members, but who also experienced warrantless civil immigration arrests under similar circumstances or who witnessed or attest to the arrest of others. *See* Ana Gracia Decl., ECF No. 17-7 (attorney describing the arrest of her client); Anamaria Doe Decl., ECF No. 17-8 (pseudonymous); Andrés Doe Decl., ECF No. 17-9 (pseudonymous); B.R.G. Decl., ECF No. 17-11 (pseudonymous); C. Decl., ECF No. 17-12 (pseudonymous); Camilo Doe Decl., ECF No. 17-13 (pseudonymous); Cristina Decl., ECF No. 17-14 (pseudonymous); Decl. of Daniela Anello ("Anello Decl."), ECF No. 17-15 (describing when she witnessed the arrest of two unnamed men); Decl. of Darwin Lopez Castañón ("Lopez

21

Castañon Decl."), ECF No. 17-16; Decl. of Fiona Lewis ("Lewis Decl."), ECF No. 17-18 (describing the arrest of her friend, Alex); M.P. Decl., ECF No. 17-23 (pseudonymous); Decl. of Paola Flores Roman ("Flores Roman Decl."), ECF No. 17-25 (attorney describing the arrests two of her clients); W.G.M. Decl., ECF No. 17-26 (pseudonymous); Y.R.M. Decl., ECF No. 17-27 (pseudonymous); Carlos Peña Decl., ECF No. 34-2 (pseudonymous); Decl. of Gerson Aaron Lopez Funez ("Lopez Funez Decl."), ECF No. 34-3; Decl. of Gustavo Reyes Solis ("Reyes Solis Decl."), ECF No. 34-4; *see also* Min. Order (Oct. 6, 2025) (granting plaintiffs' motion for non-plaintiff declarants to proceed pseudonymously, without foreclosing defendants' ability to seek disclosure of those declarant's identities at a future stage); Min. Order (Oct. 20, 2025) (granting plaintiffs' motion for additional declarants to proceed pseudonymously under the same conditions).

Like the individual plaintiffs and like CASA's members, these individuals reported being approached by officers who did not identify themselves, wore plain clothes, and drove unmarked vehicles. *See, e.g.*, Anello Decl. ¶ 3 (arresting officers emerged from "three unmarked cars"); Y.R.M. Decl. ¶ 2 (five "unmarked cars"); M.P. Decl. ¶ 4 ("The agents were plain clothed and were not wearing anything to indicate that they were law enforcement."); W.G.M. Decl. ¶ 2 ("They got out of an unmarked Subaru car with Texas license plates. The officers were in plain clothes wearing vests . . . ."); Lopez Castañon Decl. ¶¶ 3-4 ("[W]e saw two unmarked vehicles that began to follow us. . . . A masked agent approached my side . . . . He was wearing a red t-shirt and gray pants and had on a velcro vest that said 'Police' across the front. I could not see a badge of any kind.").

The officers often did not ask for their names or any other information before arresting them. B.R.G. Decl. ¶ 4 ("None of the agents at any point identified themselves, . . . or indicated

that they knew me or my name prior to the arrest."); C. Decl. ¶ 5 ("Neither officer appeared to know my colleague's name . . . before throwing him on the ground and restraining him."); Cristina Decl. ¶ 6 ("[H]e was not asked for his name, his identification, [or] what his immigration status was . . . ."); Lopez Castañon Decl. ¶ 11 ("None of the agents at any point ever identified themselves, . . . explained why they stopped us, or indicated that they knew us/knew our names prior to stopping us.").  Nor did the officers ask many other questions.  *See, e.g.*, Anamaria Doe Decl. ¶ 5 ("The agents did not ask me where I lived in Washington, D.C., how long I had lived there, whether or not I had family in Washington, D.C. other than my children, or any questions about my connections to the city or my community."); B.R.G. Decl. ¶ 4 (similar); Camilo Doe Decl. ¶ 5 (similar); Cristina Decl. ¶ 6 (similar); W.G.M. Decl. ¶ 6 (similar).

The officers displayed no warrants before making civil arrest of these individuals, often with the use of force.  *See, e.g.*, Anamaria Doe Decl. ¶ 5 (no warrant); Andrés Doe Decl. ¶ 3 (same); B.R.G. Decl. ¶¶ 2-3 ("The agent . . . told me that if I try to run away they would shoot me. An ICE agent in a mask put handcuffs on me really tight and shoved me against a car."); C. Decl. ¶ 5 ("The second agent opened the passenger-side door, grabbed my colleague, threw him on the ground, and got on top of him.  My colleague had not said a word or moved from his seat the entire time [before that]."); W.G.M. Decl. ¶¶ 3, 6 ("One of them grabbed me by my shirt and another grabbed me by my feet and they shuffled me into the car"); Camilo Doe Decl. ¶ 5 (no warrant); Lopez Castañon Decl. ¶ 11 (same); Cristina Decl. ¶ 6 (same); M.P. Decl. ¶ 7 (same); Y.R.M. Decl. ¶ 4 (same).

Declarants describe detentions following their civil immigration arrests that deprived them of basic human dignity, including being ill-treated, with inadequate food and uncomfortable and crowded sleeping facilities, and being denied medical attention.  *See* Pls.' Prelim. Inj. Mot. at 15;

23

*see, e.g.*, B.R.G. Decl. ¶¶ 5-6 (sleeping in a room so cold that detainees called it the "freezer"; being fed little food; and sleeping in jails where the lights are always kept on); Y.R.M. Decl. ¶¶ 5, 6, 8 (needing to drink toilet water to survive; watching other detainees pass out from dehydration and hunger; being told by guards they have "no right[s] to anything"; taking multiple flights in a day while shackled; and witnessing beatings by detention center guards); Camilo Doe Decl. ¶ 7 ("I was put in a room made for 4 people with about 15 people in it. . . . Over the course of . . . two days, all they gave me to eat was a cold bean burrito and two ham sandwiches."); M.P. Decl. ¶¶ 8, 10-11 (being denied access to restrooms; kept in jails where the lights are always on; and not being able to bathe for days at a time); Carlos Peña Decl. ¶ 12 (being denied adequate medical care); Gracia Decl. ¶ 6 (having pleas for medical attention ignored).

g. <u>Putative Class and Subclasses</u>

Plaintiffs propose and seek certification of one over-arching class and two subclasses, as described below.

Escobar Molina, B.S.R., N.S., and R.S.M. seek to represent the following class:

**Warrantless Arrests Class**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses a flight risk.

Compl. ¶ 62; *see also* Pls.' Class Cert. Mot. at 1; Pls.' Notice of Filing Revised Proposed Orders at 4.

Escobar Molina seeks to represent the following subclass:

**Immigration Status Subclass**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully.

Compl. ¶ 63; Pls.' Notice of Filing Revised Proposed Orders at 4 n.2.

Escobar Molina, B.S.R., N.S., and R.S.M. seek to represent the following subclass:

> **Unassessed Escape Risk Subclass**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses an escape risk.

Compl. ¶ 64 (with original name "Flight Risk Subclass" modified herein to "Unassessed Escape Risk Subclass"); Pls.' Notice of Filing Revised Proposed Orders at 4 (same).

### B.    Procedural History

Plaintiffs filed the instant suit on September 25, 2025, *see* Compl., alleging that "[d]efendants have a policy and practice of making mass civil immigration arrests in Washington, D.C., without a warrant and without the probable cause findings that are required by Congress under federal statute," which "policy and practice are tied to the President's promise to carry out mass immigration arrests and deportations," *id.* ¶ 19.

Plaintiffs bring two claims: The first claim challenges defendants' alleged policy of making warrantless civil immigration arrests without individualized assessment of immigration status, *see* Compl. ¶¶ 72-77, and the second claim challenges defendants' alleged policy of making warrantless civil immigration arrests without individualized assessment of escape risk, *see* Compl. ¶¶ 78-83. Both claims contend that defendants' policy violates statutory and regulatory provisions governing immigration arrests, *see* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(i)-(ii); the *Accardi* doctrine, which requires agencies to follow their own regulations; and the Administrative Procedure Act, 5 U.S.C. § 706, which directs courts to "hold unlawful and set aside" final agency actions that are arbitrary and capricious, contrary to law, or in excess of statutory authority.

As relief, plaintiffs seek, *inter alia*, class certification; declaratory judgment that defendants' policy of making warrantless civil immigration arrests without an individualized determination of both an immigration law violation and escape risk violates 8 U.S.C. § 1357(a)(2)

25

and 8 C.F.R. § 287.8(c)(2); vacatur of the allegedly unlawful policy and practice; and an injunction against further application of that policy and practice. *See* Compl. at 29-31 (Relief).

On October 3, 2025, plaintiffs filed a motion for preliminary injunction, to stay agency action, and for provisional class certification of the "Warrantless Arrest Class." *See* Pls.' Prelim. Inj. Mot. Concurrently, plaintiffs filed a motion for class certification. *See* Pls.' Class Cert. Mot.[18]

A hearing was held on these motions on November 19, 2025. At the end of hearing, both parties requested and were given an opportunity to submit supplemental filings. On November 20, 2025, plaintiffs filed a revised proposed order in response to concerns raised at the hearing about the burdens on law enforcement and the court of judicial micromanaging and second-guessing each civil immigration arrest conducted by defendants in the District. Pls.' Notice of Filing Revised Orders. To address these concerns, plaintiffs' revised proposed order modified the scope of relief requested "to apply against Defendants' unlawful policy" only, to require a "detailed meet-and-confer process" before seeking court intervention, and to add "documentation and reporting requirements" for defendants. *Id.* at 2-3. Plaintiffs also modified the proposed provisional class definition "to encompass only individuals for whom Defendants did not make a pre-arrest, individualized assessment of probable cause as to flight risk," or the "Unassessed

---

[18]    Several amici have also filed briefs in support of plaintiffs. *See* Brief of *Amici Curiae* Washington Teachers' Union et al., ECF No. 46 (teachers' union explaining that defendants' "mass, warrantless arrests have . . . caused a sudden increase in absenteeism in D.C. schools . . . because both students and their parents fear being arrested and detained on the way to school"); Brief of *Amici Curiae* District of Columbia Legal Services Organizations, ECF No. 47 (legal services providers explaining that when ICE "arrest[s] first and ask[s] questions later, U.S. citizens and immigrants with lawful and protected status are also at risk every time they leave their homes," which "instills fear," "impacts economic stability," and "harm[s] residents' health because people delay medical care out of fear of detention"); Brief of *Amici Curiae* Busboys and Poets et al., ECF No. 48 ("companies and individuals who are part of . . . the local business community" explaining that "[g]iven the critical role that immigrants play in the local business community, adherence to the statutory guardrails [in 8 U.S.C. § 1357(a)(2)] will . . . benefit the local businesses of D.C. and the residents it serves"); Brief of Churches, Faith Leaders, and Religious Organizations as *Amici Curiae*, ECF No. 49 ("[Faith organization] *[a]mici* have become all too familiar with accounts of worshippers unable to participate in religious services out of fear of being subject to warrantless arrests while en route to their places of worship," including specific instances of arrests on the way to and from worship services, which has "interfered with the free exercise of religion.").

Escape Risk Class." *Id.* at 4.  On November 24, 2025, defendants filed a supplemental brief responding to the plaintiffs' revised proposed order and expounding on their jurisdictional argument under 8 U.S.C. § 1252(f)(1), *see* Defs.' Supp. Br., ECF No. 63; Defs.' Amend. Supp. Br., ECF No. 64 (amended), as well as two supplemental declarations and a proposed order, *see* First Supp. Decl. of Joseph Simon ("Supp. Simon Decl."), ECF No. 63-1; Supp. Blanchard Decl.; Defs.' Proposed Order, ECF No. 63-3.  On November 25, 2025, plaintiffs filed a response.  *See* Pls.' Resp. to Defs.' Supp. Opp'n ("Pls.' Supp. Resp."), ECF No. 65.  Plaintiffs' two pending motions are now ripe for resolution.

## II.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (emphasis in original) (internal quotation marks omitted)).  As a result, such relief is "never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 690 (2008) (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)).

A party seeking to obtain a preliminary injunction "must show that (1) it 'is likely to succeed on the merits'; (2) it 'is likely to suffer irreparable harm in the absence of preliminary relief'; (3) 'the balance of equities tips in [its] favor'; and (4) the issuance of a preliminary injunction 'is in the public interest.'"  *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1324 (D.C. Cir. 2024) (alteration in original) (quoting *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 721 (D.C. Cir. 2022)).  The last two factors "merge when the Government

27

is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), because "the government's interest *is* the public interest," *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original).[19]   A likelihood of success on the merits "encompass[es] not only substantive theories but also establishment of jurisdiction," *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015), and "the movant must raise at least a serious legal question on the merits" for entitlement to preliminary injunctive relief, *Changji Esquel Textile Co.*, 40 F.4th at 726 (cleaned up); *see also Pheinx USH LLC v. Dist. Dep't of Transp.*, No. 25-7060, 2025 WL 3013527, *3 (D.C. Cir. Oct. 24, 2025) ("But in making 'a prediction of the likelihood of success on the merits,' a court must assess the likelihood that jurisdiction exists." (quoting *Lackey v. Stinnie*, 604 U.S. 192, 207 (2025))); *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 774 (D.C. Cir. 2025) ("[I]f a court concludes that a claim fails as a matter of law—on a point of jurisdiction or merits— then a preliminary injunction is inappropriate.").   Similarly, failure to establish irreparable harm is a sufficient basis for denial of such relief.   *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (noting that "movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief").

---

[19]     The D.C. Circuit has "[i]n the past . . . applied a 'sliding scale' approach under which 'a strong showing on one factor could make up for a weaker showing on another,'" *Changji Esquel Textile Co.*, 40 F.4th at 726 (quoting *Sherley*, 644 F.3d at 392), but now regularly acknowledges that "[t]his approach is arguably in tension with intervening Supreme Court decisions stating without qualification that 'a party seeking a preliminary injunction must demonstrate, among other things, a likelihood of success on the merits,'" *id.* (quoting *Munaf*, 553 U.S. at 690); *see also Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1235-1236 (D.C. Cir 2025) ("It is questionable that the sliding scale approach remains good law after 2008, when the Supreme Court decided *Winter v. Natural Resources Defense Council, Inc.*[,] [which] can be read to require movants to establish *each* preliminary injunction factor independently. But we have (somehow) gone seventeen years without needing to say if *Winter* really meant what it can be read to have said." (emphasis in original; internal citations omitted)); *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) ("[T]his court has not yet decided whether *Winter v. National Resources Defense Council* is properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned . . . .") (internal citation omitted).  In accordance with *Winter*, plaintiffs' satisfaction of each factor is considered here.

III.    **DISCUSSION**

Plaintiffs seek a preliminary injunction prohibiting defendants from enforcing a policy of conducting warrantless immigration arrests without an individualized determination of probable cause, and for provisional certification of the Unassessed Escape Risk Class, *see* Pls.' Prelim. Inj. Mot.; Pls.' Notice of Filing Revised Proposed Order at 2, and request certification of a class of all persons who, since August 11, 2025, have been or will be subject to either of defendants' challenged policies, *see* Pls.' Class Cert. Mot.    Defendants oppose both motions, raising jurisdictional and substantive arguments as well as concerns about the scope of relief.    *See* Defs.' Opp'n; Defs.' Amend. Supp. Mem.

Following an overview of the relevant statutory framework, *see infra* Part III.A, plaintiffs' request for preliminary injunctive relief is addressed, *see infra* Part III.B, then plaintiffs' request for provisional class certification and class certification is considered, *see infra* Part III.C, and, finally, the relief granted and bond imposed are discussed, *see infra* Part III.D.

A.    **Statutory Framework**

Generally, officers making civil immigration arrests must have an administrative warrant. *See Arizona*, 567 U.S. at 408.    "If no federal warrant has been issued, those officers have more limited authority."    *Id.*    Specifically, under the INA, an officer may conduct a warrantless immigration arrest only if the officer "has reason to believe that [1] the alien so arrested is in the United States in violation of any . . . law or regulation and [2] is likely to escape before a warrant can be obtained for his arrest."    8 U.S.C. § 1357(a)(2).    Regulations promulgated under the INA track the statute.    *See* 8 C.F.R. § 287.8(c)(2)(i)-(ii) (providing that "an arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States," and

29

"that the person is likely to escape before a warrant can be obtained"). Though 8 U.S.C. § 1357(a)(2) uses the phrase "reason to believe" as the standard for executing warrantless civil immigration arrests, "aliens in this country are sheltered by the Fourth Amendment in common with citizens," and therefore, to avoid running afoul of the Fourth Amendment, this statutory phrase is "considered the equivalent of probable cause." *Au Yi Lau v. U.S. Immigr. & Naturalization Serv.*, 445 F.2d 217, 222-23 (D.C. Cir. 1971); *see also Tejeda-Mata v. Immigr. & Naturalization Serv.*, 626 F.2d 721, 725 (9th Cir. 1980) ("The phrase 'has reason to believe' [in § 1357] has been equated with the constitutional requirement of probable cause."); *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975) ("The words [in § 1357] of the statute 'reason to believe' are properly taken to signify probable cause."). Put simply, immigration enforcement officers may conduct a warrantless civil immigration arrest only if they have probable cause to believe that a person is both in the United States unlawfully *and* an escape risk.

Whether a person is likely to escape before an administrative warrant can be obtained requires an individualized determination based on knowledge of facts "particularized with respect to that person." *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). The facts informing this assessment may vary. Some courts have found the likelihood of escape to be higher when, for example, the noncitizen presented "conflicting documents," *Yam v. Immigr. & Naturalization Serv.*, 411 F.2d 683, 687 (D.C. Cir. 1969); "had been 'picked up before,'" *Aguirre v. Immigr. & Naturalization Serv.*, 553 F.2d 501, 502 (5th Cir. 1977); admitted that he had previously been removed, *United States v. Puebla-Zamora*, 996 F.3d 535, 538 (8th Cir. 2021); or appeared "extremely nervous" as if "looking for an opportunity to run," *United States v. Meza-Campos*, 500 F.2d 33, 34 (9th Cir. 1974).[20] Courts have also made

---

[20]    Defendants cite one out-of-circuit district court case for the proposition that being "stopped in a vehicle" may also signal a high likelihood of escape. *See* Defs.' Opp'n at 26 (quoting *United States v. Murillo-Gonzalez*, 524 F.

the self-evident finding that the likelihood of escape is lower when the individual has resided in the country for a lengthy period of time and has strong community ties. *See, e.g.*, *La Franca v. Immigr. & Naturalization Serv.*, 413 F.2d 686, 689 (2d Cir. 1969) (noting that being "the owner and operator of a bakery in Jersey City" lowered petitioner's likelihood of escape before a warrant could be obtained); *United States v. Abdi*, No. 04-cr-88 (ALM), 2005 WL 6119695, at *6 (S.D. Ohio Sept. 12, 2005), *rev'd on other grounds*, 463 F.3d 547 (6th Cir. 2006) (no probable cause for escape risk where defendant owned a business, leased property, lived with his then-pregnant wife and two children, and had family in the area); *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 890 (S.D. Ohio 2016) (same, where defendant had a stable job, lived with his fiancé, and helped pay her rent and raise her two children); *United States v. Khan*, 324 F. Supp. 2d 1177, 1187 (D. Colo. 2004) (same, where defendant worked two jobs, owned a vehicle, paid rent, and never experienced legal trouble before his immigration arrest).

Defendants discount the escape risk prong in § 1357(a)(2), arguing that being "clear[ly] and undisputed[ly]" deportable alone may signal a likelihood of escape, citing to Second Circuit cases as support. Defs.' Opp'n at 26 (citing *Vazquez-Medrano v. Sessions*, 726 F. App'x 92, 93 (2d Cir. 2018); *Contreras v. United States*, 672 F.2d 307, 309 (2d Cir. 1982)). This view has been rejected by other courts, however. *See, e.g.*, *United States v. Harrison*, 168 F.3d 483, 1999 WL 26921, *4 (4th Cir. 1999) (per curiam) (unpublished table decision) (discussing *Contreras*, 672 F.2d at 309 and rejecting proposition that "in every case in which an alien is deportable an arrest

---

Supp. 3d 1139, 1151 (D.N.M. 2021), *aff'd on other grounds*, No. 22-2123, 2024 WL 3812480 (10th Cir. 2024)). That case, however, reflects cursory reasoning on this point and a highly deferential acceptance of testimony by the arresting officer, who said the defendant was likely to escape because he "was stopped in a vehicle" and, although he was not behind the wheel, "might attempt to flee and . . . a foot chase could ensue." *Murillo-Gonzalez*, 524 F. Supp. 3d at 1151. The conclusion that an individual poses an escape risk simply by being a passenger in a vehicle, because he could flee on foot, without more, is unpersuasive, as is the court's decision to defer to the officer's assessment on this point.

31

can be made without a warrant"); *Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 937, 946 (D.

Minn. 2017) (holding, despite defendant's admission that "he was in the country illegally," that

"having reason to believe [that the defendant] is an alien subject to removal from the United States

does not, without more, provide the probable cause needed to make a lawful [warrantless] arrest"

(internal quotation marks omitted)); *Pacheco-Alvarez*, 227 F. Supp. 3d at 872, 889-90 (holding

that "ICE officers lacked 'reason to believe' [the defendant] posed a risk of escape," even though

the defendant admitted he "was born in Mexico and did not have any documentation that would

allow him to reside in the United States"); *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1007 (N.D.

Ill. 2016) ("Nor can it be the case that, simply by being potentially removable, an alien must be

deemed to be likely to evade detention by ICE.  Such a reading would render the limitations on

warrantless arrest created by . . . [§] 1357(a)(2) meaningless.").  Though the D.C. Circuit has not

weighed in on this circuit split, the Fourth Circuit has explained persuasively that conflating

unlawful status and escape risk "is contrary to the statute itself, which requires that the

[Immigration and Naturalization Service] must have reasonable belief both that the alien is in the

country illegally *and* that the alien is likely to escape before a warrant can be obtained." *Harrison*,

1999 WL 26921, at *4 (emphasis in original) (citing 8 U.S.C. § 1357(a)(2)).  Indeed, such a

conflation as defendants suggest would run counter to the Supreme Court's instruction that the

likelihood-of-escape requirement be seriously applied to cabin "officers [to a] more limited

authority" where "no federal warrant has been issued." *Arizona*, 567 U.S. at 408.

### B.    Preliminary Injunction

To obtain the preliminary injunctive relief they seek, plaintiffs must show a likelihood of

success on the merits of their claim that defendants have an alleged new policy of executing

warrantless civil immigration arrests in the District of Columbia based on a lower standard than

probable cause, which policy is in violation of applicable law and regulations; that, absent the requested preliminary relief, plaintiffs are likely to suffer irreparable harm; and, finally, that consideration of the equities and the public interest favors the requested relief.  *See supra* Part II. These factors are considered *seriatim*.

### 1.  *Likelihood of Success on the Merits*

Defendants raise a bevy of threshold arguments that plaintiffs' claims are likely to fail for jurisdictional reasons—primarily, that both individual plaintiffs and CASA lack standing, *see* Defs.' Opp'n at 9-15, that various INA jurisdiction-stripping provisions applies, *see id.* at 15-21, and that no reviewable final agency action is established because the new policy plaintiffs allege "does not exist," *see id.* at 12, 21-25.  As to the substantive merits of plaintiffs' claims, defendants contend that the civil immigration arrests executed against the four individual plaintiffs were supported by probable cause of removability and escape risk, *see id.* at 25-28, and thus show only that immigration arrests are conducted in the District in a manner "consistent with the law," *id.* at 9.  For the reasons discussed below, defendants' arguments are legally flawed and belied by the record and therefore unpersuasive.

### a.  Individual Plaintiffs' Standing

To establish standing, a plaintiff "must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  Where plaintiffs seek "forward-looking injunctive" relief, as is the case here, "past injuries alone are insufficient to establish standing."  *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012) (internal quotation marks omitted). Rather, "plaintiffs must show that they face an imminent threat of future injury."  *Chaplaincy of*

*Full Gospel Churches v. Navy*, 697 F.3d 1171, 1175 (D.C. Cir. 2012).   At the preliminary injunction stage, a plaintiff need only demonstrate "a substantial likelihood of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015); *see also Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020) ("At earlier stages of litigation, . . . the manner and degree of evidence required to show standing is less than at later stages."); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("[E]ach element [of standing] must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation.").

Defendants challenge only plaintiffs' satisfaction of the first injury-in-fact requirement of standing.  Defs.' Opp'n at 9-15.  Plaintiffs, however, have clearly established injury in fact based on several factors which, combined, render the likelihood of another arrest "real and immediate," *see City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983), and not mere "subjective apprehensions," Defs.' Opp'n at 11.

First, plaintiffs have presented evidence that defendants "are engaging in a systemic policy and practice of making warrantless arrests without individualized determinations of flight risk." Pls.' Combined Reply Supp. Prelim. Inj. Mot. and Class Cert. Mot. ("Pls.' Reply") at 5, ECF No. 54.  "Courts generally agree that, 'when the threatened acts that will cause injury are authorized or part of a policy, it is significantly more likely that the injury will occur again,' and it is consequently more likely that plaintiffs have standing to pursue equitable relief." *Hinton v. D.C.*, 567 F. Supp. 3d 30, 49 (D.D.C. 2021) (quoting *Does I Through III v. District of Columbia*, 216 F.R.D. 5, 11 (D.D.C. 2003)); *see also Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 979 (D. Ariz. 2011), *aff'd sub nom. Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ("[E]xposure to [the allegedly unlawful] policy is both itself an ongoing harm and evidence that there is 'sufficient likelihood' that Plaintiffs' rights will be violated again.").  Here, as explained further below, *see*

34

*infra* Part III.B.1(d), the alleged existence of an unlawful policy is supported, *inter alia*, by defendants' own public statements acknowledging the use of a standard lower than probable cause to make warrantless immigration arrests, *see, e.g.*, Widas Decl., Ex. 17 at 1; *id.*, Ex. 19 at 1; Second Widas Decl., Ex. 1 at 1, ECF No. 34-1; *id.*, Ex. 2 at 1; as well as over two dozen sworn declarations from plaintiffs recounting examples where defendants' agents failed to make any inquiry to evaluate escape risk before making warrantless arrests, *see* ECF Nos. 17-2 to 17-27.

Second, plaintiffs have shown a substantial likelihood that they are among the group of individuals that defendants target for civil immigration arrests. As other courts have found, the likelihood of imminent harm increases when plaintiffs are among those targeted by a defendant's policy. *See, e.g.*, *Church v. City of Huntsville*, 30 F.3d 1332, 1337-39 (11th Cir. 1994) (plaintiffs who were homeless were "far more likely to have future encounters with the police" under city's alleged policy of harassing or removing homeless individuals); *Williams v. City of Chicago*, No. 22-cv-3773, 2023 WL 6388891, at *5 (N.D. Ill. Sept. 29, 2023) (plaintiffs alleged "sufficient risk of future harm" from police encounters where the city had an alleged policy of targeting plaintiffs' neighborhoods for stop-and-frisks due to the "high rates of ShotSpotter activations"). In this case, evidence from both parties at the preliminary injunction stage offer support for plaintiffs' allegation that defendants target individuals who "appear Latino, work in low-wage jobs, and live in or frequent neighborhoods with large numbers of Latino residents." Pls.' Reply at 6; *see also* Second Widas Decl., Ex. 2 (quoting Chief Border Patrol Agent stating that defendants consider "how [the arrestee] look[s]")[21]; *see also, e.g.*, Escobar Molina Decl. ¶¶ 1, 5 (fitting these

---

[21]    Second Widas Decl., Ex. 2, ECF No. 34-1 at 9 (*Border Patrol official denies racial profiling* at 2).

35

characteristics); B.S.R. Decl. ¶¶ 1, 3, 12 (same); N.S. Decl. ¶¶ 1, 5 (same); R.S.M. Decl. ¶¶ 1-2 (same).[22]

Finally, plaintiffs have sufficiently shown that they cannot avoid repeating the quotidian conduct that led to their original arrests. Courts have been more willing to find that a plaintiff will once again be placed at risk of future injury "when, for reasons beyond the plaintiff's control, he or she is unable to avoid repeating the conduct that led to the original injury at the hands of the defendant." *Church*, 30 F.3d at 1338; *see also Melendres*, 695 F.3d at 998 (standing to challenge policy and practice of traffic stops while Latino plaintiffs were "going about . . . daily life"); *Smith v. City of Chicago*, 143 F. Supp. 3d 741, 752 (N.D. Ill. 2015) (standing to challenge alleged suspicionless stops and/or frisks because plaintiffs were engaging in "innocent, lawful conduct" such as "walking home from the grocery store, standing in front of their own homes or the homes of friends, or taking digital photographs"). Here, plaintiffs' declarations indicate that they were arrested while going about unavoidable, lawful activities of daily life. *See, e.g.*, Escobar Molina Decl. ¶ 5 (leaving apartment building and toward work truck); B.S.R. Decl. ¶ 12 (sitting in driveway in work truck); N.S. ¶ 5 (at Home Depot); R.S.M. Decl. ¶ 2 (passenger of car on way to work). Plaintiffs are thus "realistically threatened by a repetition of [their] experience." *Lyons*, 461 U.S. at 109.

---

[22] To the extent defendants argue that they target individuals based on their lack of legal status—rather than based on the factors plaintiffs claim—that argument would not defeat plaintiffs' standing. *See* Widas Decl., Ex. 19 (post from DHS's official social media account that plaintiffs' allegations in the instant lawsuit are "disgusting, reckless, and categorically FALSE," explaining that "[w]hat makes someone a target for immigration enforcement is if they are illegally in the U.S. – NOT their skin color, race, or ethnicity"). Even if defendants' representation were true, absent any changes to each of the plaintiff's legal status, plaintiffs would *still* be among the group of individuals that defendants target. Defendants have not, for instance, represented that previously arrested plaintiffs who are now in removal proceedings and released, will not be arrested again. *See generally* Defs.' Opp'n*; see, e.g.*, N.S. Decl. ¶ 2 (immigration officers arrested N.S. notwithstanding the fact that he was already in removal proceedings but had been released and had plainly not fled or escaped).

36

Defendants argue that the individual plaintiffs' claims "are based on pure speculation that they will be rearrested simply because they were arrested in the past," noting that "[t]he Supreme Court has rejected 'past-is-prologue' standing." Defs.' Opp'n at 9-10. None of the Supreme Court cases cited, however, is controlling on the facts present here. To start, defendants rely on *Lyons*, the seminal case on finding a lack of standing for forward-looking relief, to contend that "the individual Plaintiffs' standing theory is a redux of *Lyons." Id.* at 10. In *Lyons*, the plaintiff alleged he was stopped by the police for a traffic violation and, despite offering no resistance or threat, subjected to a chokehold that rendered him unconscious. 461 U.S. at 97-98. The Court held that the plaintiff lacked standing to enjoin future chokeholds absent a concrete, imminent threat that he personally would be choked again. *Id.* at 105. "[T]he odds that Lyons would not only again be stopped for a traffic violation but would also be subjected to a chokehold without any provocation," the Court reasoned, were insufficient to make out a federal case for equitable relief. *Id.* at 108 (internal quotation marks and citation omitted). To establish an actual controversy for standing, the Court indicated that plaintiff would have needed to allege, for instance, "that he would have another encounter with the police" by committing another offense and "that the City ordered or authorized police officers to act in such manner." *Id.* at 105-06.

This case differs materially from the facts of *Lyons* on the three considerations discussed above—namely, that defendants have likely adopted a policy and practice of warrantless arrests without probable cause, that plaintiffs are likely among those targeted, and that plaintiffs likely cannot avoid repeating the conduct that led to their original injuries. All these considerations crystallize the "reality of the threat of repeated injury." *See id.* at 107 n.8 (emphasis omitted). The Supreme Court stressed that the plaintiff in *Lyons* had not established a policy that "ordered or authorized police officers to" perform illegal chokeholds against those they encounter, *id.* at 106,

37

whereas plaintiffs here have proffered multiple sworn declarations indicating that defendants *have* adopted a policy and practice of conducting warrantless civil immigration arrests in the District without consideration of escape risk.  Also, unlike the *Lyons* plaintiff*,* whom the Court had refused to assume would again commit a traffic infraction prompting a police stop in which a chokehold was likely to be used, plaintiffs here are far more likely to have future encounters with the immigration officers.  Plaintiffs have proffered evidence suggesting not only that they are among the group of individuals targeted by defendants' agents, but also that they cannot avoid run-ins with these agents lest they avoid "going about . . . daily life."  *See Melendres*, 695 F.3d at 998. Moreover, defendants are under pressure from the White House to meet increasing goals in the number of arrests of individuals targeted by the policy.  *See* Widas Decl., Ex. 4 (quoting senior White House adviser Stephen Miller who, in May 2025, said, "Under President Trump's leadership, we are looking to set a goal of a minimum of 3,000 arrests for ICE every day and President Trump is going to keep pushing to get that number up higher each and every day.").[23] As those "goals" remain in place or even rise, so too does the risk that plaintiffs, who are already being targeted by the policy, will be subject again to warrantless arrest without meeting the statutorily required predicates.

Defendants also invoke Justice Kavanaugh's concurrence in *Noem v. Perdomo*, 2025 WL 2585637 (Sept. 8, 2025), a recent Supreme Court emergency order staying a district court's injunction in a case challenging federal immigration stops without reasonable suspicion, and note the concurrence suggested the plaintiffs there likely lacked standing under *Lyons*.  Even defendants

---

[23]    Widas Decl., Ex. 4, ECF No. 17-1 at 29 (Kyle Cheney and Josh Gerstein, *DOJ Is Walking Back the White House's Goal to Arrest 3,000 Immigrants Per Day* at 1-2, Politico (Aug. 3, 2025) (noting that government attorneys "denied any such quota existed" in response to a lawsuit challenging the immigration arrests in Los Angeles, and observing "a gulf between what White House advisers say in public and what the Justice Department says in court").

concede that this "concurrence" does not "constitute[] binding precedent," *Maryland v. Wilson*, 519 U.S. 408, 412-13 (1997); *see* Hr'g Tr. at 75:5-6.  The Court majority merely issued a one-paragraph order granting a stay without any explanation for its holding.  *See Perdomo*, 2025 WL 2585637, at *1.  Bluntly put, why the Court ruled as it did remains unclear—and without reasoning, this order cannot even be considered as persuasive.  Second, Justice Kavanaugh's conclusion that the plaintiffs lacked standing in *Perdomo* rested on the claims asserted in that case—specifically, plaintiffs there sought to enjoin defendants from targeting individuals for immigration stops based on certain factors, such as race or ethnicity, their accent, and the type of work they did.  *Id.*  Justice Kavanaugh reasoned that plaintiffs in *Perdomo* likely lacked standing under *Lyons,* as defendants may "stop suspected illegal immigrants based on a variety of factors," and thus "plaintiffs ha[d] no good basis to believe that law enforcement will unlawfully stop *them* in the future" based "*only* on [prohibited] factors."  *Id.* at *3 (emphases in original).  In contrast, this case concerns an entirely different context, namely, civil immigration arrests rather than immigration stops, which were at issue in *Perdom*o, and a different type of challenge.  Specifically, plaintiffs are not arguing which factors defendants may consider in their application of a legal standard, but rather contend that defendants have abandoned the proper legal standard entirely.  *See* Pls.' Reply at 8.  Thus, Justice Kavanaugh's concurrence in *Perdomo*, to the extent it has persuasive, let alone controlling, authority, is inapposite.

Defendants further rely on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), contending "the mere fact that [an] allegedly unlawful government enforcement operation has been authorized does not satisfy the 'certainly impending' requirement," especially as "ICE's directives expressly prohibit . . . warrantless arrests under § 1357(a)(2) without prior consideration of flight risk."  Defs.' Opp'n at 11. Relatedly, defendants argue that plaintiffs lack standing to challenge

39

immigration arrests as to nonparties, noting that the Supreme Court has "long held that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* at 14 (internal quotation marks omitted) (quoting *United States v. Texas*, 599 U.S. 670 (2023)).    *Clapper* and *United States v. Texas* are similarly inapposite.  In both cases, the Court found the plaintiffs' alleged future harms highly speculative in large part because plaintiffs could not show they were subject to the policy being challenged. *See Clapper*, 568 U.S. at 411 (reasoning that plaintiffs "fail[ed] to offer any evidence that their communications have been monitored under" the challenged policy); *Texas*, 599 U.S. at 673-74 ("[A] citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.").  In contrast, the individual plaintiffs in this case have already been arrested once pursuant to the challenged policy and have sufficiently established a concrete future threat of arrest given that they are among the group of individuals targeted by defendants' challenged policy and practice.

Lastly, defendants do not challenge the causation or redressability requirements of standing at this stage, *see* Hr'g Tr. at 75:23, nor can they.  "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).  Here, defendants' alleged policy has directly resulted in plaintiffs' arrests without administrative warrants and without consideration of escape risk, and enjoining the policy would "relieve [this] discrete injury" to plaintiffs, *Massachusetts v. Env't Prot. Agency*, 549 U.S. 497, 525 (2007).  The individual plaintiffs have therefore established their standing to pursue their claims.

40

b.  CASA's Standing

An association has standing to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

Defendants contest only that CASA has not satisfied the first requirement for such associational standing.  *See* Defs.' Opp'n at 14-15.  For all the reasons the individual plaintiffs have standing, *see supra* Part III.B.1(a), however, so too would CASA's members have standing to sue in their own right.  Like the individual plaintiffs, CASA's members are also subject to defendants' allegedly unlawful policy, are among the group of individuals that defendants target, and cannot avoid repeating the quotidian conduct that led to their original arrests.  *See, e.g.*, CASA Decl. ¶ 26 (CASA member Luz arrested while working food delivery job); *id.* ¶ 29 (CASA member Mateo arrested while picking up food delivery in parking lot); *id.* ¶ 31 (CASA member Javier arrested at Fort Totten Metro stop); *id.* ¶ 34 (CASA member Miguel arrested while walking out of a grocery store).

Defendants do not challenge CASA's ability to satisfy the second and third requirements for associational standing, *see* Defs.' Opp'n at 14-15, and, thus, "the court may treat the unaddressed arguments as conceded," *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014).  In any event, the interests CASA seeks to protect in this litigation are germane to its mission "to create a more just society by building power and improving the quality of life in . . . immigrant communities," CASA Decl. ¶ 7, and CASA's members will not need to participate in the lawsuit

41

because the issue of defendants' systemic policy and practice of conducting warrantless arrests does not "require the consideration of the individual circumstances of any aggrieved member of the organization," *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015).

Since CASA has associational standing, the question of CASA's organizational standing need not be reached. *See Ctr. For Biological Diversity v. Env't Prot. Agency*, 56 F.4th 55, 69 (D.C. Cir. 2022) ("Because we conclude that the Center for Biological Diversity has associational standing, we need not address its claim of organizational standing . . . ."); *Children's Health Def. v. FCC*, 25 F.4th 1045, 1049 n.2 (D.C. Cir. 2022) ("Because we conclude that [the plaintiff] has associational standing, we do not address whether it has organizational standing.").

### c.   The INA's Jurisdiction-Stripping Provisions

Plaintiffs have established standing to sue, but defendants point to three subparagraphs of the INA's § 1252 as stripping this Court of jurisdiction to adjudicate plaintiffs' claims. *See* Defs.' Opp'n at 15-21. Two subparagraphs, in § 1252(a)(5) and (b)(9), operate jointly and are discussed first, followed by discussion of § 1252(g).

#### i.    8 U.S.C. § 1252(a)(5) and (b)(9)

Section 1252 is titled "Judicial review of orders of removal," setting the focus of this section precisely on "orders of removal." This section's subparagraph (a)(5), titled "Exclusive means of review," states, in relevant part, that "[n]otwithstanding any other provision of law . . . , a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter." 8 U.S.C. § 1252(a)(5). This places judicial review of removal orders solely before courts of appeals, not district courts.

Section 1252's subsection (b), titled "Requirements for review of orders of removal," reiterates the focus on "orders of removal" both in the title and again in the introductory text to this subsection.  This introductory text states, "With respect to review of an order of removal under subsection (a)(1), the following requirements apply," *id.* § 1252(b), and goes on, in subparagraph (b)(9), titled "Consolidation of questions for judicial review," to clarify the scope of matters placed solely before courts of appeals.  *Id.* § 1252(b)(9).  Specifically, subparagraph (b)(9) provides, in relevant part, that, "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." *Id.*  In other words, when the government takes actions to remove a noncitizen from this country, "§ 1252(a)(5)[] prescribes the vehicle for judicial review," namely a petition for review filed with an appropriate court of appeals, and "[l]est there be any question about the scope of judicial review, § 1252(b)(9) mandates that '[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order.'" *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) (quoting 8 U.S.C. § 1252(b)(9)).  Article I immigration courts develop factual records that may support the removal of a noncitizen, and courts of appeals review those factual records for error; subparagraphs 1252(a)(5) and (b)(9) ensure district courts do not become involved in reviewing such factual records.

According to defendants, "[t]he arrests that the individual Plaintiffs challenge were actions taken to remove them from the United States," and, since "[p]laintiffs challenge the questions of

law and fact behind these actions, . . . 8 U.S.C. § 1252(a)(5), (b)(9) require that they bring the[ir] claims in petitions for review in the court of appeals." Defs.' Opp'n at 16.

Under binding precedent, defendants' argument fails. Subparagraph (b)(9) applies only "[w]ith respect to review of an order of removal," 8 U.S.C. § 1252(b), and "'does not present a jurisdictional bar' where those bringing the suit 'are not asking for review of an order of removal,' 'the decision . . . to seek removal,' or 'the process by which . . . removability will be determined.'" *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 19 (2020) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018)) (allowing challenge to Deferred Action for Childhood Arrivals ("DACA") recission); *see Jennings*, 583 U.S. at 354 (three-Justice plurality) (holding that, "by its terms," § 1252(b)(9) did not apply when "respondents challenge[d] their detention without bail, not an order of removal"); *id.* at 293 (additional three-Justice plurality) (emphasizing that an "expansive interpretation of § 1252(b)(9) would lead to staggering results," such as "cramming" challenges to "inhumane conditions of confinement" into the petition-for-review process).

None of the individual plaintiffs have been issued orders of removal, *see* Simon Decl. ¶¶ 20-23, and three of the plaintiffs were not even in removal proceedings at the time they were arrested, *id.* ¶¶ 20, 22-23. The fourth plaintiff, B.S.R., had removal proceedings ongoing for months before his arrest but had been released, and was released again shortly after the challenged arrest. *See* Defs.' Opp'n at 4-5.[24] None of these arrests were made as a "direct[], linear[] part of

---

[24]    Defendants claim that nine days before B.S.R.'s rearrest on August 18, 2025, "B.S.R. violated a term of the alternative to detention program by failing to charge his ankle monitor." Defs.' Opp'n at 27 (citing Simon Decl. ¶ 21). Nothing in defendants' proffered exhibits support this assertion, however. *See* Simon Decl.; Blanchard Decl. (no mention of B.S.R.'s ankle monitor in either declaration). Plaintiffs also dispute this information, stating that B.S.R. has no recollection of letting his ankle monitor die and has never been informed that he did so outside the context of this litigation, and additionally arguing that the ankle monitor program is administered by an independent contractor that would not have passed this information to the government. Hr'g Tr. 95:13-24. When confronted with the lack of evidence in the record, government counsel asserted that the information that B.S.R. was targeted for arrest because he failed to charge his ankle monitor came from conversations with "folks at CBP and by looking at his arrest packet." Hr'g Tr. 68:19-20. Government counsel indicated that defendants "certainly can supplement the record with that information." Hr'g Tr. 68:20-21. When provided with such an opportunity, however, defendants' declarants

44

the removal process." *Id.* at 17; *see Nava v. Dep't of Homeland Sec.*, 435 F. Supp. 3d 880, 890-91 (N.D. Ill. 2020) (holding that, since arrests took place before the Attorney General decided to commence removal proceedings, arrests could not be "action[s] taken . . . to remove an alien" (omission in original and emphasis omitted)).  Defendants submitted declarations indicating that officers arrest individuals, bring them back to ICE facilities, and *then* "r[u]n systems-checks" and "determine[] what, if any further enforcement action or appropriate next step would take place in the case."  Simon Decl. ¶ 10; *see Nava*, 435 F. Supp. 3d at 891-92 (holding that challenge to arrests was permissible because the arrests allegedly took place "before [ICE] had any reason to believe that the [plaintiffs] had violated an immigration law" and without an escape-risk determination).  In no sense, then, were plaintiffs' arrests part of their removal, and their claims do not challenge an order of removal, directly or indirectly.

The consequences of applying § 1252(b)(9) to the instant plaintiffs' claims demonstrate why that provision covers only claims "[w]ith respect to review of an order of removal."  8 U.S.C. § 1252(b)(9).  Defendants urge application of § 1252(b)(9) to require an individual to wait to challenge his or her arrest until an order for removal is entered, but "no such order [might] ever be entered in a particular case," and, thus, this interpretation potentially "depriv[es] that detainee of any meaningful change for judicial review" of a claimed unlawful arrest.  *Jennings*, 583 U.S. at 293.  Even noncitizens eventually subject to an order of removal would, as a procedural matter, be able to challenge the manner of their arrests only by attempting to show that evidence obtained by

---

continued to remain silent on the status of B.S.R.'s ankle monitor and its relation to B.S.R.'s arrest.  *See* Supp. Simon Decl.; Supp. Blanchard Decl.  Notably, none of the records in the referenced "arrest packet" or otherwise relied upon by defendants' declarants have been submitted for the record.  Given the continued lack of evidence backing up defendants' allegation regarding B.S.R., plaintiffs request that the "allegation should be stricken from the record and not considered by this Court."  Pls.' Amend. Supp. Resp. at 13 n.5.  This request is denied since these holes in the factual record, where defendants hold the pertinent backup evidence—should such evidence exist—are actually probative in assessing the reliability and accuracy, or lack thereof, of other representations by defendants about their actions more broadly.

the arrest prejudiced the outcome of their removal proceedings and should be suppressed—not to challenge the arrest itself as an unlawful seizure under the INA and the U.S. Constitution. *See Sanchez v. Sessions*, 904 F.3d 643, 649 (9th Cir. 2018) (considering unlawful arrest allegation as part of suppression motion); *Yanez-Marquez v. Lynch*, 789 F.3d 434, 450-51 (4th Cir. 2015) (same); *Oliva-Ramos v. Att'y Gen.*, 694 F.3d 259, 274-75 (3d. Cir. 2012) (same); *Leal-Burboa v. Garland*, No. 21-70279, 2022 WL 17547799, *1 (9th Cir. Dec. 9, 2022) (same); *Rajah v. Mukasey*, 544 F.3d 427, 44 (2d Cir. 2008) (same).

For these reasons, courts have repeatedly held that government actions collateral to the removal process may be challenged via lawsuits filed in district court, notwithstanding § 1252(a)(5) and (b)(9). *Nielson v. Preap*, 586 U.S. 392 (2019) (challenge to scope of mandatory detention after lawful permanent residents were released from criminal incarceration); *Uranga v. U.S. Citizenship & Immigr. Servs.*, 490 F. Supp. 3d 86 (D.D.C. 2020) (challenge to delay in deciding U-visa application); *Ahmed v. Noem*, No. 25-cv-1351 (RBW), 2025 WL 2299447 (D.D.C. Aug. 8, 2025) (challenge to deletion of student's record from federal database allowing international student to enroll at U.S. university); *Medina v. DHS*, No. 17-cv-218 (RSM), 2017 WL 2954719, at *1, 15 (W.D. Wash. Mar. 14, 2017) (challenge to post-arrest interrogation methods); *Roy v. Cnty. of Los Angeles*, No. 12-cv-09012 (AB), 2018 WL 914773, at *2, 18 (C.D. Cal. Feb. 7, 2018) (challenge to immigration detainer agreements between DHS and local law enforcement agencies). Indeed, multiple other courts have held that lawsuits addressing claims identical to those raised here, alleging warrantless civil immigration arrests without probable cause, are not barred by § 1252(b)(9). *See Nava*, 435 F. Supp. 3d at 895 (denying motion to dismiss for lack of jurisdiction); *United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 704 (E.D. Cal. 2025) (issuing preliminary injunction); *see also Ramirez Ovando v. Noem*, 25-cv-3183 (RBJ), 2025 WL

46

3293467 (D. Colo. Nov. 25, 2025) (issuing preliminary injunction where government did not raise any INA jurisdictional bars).

>   ii.    *8 U.S.C. § 1252(g)*

Defendants also argue that plaintiffs' claims constitute "challenges to decisions and actions about whether and when to commence removal proceedings" and are therefore barred by § 1252(g) of the INA.  Defs.' Opp'n at 18.  Not so.  Subsection 1252(g) bars district court jurisdiction over claims "only [as] to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases,  or *execute* removal orders,'" not to "all claims arising from deportation proceedings."  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (emphasis in original).  Plaintiffs specifically disavow that they are "seeking relief related to any removal proceedings or challenging any removal order" or "challenging the commencement, result, or any part of the process by which their removability will be determined." Pls.' Reply at 1, 13.  Instead, they challenge their warrantless civil arrests, not any of the three enumerated actions, so § 1252(g) does not bar jurisdiction.

One plaintiff, Escobar Molina, has no pending removal proceeding and has never been issued a Notice to Appear (the document required to commence removal proceedings), even now, months after his arrest and release.  Simon Decl. ¶ 20; Hr'g Tr. at 17:16-17 (plaintiffs' counsel stating that "Escobar Molina, as defendants acknowledge, is not even in removal proceedings"). B.S.R. had been in removal proceedings for seven months when he was arrested, Simon Decl. ¶ 21, and thus his arrest could not "commence [removal] proceedings" nor was part of the adjudication, let alone execution, of an order of removal, thereby falling outside the scope of 8 U.S.C. § 1252(g).  N.S. and R.S.M. were issued NTAs commencing removal proceedings shortly after their arrests, Simon Decl. ¶¶ 22-23, but the decision to initiate removal proceedings occurred

47

*after* their arrests when they had already been taken to ICE detention facilities, *id.* ¶¶ 10, 22-23; N.S. Decl. ¶ 15 (NTA issued after interview at ICE facility); R.S.M. Decl. ¶ 11 ("document about immigration court" issued after interview at ICE facility); Hr'g Tr. 54:13-14 (government confirming that only "[t]wo of the plaintiffs were targeted arrests").

This conclusion is bolstered by the fact that the challenged actions are not the kinds of classic prosecutorial decisions covered and protected from judicial review by the terms of § 1252(g).  The Supreme Court has described prosecutorial decisions as "particularly ill-suited to judicial review" because such decisions require assessment of "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Reno*, 525 U.S. at 490 (quoting *Wayte v. United States*, 470 U.S. 598, 607-08 (1985)).  Here, the substantive issues before the Court involve interpreting the INA and DHS regulations and deciding whether plaintiffs have shown a likelihood that defendants have a policy and practice of making civil immigration arrests without the requisite probable cause.  Statutory interpretation and assessments whether probable cause exists for an arrest are well within courts' normal purview.

The cases cited by defendants to interpret § 1252(g) so broadly as to bar plaintiffs' instant claims are unpersuasive.  Defendants rely most heavily on *Tazu v. Att'y Gen.*, 975 F.3d 292 (3d Cir. 2020), Defs.' Opp'n at 19-20, where the noncitizen plaintiff challenged, *inter alia*, his brief detention prior to being put on a plane back to his home country, *Tazu*, 975 F.3d at 298.  A removal order was already in place, but the government had previously been unable to execute the order because Tazu's passport had expired.  *Id.* at 294.  Once the government obtained a new passport for Tazu, his removal order could be executed and, at that point, he was arrested, detained, and (had he not filed suit) would have been on a plane back to Bangladesh within several days.  *Id.* at

295, 297-98.  The Third Circuit held that § 1252(g) barred judicial review of his claim challenging those actions because the arrest and detention were actions taken to effectuate Tazu's final order of removal.  *Id.* at 298.  Most of the cases cited by defendants similarly involve noncitizens' efforts to prevent the government from removing them from the country *after* a final order of removal has issued.  *See Hamama v. Homan*, 912 F.3d 869, 874 (6th Cir. 2018) (§ 1252(g) barred review of "Attorney General's enforcement of long-standing removal orders"); *Rauda v. Jennings*, 55 F.4th 773, 777-78 (9th Cir. 2022) (§ 1252(g) applied when government declined to reopen noncitizen's appeal of removal order); *Camerena v. Dir., ICE*, 988 F.3d 1268, 1274 (11th Cir. 2021) (§ 1252(g) barred habeas claims that sought to delay removal under final removal orders).

Defendants point to one out-of-circuit magistrate judge decision, *Saadulloev v. Garland*, which found that § 1252(g) barred review of a habeas corpus claim by a noncitizen seeking his release from detention after he was arrested by ICE, before a final order of removal had issued.  No. 23-cv-106, 2024 WL 1076106, at *1 (W.D. Pa. Mar. 12, 2024); Defs.' Opp'n at 19.  In that case, however, the arresting officers "served [plaintiff] with a notice to appear" during the arrest, "which initiated the . . . removal proceedings," demonstrating that the arrest "flowed directly from the [arresting] agents' discretionary decision to commence removal proceedings."  *Saadulloev*, 2024 WL 1076106, at *1, 3.

Each of the individual plaintiffs' situations here stand in stark contrast to those in *Tazu*, *Saadulloev*, and the other cases cited by defendants.  In those cases, plaintiffs' challenges were to the execution or commencement, respectively, of removal proceedings, to which their detention and arrest were merely instrumental.  *See Tazu*, 975 F.3d at 298-99 ("[D]etaining Tazu was simply the enforcement mechanism the Attorney General picked to execute his removal."); *Saadulloev*, 2024 WL 1076106, at *1 ("The [arresting ICE] officers served Saadulloev with a notice to appear

before an immigration judge on April 18, 2023, which initiated the current removal proceedings."). None of the arrests of the four individual plaintiffs in this case, on the other hand, were made in immediate anticipation of commencing removal proceedings, much less executing a final order of removal. Two plaintiffs' arrests were not close in time to the commencement of removal proceedings; B.S.R. was already in removal proceedings at the time of his arrest, Simon Decl. ¶ 21, and the Attorney General has yet to initiate removal proceedings against Escobar Molina, *id.* ¶ 20. Their arrests thus cannot be characterized as "actions taken to commence" removal proceedings. 8 U.S.C. § 1252(g). N.S. and R.S.M. did receive NTAs *after* their arrests, but unlike in *Tazu* and *Saadulloev*, their arrests were not made as part of a "discretionary decision to commence removal proceedings." *Saadulloev*, 2024 WL 1076106, at *3. Instead, the agents apparently arrested N.S. and R.S.M. and took them to ICE facilities where, only after an interview, the decision was made to commence removal proceedings. N.S. Decl. ¶ 15; R.S.M. Decl. ¶ 11.

Thus, the INA does not bar jurisdiction over plaintiffs' individual claims because plaintiffs are challenging neither a final order of removal nor a discretionary prosecutorial decision to commence, adjudicate, or execute removal, but rather the defendants' alleged policy and practice of making civil immigration arrests without the probable cause required under the INA's § 1357(a)(2) to make such arrests.

> d. <u>Final Agency Action</u>

Defendants contend that "plaintiffs cannot proceed under the APA because they have not shown that the purported policy and practice of making warrantless arrests is a final agency action." Defs.' Opp'n at 21 (capitalizations altered). This argument, again, discounts binding legal precedent and is belied by the record and, therefore, is unpersuasive.

For an agency action to be "final," the action must "mark[] the consummation of the agency's decisionmaking process" and be "one by which rights or obligations have been determined, or from which legal consequences will flow." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (internal quotation marks omitted).  What constitutes a final agency action should be interpreted "pragmatic[ally]," *Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1, 40 (D.D.C. 2018), as agency action may be final despite expression in a more "informal" form, *see Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000).  *See, e.g.*, *CropLife Am. v. Env't Prot. Agency*, 329 F.3d 876, 881 (D.C. Cir. 2003) (finding that an agency's press release with "clear and unequivocal language" that the agency "will not consider or rely on any [third-party] human studies in its regulatory decision making" to "create[] a 'binding norm'").  "The crux of the inquiry is whether the action is official and presently in effect."  *Planned Parenthood of Greater New York v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-2453, 2025 WL 2840318, at *17 (D.D.C. Oct. 7, 2025) (citing *Soundboard Ass'n v. Fed. Trade Comm.*, 888 F.3d 1261, 1267 (D.C. Cir. 2018)).

Here, "the record" as a whole "leaves no doubt" that defendants in practice have consummated a decisionmaking process that resulted in the implementation of a new policy of conducting warrantless civil immigration arrests based on a lower standard than probable cause. *See Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008) (holding that "the record leaves no doubt the [agency] has a policy of disclosing confidential information," which constituted a final agency action even where "the details of the . . . policy are still unclear"); *see also R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (finding that DHS adopted an unwritten policy directing ICE officers to consider deterrence of mass migration in their custody determinations based on "ample support in the record," including "firsthand knowledge and

collection of data" from immigration experts and defendants' own statements that they consider deterrence as a factor).

The challenged decision originates from the top, coming to a head with the current administration's August 11, 2025 declaration of an "emergency" in the District, *see* Exec. Order No. 14333, 90 Fed. Reg. 39301 (Aug. 11, 2025), which placed the District's Metropolitan Police Department under "direct federal control" for a 30-day period and deployed 800 National Guard troops onto the city's streets, Widas Decl., Ex. 20 (quoting the current president).[25]   In that declaration of emergency, the president repeatedly referenced the topic of immigration, proclaiming that the federal government was going to put things "in control very quickly, like we did in the southern border," *id.*, Ex. 5,[26] and promising that "[t]his city will no longer be a sanctuary for illegal alien criminals," *id.*, Ex. 6.[27]   A few days later, on August 15, 2025, defendant Attorney General Pamela Bondi issued an order directing the District's Mayor to use local resources to assist with "enforcement of federal immigration law," including with "locating, apprehending, and detaining aliens unlawfully present in the United States." *Id.*, Ex. 7.[28]   This enforcement push was further buttressed by an earlier directive from defendant Kristi Noem, the Secretary of DHS, granting to certain enumerated non-DHS federal agents the "authority to arrest and apprehend illegal aliens," *id.*, Ex. 8[29]; as well as the imposition of rising quotas—or, as defendants describe, nonbinding "goals," Hr'g Tr. 69:14-15, 18 (defendants' counsel conceding White House officials made statements about rising "goals" for civil immigration arrests)—that quickly grew to 3,000

---

[25]     Widas Decl., Ex. 20, ECF No. 17-1 at 107 (Kaia Hubbard, *Trump deploys National Guard to D.C., takes control of local police in crime crackdown* at 2, CBS News (Aug. 11, 2025), https://perma.cc/H7QT-ZPSS).
[26]     *Id.*, Ex. 5, ECF No. 17-1 at 34 (Michelle Stoddart et al., *Trump puts DC police department under federal control, deploys National Guard* at 1, ABC News (Aug. 12, 2025), https://perma.cc/4VZ6-UJL7).
[27]     *Id.*, Ex. 6, ECF No. 17-1 at 43 (*DC Critics Slam Trump's Crackdown* at 3).
[28]     *Id.*, Ex. 7, ECF No. 17-1 at 48 (Off. of Att'y Gen., Order No. 6372-2025, "Restoring Safety and Security to the District of Columbia" at 2 (Aug. 15, 2025), https://perma.cc/7NPP-U3EP).
[29]     *Id.*, Ex. 8, ECF No. 17-1 at 50 (*Statement from a DHS Spokesperson on Directive Expanding Immigration Law Enforcement to Some Department of Justice Officials* at 1, DHS (Jan. 23, 2025), https://perma.cc/XW6H-ERZ6).

arrests nationwide per day, *id.*, Ex. 3 (reporting on a call in January 2025 in which senior ICE officials "were told that each of the agency's field offices should make 75 arrests per day [totaling more than 1,800 daily arrests nationwide]" and that "managers would be held accountable for missing those targets");[30] *id.*, Ex. 4 (quoting senior White House adviser Stephen Miller increasing quota to 3,000 daily nationwide in May 2025, and promising that the administration was "going to keep pushing to get that number up higher each and every day").[31]

Heeding these orders, DHS's leadership has, according to plaintiffs, implemented a policy and practice of arresting people who live or work in the District and whom they perceive to be Latino, without the required probable cause findings that those individuals are in the United States unlawfully and are likely to escape before an administrative warrant can be obtained. *See* Pls.' Prelim. Inj. Mot. at 6.

Finding that defendants have implemented such a policy and practice does not require a far leap of logic: defendants *themselves* have repeatedly emphasized an abandonment of the probable cause standard. For example, Tricia McLaughlin, DHS Assistant Secretary for Public Affairs and "the principal advisor to Secretary Noem on all external and internal communications," has made multiple public statements confirming this point.[32] On September 25, 2025, in response to this lawsuit, McLaughlin, as DHS spokesperson, is quoted as making the following public statement:

---

[30]      *Id.*, Ex. 3, ECF No. 17-1 at 21 (Nick Miroff Maria Sacchetti, *Trump officials issue quotas to ICE officers to ramp up arrests* at 1, The Washington Post (Jan. 28, 2025)).

[31]      *Id.*, Ex. 4, ECF No. 17-1 at 28-29 (*DOJ Is Walking Back the White House's Goal* at 1-2).

[32]      Tricia McLaughlin's biography page on DHS's website describes her role as quoted in the text. *See* Tricia McLaughlin, DHS (last updated Jan. 31, 2025), https://perma.cc/KF5B-5AAY. The law is well-settled that "judicial notice may be taken of factual content found on official public websites of government agencies." *Bega v. Jaddou*, No. 22-cv-02171 (BAH), 2022 WL 17403123, at *3 (D.D.C. Dec. 2, 2022), *aff'd sub nom. Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330 (D.C. Cir. 2023); *see also* Fed. R. Evid. 201(b)(2), (d) (providing that a court may, "at any stage of the proceeding," "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of facts available on the District of Columbia's website); *Carik v. U.S. Dep't of Health & Human Servs.*, 4 F. Supp. 3d 41, 48 n.4, (D.D.C. 2013) (same, as to information on a federal agency's website).

"Allegations that DHS law enforcement officers engage in 'racial profiling' are disgusting, reckless, and categorically FALSE. . . .   Under the fourth amendment of the U.S. Constitution, DHS law enforcement uses '*reasonable suspicion*' to make arrests. . . .   The Supreme Court recently vindicated us on this question." Widas Decl., Ex. 17 (emphasis added).[33]   That same day, DHS's official social media account, @DHSgov, posted the same statement, again reiterating that DHS "uses '*reasonable suspicion*' to make arrests" and that "[t]he Supreme Court recently vindicated us on this question." *Id.*, Ex. 19 (emphasis added).   On October 1, 2025, DHS issued a press release on its official website to "set[] the record straight," declaring that its "law enforcement officers are trained to ask a series of well-determined questions to determine status and removability" when they "encounter individuals subject to arrest," *id.*, Ex. 18[34]—yet the press release notably said nothing about escape risk assessments, one of the two-pronged requirements for a warrantless civil immigration arrest.   Later that same month, DHS issued another press release on its official website, again confirming that "DHS law enforcement uses '*reasonable suspicion*' to make arrests," as "vindicated" by the Supreme Court.   Second Widas Decl., Ex. 1, ECF 34-1.[35] Around the same time, Chief Border Patrol Agent Gregory Bovino told the press, "We need *reasonable suspicion* to make an immigration arrest . . . .   You notice *I did not say probable cause*, nor did I say I need a warrant. We need *reasonable suspicion* of illegal alienage that's well grounded within the United States immigration law." *Id.*, Ex. 2 (emphases added).[36]

---

[33]     Widas Decl., Ex. 17, ECF No. 17-1 at 95 (*Lawsuit accuses ICE of illegally arresting Latino immigrants in D.C.* at 2).

[34]     *Id.*, Ex. 18, ECF No. 17-1 at 101 (*DHS Oct. 1, 2025 Press Release* at 1).

[35]     Second Widas Decl., Ex. 1, ECF No. 34-1 at 4 (*DHS Debunks Governor Pritzker's Harmful Lies About Operation Midway Blitz in Chicago, Federal Law Enforcement* at 1 (hereinafter, "*DHS Debunks Governor Pritzker's Harmful Lies*"), DHS (Oct. 6, 2025)).

[36]     Second Widas Decl., Ex. 2, ECF No. 34-1 at 8 (*Border Patrol official denies racial profiling* at 1).

These statements are just some examples, of many, illustrating the finality of defendants' recent policy of making warrantless arrests under a standard lower than probable cause. *See also, e.g.*, Widas Decl., Ex. 22 (White House official, Stephen Miller, quoted as instructing ICE to stop developing target lists of immigrants and to instead "just go out there" and arrest people right away at Home Depots or 7-Elevens)[37]; *id.*, Ex. 23 (quoting statement from Acting Executive Associate Director of ICE Enforcement and Removal Operations telling his agents to "turn up the creative knob up to 11 and push the envelope," and another statement from a senior ICE official telling agents, "If it involves handcuffs on wrists, it's probably worth pursuing").[38]  In fact, when a former-acting U.S. Attorney for the Eastern District of California told Bovino that he could not make civil immigration arrests without probable cause, she reportedly was fired. *Id.*, Ex. 16.[39]

Tellingly, neither defendants' briefs nor their declarations disavowed these public statements.  When questioned at the hearing, government counsel's principal defense was that "these statements [were made] by non-attorneys" who "don't necessarily understand" "legal terms of art" like "reasonable suspicion, [and] probable cause."  Hr'g Tr. at 63:15-19.  This is a remarkable assertion.  On its face, the government's defense appears to be that the individuals behind these statements are ignorant or incompetent, or both.  These statements, however, were made by high-ranking officials—including Secretary Noem's principal communications advisor and a Chief Border Patrol Agent—in their official capacity to the press, on DHS's official website, and on DHS's official social media account.  The Chief Border Patrol Agent, in fact, made clear that he meant "reasonable suspicion" and not "probable cause."  Second Widas Decl., Ex. 1

---

[37]    Widas Decl., Ex. 22, ECF No. 17-1 at 121 (*The White House Marching Orders* at 1).
[38]    *Id.*, Ex. 23, ECF No. 17-1 at 130, 132 (*US immigration officers ordered to arrest more people* at 2, 4).
[39]    *Id.*, Ex. 16, ECF No. 17-1 at 86-87 (*Trump Fired a U.S. Attorney Who Insisted on Following a Court Order* at 1-2).

(quoting Chief Border Patrol Agent to say, "You notice I did not say probable cause.").[40]   The statements were made repeatedly, and publicly, to reach a broad audience, which includes law enforcement officers under DHS's command.   Attempting to add authority and credibility, the statements proclaimed that a recent Supreme Court decision—presumably, *Perdomo*—vindicated DHS's warrantless arrests under a reasonable suspicion standard.   In short, nothing about these statements suggests ignorance or incompetence; indeed, to assume so would also be to assume ignorance or incompetence from DHS's legal counsel, who repeatedly failed to prevent these statements from being made in DHS's official communications to the public.

Nonetheless, to dispel any doubt that these high-ranking officials were simply confused, ignorant, or incompetent, government counsel at the hearing was offered the opportunity to present witnesses under oath to testify that those public statements are wrong and that immigration officers are applying the proper probable cause standard, but defendants' counsel declined the opportunity. Hr'g Tr. at 65:8-11, 21-25.   Later that day, "DHS sent News4 [of NBC] a statement" in response to the hearing in this case, maintaining: "'DHS law enforcement uses '*reasonable suspicion*' to make arrests. . . .   The Supreme Court recently vindicated us on this question."   Mauricio Casillas, *Lawsuit could limit how ICE conducts arrests in DC*, NBC (Nov. 19, 2025) (emphasis added), https://perma.cc/2ZKG-GY3B?type=image.[41]   Though granted permission to make post-hearing submissions, defendants' supplemental declarations likewise did not address these public statements, let alone correct or disavow them.   *See* Supp. Simon Decl., ECF No. 63-1; Supp. Blanchard Decl., ECF No. 63-2.   Nor did the supplemental filings explain why—if a probable

---

[40]     Second Widas Decl., Ex. 1, ECF No. 34-1 at 4 (*DHS Debunks Governor Pritzker's Harmful Lies* at 1).
[41]     Judicial notice is taken of defendants' public statement to NBC News after the hearing in this case, which is consistent with statements defendants have previously made that are included in the record. *See, e.g.*, *Xiaobing Liu v. Blinken*, 544 F. Supp. 3d 1, 6 (D.D.C. 2021) ("The 'Court may take judicial notice of Executive Branch statements and reports pursuant to Federal Rule of Evidence 201[.]'" (quoting *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 24 n.6 (D.D.C. 2018))).

cause standard is being applied as defendants' claim, *see* Supp. Blanchard Decl. ¶ 7—an acting U.S. Attorney was reportedly fired after informing DHS leadership that civil immigration arrests could not be made without probable cause.  *See* Widas Decl., Ex. 16.[42]  Defendants' continued silence regarding these public statements in their declarations, submitted under penalty of perjury, is particularly telling as defendants were cautioned by the Court at the hearing to approach post-hearing submissions with the understanding that "[s]ilence is loud in this case."  Hr'g Tr. at 102:12. Whether defendants decline to correct or are unable to disavow the statements made by high-ranking DHS officials is no matter since the result is the same: these statements are taken at face value as reflecting the current policy and practice of DHS and federal law enforcement agents making civil immigration arrests.

This is, in fact, plaintiffs' point in citing to public statements by high-ranking DHS officials as proof of the current challenged policy and practice. Rather than the possible alternative excuse that such public statements are the result of ignorance or incompetence on the part of DHS's high-ranking officials and legal counsel, the better, straight-forward explanation is that DHS's statements derive from an intentional policy and practice of conducting warrantless civil immigration arrests without the requisite probable cause findings and reflect a purposeful attempt to conflate such *arrests* with civil immigration *stops*, which were the subject of a lower standard outlined in a single Supreme Court Justice's concurrence in *Perdomo*.

In any event, the finding of final agency action does not rest on defendants' official statements alone: Defendants' public statements are *corroborated* by on-the-ground examples from over two dozen declarations describing roughly forty warrantless civil immigration arrests conducted without the requisite probable cause findings.  As plaintiffs aptly note, in none of these

---

[42]    Widas Decl., Ex. 16 (*Trump Fired a U.S. Attorney Who Insisted on Following a Court Order* at 1-2).

arrests documented in their declarations did the agents ask any questions about the arrestees' personal circumstances—such as the person's residence, length of stay in the United States, family members, work history, or anything else about the person's community ties—which courts have found to be relevant in the consideration of escape risk. *See* Pls.' Prelim. Inj. Mot. at 22; *see, e.g.*, Escobar Molina Decl. ¶ 8; B.S.R. Decl. ¶ 7; N.S. Decl. ¶ 7; R.S.M. Decl. ¶ 6; Antony Doe Decl. ¶ 6; Anamaria Doe Decl. ¶ 5; B.R.G. Decl. ¶ 4; Camilo Doe Decl. ¶ 5; Franco Doe Decl. ¶ 4; Cristina Decl. ¶ 6; W.G.M. Decl. ¶ 6. Nor did the arrested individuals display attempts to evade law enforcement, such as by walking, running or driving away when stopped. *See, e.g.*, Escobar Molina Decl. ¶ 5; B.S.R. Decl. ¶¶ 5-6; N.S. Decl. ¶¶ 5-6; R.S.M. Decl. ¶ 5; Anamaria Doe Decl. ¶ 6; Andrés Doe ¶¶ 3-4; Antony Doe ¶ 5; B.R.G. Decl. ¶ 3; Franco Doe Decl. ¶ 3; Javier Doe Decl. ¶¶ 5-6; Luz Doe ¶ 5.

Despite the record evidence, defendants dispute the existence of such a policy, insisting that ICE's directive issued in 2022 to its officers, plus annual trainings, require probable cause findings and comport with section 1357(a)(2). *See* Defs.' Opp'n at 23 (citing *Broadcast Statement of Policy*, Appendix A, Pls.' Ex. 1, ECF 17-1; Simon Decl. ¶ 18). This defense puts a new twist on the old saying, "I can't believe what you say, because I see what you do,"[43] by asserting the position "don't believe <u>either</u> what we say or what we do, just trust whatever we tell you now." This position is unavailing for several reasons.

First, as already noted, recent public statements by DHS high-ranking officials are taken at face value as the articulation by the current administration of the policies and practices being implemented for civil immigration arrests, as borne out by sworn declarations by persons targeted by that policy. That is more than ample proof of the challenged policy at issue in this lawsuit.

---

[43]   James Baldwin, "A Report From Occupied Territory," THE NATION (July 11, 1966).

Second, as plaintiffs note, defendants' declarations discussing the training provided to some of its officers is "virtually irrelevant," Pls.' Supp. Resp. at 11, as all of the trainings discussed with respect to the officers who arrested plaintiffs occurred *before* August 11, 2025—i.e., before defendants instituted the alleged policy and practice challenged in this case, *see* First Supplemental Decl. of Joseph Simon ("Supp. Simon Decl.") ¶¶ 7-8, ECF No. 63-1 (discussing trainings in March 2024 and February 2025); Supp. Blanchard Decl. ¶ 6 (discussing a training in June 2025). Defendants have not proffered any evidence suggesting that federal officers tasked with making civil immigration arrests since the administration's recent implementation of a lower "reasonable suspicion" standard have been trained on the legally correct standard required for such arrests. Any training that the officers may have received under a prior policy thus has no bearing on the current policy and practice.

Third, as a factual matter, defendants' own declarations state only that these trainings were provided to Enforcement and Removal Operations officers from ICE, Simon Decl. ¶ 23, and law enforcement personnel from CBP, Supp. Blanchard Decl. ¶¶ 5-6. Defendants' declarations do not attest that personnel from other federal agencies tasked with conducting civil immigration arrests receive similar training. Defendants' counsel also could not make such a representation when questioned at the hearing. *See* Hr'g Tr. at 88:14-15, 24-25 (responding, when asked what training has been provided to other agents outside of CBP and ICE, that "the declarations are silent on that"). Nor could defendants produce any supplemental declarations after the hearing describing the training that such deputized non-DHS agents received. *See* Supp. Simon Decl., ECF No. 63-1; Supp. Blanchard Decl., ECF No. 63-2. The D.C. Circuit has been clear that INA regulations, *see* 8 C.F.R. § 287.5(e)(3) and § 287.5(c)(1), require immigration officers to receive training before they can make civil immigration arrests, and that when this authority is delegated to other federal

agents, they too must undergo the required training prior to making civil immigration arrests. *See N.S.*, 141 F.4th at 286-87 (concluding that the U.S. Marshals, though delegated authority by the Attorney General to make a civil immigration arrest of a noncitizen, were not authorized to do so because they failed to undergo the required training, and therefore the arrest "was not valid"). Without adequate training, such deputized personnel would be even more susceptible to following directives from high-ranking DHS officials without recognizing the officials' misstatements about the lawful standard for making civil immigration arrests.

Finally, defendants cite the Broadcast Statement of Policy, issued in 2022, instructing ICE officers to comply with section 1357(a)(2)'s probable cause requirements, Defs.' Opp'n at 23, and explain that any warrantless arrests made without probable cause is "unsanctioned," *id.* at 35. This citation is not at all helpful to defendants, however, since, on June 11, 2025, ICE's Principal Legal Advisor "unequivocal[ly]" dictated to all ICE officers nationwide that the Broadcast "remains terminated" and has been "rescind[ed]." *Castañon Nava v. Dep't of Homeland Sec.*, 2025 WL 2842146, at *22 (N.D. Ill. Oct. 7, 2025). On October 7, 2025, a district court in Illinois ordered ICE "to reissue the Broadcast to all ICE officers nationwide . . . with the instruction that the Broadcast shall remain in effect through February 2, 2026." *Id.* at *24. Defendants do not address this history in their brief, and the exact status of the Broadcast remains unclear. In any event, one directive from 2022 cannot outweigh the host of more recent evidence indicating that a lower standard than probable cause is being implemented. *See, e.g.*, Widas Decl., Ex. 17 (quoting DHS Assistant Secretary for Public Affairs, Tricia McLaughlin, who said in September 2025 that immigration officers use a "reasonable suspicion" standard to make arrests);[44] *id.,* Ex. 22, (quoting

---

[44]     Widas Decl., Ex. 17, ECF No. 17-1 at 95 (*Lawsuit accuses ICE of illegally arresting Latino immigrants in D.C.* at 2).

White House official, Steven Miller, instructing ICE to stop developing target lists and to instead "just go out there and arrest illegal aliens" right away in May 2025).[45]

In sum, on the current record, plaintiffs have established that defendants' alleged policy and practice of making warrantless arrests without probable cause is a final agency action.

> e. <u>Defendants' Policy and Practice of Making Unlawful Warrantless Civil Immigration Arrests</u>

Not only are plaintiffs likely to establish this Court's jurisdiction over their claims, plaintiffs are also likely to succeed on the substantive merits of those claims.

Recall that under the INA, an agent can make an immigration arrest without an administrative warrant only if the agent "has reason to believe that [1] the alien so arrested is in the United States in violation of any such law or regulation and [2] is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); *see also* 8 C.F.R. § 287.8(c)(2)(i)-(ii) (similar). Further, the law is clear that, to comport with the Fourth Amendment, the "reason to believe" standard for a civil immigration arrest under the INA is "the equivalent of probable cause." *Au Yi Lau*, 445 F.2d at 222-23; *see also Tejeda-Mata*, 626 F.2d at 725; *Cantu*, 519 F.2d at 496.

Here, as discussed in the section above, plaintiffs have established a substantial likelihood of an unlawful policy and practice by defendants of conducting warrantless civil immigration arrests without probable cause. *See* Part III.B.1.d. This finding is supported, *inter alia*, by defendants' own official public statements that they apply a "reasonable suspicion" standard to conduct warrantless arrests, as well as roughly forty examples detailed in plaintiffs' declarations of arrests conducted without any questions as to escape risk. *Id.*

---

[45] Widas Decl., Ex. 22, ECF No. 17-1 at 121 (*The White House Marching Orders* at 1).

Defendants' systemic failure to apply the probable cause standard, including the failure to consider escape risk, directly violates the clear statutory requirements under the INA, *see* 8 U.S.C. § 1357(a)(2), and DHS's implementing regulations, *see* 8 C.F.R. § 287.8(c)(2)(ii); *see also, e.g.*, *Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 945 (D. Minn. 2017) ("[The plaintiff's] admission regarding his immigration status provided probable cause for the first half of what § 1357(a)(2) demands. There is, however, no evidence that ICE or any other immigration officer had probable cause to believe that [the plaintiff] was 'likely to escape before a warrant can be obtained for his arrest,' the second half of what is needed before a warrantless arrest under § 1357(a)(2) is lawful."); *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1008-09 (N.D. Ill. 2016) ("[B]ecause immigration officers make no determination whatsoever that the subject of a detainer is likely to escape upon release before a warrant can be obtained, ICE's issuance of detainers that seek to detain individuals without a warrant goes beyond its statutory authority to make warrantless arrests under 8 U.S.C. § 1357(a)(2).").

As such, defendants' policy and practice of making warrantless civil immigration arrests without the requisite probable cause findings is also "arbitrary, capricious, or contrary to law" and "in excess of statutory authority," in violation of the APA. *See* 5 U.S.C. § 706(2)(A), (C).[46]  Under the APA, agency actions may "be set aside if they are contrary to law—if, in other words, they are 'not authorized by the statutory text,' or some other source of lawful authority." *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 2025 WL 1825431, at *16 (D.D.C. July 2, 2025) (quoting *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006)).  Similarly, under the APA, agency

---

[46]    Plaintiffs have established a likelihood of success in showing that defendants' policy and practice of making warrantless civil immigration arrests without probable cause as to escape risk violates the APA, and thus plaintiffs' alternative argument that defendants' policy and practice also violates the *Accardi* doctrine need not be reached.  *See* Pls.' Prelim. Inj. Mot. at 26-27.

actions "may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations." *Nat'l Env'l. Dev. Ass'n's Clean Air Project v. Env't Prot. Agency*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks omitted). Indeed, although defendants dispute the policy's existence, defendants do *not* dispute that if such a policy and practice did exist, it would violate the INA, the accompanying regulations, and the APA. Hr'g Tr. at 87:18-20 (defendants' counsel answering, in response to whether the policy alleged by plaintiffs would violate the law, that "[i]f the Court were to find that [defendants did have the policy plaintiffs' alleged], yes, but as I have mentioned before, there is no such policy, but, yes, we don't dispute, the two sides, as to what the law is").[47]

### 2. *Irreparable Harm*

To establish irreparable harm for purposes of obtaining preliminary injunctive relief, the moving party "must make two showings": "First, the harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm. Second, the harm must be beyond remediation." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) (citations, internal quotation marks, and alteration omitted). The second showing means that the harm cannot later be fixed by "adequate compensat[ion] or other corrective relief." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297-

---

[47]    Defendants' argument that plaintiffs fail to state a plausible claim against defendant Drug Enforcement Administration ("DEA") fails. Defs.' Opp'n at 29-30. Contrary to defendants' assertion that "there are no allegations that DEA made illegal immigration arrests of Plaintiffs in violation of immigration laws asserted in the complaint," *id.* at 29, plaintiffs have proffered evidence that the DEA is one of the federal agencies enlisted to assist in immigration enforcement, *see* Widas Decl., Ex. 8 (DHS press release indicating that the DEA has been given "authority to investigate and apprehend illegal aliens"), and the sworn declaration of an individual plaintiff that an agent involved in his challenged arrest wore a vest that said "DEA," N.S. Decl. ¶¶ 6-8. Defendants' counsel, at the hearing, argued that although "the person was wearing a DEA vest, . . . they were wearing an ICE badge, so they were ICE agents." Hr'g Tr. at 84:21-22. This is not a game of "catch me if you can" and, in construing the complaint liberally, as is required at this stage, as well as "granting plaintiff the benefit of all inferences that can be derived from the facts alleged," *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), plaintiffs have alleged sufficient facts of a DEA agent participating in a challenged civil immigration arrest to make the claim against the DEA plausible.

98 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  As applied more specifically to an organization, harm is shown "if the 'actions taken by [the defendant] have perceptibly impaired the [organization's] programs," *League of Women Voters*, 838 F.3d at 8 (alterations in original) (quoting *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994)), including by making "the organization's *activities* more difficult," *id.* (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (emphasis in original)).  "If so, the organization must then also show that the defendant's actions 'directly conflict with the organization's mission,'" which "is required to ensure that organizations cannot engage in activities simply to create an injury."  *Id.* (quoting *Nat'l Treasury Emps. Union*, 101 F.3d at 1430).

Both the individual and organizational plaintiffs satisfactorily show irreparable harm. While defendants reprise their standing argument to contend concerns about re-arrests of the individual plaintiffs and CASA members is merely speculative or theoretical, and consequently not imminent, Defs.' Opp'n at 31, plaintiff B.S.R. has actually been subjected twice to civil immigration arrests, B.S.R. Decl. ¶¶ 7, 14, and these plaintiffs are subject to a much heightened risk of such re-arrest given that they fall within the targeted group for such arrests.

The D.C. Circuit and courts in this District have widely held that an "irreparable loss of personal liberty . . . would follow from an arrest."  *See Rubinstein v. Brownell*, 206 F.2d 449, 456 (D.C. Cir. 1953); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 155 (D.D.C. 2018) ("Courts in this and other jurisdictions have found that deprivations of physical liberty . . . are the sort of actual and imminent injuries that constitute irreparable harm." (collecting cases)); *Sec. & Exch. Comm'n v. Bankers All. Corp.*, No. 95-cv-0428 (PLF), 1995 WL 317586, *6 (D.D.C. 1995) ("As for the question of irreparable harm in the absence of a stay, clearly [defendant] will be harmed by being

incarcerated."); *Barwood, Inc. v. District of Columbia*, 1999 U.S. Dist. LEXIS 21427, at *18 (D.D.C. Feb. 16, 1999), *overruled on other grounds*, 202 F.3d 290 (D.C. Cir. 2000) ("[T]here can be no injury more irreparable than being illegally arrested."). "Unlike economic harm, the harm from detention pursuant to an unlawful policy cannot be remediated after the fact." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015).

In line with these cases involving arrests and detentions, this Court easily finds that the individual plaintiffs and CASA members face irreparable injury under defendants' policy and practice of making unlawful warrantless immigration arrests. Indeed, "being shackled and detained" is so "serious [an] infringement on one's personal freedoms" that even "a few hours" of detention has been found to constitute irreparable harm. *See N.S. v. Hughes*, 335 F.R.D. 337, 351-52 (D.D.C. 2020), *injunction vacated on other grounds sub nom. N.S. v. Dixon*, 141 F.4th 279 (D.C. Cir. 2025). Here, plaintiffs have been arrested and detained for periods ranging from hours to weeks. *See* N.S. Decl. ¶ 23 (detained for a month); Escobar Molina Decl. ¶¶ 5, 14 (detained for a day and a half); B.S.R. Decl. ¶¶ 12, 19-20 (detained approximately 14 hours); R.S.M. Decl. ¶¶ 2, 12 (detained approximately 12 hours).

The irreparability of the threatened injury is further intensified by "inhumane and devastating" conditions plaintiffs will likely face upon another detention, *see* Pls.' Prelim. Inj. Mot. at 28, including being screamed at by federal officials, Escobar Molina Decl. ¶ 7; N.S. Decl. ¶ 13; Y.R.M. Decl. ¶ 8, held in overcrowded and frigid cells, Escobar Molina Decl. ¶ 11; B.S.R. Decl. ¶ 18; Julio Decl. ¶ 6; B.R.G. Decl. ¶ 5, denied sufficient food, N.S. Decl. ¶ 14; Escobar Molina Decl. ¶ 11; B.S.R. Decl. ¶ 18; Camilo Decl. ¶ 7, denied access to restrooms, M.P. Decl. ¶ 8, denied adequate sleep, Escobar Molina Decl. ¶ 11; B.S.R. Decl. ¶ 18; B.R.G. Decl. ¶ 6; M.P. Decl. ¶ 10, denied timely medical care, Cristina Decl. ¶ 8; Gracia Decl. ¶ 6; Carlos Peña Decl.

65

¶ 12, forced to drink water from the toilet, Y.R.M. Decl. ¶ 5, and moved constantly between different locations, N.S. Decl. ¶¶ 12-22; Escobar Molina Decl.¶¶ 9-13; Camilo Decl. ¶¶ 7-8; Y.R.M. Decl. ¶ 6. Such "harm from detention surely cannot be remediated after the fact and is a quintessential irreparable harm." *Make the Rd. New York v. Noem*, No. 25-cv-190 (JMC), 2025 WL 2494908, at *20 (D.D.C. Aug. 29, 2025) (internal quotation marks omitted).

### 3. *Balance of the Equities and the Public Interest*

The last two preliminary-injunction factors, merged in this case where the government is a party, also favor plaintiffs. Federal agencies "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). As the D.C. Circuit has made clear, "there is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977). For this reason, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

Defendants point to a parade of horribles that may ensue if plaintiffs' original proposed injunction were granted and argue vigorously that the "balance of the equities and public interest tips decisively in Defendants' favor." Defs.' Opp'n at 32. To bolster this point, defendants initially described two negative effects of the proposed injunction: (1) the "injunction would throw a central element of immigration enforcement, immigration arrests, into intolerable uncertainty," which would "risk unintended operational consequences and public-safety concerns," and (2) "such an injunction would inject the judiciary into micromanaging every operation and stop conducted in a district of 700,000 people," because "[p]laintiffs would risk nothing by alleging each arrest violates

66

the injunction," potentially subjecting the government to endless contempt proceedings. Defs.'
Opp'n at 29, 32.  At oral argument, defendants' counsel clarified that the "operational
consequences" and "intolerable uncertainty" were "related to the second" concern regarding the
potential for time-consuming and potentially "chill[ing]" contempt proceedings. Hr'g Tr. 91:4,
92:13.  Since officers are already required to fill out a form to "describe the basis for the civil
immigration arrest," *id.* at 91:24-25, the operational consequences of reporting the probable cause
reasons for such an arrest appear to be minimal.  Moreover, while defendants point to "public-
safety concerns" and the "myriad significant economic and social problems caused by illegal
immigration," Defs.' Opp'n at 32 (quoting *Perdomo*, 2025 WL 2585637, at *12-13), the requested
injunction would allow all aspects of immigration enforcement to continue, within the express
bounds of the INA, as interpreted to align with the Fourth Amendment, *see Au Yi Lau*, 445 F.2d at
222; Hr'g Tr. 41:1-2 (plaintiffs' counsel stating, "We are not challenging the government's ability
to make a lawful immigration arrest.")

    Defendants' second concern—that the injunction will subject defendants and their agents
to a never-ending flurry of contempt proceedings and invite "micromanaging" by the Court—is
well-taken. Defs.' Opp'n at 32.  As defendants note, "probable cause is a fact-specific, totality of
the circumstances inquiry."  *Id.* at 29 (citing *District of Columbia v. Wesby*, 583 U.S. 48, 57
(2018)).  Thus, plaintiffs' original proposed relief, which would enjoin defendants and their agents
"from making warrantless immigration arrests in this District unless, pre-arrest, the arresting agent
has probable cause to believe that the person being arrested is likely to escape before a warrant can
be obtained," *see* Pls.' Original Proposed Order at 2, ECF No. 17-28, could be read to encompass
individual mistaken or overzealous civil immigration arrests which, while perhaps unlawful, are
not a consequence of defendants' challenged policy.  Although plaintiffs indicate that they "are

67

not challenging the specific facts of every single arrest" and "whether the probable cause determination was erroneous," Hr'g Tr. 47:23-25, the original proposed injunction posed the risk of allowing exactly such challenges via contempt proceedings. *See Canadian Club Corp. v. Canada Dry Ginger Ale*, 60 F.2d 785, 788 (3d Cir. 1932) (modifying proposed injunction when plaintiffs' version "might, conceivably, provoke endless contempt proceedings").

Plaintiffs' revised proposed order submitted after the hearing resolves defendants' legitimate concern about judicial micromanagement of individual civil immigration arrests and tips the balance of the equities in plaintiffs' favor. *See* Pls.' Revised Proposed Order, ECF No. 62-1; Hr'g Tr. 49:20-21 (Court directing plaintiff to "go back and wordsmith" the injunction to ensure these concerns are resolved). Rather than enjoining the warrantless arrests themselves, the newly proposed injunction enjoins defendants from "enforcing their *policy and practice* of making warrantless civil immigration arrests" without a probable cause finding of escape risk. Pls.' Revised Proposed Order ¶ 1 (emphasis added). This revision avoids the prospect of contempt proceedings for individual erroneous arrests, bolstered by plaintiffs' inclusion of a requirement that parties meet and confer regarding any alleged noncompliance prior to initiating contempt proceedings. *Id.* at 4. Defendants continue to express concerns that the "revised proposal would still require the Court to review the circumstances behind individual arrests and adjudicate whether a given arrest was lawful." Defs.' Amend. Supp. Br. at 3. Any such inquiry would be part of a larger inquiry into whether the defendants were continuing to apply a *policy* of making such arrests unlawfully, with individual arrests as evidence, rather than as individual violations themselves. *See Potter v. District of Columbia*, 126 F.4th 720, 723 (D.C. Cir. 2025) (contempt proceedings require "'clear and convincing evidence'" of violation of "'clear and unambiguous' order of the court" (quoting *Armstrong v. Exec. Off. of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993))).

68

With the defendants' "separation of powers" concerns regarding judicial micromanagement of immigration arrests resolved, *see* Defs.' Opp'n at 33, the balance of equities and the public interest favor entry of a preliminary injunction. The revised injunction sought by plaintiffs requires only that defendants remedy ongoing violations of the law and take steps to communicate the boundaries of the law to their agents. *See* Pls.' Revised Proposed Order ¶¶ 1-2; *see Robbins*, 715 F.3d at 1146 (finding that "the public interest . . . benefits from a preliminary injunction that ensures that federal statutes are construed and implemented in a manner that avoids serious constitutional questions").

Plaintiffs have thus satisfied the requirements to enjoin preliminarily defendants from enforcing a policy, evinced in the statements of senior officials and the conduct of field-level agents, of making warrantless civil immigration arrests without a probable cause assessment as to the likelihood of escape before a warrant can be obtained. Whether plaintiffs qualify for class-wide relief will be discussed next.

### C.    Provisional Class Certification

Plaintiffs seek provisional certification of the following class for the purposes of their request for preliminary injunctive relief:

> **Unassessed Escape Risk Class**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses an escape risk.

Pls.' Revised Proposed Order at 2, ECF No. 62-1 (with original name "Flight Risk Subclass" modified herein to "Unassessed Escape Risk Subclass"). For the reasons discussed below, provisional certification of the Unassessed Escape Risk Class is appropriate.

Separate from a request for provisional class certification, plaintiffs also move for final certification of the following broader class and an additional subclass to the Unassessed Escape Risk Class:

> **Warrantless Arrests Class**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses a flight risk.

> **Immigration Status Subclass**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully.

Pl.'s Revised Proposed Order at 1-2, ECF No. 62-2. Since factual disputes remain with respect to what law enforcement personnel knew about the proposed class representatives' legal statuses prior to their arrests, plaintiffs' motion for final class certification is reserved for a later time.[48]

Given the preliminary posture of the case, plaintiffs "need only provisional class certification in order for the Court to grant their preliminary injunction," *Damus v. Nielsen*, 313 F. Supp. 3d 317, 329 (D.D.C. 2018) (emphasis omitted). Indeed, courts in this district have commonly granted provisional class certification for the purposes of granting a preliminary injunction. *See, e.g.*, *L.G.M.L. v. Noem*, No. 25-cv-2942, 2025 WL 2671690, at *21 (D.D.C. Sept. 18, 2025); *Charles H. v. District of Columbia*, 2021 WL 2946127, at *14 (D.D.C. June 16, 2021);

---

[48] Specifically, the parties dispute, for example, whether the arresting officers had reason to believe the named plaintiffs were in the United States unlawfully prior to making warrantless civil immigration arrests. Plaintiffs contend that, with respect to Escobar Molina and B.S.R., the law enforcement personnel who arrested them did not have probable cause as to removability, because the officers did not ask any questions related to immigration status before conducting the arrests. *See* Pls. Class Cert. Mot. at 14; Pls.' Notice of Filing Revised Proposed Orders for Plaintiffs' Motions at 4 & n.2. On the other hand, defendants assert that Escobar Molina and B.S.R. were "specifically targeted" by immigration enforcement personnel "based on information in law enforcement records," Supp. Blanchard Decl. ¶ 8, which underlying records defendants have not submitted to the court as evidence. Given this factual issue, determination of plaintiffs' final class certification motion—which seeks certification not only of the Unassessed Escape Risk Class but also of the broader Warrantless Arrests Class and the Immigration Status subclass—will be addressed at a subsequent time.

*P.J.E.S. by and through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 501-02 (D.D.C. 2020); *Damus*, 313 F. Supp. 3d at 328-35; *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 44 (D.D.C. 2017); *R.I.L.-R.*, 80 F. Supp. 3d at 191. "In granting such provisional certification, the Court must still satisfy itself that the requirements of [Federal Rule of Civil Procedure] 23 have been met." *Damus*, 313 F. Supp. 3d at 329. "Provisional certification does not lessen the rigor of Rule 23," *L.G.M.L.*, 2025 WL 2671690, at *7, but the court proceeds with the understanding that "[a]n order that grants . . . class certification may be altered or amended before final judgment," FED. R. CIV. P. 23(c)(1)(C).

Under Rule 23, a class may be certified only if the class satisfies all the requirements in Rule 23(a) and the requirements in one of the three subparagraphs of Rule 23(b). Rule 23(a) contains four requirements: "numerosity, commonality, typicality, and adequacy of representation." *Amgen v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 460 (2013) (discussing FED. R. CIV. P. 23(a)(1)-(4)). Once plaintiffs show that the prerequisites listed in Rule 23(a) are met, they must fit their class within one of three "types of class actions" listed in Rule 23(b). FED. R. CIV. P. 23(b). As relevant here, to certify a class under Rule 23(b)(2), plaintiffs must show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Id.* Plaintiffs have satisfied these requirements for provisional class certification purposes, as reviewed below, following discussion of defendants' jurisdictional objections.

### 1. Jurisdiction

As two threshold matters, defendants contend that the court should not certify the proposed class or subclasses because "[p]laintiffs lack standing to seek class certification," and "Section

71

1252(f)(1) prohibits the Court from issuing class wide relief." Defs.' Opp'n at 34; *see* Def.'s Amend. Supp. Br. at 5. Neither argument holds water.

With respect to plaintiffs' standing to certify a class, defendants rehash the same arguments they raised to challenge plaintiffs' individual standing. *See* Defs.' Opp'n at 34-35. As already explained, defendants' standing argument fails. *See supra* Part III.B.1(a)-(b). Nor does 8 U.S.C. § 1252(f)(1) strip jurisdiction to issue APA or class-wide injunctive relief requiring defendants to comply with § 1357(a)(2), for the simple reason that § 1357(a)(2) does not fall within § 1252(f)(1)'s bar on injunctive relief, which bar applies only to the covered INA provisions in 8 U.S.C. §§ 1221-1232.

Defendants try to shoehorn § 1357(a)(2) into the enumerated covered INA provisions, arguing that because among the covered provisions are § 1226 governing arrests and detention with an administrative warrant and § 1229 governing the initiation of removal proceedings, enjoining DHS's implementation of § 1357(a)(2) will "necessarily interfere[] with operation of Sections 1226 and 1229." Defs.' Opp'n at 36; *see* Defs.' Amend. Supp. Br. at 6 (also referencing § 1231, which governs mandatory detention pending removal, and § 1225, which governs arrest and detention of arriving aliens, neither of which was mentioned in defendants' original briefing). Similarly, defendants argue that because *some* parts of 8 C.F.R. § 287, which contains the implementing regulation for 8 U.S.C. § 1357(a)(2), rely upon or cross-reference covered INA provisions, § 1252(f)(1) strips jurisdiction to grant the plaintiffs' requested injunction based on 8 C.F.R. § 287.8(c)(2), which derives its power solely from 8 U.S.C. § 1357(a)(2). *See* Defs.' Amend. Supp. Mem. at 7. In essence, defendants argue that because the government must first arrest someone in order to detain them, any injunction affecting the way arrests are made will necessarily affect the "operation of" provisions governing detention. *See id.* at 6 ("A warrantless

arrest under section 1357(a)(2) is simply a threshold exception to arrest by warrant . . . , and after the arrest, detention may proceed under sections 1225, 1226, and 1231 no differently.").  Such a reading would give § 1252(f)(1) a meaning without any limiting principle, expanding the provision far beyond its terms to strip district courts of jurisdiction over all kinds of matters not expressly covered.  Under defendant's reading, *any* class-wide injunction that has downstream effects on the detention of unlawful immigrants might be barred by § 1252(f)(1), even if the injunction arose under non-covered provisions the INA or even under some other statute.  The Supreme Court has rejected such a reading of this class-action bar provision, noting instead that "a court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision."  *Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022) (emphasis in original).

Defendants rely on cases that, ironically, only confirm the inapplicability of the § 1252(f)(1) bar here.  In *N.S. v. Dixon*, the D.C. Circuit overturned an overbroad injunction that prohibited the U.S. Marshals from making *any* immigration arrests—whether with an administrative warrant (governed by § 1226) or without (governed by § 1357).  141 F.4th 279, 289 (D.C. Cir. 2025); *see* Defs.' Opp'n at 36-37.  Here, plaintiffs seek an injunction restraining only warrantless civil immigration arrests governed by § 1357(a)(2), which is not covered by § 1252(f)(1).  *See* Pls.' Revised Proposed Order.  Defendants also emphasize that under *Garland v. Aleman Gonzalez*, § 1252(f)(1) covers "not just [] the statute itself but [] the way that it is being carried out," and argue that § 1252(f)(1) therefore bars any injunction that in some way affects the operation of one of the covered sections.  Defs.' Opp'n at 36 (cleaned up in original) (quoting *Aleman Gonzalez*, 596 U.S. at 550).  In *Aleman Gonzalez*, however, the question was whether § 1252(f)(1) barred injunctions as to regulations or policies implementing §§ 1221-1232,  or just

73

injunctions that would halt the enforcement of statutory provisions altogether by, for example, holding an entire provision of the INA unconstitutional. *Aleman Gonzalez*, 596 U.S. at 550, 553-54. Indeed, the Court clarified that *Aleman Gonzalez* did not mean that courts must refrain from issuing injunctions that might have "some collateral effect" on §§ 1221-1232. *Id.* at 554 n.4.

Confirming the limits of *N.S.* and *Aleman Gonzalez*, the Ninth Circuit considered and rejected a similar argument by DHS in *Gonzales v. Department of Homeland Security*, 508 F.3d 1227, 1232-33 (9th Cir. 2007). In that case, plaintiffs sought to enjoin DHS from denying certain applications for permission to reapply for admission to the United States after being removed previously, a process governed by § 1255(a) of the INA, which is not covered by § 1252(f)(1). *Id.* at 1230. DHS pointed out that, after such an application is denied, the next step is a proceeding to reinstate the order of removal that was originally used to remove the noncitizen—a process governed by § 1231(a)(5) of the INA, a provision that is covered by § 1252(f)(1)'s bar on class-wide injunctions. *Id.* at 1232-33. According to DHS, an injunction affecting reapplications for admission would affect the operation of a covered provision, since rejecting a noncitizen's reapplication was a step toward reinstatement of a removal order. *Id.* The Ninth Circuit squarely rejected that argument because the injunction "implicates . . . [a] provision which falls under part V [rather than part IV, the part covered by § 1252(f)(1)], notwithstanding that a reinstatement proceeding may be a collateral consequence of an unsuccessful . . . application." *Id.* at 1233. The exact same logic applies here. Just because a warrantless civil immigration arrest, governed by § 1357(a), may lead to detention or other consequences governed by §§ 1221-1231 does not mean that an injunction implicating § 1357(a)(2) is effectively an injunction impairing the operation of the covered sections. *See Refugee & Immigr. Center for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 107 (D.D.C. 2025) (injunction requiring compliance with asylum law governed by

non-covered provisions was permissible even if the injunction "might have downstream effects on removal proceedings" covered by § 1252(f)(1)).  Section 1252(f)(1) thus poses no bar to the exercise of jurisdiction to issue a class-wide injunction here.[49]

### 2. *Rule 23(a) Factors*

#### a.  Numerosity

To satisfy numerosity, the class representatives must demonstrate that the "class is so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1).  The requirement imposes no "hard rules for when joinder will be found to be impracticable," *Coleman through Bunn v. District of Columbia*, 306 F.R.D. 68, 76 (D.D.C. 2015), but "[g]enerally speaking, courts have found that a proposed class consisting of at least forty members will satisfy the impracticability requirement," *Bynum v. D.C.*, 214 F.R.D. 27, 32 (D.D.C. 2003).  In addition, "classes including future claimants generally meet the numerosity requirement due to the 'impracticality of counting such class members, much less joining them.'" *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019) (quoting 1 Rubenstein, Newberg on Class Actions § 3:15); *see also Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975) ("Smaller classes are less objectionable where . . . the plaintiff is seeking injunctive relief on behalf of future class members as well as past and present members.").

Numerosity in this case is straightforward.  Indeed, defendants concede that plaintiffs have "identif[ied] roughly forty alleged instances" of unlawful arrests in their declarations alone.  Defs.' Opp'n at 38.  Plaintiffs further indicate that "ICE made around 1,200 arrests" from early August until mid-September, and that "[m]ass immigration arrests in D.C. remain ongoing."  Pls.' Prelim.

---

[49]    Defendants devote several pages in their supplemental briefing to arguing that § 1252(f)(1) would also prohibit declaratory relief or a stay of agency action.  Defs.' Amend. Supp. Mem. at 7-12.  Since neither type of relief will be granted at this stage, those questions are not reached.

Inj. Mot. at 5 (citing Widas Decl., Ex. 10 (reporting information received from "officials with knowledge of the data")[50]).  Defendants fault plaintiffs' inability to identify exactly "how many of the 1,200 ICE arrests were made subject to an impermissible policy and practice," Defs.' Opp'n at 38, but in considering "the number of potential class members, the Court need only find an approximation of the size of the class, not an exact number of putative class members." *Coleman*, 306 F.R.D. at 76 (internal quotation marks omitted).  Here, plaintiffs have plainly demonstrated that the proposed class consists of at least 40 members, and likely many more than that.  *See Bynum*, 214 F.R.D. at 32.

b.  Commonality

To satisfy commonality, the class representatives must establish that "there are questions of law or fact common to the class."  FED. R. CIV. P. 23(a)(2).  A common question is one that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).  In other words, "the class must show that its theory can be proved on a classwide basis."  *Brown v. D.C.*, 928 F.3d 1070, 1080 (D.C. Cir. 2019) (internal quotation marks omitted).

Here, plaintiffs have satisfied the commonality requirement because their provisional class seeks to challenge a system-wide practice or policy affecting all putative class members—namely, defendants' alleged policy and practice of conducting warrantless civil immigration arrests without the required finding of escape risk.  The alleged policy "appl[ies] equally and generally to the entire class," *Steele v. United States*, 159 F. Supp. 3d 73, 80 (D.D.C. 2016), and thus "the truth or falsity of these questions would 'resolve an issue that is central to the validity of each one of the

---

[50]     Widas Decl., Ex. 10, ECF No. 17-1 at 61 (*How Washington Became a Testing Ground for ICE* at 5).

claims in one stroke,'" *id.* (quoting *Wal-Mart*, 564 U.S. at 349-50). *See also, e.g.*, *DL v. D.C.*, 713 F.3d 120, 127-28 (D.C. Cir. 2013) (noting that commonality can be established by showing "widespread" wrongdoing by a defendant through a "uniform policy or practice that affects all class members."); *Stephens v. Farmers Rest. Grp.*, 329 F.R.D. 476, 483 (D.D.C. 2019) (holding that it was "more than sufficient to meet the commonality requirement" when class members "were subject to the same work policies and practices" (internal quotation marks omitted)); *Damus*, 313 F. Supp. 3d at 332 (holding commonality satisfied where plaintiffs "sufficiently identified a common cause and injury as a result of the [challenged policy,] the current parole regime").

Contrary to defendants' contentions, the legality of the challenged policy and practice is not a question that requires wading into "fact-specific and individualized" determinations about each class members' arrest. Defs.' Opp'n at 40. As plaintiffs explain, they do not challenge whether the agents actually had probable cause to arrest each putative class member, but rather whether defendants were making pre-arrest individualized assessments for "flight risk *at all*, across the entire class." Pls.' Reply at 35-36 (emphasis in original). Indeed, a district court in California rejected a similar argument by defendants in a case challenging Border Patrol agents' alleged arrest and detention of farm workers without reasonable suspicion or probable cause. *See United Farm Workers*, 785 F. Supp. 3d at 725. There, the court found that defendants' characterization of escape risk assessments as "inherently individualized determinations" "misse[d] the mark," because the plaintiffs "d[id] not contend Border Patrol erred in assessing flight risks; they contend[ed] that the probable cause determinations were not performed *at all*." *Id.* (emphasis in original).

Other courts have reached similar conclusions. *See also, e.g.*, *L.G.M.L.*, 2025 WL 2671690, at *8 (noting that "the potential factual differences that Defendants identify," in a class suit challenging the hasty expulsion of "certain unaccompanied alien children . . . back to their

home country of Guatemala," "do not affect Plaintiffs' entitlement to relief on their claims about statutorily and constitutionally required *process*" (emphasis in original) (internal quotation marks omitted)); *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994) ("Indeed, (b)(2) classes have been certified in a legion of civil rights cases where commonality findings were based primarily on the fact that defendant's conduct is central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the conduct."); *Moreno v. Napolitano*, 2014 WL 4911938, at *8 (N.D. Ill. Sept. 30, 2014) ("Defendants . . . misunderstand the nature of Plaintiffs' claims. Rather than challenge the reasonableness or constitutionality of each individual decision to issue a detainer, Plaintiffs are challenging the general policies and procedures used by Defendants when issuing detainers."). Plaintiffs thus satisfy the commonality requirement.

### c.   Typicality

To satisfy typicality, the class representatives must show that "the claims or defenses of the representative parties are typical of the claims or defenses of class." FED. R. CIV. P. 23(a)(3). "The requirement for typicality is satisfied if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." *Stephens*, 329 F.R.D. at 483. Varying fact patterns "do[] not mandate a finding of a lack of typicality, as long as the claims arise out of the same legal or remedial theory." *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 27 (D.D.C. 2001). The commonality and typicality inquiries "tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).

The proposed class representatives' claims in this case are typical of those of the putative class members. Each plaintiff alleges he was arrested without a warrant and without consideration

of escape risk.  *See* Escobar Molina Decl. ¶¶ 5-8 (arresting agents did not ask any questions about immigration status or ties to the community before arresting without a warrant); B.S.R. Decl. ¶¶ 14-16 (did not ask about immigration status or ties to the community); R.S.M. Decl. ¶¶ 3-6 (did not ask about ties to the community); N.S. Decl. ¶¶ 5-7 (did not ask about ties to the community). Thus, notwithstanding the "individual factual circumstances" behind each arrest, Defs.' Opp'n at 42, individual plaintiffs at bottom "suffered a similar injury from the same course of conduct," *Bynum*, 214 F.R.D. at 34.  *See also, e.g.*, *Damus*, 313 F. Supp. 3d at 334 ("Although the specific details of each named Plaintiff's parole adjudication may vary, the crux of their allegations is typical of the claims of the putative class that the Government is no longer providing asylum-seekers with the individualized determinations and opportunities for release required under the Directive."); *Gonzalez v. U.S. Immigr. Customs Enf't*, 975 F.3d 788, 810-12 (9th Cir. 2020) (finding typicality despite the purportedly "unique" factual circumstances of plaintiff's probable cause determination, because plaintiff's legal claim was "no different than [that of] any other class member"); *Kidd v. Mayorkas*, 343 F.R.D. 428, 439 (C.D. Cal. 2023) (finding typicality despite "factual differences across various ICE encounters," because "[p]laintiffs do not . . . seek a declaration or injunction directed at any individual ICE encounter" but rather "challenge ICE's policies or practices on a systemwide basis.").  Typicality is also satisfied.

> d.  <u>Adequacy</u>

Finally, to satisfy adequacy, the representative parties must show they "will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4).  The adequacy requirement "embraces two components: the class representative (i) 'must not have antagonistic or conflicting interests with the unnamed members of the class' and (ii) 'must appear able to vigorously prosecute

the interests of the class through qualified counsel.'" *J.D.*, 925 F.3d at 1312 (quoting *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997)).

The proposed class representatives in this case are adequate. With respect to the first element, the proposed class representatives do not have antagonistic or competing interests with the unnamed members of the class. Plaintiffs and putative class members all are subject to defendants' policy and practice with respect to making warrantless civil immigration arrests without consideration of escape risk, risk suffering similar injuries including detention and separation from their families, and share a common interest in ensuring the protection of their rights. *See generally* Escobar Molina Decl. ¶¶ 22-28; B.S.R. Decl. ¶¶ 26-33; N.S. Decl. ¶¶ 27-33; R.S.M. Decl. ¶¶ 18-24.

With respect to the second element, the proposed class representatives are able to vigorously prosecute the interests of the class through qualified counsel. Courts typically find proposed class representatives inadequate in "flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." *Garnett v. Zeilinger*, 301 F. Supp. 3d 199, 210-11 (D.D.C. 2018). None of these concerns are present here. The proposed class representatives are represented by very capable counsel from Covington & Burling LLP and a number of civil rights organizations, whose adequacy is not contested. *See* Defs.' Opp'n at 43-44; *see also* ECF Nos. 19-1 to 19-6 (detailing proposed class counsel's credentials and experience with class actions). Plaintiffs also attest that they understand the responsibility of being a class representative and are willing to protect the class's interests. *See* Escobar Molina Decl. ¶¶ 22-28; B.S.R. Decl. ¶¶ 26-33; N.S. Decl. ¶¶ 27-33; R.S.M. Decl. ¶¶ 18-24. The proposed class representatives satisfy the adequacy requirement.

### 3. *Rule 23(b)(2) Requirements*

A Rule 23(b)(2) class may be certified where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores*, 564 U.S. at 360 (internal quotation marks omitted). Accordingly, Rule 23(b)(2) has been interpreted as imposing two requirements: (1) the defendant's action or refusal to act must be generally applicable to the class, and (2) plaintiff must seek final injunctive relief or corresponding declaratory relief on behalf of the class. *See Steele*, 159 F. Supp. 3d at 81; *Bynum*, 214 F.R.D. at 37–38; *R.I.L-R*, 80 F. Supp. 3d at 182.

Plaintiffs' proposed class suit satisfies both requirements. First, plaintiffs challenge what they allege to be a systemic policy and practice of effectuating warrantless arrests without probable cause, and thus defendants' challenged actions are "generally applicable to the class." *Steele*, 159 F. Supp. 3d at 81. Second, enjoining such a policy and practice "would provide relief to each member of the class," *Wal-Mart*, 564 U.S. at 360, by prohibiting defendants from arresting class members without an administrative warrant and without probable cause that the person is an escape risk.

Defendants' objection to Rule 23(b)(2) certification stems from similar grounds to their objections regarding commonality and typicality, arguing that "each arrested alien has a unique set of circumstances and unique avenues for seeking relief." Defs.' Opp'n at 44. Again, this argument is unpersuasive because plaintiffs are only challenging defendants' general policy and

practice of conducting warrantless arrests without probable cause; they "are not asking for this Court to remedy discrete errors," *Damus*, 313 F. Supp. 3d at 334.

Indeed, Rule 23(b)(2) exists precisely "so that parties and courts, especially in civil rights cases like this, can avoid piecemeal litigation when common claims arise from systemic harms that demand injunctive relief." *DL v. D.C.*, 860 F.3d 713, 726 (D.C. Cir. 2017). As such, courts have regularly certified classes challenging immigration-related policies. *See, e.g.*, *J.D.*, 925 F.3d at 1312 (upholding certification of pregnant noncitizen unaccompanied minors in the government's custody who challenged the government's alleged "across-the-board ban on access to abortion"); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-cv-306, 2025 WL 1825431, at *46 (D.D.C. July 2, 2025) (certifying Rule 23(b)(2) class of all individuals subject to a presidential proclamation that declared an "invasion" of noncitizens across the southern border and limited the ability of those noncitizens to apply for asylum or a withholding of removal); *R.I.L-R*, 80 F. Supp. 3d at 182 (certifying Rule 23(b)(2) class of noncitizen plaintiffs challenging an alleged DHS policy of "denying release to all asylum-seeking Central American families in order to deter further immigration"); *L.G.M.L.*, 2025 WL 2671690, at *7 (provisionally certifying Rule 23(b)(2) class "of all unaccompanied alien children from Guatemala in (and who will be in) [the government's] custody" who challenge their hasty expulsion back to their home country); *United Farm Workers*, 785 F. Supp. 3d at 731 (provisionally certifying two classes, one challenging detentive stops without reasonable suspicion and another challenging warrantless arrests without consideration of flight risk), *appeal docketed*, No. 25-4047 (9th Cir.). This case is no different, and Rule 23(b)(2) provisional class certification is granted.

### D.    Relief and Bond

#### 1.  *Relief*

Plaintiffs have demonstrated a likelihood of success on the merits of their challenge to defendants' policy and practice of making warrantless civil immigration arrests without an individualized determination supporting a probable cause finding of escape risk, as well as the likelihood of their irreparable harm and the balance of equities in their favor.  *See supra* Part III.B.1.  Additionally, they have shown entitlement to provisional class certification as to their Unassessed Escape Risk Class.  *See supra* Part III.C.  Accordingly, an injunction will issue against defendants' unlawful policy and practice of making warrantless civil immigration arrests without probable cause that the individual is likely to escape before a warrant can be obtained.

"Every order granting an injunction," including a preliminary injunction, "must . . . state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required." FED. R. CIV. P. 65(d)(1).  Although an injunction may not "order[] the defendant simply to refrain from violating the law 'in any particular' or from breaching a general duty," *Sec. & Exch. Comm'n v. Savoy Indus., Inc.*, 665 F.2d 1310, 1317 (D.C. Cir. 1981) (quoting *Russell C. House Transfer & Storage Co. v. United States*, 189 F.2d 349, 351 (5th Cir. 1951)), an injunction will "not [be] too vague if it relate[s] the enjoined violations to the context of the case," *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009).[51]

---

[51]    Defendants characterize plaintiffs' requested relief as an "impermissible 'follow the law' injunction." Defs.' Opp'n at 29 (capitalization altered).  Yet, there is no bar on injunctions that order the defendant to cease conduct identified as violating a statute.  *See, e.g.*, *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 189, 191-92 (1949) (enforcing an injunction not to violate specific provisions of the FLSA as to plaintiff class); *Philip Morris USA*, 566 F.3d at 1137 (permitting injunctions that "track[] the language of the statute," so long as the terms are concrete enough to be followed).  In any case, plaintiffs request injunctive relief beyond the plain terms of the statute. *See* Pls.' Revised Proposed Order.

Defendants have adopted a policy of making arrests using a deficient standard under both the INA and well-settled constitutional principles.  *See supra* Part III.B.1(d)-(e).  An injunction directing defendants to cease applying such policy and instead to instruct their agents to arrest members of the plaintiff class in compliance with the law—i.e., only after establishing probable cause that they are likely to escape before a warrant can be obtained—is entirely reasonable and sufficiently specific for defendants to follow.  *See* Pls.' Revised Proposed Order ¶ 1.[52]  While defendants have submitted declarations indicating that at least ICE and CBP agents have historically been trained on the correct standard for warrantless arrests, *see* Simon Supp. Decl. ¶ 5; Blanchard Supp. Decl. ¶ 7, plaintiffs' proposed injunction requires defendants to transmit the injunction itself to *all* agents of *all* defendants who might have responsibilities related to the Order, *see* Pls.' Revised Proposed Order ¶ 2—clarifying for defendants' field officers any confusion caused by senior officials' statements that "reasonable suspicion," rather than probable cause, should be used to make arrests.  *See, e.g.*, Widas Decl., Ex. 17 (quoting DHS public statement that "DHS law enforcement uses 'reasonable suspicion' to make arrests"); Second Widas Dec., Ex. 2 (quoting Chief Border Patrol Agent Gregory Bovino as stating, "We need reasonable suspicion to make an immigration arrest . . . .  You notice I did not say probable cause, nor did I say I need a warrant." ).

Plaintiffs' request for reporting will also be granted as part of the preliminary injunction.  *See* Pls.' Revised Proposed Order ¶¶ 3-5.[53]  Defendants object that the proposed reporting

---

[52]    Defendants' concern that the injunction originally sought by plaintiffs would subject defendants to regular contempt proceedings in which defendants would have to lodge a "fact-specific, totality-of-the-circumstances" defense of individual arrests, Defs.' Opp'n at 29, has been resolved by plaintiffs' revised proposed injunction, as discussed *supra* Part III.B.3.

[53]    Additionally, plaintiffs' proposed meet-and-confer requirements are, as defendants say, "essentially imbedded in Local Civil Rule 7(m)," Defs.' Amend. Supp. Mem. at 3, but include slightly more detail as to the timeline and method for conferral, *see* Pls.' Revised Proposed Order ¶¶ 6-8.  These requirements will promote efficient administration and enforcement of the injunction and will be included in the order of the Court.

requirements, which would require defendants and their agents to "document the facts and circumstances surrounding [each] warrantless civil immigration arrest in narrative form" including "the specific, particularized facts that supported the agent's pre-arrest probable cause to believe that the person [was] likely to escape before a warrant [could] be obtained," Pls.' Revised Proposed Order ¶ 3, would "subject the Government to on-going and rolling discovery even though Plaintiffs brought claims solely under the Administrative Procedure Act" and thereby "convert the Court into one that constantly supervises mini-discovery disputes." Defs.' Amend. Supp. Br. at 4. These concerns do not outweigh the benefits of the proposed reporting requirements. While in APA cases "the focal point for judicial review should be the administrative record already in existence," *Camp v. Pitts*, 411 U.S. 138, 142 (1973), this reporting is not aimed at assisting plaintiffs in proving their underlying APA case, but rather at ensuring compliance with the court-ordered preliminary injunction, especially given that defendants appear unable to keep their policies straight between the high-ranking DHS officials, DHS counsel, and other levels of management. *See* Hr'g Tr. 59:21-22 (defendants' counsel confirming reasonable suspicion is not a lawful basis to make a civil immigration arrest); *id.* 60:5-6 (defendants' counsel admitting that "communications people in the government" made statements that reasonable suspicion does provide a basis for civil immigration arrests); Supp. Blanchard Decl. ¶ 7 (stating that "CBP instructs its law enforcement personnel that to conduct a warrantless civil immigration arrest pursuant to 8 U.S.C. § 1357(a)(2) there must be probable cause" but not contradicting the statements by DHS leadership that "reasonable suspicion" is used). Even if plaintiffs could use some of the information disclosed in later stages of litigation, the reporting requirements are still permissible because courts may allow discovery in APA cases when "[t]he agency action challenged . . . is unlike the actions normally challenged in APA cases, such as a promulgated regulation." *AFL-CIO v. Dep't of Lab.*, 349

85

F.R.D. 243, 248 (D.D.C. 2025), especially when discovery is needed to "ascertain the contours of the precise policy at issue," *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018) (quoting *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 928 (D.C. Cir. 2008)).

The balance of the equities also tips in favor of ordering the defendants to provide information about individual arrests to plaintiffs while the preliminary injunction is in place. Notably, the reporting requirements are not unduly burdensome given that defendants' counsel conceded at trial that agents making immigration arrests "already fill out" a form for each arrest that "should" include the facts giving rise to probable cause to make the arrest.  Hr'g Tr. 91:11-25.

On the other hand, the reporting requirements support the public interest and the administrability of the preliminary injunction order given the substantial ambiguities in the record about who is making these civil immigration arrests, whether these officers have the required training to do so, and on what basis these officers are making such arrests.  For instance, when N.S. was arrested, one officer wore a vest that said "DEA" but a badge that said "ICE," and none of the arresting officers identified themselves, N.S. Decl. ¶ 4, but the government was unable to clarify at oral argument why an agent would have been wearing the insignia of multiple agencies, Hr'g Tr. 85:14-25.  Reports of masked agents making what appear to be civil immigration arrests without identification or explanation are widespread, *see* Antony Doe Decl. ¶ 4; Mateo Doe Decl. ¶ 6; B.R.G. Decl. ¶ 2-3, furthering confusion over who is arresting immigrants and why, *see Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685 (WBY), 2025 WL 2777659, *40 (D. Mass. Sept. 30, 2025).  As Judge Young of the District of Massachusetts recently wrote, "ICE goes masked for a single reason—to terrorize Americans into quiescence." *Id.*  The same is true of agents making arrests without identifying themselves or their reasons for the arrest.  Transparency

during these arrests "is a matter of honor." *Id.* Requiring defendants to put pen to paper and explain who made each arrest and why constitutes the bare minimum to ensure defendants are compliant with the Constitution, the INA, and this Court's order, given the blatant misstatements about the INA's requirements for such arrests repeatedly espoused by DHS high-ranking officials.

Thus, the injunction requested by plaintiffs with revisions will be entered.

### 2. *Bond*

Defendants request that any injunctive relief be accompanied by a bond pursuant to Federal Rule of Civil Procedure 65(c), which provides that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). Rule 65(c), however, "gives this court broad discretion to determine the appropriate amount of an injunction bond." *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 121 (D.D.C. 2025) (citing *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999)). "Exercising that discretion, federal courts typically require substantial bonds only in suits between private parties with significant monetary interests at stake." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 224 (D.D.C. 2025).

Plaintiffs reasonably request the security required by Rule 65(c) to be set at $1.00. Pls.' Prelim. Inj. Mot. at 35 n.2. Courts have commonly found that "in public interest cases," such as this one, "when the risk of harm to the government is non-existent or remote, [only] a nominal bond may be appropriate." *CASA, Inc. v. Trump*, No. 25-cv-201 (DLB), 2025 WL 2257625, *10 (D. Md. Aug. 7, 2025); *see also J.G.G. v. Trump*, 786 F. Supp. 3d 37, 83 (D.D.C. 2025), *vacated and remanded on other grounds*, No. 25-5217, 2025 WL 2317650 (D.C. Cir. 2025) (imposing a $1.00 nominal bond in class suit challenging summary removal of plaintiffs from United States to

87

El Salvador as violative of due process); *L.G.M.L. v. Noem*, No. 25-cv-2942 (TJK), 2025 WL 2671690, *20 (D.D.C. Sept. 18, 2025) (same bond required, in a class suit challenging the government's plan to expel hastily from the United States certain unaccompanied alien children and send them back to their home country of Guatemala); *Barbara v. Trump*, 790 F. Supp. 3d 80, 104 (D.N.H. 2025) (same bond required, in a suit defending birthright citizenship).  This is especially true in cases where plaintiffs seek to "vindicate fundamental rights" under immigration laws, as "given their vulnerable status," plaintiffs "in all likelihood lack the monetary resources necessary to post a bond."  *J.G.G.*, 786 F. Supp. 3d at 83.  Accordingly, plaintiffs in this case are directed to collectively post a nominal bond of $1.00.

## IV.    CONCLUSION

For the reasons set forth above, plaintiffs' Motion for a Preliminary Injunction, to Stay, and for Provisional Class Certification, ECF No. 17, is **GRANTED IN PART**, as described above, and **DENIED IN PART** as to plaintiffs' request for a stay, pursuant to 5 U.S.C. §706. Plaintiffs' Motion for Class Certification, ECF No. 19, is **DENIED** without prejudice.  An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  December 2, 2025

_____
**BERYL A. HOWELL**
United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOSÉ ESCOBAR MOLINA, *et al.*,
*individually and on behalf of all others
similarly situated*,

              Plaintiffs,

              v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

              Defendants.

Civil Action No. 25-3417 (BAH)

Judge Beryl A. Howell

## <u>ORDER</u>

Upon consideration of plaintiffs' Motion for Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification ("Pls.' Prelim. Inj. Mot."), ECF No. 17, and Motion for Class Certification, ECF No. 19, the memoranda and supplemental memoranda and declarations and exhibits attached thereto, in support and opposition, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby—

**ORDERED** that plaintiffs' Motion for Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification, ECF No. 17, is **GRANTED IN PART** and **DENIED IN PART** as to plaintiffs' request for a stay, pursuant to 5 U.S.C. § 705; it is further

**ORDERED** that the following class is provisionally certified:

**Unassessed Escape Risk Class**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses an escape risk.

it is further

**ORDERED** that plaintiffs' counsel from the Amica Center for Immigrant Rights, American Civil Liberties Union Foundation of the District of Columbia, American Civil Liberties

1

Union Foundation, National Immigration Project, Washington Lawyers' Committee for Civil Rights and Urban Affairs, and Covington & Burling, LLP, are hereby provisionally appointed as counsel for the provisionally certified plaintiff class; it is further

ORDERED that defendants and their agents are **PRELIMINARILY ENJOINED** from enforcing their policy or practice of making warrantless civil immigration arrests in the District of Columbia without a pre-arrest individualized determination by the arresting agent of probable cause that the person being arrested is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii), which statute and regulation also require the same individualized determination of probable cause that the person being arrested is in the United States in violation of law or regulation regulating the admission, exclusion, expulsion or removal of aliens; it is further

ORDERED that defendants shall, within 72 hours of the issuance of this order, transmit a copy of this Order to defendants' officers, employees, agents, and contractors who have responsibilities related to the subject matter of this Order; it is further

ORDERED that defendants comply with the following reporting requirements:

(1) Any defendant or their agent who conducts a warrantless civil immigration arrest in the District of Columbia shall, as soon as practicable, document the facts and circumstances surrounding the warrantless civil immigration arrest in narrative form. This documentation shall include the specific, particularized facts that supported the agent's pre-arrest probable cause to believe that the person is likely to escape before a warrant can be obtained, including the following facts that are required to be documented pursuant to the Department of Homeland Security's "Broadcast Statement of Policy" on compliance with 8 U.S.C. § 1357(a)(2) (available at:

2

https://www.ice.gov/doclib/legalNotice/220527castanonSettlement_attA.pdf
[https://perma.cc/MDT7-9DJP]): "that the alien was arrested without a warrant"; "the
location of the arrest and whether this location was a place of business, residence,
vehicle, or a public area"; "the alien's ties to the community, if known at the time of
arrest, including family, home, or employment"; and "the specific, particularized facts
supporting the conclusion that the alien was likely to escape before a warrant could be
obtained."  The documentation shall include the date and time of the arrest, and the date
and time the agent completed the documentation;

(2) In describing the individualized assessment of escape risk in the documentation ordered
above, specific details as to the person being arrested must be provided such that the
use of boilerplate language may be deemed indicative of noncompliance;

(3) Within 30 days of this Order and every 30 days thereafter until this litigation is
terminated or the Court rules otherwise, defendants shall release to plaintiffs' counsel
the documentation describing defendants' and their agents' warrantless civil
immigration arrests within this District, or if requested by plaintiffs' counsel concerning
specific individual warrantless arrests, no later than seven days after the request;  it is
further

**ORDERED** that, in addition to complying with D.C. Local Civil Rule 7(m), the parties
shall comply with the following procedures regarding any alleged violations of this Order:

(1) If plaintiffs have a reasonable basis to believe that the defendants are in substantial
noncompliance with one or more provisions of this Order, plaintiffs shall notify
defendants in writing of the specific alleged compliance issue, which notice shall

3

identify, with particularity, the basis of the claim that defendants are not in substantial

compliance and the specific provisions of this Order that are implicated;

(2) Within seven days of plaintiffs' response, the parties shall meet and confer.  If the

parties are unable to resolve the dispute within seven days of the meet and confer,

plaintiffs may seek intervention from the Court by filing a motion for enforcement of

the provisions identified through the aforementioned notice of substantial

noncompliance or a motion for an order to show cause why defendants should not be

held in contempt; it is further

**ORDERED** that plaintiffs' Motion for Class Certification, ECF No. 19, is **DENIED**

without prejudice; it is further

**ORDERED** that plaintiffs shall post a bond of $1.00.

This Order shall remain in effect until further order of the Court.

**SO ORDERED**.

Date: December 2, 2025

_____
**BERYL A. HOWELL**
United States District Judge