**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOSÉ ESCOBAR MOLINA, *et al.,*
*individually and on behalf of all others*
*similarly situated*

         *Plaintiffs,*

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.,*

         *Defendants.*

Civil Action No. 25-3417 (BAH)

**<u>DECLARATION OF ALEXANDRA J. WIDAS IN SUPPORT OF PLAINTIFFS'
MOTION TO ENFORCE PRELIMINARY INJUNCTION
("THIRD WIDAS DECLARATION")</u>**

I, Alexandra J. Widas, declare pursuant to 28 U.S.C. § 1746 that:

1.     I am an attorney with the law firm Covington & Burling LLP.  I represent Plaintiffs José Escobar Molina, B.S.R., N.S., R.S.M., and CASA, Inc., on behalf of themselves and similarly situated individuals ("Plaintiffs") in this action.  I submit this declaration in support of Plaintiffs' Motion to Enforce the Preliminary Injunction.  If called upon to do so, I could and would competently testify as follows:

2.     Attached hereto as **Exhibit 1** is a true and correct copy of an X post by the U.S. Department of Homeland Security (@DHSgov) from Jan. 17, 2026 at 9:45 p.m., available at https://x.com/DHSgov/status/2012718004480393474 (last accessed Feb. 10, 2026).

3.     Attached hereto as **Exhibit 2** is a true and correct copy of an X post by the U.S. Department of Homeland Security (@DHSgov) from Jan. 16, 2026 at 11:36 a.m., available at https://x.com/DHSgov/status/2012202324991635495 (last accessed Feb. 10, 2026).

4.     Attached hereto as **Exhibit 3** is a true and correct copy of an X post by the U.S. Department of Homeland Security (@DHSgov) from Jan. 16, 2026 at 5:49 p.m., available at https://x.com/DHSgov/status/2012296163278405727 (last accessed Feb. 10, 2026).

5.     Attached hereto as **Exhibit 4** is a true and correct copy of an NPR article by Sergio Martínez-Beltrán and Meg Anderson entitled "Minnesota officials sue to block Trump's immigration crackdown as enforcement intensifies" (Jan. 12, 2026), available at https://www.npr.org/2026/01/12/nx-s1-5675315/minnesota-sues-to-block-trump-immigration-crackdown (last accessed Feb. 10, 2026).

6.     Attached hereto as **Exhibit 5** is a true and correct copy of an NBC News article by Suzanne Gamboa, et al. entitled "Immigration officers around Minneapolis are approaching people and demanding proof that they're U.S. citizens" (Jan. 16, 2026), available at https://www.nbcnews.com/news/us-news/ice-approaching-people-minneapolis-demanding-proof-citizenship-rcna254247 (last accessed Feb. 10, 2026).

7.     Attached hereto as **Exhibit 6** is a true and correct copy of a Wall Street Journal article by Michelle Hackman, et al. entitled "The Standoff That Has Turned Minnesota Into a Tinderbox" (Jan. 17, 2026), available at https://www.wsj.com/us-news/the-standoff-that-has-turned-minnesota-into-a-tinderbox-a3a7e672?st=hEbqve&reflink=desktopwebshare_permalink (last accessed Feb. 10, 2026).

8.    Attached hereto as **Exhibit 7** is a true and correct copy of an Associated Press article by Sarah Raza entitled "Somali businesses struggle during the Minneapolis ICE crackdown" (Jan. 18, 2026), available at https://apnews.com/article/immigration-ice-minneapolis-somali-business-bfeae0007ce78a2c7e954d8061085153 (last accessed Feb. 10, 2026).

9.    Attached hereto as **Exhibit 8** is a true and correct copy of an article from The Guardian by Melissa Hellmann entitled "'It's like they're hunting': US citizens and legal residents report increase in racial profiling by ICE" (Jan. 22, 2026), available at https://www.theguardian.com/us-news/2026/jan/22/us-citizens-racial-profiling-ice    (last accessed Feb. 18, 2026).

10.    Attached hereto as **Exhibit 9** is a true and correct copy of an article from The Daily Caller by Anthony Iafrate entitled "'Nothing But Green Lights': ICE Memo Expands Agents' Warrantless Arrest Powers" (Jan. 31, 2026), available at https://dailycaller.com/2026/01/31/immigration-customs-enforcement-memo-expands-agents-warrantless-arrest-powers/ (last accessed Feb. 10, 2026).

11.    Attached hereto as **Exhibit 10** is a true and correct copy of a U.S. Department of Homeland Security memorandum issued by Todd Lyons, Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement ("ICE"), to all ICE personnel entitled "Civil Immigration Arrest Authority: Administrative Arrest Warrants and Warrantless Arrests" (Jan. 28, 2026).  The attached version of the memorandum is produced in its entirety as submitted by the defendants in *Hussen v. Noem*, No. 0:26-cv-00324 (D. Minn. Jan. 15, 2026), ECF No. 85-1 (last accessed Feb. 18, 2026).

12.    Attached hereto as **Exhibit 11** is a true and correct copy of a New York Times article by Hamed Aleaziz and Charlie Savage entitled "ICE Expands Power of Agents to Arrest People Without Warrants" (Jan. 30, 2026), available at https://www.nytimes.com/2026/01/30/us/politics/ice-expands-power-agents-warrants.html (last accessed Feb. 18, 2026).

13.    Attached hereto as **Exhibit 12** is a true and correct copy of a Colorado Public Radio article by Allison Sherry entitled "Exasperated Colorado federal judge orders Trump administration back to court on warrantless ICE arrests" (Feb. 18, 2026), available at https://www.cpr.org/2026/02/18/trump-administration-warrantless-ice-arrests-colorado-judge (last accessed Feb. 19, 2026).

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on February 19, 2026, in Washington, D.C.

_s/ Alexandra J. Widas_
Alexandra J. Widas (D.C. Bar No. 1645372)

# Exhibit 1

← Post

**Homeland Security** ✓
@DHSgov

Once again, the media is lying for clicks and deceptively pushing clips to demonize our brave law enforcement.

U.S. Border Patrol was conducting immigration enforcement operations in a public-access parking lot when several agitators exited their homes and began yelling at law enforcement in Spanish. One agent, who is fluent in Spanish, recognized one individual's accent as being from Mexico.

During questioning, the individual at first lied about where he was born, claiming Minnesota. When asked for proof and a second time about where he was born, the individual refused and then changed his answer to Mexico. Lying to a federal agent is a crime. Given the inconsistencies in his story and refusal to provide documents, agents briefly detained him. Records check revealed he was a naturalized U.S. citizen, and he was immediately released. Our agents acted appropriate and with a high amount of professionalism—despite having several agitators yelling at them.

Any claim from him or the media that agents racially profiled is categorically FALSE. A person's immigration status makes them a target for enforcement, not their skin color, race or ethnicity. Law enforcement uses 'reasonable suspicion' to make arrests, as allowed under the Fourth Amendment to the U.S. Constitution. The Supreme Court has already vindicated us on this question.



**Jesus Freakin Congress** ✓ @TheJFreakinC · Jan 16
🚨BREAKING: In Columbia Heights, MN, ICE agents are going door to door and targeting people based on how they sound, demanding proof of citizenship, then human trafficking them when they refuse to comply with unlawful orders.

In the video, a man is standing by a garage on
Show more

*ICE Asking For Paperwork Inside Private Residence Of Citizen Because Of Accent Columbia Heights*

0:03 / 1:17

9:45 PM · Jan 17, 2026 · **875.9K** Views

💬 2K          ⟲ 3.5K          ♡ 13K          🔖 558          ⬆️

💬 **Read 2K replies**

---

X

Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

**What's happening**

Trending in United States
**AARONMERCURY X SUPERNOVA**

Politics · Trending
**Nancy Guthrie**

Politics · Trending
**REGISTER**

Trending in United States
**ALDO EN RR**
Trending with #RingRoyale

Show more

**Don't miss what's happening**
People on X are the first to know.

Log in          Sign up

# Exhibit 2



← **Post**

Sign up now to get your own personalized

G  Sign up with Google

🍎  Sign up with Apple

Create account

By signing up, you agree to the Terms of Se
Privacy Policy, including Cookie Use.

**Homeland Security** ✓
@DHSgov

Law enforcement uses 'reasonable suspicion' to make arrests, as protected under the Fourth Amendment to the U.S. Constitution. The Supreme Court has already vindicated us on this position.

A person's immigration status makes them a target for enforcement, not their skin color, race or ethnicity.

@TriciaOhio



BREAKING NEWS — TENSIONS HIGH IN MINNEAPOLIS AS TRUMP WEIGHS SENDING IN TROOPS — LIVE 8:03 AM PT — CNN — SITUATION ROOM

👥 **Readers added context they thought people might want to know**  →

The Fourth Amendment requires probable cause for arrests; reasonable suspicion suffices only for brief investigatory stops, not full arrests.
law.cornell.edu/wex/probable_c...  law.cornell.edu/wex/fourth_ame...

Context is written by people who use X, and appears when rated helpful by others.  Find out more.

11:36 AM · Jan 16, 2026 · **1.2M** Views

💬 1.3K            ↻ 1.2K            ♡ 4.5K            🔖 304            ↥

💬  Read 1.3K replies

**What's happening**

Sports · Trending
**Memorial Stadium**

Trending in United States
**Axing**

Trending in United States
**Family Affair**

Late night talk · Trending
**Cirie**

Show more

Terms of Service  |  Privacy Policy  |  Cookie Pol
Accessibility  |  Ads info  |  More ···  |  © 2026 X

**Don't miss what's happening**
People on X are the first to know.

Log in        Sign

# Exhibit 3



← **Post**



Homeland Security ✔
@DHSgov

False. A person's immigration status makes them a target for enforcement, not their skin color, race or ethnicity.

Law enforcement uses 'reasonable suspicion' to make arrests, as protected under the Fourth Amendment to the U.S. Constitution. The Supreme Court has already ruled that such actions are in line with the Constitution.

> **R A W S A L E R T S** ✔ ◁ @rawsalerts · Jan 16
> 🚨 #BREAKING: The Department of Homeland Security has announced and is advising its U.S. citizens to be prepared to present proof of citizenship.

5:49 PM · Jan 16, 2026 · **1.8M** Views

💬 1.6K          ⟲ 2K          ♡ 12K          🔖 592          ⬆

💬 **Read 1.6K replies**



**New to X?**

Sign up now to get your own personalized

G  Sign up with Google

  Sign up with Apple

**Create account**

By signing up, you agree to the Terms of Se
Privacy Policy, including Cookie Use.

Something went wrong. Try relo

↻ **Retry**

Terms of Service  |  Privacy Policy  |  Cookie Pol
Accessibility  |  Ads info  |  More ···  © 2026 X

**Don't miss what's happening**
People on X are the first to know.

Log in        Sign

# Exhibit 4

Case 1:25-cv-03417-BAH   Document 78-1   Filed 02/19/26   Page 12 of 68

 NPR

DONATE

IMMIGRATION

# Minnesota officials sue to block Trump's immigration crackdown as enforcement intensifies

JANUARY 12, 2026 · 6:51 PM ET

By Sergio Martínez-Beltrán, Meg Anderson



Federal immigration officers get in a car as they prepare to deploy tear gas at a protest Monday in Minneapolis.

*John Locher/AP*

MINNEAPOLIS — State officials are suing the Trump administration over the widespread immigration operation taking place across the Minneapolis region.

The lawsuit, filed Monday in the U.S. District Court for the District of Minnesota, comes days after an Immigration and Customs Enforcement agent fatally shot 37-year-old Renee Macklin Good in her car as she blocked the road.

State Attorney General Keith Ellison said in a press conference that federal agents during the surge have arrested peaceful bystanders, detained U.S. citizens and fired chemical irritants at demonstrators and others exercising their First

Amendment rights, including outside a local high school. The lawsuit calls on the Trump administration to end its immigration crackdown in the state.

**Sponsor Message**

"Thousands of armed and masked DHS agents have stormed the Twin Cities to conduct militarized raids and carry out dangerous, illegal, and unconstitutional stops and arrests in sensitive public places, including schools and hospitals—all under the guise of lawful immigration enforcement," the lawsuit says. The complaint also alleges that immigration agents have engaged in racial profiling.

In a statement, Homeland Security spokesperson Tricia McLaughlin accused Ellison of "prioritizing politics over public safety," and called the allegations of racial profiling false, saying, "Law enforcement uses 'reasonable suspicion' to make arrests, as protected under the Fourth Amendment to the U.S. Constitution."

"President Trump's job is to protect the American people and enforce the law — no matter who your mayor, governor, or state attorney general is," McLaughlin said. "That's what the Trump administration is doing; we have the Constitution on our side on this, and we look forward to proving that in court."

More than 2,000 federal immigration agents are in Minnesota, and that number is expected to increase.

On Monday, an NPR reporter witnessed multiple instances where immigration agents drove around Minneapolis and questioned people about their immigration status. Some took place in the parking lots of big box stores.

"Are you a green card holder? Do you have it on you?"

**Sponsor Message**

Those were some of the questions federal immigration agents asked Joel Keleekai as he was charging his Tesla in a parking lot.

It's unclear why Border Patrol agents chose to question Keleekai and other drivers who were also charging their vehicles. All of them were people of color. All of them were able to prove they were in the U.S. legally after showing documentation.

Keleekai, who is a permanent U.S. resident, told NPR he knew this could happen given the number of immigration agents in the state and the amount of time he spends driving every day.

"We don't want this to escalate. As you see, ICE is going around and people are getting killed," he said. "We just gotta do our best out here to make sure that we live to see tomorrow."

In a statement, DHS's McLaughlin said, "ICE does not randomly arrest people or conduct operations without specific objectives. Nor does federal law enforcement execute operations without undergoing proper procedure, such as securing warrants when necessary."

These tactics are highly unusual. In the past, immigration enforcement agencies had focused on targeted operations. But the Trump administration has appeared to have shifted its tactics and, in Minnesota, become even more aggressive with its immigration crackdown.

Vice President JD Vance said in a press conference recently that immigration agents were also going door to door in an attempt to find undocumented immigrants.

The Trump administration's efforts are receiving fierce backlash from local public officials, and people in Minneapolis.

Residents are organizing in group chats and trailing immigration agents, honking their horns and making noise, alerting their neighbors of ICE's presence and migrants of their rights.

In a separate incident witnessed by an NPR reporter, a man who was on his way to work was briefly detained and asked questions about his legal status.

2/10/26, 2:53 PM
Case 1:25-cv-03417-BAH    Document 78-1    Filed 02/19/26    Page 15 of 68
Minnesota sues to block Trump's immigration crackdown as enforcement intensifies : NPR

**Sponsor Message**

The man asked NPR to identify him by his initials of M.A. because he fears for his safety for speaking to the media. He said he was born in Somalia, but is a U.S. citizen. He was released by immigration agents.

"I know my rights here — I'm a U.S. citizen, I'm legal here, I've been over 25 years here," M.A. said.



Federal immigration agents question a man on Monday in Minneapolis. The man asked NPR to identify him by his initials, M.A., because he fears for his safety for speaking to the media. A bystander films the incident on his cell phone. After questioning, the Somali-born U.S. citizen was subsequently released by immigration agents.
*Ben Hovland/MPR News*

2/10/26, 2:53 PM
Case 1:25-cv-03417-BAH    Document 78-1    Filed 02/19/26    Page 16 of 68
Minnesota sues to block Trump's immigration crackdown; enforcement intensifies : NPR

Things seemed chaotic Monday in the Minneapolis region. Immigration agents could be seen in many places driving in unmarked vehicles.

A particularly tense exchange happened Monday afternoon in south Minneapolis. Immigration officers in a vehicle rear-ended a resident's car.

An NPR reporter was on the scene shortly after the incident and could see the rear left side of the car damaged.

The driver, Christian Molina, told NPR he and his wife Lorena, both U.S. citizens, were driving separate cars on their way to drop one off with a mechanic when he saw immigration agents engaging with another person.

Molina said he stared at them before they started chasing him.

"They don't have a reason to stop me, they are not the police," Molina said in Spanish.

After federal agents ran into his vehicle, Molina said the agents kept asking him about his immigration status. He refused to give them an identification; Molina told the federal agents he would only give his drivers license if Minneapolis Police officers showed up.

Molina said the federal agents left after running his license plate and confirming his identity.

Lorena, the wife, said she felt scared.

"I felt like I had the need to talk to the officers and say, 'Hey, please ignore whatever he's saying, let him live!'" she said.

Christian Molina said he is not afraid of immigration agents.

"They are abusing their power," Molina said.

Illinois and the city of Chicago also took legal action Monday against the Trump administration over its immigration enforcement actions. Chicago officials and Illinois Attorney General Kwame Raoul filed the lawsuit in U.S. District Court for the Northern District of Illinois, Eastern Division.

---

**Sponsor Message**

Case 1:25-cv-03417-BAH    Document 78-1    Filed 02/19/26    Page 17 of 68

"The Trump administration has repeatedly violated the law and undermined public trust," Chicago Mayor Brandon Johnson said in a news release about the lawsuit. "These actions weren't just unlawful; they were cruel, needlessly inflicting fear and harm on our communities."

That lawsuit alleges that federal immigration agents interrogate residents about their citizenship status without reason to believe they are in the U.S. illegally, that they "make civil immigration arrests without a warrant and without probable cause, and deploy tear gas and other noxious chemicals without warning against persons who are not resisting," the city's news release says.

u.s. immigration and customs enforcement     immigration crackdown     minnesota

## Together, we chart the course.

You count on public media for stories that help you understand your world — voices that bring us closer together.

People like you power public media. You make it possible for the NPR Network to share our journalism with you and millions of other people, regardless of their ability to pay.

**You are the "public" in public media.** Can we count on you to support this essential public resource today?

**DONATE →**

**More Stories From NPR**

# Exhibit 5

2/10/26, 2:50 PM

Case 1:25-cv-03417-BAH    Document 78-1    Filed 02/19/26    Page 19 of 68
ICE is approaching people in Minneapolis demanding proof of citizenship

U.S. NEWS

# Immigration officers around Minneapolis are approaching people and demanding proof that they're U.S. citizens

U.S. citizens who are out walking or standing in public are not required to provide documentation or provide identification, one legal expert says.



A man shows his passport card as he waits in line at a cafe inside 24 Somali Mall in December in Minneapolis.
Joshua Lott / The Washington Post / Getty Images

Jan. 16, 2026, 1:04 PM EST

**By Suzanne Gamboa, Shaquille Brewster and Colin Sheeley**

The officers and agents the Trump administration has unleashed in Minneapolis and nearby communities have turned to stopping U.S. citizens, apparently at random, demanding identification and grilling them about their citizenship, residents who have recorded these encounters on video say.



**Subscribe to read this story ad-free**

Get unlimited access to ad-free articles and exclusive content.

>

The "show me your papers" encounters are showing up on social media and have even prompted podcaster Joe Rogan, a Trump backer in the 2024 campaign, to ask, "Are we really going to be the Gestapo?"

One man, Gage Diego Garcia, said he was held for six hours on Monday in Columbia Heights, Minnesota, after an encounter with officers that he told NBC News began when he was leaning into his friend's car in an alleyway.

"They came off pretty aggressive and asking for my ID. I refused because I had done nothing wrong," Garcia said. He said that, as he started to blow a whistle draped around his neck, agents "got angry and grabbed him."

Video recorded by a friend shows officers pushing Garcia onto the side of a car and pointing a Taser at him. The video does not show what happened before the officers grabbed Garcia. Garcia told NBC News later that officers grabbed him when he was trying to blow his whistle and an officer accused him of committing assault by spitting at him.

"All I needed was your f---ing ID," a masked officer said. Garcia responds to the officer using expletives. The officer responds, "You're a f---ing b--- and you are gonna learn the f---ing hard way."

As officers search his pockets, one finds his firearm, saying, "He has a gun on him! Look at that." Garcia interjects, saying, "a fully registered firearm 'cause I'm a U.S. citizen." Later in the arrest, as the two argue, an officer is heard saying, "You are a f---ing citizen, you shouldn't have done that." It's unclear what the officer was referring to when he said that.

Garcia said that as he was being driven to the Whipple Building in Minneapolis, officers told him in response to his question that he was picked up because he looked like someone who committed a crime. "When I asked what crime, I was told, 'we'll figure it out,'" he said.

He also said officers told him, "I could have f---ing smoked you," and that things "could have gone really south for you like those agents did to Renee Good." Good was fatally shot last week by an officer who fired through her windshield as she drove forward on a Minneapolis street. She was a U.S. citizen.

Minnesota residents share their stories of ICE encounters

02:45



The Department of Homeland Security said the media is "peddling a false narrative" and "attempting to demonize" law enforcement, which it says are being attacked and assaulted at significantly higher rates.

DHS spokesperson Tricia McLaughlin said in a statement emailed to NBC News that Garcia fled on foot when he saw the officers, "giving them reasonable suspicion." She said Garcia became "extremely hostile" and alleged he physically assaulted one officer by spitting on his face. McLaughlin did not specifically address Garcia's allegations regarding what officers said to him as he was being driven to the Whipple Building.

McLaughlin said the Fourth Amendment allows law enforcement to use "reasonable suspicion" to make arrests," and that the Supreme Court recently affirmed its authority to do so.

McLaughlin was referring to a September 2025 Supreme Court ruling that allowed immigration officers to continue immigration patrols using race, ethnicity and language as factors in stopping individuals. Opponents have said it allows for racial profiling. McLaughlin said DHS "enforces federal immigration law without fear, favor or prejudice."

The Fourth Amendment also protects individuals from unlawful search and seizure.

David Schultz, an attorney and legal studies professor at Hamline University in St. Paul, said U.S. citizens do not have to provide identification or prove their citizenship when out walking or standing in a street or in public.

"We have a First Amendment right of association, to be out on the street and we don't have any requirement to have an ID," Schultz said.

In one encounter Sunday, a woman was stopped and grilled about her citizenship while walking in her neighborhood. Nimco Omar of Minneapolis said she was confused when, as she started walking after parking her car, she heard commands for her to stop. Suddenly several people she thought were soldiers began running toward her.

"I was like, what's going on? Did I do something? Is something happening? Is it war?" she told NBC News in an interview in Minneapolis.

She said when she heard someone ask for her citizenship she realized they were immigration officers. Fearing she'd be "kidnapped," she pulled out her phone to record the encounter.

The video shows a masked officer threatening to put her in a vehicle to ID her if she doesn't provide identification. Omar calmly responds that she doesn't need an ID to walk around her city and that she is a U.S. citizen, declining to provide her identification.

The officer continues to insist on identification and says, "We are doing an immigration check. We are doing a citizen check." He repeatedly asks where she was born and informs her that if she's lying about being a citizen, she can face federal charges.

Other such encounters were recorded in Minneapolis.

Last weekend, officers walked up to a man pumping gas and asked if he was a U.S. citizen, demanding to see documentation. The man responds, "I don't have to show you." As with Omar, the officer in this encounter states that the man can show him ID there or he can take him aside. The man provides what appears to be a license, but the officer continues to ask whether he is naturalized, where he was born and when he was naturalized. In another incident, officers questioned a man at a vehicle charging station.

DHS did not provide information on the citizenship status of the people approached in these encounters.

In her statement, McLaughlin did not provide details about the incidents with Omar, the man pumping gas or the man at the vehicle charging station.

These are not the first such encounters. Rep. Ilhan Omar, D-Minn., said in December that her son was pulled over and asked about his citizenship. The Department of Homeland Security has said it has no record of the encounter.

The administration has sent about 3,000 officers and agents to Minneapolis, a city of 430,000. Much of the enforcement activity has taken place in south Minneapolis, where a federal officer fatally shot Good.

Schultz advised that U.S. citizens who are stopped should keep their composure, as Omar did. They should ask why they are being stopped and they should ask if they are under

arrest. If the officers say no, they should then ask if they are free to leave.

He said he would never turn over ID and "we don't have any requirement in our society to prove who we are to walk the streets," he said.

When driving a car and if pulled over for probable cause, showing a driver's license is required. But he said you are not required to say whether you are a citizen, though some states, not including Minnesota, have laws that allow authorities to question immigration status.

*Shaquille Brewster and Kailani Koenig reported from Minneapolis, Colin Sheeley from New York and Suzanne Gamboa from San Antonio.*



Suzanne Gamboa

Suzanne Gamboa is a national reporter for NBC News.



Shaquille Brewster

Shaquille Brewster is a correspondent for NBC News.

Colin Sheeley

Colin Sheeley is a senior reporter for NBC News' Social Newsgathering team based in New York.

Kailani Koenig contributed.

# Exhibit 6

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/us-news/the-standoff-that-has-turned-minnesota-into-a-tinderbox-a3a7e672

U.S.

# The Standoff That Has Turned Minnesota Into a Tinderbox

ICE agents with arrest quotas are colliding with angry residents, a compact city and a relatively small proportion of immigrants here illegally



An observer filming ICE agents in Minneapolis Friday. CHRISTOPHER LEE FOR WSJ

By *Michelle Hackman* [Follow] , *Kris Maher* [Follow] and *Brenna T. Smith* [Follow]
*Updated Jan. 17, 2026 4:20 pm ET*

### Quick Summary ⌄

- Federal immigration operations in Minneapolis are causing significant local pushback, with residents viewing it as overreach.

**View more**

MINNEAPOLIS—The collision of the Trump administration's huge immigration operation and the [enormous pushback from residents](#) is leading to a tinderbox in Minneapolis.

For locals, much of the anger stems from the clash between the administration's stated rationale for being in the area and the reality on the ground.

They are here, federal officials say, to find "criminal illegal aliens hurting Americans" after a sprawling [welfare-fraud scandal](#) involving dozens of Minnesotans of Somali descent gained national attention.

But residents see massive federal overreach in a place with a relatively small proportion of immigrants in the country illegally compared with other states.

Minnesota's population of immigrants here illegally stands at an estimated 2.2%, about half the national average, according to the Pew Research Center. More than 90% of the state's Somali population, the group highlighted in the fraud investigation, have some sort of permanent legal status, according to the Census Bureau's American Community Survey.

"They are taking people that are working within the system, that are asylum seekers, that are green-card holders," said Dan Engelhart, a northeast Minneapolis resident and a commissioner on the city's park board. "It's really terrifying to see our neighbors terrorized in this way."



Officers and residents are coming into close contact in Minneapolis's tight neighborhoods. STEPHEN MATUREN/GETTY IMAGES

In a statement Friday, Tricia McLaughlin, a spokeswoman for the Department of Homeland Security, said allegations that ICE engages in racial profiling were false, and that "obstructing

federal law enforcement officers during the performance of their duties is not only dangerous but also a federal crime and a felony."

"Law enforcement uses 'reasonable suspicion' to make arrests, as allowed under the Fourth Amendment to the U.S. Constitution," she said.

## Pressure to make arrests

Over the past 12 months, DHS has pushed personnel into one liberal city at a time with high-profile immigration actions, but the Minneapolis operation feels different on the ground. Some 3,000 federal officers are operating in and around a city of just 430,000, compared with a few hundred sent to Chicago—population of 2.7 million—this past fall.

Immigration and Customs Enforcement officers here and elsewhere are under pressure from daily arrest quotas that leadership has set at 3,000 a day across the country—the number it would take to reach one million arrests in a year, according to ICE officials familiar with the matter. Though ICE has never come close to meeting that daily goal, officers are rewarded for making arrests, even if the immigrants they take in are later released.

In Minneapolis, those officers are walking and driving through the largely residential city looking for people to arrest—and coming into close contact with angry and organized residents. That proximity helps explain why federal agents are clashing more with locals here than anywhere else.



A protester is sprayed with pepper spray in Minneapolis. ADAM GRAY/ASSOCIATED PRESS



The surge of federal officers to Minneapolis has led to confrontations with residents. OCTAVIO JONES/AFP/GETTY IMAGES

"Unfortunately, in Minneapolis, I call this a contrast in operations, a vast, conspicuous contrast in operations," U.S. Border Patrol commander Gregory Bovino told a local TV station this week. "A lot of unfriendly individuals out there, a lot of violence against ICE and Border Patrol."

Inside ICE, some officials have grown frustrated with their lack of control over the Minneapolis operation, but at the same time don't want to back down in the face of pushback from protesters, the people familiar with the matter added.

And the situation is growing more combustible. President Trump has floated bringing in the military, and far-right influencer Jake Lang organized a "March Against Minnesota Fraud" for Saturday, while more locals mobilize to confront ICE.

On Saturday, several hundred anti-ICE demonstrators showed up outside Minneapolis City Hall to confront Lang, whose conviction for assaulting a police officer during the Jan. 6, 2021, attack on the Capitol was pardoned by Trump.

Lang and his handful of supporters were largely drowned out by bullhorn-led chants from the raucous crowd, though at one point he could be heard saying: "ICE, ICE, baby. Minnesota is out of control, we need you President Trump." Protesters responded with chants of: "How do you spell Nazi? J-A-K-E."



Crowds held anti ICE signs to counterprotest right-wing influencer Jake Lang Saturday. CHRISTOPHER LEE FOR WSJ



Lang (center) and his supporters were driven away by the crowd. CHRISTOPHER LEE FOR WSJ

A growing contingent of thousands of federal officers dwarfs the roughly 600 police officers in Minneapolis, leading some locals to believe they must protect themselves. Some City Council members now carry gas masks everywhere they go, and the Minnesota Star Tribune editorial board described the city as being "under siege" by the federal government. Late Friday, a federal judge overseeing a suit brought by protesters imposed new limits on how immigration-enforcement officials can interact with demonstrators, including blocking agents from pepper-spraying or arresting peaceful protesters.

## 'Hard to understand'

Critics contend Minnesota doesn't deserve to be the staging ground for what the DHS has billed as the largest operation in the department's history.

Out of about six million residents, Minnesota has roughly 130,000 who are in America illegally, a number on par with Utah, Wisconsin and Indiana, and far fewer than New York, Texas and Florida, which haven't seen comparable enforcement surges. Mexico is the most common country of origin for Minnesota's unauthorized immigrants.

**Estimated unauthorized immigrants as a share of population, 2023**

Source: Pew Research Center estimates based on U.S. Census Bureau data

"It's a massive effort on the part of ICE, and when you look at the numbers it's hard to understand the logic," said Ryan Allen, associate dean for research at the University of Minnesota's Humphrey School of Public Affairs.

That federal ground force in Minnesota has arrested more than 2,000 people since late November, according to McLaughlin, the DHS spokeswoman, although it couldn't be determined how many arrestees were later released.

Part of the government's strategy in Minneapolis has been to arrest refugees whose legal status officials are re-examining and, in some cases, revoking. Not all of those arrested were in the country

illegally, according to lawyers and advocates. McLaughlin didn't specify how many arrests were of refugees.

In recent days, there have been reports of blockades at shopping areas where "roving groups of DHS agents block all traffic and demand the citizenship of riders in every car," according to a lawsuit Minnesota filed against the Trump administration earlier this week.

In response to the lawsuit, DHS said the administration was acting lawfully. The Justice Department is now investigating Minnesota Gov. Tim Walz and Minneapolis Mayor Jacob Frey over whether they are impeding federal law enforcement. Walz suggested the administration is "weaponizing law enforcement," while Frey called it "an attempt to intimidate me for standing up for Minneapolis."

One video verified by The Wall Street Journal and posted to social media this week appears to show border patrol agents surrounding a Somali resident on a street, asking for identification for what one officer called a "citizen check." The footage shows the agent repeatedly asking where she was born, despite her saying she is a U.S. citizen. He warned that if she didn't provide ID, "we're going to put you in the vehicle"—and motioned to a black SUV. After passersby blew whistles and honked horns, the agents left.

Ryan Wood, who formerly served as an ICE prosecutor and an assistant chief immigration judge overseeing deportation cases, said the pace of detentions and failure to maintain information about detainees' locations are unprecedented.

"I've prosecuted the worst of the worst of noncitizens committing crimes in Minnesota and don't have a problem with enforcing the law," said Wood, who now heads an immigration law consulting firm. "ICE seems to be taking many people into custody and asking questions later."



A woman was dragged away from her car by federal agents in Minneapolis this week. RYAN MURPHY/REUTERS

Federal authorities have publicized lists of serious alleged criminals they arrested in the Minnesota surge. They also point out Minneapolis protesters vandalized and broke into government vehicles Wednesday evening, after an immigration agent shot and injured a Venezuelan man in what the DHS said was self-defense.

Rep. Tom Emmer (R., Minn.), the House Republicans' whip, publicly called on Walz to resign. "This violence cannot be tolerated," he said.

Throughout the past year, federal officials have focused immigration enforcement on blue cities one at a time, both to manage resources and maximize media attention. But ICE leadership, traditionally charged with leading the nation's immigration enforcement, have played a relatively small role in selecting which cities to target and why, according to the officials familiar with the matter.

The Minnesota operation was conceived by officials at the White House and Homeland Security Secretary Kristi Noem, who viewed targeting Minnesota as a fitting response to the welfare scandal, according to current and former ICE officials.

The government has sent officers to Minneapolis on four- and six-week deployments, the officials said.

Ruth Buffalo, chief executive of the Minnesota Indian Women's Resource Center, said her office building locked down Wednesday because of ICE activity in the neighborhood. Its doors remained locked Friday, and it posted a guard at its parking lot to prevent ICE from coming on the property.

"Things are getting tense, and it's taking a toll on people's well-being because it's constant fight or flight," she said. "We're being told to brace for the worst."

# Watch: How Deadly ICE Shooting Turned Minneapolis 'Upside Down'

**Corrections & Amplificationsr**

The Minnesota Star Tribune editorial board described Minneapolis as being "under siege" by the federal government. An earlier version of this article incorrectly referred to the publication as the Minneapolis Star Tribune. (Corrected on Jan. 19)

*Appeared in the January 17, 2026, print edition as 'ICE Surge, Protesters Turn Minneapolis Into a Tinderbox'.*

Michelle Hackman is a reporter in The Wall Street Journal's Washington bureau, where she covers U.S. immigration policy. Her coverage includes writing about the southern border, legal and employment-based immigration, refugee resettlement, care of unaccompanied children, immigration enforcement and relevant legislation on Capitol Hill....

✉  𝕏  in

Kris Maher is a Pittsburgh-based reporter who writes about environmental issues, regional economic trends, politics and breaking news in The Wall Street Journal's Midwest bureau.

He has reported on the Flint water crisis, PFAS drinking-water contamination and the Covid-19 pandemic's effects on...

✉  𝕏

Brenna Smith is a visual investigations reporter on The Wall Street Journal's investigations team. She specializes in using visual storytelling and open-source intelligence to uncover and report in-depth investigative stories.

Before joining the Journal, Brenna was an investigative reporter at the Baltimore Banner, where her work earned...

✉  𝕏  in

# Exhibit 7

ADVERTISEMENT

U.S. NEWS

# Somali businesses struggle during the Minneapolis ICE crackdown



BY **SARAH RAZA**
Updated 5:30 PM EST, January 18, 2026
Leer en español

MINNEAPOLIS (AP) — Rows of businesses stood shuttered inside a sprawling complex of Somali businesses on a recent afternoon.

Karmel Mall in south Minneapolis contains more than a hundred small businesses in suites offering everything from clothing and food to insurance and accounting services. On Thursday, the noisy hallways inside lay quiet, save for occasional chatter between neighboring vendors. The smell of fried food still wafted from the bakeries, the central heating hummed and the sound of Quran recitation flowed quietly from some shops.

But many sellers sat alone in their clothing stores, waiting for the occasional customer to walk by. Everyone is afraid of federal immigration agents, business owners said. Sellers and customers, citizens and noncitizens. Some don't bother opening shop because they aren't expecting any customers.

ADVERTISEMENT

"It's been like this for three weeks now," said Abdi Wahid, who works at his mom's convenience store in the mall. "Everywhere it's all been closed up, all the stores."

Kashmiri Muslim economic hub for the area's Somali population, which is the largest in the U.S. Built to features housing, a mosque and Quran classes, serving as a robust community center for the area.

---

**RELATED STORIES**



**ICE shooting reinforces Minnesota's grim role as Trump's target**



**Oglala Sioux president walks back claims of DHS pressure, member arrests**



**Thousands rally against immigration enforcement in subzero Minnesota temperatures**

The economic impact of the Trump administration's "Operation Metro Surge" stretches beyond the Somali community: many immigrants are on edge, afraid to go to work or leave their homes amid the immigration crackdown.

But President Donald Trump has made the Somali community a special target of his deportation rhetoric after recent government fraud cases in Minnesota in which a majority of defendants had Somali roots. Since December, Trump has made numerous jabs at the community, calling them "garbage" and saying "they contribute nothing."

Wahid said early afternoons at the family business once meant 15 to 20 customers. These days, it's tough to get one.

ADVERTISEMENT

Wahid is a citizen, but he said the fear extends beyond just immigrants. Citizens are also scared of coming in, especially following the killing of Renee Good and the ICE raid at Roosevelt High School in south Minneapolis.

"I think that caused a lot of people to not even want to come," he said, because they could be targeted "just because of their race."

Homeland Security assistant secretary Tricia McLaughlin said in a statement that law enforcement uses "reasonable suspicion" to make arrests under the fourth amendment.

"A person's immigration status makes them a target for enforcement, not their skin color, race or ethnicity," she said.

Upstairs, Bashir Garad runs Safari Travel & Accounting Services. Not only has the crackdown in Minneapolis meant he's lost almost all his customers, but his existing clients are canceling upcoming trips because they're worried they won't be let back into the country.

"They see a lot of unlawful things going on in the city," he said. "They look at something bad, and then they think some bad things may happen to them." The majority of his clients are East African, and nearly all are U.S. citizens. They still hesitate to travel.

ADVERTISEMENT

"The government is not doing the right thing," he said. "If there's a criminal, there's a criminal. Regardless, there are ways to find the criminal, but to marginalize the community's name, and a whole people, that is unlawful."

Ibrahim Dahiye, who sells electronics, said winter always used to be slow, "but now it's totally different. No one comes here. All the stores are closed, few are open."

Since the crackdown began, Dahiye said his business is down $20,000 monthly, and he's now pooling funds to make rent.

He said he's lost most of his customers. His employees are too frightened to come to work. He tapped his jacket pocket, saying he keeps his passport on him at all times.

"I don't know what we can do," Dahiye said. "We believe in Allah, but we can't do anything."



**SARAH RAZA**
Raza covers South Dakota for The Associated Press. She is based in Sioux Falls, South Dakota.
𝕏  ✉

# Conversation

All comments are subject to our **Community Guidelines**.
Please note that comments are not moderated immediately — every post is reviewed before appearing publicly to ensure it meets our community guidelines. This means there may be a delay before your comment is visible.



Join the conversation

| ALL COMMENTS 17 |  | NEWEST ⌄ | 💬 |

---

**Mchaber**  · 21 DAYS AGO
I've heard they have about 9 billion in reserve, so they should be fine.
REPLY    👍 0    👎 0

**LorenzoValla**  · 22 DAYS AGO
They should apply for Federal relief.
REPLY    👍 4    👎 1



**BaconGod**   · 22 DAYS AGO
If America realized what America was doing to America, they would invade America to save America from America.
I cannot anymore
So let it be written.
So shall it be.
Third time's the charm....
REPLY    1 REPLY    👍 2    👎 3

**Mchaber**  · 21 DAYS AGO
Reply to **BaconGod**
Yawn, get a new Schtick. In case you've missed it, the invasion started in the early 90's by third world countries.
REPLY    👍 0    👎 1

**SalArmadillo**  · 22 DAYS AGO
They should have saved some of the fraud money for these ICY days...
REPLY    👍 6    👎 2

# Exhibit 8

Case 1:25-cv-03417-BAH Document 78-1 Filed 02/19/26 Page 40 of 68

## US immigration

# 'It's like they're hunting': US citizens and legal residents report increase in racial profiling by ICE

### Trump administration's immigration crackdown has led some people to take drastic measures to ensure their safety



📷 Federal law enforcement agents outside a private residence in St Paul, Minnesota, on 18 January 2026. Photograph: Victor J Blue/Bloomberg via Getty Images

**Melissa Hellmann**

Thu 22 Jan 2026 11.36 EST

Ⓖ Prefer the Guardian on Google

t was a normal Tuesday morning for Mohamed when he left his San Diego, California, house for his daily exercise in mid-January. But as he walked around the Colina del Sol park, four US Immigration and Customs

I Enforcement (ICE) agents approached and encircled the middle-aged father, who is using a pseudonym out of fear of retaliation from federal agents. The officers, Mohamed said, who wore jackets with ICE emblazoned on them and balaclavas that obscured their faces, asked for his green card before they began drilling him with questions about what he was doing in the park.

"I was terrified," Mohamed, a lawful permanent resident from Somalia, said through a translator. The ordeal ended shortly thereafter, but the experience has left a lasting impact on him. "I have high blood pressure," Mohamed said about the encounter he believes was based on racial profiling. "I used to do my daily exercises; now I don't even do that any more because I'm scared."

The Guardian spoke to several US citizens and legal permanent residents who said that they were racially profiled by ICE and US Customs and Border agents in recent weeks following the Trump administration's immigration crackdown that has swept the nation. The incidents have led to lasting stress, they said, with some of them taking drastic measures to ensure their safety including sleeping with their passports, or only traveling at night. They feel they have little recourse to hold the agents accountable for what they perceive as mistreatment.

Community organizers told the Guardian that federal agents have targeted the Black and brown neighborhoods that they serve in Minnesota, New York, Washington state, California and Illinois. And immigration enforcement agents have patrolled Home Depot stores, mosques, daycares, street vending areas and construction sites. As a result, organizations have increased training to prepare people if they are detained, have equipped businesses with signs attempting to ward off ICE and have offered whistles to residents so that they can alert their neighbors when federal agents are nearby.

In recent weeks, the Trump administration has focused its immigration-enforcement efforts on Somalis. About 2,000 ICE officers and 800 US Customs and Border Protection agents have been deployed in the Minneapolis area, which has the largest Somali population in the US. The Trump administration also began arresting immigrants in Maine this month, with a focus on the thousands of Somalis who have settled in the state beginning in the early 2000s. Additionally, it announced that in March it would end the temporary protected status designation for Somalis in the US, which has provided work authorization and protection from deportation for migrants from the country.

The main recourse for challenging racial profiling is through the Federal Tort Claims Act, which allows people to sue the federal government for harm caused by federal employees, said Thomas A Saenz, the president and general counsel at the Mexican American Legal Defense and Educational Fund. But a recent supreme court ruling may have complicated how racial-profiling allegations are handled. In September 2025, supreme court justices allowed immigration enforcement agents in southern California to interrogate anyone who they thought may be in the country illegally, and noted that perceived race or ethnicity can be a relevant factor along with others.

In recent months, the amount of people held in detention reached an all-time high. As of 8 January 2026, ICE held 68,990 people in detention, according to data published by the agency. "Anytime you impose a target for a number of arrests and detention, you're going to encourage the use of unconstitutional shorthands like racial profiling," Saenz said. "It's not at all clear that this administration cares whether they're in compliance with the constitution or not."

"Allegations that ICE engages in 'racial profiling' are disgusting, reckless and categorically FALSE. This type of garbage is contributing to our officers facing a more than 1,300% increase in assaults against them," said Tricia McLaughlin, the Department of Homeland Security's spokesperson, in an email to the Guardian. "A person's immigration status makes them a target for enforcement, not their skin color, race or ethnicity. Law enforcement uses 'reasonable suspicion' to make arrests, as allowed under the fourth amendment to the US constitution. The supreme court has already vindicated us on this position."

## 'Anybody could snatch him off the street'

Last month, Fernando was driving on a two-way street in Nebraska when he said that he was pulled over by ICE agents in the morning. They told Fernando, a US citizen who is only using his first name out of fear of retaliation, that he fit the description of a Hispanic male whom they were looking for. The four officers interrogated him over the course of an hour, he said.

"As soon as it happened, I kind of laughed it off," Fernando said. "I was kind of like, 'This is pretty funny.' You don't expect it to happen to you until it does." But after he gave them his Real ID, he said they became visibly irritated and insinuated that it was fake. A veteran, Fernando shared his name, rank, branch of service and social security number, but he said the

2/18/26, 11:49 PM    'It's like they're hunting us': US citizens and legal residents report increased racial profiling by ICE | US immigration | The Guardian

Case 1:25-cv-03417-BAH    Document 78-1    Filed 02/19/26    Page 43 of 68

officers were unfazed. They demanded that he step out of the car, Fernando said, and as he did so, they threw him to the ground and laid their body weight on top of him. They yelled that he was interfering with an investigation, as Fernando continued to ask what they were looking for. Not long after, he said that the agents stood up, threw his ID to the ground, flipped him off and drove away.

The incident rattled Fernando. He said he becomes anguished whenever he sees a Dodge Durango with tinted windows – the same car that stopped him that day. Now he tries to only travel at night so that he won't be targeted by agents during the day.

"It feels like a slap in the face. I gave nine years of my life to a country for me to be racially profiled and be questioned about my citizenship. It makes me emotional. It makes me feel like all of that was in vain," Fernando said. "One of the guys that stopped me was a younger Hispanic guy, and it was like, 'Hey, we're supposed to be on the same team. I don't understand why you would become the aggressor.'"

Over the past few weeks, he said that he's called the US Department of Homeland Security office in Nebraska or ICE every couple of days to try to report the incident, but that he's never received a call back. "It makes it a lot more difficult to report," Fernando said, "than it does to actually try to chase down a ghost."

In Tampa, Florida, Sara, who is of Persian descent, said that she believes ICE officials followed her because they perceived her as Latina. In March 2025, Sara, a US-born citizen who is using a pseudonym out of fear of being further targeted, said that a white SUV followed her car upwards of 15 times for a month. "It was extremely rattling," Sara said, "to the point where I carried our passports with us everywhere and then even started to sleep with them. I felt very fearful because of what was going on in Tampa and what it seemed like was racial profiling and me looking like I'm of Hispanic background."

Case 1:25-cv-03417-BAH   Document 78-1   Filed 02/19/26   Page 44 of 68

Sara said she eventually stopped being followed, but that the experience greatly affected her mental health – as it was happening, she couldn't sleep or eat, and her hair began falling out. "I do worry about our nation and about the rights of people," Sara said. "How things are being approached with such violence, that's very frightening to me.

In Maryland, the threat of immigration enforcement led one family to change their daily routine to ensure their children's safety. Kate, a European woman who is a US citizen and is using a pseudonym, is the guardian of four Guatemalan teens. During the winter and spring of 2025, she began walking the youngest child, a fifth grader, to school because she feared that he might be targeted by immigration enforcement agents due to his appearance.

"[ICE agents] were threatening to come to schools and to come into neighborhoods and I was really worried for a while," Kate said. "At that time he was 11. He's a little kid. Anybody could snatch him off the street." Now that he's in sixth grade, Kate said that she allows the child to walk to school with his older cousins. But she's still worried that the children's biological family could be detained by ICE.

Organizations throughout the nation have come to refugees and immigrants' aid by offering them support in areas where federal agents have been known to patrol. Any Huamani, an immigration defense coordinator at the Brighton Park Neighborhood Council in Chicago, said that her non-profit has hosted more than 50 "know your rights" trainings in the area since Trump took office last year. Since ICE launched Operation Midway Blitz, its immigration crackdown in Chicago last fall, Huamani said that she has seen an uptick in racial profiling of Black and brown community members. In October, she said that she witnessed two Spanish-speaking people be abducted by ICE back-to-back within a couple of minutes.

The organization has set up a table outside of Home Depot to help day laborers by offering them information about what to do if they're detained, as well as hand warmers, toe warmers and whistles so that they can warn people when they see ICE.

In Minnesota, the sound of whistles wafts through the Cedar-Riverside neighborhood, as community members alert their neighbors that ICE agents are patrolling the area. Volunteers in green vests are stationed near mosques and Somali-owned businesses in the area, which has a large Somali population, said Suleiman Adan, the deputy executive director at Cair Minnesota, a Muslim civil rights organization.

Case 1:25-cv-03417-BAH    Document 78-1    Filed 02/19/26    Page 45 of 68

Adan said that community members have also shared that ICE has patrolled the Karmel Mall, where many Somalis frequent. "It's like you're looking for game," he said about ICE's tactics. "It's like you're hunting; who can I prey on today?"

"Right now, it's like 'to hell with the constitution'," said Adan. "Freedom for whom is really the question."

## Most viewed

# Exhibit 9

Case 1:25-cv-03417-BAH   Document 78-1   Filed 02/10/26   Page 47 of 68



# DAILY CALLER

# 'Nothing But Green Lights': ICE Memo Expands Agents' Warrantless Arrest Powers

DAILY CALLER

Photo by Bryan Cox/U.S. Immigration and Customs Enforcement via Ge

January 31, 2026 2:33 PM ET

**Anthony Iafrate** Associate Editor

An internal memo sent to all Immigration and Customs Enforcement perso
Wednesday declared the agency has the power to arrest suspected illegal
immigrants, including those "likely to escape" in the time required to obtai
warrant.

The **memo**, sent by acting Immigration and Customs Enforcement (ICE)
Director Todd Lyons and first **reported** Friday by The New York Times, st
the Immigration and Nationality Act of 1952 "unequivocally authorizes an
immigration officer to execute a warrantless arrest" of an "alien" that meet
of two criteria. Lyons's memo outlines that immigrants subject to warrantl
arrests include those whom an officer has determined are "entering or
attempting to enter the United States in violation of any law ... regulating the
admission, exclusion , expulsion, or removal of alien" or who are both in violation
of such laws and are "likely to escape before a warrant can be obtained."

(**RELATED: ICE Reportedly Orders Agents To Avoid Minnesota 'Agitators,'
Hunt Down Worst Illegal Aliens**)

What is your stand
authority to arrest
warrant?

Support the memo

Oppose the memo'

8 votes

Powered by (

"[A]n alien is 'likely to escape' if an immigration officer determines he or she is unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained," the memo defines.

"Immigration officers are expected to ensure they obtain administrative warrants in advance of targeted enforcement operations. If warrantless arrests become necessary under the circumstances, immigration officers must effectuate such arrests in a manner consistent with the ICE policy and the law," the memo concludes. "Immigration officers must therefore conduct an analysis of an alien's likelihood of escape prior to effectuating a civil warrantless arrest and, as soon as practicable after the arrest, immigration officers must properly document all the likelihood of escape factors on Form I-213."



MINNEAPOLIS, MINNESOTA – JANUARY 13: ICE agents approach a house before detaining two people on January 13, 2026 in Minneapolis, Minnesota. (Photo by Stephen Maturen/Getty Images)

"This nothing new. This is just a reminder to officers to be keep detailed records on their arrests," Department of Homeland Security (DHS) Assistant Secretary for Public Affairs Tricia McLaughlin told the Daily Caller News Foundation in a statement. ICE is an agency of DHS.

"Authority under USC 1357 and of course reasonable suspicion are protected by the U.S. Constitution. Law enforcement uses 'reasonable suspicion' to make arrests, as allowed under the Fourth Amendment to the U.S. Constitution. The Supreme Court has already vindicated us on this position," McLaughlin added.

Case 1:25-cv-03417-BAH   Document 78-1   Filed 02/19/26   Page 49 of 68

"The Immigration and Nationality Act authorizes immigration officers to 'interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States,'" Supreme Court Justice Brett **Kavanaugh** wrote in a September 2025 concurring **opinion** in Noem v. Vasquez Perdomo, in which the Court **sided** with the Trump administration, 6–3.

"Immigration officers 'may briefly detain' an individual 'for questioning' if they have 'a reasonable suspicion, based on specific articulable facts, that the person being questioned … is an alien illegally in the United States,'" Kavanaugh continued.



United States Supreme Court Associate Justice Brett Kavanaugh poses for an official portrait at the East Conference Room of the Supreme Court building on October 7, 2022 in Washington, DC. (Photo by Alex Wong/Getty Images)

Scott Shuchart, who served in a senior role at ICE during former President Joe Biden's administration, told The New York Times that Lyons's Wednesday memo "bends over backwards to say that ICE agents have nothing but green lights to make an arrest without even a supervisor's approval."

Under the memo, "even that supervisor's note can almost always be sidestepped so long as the officer can say anything remotely plausible about the person being arrested possibly leaving the area," the Biden-era ICE official told the outlet.

The memo "would cover essentially anyone they want to arrest without a warrant, making the general premise of ever getting a warrant pointless," Claire

Case 1:25-cv-03417-BAH    Document 78-1    Filed 02/19/26    Page 50 of 68

Trickler-McNulty, another former ICE official during the Biden era, told the outlet.

Anti-ICE **protests**, many of them **violent**, intensified throughout the country in January 2025, following the fatal shootings of **Renee Good** and **Alex Pretti** by ICE and Border Patrol officers, respectively.

*All content created by the Daily Caller News Foundation, an independent and nonpartisan newswire service, is available without charge to any legitimate news publisher that can provide a large audience. All republished articles must include our logo, our reporter's byline and their DCNF affiliation. For any questions about our guidelines or partnering with us, please contact licensing@dailycallernewsfoundation.org.*

# Exhibit 10

EXHIBIT A



*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, DC 20536

**U.S. Immigration
and Customs
Enforcement**

January 28, 2026

MEMORANDUM FOR:    All ICE Personnel

FROM:    Todd M. Lyons
Senior Official Performing the Duties of the Director

SUBJECT:    Civil Immigration Arrest Authority: Administrative Arrest
Warrants and Warrantless Arrests

---

On January 20, 2025, President Donald J. Trump issued Executive Order 14159, *Protecting the American People Against Invasion*, setting forth "the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people."[1] Central to the enforcement of the immigration laws is the civil immigration arrest authority possessed by the U.S. Immigration and Customs Enforcement (ICE) immigration officers within both Enforcement and Removal Operations (ERO) and Homeland Security Investigations (HSI).

Civil administrative arrest warrants have been part of the immigration laws since as early as 1798, and their use has long been acknowledged by the federal courts.[2] Federal regulations expressly delegate to specified immigration officers[3] the authority to issue administrative warrants of arrest under the immigration laws, Forms I-200, *Warrant for Arrest of Alien* (Form I-200), and to ERO and HSI immigration officers the authority to execute warrants of arrest for immigration violations.[4] In addition, the Immigration and Nationality Act (INA) unequivocally authorizes an immigration officer to execute a warrantless arrest of: (1) any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens; or (2) if he has reason to believe[5] that the alien so arrested is in the United States in

---

[1] 90 Fed. Reg. 8443 (Jan. 29, 2025).

[2] *See, e.g., Abel v. United States*, 362 U.S. 217, 233 (1960).

[3] 8 C.F.R. § 287.5(e)(2).

[4] *Id.* § 287.5(e)(3).

[5] The federal courts have consistently equated the term "reason to believe" in this context as "probable cause." *E.g., Morales v. Chadbourne*, 793 F.3d 208, 216-17 (1st Cir. 2015) (equating reason to believe in INA § 287(a)(2), 8 U.S.C. § 1357(a)(2) with probable cause); *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010) ("Because the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in § 1357(a)(2) means

FOR OFFICIAL USE ONLY

Civil Immigration Arrest Authority: Administrative Arrest Warrants and Warrantless Arrests
Page 2 of 5

violation of any such law or regulation **and** is likely to escape before a warrant can be obtained for his arrest.[6]

This memorandum serves as a reminder of this essential authority and provides guidance for the lawful and consistent exercise of warrantless arrest authority for civil violations of immigration laws.

**Civil Immigration Arrests Pursuant to an Administrative Warrant**

Only specified categories of supervisory immigration officers within ICE have been delegated the authority to issue Form I-200 for the arrest of an alien when there is probable cause to believe the alien is present in the United States in violation of the immigration laws or is otherwise removable from the United States.[7] As delineated in the regulations, within ICE, Forms I-200 may only be issued by supervisory detention and deportation officers, supervisory special agents, or their superiors.[8] Although ICE immigration officers also possess warrantless arrest authority for civil violations of the immigration laws, as discussed below, such authority is not without limits. Accordingly, ICE immigration officers are required to ensure civil immigration arrest warrants[9] are issued for all target aliens prior to conducting targeted arrest operations.

Despite this requirement, it is without a doubt that ICE immigration officers will encounter additional aliens present in violation of the immigration laws or otherwise removable during at-large operations. In that case, immigration officers must immediately determine whether an administrative warrant can be timely obtained. If an authorized supervisory immigration officer is present or otherwise accessible, he or she may immediately issue Form I-200 if probable cause of removability is established.[10] If no supervisor is available to issue an administrative warrant, or a supervisor cannot timely issue an administrative warrant, then the officer or agent must consider whether a warrantless immigration arrest is permissible.

---

constitutionally required probable cause."); *Tejeda–Mata v. INS*, 626 F.2d 721, 725 (9th Cir.1980) ("The phrase 'has reason to believe' [in § 1357] has been equated with the constitutional requirement of probable cause."); *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975) ("The words [in § 1357] of the statute 'reason to believe' are properly taken to signify probable cause."); *Au Yi Lau v. INS*, 445 F.2d 217, 222 (D.C. Cir. 1971) (the "reason to believe" phrase in § 1357 "must be read in light of constitutional standards, so that 'reason to believe' must be considered the equivalent of probable cause.").

[6] INA § 287(a)(2), 8 U.S.C. § 1357(a)(2).

[7] 8 C.F.R. § 287.5(e)(2).

[8] *Id.* § 287.5(e)(2)(xxiii), (xxiv), (xxxi)-(lii).

[9] Although this guidance addresses only Forms I-200, certain supervisory immigration officers within both ERO and HSI are also authorized to issue an administrative warrant, Form I-205, Warrant of Removal, for the arrest of an alien with a final order of removal. 8 C.F.R. § 241.2(a)(l). And all ICE special agents and deportation officers are authorized to execute Forms 1-205. *Id.* § 287.5(e)(3)(iii)-(v).

[10] Officers and agents are reminded that they are empowered to detain and conduct a brief investigative stop of any person that is reasonably suspected to be engaged in an offense against the laws of the United States or unlawfully present in the United States. 8 C.F.R. § 287.8(b)(2). Officers and agents may not detain aliens for the sole purpose of obtaining a Form I-200.

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

Civil Immigration Arrest Authority: Administrative Arrest Warrants and Warrantless Arrests
Page 3 of 5

## Warrantless Civil Immigration Arrests[11]

The immigration laws authorize immigration officers to effectuate civil immigration arrests without a warrant where there is probable cause to believe that: (1) the subject is a removable alien; **and** (2) the subject is "likely to escape" before a warrant for his arrest can be obtained.[12] These determinations must be made before a warrantless arrest is effectuated.[13]

The phrase "likely to escape" is not specifically defined in the statute or implementing regulations. The plain meaning of that phrase, which is reinforced by context, is that an alien is "likely to escape" if an immigration officer determines he or she is unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained. The word escape indicates immediacy, and the plain meaning of the word is "to get away (as by flight)."[14] Whether an alien is likely to remain at the scene of the encounter is based on the totality of the circumstances known to the immigration officer at the time of the encounter and prior to the arrest. Possible factors include, but are not limited to:

1. The subject's behavior prior to and during the encounter (e.g., refusal to follow lawful commands, attempts to evade officers, or other suspicious behavior prior to the arrest);[15]

2. The subject's ability and means to promptly depart the scene of the encounter (e.g., the subject was encountered in a vehicle and continues to have control over the vehicle);[16]

3. The subject's age and health;

4. Possession of identity or work authorization documents that the immigration officer suspects are fraudulent;[17]

---

[11] Although this guidance addresses only civil immigration arrest authority, ICE immigration officers also possess authority to conduct certain warrantless criminal arrests under Title 8 of the U.S. Code, and the same "likely to escape" analysis applies to such arrests. INA § 287(a)(4)-(5), 8 U.S.C. § 1357(a)(4)-(5).

[12] INA § 287(a)(2), 8 U.S.C. § 1357(a)(2).

[13] *Id.*

[14] *Escape*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/escape (last visited Jan. 1, 2026).

[15] *See United States v. Meza-Campos*, 500 F.2d 33, 34 (9th Cir. 1974) (warrantless arrest was proper where alien appeared extremely nervous, looked around as if intending to run, and admitted alienage and that he had no immigration papers).

[16] *See United States v. Cantu*, 519 F.2d 494, 497 (7th Cir. 1975) (warrantless arrest was proper for alien in a moving car, who was highly mobile and possessed the capacity to change momentarily their location and direction).

[17] *See United States v. Reyes-Oropesa*, 596 F.2d 399, 400 (9th Cir. 1979) (warrantless arrest was proper when an alien working in a garage presented a forged resident card to immigration officers).

FOR OFFICIAL USE ONLY

Civil Immigration Arrest Authority: Administrative Arrest Warrants and Warrantless Arrests
Page 4 of 5

5. Presentation of unverifiable or suspected false information to the immigration officer;[18]

6. Whether the officer has probable cause to arrest the subject for improper entry by an alien, in violation of INA § 275, 8 U.S.C. § 1325, or reentry of a removed alien, in violation of INA § 276, 8 U.S.C. § 1326;[19] and

7. Whether the alien has complied with the legal requirements for registration under INA § 262, 8 U.S.C. § 1302, and notification of the Secretary of his or her address under INA § 265, 8 U.S.C. § 1305, including whether he or she is carrying on his or her person evidence of registration as required by INA § 264(e), 8 U.S.C. § 1304(e).

No single factor is determinative. The circumstances of an alien's failure to comply with the immigration laws of the United States or unwillingness to cooperate with an immigration officer's lawful authority to enforce those laws may support the conclusion that the alien is likely to escape before the officer can effectuate his or her arrest by obtaining a warrant. For example, an alien who admits to illegally crossing the border without inspection at a port of entry (or who otherwise never lawfully entered) is not only removable from the United States but has facilitated his or her unlawful presence in a surreptitious and criminal manner that demonstrates a wanton disregard for the laws of the United States. Having already committed a serious and deceitful federal offense, officers should closely consider whether the alien is likely to remain at the scene of the encounter while a warrant for his or her arrest is issued.

**Likelihood of Escape Compared with Risk of Flight**

Without explanation, and without any formal policy, ICE previously applied the phrase "likely to escape" as being the equivalent of "flight risk." This unreasoned position was incorrect. In fact, there are significant differences between the two standards in the immigration regulatory context and immigration officers should avoid conflating them. A flight risk analysis looks at whether an alien is likely to attend future immigration court hearings, appear before ERO as directed, surrender for removal, and comply with other immigration obligations.[20] Flight risk determinations are made <u>after</u> an alien's arrest, where the alien has already been identified, fingerprinted, interviewed, and may have had DNA collected. In these scenarios, an immigration officer has greater information at his or her disposal than prior to an at-large arrest, to determine the likelihood of an alien's compliance with release conditions and attendance at future immigration court hearings.

These factors are entirely absent during an at-large arrest. An immigration officer in the field must develop probable cause that the subject is an alien removable from the United States. Once

---

[18] *See United States v. Quintana*, 623 F.3d 1237, 1241 (8th Cir. 2010) (warrantless arrest was proper when an alien provided a name, date of birth and immigration status that could not be corroborated by the officer's records check).

[19] *See United States v. Puebla-Zamora*, 996 F.3d 535, 538 ("previous removal for illegal entry established probable cause that he may escape before a warrant could issue").

[20] 8 C.F.R. § 236.1(c)(3).

FOR OFFICIAL USE ONLY

Civil Immigration Arrest Authority: Administrative Arrest Warrants and Warrantless Arrests
Page 5 of 5

established, the officer is empowered to effectuate an arrest and must determine whether the arrest may be made with or without a warrant. While the flight-risk analysis assesses whether an already identified and detained alien is likely to comply with future immigration obligations such as court appearances and appearances before ERO, the likelihood-of-escape analysis is narrowly focused on determining whether the person is likely to escape before the officer can practically obtain an administrative arrest warrant, while in the field. This on-the-spot determination as to the likelihood of escape is often made with limited information about the subject's identity, background, or place of residence and no corroboration of any self-serving statements made by the subject.

Therefore, when an immigration officer assesses whether an alien is likely to escape, he or she should consider the factors relevant to immediacy of obtaining and serving an arrest warrant on alien who may not yet have been subject to immigration enforcement, rather than factors relevant to whether an alien is likely to appear for immigration hearings and cooperate after having already been subject to immigration enforcement.

**Documentation Requirements**

Because the actions of ICE law enforcement personnel are often challenged months or years after the fact, it is important for officers and agents to clearly, succinctly, and contemporaneously document all factors that led to an immigration officer's determination that the subject was likely to escape before a warrant could be obtained. To this end, following a warrantless arrest, officers and agents shall document in the narrative section of the Form I-213, Record of Deportable/Inadmissible Alien, all factors considered in determining that the alien was likely to escape before a warrant could be obtained. Officers and agents should include both aggravating and mitigating factors and should include only the facts learned prior to the warrantless arrest. If an immigration officer encounters and arrests multiple collateral aliens, his or her analysis as to the likelihood of escape must be specific to each alien arrested. That one collateral alien is likely to escape does not necessarily mean another collateral alien is also likely to escape. Although the analysis must be conducted on an individualized basis, particular factors may be common to multiple aliens arrested at the same time.

Documentation should be completed during processing, as soon as practicable following the arrest.

**Conclusion**

Immigration officers are expected to ensure they obtain administrative warrants in advance of targeted enforcement operations. If warrantless arrests become necessary under the circumstances, immigration officers must effectuate such arrests in a manner consistent with the ICE policy and the law. Immigration officers must therefore conduct an analysis of an alien's likelihood of escape prior to effectuating a civil warrantless arrest and, as soon as practicable after the arrest, immigration officers must properly document all the likelihood of escape factors on Form I-213.

FOR OFFICIAL USE ONLY

# Exhibit 11

# ICE Expands Power of Agents to Arrest People Without Warrants

An internal memo changed the standard from whether people are unlikely to show up for hearings to whether they could leave the scene.

▶  **Listen to this article · 6:20 min**  Learn more



**By Hamed Aleaziz and Charlie Savage**

Reporting from Washington

Jan. 30, 2026

Amid tensions over President Trump's immigration crackdown in Minnesota and beyond, federal agents were told this week that they have broader power to arrest people without a warrant, according to an internal Immigration and Customs Enforcement memo reviewed by The New York Times.

The change expands the ability of lower-level ICE agents to carry out sweeps rounding up people they encounter and suspect are undocumented immigrants, rather than targeted enforcement operations in which they set out, warrant in hand, to arrest a specific person.

The shift comes as the administration has deployed thousands of masked immigration agents into cities nationwide. A week before the memo, it came to light that Todd M. Lyons, the acting director of the agency, had issued guidance in May saying agents could enter homes with only an administrative warrant, not a judicial one. And the day before the memo, Mr. Trump said he would "de-escalate a little bit" in Minneapolis, after agents fatally shot two people in the crackdown there.

Case 1:25-cv-03417-BAH   Document 78-1   Filed 02/19/26   Page 60 of 68

The memo, addressed to all ICE personnel and signed on Wednesday by Mr. Lyons, centers on a federal law that empowers agents to make warrantless arrests of people they believe are undocumented immigrants, if they are "likely to escape" before an arrest warrant can be obtained.

ICE has long interpreted that standard to mean situations in which agents believe someone is a "flight risk," and unlikely to comply with future immigration obligations like appearing for hearings, according to the memo. But Mr. Lyons criticized that construction as "unreasoned" and "incorrect," changing the agency's interpretation of it to instead mean situations in which agents believe someone is unlikely to remain at the scene.

"An alien is 'likely to escape' if an immigration officer determines he or she is unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained," Mr. Lyons wrote.

The Times shared a description of the memo's contents with several former senior ICE officials from the Biden administration. Claire Trickler-McNulty, a former senior adviser at ICE, called the new definition "an extremely broad interpretation of the term 'escape.'"

"It would cover essentially anyone they want to arrest without a warrant, making the general premise of ever getting a warrant pointless," she added.

Mr. Lyons's memo explicitly portrays the revised interpretation of "likely to escape" as a change from how ICE had "previously applied the phrase." But Tricia McLaughlin, a Department of Homeland Security spokeswoman, said that "this is not new."

"This is simply a reminder to officers," she wrote in a statement, to keep "detailed records on their arrests."

The Trump administration has pushed ICE to significantly increase arrests per day as part of its mass deportation campaign. The agency has carried out more indiscriminate sweeps — like rounding up people in Home Depot parking lots

Case 1:25-cv-03417-BAH   Document 78-1   Filed 02/19/26   Page 61 of 68

looking for work — rather than targeted operations in which agents set out, warrant in hand, to arrest specific people.

Such roundup operations could still involve administrative warrants if supervisors on the scene quickly fill out the paperwork, known as a Form I-200. The change lowers the standard for arrests even without a supervisor's approval.

Mr. Lyons's memo lists factors agents can consider when deciding whether the standard has been met, including whether someone obeys commands or tries to evade them; has access to a car or other means to leave; has identification or work authorization documents agents suspect are fraudulent; or provides "unverifiable or suspected false information."

The memo tells agents who make warrantless arrests to fill out a form afterward that documents the factors they considered in determining that someone was "likely to escape." That includes situations in which agents set out to arrest a particular person and then take others in the vicinity into custody. Mr. Lyons called that group "collateral aliens."

"If an immigration officer encounters and arrests multiple collateral aliens, his or her analysis as to the likelihood of escape must be specific to *each* alien arrested," the memo said. "That one collateral alien is likely to escape does not necessarily mean another collateral alien is also likely to escape."

But this kind of assessment requirement only goes so far: The memo stresses that "particular factors may be common to multiple aliens arrested at the same time."

During the first Trump administration, a class-action lawsuit claimed that agents had been illegally profiling in traffic stops as a pretext for warrantless arrests. In 2022, the Biden administration agreed to a settlement that included a three-year nationwide policy. Plaintiffs last year accused the second Trump administration of violating the agreement, prompting litigation.

The policy standard in the 2022 settlement included factors that resembled Mr. Lyons's list. But it also included "ties to the community (such as a family, home or employment) or lack thereof, or other specific circumstances that weigh in favor or

against a reasonable belief that the subject is likely to abscond.”

But Mr. Lyons's memo noted that when agents encounter people they suspect are in the country illegally, the agents are not likely to be able to know much about them. “This on-the-spot determination as to the likelihood of escape is often made with limited information about the subject's identity, background or place of residence and no corroboration of any self-serving statements made by the subject,” he wrote.

Scott Shuchart, a former head of policy at ICE during the Biden administration, said the memo would open the door to more frequent warrantless arrests.

“This memo bends over backwards to say that ICE agents have nothing but green lights to make an arrest without even a supervisor's approval,” he said. The memo, he warned, said that “even that supervisor's note can almost always be sidestepped so long as the officer can say anything remotely plausible about the person being arrested possibly leaving the area.”

**Hamed Aleaziz** covers the Department of Homeland Security and immigration policy for The Times.

**Charlie Savage** writes about national security and legal policy for The Times.

---

A version of this article appears in print on , Section A, Page 20 of the New York edition with the headline: ICE Memo Widens Power Of Agents to Make Arrests Without Needing Warrants

# Exhibit 14



LISTEN LIVE  DONATE

## Win a trip for two
## to an island resort in Panama!

**• MORE INFO •**

POLITICS  MONEY  ARTS  JUSTICE

ENVIRONMENT  NEWSLETTER  WAYS TO SUPPORT

# Exasperated Colorado federal judge orders Trump administration back to court on warrantless ICE arrests

 By Allison Sherry · Feb. 18, 2026, 2:58 pm

SHARE:  f  X  ✉

DONATE

*FILE - A deportation officer with Enforcement and Removal Operations with U.S. Immigration and Customs Enforcement, Tuesday, Dec. 17, 2024.*

An exasperated Colorado federal judge on Wednesday ordered the U.S. Department of Justice to return to court and explain why it has so far not appeared to be following orders on detaining undocumented immigrants in the state without warrants.

"These things shouldn't be that difficult," Senior U.S. District Judge R. Brooke Jackson told Trump administration lawyers in a remote hearing on a preliminary injunction they are apparently not complying with.

"The policy of (Immigration and Customs Enforcement) was a good policy and all they have to do is comply with their own policies, and we're good. But, for whatever reason, they insisted on not agreeing to that … and here we are sitting here today. I don't get that."

**The Lookout:** Important stories delivered to your inbox daily, for free.

Example@mail.com

# November order

In November, Jackson **ordered immigration agents to stop making warrantless arrests** in Colorado, which means, in essence, that they comply with existing federal law that bans detentions of people unless they've gone through a flight-risk assessment.

Attorneys from the American Civil Liberties Union of Colorado have argued since last year that federal immigration officers are routinely, even daily, detaining people without warrants signed by judges and without probable cause that the person being arrested is both in violation of immigration laws and likely to run and escape before a warrant can be obtained.

2/19/26, 12:51 PM
Exasperated Colorado federal judge orders Trump administration back to court on warrantless ICE arrests

Case 1:25-cv-03417-BAH    Document 78-1    Filed 02/19/26    Page 66 of 68

DONATE

pattern in the way ICE agents have been operating in Colorado during the second Trump administration.

The four people were arrested and placed into detention without a warrant and without public evaluation about whether they were likely to flee before a warrant could be obtained. The four had lived in their communities for years, had long histories of local employment, schooling and presented no likelihood of running away — let alone probable cause that they would commit a crime.

One of the plaintiffs is Caroline Dias Goncalves, a University of Utah student who was detained after being stopped on Interstate 70 in Mesa County. She was brought to the United States from Brazil as a child and was in the U.S. on an expired visa. She had no criminal record and was detained for more than two weeks. She's since been released.

## Samples of arrest forms

Jackson's preliminary injunction order in November required the federal government to send ACLU lawyers a sampling of arrest forms, called I-213s, so they could ensure the agents were making proper arrests moving forward.

In Tuesday's hearing, ACLU lawyers argued the federal government is 100 percent out of compliance so far on the judge's orders. And that the handful of forms they've received so far in the last couple of months are proof of that.

Tim Macdonald, the ACLU's legal director, described a form he received from the federal government from a couple of weeks ago. He characterized the story to Jackson because the I-213s shared with the ACLU in the court records are sealed.

A man was arrested by ICE and detained. He didn't have any criminal record or any pending criminal charges, he had been in the United States for eight years. ICE agents pulled his car over. There was no assessment of flight risk, no assessment of local family or community ties and he was eventually placed in detention at the GEO facility in Aurora.

and he doesn't know where he is. He was likely deported to another country, he said.

"They are in fact detaining and arresting people before they call headquarters, the arrests are being effectuated without a warrant," Macdonald said. "All of the I-213s we submitted show ongoing violations of your order."

## Hearing set in March

Macdonald on Wednesday ultimately got what he went to the judge for, which is an evidentiary hearing that will make the federal government prove that they are indeed training ICE agents to follow the earlier preliminary injunction order and doing all that they can to comply.

Brad Leneis, an assistant U.S. attorney, told Jackson on Wednesday that they told immigration authorities that they had to comply with flight-risk assessments and obtain warrants before detaining people. He acknowledged that the arrest reports they have turned over to the ACLU so far are not fully in compliance.

"Looking at these I-213s, it doesn't give the description of the arrest that is required by the court's order," Leneis said. "We started with zero, we had a lot of things to get in place … We are working through a set of challenges we face to implement the preliminary injunction, and we think the numbers now are better than they were in December. We think they will continue to improve."

## Issues over compliance

Leneis went on to tell Jackson, "the standard there is not absolute compliance, there is repeated material noncompliance."

The ACLU's Macdonald clapped back.

"They may not be complying in every instance, they aren't complying in any of them that we've seen," he said. "We are seeing uniform non-compliance."

DONATE

hearing and work together to see if they could eliminate the need for it.

"I want you to make a good faith effort to narrow this and even eliminate the need for this if possible. And come back to tell me where you are with these issues and disputes you have," he said. "And so I can better prepare for the hearing myself."

---

## [↗] Related coverage:

- **Prosecutor's aggressive talk about Tren de Aragua has so far produced only plea deals**
- **ICE agents leave Ace of Spades 'death cards' on detained immigrants' cars**
- **Trump muddles some facts, omits others from two Colorado stories to help justify U.S. raid on Venezuela**

---

## You care.

You want to know what is *really* going on these days, especially in Colorado. We can help you keep up.  The Lookout is a free, daily email newsletter with news and happenings from all over Colorado. Sign up here and we will see you in the morning!

| Enter Your Email | **Sign Up** |