UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ESCOBAR MOLINA, et al., | . | |
| Plaintiffs, | . | CA No. 25-3417 (BAH) |
| v. | . | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | . | Washington, D.C. Wednesday, March 11, 2026 10:00 a.m. |
| Defendants. | . | |

. . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE BERYL A. HOWELL
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiffs: ADITI SHAH, ESQ.
American Civil Liberties Union
529 14th Street NW
Suite 722
Washington DC 20045

MADELEINE GATES, ESQ.
Washington Lawyers' Committee
700 14th Street NW
Suite 400
Washington, DC 20003

For Defendants: JOHN BARDO, AUSA
U.S. Attorney's Office
601 D Street NW
Washington, DC 20530

Court Reporter: BRYAN A. WAYNE, RPR, CRR
U.S. Courthouse, Room 4704-A
333 Constitution Avenue NW
Washington, DC 20001

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

DEPUTY CLERK: Your Honor, this is civil action 25-3417, Jose Escobar Molina versus U.S. Department of Homeland Security, et al. Counsel, please state your appearances for the record, starting with plaintiffs' counsel.

MS. SHAH: Good morning, Your Honor. Aditi Shah for plaintiffs.

THE COURT: Good morning, Ms. Shah. And do you want to introduce everybody else who's at counsel table?

MS. SHAH: Absolutely. With me at counsel table are Madeleine Gates, Yurie Landan, Scott Michaelman, Shana Khader, and Jehan Patterson.

THE COURT: All right. Thank you very much.

MR. BARDO: Good morning, Your Honor. John Bardo, assistant U.S. attorney, on behalf of the government, and I'm joined at the table by Dhruman Sampat, also an assistant U.S. attorney.

THE COURT: Good morning.

All right. We're here this morning because on February 19 the plaintiff moved to enforce the preliminary injunction order that I issued on December 2nd of 2025.

In connection with this hearing, I received the plaintiffs' motion and all of their exhibits, both redacted versions publicly and the sealed versions. I did order expedited briefing on the matter, and I did receive the defendants'

opposition brief with also several exhibits, and I've also received the plaintiffs' reply brief. So I think we're ready to go on that one.

Meanwhile, the plaintiffs filed a motion for extra-record discovery, which is still in the midst of briefing, but I do have a few questions about that since this was a fairly unusual posture for the case to be in, with an appeal of my PI order pending and two actions still being litigated in front of me.

So I've got some jurisdictional questions which are automatically raised, because typically when a case is on appeal, the district court's authority is far more limited in terms of what I can do while the merits of the case is on appeal. So I'll start with the plaintiffs.

Ms. Shah, are you speaking for the plaintiffs on all issues? You have a lot of help there.

MS. SHAH: Your Honor, with your permission, I will address the merits of our motion to enforce, and my colleague, Ms. Gates, will address the scope of the relief that we requested which includes the jurisdictional questions.

THE COURT: Okay. So I'm just going to ask my questions, and whichever of you feels comfortable answering, just pop on up or stand right there, totally up to you. I just want the clearest answers I can get, so I don't mind how you're dividing it. I'll leave it to you.

MS. SHAH: Yes, Your Honor.

THE COURT: So why don't you explain to me why I have jurisdiction to consider one or both of your motions given the appellate limits on my jurisdiction.

MS. GATES: Madeleine Gates on behalf of plaintiffs.

So in this circuit, unless an injunction has been stayed pending appeal, the court's order retains its full vitality. Here the injunction has not been stayed, and Rule 62(g) specifically codifies the court's inherent authority to preserve the status quo of the parties.

So that's really what we're seeking here. We're seeking to have the court enforce its injunction to ensure the parties' rights are protected as the appeal is unfolding.

THE COURT: So that's for the motion framed as a motion to enforce the order. What about the plaintiffs' motion to conduct extra-record discovery? Is that also connected to the motion to enforce the PI order?

MS. GATES: No, Your Honor. We would consider that a separate matter. That is because the issues that are implicated in the appeal are not implicated in the ruling on the discovery request, and so litigation can continue to unfold, even as the appeal is ongoing, of the preliminary injunction order.

THE COURT: So if they're separate -- I think -- I don't want to prejudge it. I mean, I think there is some

sound legal basis for me to be able to conduct proceedings to ensure enforcement of my order which, as you say, has not been stayed by either this court or the circuit.

But conducting discovery, if it's related to the motion to enforce the PI, wouldn't you have a better argument for me to consider the merits of that than if what you're saying to me right now is that it is not related while the case is on appeal? Do you want to think about that?

MS. GATES: Yes, Your Honor. I apologize I did not prepare specifically for the --

THE COURT: Okay. A first litigator's lesson: You got an open motion in court, be prepared to talk about it. Every open motion. I'm going to be a lot kinder, quite frankly, to the defendants on that because they haven't even had an opportunity yet to think through all their arguments because they haven't filed their opposition. So we're really in the midst of briefing on that.

But I -- just to put my cards on the table, I have some puzzlement here about which comes first, chicken-or-egg issues, because, quite frankly, the plaintiffs' motion for extra-record discovery so as to understand the contours of the policy being implemented by DHS both before and after the Lyons memo, and that seems to be also relevant, perhaps, depending on what you think through your answer to be, to enforcement of the PI order.

So do I decide the extra-record motion, which is in the midst of briefing, not at all ripe for resolution and I'm not prejudging that before I reach the plaintiffs' motion for enforcement of the PI order? Because if the policy is so vague in its contours you need extra-record discovery, what am I doing with the enforcement of the PI order?

So you see my chicken-and-egg problem here?

MS. GATES: I do understand, Your Honor. We'll think more on that. I think, preliminarily, I would just say the injunction, this court did find that the defendants are enforcing this policy. I think the evidence my colleague will discuss amply shows they're continuing to enforce it. Their statements show they're continuing to enforce it.

And so that's really what our motion to enforce is about, and our documentation requirements that we've asked the court to order are not for discovery purposes primarily; they're for enforcement purposes of the injunction.

THE COURT: Ah. So they are related. Is that your answer, that the two are related, interrelated? Okay. I'm going to let you think through that. I'm going to move on.

MS. GATES: Yes, Your Honor.

THE COURT: Because I'm puzzled about it and about both my jurisdiction when there's an appeal pending. So I'm going to let you think about that. All right. And this is when, if the parties are puzzled about something that's puzzling me,

that's oftentimes a good opportunity to ask for supplemental briefing when you have time to think about it and confer about it thoroughly.

Okay. So now let me turn to the motion to enforce the PI. So I think I go back to Ms. Shah. All right.

So, Ms. Shah, there's a real big difference between ignoring a court order and implementing the order in good faith but with hiccups, including perhaps legal errors in the implementation. The former, I think we can all say, is a legal matter, it's contemptuous, but the latter may require a little additional guidance or direction or legal briefing.

So plaintiffs' motion here for enforcement of the PI is claiming what occurred here: contemptuous behavior, ignoring the order, or lots of hiccups? You haven't moved for contempt, but I just want to know where we are heading here.

MS. SHAH: We think that the evidence in the record overwhelmingly shows that it is contemptuous behavior. But Your Honor is correct, we did not take the step at this juncture of actually moving for civil contempt, and that's because, upon studying the case law in this district, the circuit determined that a slightly lesser step of moving to enforce the injunction at the first stage would be more appropriate.

But this certainly is not a case where the record shows that there are hiccups or examples of, as Your Honor and I

discussed during the preliminary injunction hearing, you know, what happens after the PI order if defendants continue to make erroneous civil immigration arrests without warrants in this district.

The record here doesn't show mistakes in individual arrests or overzealous agents going beyond in a few instances. What the record shows is that the overwhelming majority of the documentation that defendants produced, plus their continued statements even after this court's order about using the wrong standard for warrantless civil immigration arrests, plus the --

THE COURT: Am I correct that all of those statements are mostly from the same spokesperson, Tricia McLaughlin, who is no longer there?

MS. SHAH: They were from -- many of them were from the same person, made repeatedly on different occasions, and there also were a few I know --

THE COURT: I know. It's like, how do you get a message to Tricia McLaughlin, one wonders.

MS. SHAH: And at least some of them were also from the DHS's official X account. So these are agency statements, agency public representations about the standard to use. And to quote Ms. McLaughlin, even after the Lyons memo, she said this is nothing new.

In other words, defendants have not done anything new, and

this is -- the I-213s in particular, I would say all I-213s we submitted, all 26 of them out of 33 that we reasonably narrowed to present to Your Honor as warrantless arrests over the past few months, all of them show this same systemic pattern of violations.

They show that either defendants' agents are not conducting any probable cause assessment for escape risk whatsoever or, in the few that actually use the words "escape risk," they're doing the same thing that they did before the PI order. They're relying on facts that go to removability --

THE COURT: Okay. This is the problem, though, with saying that in your view it's contemptuous behavior, because the defendants have outlined steps taken at DHS to comply with the December 2nd order. They've added fields to the arrest reports to prompt officers making warrantless civil immigration arrests to provide additional details. CBP did that. I don't know what ICE has done on that.

ICE says it has reviewed its I-213 forms. It reviews those, identifies deficiencies. When it found deficiencies, they set up a weekly review process. They have now a method of counseling arresting officers who've submitted deficient forms. They've taken steps to amend the forms promptly.

I mean, these are not steps the court can ignore, and they appear to have been taken in good faith to comply with the PI order. To the extent that -- I mean, wouldn't you agree that

those are positive steps to comply with the PI order?

MS. SHAH: Your Honor, we have significant concerns with defendant's representations of taking these purported steps of improvement. I think the biggest concern we have, if I had to sum it up, is that they go to potential improvements in documentation but not to the overarching substantive concern we have and the dispute the parties have over what is the correct probable cause standard for escape risk.

THE COURT: Right. Okay. So I think that's where I want to head exactly, because we now have the Lyons memo, and that was not in existence at the time I issued my PI order. And it seems that defendants explained it. That was part of their good-faith compliance with the PI order.

ICE issued guidance continuing to make clear that civil immigration arrests require probable cause of a violation of the immigration laws and risks that the person will not be at the scene or the encounter or another clearly identifiable location before a warrant can be obtained.

That's what the opposition briefed. They embrace the Lyons memo as implementation of the PI order, a clear written policy with clear contours that they say is consistent with the PI order and was in fact, although I'll get clarity about that from the defendants since they put forward the Lyons memo as an exhibit in their opposition brief, as compliant.

Do the plaintiffs think the Lyons memo is compliant with

the PI order?

MS. SHAH: Absolutely not, Your Honor. There are several reasons why we think that not only does the Lyons memo do nothing to save defendants in this posture, but also that the Lyons memo itself violates this court's order and is not consistent with well-established precedents on what 1357(a)(2) "probable cause for escape risk" means and requires.

THE COURT: So the Lyons memo -- first of all, the Lyons memo says it's only applicable to ICE personnel. I think it's only directed to ICE personnel, but of course civil immigration arrests can also be done by Customs and Border Patrol. So you think that the Lyons memo is being applied or followed by other DHS components, or all DHS components making civil immigration arrests, or only ICE, or do you have any view on that?

MS. SHAH: Well, first I would say that even if everyone was following the Lyons memo, it wouldn't help in terms of complying with this court's order.

THE COURT: Right. I know. But just in terms of identifying the scope of the problem.

MS. SHAH: Absolutely. I don't think there is any evidence before the court to suggest that other federal agents who are involved in immigration arrests, including CBP agents and agents from other federal agencies who have been deputized to conduct immigration arrests in this district, that they

have received the Lyons memo or that they have been instructed to follow it.

THE COURT: Okay. Well, we'll find out from the defendants like how far does this Lyons memo go, what's its circulation, so to speak, within DHS or other deputized agents working with ICE.

So the Lyons memo itself states that ICE previously applied the phrase "likely to escape" from 1357(a)(2) as being equivalent to flight risk. It's the Lyons memo at page 5. And do plaintiffs have a view as to whether this previous ICE interpretation or the current view expressed in the Lyons memo is the more correct interpretation of "likely to escape" under 1357(a)(2)?

MS. SHAH: A couple of reactions to that paragraph that you're referencing, Your Honor, from the Lyons memo. So I see that distinction that the Lyons memo draws between escape risk under 1357(a)(2) and flight risk as sort of a red herring, a kind of a false distinction.

I think the parties at this point agree that 1357(a)(2) "escape risk" means, is the person likely to escape before warrant can be obtained. We agree that that is different from the kind of flight-risk analysis that immigration judges typically do on a bond hearing as to whether the person should be released from immigration detention because they are not a danger to the community and have sufficient ties to show that

they are likely to attend future immigration court hearings.

THE COURT: Do you agree that's a different standard?

MS. SHAH: We --

THE COURT: -- for conducting warrantless arrests than from the in-out decision, detention decision, an immigration judge makes?

MS. SHAH: We agree it's a different meaning. I hesitate to go so far as to say they're completely different standards because many of the factors that are relevant to the immigration detention bond hearing flight-risk analysis are also relevant to probable cause for escape risk.

And that's clear through the case law. There are so many 1357(a)(2) escape-risk cases that we've cited in our briefing as well where courts did take into account the person's ties to the community and all the circumstances.

I think the difference lies in sort of the nature of the fact-finding, to some degree. Typically at bond hearings, at least when the person is lucky enough to be represented by counsel, usually there can be more of an evidentiary record about this person's family here and their criminal history, whereas in the context of the 1357(a)(2) probable cause analysis, it is more limited to the circumstances and facts that the agent is aware of or can know during the actual encounter.

But the factors that are relevant are still the same.

It's still the question of is this person actually likely to escape before a warrant can be obtained, and that does require some analysis of -- or at least the knowledge of facts relating to this person evidencing any intent to escape, are there --

THE COURT: Would you agree that I do not have before me deep legal analysis from either side on the Lyons memo and all its various parts, the sufficiency of its citations, its legal conclusions, its interpretation of what key phrases in 1357(a) mean?

I mean, you're telling me for the first time, right now, that you think that what happens in an immigration judge detention hearing, applying the "likely to escape" standard, is a different context and may rely on a different evidentiary record and somewhat different factors than an officer on the street making, by necessity, more quicker decisions.

So this is something that is not detailed in your briefing. Is that right?

MS. SHAH: That's correct, Your Honor. And I think that's because we have not brought a claim specifically on the Lyons memo. I think that --

THE COURT: Well, when you're seeking enforcement of a PI order, and we now have really for the first time a clear statement from DHS that the defendants have put forward as evidence of their good-faith compliance with the PI order a

policy memo of how they're interpreting the PI order and implementing it, at least throughout ICE, not just in D.C. but nationally, although I'll get that confirmed by the defendants, but it appears to me national implementation.

And so to me the Lyons memo appears to be a key policy implementation of the PI order, for which I have not had really detailed briefing from the parties.

And it also seems to me that the citations in the Lyons memo should require analysis as to where is this person -- where is Mr. Lyons coming up with these factors that he details for implementation and guidance for officers on the street, which is generally an excellent way to proceed to give clear guidance, as clear as possible, to agents on the street who have to make, you know, quick decisions.

So you want them to be well trained. You want them to have as clear guidance as possible. But if the Lyons memo, as that guidance, is giving incorrect advice that is not legally viable or sustainable, then shouldn't that be the focus of the Lyons memo of briefing here on whether DHS and its components are implementing the PI order appropriately?

MS. SHAH: Two responses to that, Your Honor.

First, to the extent that the Lyons memo does get it wrong, and we certainly think it does --

THE COURT: I could tell that.

MS. SHAH: We've explained in our reply brief why

the cases that the Lyons memo cites — *Meza-Campos*, *Cantu*, *Reyes-Oropesa* — the appellate authority that defendants cite, which is cited in the Lyons memo, do not support the factors that are listed there. And so I'm happy to get into more detail about why the analysis that's set forth in the Lyons memo is legally incorrect, and not only is it legally incorrect but in contravention of this court's PI order.

But the second, I just want to emphasize here, is that as problematic as the Lyons memo is, and we certainly think it is, defendants' actions on the ground in D.C., the documentation through the I-213s, the class-member declarations we've submitted and their public statements, their actions demonstrate that they are violating this court's order with or without the Lyons memo.

We think that the Lyons memo bolsters the fact that defendants are not following this court's order and are continuing to enforce their unlawful policy. But even if we do have the Lyons memo, the I-213s submitted here, the overwhelming majority of them speak for themselves.

They show that defendants are either systemically not making any escape-risk analysis whatsoever, just as before the court ordered the PI.

THE COURT: But I think the defense is, you know, the Lyons memo sets down the factors and gives us guidance that says, Wow, if they're at large — meaning not at home,

presumably — if they're in a car, that's escape risk.

So you keep pointing me to the I-213s. Okay. I get it. Facts are really important. I am the district court. Love facts. But the deeper I get into the I-213s, with the back and forth between the parties about what happened to this particular fellow in their arrest and detention and the justification, I get sucked deeper outside the policy realm where I've determined I have jurisdiction and deeper into where the defendants want me to go, which is the immediate arrest situations of individual people preceding, connected with, arising from removal proceedings where my jurisdiction is slim to none.

So that's why the Lyons memo is a gift. It's a policy memo. Doesn't get me deep into individual cases which, you know, some of them are disturbing, to say the least. Some of them make you wonder whether part of the training is how to break down car windows to get people out. There have been too many occasions where the ICE agents or other agents associated with ICE have just broken car windows.

But putting aside the individual facts, I have to stay at the policy level where I have jurisdiction. It is not -- it was no surprise in some ways, though disappointing, that the administrative record in this case consisted of 11 pages, all dealing with the individual plaintiffs' situations, because that's where the defendants want us to be and wants my

attention, because that is where my jurisdiction is, as I said, zero to none. I have to stay at the policy level.

So the Lyons memo and the directions that are being given in the Lyons memo, if you look at those directions, what's bothersome about the I-213s and the boxes that are being checked is there's that much inconsistency that you see between the Lyons memo directions and what's happening on the ground.

MS. SHAH: That's exactly the point I was about to make, Your Honor, is that I think the best way to look at the evidence in the record before the court in a cumulative sense, what is happening on the ground and what is wrong about the Lyons memo are the same.

So if Your Honor -- and I understand, you know, there are a lot of I-213s and declarations in the record that go into the facts of each arrest, and I understand the challenges that that poses. But if Your Honor were to step back and take a bird's-eye view of what is happening in these I-213s, it is exactly what is codified in the Lyons memo.

THE COURT: That's how it struck me. So I can just stick at the policy level where my jurisdictional hook is strongest.

MS. SHAH: Correct, Your Honor. And that is exactly the point that we have been trying to make throughout the briefing, is that this is not about individual errors or purported attempts to improve documentation by adding a field

entry or providing counseling, which was also stated very vaguely in the Weiss declaration as to what that counseling would mean or whether it would even be provided to the actual agent who made the arrest because, of course, most of the I-213s were in fact prepared by agents other than the arresting agents. But setting --

THE COURT: Okay. So can I just go back to a jurisdictional issue --

MS. SHAH: Yes.

THE COURT: -- because, not only do I have lots of jurisdictional potholes here because the INA strips jurisdictions from courts in lots of different ways, now I have appellate jurisdiction issues because this case is on appeal, which further limits what I can continue to deal with in this case.

And so, to my view, the Lyons memo is an effort to implement the PI order. It's giving guidance to at least ICE agents and perhaps broader agents, components of DHS, and none of the briefing has addressed my authority to scrutinize the Lyons memo to make it clear that I have jurisdiction to do that here, and none of the briefing addresses that. To me, that's an issue. Given the complicated jurisdictional needles we're threading here, that would be helpful. Do you agree?

MS. SHAH: Absolutely agree that, to the extent the court is concerned about jurisdiction over how to address the

Lyons memo, happy to submit supplemental briefing on that.

THE COURT: Because you have said you didn't have a specific claim about the Lyons memo. I noticed that because it didn't exist when you filed your complaint, nor did it exist when I issued my PI order. But the defendants have proffered that the compliance memo was implemented as part of the compliance with the PI order, but I think it would be helpful to assure the D.C. Circuit that I am sticking within my jurisdictional realm while this case is on appeal if I have that fully thought through and explained.

Okay. Let me just talk about the Form I-213s.

MS. SHAH: Yes.

THE COURT: The defendants state that ICE has had discussions to address the deficiencies in the I-213 narratives. They've improved their documentation since the first group of I-213s produced on January 2, 2026. A number of the I-213s shared with the court contain the phrase "entered into the United States after evading inspection," and that is one of the factors in favor of escape risk, finding an escape risk.

Do you have an understanding, because you've been conferring with the defendants, what that phrase "entered into the United States after evading inspection" actually means?

MS. SHAH: Your Honor, that phrase, I think it's a little bit of a misnomer. And the reason I think that is is

because the immigration violation that's being alleged there is really entering without inspection, entering the United States without inspection, not evading inspection.

And I think the use of the phrase "evading" there is -- I see it as intentionally harmful or trying to impute some sort of intention of showing -- trying to show that there was some prior evidence of these individuals trying to evade ICE authority, when, in reality, entering the United States without inspection is entering through a port of entry, usually a border, without having been inspected first. And without getting super into the --

THE COURT: Or being brought here as a child?

MS. SHAH: Yes, exactly. As one of our class members was in fact brought here as a child and placed in ORR resettlement custody.

But for a while, ports of entry were actually shut down for people seeking asylum so that those who were entering the U.S. actually couldn't even get inspected. And those who fall under this umbrella of entering without inspection, which defendants have put into their I-213s as evading inspection, are generally -- in fact, many of them are asylum seekers. And more importantly, Your Honor, I think setting aside the language of how they phrased it --

THE COURT: Because this is one of the things that puzzled me about -- the briefing hasn't really elaborated on

the meaning of this, which I think I need to understand fully in evaluating compliance with my PI order, but if somebody has applied for asylum, would they fall under "entered into the United States after evading inspection" or not? Because they've had contact with immigration authorities by filing asylum applications, but do you know the answer to that question? Because it's not clear to me from the briefing.

MS. SHAH: Individuals can be asylum applicants and still have entered the United States without inspection. It goes back to sort of what happened at the port of entry, were they inspected before sort of entering the interior being able to apply for asylum.

THE COURT: So a person who has applied for asylum, has asylum hearings, has contact with immigration authorities, that is a person who, under the I-213 improved documentation, would be somebody who would be perhaps automatically considered a risk of escape because that person entered into the United States after evading inspection? Is that your understanding?

MS. SHAH: Well, that's exactly what I think does not make any sense.

THE COURT: But is that your understanding of how it's being implemented?

MS. SHAH: That's my understanding of how that factor's being used. I see it really no different from what the record

was before this court during the PI stage, where entering the United States after evading inspection is really a factor that goes to removability; it goes to immigration status. It goes to the first prong of 1357(a)(2), not the escape-risk prong.

So that's why I don't think there are any cases, certainly none that defendants were able to cite or that we could find, that hold that the removability factor, except that Second Circuit case that Your Honor already found was unpersuasive compared to the Fourth Circuit case, none of the more recent case law on 1357(a)(2) permits this type of inference.

And this is really important. I think that what defendants are misapprehending and failing to comply with with respect to this court's order is the fundamental conception of what is probable cause for escape risk, and Your Honor made that clear in the December 2nd decision.

THE COURT: And the Lyons memo articulated what factors ICE views as meeting the PI standard. Now, maybe Mr. Lyons got it wrong, but I need more adequate briefing to know that. I need to have briefing from the defendants on that issue, all about the Lyons memo. And so that just brings us back to where we were before, but let me just move on.

So among the factors both listed in the Lyons memo and on the form is that being stopped while at large -- that's a quote -- and in a vehicle, another phrase, are factors being considered for "likely to escape" and that prong of Section

1357(a)(2). Plaintiffs argue that those should not be factors considered at all. Is that the plaintiffs' position?

MS. SHAH: They certainly cannot be factors that are sufficient to establish probable cause for escape risk, and certainly not the way that they have been presented in these I-213s and the way that agents have been considering this, and that's because simply existing in public, being in a car, does not support an inference that the person is likely to escape before a warrant can be obtained.

As this court noted in footnote 20 on page 30 of this court's December 2nd opinion, this court distinguished the District of New Mexico case, which is the only case defendants have cited where the defendants' presence in a vehicle supported a probable cause for a escape risk.

So of course that's the right answer, because simply being in a car, especially in situations like this where the individuals were pulled over, they stopped, presumably these individuals were parked, the engines probably were turned off, this is where I think the disconnect between the factors in the I-213s, which are also the same factors in the Lyons memo and what the law on probable cause actually requires.

THE COURT: But if a person is at large -- meaning, I'm understanding that, and the defendants can correct me -- "not at large," meaning not at your home or inside your home. Be prepared to tell me what that means to the defendants. And

the person is at large, in a vehicle, and is asked by an ICE agent for an ID, refuses to produce one, refuses to answer questions, would that change the calculus since the officers would then not know where to find that person later? So would it be those factors plus declination to produce identification or answer questions? Being uncooperative?

MS. SHAH: I think that the majority of the case law on 1357(a)(2) suggests that more is required, and that's why we have so many cases that do speak to the person's connections and ties to the community, their family, their employment --

THE COURT: But what if the person is refusing to talk about community ties and just refusing to answer questions?

Rolando Doe's declaration. He was asked for his ID. He said he didn't have one. He told the officers he didn't want to answer questions. He was at large in a vehicle, and they arrested him. Is that -- is that -- I mean, that's what's reflected in the I-213. Is that, to get a little bit into the I-213s, is that one really one that should be contested?

MS. SHAH: We think that is still deficient under the probable cause standard for escape risk, and that's because the other two facts there, being at large, just not being in your home, I don't think any reasonable inference can be made just from the fact that someone is not in their home.

And even just being in a vehicle, other facts about that really do matter. The fact that they were pulled over or

stopped, still responding and engaging with the officer, many of these I-213s describe consensual encounters. There are multiple agents on the field. They're armed. They have all of the power to hold individuals there, essentially.

That makes the probability of someone escaping, that they're actually going to escape before a warrant can be obtained -- especially given, as Your Honor's aware, how administrative warrants and immigration arrests work, it's highly improbable. And I think the *United States v. Jackson* case, which I know is in the criminal context, supports the type of distinction that I'm making here.

In that case there were stolen car tags and traffic violations; the person wasn't perfect. But the majority of the D.C. Circuit still held that to permit those facts to allow the police to search the trunk of the car for contraband would impermissibly water down the probable cause standard and make it so broad that any facts going to outside factors, factors that are different from what is actually being assessed, those can't be conflated with the determination that is actually at issue here.

And that's where the issue of escape risk and removability matter, why simply being in a vehicle and not being in a two-day, cross-country, high-speed interstate highway chase like it was in *Cantu*, why the parallels don't work here.

THE COURT: Yes. But I actually -- I mean, I do think

that pointing to *Cantu* and some of the cases with much more extreme contextual facts to raise concerns about escape risk makes it difficult to go -- I mean it only demonstrates -- going I-213 by I-213, you can see contextual issues that would make an ICE agent say this person isn't cooperative, this person's not giving me an ID showing me he has a place to live, let alone a place to live in D.C. or somewhere near here, no work documentation, just not cooperative, that the officer is just left sort of saying, this person, I'm not going to be able to find the person again because I don't have the documentation, so, you know, that is a person where I might not come down on the plaintiffs' side that that is an unwarranted arrest in that situation.

Now, in the Rolando Doe situation, that also got my attention because the ICE agents almost immediately started saying, we're going to break down your windows in your car unless you start talking. That did not show particularly civil or patient law enforcement conduct to engender sufficient trust to get documentation and to answer questions, to avoid arrest.

But I think once you dig down deep into each of these I-213s, you get involved in a factual morass that only demonstrates the need for clear guidance from ICE, which is, I think, what the Lyons memo was trying to do, with some credit to the defendants for putting on paper what ICE agents

should be doing, and brings me back, I guess, to my original point that once you get into the I-213s, you get into a morass of factual situations when we have the Lyons memo to really deal with without getting into the back and forth of, yeah, but he did this and then they did that, and then threatened to break the windows, which is not productive at the policy level where I can exercise jurisdiction.

Okay. So let me go to the relief you're asking for in the motion to enforce the PI order. The defendants characterize the request, the ask here, from the court is to expand the preliminary injunction to require defendants to create written training materials based on this court's orders and memorandum opinion, train their immigration officers based on those training materials, and require agents to include additional information in their documentation.

I think that characterization struck me as correct. Is that a correct characterization of, in a general summary, what the ask is here?

MS. SHAH: If I may, Your Honor, I'd like to turn the mic back to my colleague, Ms. Gates, who's prepared to answer this line of questioning.

THE COURT: Fine.

MS. GATES: Thank you, Your Honor.

THE COURT: Is that characterization correct?

MS. GATES: I think it is broadly correct. We are --

you know, as this court ordered in the injunction, defendants were required to disseminate the order to the agents who were responsible for effectuating it. This court stated in the opinion that the injunction requires the defendants to remedy ongoing violations of the law and to take steps to communicate the boundaries of the law to their agents.

And what we've seen is that the appropriate legal boundaries have not been communicated. So as this court recognized in its memorandum opinion, training on civil warrantless requests is already required under the law. So we're not asking for --

THE COURT: Well, let me just go back into the details about the ask. I also thought the defense characterization about the ask was generally correct. The defendants go on to point out this could be a quite burdensome task. I don't think the defendants used that word, but I view it as perhaps a quite burdensome task with the court taking on since the plaintiffs seek to review the training materials, set up a very thorough system where the plaintiffs can object to training materials, litigate their objections to the materials before the court, observe the trainings themselves, raise objections about that too, and bring it to the attention of the court, and then when there are disputes, the court will resolve those disputes.

And I -- you know, I wear a black robe, but I have a

certain level of humility. I know I have a mere JD. I have zero training in conducting training. I have zero training, education, or skills in communicating to a whole host of law enforcement officers what they should be doing on the street. I decide cases on a case-by-case basis. I don't know how to write educational programming material, and I'm not up to date on, like, the most recent sociological, educational theories about what is the best way to communicate it.

I'm not sure I feel competent to review training materials to tell DHS how their training materials should be changed, what trainings should look like to keep both law enforcement agents and the public and the targets safe on the street. So I look at the job you're envisioning for this court as to test the limits, as an understatement, of my expertise and -- is that what you're envisioning my role to be?

MS. GATES: No, Your Honor. So we're not asking defendants to produce a totally new set of trainings or to engage in certain pedagogical techniques or anything similar. What we are asking the court to order is a process that we think will efficiently ensure that defendants' training materials reflect the standards that this court already articulated in the memorandum opinion.

Defendants have had several months to develop training materials, come into compliance with the law as articulated in the opinion. But what we saw was the Lyons memo, which for

the reasons my colleague already articulated does not --

THE COURT: Can I just ask you a question? Rather than getting enmeshed in what -- I have a busy calendar. I have lots of other people who want my attention and decisions, both criminal matters, civil matters, miscellaneous matters. I could see the plaintiffs' very thorough team raising objections to written training materials, training on the ground because they're going to be observing.

I mean, that could be a full-time job. And if the training materials, in execution and in practice, are reflecting the Lyons memo policies, wouldn't it be a simple, straightforward task for me to focus on the Lyons memo?

And to the extent that the Lyons memo is articulating incorrect factors, insufficient factors to interpret this key phrase of "likely to escape" in Section 1357(a)(2), wouldn't it be a simpler task, much more within my skill set, to look and scrutinize with analysis and input from the parties and complete briefing on the Lyons memo, how that Lyons memo is deficient in implementing the PI order as a remedy here than getting the court intimately involved in the training of DHS agents.

MS. GATES: I think it would be achieving the same goal, which is ensuring that defendants' agents are getting correct statements of the law to guide their enforcement actions.

THE COURT: Okay.

MS. GATES: And that's really what we're thinking here.

THE COURT: That's what I think. All right. But I don't have -- so you might want to think about how your proposed order might look differently.

MS. GATES: Yes, Your Honor.

THE COURT: Okay. So now let me just get to something that really stood out to me, jumped out at me from the declarations that wasn't really focused on in the briefing, but you all are clearly sensitive to it since you were focusing on it in eliciting the facts with respect to each of the declarants about it.

So 8 U.S.C. § 1357(a)(2) of the INA makes clear that "when a warrantless civil immigration arrest is made" -- and I'm quoting -- "the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States."

So unnecessary delay. And I'm going to get back to that because that is a well-used statutory phrase both in criminal law, federal criminal procedure, and in the INA. And when I look in the declarations submitted by the plaintiffs about what happened to arrested individuals and how long they were being detained without a hearing, and with some examples:

Adolfo Doe, whose declaration was docketed as 78-2. He had

one month in detention before his hearing. He was arrested on December 6, 2025, taken to Chantilly, then Riverside, then Farmville, and his first immigration hearing was on January 6, 2026.

Edwin Espinoza Forsith, docketed at 78-4. He was arrested on January 6, 2026, taken to Chantilly, then Riverside, then Farmville, and as of February 12, 2026, he still had no hearing.

Jose Argueta, docketed at 78-6. He was arrested on December 5, 2025, taken to Chantilly, then Riverside, then Caroline Detention Facility. I have no idea where that is. Where is that?

MS. GATES: I think that's Virginia, Your Honor.

THE COURT: And he had his first immigration hearing on January 8, over a month later, 2026.

Rolando Doe, docketed at 78-9. He was arrested on December 10, 2025, taken to Chantilly, then Riverside, than Farmville. His first immigration hearing was on January 8, 2026. I mean, over a month before his first hearing. I found that to be honestly shocking.

I mean, for criminal defendants who are arrested because of probable cause to believe they committed a crime, under Rule 5 they're to be taken to a magistrate judge without unnecessary delay, the same words used in the INA, and that's typically within 48 hours. Congress made it pretty clear what they thought unnecessary delay was because they issued a statute

saying you can admit confessions, postarrest confessions, if they're taken within six hours of arrest. It's a six-hour time frame that Congress was thinking of as an unnecessary delay that would make a postarrest confession generally admissible.

Now, they said if it's more than six hours, but it's still not an unnecessary delay for various reasons. Okay. A court can weigh all the factors. But when Congress was thinking about unnecessary delay in the criminal arrest context for somebody suspected of committing a crime, very different context from a civil immigration arrest where people aren't being arrested for committing a crime.

You know, Congress was thinking six hours, so I look at months of delay. Is that part of this case? Do I have jurisdiction to consider that? And you can think about it and let me know.

MS. GATES: I will, Your Honor.

THE COURT: Because I found that very troubling. And you were eliciting the evidence about that and the facts about that that you were relaying in all these declarations. No one talked about it in the briefing, but to me that is like a huge walking statutory violation. I mean, you know, certainly raises questions about what is going on with these detentions that it is -- a month is an unnecessary delay.

MS. GATES: Yes, Your Honor.

THE COURT: But -- yeah. Why are you giving me these shocking facts if you're not making a claim about it, or do I have jurisdiction to deal with that?

MS. GATES: We will consider and I can provide a fuller answer, but I would like to say that I think the conditions of detention, the delays in getting these hearings, I think they really point to the importance on defendants getting the analysis right at the outset and not making these arrests where they don't have the authority to.

I think you spoke of Mr. Argueta. I think his arrest was really illustrative. In his I-213, no flight-risk analysis whatsoever. He's detained through the holidays in horrific conditions, in multiple locations, only to ultimately be released on bond after the immigration judge determined he's not a flight risk, not a danger to the community.

THE COURT: Okay. Well, I am interested in whether the defendants' compliance, or lack thereof, with 8 U.S.C. Section 1357(a)(2)'s mandate for a prompt immigration hearing is something that this court can even consider given the limited scope of plaintiffs' complaint, this court's PI order where this wasn't an issue I was asked to focus on, and because I now have a case -- this is a case pending on appeal where my jurisdiction is even more, you know, is more cabined.

MS. GATES: Yes, Your Honor.

THE COURT: Okay. Because that can't be considered in

this case, perhaps it can be considered in another case not before me. Okay. But that sort of jumped out at me as I was reading all these declarations.

So one of the questions I had about the arrest numbers where the total number of warrantless arrests between CBP and ICE combined appears to be quite low. You know, from the PI order through February 2026, it seems to be a total of three warrantless immigration arrests for CBP and 11 for ICE, at least I think that's what the defendants' declarations suggest. And so what's your view about those numbers?

MS. GATES: Yes, Your Honor. I believe there are about 33 total between December and the end of January, and I think three of those were CBP and the remainder were ICE.

THE COURT: Okay.

MS. GATES: Our view is it does appear there is a decrease in warrantless immigration arrests.

THE COURT: And why do you think that is? I know that there was a snowstorm, but is that all explained by the snowstorm, or do you think that more arrests are being shifted to the administrative warrant side -- they're being executed with administrative warrants?

MS. GATES: Your Honor, we have no reason to think so. It appears -- and I think defendants can speak better to this, but it appears arrests are down generally than they were in the fall when we initially brought this case. I agree that

the defendants point to the snowstorm as a reason for not having any arrests, but I think the issuance of the Lyons memo on January 28 makes clear defendants are not discontinuing making warrantless civil immigration arrests and are in fact instructing their agents on how best to do so.

THE COURT: All right. So let me just talk about the *Khalil* Third Circuit case which the defendants have brought to my attention. It was a case that was decided after the PI order was issued. And I'm sure it's going to be an issue on appeal and talked about there, but the defendants make the statement in opposition, and I quote, "In light of an intervening significant legal ruling, the Court should now revisit its conclusion as to jurisdiction in this case."

So what's the plaintiffs' view about whether *Khalil* should prompt reconsideration, and do I even have jurisdiction to entertain essentially a request or motion for reconsideration since this case is on appeal?

MS. GATES: Your Honor, we would absolutely disagree that there's any basis for this court to reconsider its ruling. As you note, it's a Third Circuit case. Motions for reconsideration are only proper where there's been a change in controlling law.

That case obviously does not bind this court, and as we noted in our papers, that was a direct challenge to removal and detention pending removal. Here we have a plaintiff who's

not even in removal proceedings; it's a challenge to the policy. So the facts are not really analogous. And I would agree that because this case is pending and this court's decision on 1252(g) is very likely going to be an issue on appeal, reconsidering the rule at this stage also doesn't make sense for that reason.

THE COURT: All right. Okay. I just have a couple more questions, although I sort of addressed some of them on the plaintiffs' unripe motion pending extra discovery. I don't know whether you or Ms. Shah is handling that.

Part of the reason for the extra-record discovery motion is concerns about the completeness of the produced AR which, as you point out, is only 11 pages and only consists of the specific arrest reports for plaintiffs in the case when the focus of this case is on policy implementation and its compliance with the law.

So normally a motion where there's an insufficient administrative record is a motion for supplementation of the AR, and so I was a little bit puzzled when I got a motion for extra-record discovery. So why isn't this a motion for supplementation of the AR?

MS. SHAH: It's not a motion to supplement the AR because --

THE COURT: It's on appeal.

MS. SHAH: Because when we conferred with defendants'

counsel, we asked, is this the complete record? Are you withholding any documents on the basis of any privilege? On the basis of the fact that we don't yet have a protective order? The only two documents that defendants' counsel said may be forthcoming are I-213 reports for Mr. Escobar Molina and for BSR's August arrests, which were not part of the 11-page administrative record.

And I believe defendants' counsel said that he would confirm and get back to us whether any documents are being withheld on the basis of privilege, but so far we haven't heard any representation that any other documents are being withheld, and they're not being withheld on the basis of a lack of protective order. So there are no other documents, according to defendants, to supplement or add to the administrative record.

THE COURT: Because they want the focus to be on the specific individual defendant as opposed to a broader policy. I get that. So the Lyons memo talks about the policy and practice at ICE, or DHS, prior to the Lyons memo and says that the Lyons memo now supersedes those, those weren't really reasonable, now we can have a reasonable policy.

So would you think that whatever documentation existed prior to the Lyons memo, that the Lyons memo is intended expressly, within the four corners of the Lyons memo, to supersede and clarify all of that documentation as to the

policies guiding civil immigration arrests should be part of the administrative record? And have you had additional conferral with defendants about that?

MS. SHAH: When we conferred, we did certainly ask about whether any records are being withheld, and that was primarily in the context of any records that would go into the AR for the policy and practice that we've challenged. And I agree that any documents underlying the Lyons memo that may have been considered would be relevant, whether they should be supplemented to the AR or we are entitled to discover those documents in discovery.

I want to note for the court that the posture that the case is currently in is actually somewhat similar to another case that's pending in this court right now called *Kingdom v. Trump* that's before Judge Lamberth, where similarly in that case there was an executive order and implementing memoranda from BOP that were challenged and --

THE COURT: Is that the --

MS. SHAH: And Judge Lamberth entered a preliminary injunction for a nationwide class, enjoining the implementation of the executive order. And a few weeks ago, BOP came out with a new policy, refused to provide an AR, and Judge Lamberth in that case granted plaintiff's motion for discovery given that there are still, to date, in that case is no AR.

THE COURT: Well, we have an AR in this case, and so I

think your motion for extra-record discovery, you know, is akin to a motion to supplement the administrative record. So, you know -- let me just put it to you this way: You have framed your motion in a manner that asks for discovery in an APA case. That is not the norm.

You know, there are ways to ask for supplementation of the record with admissions by the defendants in the Lyons memo that they had other policies and practices that had to have been articulated in writing somewhere that should be appropriate, I think, for the AR in this case, unless the defendants tell me and give me good reasons why they shouldn't be, which they could respond to with a proper motion to supplement the record with all that.

And then I could hear from the defendants, like, what all their excuses are for not supplementing the record with documentation of policies in effect at the pertinent times underlying the Lyons memo, for example, and then I could make a determination of that rather than getting into depositions and interrogatories and requests for admission and all the other tools of civil discovery.

MS. SHAH: One thing I want to correct that I said a bit earlier, as my colleagues reminded me, is that when we conferred with defense counsel, defense counsel did represent that there is no policy on warrantless civil immigration arrests before the Lyons memo. So that is, I think, an

admission that counsels in favor of discovery.

THE COURT: You think defense counsel is in favor of discovery. Well, I haven't heard from them, either in writing because it's not ripe or maybe this is the way the parties want to proceed. Maybe even though --

MS. SHAH: Oh, I'm sorry. I said "counsels in favor," as in the lack of the policy on warrantless arrests. The lack of a policy on warrantless arrest prior to the Lyons memo counsels in favor of extra record --

THE COURT: I mean --

(Laughter.)

MS. SHAH: I apologize. I meant that, from our conferral so far with defendants' counsel, there's nothing to suggest to us that there are any documents available to supplement the AR. If there are, of course, we would like to know about them, and defense counsel is best equipped to speak about that.

THE COURT: But debates about supplementation of an administrative record are frequently ones where the plaintiffs think these are pertinent documents to the issue at hand and to resolution of the issue at hand, and the agencies say, no, not relevant, you know, we don't have a formal policy, this was just sort of written, you know, informal guidance. Well, that could be part of the administrative record. So that is what is teed up so they can evaluate it on a motion to

supplement the administrative record.

You know, in some ways, maybe the defendants have a good argument: it was too informal, it was an offhand, over-a-coffee-cup kind of direction. You know, it was that loose or -- I can make an evaluation about whether an administrative record needs to be supplemented, and that is not teed up for me correctly.

I'm having a debate -- I will have a debate about who gets deposed, how many interrogatories, when, what the questions are going to be, whether it's beyond the scope of the claims, certainly when a case is on appeal. It just -- the way that the 11-page AR raises questions that are legitimate questions to ask is framed in a way that doesn't really help facilitate the disputes over what should or shouldn't be in the administrative record. Let me just leave it at that.

Okay. Anything else that you want to add before I turn to the defendants?

MS. SHAH: I wanted to just note one further point about the Lyons memo. We completely understand and hear Your Honor that additional briefing would be helpful, and we'd be happy to submit supplemental briefing that's specific to the Lyons memo, as well as a revised proposed order that is more focused on the Lyons memo.

I just wanted to go back to one point that I don't want to get lost from our earlier discussion, which is that although

the I-213s present varied facts to some extent, what we contend is the key takeaway from all of them are the common denominators, the common factors, boilerplate factors that exist throughout all of them that defendants' agents have relied upon to find probable cause for escape risk when those factors individually or collectively do not speak to escape risk, and those factors are bolstered and in fact authorized now by the Lyons memo.

And so whether it's looking at the Lyons memo as a whole just on its own or in conjunction with the actions on the ground, the statements the I-213s, the declarations including if Your Honor felt more comfortable discounting one or two of them where there may be some contention, the overwhelming majority, 26 out of 33 warrantless arrests, still show the same pattern and practice that was evidenced in these 40 or so arrests that were documented before Your Honor during the PI stage. So I just didn't want that point to get lost.

THE COURT: And that would be very helpful to show that the Lyons memo is being implemented and is being implemented as reflected in the I-213s and the Lyons memo itself is inadequate implementation of the PI order. And I haven't sort of had all those different pieces presented to me in that way, nor presented to the defendants so they can respond to it in that way.

MS. SHAH: And if I could just say one more thing about

the Lyons memo, really I think one of the truly shocking things about it is that it purports to be this brand-new policy from ICE about warrantless arrests. But, of course, preceding policy on warrantless arrest was the broadcast statement on policy, which is still being litigated in the *Castañon-Nava* case in the Illinois district court, and it's deeply troubling that the Lyons memo conspicuously omits any reference to community ties as one of the factors, when that was spelled out as a relevant factor not only in the broadcast statement but also in the plain text of this court's order.

THE COURT: Do you think that the broadcast statement is what Mr. Lyons is referring to when he says, without explanation and without any formal policy, ICE previously applied the phrase "likely to escape" as being the equivalent of flight risk? Do you think that "not formal policy" and "without explanation" is actually referring to the broadcast statement?

MS. SHAH: My understanding, Your Honor, when I read the Lyons memo, the reference to prior policy was the broadcast statement because that's the only other written policy that we're aware of that --

THE COURT: But there's no citation --

MS. SHAH: There's no citation. Exactly.

THE COURT: So that'll be an interesting question to hear from Mr. Bardo, because I was puzzled. I wondered about

that. All right. Thank you.

MR. BARDO: Good morning, Your Honor.

THE COURT: Good morning.

All right. So, Mr. Bardo, anything you want to respond to before I get into my questions?

MR. BARDO: Sure. Let me just say, at a high level we're taking steps to implement the court's order. As the court mentioned, we have an assistant field director for the Washington Field Office who's inspecting the I-213s every week to make sure that they're complying with the court's order. Agents who's documentation is deemed deficient, they're being counseled to improve, and CBP added those additional fields to their arrest reports showing CBP folks what they're supposed to document.

THE COURT: And, Mr. Bardo, let me just interrupt and say that I know that agencies never like to be told what to do or that they did something wrong in a court order, and it takes, you know, some strong-arming sometimes by civil AUSAs to tell agencies that they gotta do what they gotta do.

So I do give some credit to the civil AUSAs in the Civil Division here for making sure that my PI order is complied with, and so I just wanted to start off by saying that I know it's not always an easy job for civil AUSAs.

MR. BARDO: I appreciate that, Your Honor.

THE COURT: So first, do defendants dispute at all that

this court has jurisdiction over a motion to enforce the preliminary injunction during the pendency of an appeal? I know you have the *Khalil* decision, but before I get to *Khalil*.

MR. BARDO: Right. So the court would only have jurisdiction to consider in a way that it won't frustrate appellate review. So the court wouldn't be able to issue a new injunction, but the court would in theory have jurisdiction -- assuming you disagree with us on the *Khalil* matter, would have jurisdiction to issue a clarifying order.

THE COURT: Okay. And so to *Khalil*, the defendants argue that, in light of *Khalil*, I should now revisit its conclusion as to jurisdiction-stripping under the Immigration and Naturalization Act. You filed no formal motion for reconsideration here, but is that how you want me to interpret that request buried in your opposition to the motion to enforce?

MR. BARDO: Well, Your Honor, yes. We didn't move to reconsider because we've already advanced those arguments the first time around, and we respect that the court rejected them. We're just flagging for Your Honor the subsequent development that may warrant taking a second look at those arguments and also --

THE COURT: But are you asking me to reconsider here? That's what you said.

MR. BARDO: Yes.

THE COURT: Do you really mean that? Because it's on appeal now.

MR. BARDO: We are, Your Honor. We think we can raise jurisdictional objections at any point during the case. I highlight it more to consider the balance of equities here to show that these class members do have an alternative remedy. If they believe they were subject to a warrantless immigration arrest, they have a remedy when they go to removal proceedings to terminate those removal proceedings or move to suppress evidence when they get to that point.

THE COURT: So despite the limits on my jurisdiction now that there's an appeal pending, it's your view that I would have the authority to consider reconsideration of the jurisdictional issues. Why wouldn't that frustrate the circuit's ability to make a decision on that very question?

MR. BARDO: We're going to advance that same argument before the circuit. I think this is something we can raise at any time.

THE COURT: Okay. My question's a little bit different, which is how do I have the jurisdiction now to entertain a motion for reconsideration of the jurisdictional question that is squarely in front of the D.C. Circuit on appeal?

MR. BARDO: I take your point, Your Honor. We haven't formally moved for reconsideration.

THE COURT: And so are you formally withdrawing that request to reconsider the reconsideration -- your explicit request to reconsider the jurisdictional question, are you sort of withdrawing that request here?

MR. BARDO: I wouldn't say we're withdrawing the request. I kind of threw it --

THE COURT: I didn't give you much time on opposition. You know, if you want me to consider it in terms of the merits, consider *Khalil* on the merits in terms of whether or not to grant relief because there might be a question that the Third Circuit has expressed about jurisdiction, I'll take it at that. But I just want to make it clear you're not asking me to reconsider the jurisdictional issue when it is squarely in front of the D.C. Circuit.

MR. BARDO: Yeah. We are not formally moving to reconsider, but the court, of course, could sua sponte reconsider because it's a jurisdictional question.

THE COURT: All right. So let's turn to the Lyons memo. So I understand that the Lyons memo was issued, at least in part, to facilitate compliance with the preliminary injunction order. Is that a correct understanding or not? It was just a happy circumstance, or coincidence?

MR. BARDO: It's this case and other cases around the country. This isn't the only case challenging alleged warrantless immigration arrests so that this is part of that

to explain. And it applies -- I believe one of the court's questions was does this apply to ICE agents nationwide, and the answer to that is, yes, this is a directive from the acting director to field agents what they're supposed to consider when they're conducting warrantless arrests.

THE COURT: He's not really the acting director. He calls himself a title I've never heard of before: Senior Official Performing the Duties of the Director.

MR. BARDO: I think that's another way of saying "acting director."

THE COURT: Okay. Just with a lot more words for a bigger title?

MR. BARDO: Yes, Your Honor.

THE COURT: Okay. I had never seen that before. I thought it was interesting.

So, now, is the Lyons memo guidance -- clearly, it's just directed to all ICE personnel, but is it also directed to any DHS components assisting ICE or law enforcement agents from any agency assisting ICE?

MR. BARDO: It should be -- I mean, it's only explicitly directed to ICE, but any other agency that's conducting warrantless immigration arrests should be following it. This is the government's interpretation of 1357(a)(2). And I should emphasize, this isn't a change in policy. The text of 1357, it's been the same at least since 1965, if not

before then. This simply reiterates what's been ICE's or the government's longstanding policy about what's required to do an escape-risk determination.

THE COURT: That's interesting, because I thought the Lyons memo was changing prior policy. On page 5 it says, without explanation, without any formal policy, ICE previously applied the "likely to escape" as being the equivalent of flight risk.

And the Lyons memo said this unreasoned position was incorrect and says there are differences between the two standards. And so part of the reason for the Lyons memo was to change whatever the formal policy or position was that the Lyons memo finds was incorrect.

MR. BARDO: Well, Your Honor, I think the memo is saying that there wasn't a formal policy, and there were times where the agency was conflating escape risk and flight risk. But the statute uses the term "escape risk." You got into this a little bit with Ms. Shah, but --

THE COURT: It doesn't actually use the term "escape risk." It uses the term "likely to escape."

MR. BARDO: Yes. It does say "likely to escape," but we view -- the standard for assessing whether someone's an escape risk is --

THE COURT: -- about to just follow up my last questions with Ms. Shah, which is what -- this is clearly

critical of a prior position, prior to the Lyons memo position, that had to have been not floating in the ether or in the air within DHS or ICE. It had to be written somehow, somewhere.

This position that the Lyons memo is taking steps, and an entire section of the Lyons memo, to distinguish this from the prior position, whether you call it a policy or a position and you think there's a distinction between those two things, what is he referring to? Is he referring to the broadcast statement?

MR. BARDO: I'm not sure -- well, first, Your Honor, the broadcast statement was issued pursuant to a settlement agreement. But, yeah, this is -- I'm not sure --

THE COURT: And settlement agreement, by its terms, means the parties agreed and -- that the parties to the broadcast statement agreed to it, and that's why ICE agreed to it and disseminated it.

MR. BARDO: Yes. I believe the settlement agreement, though, only bound the parties in that case. And this is --

THE COURT: Remind me, who are the parties?

MR. BARDO: It was ICE and -- I believe it was several noncitizens who were arrested in Illinois.

THE COURT: You can't be saying that the broadcast statement only applied to those plaintiffs. The broadcast statement was broadcast to all ICE agents. So what are you

saying, Mr. Bardo?

MR. BARDO: There was never a formal -- there's no formal policy that this is replacing. There were times, yes, there was that broadcast statement that was issued pursuant to a settlement agreement.

THE COURT: Can you find out the answer for me by talking to Mr. Lyons?

MR. BARDO: Sure.

THE COURT: When he talks, without explanation, without any formal policy, what was he talking about? And is it documented in writing anywhere? I want the answer to that.

MR. BARDO: I can --

THE COURT: I could ask for you to give me that in supplemental briefing or by 5 p.m. today. I really don't have time to go back and forth with you, Mr. Bardo.

MR. BARDO: Understood, Your Honor.

THE COURT: I want the answer to that question.

MR. BARDO: Okay. I can get that answer. But the Lyons memo --

THE COURT: 5 p.m. today.

MR. BARDO: Sure. The Lyons memo is reflective of the text of the statute, the INA.

THE COURT: All right. In terms of its interpretation of different phrases within 1357, the Lyons memo says that ICE previously applied the phrase "likely to escape" as looking at

whether an individual is likely to attend future immigration court hearings, appear before ERO enforcement and removal operations as directed, surrender for removal and comply with other immigration obligations, and the Lyons memo is changing the prior interpretation of that phrase to mean the person is "unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained."

So this clear statement of what "likely to escape" had previously been interpreted to mean, this looks at whether an individual is likely to attend future immigration court hearings, etc. Where does that appear? Does that appear in regulations?

MR. BARDO: That was --

THE COURT: It's written somewhere. Mr. Lyons is quoting it. Why isn't that documentation in the written administrative record?

MR. BARDO: I think that goes back to the question you asked me to get back to you by 5 p.m.

THE COURT: Perhaps. By 5 p.m., you can tell me what he's quoting from that he says that "likely to escape" used to mean one thing and now post-Lyons memo means "unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained." That's a change.

MR. BARDO: Yeah. That was an informal understanding among various ICE officials. And as he mentioned, "likelihood of escape" was never codified in any regulation.

THE COURT: So it appeared somewhere. I want to know where it appeared.

MR. BARDO: Sure.

THE COURT: What's he quoting? And then you can also explain why it isn't also in the AR, unless you want more opportunity to brief that.

MR. BARDO: Could you, Your Honor, point to where in the Lyons memo, where the quote is that you're referring to? I'm on page 4.

THE COURT: I think it's on page 5. It defines what flight risk is. On page 5, a flight-risk analysis, which this is the Lyons memo's distinguishing and changing the definition --

MR. BARDO: Oh, I see.

THE COURT: -- analysis looks at blah, blah, blah. It is line 3 under the paragraph titled "Likelihood of Escape Compared with Flight Risk" and appears to be the justification and the explanation of the new definition of "likely to escape" in 1357(a)(2).

MR. BARDO: I see that, Your Honor.

THE COURT: Okay. All right.

So has any court specifically approved this specific

interpretive change made in the Lyons memo?

MR. BARDO: Well, the Lyons memo cites to cases -- it's similar to criminal arrests in the Fourth Amendment context. It's a totality of the circumstances assessment, and what the memo cites and we cite in our brief are cases where appeals courts and other jurisdictions have found, yes, this particular factor is sufficient to establish an escape risk.

THE COURT: "That a person is unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained." I haven't seen that in any case.

MR. BARDO: Well, in these circuit cases that they cite, I believe the plaintiff had contested whether the arrest itself was a lawful, civil immigration arrest.

And, for example, this case from the Ninth Circuit from 1974 said the warrantless arrest was proper where an alien appeared extremely nervous, looked around as if intending to run, and admitted alienage, that he had no immigration papers. So in that case, I understand it's an old case and it's from a different jurisdiction --

THE COURT: This is a Ninth Circuit case before the Ninth Circuit had decided that this arrest required probable cause. So this was not a case where we're even applying the standard that subsequently came into effect in both the Ninth Circuit and across the country that you needed probable cause.

That is such an old case. To rely on a case where they were applying the wrong standard of reasonable suspicion, not even probable cause, that seemed to be a bit of a weak support.

MR. BARDO: Well, with respect, Your Honor, this case hasn't been overturned, and it applies to the same provision, 1357(a)(2), that we're dealing with in this case.

THE COURT: Construing 1357 as requiring something less than probable cause.

MR. BARDO: I believe the Ninth Circuit has always required probable cause. This goes to the escape-risk determination. And I know the D.C. Circuit, as far back as 1969, has required probable cause. So I think, going back, people or courts have always interpreted the "reason to believe" phrase as --

THE COURT: Well, the Lyons memo itself only cites 1980, Ninth Circuit cases requiring probable cause. I'm not going back earlier than that. Okay.

So do defendants have a view as to whether, in connection with the pending motion to enforce the PI order, the court has the authority to scrutinize the Lyons memo since that is implementing the PI order?

MR. BARDO: I mean, the court can certainly look at it, but this case ultimately is not about the lawfulness of the Lyons memo. The plaintiffs haven't brought an APA claim alleging that the Lyons memo is unlawful or that it's

arbitrary or capricious or whatnot. This was a memo that was put out after the court implemented its PI.

THE COURT: So are you saying I do or I don't have jurisdiction to look at the Lyons memo?

MR. BARDO: I mean, you don't have jurisdiction to opine on whether it was proper, it was issued in accordance with the APA, one because plaintiffs don't bring that claim, and two because, going back to *Khalil*, these are various alternative remedies that Congress set out for folks to challenge warrantless immigration arrests.

THE COURT: But I do have authority to look at it in some other circumstances.

MR. BARDO: You have authority to look at it as evidence that we are complying with the PI. This is a reflection of ICE's policy for warrantless immigration arrests.

THE COURT: Okay. I would appreciate seeing briefing on what the precise views of the defendants are in terms of my jurisdiction to look at the Lyons memo where, in the defendants' view, I can look at it in some ways but can't look at it in others. So where does that leave me in terms of how much I can scrutinize the Lyons memo?

So I'm not going to issue a time frame for that. I'm going to want the parties to confer about when they're going to be submitting supplemental briefing on the fairly complicated

jurisdictional issues of which my PI order is already on appeal over jurisdictional issues, so I do try and stay within my lane here.

Okay. So would you agree that in terms of the numbers of warrantless civil immigration arrests in D.C. that the numbers have decreased?

MR. BARDO: They have.

THE COURT: And is the only explanation for that the snowstorm, or are there other reasons including shifting to making civil immigration arrests with administrative warrants?

MR. BARDO: I would refer Your Honor to the declarations that we filed, and yeah, the snowstorm was part of it. The cold weather was part of it. I mean there were fewer people out and about, and -- yeah. There has been more use of I-200 arrest warrants than there had been in the past.

THE COURT: I mean, there are no numbers in the -- I don't think there are any numbers in the declarations about sort of the comparative numbers of warrantless arrests versus administrative-warrant arrests.

MR. BARDO: There are not?

THE COURT: Did I miss those in the declarations?

MR. BARDO: Those are not in the declarations. But in -- for example, in February there were no warrantless immigration arrests. And I don't have the number in front of me, but there were some arrests that were done with warrants.

THE COURT: And do the defendants agree that at least some of the I-213s reflect that warrantless arrests were conducted without fully considering escape risk?

MR. BARDO: We agree that there are some forms where the escape-risk analysis could have been better.

THE COURT: Well, for example, the Harvey Valle-Gutierrez form docketed at 78-23, there's no discussion of escape risk at all. So it's not fully, but there was none. Some of them have *none*. Right?

MR. BARDO: There are some, but most of them do have a documentation of escape risk, and the standard for whether to issue an enforcement on a PI is whether there's been substantial noncompliance. And, sure, there are instances where rank-and-file agents mess up and some of these could be better, but on the whole, I think the evidence we've submitted shows that we are making efforts to comply.

THE COURT: Okay. So the plaintiffs argue that being at large should not be considered as a factor because that fact applies to everyone who is -- and I'm quoting the plaintiffs -- "who are merely existing in public." So first of all, what does "arrested at large" mean, and why is that indicative of "likely to escape?"

MR. BARDO: Arrested at large means the person is arrested not at home or place of business.

THE COURT: Okay. So not at home or place of business.

MR. BARDO: Yeah, not at some specific place where you typically would find them. And the likelihood of escape, it's a totality of the circumstances assessment. It's -- this is an on-the-spot determination that an arresting officer needs to make quickly, which is --

THE COURT: So if I'm understanding -- I'm sorry to interrupt you, but when you say it's part of the totality of the circumstances, would you agree then that being at large or arrested at large, standing alone, is not a sufficient factor to show "likely to escape" under 1357(a)(2), but that's a factor that could only be considered in conjunction with others?

MR. BARDO: It's hard to opine on a hypothetical, Your Honor, but yes. If someone -- if you have someone who's at large but they're also acting really nervous, the officer asks for their ID, they refuse to provide ID, they're showing that they're not being cooperative, they're giving signs that if the officer waits for his supervisor to come and issue an I-200, that person's going to be gone.

THE COURT: So if an I-213 comes in, or a warrantless arrest, and the only checkbox is "arrested at large," would that be an I-213 that would be pulled for review and counseling to the arresting officer?

MR. BARDO: If that's all that's in there, then yes. That's something where the arresting officer should be counseled.

THE COURT: And is that clear from the Lyons memo?

MR. BARDO: Yes, because -- so the Lyons memo lists various factors. It's a nonexhaustive list that an agent can consider in determining whether there's a likelihood of escape, and I don't see just being at large as one of the ones that Mr. Lyons lists. And again, this is --

THE COURT: But it's not clear -- but my question is, it's not clear from the Lyons memo that just being at large is sufficient.

MR. BARDO: It doesn't say that, no.

THE COURT: Okay. So let's move on to being in a vehicle, because a number of the I-213s produced have "in a vehicle" as a factor checked for likely to escape. Is being in a vehicle, standing alone, if that was the only thing checked, would that also be an I-213 that would be pulled as being insufficient to show "likely to escape" with the officer counseled?

MR. BARDO: Well, two parts to that answer, Your Honor. Well, first we understand that this court's opinion is that that, standing alone, is not sufficient. So, yes, that would be flagged as not compliant with the court's order.

But we do have authority, and I understand it's from the District of New Mexico, that someone who has control over the vehicle is an escape risk. If an officer pulls someone over and the person has the keys in the ignition and can drive away

at this point, that would be an escape risk. And I do think it matters, too, whether the person is the passenger in the vehicle versus whether they're the driver.

THE COURT: All right. I've already articulated how I feel about that New Mexico case and the reasoning in that case as being wholly insufficient.

All right. So the Lyons memo basically has two prongs, so to speak, in its definition of escape risk, and that is whether the person is unlikely to be located at the scene of the encounter or, the second prong, another clearly identifiable location once an administrative warrant is obtained.

So some of the arrested individuals for whom I-213s have been put in the record show officers their D.C. identification that contains their home address, which is a clearly identifiable location. So why -- so it's not clear to me why the arrest occurred when there was another clearly identifiable location. Do you understand why that is?

MR. BARDO: It's an on-the-spot determination. I mean, just standing alone, having a home address in D.C. doesn't mean you're not an escape risk. If the -- say the person has a criminal history. That goes to the fact that person may be likely to evade agents if they come to his house or --

THE COURT: Well, let's just look at the two prongs here, because the first prong as defined in the Lyons memo is "unlikely to be located at the scene of the encounter."

MR. BARDO: Right.

THE COURT: I mean, when people are arrested at large in a vehicle, presumably because they're on their way to someplace else, I think that that would be -- would that satisfy "unlikely to be located at the scene of the encounter" because the person is en route somewhere?

MR. BARDO: It definitely could, Your Honor. That suggests they aren't going to be there if the agent has to wait --

THE COURT: Right. So that prong, doesn't that basically give carte blanche to execute a civil immigration arrest to anybody who's en route someplace and unlikely to stay standing still at the scene of the encounter, like, forever?

MR. BARDO: Well, that's what the statute allows, though. It's a tool that agents can use to make arrests if they can't guarantee that person's going to be there in time for them to obtain a warrant.

THE COURT: You think that's the defendants' -- that's your interpretation of 1357(a)(2), and you think that that interpretation is consistent with my PI order?

MR. BARDO: We understand Your Honor's position on vehicles, and I have conveyed that to my client. And we understand the PI order, but it is the government's position that in the hypothetical you described, the person can drive

away in a car, that that's enough. But we understand we are obligated to follow the court's order.

THE COURT: So put aside the vehicle. This Lyons memo says "is unlikely to be located at the scene of the encounter." What if the person's walking and is en route to work, to the library, to school, taking the kids to school? They're probably unlikely to remain standing at the place of the encounter for very long if they're en route somewhere, even on foot. Would that be sufficient under the Lyons memo to execute a civil immigration arrest?

MR. BARDO: Well, at that point, Your Honor, they're at another clearly identifiable location. So if the person's en route to work, the identifiable -- they could be found at work.

THE COURT: So it's not clear to me from reviewing the I-213s that they inquired whether they were on their way to work, whether they were on their way to their residence or paid much attention to even documentation produced showing clearly identifiable locations where the person resided.

So how is this -- the fact that the Lyons memo has in it "unlikely to be located at the scene of the encounter," isn't that just swallowing the whole standard, the definition that the Lyons memo is putting out?

MR. BARDO: I don't believe so, Your Honor. It's a much different standard than flight risk; it's is the person going to be there at the same location or at another location

where they can easily be found. And it's a split-second, on-the-spot determination that the officer has to make. And these officers, they don't have the luxury of, like, an immigration judge who can have the person's file in front of him or her and look at their background and history to make a determination on a bond.

THE COURT: Okay. So when a person's arrested at large, which I presume means public street, sidewalk, not at their place of business, not at their home, what would it take to verify the address where they're heading?

MR. BARDO: I mean, you could ask them, ask them to show a ID, work ID. But again, this --

THE COURT: And aren't there I-213s here where the person being arrested produces documentation with an address on it or say they're going to work, and nonetheless a warrantless civil immigration arrest occurs?

MR. BARDO: There are. But in many of those, there are other factors that counseled in favor of a warrantless immigration arrest being appropriate, like the person seemed like they're going to run away or the person had a criminal history.

THE COURT: Or the person is giving a recipe for how to make a particular kind of food, which is misinterpreted as some kind of threat? Didn't that happen in one of the cases?

MR. BARDO: He said he would turn the agent into

carne asada.

THE COURT: Well, that's what the agent who didn't speak Spanish thought he said, but he was actually just offering a recipe for it. Right?

MR. BARDO: But again, it's what the agent believed at the scene.

THE COURT: Okay. Can I just go back to what sort of screams out of these declarations, although there's no briefing on it, and that's about the delays in these detained at great government expense for a month or more before they get a hearing, when 1357(a)(2) makes it clear that warrantless civil immigration arrests require that the person being arrested be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States.

When it talks about officer of the Service in the statute with authority to examine arrested individuals and their right to enter or remain in the United States, who's being referred to here?

MR. BARDO: I believe that refers to immigration judges, Your Honor.

THE COURT: So not the arresting officer, right?

MR. BARDO: No. This is a separate -- this case is about arrest. Plaintiffs didn't bring an unlawful detention or overdetention or a habeas claim here. So that's why our

focus here is on the arrest.

THE COURT: Or a policy or practice claim about unnecessary delays. So what's the defendants' view about my authority to, based on all the facts and all these declarations about what's happening here, address that?

MR. BARDO: Well, the detention claims are channeled under 1252(g) into the petition for removal process, so the court wouldn't have jurisdiction in that respect. And even if that weren't a factor, there is no unlawful detention claim here. This is about unlawful arrest. And I'm not privy to all the facts --

THE COURT: So what would be your position if the plaintiffs decided to amend their complaint, even though the PI is pending on appeal but the case is still here, to add, amend their complaint, to add an express claim based on the facts that the plaintiffs have developed about violation of the unnecessary delay requirement in 1357(a)(2) that applies to civil immigration arrests?

MR. BARDO: We would renew our 1252(g) arguments for why that amendment is futile.

THE COURT: Okay. I don't have that in front of me. So, Mr. Bardo, were you concerned about the month-long delays as being an unnecessary delay before these arrested individuals are getting before an immigration judge?

MR. BARDO: Well, it's based on the available --

THE COURT: I mean, in ICE, they're moving people from -- it's like musical chairs between facilities. They're spending weeks doing that. And then they're having them sit in a place for a month before they get a hearing.

As an officer of the court, as somebody who's job it is to enforce the law, I mean, have you raised the facts that are shining out of these declarations about the unnecessary delay and compliance with 1357(a)(2)?

MR. BARDO: Well, the hearings are based on the availability of immigration judges, but I haven't focused on the delays in hearings because that's not --

THE COURT: Is that a group of federal employees who've also been fired, a lot of them?

MR. BARDO: I believe they are hiring some immigration judges, but I don't know all the details there.

THE COURT: So --

MR. BARDO: I haven't focused on the detention piece because it's not part of this lawsuit.

THE COURT: Okay. Well, I'm concerned about it. But, you know, you're right. I have to have the appropriate claim. So -- okay.

Let me just turn to the plaintiffs' pending motion for extra-record discovery. I'm not going to press you on the defendants' position. I know your due date for your opposition is not until a week or so, but let me just ask you

some broader questions. If you say you don't want to answer because you're still formulating your opposition argument, just let me know, because I know this is an awkward position for you. But do you see plaintiffs' motion to enforce the PI motion and the motion for extra-record discovery as interrelated?

MR. BARDO: They're interrelated in a sense that both of them are asking for additional documentation, and they are subjecting the government to discovery obligations in an APA case. So in that respect, they're related.

THE COURT: And do you think that both of these motions should be resolved on the same time frame or in a staggered time frame?

MR. BARDO: I would defer to the court on that. I don't see the problem with resolving them on a staggered time frame. The motion to enforce right now is fully briefed. The other one is still in briefing. So I think whatever the court pleases, I think...

THE COURT: Okay. So the AR is very slim in this case, and given the fact that the Lyons memo does describe ICE's previous interpretation of the key phrase at issue in this lawsuit, "likely to escape" in 1357(a)(2), why is it that -- whether it's a formal policy, an informal policy, there's gotta be some documentation about that policy. Why isn't that in the AR?

MR. BARDO: I have -- well, because our position is

there is -- so plaintiffs claim that there is an unlawful policy of conducting warrantless immigration arrests without an escape-risk determination. Our position is there is no policy and never was such a policy, so we wouldn't have documents reflecting such a policy.

And the Lyons memo, the reason that's not in the AR is because it was after these individuals were arrested. It's dated January 28 of this year. And I've asked my client if they have other policy documents, and they have confirmed they do not. But I will go back and ask about this paragraph on page 5 of the Lyons memo.

THE COURT: Okay. Anything else you want to add?

MR. BARDO: I just want to say, the scope of relief that plaintiffs are asking in this motion is exceedingly broad. The type of relief they're asking for, it may be appropriate for like a consent decree with a police department, but it's not appropriate at a preliminary injunction phase. We have training for agents. The materials are law enforcement-sensitive, and we aren't in a position to be able to allow the ACLU to be able to supervise training for immigration agents.

And as I mentioned, Your Honor, there are similar cases around the country that deal with the same issue, and to date no court has ordered such broad relief.

THE COURT: Okay. Thank you.

MR. BARDO: Thank you, Your Honor.

THE COURT: Ms. Shah, do you want to respond?

MS. SHAH: Just a few brief points on rebuttal, Your Honor. Defendants' counsel made several points about the Lyons memo and I-213s that I just want to address on sort of a broader view, which is that the I-213s that Mr. Bardo discussed, there was a lot of -- I heard description of the agents being forced to make on-the-spot determinations, and I just want to note that in nearly every probable-cause, Fourth Amendment case, there's some officer or agent making an on-the-spot determination.

Many of these cases arise in the criminal context where there are also arrests and traffic stops and things like that, yet none of them seem to use the on-the-spot idea as an excuse to water down their probable cause standard.

If stolen car tags in an unregistered vehicle and other traffic violations in *United States v. Jackson* were insufficient to establish probable cause to search the trunk of the car for contraband, if the demonstrators at Pershing Park during the 2002 World Bank demonstration who may have exhibited behavior that could have supported probable cause wasn't sufficient to arrest everyone in the park that day, the same applies to ICE agents and other immigration agents who are out on the streets of D.C. making warrantless immigration arrests without probable cause or escape risk.

So I just wanted to note that, as Your Honor said, the

defendants' interpretation of probable cause and the overly broad conception of, as I heard defendants' counsel say, really the person just having control over a vehicle being able to drive away, or I suppose it would also apply to people who are waiting at a bus stop like Mr. Adolfo Doe was, going to work. The ability to be mobile cannot suffice for probable cause for escape risk, nor can the other factors that are listed in the Lyons memo.

And to Your Honor's question about whether any other court has blessed the Lyons memo, defendants' counsel I don't think directly addressed this but instead relied on some of the Ninth Circuit cases that are cited in footnotes to the Lyons memo, but no court has blessed the Lyons memo, the January 28th Lyons memo.

And I don't have the transcript yet, but I understand that during the hearing in the *Castañon-Nava* case a few weeks ago, I think on February 27, the judge there did express concerns about the Lyons memo and whether that was consistent with the settlement agreement and judgment in *Castañon-Nava*. I don't have the transcript yet, so I'm waiting to receive that. But I wanted to note those things.

And to defendants' point about the issue here is substantial noncompliance, this record demonstrates substantial noncompliance. And we understand Your Honor's focus on the Lyons memo, and we're happy to submit

supplemental briefing there. But I wanted to note that the improvements and purported improvements and efforts to make the documentation better are irrelevant for two reasons:

One, they don't address the substantive disagreement between the parties as to what the correct standard for probable cause for escape risk is under 1357(a)(2) --

THE COURT: And that is the Lyons memo.

MS. SHAH: And that is the Lyons memo. And I wanted to cite the 2002 DDC case, *Stewart v. O'Neill*, 225 F.Supp 2d 6, 10, where the court held that in the civil contempt context, although we're not in a contempt proceeding at this point, good faith or intention to comply doesn't matter.

It's not necessary in civil contempt proceedings to be intentional for the putative contemnor to have acted in bad faith. So any good-faith arguments that defendants are making, which we disagree with as relevant in the first place, are also not relevant to the civil contempt context, although we're not there yet.

And the last point I just wanted to make was about the scope of relief. Of course, we are going to submit supplemental briefing which will include a revised proposed order, and we intend to focus more on the Lyons memo, but to --

THE COURT: These are the issues that I think supplemental briefing would be helpful on, and I want the

parties to confer about a briefing schedule for this and submit a briefing schedule.

Mr. Bardo's 5 p.m. today deadline for clarifying documentation that is referenced in the Lyons memo, that the Lyons memo intends -- calls an incorrect position and intends to correct for purposes of ICE is something that is due by 5 p.m. today.

But with respect to the pending motion to enforce the PI order, I want the parties to address whether I have the authority to scrutinize the Lyons memo and what the borders of that review can consist of. I think that there's a difference of opinion between the parties as to that without running afoul of my jurisdictional limits, particularly when I don't -- particularly when I don't have a claim against the Lyons memo pending in front of me, and I cannot frustrate the circuit's appellate review authority.

Whether the Lyons memo has provided an accurate and proper guidance on the statutory requirements for warrantless civil immigration arrests to be supported by probable cause to believe the individual is likely to escape, whether as a legal matter the new policy interpretation of the meaning of the phrase "likely to escape." And I understand defendants think it's not a new policy, it's the policy that's always been in effect, but that's not what the Lyons memo says.

The Lyons memo says it's a change. And whether that

presents a broader set of circumstances for warrantless civil immigration arrests than ICE's prior position where the Lyons memo explains that ICE used to interpret "likely to escape" as the equivalent of flight risk, and no more.

So those are some of the issues that we've addressed that I think I have insufficient briefing in front of me on all of those issues, particularly given the complicated jurisdictional posture this case is in right now with a pending appeal.

All right. And if the parties confer and think there are other things they want to brief, you're welcome to present the arguments to the court. All right. Is there anything further today from the plaintiffs?

MS. SHAH: Not today, Your Honor. We understand the instructions. Thank you.

THE COURT: And I'm going to give you-all until Friday at noon to confer and propose a schedule.

MS. SHAH: Will do.

THE COURT: Mr. Bardo, anything further for the defendants?

MR. BARDO: Yes. I think Ms. Shah's arguments reemphasize why these issues are better dealt with during petition for removal proceedings. These are very fact-specific determinations. And, sure, the Justice Department and the ACLU are always going to have a different perspective on what constitutes probable cause and what constitutes escape

risk, and that needs to be resolved on an individual basis. And that's the difficulty of trying to litigate an alleged policy, in this case, in the APA context.

THE COURT: You would agree, Mr. Bardo, that instructions from on high from supervisors within ICE and management within ICE to officers on the ground as to what may and may not constitute sufficient probable cause under 1357(a)(2) to conduct a warrantless immigration arrest would be very important for agents on the ground to do their jobs legally and properly. Wouldn't you agree?

MR. BARDO: I would agree it's important, Your Honor.

THE COURT: So putting aside all the evidence collected by the plaintiffs and produced by defendants in exhibits as to what's happening on the ground with I-213s, the Lyons memo makes it clear what those instructions are with all the downstream consequences from instructions by law enforcement agents who hopefully want to do things properly, in compliance with their instructions from their supervisors.

So I appreciate that you don't want to get down into the details to and fro of individual cases that are reflected in the I-213s, but that, as I've already said, could be avoided by focusing on what the overall policy guidance is to those agents. All right. With that, you're all excused.

(Proceedings adjourned at 12:17 p.m.)

* * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne