**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-3417 (BAH) |

**<u>DECLARATION OF ALEXANDRA J. WIDAS IN SUPPORT OF
PLAINTIFFS' MOTION FOR EXTRA-RECORD DISCOVERY
("SIXTH WIDAS DECLARATION")</u>**

I, Alexandra J. Widas, declare pursuant to 28 U.S.C. § 1746 that:

1.　　I am an attorney with the law firm Covington & Burling LLP. I represent Plaintiffs José Escobar Molina, B.S.R., N.S., R.S.M., and CASA, Inc., on behalf of themselves and similarly situated individuals ("Plaintiffs") in this action. I submit this declaration ("Sixth Widas Declaration") in support of Plaintiffs' Motion for Extra-Record Discovery. If called upon to do so, I could and would competently testify as follows:

2.　　Attached hereto as **Exhibit 1** is a true and correct copy of an article from the New York Times by Zolan Kanno-Youngs, Hamed Aleaziz, Christopher Flavelle, Emily Cochrane, and Glenn Thrush entitled "Stephen Miller Is Still Pursuing His Immigration Agenda, but More Quietly" (April 5, 2026), available at https://www.nytimes.com/2026/04/05/us/politics/stephen -miller-immigration-agenda.html (last accessed April 7, 2026).

3.　　Attached hereto as **Exhibit 2** is a true and correct copy of the April 3, 2026 order of the court in *Castañon Nava v. Department of Homeland Security*, No. 1:18-cv-03757 (N.D. Ill.) at ECF 342.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on April 10, 2026, in Washington, D.C.

*/s/ Alexandra J. Widas*
 Alexandra J. Widas (D.C. Bar No. 1645372)

# Exhibit 1

The architect of President Trump's mass deportation campaign wants "a moratorium on immigration from third world countries until we can heal ourselves as a nation." The chaos in Minneapolis has not pushed him off that course.

▶ Listen · 16:38 min

    

By Zolan Kanno-Youngs, Hamed Aleaziz, Christopher Flavelle, Emily Cochrane and Glenn Thrush

April 5, 2026

It was May 2025, a few months into the second Trump administration, and Stephen Miller, the right-wing populist powering the White House crackdown on immigration, was clearly frustrated.

President Trump had talked about arresting "the worst of the worst" of undocumented immigrants — the rapists, killers and other criminals he had emphasized during the previous year's campaign. Mr. Miller, however, had long pushed for removing anyone who had entered the country illegally.

So when Mr. Miller arrived one day last spring at the headquarters of Immigration and Customs Enforcement for an update from agency leaders, an official raised a question on many agents' minds: Who exactly should they be going after?

Mr. Miller was unequivocal, according to three people with knowledge of the meeting. Agents should not limit themselves to dangerous criminals. Instead, they should stop people with the lowest level of reasonable suspicion, and detain anyone in the country illegally, with warrantless arrests. His message was clear: Push the limits.

Eight months later, Mr. Miller did something startling — he backpedaled.

His demands had helped set in motion militarized operations on the streets of Democratic-run cities, intensified by immigration agents killing two U.S. citizens protesting in Minneapolis. After initially denouncing one of the slain protesters, an

intensive care nurse, as a would-be assassin, Mr. Miller offered a rare concession that immigration authorities might have made a mistake.

Now, Mr. Miller, 40, one of the most influential presidential advisers in recent memory and an unabashed champion of Mr. Trump's hard-line immigrant crackdown, is at a crossroads. He faces questions about how aggressively he can continue to drive the deportation campaign, and how much appetite his party and the country have for tactics that proved successful in helping to boost arrests of immigrants but reignited a polarizing debate over what it means to be American.

The administration has toned down its immigration strategy. Federal agents have drawn down from the streets of major cities, and Kristi Noem, the homeland security secretary who had become the face of the policy, is out. Mr. Miller even pulled back his public appearances for a time.

But there is little sense inside the administration that Mr. Miller has lost his standing with Mr. Trump.

Far from acknowledging defeat, Mr. Miller appears to have simply adjusted his strategy in an effort to minimize political fallout. He has remained steadfast in his view that the administration should act to reverse an openness to migration that he has called "the single largest experiment on a society, on a civilization, that has ever been conducted in human history."

This account of Mr. Miller's role in the White House and his influence over one of the more far-reaching deportation crackdowns in recent decades is based on interviews with more than two dozen current and former administration officials, local representatives and people who work with Mr. Miller or have knowledge of internal administration deliberations.

Mr. Miller, who holds the dual titles of deputy chief of staff for policy and homeland security adviser, continues to preside over regular calls with national security and immigration officials. He is pushing for new ways to squeeze the lives of

undocumented immigrants and those with legal protections, such as making it harder to get public housing or other benefits, officials said. He has targeted those with refugee status, particularly Somalis, a group he has long derided.

He is also putting the finishing touches on a rule to block green cards for immigrants who might need public assistance, according to White House officials. The policy faced legal pushback during Mr. Trump's first term and was lifted under President Joseph R. Biden Jr. Mr. Miller is focused on crafting the rule to survive in court.

He has pushed Republicans in Congress to resist ICE reforms backed by Democrats, while his team in the White House has helped carry out Mr. Trump's directive to deploy ICE agents to airports. And Mr. Miller is focused on ramping up deportations of noncitizens to faraway countries, with the hopes of encouraging immigrants still in the United States to leave voluntarily.

In addition to his efforts on the federal level, Mr. Miller has worked with politicians in various Republican states to pass anti-immigrant laws. He raised with Texas lawmakers last month the idea of ending public education funding for undocumented children.



Stephen Miller's directive helped set in motion the increasingly aggressive raids on the streets of American cities that culminated in the killing of two protesters in Minneapolis.   David Guttenfelder/The New York Times

White House officials in recent weeks have said that Mr. Miller grew frustrated with Ms. Noem and the attention-grabbing approach to immigration operations endorsed by her and some of her top lieutenants. But there is little to no evidence that Mr. Miller pushed back against the aggressive tactics of agents that prompted bipartisan criticism.

In response to questions sent by The Times for Mr. Miller, Karoline Leavitt, the White House press secretary, said that he remained part of the president's inner circle.

"Stephen is a trusted and deeply loyal adviser to President Trump and has been critical to the realization of the president's historic first year in office," Ms. Leavitt said in a statement. "Stephen has demonstrated great effectiveness and

exceptional capability in every one of the president's policy initiatives."

Mr. Miller has blamed many of the country's problems on a landmark 1965 law that paved the way for more Hispanic and Asian immigrants, a shift from primarily allowing in Europeans.

Despite decades of data showing that immigrants outperform native-born Americans on major indicators, including crime rates and use of welfare, Mr. Miller contends that those who entered after the 1965 law, as well as their descendants, have largely been unsuccessful.

"If you bring those societies into our country and then give them unlimited free welfare, what do we think's going to happen?" he told Fox News in December. "We need a moratorium on immigration from third world countries until we can heal ourselves as a nation."

Mr. Miller's meeting last May at ICE headquarters demonstrated how he has flexed his power, combining stern lectures to immigration enforcement officials with often brash public statements that amplify his directives.

In addition to telling ICE leaders behind closed doors to push the limits, Mr. Miller said on Fox News the same month that "we are looking to set a goal of a minimum of 3,000 arrests for ICE every day."

The number was wildly ambitious. In the final year of the Biden administration, ICE had arrested about 300 people per day, according to federal data. After Mr. Trump had returned to the White House, arrests had roughly doubled, to about 600 per day. To meet Mr. Miller's new target, arrests would need to grow fivefold.

Within weeks, the consequences of that push would become apparent. On the first Friday in June, soon after Mr. Miller dressed down ICE officials, the agency began arresting workers at a warehouse at the edge of Los Angeles's fashion district. The next day, Mr. Trump ordered 2,000 members of the National Guard to the city.

On social media, the president laid out his strategy, pledging to rein in big cities that he called the "core of the Democrat Power Center."

The crackdown on blue America had begun.

## 'You Are Unleashed'



People protesting against the California National Guard after immigration raids in Los Angeles last June.  Gabriela Bhaskar/The New York Times

Mr. Miller's instructions to ICE underscored his clout, even as he pursued policies that led to debates with some who outranked him.

Mr. Miller and Mr. Trump's chief of staff, Susie Wiles, have debated how wide to "cast the net" on immigration enforcement, according to Senator Lindsey Graham, Republican of South Carolina and a Trump ally who has worked closely with both aides.

Case 1:25-cv-03417-BAH  Document 98  Filed 04/29/26  Page 10 of 21

Mr. Graham said the two have had "moments of tension, but they work well together." He said the conversation about immigration enforcement had centered on critical questions of "how far to go, what to do, when to do it" and what methods to use.

At times, Mr. Trump has appeared to rein in Mr. Miller and other immigration officials, particularly when enforcement has threatened business allies.

But the president for the most part has trusted Mr. Miller to pursue his immigration goals.

In September, after a video showed an ICE officer shoving a woman from Ecuador at a New York City immigration courthouse, department officials announced that the officer had been "relieved of his duties."

The statement by the agency incensed Mr. Miller, according to two people familiar with the matter. The White House contacted Department of Homeland Security leaders and got the officer back to work.

Mr. Miller's support for aggressive tactics was apparent when the administration announced the creation of a crime-focused task force in Memphis, an effort that would also involve rounding up undocumented immigrants. He joined Defense Secretary Pete Hegseth and Attorney General Pam Bondi on a stage there last October, telling a crowd of law enforcement officers to dismantle criminal networks "without apology and without mercy."

"I see the guns and badges in this room," Mr. Miller said. "You are unleashed."

Case 1:25-cv-03417-BAH Document 08 Filed 04/29/26 Page 11 of 21



Federal agents detaining a man after breaking the window of his car at a gas station in St. Paul, Minn. in January. Ryan Murphy for The New York Times

## Two Dead in Minneapolis

The turning point for Mr. Miller, and the administration as a whole, came as tensions boiled over in Minneapolis.

Mr. Miller had championed the administration's focus on that city, particularly its large Somali population, part of which was being investigated for fraud involving federal benefits. He described Somalis as "pirates" who "come here and steal everything we have."

When protests accelerated after the Jan. 7 fatal shooting by an ICE agent of Renee Good, Mr. Miller was unwavering in his support for federal agents. He wanted agents to arrest people he argued were interfering with enforcement operations, according to two officials familiar with the matter.



People protesting at the site of Renee Good's death in Minneapolis.  David Guttenfelder/The New York Times

Around that time, he discussed with Mr. Trump invoking the Insurrection Act — a step that would allow the federal government to deploy active-duty troops inside the country, according to two administration officials. The act has not been used since 1992. Mr. Trump did not use it.

Soon after federal agents killed Alex Pretti, an intensive care nurse who was carrying a handgun for which he had a permit, Mr. Miller wrote on social media that Mr. Pretti was "a domestic terrorist" who had "tried to assassinate federal law enforcement."

Video soon emerged contradicting that account. At a news conference the day after the shooting, Gregory Bovino, the Border Patrol official known for his cowboy-style aggression, offered a response notably more measured than Miller's, saying it was too early to draw conclusions.

"That, folks, is why we have something called an investigation," Mr. Bovino said.

Mr. Miller was confused why Mr. Bovino's description did not align with his own, according to White House officials, who said Mr. Miller's comments had been based on information from Border Patrol officials in Minneapolis.

Mr. Miller soon pulled back.

Three days after the shooting, he said in a statement that the White House had given "clear guidance" that federal personnel should create a barrier between protesters and officers making arrests. When Mr. Pretti was shot, federal agents "may not have been following that protocol," he said.

In the days that followed, the president, concerned about the optics in Minneapolis, tried to soften the tone of his administration. Mr. Bovino was removed from his post overseeing the Minneapolis operation, replaced by Tom Homan, the White House border czar, who had long called for ICE to focus on targeted operations. Two and a half weeks later, on Feb. 12, Mr. Homan said the surge of federal agents to Minneapolis was ending.

Mr. Miller's television appearances became less frequent, at least for a while. In the 12 months between Mr. Trump's inauguration and the Pretti shooting, Mr. Miller was interviewed on Fox News an average of every four days. In February, after Mr. Pretti was killed, Mr. Miller went on the network just twice, according to media monitoring services. In March, he resumed his normal pace.

ICE began to shift from militarized street sweeps to a campaign of more targeted — and less visible — arrests. In February, the agency arrested roughly 11 percent fewer people per day than in January, according to internal government figures reviewed by The New York Times. It was the lowest level since last September, a drop driven in part by ICE arresting fewer immigrants without criminal records.

Mr. Miller also began to draw bipartisan criticism. "It's Stephen Miller that's been repeatedly responsible for embarrassment for the president of the United States by acting too quickly, speaking first and thinking later," Senator Thom Tillis, Republican of North Carolina, told CNN last month.

Asked to respond to Mr. Tillis's comments, the White House sent statements from 11 other Republican senators praising Mr. Miller for his work carrying out Mr. Trump's agenda, including from Senator Rick Scott of Florida, who said that it was "more important now than ever to have fighters around President Trump like Stephen who can get things done."

Case 1:25-cv-03417-BAH   Document 98   Filed 04/29/26   Page 15 of 21



Mr. Miller's television appearances became less frequent after the two fatal shootings in Minneapolis.  Haiyun Jiang/The New York Times

Rather than Mr. Miller seeing his power recede, he has moved to apply it in other ways, seeking policies that would pressure undocumented immigrants to leave on their own.

On his recent calls with immigration officials, for example, Mr. Miller has asked for information on how immigrants use credit cards, potentially as part of an effort to crack down on their ability to open accounts and spend money, according to officials with knowledge of the discussions.

Mr. Miller has also pursued changes affecting legal migrants, including refugees. He has continued to push ICE to work with the Justice Department to launch investigations into immigrants who illegally obtain public benefits. And he speaks frequently with Mr. Homan, who he has worked with to develop deportation strategies.

Mr. Miller's influence has also extended beyond Washington.

In Tennessee, Republican state lawmakers have advanced a legislative package crafted in consultation with Mr. Miller that would harden immigration enforcement. It would require state or local officials to report people who receive services at hospitals, social service agencies and some public schools despite being in the country illegally. Officials who fail to report migrants improperly receiving benefits could face fines or even prison time.

The state's Republican House speaker, Cameron Sexton, said he had discussed the legislation and other ideas in multiple conversations with Mr. Miller, including at the White House last year. Mr. Sexton described Mr. Miller as "a brilliant guy."

Similar legislation has been introduced in Oklahoma by the state's House speaker, Kyle Hilbert, who said in an interview that he had also met with Mr. Miller.

Mr. Miller's immigration agenda continues to spread across the federal government.

Last month, he appeared with Vice President JD Vance in Washington to mark the start of what they billed as an anti-fraud campaign. Their remarks focused on migrants who illegally obtain public benefits, a theme the administration had hammered to help justify its armed buildup in Minneapolis.

Federal prosecutors in Minnesota have charged dozens of people in recent years with defrauding safety net programs designed to feed low-income children, treat minors with autism and help people at risk of homelessness. The vast majority of defendants are of Somali origin and several have been accused of using stolen funds to purchase luxury cars, homes and to invest in overseas ventures.

Mr. Miller appeared to seize on those cases to try stoking anger and resentment toward an immigrant community.  He invited the audience to imagine a hard-working "native Minnesotan" worried about providing for his family, living next to a Somali refugee who does not work, fraudulently receives government assistance and drives a Mercedes.

"He just went to an office in the state, lied on a piece of paper and got unlimited free money forever, for life," Mr. Miller said, citing no evidence for such a scenario.

Nicholas Nehamas, Ernesto Londoño and Albert Sun contributed reporting. Research was contributed by Sheelagh McNeill, Teresa Mondría Terol, Duy Nguyen and James O'Toole.

**Zolan Kanno-Youngs** is a White House correspondent for The Times, covering President Trump and his administration.

**Hamed Aleaziz** covers the Department of Homeland Security and immigration policy for The Times.

**Christopher Flavelle** is a Times reporter covering how President Trump is transforming the federal government.

**Emily Cochrane** is a national reporter for The Times covering the American South, based in Nashville.

**Glenn Thrush** covers the Department of Justice for The Times and has also written about gun violence, civil rights and conditions in the country's jails and prisons.

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Hewing to His Immigration Agenda, but Quietly

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARGARITO CASTAÑON NAVA,** et al., | ) ) ) | |
| **Plaintiffs,** | ) ) | **No. 18-cv-3757** |
| **v.** | ) ) | **Judge Jeffrey I. Cummings** |
| **DEPARTMENT OF HOMELAND SECURITY, et al.,** | ) ) ) | |
| **Defendants.** | ) ) | |

## ORDER

Defendants have filed a motion for clarification with respect to one portion of this Court's February 23, 2026 order, (Dckt. #311), and a separate motion for relief under Federal Rule of Civil Procedure 60(b), (Dckt. #320). Plaintiffs have filed their responses, defendants have replied, and both motions are now fully briefed. For the reasons that follow, defendants' motion for clarification, (Dckt. #311), is denied and their motion for relief under Rule 60(b), (Dckt. #320), is granted pursuant to the parties' agreement.

Defendants seek clarification of the portion of the Court's February 23, 2026 order ("Order") that ordered them "to re-circulate the Broadcast Statement of Policy to all ICE agents nationwide by email and they shall advise the agents that the Broadcast remains in effect as the ICE policy governing warrantless arrests until further notification by DHS and ICE." (Dckt. #309 at 3). As plaintiffs point out, however, defendants' request for clarification is more akin to a request for reconsideration: the Order itself is crystal clear, but defendants want to be excused from compliance based on their contention that the parties never agreed in the Consent Decree that the Broadcast should govern ICE policy nationwide. (Dckt. #311 at 1-2). Courts will grant motions for reconsideration in their discretion only "to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996). Defendants have failed to meet this standard, and their motion is denied for the following reasons.

First, as plaintiffs' counsel and the Court pointed out during the motion hearing on February 27, 2026, the parties expressly discussed the nationwide implementation of the Broadcast during their settlement negotiations and defendants acknowledge in their reply that they "expressed initial agreement" with this approach. (Dckt. #319 at 1 n.1). Consistent with the parties' agreement on this point, the Decree's text required that the Broadcast be distributed to all ICE officers nationwide, that all ICE officers be trained on the Broadcast, and that the Decree prohibited defendants from taking any actions that changed or undermined the Broadcast. (Dckt.

#155-1 at 3, 6–8).  There is no rational reason why the Decree would contain these requirements if the Broadcast did *not* apply to ICE officers nationwide.

Second, defendants (until their recent defiance of the Court's Order and the filing of this motion for clarification) have acted consistently with their understanding that the Broadcast applied nationwide.  In particular, "on June 11, 2025, ICE's Principal Legal Advisor 'unequivocal[ly]' dictated to all ICE officers *nationwide* that the Broadcast 'remains terminated' and has been 'rescind[ed].'"  *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F.Supp.3d 1, 48 (D.D.C. 2025), *quoting Castanon Nava v. Dep't of Homeland Sec.*, 806 F.Supp.3d 823, 860 (N.D.Ill. 2025) (emphasis added).  After this Court ordered that the Broadcast be reissued to ICE officers nationwide with the instruction that it should remain in effect until February 2, 2026, *Nava*, 806 F.Supp.3d at 863, defendants complied with this order and filed a certification of compliance with no request for clarification.  (Dckt. #224).

Third, counsel for defendants in other litigation outside of the Chicago Area of Responsibility have represented to other federal district courts that the Broadcast was the policy governing warrantless arrest for ICE officers in their jurisdictions.  *See, e.g., Ramirez Ovando v. Noem*, No. 1:25-CV-03183-RBJ, 2025 WL 32923467, at *2–4 (D.Colo. Nov. 25, 2025) (discussing the origin of the Broadcast ("Broadcast I"), how it was prematurely rescinded by ICE ("Broadcast II"), and how it was reinstated by this Court's October 7, 2025 Order ("Broadcast III")); *Id.* at *15 (applying the requirements in "defendants' own Broadcast statements"); *Id.* at *14 (noting that defendants themselves took the position the Colorado district court need not enter an injunction governing warrantless arrests because a sufficient policy was "*already in place*" by virtue of the Broadcast) (emphasis in original); *Id.* at *23 n.28 ("The standards for determining probable cause of flight risk for a warrantless arrest and documentation in a Form I-213 are substantially the same as those ICE has previously set out for itself in Broadcasts I and III."); *Escobar Molina*, 811 F.Supp.3d at 43, 47 (denying the existence of a new ICE "policy of conducting warrantless civil immigration arrests based on a lower standard than probable cause" by citing to the Broadcast and "ICE's directive issued in 2022 to its officers, plus annual trainings, [that] require probable cause findings and comport with section 1357(a)(2).").

Fourth, other courts in jurisdictions outside the Chicago Area of Responsibility have treated the Broadcast as a nationwide statement of policy governing warrantless arrests by ICE agents.  *See M-J-M-A v. Hermosillo*, No. 6:25-CV-02011-MTK, 2026 WL 562063, at *14 (D.Or. Feb. 27, 2026), *quoting Nava*, 806 F.Supp.3d at 837-38 ("ICE settled that case in 2022 and issued a nationwide 'Broadcast Statement of Policy,' prescribing that 'ICE officers are to conduct warrantless arrests in a manner consistent with 8 U.S.C. §1357(a)(2).'"); *see also United Farm Workers v. Noem*, No. 1:25-CV-00246 JLT CDB, 2026 WL 892070, at *5 (E.D.Cal. Apr. 1, 2026) (noting that the court's preliminary injunction required all Border Patrol agents who conducted warrantless arrests in that District to "comply with all requirements set forth in DHS's 'Broadcast Statement of Policy' on compliance with 8 U.S.C. §1357(a)(2).").

For these reasons, defendants' request for clarification is denied.

Perhaps anticipating the fate of their request for clarification, defendants subsequently filed their motion for relief under Federal Rule of Civil Procedure Rule 60(b).  In effect,

2

defendants seek "relief from the Consent Decree to the extent it operates to enjoin Defendants outside of the Chicago Area of Responsibility and with respect to [foreign nationals] who are not members of the certified class." (Dckt. #320 at 1). In their response, plaintiffs essentially agreed to defendants' motion by "agree[ing] to modify the Decree to state that from now until the end of the effective period, Defendants are relieved from the Consent Decree's provisions concerning the Broadcast Policy, Sections IV.A.2. [and] IV.B.5, only to the extent that those provisions operate to enjoin Defendants outside the Chicago Area of Responsibility (AOR)." (Dckt. #326 at 1–2).

In their reply, defendants state that plaintiffs have agreed to the modification of a third provision of the Consent Decree (namely, Section IV.A.4) that would extend the Broadcast outside of the Chicago AOR and that the modifying language proposed by plaintiffs should be amended to state: "only to the extent that those provisions operate to enjoin Defendants from implementing a different arrest policy outside the Chicago Area of Responsibility." (Dckt. #331 at 1-2 & n.1). In view of the parties' agreement to these modifications, the Court grants defendants' motion for relief under Federal Rule of Civil Procedure 60(b) on the above agreed terms.

**Date: April 3, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**

3