**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOSÉ ESCOBAR MOLINA, *et al.*,
*individually and on behalf of all others
similarly situated*,

Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

Defendants.

Civil Action No. 25-3417 (BAH)

Judge Beryl A. Howell

**<u>MEMORANDUM OPINION</u>**

On December 2, 2025, the Court granted in part a motion for a preliminary injunction

brought by the nonprofit membership organization CASA, Inc. and four noncitizens, who alleged

that law enforcement officers were unlawfully making warrantless civil immigration arrests in the

District of Columbia without the required probable cause findings under 8 U.S.C. § 1357(a)(2).  In

relevant part, the Court preliminarily enjoined defendants—the Department of Homeland Security

("DHS"), its Secretary, and other federal agencies and officers—from enforcing a policy and

practice of making warrantless civil immigration arrests without probable cause to believe "that

the person being arrested is likely to escape before a warrant can be obtained."  *Escobar Molina*

*v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 65 (D.D.C. 2025) (Preliminary Injunction

Order) (citing 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii)).

Just two months later, plaintiffs filed the instant motion to enforce the December 2, 2025,

preliminary injunction, contending defendants have been "[u]ndeterred" and "continue to enforce

their unlawful policy and practice, carrying out warrantless immigration arrests without the

required probable cause determinations."  Pls.' Mot. to Enforce. Prelim. Inj. ("Pls.' Mot. (Enf.)")

1

at 1, ECF No. 78.  Following a hearing and supplemental briefing, the dispute in plaintiffs' motion to enforce the injunction order has narrowed to whether a five-page memorandum—shared nationwide with personnel at Immigration and Customs Enforcement ("ICE"), a component of DHS, about, *inter alia*, the legal standards for warrantless civil immigration arrests—comports with the preliminary injunction.  *See* Mem. from Todd M. Lyons, Senior Off. Performing Duties of Dir., Re: Civil Immigration Arrest Authority: Administrative Arrest Warrants and Warrantless Arrests (Jan. 28, 2026) ("Lyons Memo"), ECF No. 78-1 (Pls.' Ex. 10).  Plaintiffs posit that defendants' continuing conduct and the Lyons Memo's instructions only confirm that the unlawful practice denied by defendants does exist and that "remarkably little has changed" despite the Court's preliminary injunction order.  Pls.' Mot. (Enf.) at 18.  The Court agrees with this assessment, as explained further below.

Around the same time that plaintiffs filed their motion to enforce the preliminary injunction, plaintiffs also filed a contested motion for extra-record discovery in the underlying action, arguing that defendants' slim eleven-page administrative record "contain[ed] essentially nothing that would aid this Court's review" on the ultimate merits of this case.  *See* Pls.' Mot. Extra-Record Discovery ("Pls.' Mot. (Disc.)") at 1, ECF No. 85 (emphasis omitted).

For the reasons discussed below, plaintiffs' motion to enforce the preliminary injunction is granted.  Defendants' flawed definition of escape risk to mean only whether an individual will remain at the scene of encounter before an administrative warrant can be obtained, as well as defendants' failure to instruct their agents to consider community ties, violate the December 2, 2025 preliminary injunction order.  Further, as explained below, plaintiffs' motion for extra-record discovery is also granted.

## I.    BACKGROUND

The following sections summarize the relevant factual and procedural background.

### A.    Plaintiffs' Complaint and Motion for Preliminary Injunction

The facts giving rise to plaintiffs' complaint are extensively recounted in an earlier memorandum opinion granting in part plaintiffs' motion for a preliminary injunction. *Escobar Molina*, 811 F. Supp. 3d at 15-27.  Rather than rehash the same facts, only the details most relevant to plaintiffs' pending motion to enforce the preliminary injunction are set out below.

Briefly, on August 11, 2025, the current presidential administration declared a "crime emergency" in the District of Columbia and directed mass immigration arrests, prompting the deployment of National Guard troops in the District.  Compl. ¶¶ 22, 23, ECF No. 1 (quoting Exec. Order No. 14333, 90 Fed. Reg. 39301 (Aug. 11, 2025)).  Four days later, then-Attorney General Pamela Bondi ordered the Mayor of the District to assist with "locating, apprehending, and detaining aliens unlawfully present in the United States." *Id.* ¶ 23 (quoting Order of the Att'y Gen., Order No. 6372-2025, Restoring Safety and Security to the District of Columbia (Aug. 15, 2025)).

Less than two months later, on September 25, 2025, plaintiffs—four noncitizens and CASA, Inc., a membership organization of immigrants—filed the instant suit under the Administrative Procedure Act ("APA") alleging that "[d]efendants have a policy and practice of making mass civil immigration arrests in Washington, D.C., without a warrant and without the probable cause findings that are required by Congress under federal statute," which "policy and practice are tied to the President's promise to carry out mass immigration arrests and deportations," *id.* ¶ 19.  Plaintiffs filed the suit on behalf of themselves and all persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a

warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses an escape risk. *Id*. ¶ 62.

Shortly after filing the complaint, on October 3, 2025, plaintiffs filed a motion for a preliminary injunction, to stay agency action, and for provisional class certification. *See* Pls.' Motion for a Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification ("Pls.' Prelim. Inj. Mot."), ECF No. 17.[1] Plaintiffs' preliminary injunction motion sought to enjoin defendants from making warrantless civil immigration arrests without the requisite probable cause findings, as well as provisional class certification for the class of individuals who have or will be arrested pursuant to the challenged policy and practice. Plaintiffs argued that the administration's push for "mass immigration arrests" resulted in defendants instituting a new "arrest first, ask questions later" policy of making warrantless civil immigration arrests without probable cause to believe that the individual is both in the United States unlawfully and an escape risk. *Id.* at 5-6; *see also* ¶¶ 3-5, 19. In support, plaintiffs proffered evidence of defendants' imposition of rising quotas for the number of immigration arrests, *Escobar Molina*, 811 F. Supp. 3d at 44; repeated and incorrect public statements from high-ranking government officials within DHS, ICE and another DHS component, U.S. Customs and Border Protection ("CBP"), that warrantless civil immigration arrests require only a finding of "reasonable suspicion," a lower standard than probable cause, *id.* at 44-45 (citing, e.g., plaintiffs' exhibits of public statements from then-DHS Assistant Secretary for Public Affairs, Tricia McLaughlin; Chief Border Patrol Agent, Gregory Bovino; and Acting Executive Associate Director of ICE

---

[1]    Plaintiffs also filed a motion for final class certification with their motion for preliminary injunction and provisional class certification, *see* Pls.' Motion for Class Certification, ECF No. 19, which was denied without prejudice as premature with the precise scope of the challenged policy uncertain, *Escobar Molina*, 811 F. Supp. 3d at 54 (explaining that "[s]ince factual disputes remain with respect to what law enforcement personnel knew about the proposed class representatives' legal statuses prior to their arrests, plaintiffs' motion for final class certification is reserved for a later time").

Enforcement and Removal Operations, Marcos Charles); and on-the-ground examples of roughly forty warrantless civil immigration arrests persuasively indicating that these civil arrests were executed without the requisite probable cause findings, such as findings as to the arrestees' community ties, *id.* at 47.

### B.    Preliminary Injunction Order

On December 2, 2025, following a hearing and supplemental briefing, plaintiffs' preliminary injunction motion was granted in part with respect to warrantless civil immigration arrests made without individualized assessment of escape risk, for the provisional class of persons who have or will be subject to this unlawful policy or practice.  Although defendants denied that any written memorandum existed memorializing the administration's policy for conducting warrantless civil immigration arrests, defendants' repeated public statements declaring their application of the incorrect "reasonable suspicion" standard were taken "at face value as reflecting the current policy and practice of DHS and federal law enforcement agents making civil immigration arrests," a policy and practice reflected in the approximately forty warrantless civil immigration arrests described in plaintiffs' declarations. *Id.* at 47.

Specifically, defendants were preliminarily enjoined "from enforcing their policy or practice of making warrantless civil immigration arrests in the District of Columbia without a pre-arrest individualized determination by the arresting agent of probable cause that the person being arrested is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii)." *Id.* at 65.  Given their persistent denial of the challenged policy despite all evidence and officials' public statements to the contrary, defendants were further ordered to comply with reporting requirements, which included: (1) requiring "[a]ny defendant or their agent who conducts a warrantless civil immigration arrest in the District" to, "as soon as

5

practicable, document the facts and circumstances surrounding the warrantless civil immigration arrest in narrative form"; (2) requiring any descriptions of "individualized assessment of escape risk in the documentation" to include "specific details as to the person being arrested"; and (3) requiring defendants to "release to plaintiffs' counsel the documentation describing defendants' and their agents' warrantless civil immigration arrests within this District" within 30 days of the Order and every 30 days thereafter, or if requested by plaintiffs' counsel concerning specific warrantless arrests, within seven days of the request. *Id.* at 66. Finally, the parties were directed to approach any disputes over defendants' compliance with the order by first meeting and conferring before seeking the Court's intervention with a motion to enforce or a motion to initiate contempt proceedings. *Id.* at 66-67.

## C.    Defendants' Actions and Documentation After the Preliminary Injunction

### 1. *Lyons Memorandum*

Less than two months following the entry of the preliminary injunction order, the then-Acting Director of ICE, Todd Lyons, issued, on January 28, 2026, a five-page memorandum to all ICE personnel nationwide outlining the scope of the civil immigration arrest authority for arrests both with and without administrative warrants.[2]  As to warrantless arrests, the memorandum instructed officers that there must be "probable cause to believe that: (1) the subject is a removable

---

[2]    On April 16, 2026, Todd Lyons announced plans to resign at the end of May 2026, adding one more name to the slew of resignations, demotions, and firings in the last few months of the senior leadership involved in the administration's immigration and law enforcement efforts. *See ICE acting director Todd Lyons will resign at end of May, DHS says*, Associated Press (Apr. 16, 2026), https://perma.cc/6UNT-KXL6. Indeed, few of the senior officials referenced in the Court's December 2, 2025 memorandum opinion remain in their positions. *See Pam Bondi, a Trump loyalist who oversaw Justice Department upheaval, is out as his attorney general*, Associated Press (Apr. 2, 2026), https://perma.cc/5KVE-DJPH (Pamela Bondi, then-Attorney General, fired); *In his words: How Gregory Bovino became a face of Trump's mass deportations and ended his career*, Associated Press (Mar. 17, 2026), https://perma.cc/9G97-GRLA (Gregory Bovino, then-commander-at-large of Border Patrol, demoted); *Trump fires Homeland Security Secretary Noem after mounting criticism over her leadership*, Associated Press (Mar. 5, 2026), https://perma.cc/A4XA-X887  (Kristi Noem, then-DHS Secretary, fired); *Top DHS spokesperson who became a face of Trump immigration policy is leaving*, National Public Radio (Feb. 17, 2026), https://perma.cc/DF24-WSYK (Tricia McLaughlin, then-DHS Assistant Secretary for Public Affairs, resigned).

alien; **and** (2) the subject is 'likely to escape' before a warrant for his arrest can be obtained."
Lyons Memo, at 3 (footnotes omitted) (emphasis in original).  The memorandum further defined the meaning of "likely to escape," explaining that "an alien is 'likely to escape' if an immigration officer determines he or she is unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained."  *Id.*  Piggy-backing on this definition of "likely to escape," the memorandum proceeded to list seven non-exhaustive factors to consider for whether when an alien is "likely to remain at the scene of the encounter":

1. The subject's behavior prior to and during the encounter (e.g., refusal to follow lawful commands, attempts to evade officers, or other suspicious behavior prior to the arrest);[3]

2. The subject's ability and means to promptly depart the scene of the encounter (e.g., the subject was encountered in a vehicle and continues to have control over the vehicle);[4]

3. The subject's age and health;

4. Possession of identity or work authorization documents that the immigration officer suspects are fraudulent;[5]

5. Presentation of unverifiable or suspected false information to the immigration officer;[6]

---

[3]    For this first factor, the Lyons Memo provided the following citation and parenthetical: "*United States v. Meza-Campos*, 500 F.2d 33, 34 (9th Cir. 1974) (warrantless arrest was proper where alien appeared extremely nervous, looked around as if intending to run, and admitted alienage and that he had no immigration papers)."

[4]    For the second factor, the Lyons Memo provided the following citation and parenthetical: "*United States v. Cantu*, 519 F.2d 494, 497 (7th Cir. 1975) (warrantless arrest was proper for alien in a moving car, who was highly mobile and possessed the capacity to change momentarily their location and direction)."

[5]    For the fourth factor, the Lyons Memo provided the following citation and parenthetical: "*United States v. Reyes-Oropesa*, 596 F.2d 399, 400 (9th Cir. 1979) (warrantless arrest was proper when an alien working in a garage presented a forged resident card to immigration officers)."

[6]    For the fifth factor, the Lyons Memo provided the following citation and parenthetical: "*United States v. Quintana*, 623 F.3d 1237, 1241 (8th Cir. 2010) (warrantless arrest was proper when an alien provided a name, date of birth and immigration status that could not be corroborated by the officer's records check)."

6. Whether the officer has probable cause to arrest the subject for improper entry by an alien, in violation of [Immigration and Nationality Act ("INA")] § 275, 8 U.S.C. § 1325, or reentry of a removed alien, in violation of INA § 276, 8 U.S.C. § 1326;[7] and

7. Whether the alien has complied with the legal requirements for registration under INA § 262, 8 U.S.C. § 1302, and notification of the Secretary of his or her address under INA § 265, 8 U.S.C. § 1305, including whether he or she is carrying on his or her person evidence of registration as required by INA § 264(e), 8 U.S.C. § 1304(e).

*Id.* at 3-4. The memorandum concluded the list of factors by directing that "officers should closely consider whether the alien is likely to remain at the scene of the encounter while a warrant for his or her arrest is issued." *Id.* at 4.

The memorandum expressed the view that "significant differences" exist between the meaning of "likely to escape," in the context of warrantless immigration arrests under 8 U.S.C. § 1357(a)(2), and "risk of flight," as understood in custody determinations, *id.* n.20 (citing 8 C.F.R. § 236.1(c)(3)). *Id.* at 4-5. As the memorandum articulated, "[f]light risk determinations are made after an alien's arrest, where the alien has already been identified, fingerprinted, interviewed, and may have had DNA collected." *Id.* (emphasis in original). Meanwhile, the "likelihood of escape" is an "on-the-spot determination . . . often made with limited information about the subject's identity, background, or place of residence and no corroboration of any self-serving statements made by the subject." *Id.* at 5. Said differently, "[w]hile the flight-risk analysis assesses whether an already identified and detained alien is likely to comply with future immigration obligations such as court appearances and appearances before [Enforcement and Removal Operations], the likelihood-of-escape analysis is narrowly focused on determining whether the person is likely to

---

[7] For the sixth factor, the Lyons Memo provided the following citation and parenthetical: "*United States v. Puebla-Zamora*, 996 F.3d 535, 538 ('previous removal for illegal entry established probable cause that he may escape before a warrant could issue')."

escape before the officer can practically obtain an administrative arrest warrant, while in the field."
*Id.* at 5.[8]

Finally, the memorandum instructed its officers and agents, following a warrantless arrest, to "document in the narrative section of the Form I-213, Record of Deportable/Inadmissible Alien, all factors considered in determining that the alien was likely to escape before a warrant could be obtained." *Id.* The memorandum required documentation of "both aggravating and mitigating factors," to be "completed during processing, as soon as practicable following the arrest." *Id.*

### 2. Form I-213s

Plaintiffs represent that, "[p]ursuant to the Order, Defendants have produced Form I-213s, a standard form entitled 'Record of Deportable/Inadmissible Alien,' for 33 warrantless civil immigration arrests that occurred in the District of Columbia after December 2, 2025." Pls.' Mot. (Enf.) at 4. Plaintiffs received the first batch of Form I-213s on January 2, 2026, and the second batch on February 2, 2026. *Id.* at 15. In the time following the preliminary injunction order, almost all the recorded warrantless arrests were conducted by ICE; only three were conducted by CBP. Third Blanchard Decl. ¶¶ 4-5, ECF No. 82-11.

Generally, the Form I-213s "contain[ed] a 'Narrative' section that describe[d] the immigration agent's encounter with the individual who was arrested," and "[m]any of the

---

[8]    As more fully discussed below, *see infra* n.11, the Lyons Memo's definition of "escape risk" is in tension with statutory text and historical understanding, and defendants' distinction between the statutory word "escape," under 8 U.S.C. § 1357(a)(2), and the judicial concept of "flight," under 8 C.F.R. § 236.1(c)(3) as cited by defendants, is questionable. To begin, 8 C.F.R. § 236.1(c)(3), *see* Lyons Memo at n.20, governs only detention and release of "criminal aliens." The detention and release of aliens more generally is in fact governed by 8 CFR § 236.1(c)(8). *Johnson v. Guzman Chavez*, 594 U.S. 523, 527 (2021) (noting, under 8 U.S.C. § 1226(a), 8 C.F.R. § 236.1(c)(8) and § 1236.1(c)(8), that "[a]liens who are arrested and detained may generally apply for release on bond or conditional parole" and must "show that he does not pose a danger to the community and that he is likely to appear for future proceedings). In any event, although the Lyons Memo refers to the analysis required under 8 C.F.R. § 236.1—whether clause (c)(3) or (c)(8)—as a "flight risk" analysis, the word "flight" appears nowhere in 8 C.F.R. § 236.1 or the related statutory provision the regulation is implementing, *see* 8 U.S.C. § 1226; *see also Procedures for the Detention and Release of Criminal Aliens by the Immigration and Naturalization Service and for Custody Redeterminations by the Executive Office for Immigration Review*, 63 Fed. Reg. 27441-01, 27449 (May 19, 1998) (citing as authority, *inter alia*, 8 U.S.C. § 1226).

narratives contain[ed] a list of factors purportedly establishing probable cause as to escape risk in addition to the descriptions." *Id.* at 4-5. Plaintiffs note that six of the 33 Form I-213s, three of which plaintiffs had affirmatively requested, were tardily produced. *Id.* Plaintiffs also note receiving from defendants "a chart entitled 'CBP DC Safe and Beautiful Warrantless Immigration Arrests Ending Dec. 29, 2025,' which contained summaries of, but not the I-213s or other documentation for, three arrests," and that the I-213s for those three arrests were belatedly produced after plaintiffs' counsel inquired. *Id.* & n.3.

Defendants, by way of two declarations from leadership at ICE and CBP, have represented taking steps to improve deficiencies in the I-213 narratives. At ICE, Acting Field Office Director for the District, Erik S. Weiss, shares that after production of the first batch of Form I-213s to plaintiffs in January 2, 2026, "discussions were had to address the deficiencies in the I-213 narratives." Declaration of Erik W. Weiss, Act. Field Office Dir. of ICE, Enf't and Removal Operations ("Weiss Decl.") ¶ 3, ECF No. 82-10. This conferral was, apparently, productive. On January 28, 2026, ICE officers "conducted a pull of the I-213 narratives for the production scheduled for February 2, 2026, of the warrantless arrests made in the Washington D.C." area, which uncovered that three of eleven warrantless arrests for the month of January "lacked the requisite analysis for risk of escape and a few others lacked the specific time of arrest." *Id.* In response, ICE "implemented a plan moving forward for an Assistant Field Office Director to make a weekly pull of the warrantless arrests in the Washington D.C." area, to "review for completeness with the requirements set forth in the Court Order in each I-213 narrative, and if necessary, [to] make[] available contemporaneous counseling with an officer who submitted a less than a complete I-213 narrative." *Id.* ¶ 4. Additionally, ICE permits officers to "amend the I-213 narrative to address the missing information, but the amendment must be made as soon as possible

to the arrest and be clearly marked as such." *Id.* Leadership at ICE attests that, "[m]oving forward, compliance with the Court Order for full and complete I-213 narratives should be increased, any officers not adhering to this Court's Order will be counseled, and ICE [] will continue to address and correct any substandard reporting requirements." *Id.*

Similarly, although having conducted, as of the date of the declaration on January 28, 2026, only three warrantless immigration arrests since December 2, 2025, CBP has also made changes to their documentation procedures following the Court's preliminary injunction order. Specifically, CBP's Acting Deputy Executive Assistant Commissioner, Kenneth Blanchard, attested that CBP "added fields to the arrest report to require CBP Officers and Agents who make a civil immigration arrest to enter narrative text describing the 'Probable Cause for Immigration Violation,' select the 'Location of Arrest Type' – 'Business, Residence, Vehicle, Public Area, Other,' enter narrative text describing the 'Alien Ties to Community,' and enter narrative text describing 'Facts Supporting Likely Escape.'" Supplemental Decl. of Kenneth W. Blanchard Jr., Act. Deputy Exec. Assistant Comm'r of CBP, Operations Support ("Third Blanchard Decl.") ¶ 3, ECF No. 82-11. All CBP officers conducting civil immigration arrests in the District have been informed to complete the arrest report. *Id.*

### D. Plaintiffs' Motion to Enforce Preliminary Injunction

On February 19, 2026, about two months after the December 2, 2025 preliminary injunction order, plaintiffs moved to enforce the order, contending that defendants are "[u]ndeterred" and "continue to enforce their unlawful policy and practice, carrying out warrantless immigration arrests without the required probable cause determinations." Pls.' Mot. (Enf.) at 1. Plaintiffs' motion included a declaration from plaintiffs' counsel with attached exhibits, including social media posts, press releases, and new articles commenting on the

immigration arrests nationwide, as well as a copy of the Lyons Memo. *See* Pls.' Mot. (Enf.), Decl. of Alexandra J. Widas ("Third Widas Decl."), ECF No. 78-1. This enforcement motion was also supported by sworn declarations from eight additional individuals, four of whom filed pseudonymously, who were civilly arrested without a warrant in the District after the December 2, 2025 preliminary injunction, as well as copies of 26 of the 33 Form I-213s produced by defendants to plaintiffs. *See* ECF Nos. 78-2 to 78-9 (declarations); 78-10 to 78-35 (I-213s).[9] As relief, plaintiffs sought an order compelling defendants to undertake more onerous obligations beyond those originally ordered by the preliminary injunction, including preparing written training materials subject to review by and conferrals with plaintiffs, conducting trainings of immigration officers based on the training materials, and additional reporting requirements, such as the production of body-worn camera footage or any other video footage of warrantless arrests in this District. Pls.' Mot. (Enf.), [Proposed] Order Granting Mot. Enf. Prelim. Inj. ("Pls.' Original Proposed Order"), ECF No. 78-36.

Defendants oppose plaintiffs' motion, denying any failure to comply with the preliminary injunction to warrant any additional relief. *See* Defs.' Mem. Opp. Pls.' Mot. Enforce Prelim. Inj. ("Defs.' Opp'n (Enf.)"), ECF No. 82. In opposition, defendants also submitted additional evidence to supplement the record, including four more Form I-213s produced to but not shared by plaintiffs, *see* ECF Nos. 82-5 (J.L.H.), 82-6 (E.A.G.R.), 82-7 (N.A.V.C.), 82-8 (E.E.F.), resulting in a combined total of thirty Form I-213s shared with the Court by the parties; and the two declarations

---

[9]    The eight individuals submitting sworn declarations are new and only add to the roughly forty warrantless civil immigration arrests described in the over two dozen sworn declarations submitted in support of the original preliminary injunction order. *See* Pls.' Mot. (Enf.), Adolfo Doe Decl., ECF No. 78-2 (pseudonym); Benito Lopez Decl., ECF No. 78-3 (pseudonym); Edwin Espinoza Forsith Decl., ECF No. 78-4; Harvey Valle Gutierrez Decl., ECF No. 78-5; Jose Argueta Decl., ECF No. 78-6; Joshua Doe Decl. (pseudonym), ECF No. 78-7; Luis Neri Amado Decl., ECF No. 78-8; Rolando Doe Decl. (pseudonym), ECF No. 78-9; *see* Pls.' Mot. (Enf.) at 18 (confirming that the eight declarations are from individuals arrested after the preliminary injunction order).

discussed above from ICE's Acting Field Office Director for the District, Erik S. Weiss, and CBP's Acting Deputy Executive Assistant Commissioner, Kenneth Blanchard, *see* Weiss Decl.; Third Blanchard Decl.

Following full briefing of the motion, *see* Pls.' Reply in Supp. Mot. Enforce Prelim. Inj. ("Pls.' Reply (Enf.)"), ECF No. 83, an over two-hour hearing was held on March 11, 2026, at which the parties provided extensive oral arguments, *see* Min. Entry (Mar. 11, 2026).  At the hearing, this Court questioned why plaintiffs "keep pointing . . . to the I-213s," when the individual Form I-213s fall further "outside the policy realm" than the Lyons Memo.  Hr'g Tr. (Mar. 11, 2026) 17:2, 7; *see also id.* 17:20-21 (reminding parties that the Court "ha[s] to stay at the policy level where [it] ha[s] jurisdiction").  In response, plaintiffs agreed that the Court may "stick at the policy level" with the Lyons Memo rather than assess each individual Form I-213, because "what is happening in these I-213s . . . is exactly what is codified in the Lyons [M]emo."  *Id.* 18:17-22.  Plaintiffs then offered "to submit supplemental briefing that's specific to the Lyons [M]emo, as well as a revised proposed order that is more focused on the Lyons [M]emo."  *Id.* 43:21-23.

Accordingly, following the hearing, parties were ordered to submit additional briefing on the Lyons Memo, including "the Court's authority to scrutinize the Lyons Memo and any jurisdictional limits to that authority," and "whether, as a legal matter, the Lyons Memo provides accurate guidance as to what may satisfy probable cause to believe that a person being arrested is likely to escape before a warrant can be obtained, *see* 8 U.S.C. § 1357(a)(2)."  *See* Min. Order (Mar. 11, 2026).  Plaintiffs' supplemental briefing included a revised proposed order, which simply requests that this Court "order[] that Defendants shall not rely on the probable cause standard or analytical approach set forth in the Lyons Memo when conducting civil immigration arrests without a warrant in this District."  Pls.' Supp. Br., [Revised Proposed] Order Granting Motion to

Enforce ("Pls.' Revised Proposed Order"), ECF No. 91-2 (capitalization altered).    With

supplemental briefing complete, *see* Pls.' Supp. Br. Supp. Mot. Enforce Prelim. Inj. ("Pls.' Supp.

Br."), ECF No. 91; Defs.' Supp. Mem. Opp'n Pls.' Mot. Enforce ("Defs.' Supp. Opp'n"), ECF

No. 94; Pls.' Supp. Reply Supp. Mot. Enforce Prelim. Inj. ("Pls.' Supp. Reply"), ECF No. 95,

plaintiffs' motion is ripe for review.

### E.    Plaintiffs' Motion for Extra-Record Discovery

Around the same time plaintiffs filed their motion to enforce the preliminary injunction

order, plaintiffs also continued with dispositive briefing on the merits of the underlying APA claim

by filing a motion for extra-record discovery, *see* Pls.' Mot. (Disc.), ECF No. 85, consistent with

the Court's dispositive motion briefing schedule, *see* Min. Order (Jan. 26, 2026).    Plaintiffs'

discovery motion criticized the administrative record produced by defendants, totaling eleven

pages, as "sparse" and "contain[ing] essentially *nothing* that would aid this Court's review."  Pls.'

Mot. (Disc.) at 1 (emphasis in original).  Plaintiffs "request that the Court order Defendants to

respond to requests for production and requests for admission, answer a limited set of ten

interrogatories, and sit for five depositions."  *Id.* at 13.  This contested motion also became ripe

for review on April 29, 2026.   *See* Defs.' Mem. Opp. Pls.' Mot. Discovery ("Defs.' Opp'n

(Disc.)"), ECF No. 90; Pls.' Reply in Supp. Pls.' Mot. Extra-Record Disc. ("Pls.' Reply (Disc.)");

Pls.' Decl. of Alexandra J. Widas Supp. Pls.' Mot. Extra-Record Disc., ECF No. 98;

Administrative Record, ECF No. 99-1.

Both of plaintiffs' pending motions inform the other and are resolved in this Memorandum

Opinion.

## II.    LEGAL STANDARD

When deciding a motion to enforce a preliminary injunction, a district court has the authority to enforce the terms of its mandates absent a stay of the preliminary injunction order. *See Deering Milliken, Inc. v. F.T.C.*, 647 F.2d 1124, 1128-29 (D.C. Cir. 1978) (recognizing that a district court has "power[] to enforce its unstayed judgment since the [district] court has retained that power throughout the pend[e]ncy of the appeal"). A motion to enforce must be granted if a prevailing plaintiff demonstrates that a defendant has not complied with a prior judgment entered against it, and denied if a plaintiff has received all relief required by the prior judgment. *See Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29 (D.C. Cir. 2005) ("Success on a motion to enforce a judgment gets a plaintiff only 'the relief to which the plaintiff is entitled under its original action and the judgment entered therein.'" (quoting *Watkins v. Washington*, 511 F.2d 404, 406 (D.C. Cir. 1975)) (alterations omitted)).

When reviewing a motion for extra-record discovery in an APA case, a court is typically "limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019). Where, however, an agency has compiled an administrative record that is "so bare as to frustrate effective judicial review," extra-record discovery may be permitted. *Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d 992, 998 (D.C. Cir. 1990); *see also Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487-88 (D.C. Cir. 2011) ("[I]f a party makes a significant showing—variously described as a strong, substantial, or prima facie showing—that it will find material in the agency's possession indicative of . . . an incomplete record, it should be granted limited discovery." (citation omitted)).

15

## III.    DISCUSSION

As detailed above, plaintiffs have filed two contested motions, each supported by supplemental exhibits: (1) a motion to enforce the Court's December 2, 2025 preliminary injunction prohibiting defendants from enforcing a policy of conducting warrantless civil immigration arrests without an individualized determination of escape risk, *see* ECF No. 78; and (2) a motion for extra-record discovery, *see* ECF No. 85.  Each motion is discussed in turn.

### A.    Plaintiffs' Motion to Enforce the Preliminary Injunction

Jurisdiction over plaintiffs' motion to enforce the preliminary injunction is reviewed first, followed by whether the policy detailed in the Lyons Memo violates the preliminary injunction.

### 1.    *This Court Retains Jurisdiction to Enforce its Preliminary Injunction*

Defendants have appealed the preliminary injunction order, *see* Not. of Appeal, ECF No. 73, which generally divests this Court of jurisdiction "over those aspects of the case involved in the appeal." *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) (citation omitted).[10]  Plaintiffs argue, however, that "[b]ecause the Lyons Memo bears directly on Defendants' compliance with the preliminary injunction, the Court maintains jurisdiction to adjudicate Plaintiffs' motion to enforce the preliminary injunction." Pls.' Supp. Br. at 4.  Plaintiffs are correct.

"When an appeal is taken from an interlocutory order, such as the grant or denial of an injunction, . . . the district court retains jurisdiction to act with respect to matters not related to the issues involved in the appeal or when a district court's action would aid in the appeal." *Barnstead Broad. Corp. v. Offshore Broad. Corp.*, 869 F. Supp. 35, 38 (D.D.C. 1994).  Importantly, "whether

---

[10]    Defendants noticed an appeal of the preliminary injunction order on February 2, 2026, and the briefing schedule was entered on May 1, 2026, *see* Order, *Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. 26-5045 (May 1, 2026), with final briefs due almost four months from now on August 28, 2026.  The lengthy briefing schedule and the fact that no date has yet been set for oral argument militate against pausing consideration of the pending motions to await further guidance from the appeals court.

the addressee of an injunction has complied is *not* a subject 'involved in the appeal,'" and thus a district court retains its jurisdiction over such matters. *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 566 (7th Cir. 2000) (emphasis added). The D.C. Circuit has expressly recognized that a district court has "power[] to enforce its unstayed judgment since the [district] court has retained that power throughout the pend[e]ncy of the appeal." *Deering Milliken*, 647 F.2d at 1128-29. Indeed, no court has been "persuaded . . . that, absent a stay, a district court is without jurisdiction to enforce its orders pending appeal"—"[t]he precedent is voluminous and convincing." *In re Grand Jury Subpoena No. 7409*, No. 18-41 (BAH), 2018 WL 8334866, at *2 (D.D.C. Oct. 5, 2018) (collecting cases), *aff'd sub nom. In re Grand Jury Subpoena*, 749 F. App'x 1 (D.C. Cir. 2018); *see also Sergeeva v. Tripleton Int'l Ltd.*, 834 F.3d 1194, 1201-02 (11th Cir. 2016) ("Absent entry of a stay on appeal . . . the District Court retained jurisdiction to enforce its orders.").

Federal Rule of Civil Procedure 62 "codifies this inherent power of a court" to enforce or, if necessary, to clarify or modify, "the terms of the injunction being appealed from." *Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC*, 985 F. Supp. 2d 23, 29 (D.D.C. 2013) (alteration and internal quotation marks omitted). Specifically, Rule 62 provides that, "[w]hile an appeal is pending from an interlocutory order . . . that grants . . . an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." FED. R. CIV. P. 62(d); *see also Cobell v. Norton*, 310 F. Supp. 2d 77, 83 (D.D.C. 2004) ("[A] district court is not deprived of jurisdiction to modify [or enforce] a preliminary injunction while that injunction is on appeal."); *Sequen v. Albarran*, 2025 WL 3773755, at *3 n.2 (N.D. Cal. Dec. 31, 2025) ("[T]he Court notes that it retains jurisdiction to clarify and enforce the preliminary injunction and to modify it pending appeal as needed to preserve the status quo."). A court's exercise of authority under Rule 62(d) "can inure to the

17

benefit of plaintiffs or defendants." *Mayweathers v. Newland*, 258 F.3d 930, 935 (9th Cir. 2001); *see also Aubert v. Poast*, 166 F.4th 654, 656 (7th Cir. 2026) (explaining, *inter alia*, that Rule 62(d) "give[s] the district court some power to manage equitable relief even while the case is pending on appeal").

Here, the jurisdictional issue is straightforward and undisputed. Defendants agree with plaintiffs that "the Court retains jurisdiction to enforce the existing preliminary injunction," Defs.' Supp. Opp'n at 2, and concede that "the Lyons Memo explains Defendants' policy on warrantless civil immigration arrests and the Court can consider it in evaluating whether Defendants are continuing to enforce an unlawful policy of conducting warrantless civil immigration arrests without an individualized likelihood of escape determination," *id.* at 6. Indeed, defendants themselves proffer the Lyons Memo as evidence of compliance with the preliminary injunction. *See id.* ("[T]he Lyons Memo is . . . relevant to Defendants' compliance with the preliminary injunction."). Further, as the Court's preliminary injunction order covers only warrantless civil immigration arrests in the District, parties also agree that any determinations made about the legality of the Lyons Memo and any relief granted would apply only to warrantless civil immigration arrests in the District. *See id.* at 5 (agreeing to "abide by the Court's standard when making warrantless civil immigration arrests in Washington, D.C.," but not elsewhere); Pls.' Revised Proposed Order at 1 (limiting relief requested to warrantless civil immigration arrests "in this District").

Defendants' only jurisdictional challenge has been mooted by plaintiffs. Specifically, defendants protest any attempts by plaintiffs "to expand the preliminary injunction while it is on appeal," referring to plaintiffs' original proposed order "ask[ing] the Court to order Defendants to prepare written training materials . . . and use them to conduct trainings of immigration officers,

and order additional reporting requirements, including requiring Defendants to produce, among other things, body-worn camera footage." Defs.' Supp. Opp'n at 2; *see also* Pls.' Original Proposed Order, ECF No. 78-36. Plaintiffs, in reply however, clarified that their "Revised Proposed Order supersedes their earlier proposed order" accompanying their enforcement motion, and they "now seek only an order directing Defendants not to 'rely on the probable cause standard or analytical approach set forth in the Lyons Memo.'" Pls.' Supp. Reply at 2 (emphasis omitted) (quoting Pls.' Revised Proposed Order at 1). Plaintiffs thus are no longer seeking to impose additional training and reporting requirements on defendants.

In short, the parties agree, correctly, that subject matter jurisdiction exists over plaintiffs' now principal claim in their enforcement motion—namely, that the Lyons Memo fails to comply with the Court's December 2, 2025 preliminary injunction order.

### 2. The Lyons Memo Fails Fully to Comply with the Preliminary Injunction

Plaintiffs challenge just about every aspect of the Lyons Memo's guidance on escape risk, criticizing the memorandum's definition for escape risk, its list of seven non-exhaustive factors to consider, and the omission of community ties as one of the factors. In view of these flaws, plaintiffs ask the Court to prohibit defendants from "rely[ing] on the probable cause standard or analytical approach set forth in the Lyons Memo when conducting civil immigration arrests without a warrant in this District." Pls.' Revised Proposed Order at 1.

Below, the memorandum's definition for "escape risk" and the related second factor of the seven-factor list is discussed first, followed by the memorandum's silence on community ties, and finally the other factors (factors one and three through seven) are discussed. As the preliminary injunction governs defendants' conduct at the policy level, rather than arrests of any particular individual, review will be limited to whether the Lyons Memo, on its face, comports with the

19

preliminary injunction order or instead, when judged in relation to that order, sweeps more broadly than authorized by describing too broadly those circumstances in which warrantless civil immigration arrests are lawful under 8 U.S.C § 1357(a)(2).

### a. The Lyons Memo Provides Flawed Guidance on Escape Risk

Plaintiffs argue that the Lyons Memo "inconsistently and, in some places incorrectly, defines 'escape risk'" narrowly to mean whether an individual will remain in place at the scene of encounter with law enforcement before an administrative warrant can be obtained for his arrest, rather than more broadly to mean whether the individual will be located at either the scene of encounter *or another clearly identifiable location*. Pls.' Supp. Br. at 7. The former narrow interpretation, plaintiffs contend, would support a finding of escape risk for anyone who is "merely existing in public," Pls.' Mot. at 15, such as someone waiting for a bus, *see, e.g.*, Adolfo Doe Decl. ¶ 2, or driving a car on a public road, *see, e.g.*, Joshua Doe Decl. ¶ 3. Plaintiffs' challenge to the Lyons Memo's effort to define the statutory term "likely to escape," 8 U.S.C. § 1357(a)(2), as reflected throughout the memorandum and in factor two, is well taken.

Plaintiffs raise no issue with the Lyons Memo's initial definition of "escape risk" to mean whether "an immigration officer determines [an individual] is unlikely to be located at the scene of the encounter *or another clearly identifiable location once an administrative warrant is obtained*," Lyons Memo at 4 (emphasis added)—and therefore the sufficiency of this definition to reflect the meaning in the statutory text of "likely to escape" is assumed for purposes of resolving this motion.[11] Subsequent descriptions in the Memo, however, drop the italicized phrase thereby

---

[11]    The fact that this definition, agreed upon by both parties, is accepted for the purpose of resolving plaintiffs' motion to enforce does not mean that this definition best reflects the meaning of "likely to escape" under 8 U.S.C. § 1357(a)(2). The Lyons Memo understands "escape" to mean whether an immigration officer will be able to locate the individual at a particular location and at a specific time to arrest them, when dictionary and statutory definitions of "escape" in this context focus instead on whether an individual will attempt to avoid legal proceedings or evade the administration of justice. Black's Law Dictionary, for example, has defined "escape," among other things, as "[t]he

effectively limiting the immigration officer's analysis to whether an individual "is likely to remain at the scene of the encounter." *Id*; *see also* Lyons Memo at 5 (limiting "escape risk" to whether an individual "is likely to remain at the scene of the encounter while a warrant for his or her arrest is issued"). For example, the Lyons Memo also asserts that "the likelihood-of-escape analysis is narrowly focused on determining whether the person is likely to escape before the officer can practically obtain an administrative warrant, *while in the field*." Lyons Memo at 5 (emphasis added). Consistent with this narrow construction, factor two of the Lyons Memo instructs officers

---

voluntary departure from lawful custody by a prisoner with the intent to evade the due course of justice." Blacks Law Dictionary (6th ed. 1990). Merriam-Webster's Dictionary of Law similarly defines escape to mean "depart[ing] from lawful custody with the intent of avoiding confinement or the administration of justice." Merriam-Webster's Dictionary Online, https://www.merriam-webster.com/dictionary/escape (last visited May 4, 2026). The dictionary definitions of "escape" to mean the evasion of legal processes is confirmed in the criminal context under Title 18 of the United States Code, which in multiple places refer to "escape" in some form as avoiding "any process issued under the laws of the United States by any court, judge, or magistrate judge." 18 U.S.C. § 751; *see also id.* §§ 752, 755.

To put this concretely, the Lyons Memo's definition of "escape risk" does not contemplate whether a person is already in immigration proceedings or will comply with a summons to report to immigration authorities or appear before court, which is an independent and possibly narrower consideration than whether a person will be at a clearly identifiable location at a specific time when an administrative warrant for that person's arrest is obtained. After all, noncitizens whose identifying information is already in the immigration system—such as those with pending immigration applications, or work authorization, or scheduled court hearings, *see, e.g.*, Espinoza Forsith Decl. ¶ 1 (stating that he already had an immigration hearing "scheduled for April 2026" before his arrest)—have demonstrated a willingness to comply with legal processes, making them less likely to be at risk of evading the administration of justice. In contrast, noncitizens who have entered improperly without submitting themselves to the immigration process, and who remain in the country unbeknownst to immigration authorities, may pose a greater risk of evading legal proceedings.

Indeed, historically, federal civil immigration enforcement did not rely on costly mass arrests and detention centers to address the issue of law-abiding noncitizens without legal status in this country, but rather issued summonses to bring them before immigration authorities. As the Supreme Court has made clear, "it is not a crime for a removable alien to remain present in the United States," and "[i]f the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." *Arizona v. United States*, 567 U.S. 387, 407 (2012). "In the ordinary course, if [DHS] discovers that an alien is living in the United States without authorization, it may initiate removal proceedings against the alien by sending him a 'notice to appear,'" *Johnson v. Guzman Chavez*, 594 U.S. 523, 527 (2021) (citing 8 U.S.C. § 1229(a)), which "does not authorize an arrest" but instead "gives the alien information about the proceedings, including the time and date of the removal hearing," *Arizona*, 567 U.S. at 407 (citing 8 U.S.C. § 1229(a)(1)). Only in limited circumstances were arrests deemed appropriate and necessary. *See id.* (noting that arrests can be made with a warrant issued at the Attorney General's discretion under 8 U.S.C. § 1226(a), citing to a 2011 ICE Memorandum "describing factors informing this" decision, or without a warrant under 8 U.S.C. 1357(a)(2) where the probable cause findings are met). The current administration's apparent reliance on arrests as a routine method of immigration enforcement is a departure from statutory text and historical understanding, but as plaintiffs do not challenge the definition for "escape risk" set forth in the text accompanying this footnote, no occasion arises here to more fully consider its breadth.

21

that a "subject's ability and means to promptly depart the scene of the encounter (e.g., the subject was encountered in a vehicle and continues to have control over the vehicle)" may support a finding that the individual is likely to escape. *Id.* at 3 (citing *United States v. Cantu*, 519 F.2d 494, 497 (7th Cir. 1975)).

At the outset, the parties, notably, purport to *agree* on the correct definition of "escape risk." Specifically, defendants express their agreement that "[t]he likelihood of escape determination is not limited to the likelihood that the alien will remain at the scene of the encounter," Defs.' Supp. Opp'n at 7, stating that the determination also includes whether the individual is likely to be found at "another clearly identifiable location once an administrative warrant is obtained," *id.* (quoting Lyons Memo at 3). The parties' agreement as to this definition has some support in case law from district courts, concluding that an individual is not an escape risk if he is likely to be found again at a clearly identifiable location, such as his home or place of employment. *See, e.g.*, *United States v. Bautista-Ramos*, 2018 WL 5726236, at *7 (N.D. Iowa Oct. 15, 2018) (holding that "[u]nlike cases in which ICE officers do not know an alien's true name or other identifying information," "there is no indication that ICE officers would have had trouble finding [arrestee] again if they had released him while they obtained a warrant" as they had "his name and place of employment," "leads on his address, his wife's name and her restaurant's address, his two daughters' names and addresses, and another relative's name and address"), *report and recommendation adopted*, No. 18-cr-04066, 2018 WL 5723948 (N.D. Iowa Nov. 1, 2018); *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 890 (S.D. Ohio 2016) (finding "no evidence that [arrestee] posed a risk of escape" despite being arrested in a vehicle while on the road, because among other things he was "just a few miles from his home," where he lived with his partner and her children, and "had a stable job as a painter").

Thus, the parties' disagreement is not over how the Lyons Memo defined "escape risk," but rather whether the Lyons Memo properly conveys that definition to its officers. Defendants insist this guidance task is appropriately accomplished, noting the one part of the Lyons Memo that states the complete definition, *see* Defs.' Supp. Opp'n at 7 (quoting Lyons Memo at 3), and discounting plaintiffs' criticisms about the truncated definition used in the other parts of the Memo, as "misconstru[ing]" the guidance about assessing escape risk "while in the field," *id.* According to defendants, the instruction for officers to "determin[e] whether the person is likely to escape before the officer can practically obtain an administrative arrest warrant, while in the field," Lyons Memo at 5, means only that an officer must make the probable cause determination at the scene of the encounter rather than "[w]aiting until a later time," and not, as plaintiffs understand, that an officer must arrest an individual if the person will likely leave the scene of the encounter before the officer can obtain an administrative warrant while still in the field. Defs.' Supp. Opp'n at 8. Defendants also argue that the second factor of the Lyons Memo—that a factor for escape risk includes an individual's ability to "promptly depart" the scene, such as by having control over a vehicle—was based on precedent from another circuit and just "a factor" of many that can be considered. *Id.* at 5 (citing *Cantu*, 519 F.2d at 497).

Defendants' arguments are unpersuasive. Although defendants correctly note that one sentence of the five-page Lyons Memo provides a definition of escape risk drawing no criticism from plaintiffs, *see id.* at 7 (quoting Lyons Memo at 3), defendants fail to address plaintiffs' point that the memorandum later twice frames the inquiry as only whether an individual is "likely to remain at the scene of the encounter" pending issuance of an arrest warrant, without any mention about whether the individual may be found at another clearly identifiable location. *See* Lyons Memo at 3 (discussing only factors to consider for "[w]hether the [person] is likely to remain at

23

the scene of the encounter"); *id.* at 4 ("[O]fficers should closely consider whether the [person] is likely to remain at the scene of the encounter while a warrant for his or her arrest is issued."). Indeed, with respect to the related, second factor of the Lyons Memo—that a person's ability to "promptly depart the scene of encounter," such as by being a driver in a vehicle, is an escape risk factor—defendants actually concede that this guidance does not "fully incorporate this Court's opinion granting Plaintiffs' motion for preliminary injunction," as "the Court [had] determined that an alien's presence in a vehicle is not sufficient to find that an alien is likely to escape." Defs.' Supp. Opp'n at 5 (citing *Escobar Molina*, 811 F. Supp. 3d at 31 n.20).

Moreover, defendants' attempts to "soften or rewrite the Lyons Memo through briefing," Pls.' Supp. Reply at 6—by arguing that plaintiffs "misconstrue" the memorandum and offering alternative interpretations—do not override the crucial fact that officers in the field appear to share the *same* understanding of the Lyons Memo as plaintiffs complain about. Nearly every Form I-213 that discusses escape risk states that the individual was "[a]rrested at large, (not at their residence or place of business)" and/or "encountered by Immigration Officer while in vehicle."[12]   In many cases, this proffered justification for the warrantless civil arrest was made without any reference to whether the individual could be found again at another clearly identifiable location, such as their home or place of employment. *See, e.g.*, E.J.D.B. I-213 at 2, ECF No. 78-20 (listing, as only two factors relevant to escape risk, that the individual "was [a]rrested at large" and "was encountered by Immigration Officer while in vehicle"); Joshua Doe I-213 at 2, ECF No. 78-24 (same); L.C.

---

[12]     *See* A.V.J. I-213 at 1, ECF No. 78-10; A.R.G. I-213 at 3, ECF No. 78-11; Adolfo Doe I-213 at 2, ECF No. 78-12; B.A.A.G. I-213 at 2, ECF No. 78-13; Rolando Doe I-213 at 2, ECF No. 78-17; Espinoza Forsith I-213 at 2, ECF No. 78-18; E.J.D.B. I-213 at 2, ECF No. 78-20; E.D.V.V. I-213 at 2, ECF No. 78-21; F.A.A.A. I-213 at 2, ECF No. 78-22; Joshua Doe I-213 at 2, ECF No. 78-24; J.P.C. I-213 at 2, ECF No. 78-25; J.D.J.M. I-213 at 3, ECF No. 78-27; L.C. I-213 at 2, ECF No. 78-29; Benito Lopez I-213 at 2, ECF No. 78-30; Luis Neri-Amado I-213 at 2, ECF No. 78-31; P.P.C. I-213 at 2, ECF No. 78-34; W.L.R. I-213 at 2, ECF No. 78-35; E.A.G.R. I-213 at 3, ECF No. 82-6; E.E.F. I-213 at 3, ECF No. 82-8.

24

I-213 at 2, ECF No. 78-29 (same); Benito Lopez I-213 at 2, ECF No. 78-30 (same); B.A.A.G. I-213 at 2, ECF No. 78-13 (listing as factors relevant to escape risk only that the individual was "[a]rrested at large," "in a vehicle," and "entered the United States after evading inspection"); Luis Neri-Amado I-213 at 2, ECF No. 78-31 (same). Whatever defendants may represent to this Court as the correct interpretation of the Lyons Memo, defendants' officers have not received the same message.

In short, the Lyons Memo does not properly instruct law enforcement officers to comply with the preliminary injunction order: Immigration officers must consider not only an individual's likelihood of remaining at the scene of the encounter, but also, per the definition the Lyons Memo itself proffers as legally supportable and agreed upon by plaintiffs for purposes of this motion, the individual's likelihood of being found at another clearly identifiable location. This likelihood of being found elsewhere, such as a stable home or long-standing employment place, leads inexorably to the next flaw-by-omission aspect of the Lyons Memo, which simply ignores community ties.

### b.  *The Lyons Memo Fails to Address Community Ties*

Before turning to the other factors outlined in the Lyons Memo, "[e]qually significant is what the Lyons Memo omits," Pls.' Supp. Br. at 17—specifically, how an individual's community ties factor into the determination of an individual's likelihood of escape. As this Court clearly emphasized when issuing the preliminary injunction, defendants' officers were conducting warrantless civil immigration arrests without the requisite probable finding, because "in none of the[] arrests documented in [plaintiffs'] declarations did the agents ask any questions about the arrestees' personal circumstances—such as the person's residence, length of stay in the United States, family members, work history, or anything else about the person's community ties—which courts have found to be relevant in the consideration of escape risk." *Escobar Molina*, 811 F.

25

Supp. 3d at 47. An individual's community ties, as was further explained, are relevant to the escape risk determination because someone who "has resided in the country for a lengthy period of time and has strong community ties," such as employment, a family, or a home, is more likely to remain in the District. *Id.* at 31 (collecting cases). Lest there be any doubt, the preliminary injunction order also expressly required that "the alien's ties to the community, if known at the time of arrest, including family, home, or employment" be "documented" in the I-213s. *Id.* at 66.

Yet the Lyons Memo—which defendants submit as evidence of compliance with the preliminary injunction order—provides no guidance on considering an individual's ties to his or her community. The Lyons Memo does not, for instance, advise its agents and officers to query whether an individual has family, resides, or works in the District, all of which tend to weigh against establishing probable cause as to escape risk. *See, e.g.*, *La Franca v. Immigr. & Naturalization Serv.*, 413 F.2d 686, 689 (2d Cir. 1969) (noting that being "the owner and operator of a bakery in Jersey City" lowered petitioner's likelihood of escape before a warrant could be obtained); *Pacheco-Alvarez*, 227 F. Supp. 3d at 890 (same, where defendant had a stable job and lived with his partner and her two children).

The Lyons Memo's failure to address the impact of community ties on escape risk is directly reflected in the Form I-213s filled out by officers following a warrantless civil immigration arrest, which are meant to "document all the likelihood of escape factors" known to the arresting officer pre-arrest. Lyons Memo at 5. As plaintiffs point out, defendants' documentation is virtually silent about an individual's ties to the community. Pls.' Mot. (Enf.) at 7. Nor do the I-213s generally describe the agents taking any steps to query individuals about their home address, employment status, or family ties prior to making the civil arrests, such as including any questions asked by the agents regarding these factors or the answers provided by the individuals who were

26

arrested. *Id.* The lack of documentation on an arrestees' community ties is corroborated by sworn testimony of those who were arrested, many of whom live and work in the District, who confirm no inquiry whatsoever was made into their ties to the community before their arrest. *See* Adolfo Doe Decl. ¶ 4; Benito Lopez Decl. ¶ 5; Edwin Espinoza Forsith Decl. ¶ 3; Harvey Valle Gutierrez Decl. ¶ 4; Jose Argueta Decl. ¶ 5; Joshua Doe Decl. ¶ 8; Luis Neri Amado Decl. ¶ 5; Rolando Doe Decl. ¶ 4.

Defendants concede that, "[o]f course, an alien's ties to the community through family, employment or otherwise could be relevant to whether an alien is likely to escape," Defs.' Supp. Opp'n at 8, and cut against any probable cause finding of escape risk. That point is certainly not made in the Lyons Memo, however. In defending the Lyons Memo, defendants point to the instructions to its agents to consider "identity cards or work authorization" as evidence of the memorandum "contemplat[ing]" that "residence and gainful employment . . . would weigh against finding that the alien is likely to escap[e]." *Id.*[13] Defendants also protest that "an immigration officer must make a split-second determination about whether the alien is likely to escape[,] which does not allow for an extensive investigation into the alien's biography." *Id.*

Defendants' arguments amount to little more than creative reframing of the Lyons Memo. The memorandum's instruction to consider "identity cards or work authorization," read in context, clearly refers to "identity cards or work authorization documents that the immigration officer suspects are *fraudulent*," which would be a factor *supporting* a finding of escape risk. Lyons

---

[13]    Defendants are correct that production of "identity cards or work authorization" undercuts any finding of a likelihood of escape since the noncitizen is plainly participating in and complying with, rather than avoiding or evading, legal immigration processes. Similarly, entering through an immigration port, seeking asylum or another type of immigration relief, having a pending immigration case, and attending court hearings, also reflect such participation and compliance by a noncitizen. *See, e.g.*, Benito Lopez Decl. ¶ 1; Edwin Espinoza Forsith Decl. ¶ 1; Harvey Valle Gutierrez Decl. ¶¶ 1, 4. It would be hard to square as credible a probable cause finding that a noncitizen was "likely to escape," as properly defined to mean that the individual is likely to evade the administration of justice, *see supra* at n.11, where the noncitizen was engaged in the legal process and even produced documentation verifying that fact.

Memo at 3 (emphasis added).    Law enforcement agents generally do not appear to be contemplating, as defendants' brief claims, that proof of residence and gainful employment would weigh *against* a finding of a likelihood of escape.    In many of the declarations submitted by plaintiffs, individuals recount being arrested immediately after giving officers their license or work permit, without further questions being asked.  *See* Benito Lopez Decl. ¶ 2 (recounting that officers arrested him immediately after reviewing his Venezuela license and work permit); Harvey Valle Gutierrez Decl. ¶ 4 (agents arrested him immediately after reviewing his Real ID and work permit); Joshua Doe Decl. ¶¶ 6-7 (agents scanned his driver's license, told him he was not allowed in the country, broke his license in half, and arrested him).  This is not just occurring here in the District of Columbia: A district court in Oregon also recently considered a challenge to ICE's policy and practice of conducting warrantless immigration arrests, and similarly concluded that ICE officers were arresting individuals "despite [their] providing identification."  *M-J-M-A- v. Hermosillo*, No. 6:25-cv-02011, 2026 WL 562063, at *6 (D. Or. Feb. 27, 2026).

Moreover, defendants cite nothing to support their bald assertion that the necessity for immigration officers to make "split-second determination[s]" preclude questions into an individual's background.  Defs.' Supp. Opp'n at 8.  In fact, defendants' position runs counter not only to precedent, *see La Franca*, 413 F.2d at 689 (requiring consideration of background), but also to historical practice, *see* Pls.' Mot. (Enf.), Decl. of Alexandra J. Widas ("Fifth Widas Decl."), ECF No. 185-2 (Pls.' Ex. 1) (showing that an earlier ICE Academy training presentation on warrantless arrests required officers to consider "[w]hether the noncitizen is an employee or a resident of [the] location where the arrest took place," and "[t]he noncitizens['] ties to the community").  Here, many of defendants' officers persist in making warrantless civil immigration arrests without asking *any* questions about the subject's community ties.  *See, e.g.*, Jose Argueta

28

Decl. ¶ 4 (recounting that he received a phone call from someone "claiming to be from the Washington D.C. police" directing him to come pick up his stolen car, only to be immediately arrested when he arrived and identified himself); Luis Neri Amado Decl. ¶ 5 (recounting that he was arrested without any questions about his "ties to the community, how long [he's] been living/working in DC, [his] family here, or anything else about [his] circumstances").

At bottom, the preliminary injunction order's instructions to defendants were clear: among other things, law enforcement officers' "document[ation] [of] the facts and circumstances surrounding the warrantless civil immigration arrest" must include "the alien's ties to the community, if known at the time of arrest, including family, home, or employment." *Escobar Molina*, 811 F. Supp. 3d at 66. The Lyons Memo's failure to instruct its officers to inquire about community ties pre-arrest, resulting in most of the Form I-213s containing no information about community ties, constitutes a violation of the preliminary injunction order.

### c.  *The Other Factors in the Lyons Memo Facially Pass Muster*

Finally, in addition to factor two discussed above, *see supra* Part III.A.2(a), plaintiffs also find fault with the six other factors described in the Lyons Memo: factors one, three, four, five, six, and seven. *See supra* I.C.1 (listing the factors). Briefly, plaintiffs challenge factor one for "permit[ting] agents to rely on whatever they deem 'suspicious behavior,' regardless of whether the person actually manifested an intent to escape." Pls.' Supp. Br. at 15 (cleaned up); factor three for being "overbroad and vague," *id.* at 14; factors four and five for "impermissibly permit[ting] immigration agents to rely on mere suspicion, or their lack of affirmative knowledge, rather than objectively reasonable inferences," *id.* at 15; and factors six and seven for "conflating unlawful status and escape risk," *id.* at 11. As addressed below *seriatim*, despite the overarching concern about the repeated use of the truncated definition in the Lyons Memo and its omission of any

29

mention of community ties as among the factors mitigating any probable cause finding of escape risk, plaintiffs at this juncture have not established that each of the remaining factors, standing alone, violate the preliminary injunction order.[14]

### i.    Factor One

Plaintiffs have not shown that factor one on its face violates the preliminary injunction. Factor one instructs law enforcement officers to consider a "subject's behavior prior to and during the encounter (e.g., refusal to follow lawful commands, attempts to evade officers, or other suspicious behavior prior to the arrest)." Lyons Memo at 3.  As noted in the memorandum opinion accompanying the Court's preliminary injunction order, the escape risk determination under 8 U.S.C. § 1357(a)(2), "requires an individualized determination based on knowledge of facts 'particularized with respect to that person,'" which could include an agent's observations of an individual on the scene of the encounter. *Escobar Molina*, 811 F. Supp. 3d at 31.  For example, "appear[ing] 'extremely nervous' as if 'looking for an opportunity to run'" could be a reason supporting a finding of escape risk. *Id.* (quoting *United States v. Meza-Campos*, 500 F.2d 33, 34 (9th Cir. 1974)).  Plaintiffs offer no evidence to support their belief that officers are, *as a policy*, "rely[ing] on whatever they deem 'suspicious behavior,' regardless of whether the person actually 'manifest[ed] an intent to escape,'" Pls.' Supp. Br. at 15, nor does the most natural reading of factor one support that interpretation.  As explained previously, jurisdiction exists in this case only over policies, not individual arrests, *see Escobar Molina*, 811 F. Supp. 3d at 32-37 (discussing

---

[14]    On this point, it bears noting that a probable cause determination requires consideration of the totality of the circumstances, as the Lyons Memo, at 3, recognizes, and, for this reason, the promulgation of regulations implementing 8 U.S.C § 1357(a)(2) rejected commentators' recommendation to list factors governing civil immigration arrests, *see* Enhancing the Enforcement Authority of Immigration Officers, 59 Fed. Reg. 42406-01, 42411 (Aug. 17, 1994) ("The commenters also suggested that the rule should specify which factors Service officers should use to determine the likelihood of escape.  This is the type of discretionary detail that is appropriate in a training course and manual, but not in a regulation.").  The Court appreciates the challenges in identifying a comprehensive set of factors the agency itself has declined to provide in its regulations.

standing); *id.* at 37 (discussing the jurisdiction-stripping provisions under the INA); *id.* at 42 (discussing final agency action under the APA). Plaintiffs' challenge to factor one is thus unsuccessful.

### ii.    Factors Four and Five

Nor have plaintiffs shown that factors four and five, viewed at the policy level, violate the preliminary injunction. Factor four instructs agents to consider as a factor relevant to escape risk an individual's "[p]ossession of identity or work authorization documents that the immigration officer suspects are fraudulent." Lyons Memo at 3 (citing *United States v. Reyes-Oropesa*, 596 F.2d 399, 400 (9th Cir. 1979) as holding that "warrantless arrest was proper when an alien working in a garage presented a forged resident card to immigration officers"). Factor five similarly directs officers to consider an individual's "[p]resentation of unverifiable or suspected false information to the immigration officer." Lyons Memo at 4 (citing *United States v. Quintana*, 623 F.3d 1237, 1241 (8th Cir. 2010) as holding that "warrantless arrest was proper when an alien provided a name, date of birth and immigration status that could not be corroborated by the officer's records check").

Plaintiffs criticize the case cited in support of factor four (*Reyes-Oropesa*) for being "minimally reasoned (and out-of-circuit)," Pls.' Reply (Enf.) at 8, and the case cited in support of factor five (*Quintana*) for similarly "conduct[ing] no meaningful analysis," Pls.' Supp. Br. at 16. Yet plaintiffs fail to recognize that factors four and five facially also comport with D.C. Circuit precedent. *See Yam v. Immigr. & Naturalization Serv.*, 411 F.2d 683, 687 (D.C. Cir. 1969) (holding that production of "conflicting documents" calling into question a person's identity "certainly would 'warrant a man of reasonable caution in the belief' that [a subject] was in the United States illegally and that he was likely to abscond" (footnote omitted)).

31

Plaintiffs further complain that "these factors permit agents to rely on . . . an individual's 'home address, employment, and family ties' being 'unknown or unverified'" without "conduct[ing] . . . investigation into these details," but the evidence they provide to support this belief is inconclusive. Pls.' Supp. Br. at 15. As an initial matter, the Lyons Memo cited the *Quintana* case as support, which involved an officer who *did* investigate a subject's identity, arresting the subject only after a records check yielded "no immigration history, port-of-entry crossing, or visa information for the name . . . provided." 623 F.3d at 1241. Further, nothing in the record evidence at this moment supports plaintiffs' understanding of the memorandum. Of the 30 Form I-213s in the record, only seven included "unverified" home or work information to support probable cause for escape risk, and of the seven, plaintiffs provided declarations from only one of the arrested individuals.[15] That declaration, however, revealed that officers deemed information to be "unverified" only after the stopped individual refused to provide an ID or answer any questions. *See* Rolando Doe ¶ 3 (recounting that after he and his coworkers were stopped on the way to work, officers "asked [them] if [they] were citizens, what [their] names were, and how old [they] were" and "also demanded [their] IDs," but that he "didn't have an ID" and "said to them in English that [he] didn't want to respond to these questions"). In sum, plaintiffs' challenges to factors four and five are not, at this juncture, supported by precedent or record evidence.

### iii.    Factors Six and Seven

Plaintiffs' challenge to factors six and seven for "conflating unlawful status and escape risk" is also unpersuasive. Pls.' Supp. Br. at 12. Both factors provide that only *limited* types of immigration violations, not all immigration violations, may be relevant to an individual's

---

[15]    A.R.G. I-213 at 3; Rolando Doe I-213 at 2, E.D.V.V. I-213 at 2; J.P.C. I-213 at 2; J.D.J.M. I-213 at 3; P.P.C. I-213 at 2; W.L.R. I-213 at 2.

likelihood of escape on the ground that certain violations may go beyond mere unlawful status to suggest "surreptitious and criminal" behavior or an "unwillingness to cooperate with an immigration officer's lawful authority." Lyons Memo at 4-5.

Specifically, factor six states that a non-citizen is more likely to escape if he or she committed one of two specific immigration related offenses: improper entry, 8 U.S.C. § 1325 or reentry after removal, 8 U.S.C. § 1326. By statute, Congress has deemed both improper entry under 8 U.S.C. § 1325 and reentry after removal under 8 U.S.C. § 1326 to be two of the more serious types of immigration violations, elevating both from mere civil infractions to criminal offenses subject to a "fine[] under title 18" or "imprison[ment]." 8 U.S.C. § 1325(a) (misdemeanor or felony offense, depending on number of prior violations); *id.* § 1326 (felony offense). *See United States v. Texas*, 144 F.4th 632, 669 (5th Cir.), vacated on other grounds, 150 F.4th 656 (5th Cir. 2025) ("Congress criminalized the unlawful entry and reentry of aliens under 8 U.S.C. §§ 1325(a) and 1326(a)."). The memorandum directs officers to "closely consider" the escape risk of an individual whose entry constitutes a "serious and deceitful criminal offense," Lyons Memo at 4, a view seemingly supported by at least two other circuits. *See United States v. Puebla-Zamora*, 996 F.3d 535, 538 (8th Cir. 2021) (finding, on plain error review, that "previous removal for illegal entry [was sufficient to] establish[] probable cause that [a noncitizen] may escape before a warrant could issue"); *La Franca*, 413 F.2d at 689 (finding that having been "twice . . . deported" and "abscond[ing]" "subsequent to re-entry" increased likelihood of escape). In contrast, as defendants explain, factor six would not apply to individuals who are present unlawfully but entered legally, such as "an alien [who was] admitted into the United States on a non-immigrant visa [but] then remain[ed] in the United States after the visa expire[d]." Defs.' Supp. Opp'n at 9.

Similarly, factor seven does not sweep in all individuals with unlawful status, but rather focuses only on noncitizens who have failed to comply with the registration requirements under INA § 262, *see* 8 U.S.C. § 1302 (requiring "alien[s]" to register with the government, which results in the government issuing to the alien "a certificate of alien registration or an alien registration receipt card," 8 U.S.C. § 1304(d)); and the address notification requirements under INA § 265, *see* 8 U.S.C. § 1305 (requiring "alien[s]" to "notify the Attorney General in writing of each change of address and new address").  Under 8 U.S.C. § 1306(a) and (b), a willful or inexcusable violation of either requirement constitutes a criminal misdemeanor punishable by a fine or imprisonment.  Similarly, under 8 U.S.C. § 1304(e), an alien's failure to "at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card issued to him" is a misdemeanor carrying fines and imprisonment terms.  As defendants explain, "an alien who has registered and complied with the address notification requirements has demonstrated a willingness to cooperate with immigration officers and thus is less likely to escape" compared to "an alien who failed to comply with these requirements."  Defs.' Supp. Opp'n at 10.

Plaintiffs' criticism that the Lyons Memo "fail[s] to incorporate any instruction to consider individualized circumstances," Pls.' Supp. Reply at 7, ignores the memorandum's explicit instruction that although "[t]he circumstances of an alien's failure to comply with the immigration laws" or "unwillingness to cooperate" with immigration officers "*may* support the conclusion that the alien is likely to escape," "*[n]o single factor is determinative*," Lyons Memo at 4 (emphases added).  The Lyons Memo also caveats that the "possible factors" listed are non-exhaustive, and, consistent with D.C. Circuit precedent, educates that "[w]hether an alien is likely to remain at the scene of the encounter is based on the *totality of the circumstances* known to the immigration officer at the time of the encounter and prior to the arrest."  Lyons Memo at 4 (emphasis added

34

and omitted); *see United States v. Holder*, 990 F.2d 1327, 1328, (D.C. Cir. 1993) (noting that "probable cause" requires a "totality of the circumstances" analysis).  On its face, the Lyons Memo expressly cautions officers that the possible factors listed are suggestive rather than prescriptive, and absent evidence of a policy and practice of officers acting otherwise, "[t]he nature of the totality-of-the-circumstances analysis . . . precludes [courts] from holding that certain factors are presumptively given no weight without considering those factors in the full context of each particular case." *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013) (citing *United States v. Arvizu*, 534 U.S. 266, 274 (2002)); *District of Columbia v. R.W.*, No. 25-248, 2026 WL 1052344, at *3 (U.S. Apr. 20, 2026) ("The totality of the circumstances requires courts to consider the whole picture." (internal quotation marks omitted)).

Plaintiffs' proffer of various examples in which they believe a noncitizen could meet the conditions of factors six or seven yet still not pose an escape risk also misses the mark.  *See* Pls.' Supp. Reply at 6-8.  For instance, plaintiffs contend that "many individuals who enter the country improperly do not evince an ability or desire to evade immigration authorities," citing as an example to Espinoza Forsith, "who presented himself to immigration officials upon entry in April 2023 and was already in asylum proceedings at the time of his warrantless arrest in January 2026." Pls.' Supp. Reply at 7.[16]  To be sure, the Lyons Memo does not expend much effort in describing circumstances that would mitigate or even undercut any credible probable cause finding of "likely to escape," *see supra* n.11 & 13, and any future iteration of similar guidance would be improved with more attention to such mitigating factors to prove an effective guide "in the field."  Yet the preliminary injunction applies only to defendants' enforcement of an unlawful "policy or practice."

---

[16]    Plaintiffs' representation that Espinoza Forsith was "already in asylum proceedings" is not a fact in the record.  *See* Espinoza Forsith Decl. ¶ 1 (stating only that he has "not yet had any hearings in immigration court" but had one "scheduled for April 2026" before his arrest, without any mention of asylum).

*Escobar Molina*, 811 F. Supp. 3d at 65; *see also id.* at 42-43 (explaining that plaintiffs' APA claim requires finding the existence of a policy and practice); *see supra* III.A.1 (explaining that jurisdiction exists to enforce preliminary injunction, which pertained to defendants' policy and practice). Isolated ICE or CBP agent's misjudgments of escape risk thus fall outside the reach of the preliminary injunction order and this Court's jurisdiction, though a collection of such misjudgments may be probative evidence of a pervasive policy and practice that has persisted since issuance of the preliminary injunction order. *See, e.g.*, *Garro Pinchi v. Noem*, 813 F. Supp. 3d 973, 1019-20, 1022 & n.55 (N.D. Cal. 2025) (finding DHS has a policy of re-detaining without making individualized determinations of formerly released noncitizens who had entered the country improperly, including some asylum-seekers, in light of "voluminous" and "extensive" evidence"). Plaintiffs' challenges to factors six and seven are thus unpersuasive absent additional evidence.[17]

\* \* \*

To be clear, this memorandum opinion does not render any final conclusions about the legality of the challenged policy and practice, which is left for future proceedings after discovery and briefing on dispositive motions. The determination, at this juncture, that certain factors outlined in the Lyons Memo are compliant with the preliminary injunction order is not to say that those factors would survive APA review at final judgment with the benefit of a full record. Nor does this determination suggest that every warrantless civil arrest predicated on consideration of those factors would satisfy the probable cause requirement under 8 U.S.C. § 1357(a)(2). Indeed,

---

[17] Plaintiffs also cursorily challenge factor three, which instructs officers to consider a "subject's age and health," for being "overbroad and vague." Pls.' Supp. Br. at 14 (citing Lyons Memo at 3). Neither sides' briefs expend much ink on this factor, and none of the Form I-213s rely on this factor as a justification for the warrantless arrest. Absent further elucidation, and given that probable cause is a "totality of the circumstances" analysis, *Holder*, 990 F.2d at 1328, plaintiffs have not shown that inclusion of factor three violates the preliminary injunction order.

some of the Form I-213s and the accompanying declarations in the record contain, simultaneously, dubious reasons for finding escape risk and highly concerning facts about the arrest. *See, e.g.*, Luis Neri Amado Decl. ¶ 4 (recounting that officers broke his car window and dragged him out). Plaintiffs, however, have not amended their complaint to challenge the Lyons Memo under the APA, nor, for understandable jurisdictional reasons, are plaintiffs challenging specific individual arrests.

At bottom, consideration of plaintiffs' motion to enforce is limited: The only question at present is whether defendants are violating the preliminary injunction order. Review of defendants' actions is accordingly limited to whether, at the policy level, the Lyons Memo correctly instructs that officers must make "a pre-arrest individualized determination . . . of probable cause that the person being arrested is likely to escape before a warrant can be obtained" before making a warrantless arrest. *Molina*, 811 F.Supp. at 65 (Preliminary Injunction Order). For all the reasons above, the Lyons Memo's flawed definition of escape risk, *see supra* III.A.2(a), and failure to instruct officers to consider community ties, *see supra* III.A.2(b), violate the preliminary injunction order, though other challenged portions of the Lyons Memo pass muster on their face, *see supra* III.A.2(c)(i)-(iii).

As for the remedy for violation of the preliminary injunction order, plaintiffs' proposed order prohibiting defendants from "rely[ing] on the probable cause standard or analytical approach set forth in the Lyons Memo when conducting civil immigration arrests without a warrant in this District" is granted in full. Pls.' Revised Proposed Order at 1. Providing guidance on the factors relevant to a probable cause finding of escape risk is a constructive step with inherent challenges. *See supra* n.14. Yet, the Lyons Memo's flawed definition of escape risk and failure to mention community ties as a mitigating factor leaves no alternative but to prohibit reliance on the

memorandum in its entirety.  Should the parties confer and reach an alternative, *agreed-upon* resolution, the parties are welcome to propose jointly an amended remedy to the Court.

### B.    Plaintiffs' Motion for Extra-Record Discovery

Separately, to "enable the Court's review" of the ultimate merits of this APA case at final judgment, plaintiffs have also filed a motion for extra-record discovery.  Pls.' Mot. (Disc.) at 1. Plaintiffs criticize the "sparse" eleven-page administrative record—of which "one of the pages is a blank notes page, and the rest are arrest records and 'intel' workups on just a subset of the individual Plaintiffs in this case"—for "contain[ing] essentially *nothing* that would aid this Court's review." *Id.* (emphasis in original).  "[T]o fill the evidentiary chasm," *id.* at 1, plaintiffs "request that the Court order Defendants to respond to requests for production and requests for admission, answer a limited set of ten interrogatories, and sit for five depositions," *id.* at 13.  Whether jurisdiction exists to consider the motion is addressed first below, followed by a discussion of whether plaintiffs are entitled to discovery.  In short, the motion is granted.

### 1.   *This Court Retains Jurisdiction to Permit Merits Discovery*

Defendants have not challenged this Court's jurisdiction to consider plaintiffs' motion for extra-record discovery.  *See generally* Defs.' Opp'n (Disc.).  Nevertheless, the Court has an independent obligation to ascertain the adequacy of its own jurisdiction. *See Growth Energy v. Env't Prot. Agency*, 5 F.4th 1, 33 (D.C. Cir. 2021).  Jurisdiction may be exercised to proceed.

Under long-settled doctrine, absent a stay order, an appeal from an interlocutory order granting or denying a preliminary injunction does not divest the district court of jurisdiction to proceed with the underlying action on the merits.  11A Wright and Miller, Federal Practice and Procedure § 2962 (3d ed. Apr. 2026 updated) ("The district court may proceed with the litigation while the interlocutory appeal is pending.") (collecting cases); *see also Soc'y for Animal Rts., Inc.*

38

*v. Schlesinger*, 512 F.2d 915, 918 (D.C. Cir. 1975) ("We assume that the case will proceed forward expeditiously in the district court despite the pendency of the [§] 1292(a) appeal in this court."). Thus, "[a]lthough the filing of a notice of appeal ordinarily divests the district court of jurisdiction over issues decided in the order being appealed," when "the appeal is [only] from an order granting or denying a preliminary injunction," a court may proceed with litigation related to the final judgment. *Webb v. GAF Corp.*, 78 F.3d 53, 55 (2d Cir. 1996); *see also Free Speech v. Fed. Election Comm'n*, 720 F.3d 788, 791 (10th Cir. 2013) ("[I]n an appeal from an order granting or denying a preliminary injunction, a district court may nevertheless proceed to determine the action on the merits." (quoting *United States v. Price*, 688 F.2d 204, 215 (3d Cir. 1982))); *F.T.C. v. Assail, Inc.*, 98 F. App'x 316, 317 (5th Cir. 2004) (per curiam) ("[I]t is settled that a district court has jurisdiction to proceed with the merits of the case and to grant a permanent injunction while an appeal of a preliminary injunction order is pending.").

Here, defendants' interlocutory appeal challenges only the grant of the preliminary injunction, and no stay of the preliminary injunction order pending appeal is in effect, nor sought by defendants. *See* Defs.' Statement of Issues, *Escobar Molina v. DHS*, No. 26-5045 (D.C. Cir. Mar. 9, 2026) (identifying the only issue on appeal as "[w]hether the district court correctly determined that Plaintiffs established that they were entitled to an order preliminarily enjoining Defendants' alleged policy of conducting warrantless immigration arrests without probable cause and an escape risk assessment").

Defendants' interlocutory appeal of the preliminary injunction thus "does not divest the district court with jurisdiction to proceed with a decision on the merits." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 937 F. Supp. 2d 18, 26 (D.D.C. 2013). Plaintiffs' motion for extra-record discovery is focused on advancing the case toward final judgment by creating a proper record for

39

judicial review, and has no bearing on whether plaintiffs were entitled to a preliminary injunction, the determination of which will be reviewed based on the limited record before the Court at the time of its order. *See Colbert v. Potter*, 471 F.3d 158, 165 (D.C. Cir. 2006) ("Appellate courts do not ordinarily consider evidence not contained in the record developed at trial."). Accordingly, as the discovery sought will not implicate the appellate record, but rather allow the case to "proceed forward expeditiously" toward final judgment, the Court retains jurisdiction to address the merits of plaintiffs' discovery motion. *Soc'y for Animal Rts.*, 512 F.2d at 918.

### 2. *Plaintiffs are Entitled to Extra-Record Discovery*

In APA cases, "an agency must 'disclose the basis' of its action" to "permit meaningful judicial review." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167-69 (1962)); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted b[e] clearly disclosed and adequately sustained."). "Agencies bear the responsibility of compiling the administrative record, which must include all of the information that the agency considered either directly or indirectly." *Univ. of Colo. Health at Mem'l Hosp. v. Burwell*, 151 F. Supp. 3d 1, 12 (D.D.C. 2015) (internal quotation marks omitted).

Although as a general matter "[t]he APA limits judicial review to the administrative record," there are two exceptions: (1) where the party seeking discovery makes a "strong showing of bad faith or improper behavior"; or (2) "when the record is so bare that it prevents effective judicial review." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010). Relevant here, the second exception "includes cases in which a claim is premised on an agency's alleged unlawful policy, yet the record does not reveal 'whether [the] agency's challenged policy exists.'" *Univ. of Cal. Student Ass'n v. McMahon*, No. 25-cv-354, 2025 WL

1906548, at *2 (D.D.C. Mar. 18, 2025) (quoting *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 386 n.4 (D.C. Cir. 2018)). In those rare instances, a "district court is free to exercise its discretion to permit further discovery 'to ascertain the contours of the precise policy at issue.'" *Hisp. Affs. Project*, 901 F.3d at 388; *see, e.g.*, *All. for Retired Americans v. Bessent*, No. 25-cv-0313, 2025 WL 1114350, at *3 (D.D.C. Mar. 20, 2025) (permitting extra-record discovery, in case challenging defendants' alleged decision to give U.S. DOGE Service personnel access to government records and systems, because "unlike the typical APA case, which involves the enactment of a rule or other agency action taken in public view[,] only the Defendants know the 'contours' of [their] actions"); *AFL-CIO v. Dep't of Lab.*, 349 F.R.D. 243, 248 (D.D.C. 2025) (similar, finding "a key question" was "whether the alleged disclosure policy in fact exists," and "the parties' arguments and the record . . . ha[d] not clarified matters regarding the alleged policies' scope" (internal quotation marks and alteration omitted)).

This case falls squarely under the second exception articulated by the D.C. Circuit in *Hispanic Affairs Project*, 901 F.3d at 388. The parties have taken wholly divergent positions on the existence of defendants' alleged policy and practice of making warrantless civil immigration arrests in the District without the requisite probable cause findings. Defendants insist that "no such policy exists" and back up that position by producing an effectively empty administrative record totaling eleven pages. *See* Defs.' Opp'n (Disc.) at 2; Administrative Record, ECF No. 99-1. Further, defendants represent that any motions to supplement the record would be "oppose[d]" because "they have no documents to add." Defs.' Opp'n (Disc.) at 13. Plaintiffs vigorously disagree, a position supported by a preliminary finding in this case that the alleged policy and practice does exist. *Escobar Molina*, 811 F. Supp. 3d at 49 ("This finding is supported, *inter alia*, by defendants' own official public statements that they apply a 'reasonable suspicion' standard to

41

conduct warrantless arrests, as well as roughly forty examples detailed in plaintiffs' declarations of arrests conducted without any questions as to escape risk."). As "a key question" is "whether the alleged [challenged] policy in fact exists," *AFL-CIO*, 349 F.R.D. at 248, and with defendants refusing to supplement the thin record, discovery is "permissible" for the "purpose of proving that the Department of Homeland Security has a practice or policy" as alleged, *Hisp. Affs. Project*, 901 F.3d at 386 n.4.

Ignoring the preliminary finding already made in this case, *Escobar Molina*, 811 F. Supp. 3d at 49, defendants attempt to avoid the mandate of the second exception by whittling down its application to only when the *scope* but not the *existence* of the policy is disputed, arguing that where "no such policy exists," plaintiffs' discovery request is an impermissible "fishing expedition" based on "nothing but their own speculation." *See* Defs.' Opp'n (Disc.) at 4, 9; *see also id.* 8-9 (attempting to distinguish on that ground some cases cited by plaintiffs, *e.g.*, *AFL-CIO*, 349 F.R.D. 243, and *All. for Retired Americans*, 2025 WL 1114350). Yet, again, defendants fail to recognize that plaintiffs' allegations about an unlawful policy and practice have been found to be not only non-speculative, but likely meritorious. *See Escobar Molina*, 811 F. Supp. 3d at 65 (granting in large part preliminary injunction motion). In any event, defendants overstate the case law. Although "fishing expeditions" are disfavored, narrow discovery requests supported by evidence are not. In *Hispanic Affairs Project v. Acosta*, plaintiffs brought an APA claim alleging that DHS had a "practice of habitually approving and extending H-2A visas for lengthy periods of time," in violation of the requirement that H-2A visas be for "temporary" work. 901 F.3d at 388. Plaintiffs there, as here, supported their allegations with numerous declarations; and defendants there, as here, argued that plaintiffs failed to adequately allege a challengeable agency action. *Id.* Disagreeing, the D.C. Circuit explained that if plaintiffs could show that a "particular practice"

existed, the agency action would be challengeable. *Id.* The Circuit then remanded for the district court to consider the "alleged pattern and practice," informing the district court that it was "free to exercise its discretion to permit further discovery 'to ascertain the contours of the precise policy at issue.'" *Id.* The exercise of discretion in this case is no different.

Defendants further argue that the Lyons Memo is the "only nationwide guidance" and obviates the need "to discern the existence of some other policy prior to the Lyons Memo." Defs.' Opp'n (Disc.) at 4-5. Defendants' argument fails to persuade. For one, defendants maintain that the Lyons Memo "did not create [a] new policy" but merely "remind[ed]" officers of existing authority. *Id.* at 5. If defendants' representation is accepted as true, discovery would still be necessary to "ascertain the contours" of the existing policy, which is far from clear in the Lyons Memo. *Hisp. Affs. Project*, 901 F.3d at 388. Second, however, the Lyons Memo's assertion that no new policy has been created is contradicted by the memorandum's own clear statement that the way "ICE previously applied the phrase 'likely to escape' . . . was incorrect." Lyons Memo at 4; *see also* Notice at 1, ECF No. 86 (expressly repudiating this "past common practice" of ICE officers). If defendants' position is, alternatively, that the Lyons Memo—as indicated by its own representation—has replaced a "past common practice," discovery would also be appropriate to corroborate this assertion and show "when and how the principles set out in the Lyons Memo were implemented in the District" to repudiate this practice and what, precisely, that "past common practice" was. Pls.' Reply (Disc.) at 8. The Lyons Memo thus does not help defendants escape discovery and instead does the opposite.

Defendants' remaining challenges also fall short. First, defendants cripple their own argument that "[p]laintiffs should have moved to supplement the administrative record, not for discovery," by representing that, "[t]o be clear, Defendants would oppose any motion to

43

supplement the administrative record and maintain that they have no documents to add." Defs.'

Opp'n (Disc.) at 13. By defendants' own admission, having plaintiffs move to supplement the

record would amount to no more than an exercise in futility.

Second, defendants' continued attempts to explain away damaging public statements made

by senior DHS officials, *id.* at 5-7, is nothing more than a recycling of arguments made in earlier

briefing opposing the preliminary injunction, *see Escobar Molina*, 811 F. Supp. 3d at 46. These

arguments have already been rejected, *id.*, and defendants have provided no reason to revisit that

decision. Indeed, records, such as emails, memoranda or other communications, produced in

discovery may show whether these public statements were applauded or corrected within DHS and

its components, and thereby shed light on the scope of the policy and practice being challenged.

Third, defendants miss the point in asserting that discovery is unnecessary because the

Form I-213s provide plaintiffs "all the relevant information regarding individual arrests." Defs.'

Opp'n (Disc.) at 10. Plaintiffs are not challenging specific past arrests, but rather a broader policy

and practice. *See Escobar Molina*, 811 F. Supp. 3d at 19-22, 33-34 (noting that named plaintiffs,

although released, are still targets of the challenged policy and practice). Extra-record discovery

will, among other things, reveal "whether Defendants' agents received requisite training" and "the

standard on which they were trained." Pls.' Mot. (Disc.) at 9-10. Finally, defendants' last-ditch

citation to the "presumption of regularity," *see* Defs.' Opp'n (Disc.) at 9, is, bluntly stated,

incredible. Nothing about an eleven-page administrative record renders this presumption

appropriate.

In sum, plaintiffs' motion for extra-record discovery is granted on the terms they request,

namely: plaintiffs may serve on defendants requests for production and admission and up to ten

(10) interrogatories, and take up to five (5) depositions to gather evidence "with respect to the

Lyons Memo, the Broadcast Statement of Policy, Defendants' professed use of 'reasonable suspicion' to make immigration arrests, immigration arrest quotas/goals, officer training on warrantless immigration arrests, and information about ongoing immigration arrests in the District." Pls.' Reply (Disc.) at 7.  The parties may confer and propose to the Court by the date reflected in the accompanying order a scheduling order for the expeditious completion of this discovery.

## IV.    CONCLUSION

For the reasons set forth above, plaintiffs' Motion to Enforce Preliminary Injunction, ECF No. 78, is **GRANTED**.  Further, plaintiffs' Motion for Extra-Record Discovery, ECF No. 85, is **GRANTED**.  An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  May 7, 2026

_____
**BERYL A. HOWELL**
United States District Judge